**G. Michael Gruber**
**Brian N. Hail**
**Jeffrey R. Erler**
**Allison F. Jacobsen**
**Michael J. Lang**
**Laura M. Fontaine**
**William S. Richmond**

**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone:  (214) 855-6800
Facsimile:   (214) 855-6808
Email: mgruber@ghjhlaw.com
        bhail@ghjhlaw.com
        jerler@ghjhlaw.com
        ajacobsen@ghjhlaw.com
        mlang@ghjhlaw.com
        lfontaine@ghjhlaw.com
        brichmond@ghjhlaw.com

*ATTORNEYS FOR PLAINTIFF*
*MARK HOLLIDAY, the Liquidating*
*Trustee of the BosGen Liquidating Trust*

IN THE U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re | ) | Chapter 11 |
| | ) | |
| BOSTON GENERATING, LLC *et al.* | ) | Case No. 10-14419 (SCC) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| MARK HOLLIDAY, the Liquidating | ) | |
| Trustee of the BosGen Liquidating Trust, | ) | |
| | ) | |
| *Plaintiff,* | ) | Adv. Pro. No. 12-01879 (SCC) |
| | ) | |
| -against- | ) | **FIRST AMENDED COMPLAINT** |
| | | **AND JURY DEMAND** |
| | ) | |
| K ROAD POWER MANAGEMENT, | ) | |
| LLC, K ROAD BG LLC, K ROAD BG | ) | |
| HOLDINGS LLC, K ROAD BG | ) | |
| MANAGEMENT, LLC, K ROAD | ) | |

1

HOLDINGS LLC, K ROAD POWER          )
BG, LLC, K ROAD BG MM LLC, WBD      )
K ROAD POWER BG LLC, WILLIAM        )
KRIEGEL, BARRY SULLIVAN,            )
DAVID TOHIR, NICHOLAS               )
DONAHUE, MARK FRIEDLAND,            )
DANIEL O'SHEA, SCOTT                )
SILVERSTEIN, PAUL EHRENZELLER,      )
EX ORBIT, LTD., D.E. SHAW           )
LAMINAR PORTFOLIOS, LLC,            )
SATELLITE SENIOR INCOME FUND,       )
LLC, ANCHORAGE CAPITAL              )
MASTER OFFSHORE II, LTD., CMI       )
HOLDINGS INVESTMENTS LTD.,          )
THE RAPTOR                          )
GLOBAL PORTFOLIO LTD.,              )
TACONIC CAPITAL PARTNERS 1.5        )
LP, BOSTON GENERATING               )
OFFSHORE HOLDINGS LTD.,             )
MORGAN STANLEY & CO., LLC,          )
GOLDMAN SACHS & CO.,                )
STONEHILL INSTITUTIONAL             )
PARTNERS, LP, TRADE CLAIM           )
ACQUISITION, LLC, J.P. MORGAN       )
SECURITIES LLC, CREDIT SUISSE       )
SECURITIES (USA) LLC, CREDIT        )
SUISSE (USA), INC., SENECA          )
CAPITAL INTERNATIONL TLD.,          )
GREENWICH INTERNATIONAL LTD.,       )
SENECA CAPITAL LP, DB HOLDINGS      )
INC., LONGACRE MASTER FUND,         )
LTD., THE TUDOR BVI GLOBAL          )
PORTFOLIO LP, EPIC DISTRESSED       )
DEBT HOLDINGS, INC., CASTLERIGG     )
PARTNERS, LP, TUDOR                 )
PROPRIETARY TRADING LLC,            )
HIGHLAND CRUSADER OFFSHORE          )
PARNTERS, LP, SCOTTWOD FUND,        )
LTD., GK DEBT OPPORTUNITY           )
FUND, LTD., MASON CAPITAL LTD.,     )
EPIC DISTRESSED DEBT                )
OPPORTUNITY FUND LP, LATIGO         )
MASTER FUND, LTD., CEDARVIEW        )
EBG HOLDINGS, LTD., J.P. MORGAN     )
SECURITIES LLC, LONGACRE            )
CAPITAL PARTNERS (QP) LP,           )

GUGGENHEIM PORTFOLIO CO. XII        )
LLC, POWER MANAGEMENT               )
FINANCING LLC, BOSTON HARBOR        )
POWER LLC, HARBINGER CAPITAL        )
PARTNERS, HARBERT DISTRESSED        )
INVESTMENT MASTER FUND, LTD,        )
HARBINGER CAPITAL PARTNERS          )
MASTER FUND I, LTD., SATELLITE      )
ASSET MANAGEMENT, LP, D.E.          )
SHAW & CO. LP, ANCHORAGE            )
CAPITAL GROUP, LLC, SANDELL         )
ASSET MANAGEMENT                    )
CORPORATION, TUDOR                  )
INVESTMENT CORPORATION,             )
STONEHILL CAPITAL                   )
MANAGEMENT LLC, HIGHLAND            )
CAPITAL MANAGEMENT LLC,             )
SCOTTWOOD CAPITAL                   )
MANAGEMENT LLC, ONEX CREDIT         )
PARTNERS, LLC, MASON CAPITAL        )
MANAGEMENT LLC, LATIGO              )
PARNTER LP, CEDARVIEW CAPITAL       )
MANAGEMENT, LP, CITIGROUP           )
ALTERNATIVE INVESTMENTS(AS          )
SUCCESSOR IN INTEREST TO EPIC       )
ASSET MANAGEMENT LLC), RBS          )
HOLDINGS USA, INC., SATELLITE       )
OVERSEAR FUND, LTD, THE             )
APOGEE FUND, LTD., SATELLITE        )
FUND IV, LP, SATELLITE OVERSEAS     )
FUND V, LTD., SATELLITE             )
OVERSEAS FUND VI, LTD.,             )
SATELLITE OVERSEAS FUND VIII,       )
LTD.,                               )
SATELLITE OVERSEAS FUND IX,         )
LTD., SATELLITE FUND I, LP,         )
SATELLITE FUND II, LP, DOES 1-100,  )
such names being fictitious and unknown )
to Plaintiff, representing individuals or )
entities who or that may be legal or )
beneficial owners of membership units )
and warrants that were repurchased or )
redeemed in connection with the     )
Leveraged Recap Transaction underlying )
this action, or who or that benefited from )
the transfers underlying this action, or )

3

| who engaged in the acts and conduct | ) |
| described in the Complaint, | ) |
| INDIVIDUALLY AND AS CLASS | ) |
| REPRESENTATIVES OF A CLASS OF | ) |
| SIMILARLY SITUATED | ) |
| INDIVIDUALS OR ENTITIES, | ) |
| *Defendants*. | ) |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Mark Holliday, the Liquidating Trustee (the "**Liquidating Trustee**") of the BosGen Liquidating Trust (the "**Liquidating Trust**" or "**Plaintiff**"), through his undersigned counsel, as and for his complaint (the "**Complaint**") against the above-captioned defendants (the "**Defendants**"), alleges as follows:

I.   PRELIMINARY STATEMENT

1.      This case is brought to recover damages for a $2 billion fraud perpetrated on the creditors of EBG Holdings LLC ("**EBG**") and its subsidiaries, including Boston Generating LLC ("**BostonGen**," and collectively the "**Debtors**").[1] In 2006, under direction from their secret principal and self-described "joint-venturer" Harbinger (defined below) to cash out of their joint investment in EBG, K Road (defined below) devised a scheme falsely pump up the value of the Debtors, to leverage the Debtors based on these false values, and to extract the borrowed money of the Debtors and pay it out to themselves, Harbinger, and EBG's other equity unit holders. With a looming self-predicted wholesale energy market decline, K Road and Harbinger became anxious to exit their investment.  Because they doubted the prospects for a sale or IPO of EBG,

---

[1] The Debtors, along with the last four digits of their federal tax identification numbers, are Boston Generating, LLC (0631), EBG Holdings LLC (3635), Fore River Development, LLC (7933), Mystic I, LLC (3640), Mystic Development, LLC (7940), BG New England Power Services, Inc. (0476), and BG Boston Services, LLC (6921). In accordance with the *Final Cumulative Joint Plan of Liquidation of Boston Generating, LLC et al.* [ECF No. 934] (the "**Plan**"), the Debtors have been dissolved and each of their cases has been closed, except for the jointly administered case bearing Case No. 10-14419 (SCC), which shall remain open and subject to the provisions of Section 7.08 of the Plan. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

K Road caused the Debtors to borrow an aggregate amount of almost $2 billion, and to use more than $1 billion to redeem equity interests in EBG, redeem warrants, and pay a dividend to equity (the "**Leveraged Recap Transaction**"). The Debtors, who were worth far less than the previous debt incurred at the time of the Leveraged Recap Transaction, had no way of ever repaying the debt incurred. Accordingly, K Road, with the encouragement of the Nominating Committee (defined below) and Harbinger, prepared fraudulent projections and concealed from the creditors the material details of the Debtors' business.

2.      In order to generate the kind of profits that would justify increased leverage, K Road had to establish a value for the Debtors far higher than their past performance or a reasonable forward outlook would support.  K Road sought to cloak the transaction in legitimacy by retaining Lehman Brothers, Inc. ("**Lehman**"), Duff & Phelps, LLC ("**Duff & Phelps**"), Navigant Consulting Inc. ("**Navigant**") and Black & Veatch Corporation ("**Black & Veatch**") to provide consulting services and opinions to support the transaction desired by K Road and Harbinger.  K Road and the Nominating Committee controlled the output—the opinions—by controlling the input—the Debtors' projections (the "**Projections**"). K Road crafted the Projections to misrepresent the Debtors as a "contract" energy provider, rather than its true status as a "merchant" energy provider. Fundamentally, contract energy providers have fixed, reliable revenue streams, and are attractive to lenders, whereas wholesale energy providers are at the mercy of fluctuating gas and electricity markets. Historically, lenders avoid lending to wholesale market producers or require significantly higher returns, tighter covenants, or collateral guarantees, in the event they provide funding.

3.      The Projections, aside from misrepresenting the function of the Debtors' Hedges (as that term is defined herein), assumed that revenues would increase over the long term, hedge

revenues would be steady and immune from market risks, and expenses would dramatically decline, thus enabling the Debtors to service their significantly increased debts. K Road, however, had no actual internal plan to properly increase revenues, cut expenses, or otherwise explain this sunny future (as projected) vis-a-vis the actual performance of the Debtors. The Projections prepared by K Road and disseminated to the consultants, attorneys, and ultimately, the lenders, were fraudulent. K Road knew the Debtors never stood a chance of attaining the performance laid out in the Projections. As alleged herein, individual defendants, including William Kriegel, Barry Sullivan and Paul Ehrenzeller (together with David Tohir, Nicholas Donahue, Mark Friedland, Daniel O'Shea, and Scott Silverstein, the "**K Road Insiders**"), played key roles in formulating the Projections, developing the strategy underlying the Leveraged Recap Transaction, and preparing the materials used to induce lending parties to fund, the Rating Agencies (as defined herein) to provide positive support, and the Board to approve it. Each of the K Road Insiders also personally profited from the Leveraged Recap Transaction.

## II.    THE PARTIES

### A.    The Plaintiff

4.      Plaintiff Mark Holliday is the Successor Liquidating Trustee of the Liquidating Trust established pursuant to a certain Litigating Trust Agreement, dated September 15, 2011, by and between the Plaintiff and, inter alia, non-parties EGB and BostonGen (the "**LT Agreement**"). Pursuant to the LT Agreement, the Liquidating Trustee is the successor to all of the Debtors' rights, title and interests in certain rights, claims, causes of action, and defenses arising from, relating to or in connection with the Leveraged Recap Transaction.  Pursuant to the Plan, the Plaintiff is also the assignee or representative of creditors who hold Class 4B unsecured claims against the Debtors. In that capacity, he is authorized to bring or assert their rights,

claims, causes of action and defenses arising from, relating to or in connection with the Leveraged Recap Transaction.

**B.      The Transferee Defendants**

5.      Annexed hereto as Exhibit A and made a part hereof is a chart reflecting: (a) the names of those Defendants (each, a "**Transferee Defendant**" and collectively, the "**Transferee Defendants**") (i) who or that received a transfer or distribution pursuant to the Leveraged Recap Transaction; (ii) the class defendants consisting of all persons or entities who, directly or indirectly, through one or more related transfers, received payments or transfers pursuant to or in connection with the Leveraged Recap Transaction; or (iii) who or that benefited from such a transfer or distribution, (b) to the extent available and applicable, the Transferee Defendants' respective states of incorporation and last known addresses; and (c) to the extent available, the amount of the transfer or distribution made to or for the benefit of each of the Transferee Defendants pursuant to the Leveraged Recap Transaction. The Transferee Defendants include the Doe Defendants discussed in Paragraph 33 herein, each a member of the Defendant Class referenced Paragraph 38 hereof.

**C.      K Road**

6.      Defendant K Road Power Management, LLC ("**K Road Power**") is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

7.      Defendant K Road BG LLC is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

8.      Defendant K Road BG Holdings LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

9.      Defendant K Road BG Management LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

10.     Defendant K Road Holdings LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

11.     Defendant K Road Power BG LLC is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

12.     Defendant K Road BG MM LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

13.     Defendant WBD K Road Power BG LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

14.     The foregoing eight Defendants (collectively, "**K Road**" or the "**K Road Defendants**") are named as defendants herein because of their domination and control of the Debtors, their management of the Debtors, the fact that they personally profited from the transactions at issue, and their involvement in the Leveraged Recap Transaction, all as described in this Complaint.

D.     **The K Road Insiders**

15.     Defendant William Kriegel ("**Kriegel**"), at all relevant times, was the President, Chairman and CEO of K Road Power and, upon information and belief, held these positions in numerous other K Road entities. From approximately January 2006 through May 2007, Kriegel was the Chairman and CEO of EBG.

16.     Defendant Barry Sullivan ("**Sullivan**"), at all relevant times, was the Vice Chairman and COO of K Road Power, and upon information and belief, held these positions in numerous other K Road entities. From approximately April 2006 through May 2007, Sullivan was the Vice Chairman and COO of EBG.

17.     Defendant David Tohir ("**Tohir**"), at all relevant times, was the Executive Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, Tohir was the President of BostonGen, Fore River Development, LLC, Mystic I, LLC, Mystic Development, LLC, BG Boston Services, LLC, and the President and a director of BG New England Power Services, Inc.

18.     Defendant Nicholas Donahue ("**Donahue**"), at all relevant times, was the Senior Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, Donahue was the Treasurer of BostonGen and a director of BG New England Power Services, Inc.

19.     Defendant Mark Friedland ("**Friedland**"), at all relevant times, was the Senior Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, Friedland was the Senior Vice President of Acquisitions and Restructuring of EBG.

9

20.     Defendant Daniel O'Shea ("**O'Shea**"), at all relevant times, was the Senior Vice President and General Counsel of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, O'Shea was the Senior Vice President, General Counsel and Secretary of EBG.

21.     Defendant Scott Silverstein ("**Silverstein**"), at all relevant times, was the Senior Vice President of Regulatory Affairs of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, Silverstein was the Senior Vice President of Regulatory Affairs of EBG.

22.     Defendant Paul Ehrenzeller ("**Ehrenzeller**"), at all relevant times, was the Senior Vice President and CFO of K Road Power, and upon information and belief, held this position in numerous other K Road entities. From approximately April 2006 through May 2007, Ehrenzeller was the Director of Finance of EBG.

23.     The foregoing individual Defendants are named as Defendants herein because of their relationship to the Debtors, their domination and control of the Debtors, their management of the Debtors, and their involvement in the Leveraged Recap Transaction, all as described in this Complaint.

**E.     K Road- Veil Piercing**

24.     Each of the K Road Defendants was part of an integrated corporate group, all controlled and run by Kriegel, and none had an independent existence. The managing member(s) of each entity was another K Road entity, and to the extent each had officers or authorized persons, such persons were one or more of the K Road Insiders. Attached as Exhibit B is an organization chart prepared by K Road, and a list of each K Road Defendant, the member(s), and the managers, officers and authorized persons (if known). The employees of K Road were

10

unaware of any separate existence of the K Road entities; they instead understood that Kriegel controlled each as an alter ego and mere instrumentality. As one senior officer put it, "Kriegel was the Sun King around whom we all revolved."

25.    In numerous documents, the separate identities of the various entities were disregarded.  For example, in the Confidential Information Memorandum ("**CIM**"), K Road Power was identified as "owner and manager" even though it was neither. The Lenders' Presentation touted the past involvement of K Road professionals with Sithe Energies, Inc. and their familiarity with the New England regulatory and operating environment, even though these professionals had been working for K Road Power and not one of the other K Road Defendants with a beneficial ownership interest in EBG. The audited financial statement for EBG that KPMG LLP ("**KPMG**") prepared, which is discussed further below, identified K Road BG LLC as the 10% equity owner even though, as shown in the chart at Exhibit B, at least five other K Road entities had an interest in such ownership.

26.    The various K Road Defendants did not have separate identities, functions, physical facilities, employees, or management. Notably, K Road Power's corporate website (www.kroadpower.com) does not distinguish between the various K Road entities. The website's homepage begins with the line "K Road Power is an independent power producer that develops, owns and operates utility-scale renewable energy projects ..." and thereafter all but one reference are simply to "K Road." For example, "K Road affiliates oversaw the purchase of Boston Generating, LLC ... ."; "K Road is run by a seasoned team of professionals ... ."; "Today, K Road has 11 power projects in the Southwestern U.S. at various stages of development ... ."; "K Road business functions are divided between three main offices ... ."; "The K Road team is well versed

in successfully matching the right technology to meet the needs of each project"; and "K Road's business practice requires a continuous evaluation of each project."

27.     Similarly, in the "Management" section of Form S-1 for "K Road Acquisition Corp.," filed May 9, 2008, K Road is referred to as a "group of affiliated companies." The Form S-1 goes on to state: "Since founding K Road in 2000, Mr. Kriegel has served as managing member or Chief Executive Officer of each of the affiliated K Road companies. Most recently, between 2005 and 2007, Mr. Kriegel managed K Road's successful acquisition of an interest in, restructuring, management recapitalization and merger of EBG Holdings LLC ...." Again, K Road makes no distinction between the various K Road affiliates, but instead describes them broadly as a unified enterprise.

28.     Nor did K Road adhere to corporate formalities when distributing proceeds of the Leveraged Recap Transaction to individual K Road Insiders. Within two days of receiving $101,039,085.07 in proceeds from the Leveraged Recap Transaction, K Road BG LLC made a total of seven transfers totaling $100,999,999.00. Five of those transfers were made by K Road BG LLC to Kriegel (          ), Sullivan (          ), Tohir (          ), Donahue (          ), and Friedland (          ), even though none of them held a direct interest in that K Road entity. Rather, Kriegel, Sullivan, and Tohir held interests in WBD K Road Power BG LLC and K Road BG MM LLC. At about the same time K Road BG LLC also transferred          to Power Management Financing and          to Boston Harbor Power even though neither of those entities held a direct interest in K Road BG LLC either. Rather Boston Harbor Power, LLC held an interest in K Road Holdings LLC and Power Management Financing, LLC held an interest in *K Road Power BG LLC*.

12

29.     As discussed more herein, the various K Road entities that received transfers were created to conceal the involvement of Harbinger Capital Partners, LLC from EBG's other unit holders and funneling cash from EBG and BostonGen into the pockets of Harbinger (as that term is defined herein) and the K Road Insiders. Their corporate existence was used solely to perpetrate a fraud.  To further the fraud, most of these entities were purportedly cancelled soon after the Leveraged Recap Transaction. The Court should pierce the corporate veil and hold each K Road entity liable for the unlawful acts of each other K Road entity.

**F.      The Nominating Committee**

30.     During the relevant time period, the Debtors were controlled by a group of hedge funds holding the majority of the EBG units, and who had held BostonGen's secured debt at the time of the Exelon settlement in lieu of foreclosure. These hedge funds, whose affiliates formed the "Nominating Committee" of EBG, or the group responsible for nominating the non-K Road "independent" directors, were Anchorage Capital Master Offshore, Ltd., Satellite Asset Management, L.P., Stonehill Institutional Partners, L.P., and Sandell Asset Management Corp. (collectively, the "**Nominating Committee**"). While they represented about 50% of the equity of EBG, this group constituted 100% of the Board of Directors of EBG. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

31.     Communications between K Road and the Nominating Committee primarily occurred via telephone. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ On information and belief, the Nominating Committee was provided with internal EBG/BostonGen financial information that the independent directors of EBG did not receive,

and which demonstrated the falsity of the Projections.  The Nominating Committee knew that EBG, through K Road, had provided false information for the use of the lenders, yet did not disclose K Road's fraud.  The Nominating Committee had the ability to control EBG's dissemination of false information, but nonetheless approved and ratified the Leveraged Recap Transaction.

**G.**   **Class Representatives**

32.    The Defendants named in Exhibit A are named as well as representatives of a class of individuals who or entities that also benefited, directly or indirectly, from the Leveraged Recap Transaction and/or received contemporaneous or subsequent transfers of money, stock or property of the Debtors from the Transferee Defendants or otherwise in connection with the Leveraged Recap Transaction.

**H.**   **"Doe" Defendants**

33.    Upon information and belief, there exist numerous individuals who or entities that benefited, directly or indirectly, from the Leveraged Recap Transaction and/or received contemporaneous or subsequent transfers of money, stock, or other property of the Debtors from the Transferee Defendants in connection with the Leveraged Recap Transaction whose identities remain unknown to the Plaintiff. Such Defendants are sued herein as Does 1-100.

**III.**   **J**URISDICTION, **V**ENUE, **AND** **D**EMAND FOR **T**RIAL BY **J**URY

34.    This adversary proceeding has been commenced to resolve an actual controversy between the Liquidating Trustee and the Defendants.

35.    The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and 1334, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

Rules"), and Section 13.01 of the Plan. This adversary proceeding contains non-core claims and is related to the jointly administered proceeding *In re Boston Generating, LLC et al.* (No. 10-14419) (the "**Chapter 11 Cases**"). To the extent it is determined that any of the claims contained in this Complaint are core claims, the Liquidating Trustee does not consent to the entry of final orders or judgments by the Bankruptcy Court if (i) it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution, and/or (ii) the Liquidating Trustee has a right to jury trial on such claims.

36.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

37.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), Bankruptcy Rule 9015, and Rule 9015-1 of the Local Bankruptcy Rules for the Southern District of New York, the Liquidating Trustee hereby demands trial by jury as to all matters triable thereby.

## IV.   DEFENDANT CLASS ALLEGATIONS

38.     Plaintiff also brings this action as a defendant class action pursuant to, inter alia, Civil Rules 23(a), 23(b)(1)(B) and 23(b)(3), made applicable to this proceeding by Bankruptcy Rule 7023, on behalf of a class, consisting of all persons who or entities that, directly, or indirectly through one or more intermediate transferors, received payments or transfers pursuant to the Leveraged Recap Transaction (the "**Class**"). As set forth herein, Counts One through Six are asserted as Class claims.

39.     The members of the Class ("**Class Members**") are so numerous that joinder of all members is impractical. The exact number of Class Members is unknown to the Plaintiff at this

time, but is sufficiently numerous to make class treatment appropriate for Counts One through Six.

40.    Any claims against and claimed defenses of the named representatives of the Class (the "**Class Representatives**") are typical of the claims against and alleged defenses of the unnamed Class Members. The claims against and claimed defenses of each of the Class Members arise out of the same factual circumstances involving the Leveraged Recap Transaction.

41.    There are numerous questions of law and fact that are common to the unnamed Class Members, and that predominate over any questions affecting only individual Class Members, including, but not limited to: (a) each of the allegations relating to insolvency, financial condition and inability to pay debts set forth herein; (b) each of the allegations relating to the Leveraged Recap Transaction, funding, and distribution of funds set forth herein; and (c) each of the allegations relating to actual and constructive fraud set forth herein.

42.    The Class Representatives will fairly and adequately protect and represent the interests of the unnamed Class Members, such Class Representatives have tens of millions of dollars at issue, the issues related to liability are virtually identical for the Class Representatives and Class Members, and the Class Representatives have as much incentive to vigorously defend against the Plaintiff's claims as any unnamed Class Member would.

## V.    CURRENTLY KNOWN SUBSEQUENT TRANSFEREES

43.    The currently known subsequent transferees described below are among those included in the Class as Class Members.

44.    Satellite Asset Management L.P. managed and/or controlled both Ex Orbit Group, Ltd. and Satellite Senior Income Fund, LLC at the time of the Leveraged Recap Transaction, and

16

was responsible for the decisions of Ex Orbit Group, Ltd. and Satellite Senior Income, LLC to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Ex Orbit Group, Ltd. and Satellite Senior Income Fund, LLC were subsequently transferred, directly or indirectly, to Satellite Asset Management L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

45.    D.E. Shaw & Co. L.P. managed and/or controlled D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC at the time of the Leveraged Recap Transaction, and was responsible for the decisions of D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC were subsequently transferred, directly or indirectly, to D.E. Shaw & Co. L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

46.    Anchorage Capital Group, LLC f/k/a Anchorage Advisors, LLC managed and/or controlled Anchorage Capital Master Offshore II, Ltd. at the time of the Leveraged Recap Transaction, and was responsible for the decision of Anchorage Capital Master Offshore II, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Anchorage Capital Master Offshore II, Ltd. were subsequently transferred, directly or indirectly, to Anchorage Capital Group, LLC f/k/a Anchorage Advisors, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

47.     Sandell Asset Management Corporation managed and/or controlled CMI Holdings Investments, Ltd. and Castlerigg Partners, L.P. at the time of the Leveraged Recap Transaction and was responsible for the decisions of CMI Holdings Investments, Ltd. and Castlerigg Partners, L.P. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to CMI Holdings Investments, Ltd. and Castlerigg Partners, L.P. were subsequently transferred, directly or indirectly, to Sandell Asset Management Corporation in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

48.     Tudor Investment Corporation managed and/or controlled The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decisions of The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. were subsequently transferred, directly or indirectly, to Tudor Investment Corporation in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

49.     Stonehill Capital Management LLC managed and/or controlled Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decisions of Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. to participate in the Leveraged

Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. were subsequently transferred, directly or indirectly, to Stonehill Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

50.     Highland Capital Management LP managed and/or controlled Highland Crusader Offshore Partners LP at the time of the Leveraged Recap Transaction and was responsible for the decision of Highland Crusader Offshore Partners LP to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Highland Crusader Offshore Partners LP were subsequently transferred, directly or indirectly, to Highland Capital Management LP in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

51.     Scottwood Capital Management LLC managed and/or controlled Scottwood Fund. Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Scottwood Fund. Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Scottwood Fund. Ltd. were subsequently transferred, directly or indirectly, to Scottwood Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

52.     Onex Credit Partners, LLC f/k/a GK Capital, LLC managed and/or controlled GK Debt Opportunity Fund, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of GK Debt Opportunity Fund, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to GK Debt Opportunity Fund, Ltd. were subsequently transferred, directly

or indirectly, to Onex Credit Partners, LLC f/k/a GK Capital, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

53.   Mason Capital Management LLC managed and/or controlled Mason Capital Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Mason Capital Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Mason Capital Ltd. were subsequently transferred, directly or indirectly, to Mason Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

54.   RBS Holdings USA, Inc. f/k/a Greenwich Capital Holdings, Inc. wholly owned and/or controlled Greenwich International, Ltd. at the time of the Leveraged Recap Transaction, and on information and belief, some or all of the Leveraged Recap Transaction proceeds transferred to Greenwich International, Ltd. were subsequently transferred, directly or indirectly, to RBS Holdings USA, Inc. f/k/a Greenwich Capital Holdings, Inc. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

55.   Latigo Partners, L.P. managed and/or controlled Latigo Master Fund, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Latigo Master Fund, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Latigo Master Fund, Ltd. were subsequently transferred, directly or indirectly, to Latigo Partners, L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

56.   Cedarview Capital Management LP managed and/or controlled Cedarview EBG Holdings, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Cedarview EBG Holdings, Ltd. to participate in the Leveraged Recap Transaction.

On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Cedarview EBG Holdings, Ltd. were subsequently transferred, directly or indirectly, to Cedarview Capital Management LP in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

57.    Citigroup Alternative Investments LLC as successor in interest to Epic Asset Management, LLC managed and/or controlled Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. at the time of the Leveraged Recap Transaction and was responsible for the decisions of Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. were subsequently transferred, directly or indirectly, to Citigroup Alternative Investments LLC as successor in interest to Epic Asset Management, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

58.    Satellite Overseas Fund, Ltd., The Apogee Fund, Ltd., Satellite Fund IV, L.P., Satellite Overseas Fund V, Ltd., Satellite Overseas Fund VI, Ltd., Satellite Overseas Fund VII, Ltd., Satellite Overseas Fund VIII, Ltd. and Satellite Overseas Fund IX, Ltd. were each investment funds that held an interest in Ex Orbit Group, Ltd. On information and belief, Leveraged Recap Transaction proceeds transferred to Ex Orbit Group, Ltd. were subsequently transferred, directly or indirectly, to each of Satellite Overseas Fund, Ltd., The Apogee Fund, Ltd., Satellite Fund IV, L.P., Satellite Overseas Fund V, Ltd., Satellite Overseas Fund VI, Ltd., Satellite Overseas Fund VII, Ltd., Satellite Overseas Fund VIII, Ltd. and Satellite Overseas Fund

IX, Ltd. in the form of investment repayment and/or on account of their interest in Ex Orbit Group, Ltd.

59.     Satellite Senior Income Fund, LLC was a subsidiary of investment funds Satellite Fund I, L.P. and Satellite Fund II, L.P. at or about the time of the Leveraged Recap Transaction. Satellite Fund I, L.P. and Satellite Fund II, L.P. were beneficial owners of EBG units held by Satellite Senior Income Fund, LLC. On information and belief, Leveraged Recap Transaction proceeds received by Satellite Senior Income Fund, LLC were subsequently transferred, directly or indirectly, to Satellite Fund I, L.P. and Satellite Fund II, L.P. in the form of investment repayment and/or on account of their interest in Satellite Senior Income Fund, LLC.

60.     On or about December 29, 2006, K Road BG LLC transferred ████████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Kriegel.

61.     On or about December 29, 2006, K Road BG LLC transferred ████████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Sullivan.

62.     On or about December 29, 2006, K Road BG LLC transferred ████████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Tohir.

63.     On or about December 29, 2006, K Road BG LLC transferred ██████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Donahue. Additionally, pursuant to a Nominee Agreement between Donahue and Kriegel, Kriegel transferred ████████ of his proceeds from the Leveraged Recap Transaction to or for the benefit of Donahue.

64.     On or about December 29, 2006, K Road BG LLC transferred ██████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Friedland. Additionally, pursuant to a Nominee Agreement between Friedland and Kriegel, Kriegel transferred

█████████ of his proceeds from the Leveraged Recap Transaction to or for the benefit of Friedland.

65.   Pursuant to a Nominee Agreement between O'Shea and Kriegel, Kriegel transferred █████████ of his proceeds from the Leveraged Recap Transaction to or for the benefit of O'Shea.

66.   Pursuant to a Nominee Agreement between Silverstein and Kriegel, Kriegel transferred █████████ of his proceeds from the Leveraged Recap Transaction to or for the benefit of Silverstein.

67.   Pursuant to a Nominee Agreement between Ehrenzeller and Kriegel, Kriegel transferred █████████ of his proceeds from the Leveraged Recap Transaction to or for the benefit of Ehrenzeller.

68.   On or about December 28, 2006, K Road BG LLC transferred █████████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Boston Harbor Power LLC f/k/a Boston Harbor Power Corporation.

69.   On or about December 28, 2006, K Road BG LLC transferred █████████ of its proceeds from the Leveraged Recap Transaction to or for the benefit of Power Management Financing LLC f/k/a Power Management Financing Corporation.

70.   Boston Harbor Power LLC and Power Management Financing LLC were indirect, wholly owned subsidiaries of Harbert Distressed Investment Master Fund, Ltd or Harbinger Capital Partners Master Fund I, Ltd., and were managed and controlled by Harbinger Capital Partners, LLC. On information and belief, Leveraged Recap Transaction proceeds received by Boston Harbor Power LLC and Power Management Financing LLC were subsequently transferred, directly or indirectly, to Harbinger Capital Partners Master Fund I, Ltd., Harbert

Distressed Investment Master Fund, Ltd., or Harbinger Capital Partners, LLC in the form of investment repayment and/or on account of its interest in Boston Harbor Power LLC and Power Management Financing LLC.

71.     On information and belief, Willow Bend Capital Management LLC entered into a consulting and/or services agreement with Satellite Asset Management L.P. and/or its affiliates, to advise Satellite Asset Management L.P. and/or its affiliates on investments in the energy sector, including the investment of Ex Orbit Group, Ltd. and Satellite Senior Income Fund LLC in EBG. On further information and belief, this agreement entitled Willow Bend Capital Management LLC to a portion of the Leveraged Recap Transaction, and on information and belief, some of the Leveraged Recap Transaction proceeds transferred to Ex Orbit Group, Ltd., Satellite Senior Income Fund, LLC and/or Satellite Asset Management L.P. were subsequently transferred, directly or indirectly, to Willow Bend Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

## VI.    BACKGROUND AND STANDING

### A.    Liquidating Trustee

72.     At all times relevant hereto, EBG was a Delaware limited liability company. At all times relevant hereto, BostonGen, Mystic I, LLC ("**Mystic I**"), Mystic Development, LLC ("**Mystic Development**"), Fore River Development, LLC ("**Fore River**") and BG Boston Services, LLC ("**BG Boston**") were also Delaware limited liability companies, and BG New England Power Services, Inc. ("**BG New England**") was a Delaware corporation. BostonGen, Mystic I, Mystic Development, Fore River, BG Boston and BG New England were direct or indirect subsidiaries of EBG. On August 18, 2010 (the "**Petition Date**"), each of the Debtors filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11

U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), in the Bankruptcy Court, thereby initiating the

Chapter 11 Cases. On November 24, 2010, the Bankruptcy Court entered an order authorizing

the sale of substantially all of the Debtors' operating assets to Constellation Holdings, Inc. or its

nominee. On July 20, 2011, the Debtors filed the Plan, and on August 29, 2011, the Debtors filed

the Notice of Designation of Liquidating Trustee Pursuant to Section 7.02.1 of the Second

Amended Joint Plan of Liquidation of Boston Generating, LLC, in which the Debtors identified

Craig R. Jalbert as the Liquidating Trustee. On August 31, 2011, the Bankruptcy Court entered

its order confirming the Plan (the "**Confirmation Order**"). On September 14, 2011, the

Liquidating Trustee and each of the Debtors executed the LT Agreement, which created the

Liquidating Trust and which became effective on September 15, 2011 (the "**Effective Date**").

Pursuant to the Plan and the LT Agreement, the Liquidating Trust was established and Craig R.

Jalbert was appointed as the Liquidating Trustee. On April 9, 2013, Mark Holliday was

appointed successor Liquidating Trustee.

      73.     Pursuant to the Plan and the LT Agreement, the Liquidating Trust succeeded to all

of the Debtors' rights, title and interests in the Liquidating Trust Assets, including but not limited

to "the rights, Claims, Causes of Action and defenses arising from, relating to or in connection

with the [Leveraged] Recap Transaction of all of the holders of Allowed Claims in Class 4B who

[did] not make the Non-Contribution Election" when voting in favor of the Plan. Pursuant to the

LT Agreement, the Liquidating Trustee's duties and responsibilities include the investigation and

enforcement of Causes of Action relating to the Leveraged Recap Transaction, and the taking of

"all appropriate action with respect to the Trust Estate, including without limitation, the

investigation, analysis, filing, pursuit and prosecution of Causes of Action."

74.    In addition, pursuant to the Plan, all creditors in Class 4B assigned various of their individual causes of action to the Liquidating Trust to be prosecuted by the Liquidating Trustee, with any proceeds thereof or recoveries therefrom to be distributed to creditors generally pursuant to the Plan. In this regard, the Plan provides that "[i]n consideration of the rights under the Plan and the prosecution of the Causes of Action by the Liquidating Trustee, on the Effective Date, each of the holders of General Unsecured Claims in Class 4B against the Debtors shall be deemed to transfer and assign all rights, Claims, causes of action and defenses arising from, relating to, or in connection with the [Leveraged] Recap Transaction to the Liquidating Trust, except those holders who make the Non-Contribution Election." No creditor made the Non-Contribution Election. The claims and causes of action of such creditors constitute property of the Estate under Section 541(a)(7) of the Bankruptcy Code and are Liquidating Trust Assets pursuant to the Plan, Confirmation Order and LT Agreement. The Liquidating Trustee is asserting the rights of creditors that were assigned to him pursuant to the Plan, and is prosecuting this adversary proceeding for the benefit of such creditors pursuant to the Plan and the LT Agreement.

75.    Accordingly, the Liquidating Trustee, as successor-in-interest to the Debtors and assignee of certain creditors pursuant to the Plan, the Confirmation Order and the LT Agreement, and pursuant to the authority granted to him thereby, asserts the Causes of Action set forth in this Complaint.

76.    By this allegation, the Liquidating Trustee is abandoning avoidance claims belonging to the Debtors to the extent they might otherwise be asserted under Section 544(b) of the Bankruptcy Code against various Defendants who or that received or benefited from distributions or transfers made in connection with the Leveraged Recap Transaction. Instead, the

Liquidating Trustee is asserting the claims of individual creditors that were assigned to the Liquidating Trust pursuant to the Plan, as the same are described in Paragraph 4 above. Such creditors include (a) the holders of the First Lien Debt and Second Lien Debt (as that term is defined below), (b) the holders of the Mezzanine Debt (as that term is defined below), and (c) all other general unsecured creditors of the Debtors (except for those who or that elected to be included in the Convenience Class created under the Plan). This Paragraph shall constitute the notice required by Section 8.02.2 of the Plan.

**B.    EBG / BostonGen**

77.    BostonGen was founded in 2000, and was managed by Kriegel and the K Road Insiders for its then-owners, Sithe Energies, Inc. BostonGen was then sold to Exelon New England Holdings, LLC ("**Exelon**"), and the K Road Insiders temporarily exited the scene. BostonGen had financial difficulties. On February 23, 2004, Exelon entered into a settlement in lieu of foreclosure which resulted in a transfer of the ownership of BostonGen and its properties to EBG, a special purpose entity owned by BostonGen's former lenders.

78.    By late 2004, EBG and BostonGen experienced further financial distress, including events of default under their credit agreement, and sought another restructuring. With EBG and BostonGen in distress, the hedge funds who owned most of the units of EBG sought help from BostonGen's former management: the K Road Insiders.

79.    On information and belief, the equity holders of EBG concluded that Kriegel and his team, as former management, were in the best position to revamp BostonGen's business and, more importantly, get the unit holders out of the business of owning a power company. EBG required K Road to put skin in the game by contributing new equity in exchange for EBG equity interests and long-term warrants. Unbeknownst to the EBG unit holders, however, the K Road

27

Insiders contributed relatively little of their own money and instead funded over 90% of their

investment in EBG through their joint venture with Harbinger Capital Partners, LLC (acting

through its alter egos Boston Harbor Power LLC and Power Management Financing LLC (with

Harbert Distressed Investment Master Fund, Ltd. and Harbinger Capital Partners Master Fund I,

Ltd., collectively "**Harbinger**")—a predatory hedge fund that carefully concealed its role in K

Road from the rest of EBG's ownership.[2]   Boston Harbor Power LLC and Power Management

Financing LLC were special purpose vehicles for the Harbinger joint venture with K Road and

were openly disparaged as "shell entities" by Harbinger.

80.     Harbinger was founded and is controlled by Philip Falcone, who is currently

facing civil fraud charges from the Securities and Exchange Commission relating to bond

manipulation. Harbinger acted through former investment officer Howard Kagan ("**Kagan**").

Kagan and the K Road Insiders created a web of special purpose entities to structure their

investment in EBG, the purpose of which were to conceal Harbinger's involvement with K Road

from EBG's equity owners. These entities, shown in Exhibit B, had no existence or purpose

except to secretly funnel cash from EBG to the K Road Insiders and Harbinger.

81.     The agreements between K Road and Harbinger gave Harbinger total control over

K Road's actions with respect to EBG and BostonGen. Among its other powers, Harbinger's

approval was required for K Road to exercise its board vote at EBG.

82.     The joint venture between K Road and Harbinger ("**K Road/Harbinger**")

invested $65 million and obtained a 10% equity interest in EBG as well as warrants to purchase

722,222 additional equity units at an exercise price of $118.78 per unit. $61 million came from

Harbinger, and only $4 million from K Road. The propriety of the Leveraged Recap Transaction

---

[2] Harbinger made its reputation by predicting the subprime market collapse and betting against securitized subprime mortgages. Here too, it predicted EBG's poor prospects in the wholesale energy market and quickly acted to protect its position with regard to this investment.

(involving borrowings of nearly $2 billion with a redemption at $340 per unit) is contradicted by this implied $650 million valuation of EBG only a year prior.

83.      In connection with the October 2005 BostonGen restructuring, BostonGen, Mystic I, Mystic Development, Fore River and K Road entered into a Management and Operation Agreement effective as of October 11, 2005 (the "**Management Agreements**").

84.      Upon the execution of the Management Agreement and the LLC Agreement, K Road/Harbinger became an "insider" of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, a controlling person under applicable state corporate and securities laws, and a manager of the Debtors' businesses. It remained so throughout the period of the Leveraged Recap Transaction and until mid-2007.

## C.      K Road Dominates EBG and BostonGen

85.      K Road/Harbinger assumed operating control and management of EBG and BostonGen in October 2005. Pursuant to the Management Agreement and the LLC Agreement, K Road had operating and management control over virtually all aspects of the Debtors' businesses. Among other things, K Road was to provide "comprehensive management, administration, operation and maintenance services" for the Debtors' businesses and affairs, and was authorized "to act on behalf of Owner as its authorized agent in the conduct of Owner's day-to-day business." In short, K Road/Harbinger ran the businesses.

86.      Under the LLC Agreement, EBG was to be governed by seven board members, including two designated by K Road, one of whom was required to be the Chief Executive Officer of EBG (Kriegel).  All other directors were required to be independent directors.

87.      Directors whom K Road designated could only be removed for cause or by K Road. A number of actions, including those involving interested directors, could be approved by

holders of Class A units, and K Road held all of the Class A units. In addition, K Road was to nominate all senior officers, and it was contemplated that the Board of Directors would be required to appoint members, officers and employees of K Road who were nominated by K Road to serve as officers or as managerial employees of EBG. These provisions thus gave K Road pervasive control over the Debtors' business matters. They were especially significant because although the Management Agreements purported to place limits on the authority of K Road as manager and required the consent of BostonGen and its subsidiaries in respect to certain matters, as a practical matter, directors, officers, and managers of K Road comprised those entities who were responsible for giving such consents. Thus, the consent restriction was no restriction at all.

88.     As soon as K Road was in control of EBG, it began pursuing a "liquidity event." Harbinger, as part of the K Road/Harbinger joint venture, demanded a high and rapid return on its investment, and the Nominating Committee was equally eager to cash out.

89.     The EBG Board of Directors retained Lehman to get money out of the company. Initially, Lehman pursued bidders for the company outright. One prospective buyer considered by the EBG Board in June 2006 was Dynegy, Inc. ("**Dynegy**"), an electric utility company that owned several natural gas-fired plants like those operated by BostonGen. Unbeknownst to Lehman or the independent members of the Board of Directors, Harbinger had initiated the Dynegy bid. Dynegy offered $265 a unit for EBG, with 20% of the offer in cash and 80% in Dynegy stock. The Nominating Committee was dissatisfied with both the price per unit and the amount of cash that would flow immediately to the unit holders. They knew that they needed to get cash out immediately; there were no future gains to be made by holding interests in an entity containing BostonGen. EBG rejected the Dynegy offer and asked for $300 a unit. Dynegy cut off negotiations without a counteroffer.

90.    On June 29, 2006, Harbinger, as part of the K Road/Harbinger joint venture, dictated that instead of a sale to Dynegy, K Road pursue a "recap on the debt, adding 2 turns of leverage (another $750mm) and doing a buyback or dutch auction tender . . ." This is indeed what transpired. Although Harbinger's role in the Leveraged Recap Transaction was concealed, the transaction was structured just as Harbinger directed.

91.    Both Harbinger and K Road knew that a transaction had to happen soon. As a merchant seller, BostonGen was at the mercy of market forces—both natural gas and electricity. Moreover, its critical Reliability Must Run ("**RMR**") contracts—which had provided a reliable revenue stream—were terminating due to the planned transition to a forward capacity market ("**FCM**") system in the ISO-NE grid where BostonGen sold its capacity.[3] The outlook for BostonGen was dismal. BostonGen sold into the ISO-NE grid. The ISO-NE's switch to FCM auctions meant more competing capacity and lower prices for merchant electricity providers. Although K Road knew that the FCM transition was being implemented to *encourage* new market entrants and *minimize* capacity payments to merchant providers, in the Projections, K Road represented that it anticipated revenues of $9/kW-Month (possibly rising to as much as $15/kW-Month) under the FCM market—but neglected to mention that in an open auction system, payments could approach *zero* if new capacity were connected to the ISO-NE system. In fact, such capacity was planned, and was anticipated by K Road based upon numerous industry reports prior to the Leveraged Recap Transaction.

92.    In response to Harbinger's prodding, K Road determined to spin BostonGen's problems into someone else's hands after extracting any possible liquidity. Of course, it could do

---

[3] Unlike RMR contracts, by which the ISO-NE paid merchant generators like BostonGen to keep specific plants running to keep capacity available, FCM auctions are open and transparent. In an FCM auction, any generator can bid its capacity three years out. FCM auctions are therefore more competitive than RMR contracts.

so only by concealing the Debtors' true prospects from any potential counterparty—whether that included new lenders, a potential acquirer, or the IPO market.

93.    K Road and its officers and employees arranged, negotiated, documented, supported, and closed the Leveraged Recap Transaction. In so doing, K Road and its officers and employees prepared or caused the preparation of transaction documents, including the CIM and other documents discussed herein, prepared or caused the preparation of the Projections, negotiated and documented or caused the documentation of the Hedges, supervised and directed transaction diligence, provided information and advice to the Board of Directors, and negotiated and documented or caused the documentation of the Credit Facilities (defined below).

## VII.    K ROAD'S MISREPRESENTATIONS AND OMISSIONS

### A.    The Projections

94.    The centerpiece of K Road's efforts to promote the Leveraged Recap Transaction was the set of fundamentally misleading and unreasonable Projections for the financial performance of BostonGen following the Leveraged Recap Transaction. These Projections included projected EBITDA[4] of close to $1 billion during the four-year projection period of 2007 through 2010, inclusive. Thereafter, the EBITDA projections that K Road developed continued to ascend into the stratosphere, growing from a projected $199 million for 2007 (which, in fact, the Debtors missed by $69 million) to a projected $426 million in 2012, with even higher projections for the following years. In fact, EBITDA did not rise—it decreased..

95.    As a merchant seller of electricity into the wholesale market, BostonGen's profitability from operations was subject to market risks intrinsic to that industry—risks posed by the short and long-term fluctuation of the market price for electricity due to changes in supply

---

[4] Earnings Before Interest, Taxes, Depreciation and Amortization or "**EBITDA**" is often relied upon as an indicator of a business entity's intrinsic earning capacity and value.

and demand, risks posed by exposure to volatile commodities markets, regulatory and related risks posed by the functioning of the highly complex energy markets and operational risks, such as equipment failures and forced outages.

96.     To market BostonGen as an entity possessing the stable cash flow necessary to service the major new debt load required for the Leveraged Recap Transaction, K Road needed to portray BostonGen as a "contract" generator, not the "merchant" generator that it actually was. It also needed to conceal the impact that the termination of its RMR agreements, as ISO-NE moved to the FCM system, would have on its revenue.

97.     As a merchant generator, BostonGen typically entered into hedge contracts, which theoretically protect it from fluctuations in its input and output markets. Pursuant to each set of the contracts implementing the hedging transactions BostonGen entered into near the time of the Leveraged Recap Transaction (the "**Hedges**"), Credit Suisse Energy, LLC ("**CSE**") agreed to make monthly fixed payments (the "**Fixed Payments**") to BostonGen over a period of four years. Such Fixed Payments showed up in the Projections as a guaranteed, contractual "net energy margin" that was reflected in the EBITDA projections year after year. Supposedly, according to the Projections, these alleged Fixed Payments would result in the receipt by BostonGen, like clockwork, of $163 million of "Net Hedged Margin."  The Fixed Payments to BosGen, however, came at a hefty cost to BosGen.  But that cost, unlike the Fixed Payments, did not appear in the Projections. The cost of the Fixed Payments was variable payments (the "**Floating Payments**") from BostonGen to CSE. This was a material hidden liability with a significant negative impact on cash flow, the disastrous consequences of which were concealed from and not disclosed to potential lenders, the independent members of the Board of Directors, and other parties involved in the Leveraged Recap Transaction.  In short, K Road committed

fraud—it failed to disclose the way the Hedges actually worked. Contrary to the representations made to lenders, $163 million represented the theoretical ceiling for net payments to be made to BostonGen, not the Hedges' projected performance.

98.     K Road sold BostonGen as having "contracted EBITDA" via the Hedges, but in truth, BostonGen had not contracted away the variability in its costs. BostonGen may have had a small fixed revenue source, but it still had variable costs which it had not contracted to cover via its variable revenues from spot electricity sales. This was a fundamental lie to lenders.

99.     The amount of Floating Payments was to be calculated pursuant to a formula negotiated between K Road and CSE. As pitched to lenders, the contractual formula for the Floating Payments in each set of Hedges would result in a dollar amount closely approximating the gross margins that would be achieved from actual real life sales of electrical generation by the particular BostonGen power plant to which the Hedge was "tied" or "referenced." Thus, in theory, if, during a given month, the synthetic Floating Payment formula would result in the amount of $1 million due to the Hedge counterparty as a Floating Payment, the actual operations of the BostonGen plant to which that Hedge was "referenced" would generate real life energy margins of $1 million on its sales of electricity. This margin from actual operations would then be available to fund the Floating Payment. Upon payment of the Floating Payment to CSE, the exchange would be complete: the operating energy margin from the sale of electricity would fund the Floating Payment; BostonGen would get the Fixed Payment in return.

100.     K Road, by concealing the details of the Hedges from its consultants and potential lenders, also concealed the reality that the Floating Payment formula did not, in fact, approximate the actual operating performance (in the past and foreseeable future) of the BostonGen plants and thus would not produce the money needed to fund the Floating Payment

obligations. K Road had never been able to operate BostonGen in a way that would optimize the Floating Payments—and it had no plan to do so in the future. For instance, under the Navigant model, if K Road's internal projected heat rates and gas prices are used, the Net Hedged Margin does not even approach $163 million.

101.    The Floating Payments were tied to the efficiency with which BostonGen's power plants operated. Under a true swap, the Floating Payments could have gone either way—if BostonGen's performance was high enough, CSE would have paid BostonGen, rather than vice versa. However, there was a "swaption" feature of the Hedges, which was misrepresented by not being included in the projected EBITDA. Under the "swaption," CSE could turn off the Hedges if they became unprofitable to CSE—and CSE of course did exercise that option whenever it was economic to do so. Therefore, BostonGen either made Floating Payments to CSE, or CSE turned the Hedges off.  The result of the Hedges was that they did not "hedge" at all because BostonGen was completely exposed to downside market risk without any upside. The Projections did not include the impact of the swaption on EBITDA.

## B.    Additional Specific Hedge-Related Misrepresentations and Omissions

102.    The details of why the Hedges failed to replicate BostonGen's actual performance are set forth below. However, briefly, they include, inter alia:

(a)    there was a mismatch between the gas and power prices referenced in the Hedges, and the gas and power prices BostonGen was subject to in its actual operations, and the prices would diverge;

(b)    for the Hedges to be effective, they required BostonGen to attain a historically unachievable level of volume.  The formula used to calculate the Floating Payment was fundamentally negative to BostonGen because it gambled that BostonGen could sell at a level it never had and the market never wanted;

(c)    the projected Hedge revenues did not adequately reflect a "take or pay" contract BostonGen had with Distrigas, which resulted in payments for gas for which there were no revenues;

(d)    the Hedges assumed the plants would operate at a significantly lower heat rate than BostonGen's plants had historically operated, which meant actual operating costs were higher and the actual operating margin lower than assumed in the Hedges; this also meant that the Floating Payment under the Hedge would be higher than the gross margins BostonGen could actually generate from operations;

(e)    despite the K Road Insiders' historical experience with the BostonGen plant operations, which included numerous forced outages and breakdowns, the Hedges did not make allowances for forced outages for breakdowns and repairs (apart from one annual shutdown), during which the Floating Payments continued;

(f)    BostonGen had not yet hedged Fore River, and did not even have terms for a hedge for Fore River, but built in assumed stable Hedge revenue for the Fore River plant as a component of the $163 million of Net Hedged Margin throughout 2007; and

(g)    the Hedges assumed that the BostonGen plants, which were originally designed as "base load" plants, had almost perfect flexibility when cycling on and off (i.e. that they could go from zero to full generating capacity when it was profitable to generate electricity and from full capacity to zero when it was unprofitable), but this was simply not the operating reality for the BostonGen facilities.

These and other factors were later referred to by the Debtors as the "Hedge Imperfections." K Road's non-disclosure of these "Hedge Imperfections" was materially omitted from lender materials.

103.    Following the Leveraged Recap Transaction, the gross mismatch between the Floating Payment obligations and BostonGen's ability to generate the revenue needed to pay them became evident immediately. As was entirely foreseeable by those intimately familiar with the operations of BostonGen (that is to say, K Road, the K Road Insiders, and the Nominating Committee), BostonGen could not achieve a contracted EBITDA and its revenues remained subject to market risks.

C.    **K Road's Baseless Assumptions**

104.    K Road recognized that the Leveraged Recap Transaction was a high-risk transaction because of the amount of debt proposed to be incurred, and because of the use of the debt to make payments of more than $1 billion to equity unit holders. To justify the transaction and the risks, K Road made a number of factual assumptions about the future which, taken together, purported to establish that the risks were tolerable and should be assumed. These factual assumptions were (a) reflected in the Projections that Ehrenzeller certified, (b) contained in various documents disseminated to prospective lenders and financiers, including those described herein, (c) contained in documents delivered to Duff & Phelps, Navigant and Black & Veatch in connection with opinions requested from those firms, (d) conveyed to the independent members of the Board of Directors in connection with their review and approval of the Leveraged Recap Transaction, and (e) provided to S&P and Moody's (both defined below) in connection with ratings that those firms publicly disseminated. The assumptions underlying the Projections were used to make determinations as to the Debtors' solvency, capital adequacy and ability to pay their debts as they became due after the closing of the Leveraged Recap Transaction. Tellingly, K Road deleted language in a proposed engagement letter from Duff & Phelps warranting that the information provided "will be complete and correct in all material respects" and will not contain untrue statements of, or omissions to state material facts. K Road also deleted representations that the Projections had been "prepared in good faith" and were based on reasonable assumptions. Finally, after a number of drafts, Ehrenzeller inserted a disclaimer of his own expertise on such matters.

105.    The consultants in turn washed their hands of responsibility by proclaiming their unquestioning reliance on management's Projections as the sole basis for blessing the

transactions. K Road withheld from the consultants the documents necessary for an assessment of the Projections, including the Hedge contracts, so Duff & Phelps simply conjured a 20% sensitivity level for management's figures. K Road carefully controlled the dissemination of the Hedge contracts so that anyone who would have been able to point out the errors in the Projections was not privy to the Hedge terms.   The K Road Vice President of Asset Optimization, noted that he had been "compartmentalized" away from knowledge of the "features and nature of the hedge." But he was growing concerned that there was something odd about what K Road was telling the public:

> I know the term is 4 years, and I know that the sum of the fees that the hedges for Mystics, 8 & 9 and Fore River will pay to us is expected to total approximately $165 million per year [give or take]. . . . I became aware of these facts during a presentation we made to the lenders at the W hotel[.]

> But there are some important things that I still have not been informed of.

> While I know that the TOTAL of the hedges on the THREE plants [Mystic 8, Mystic 9, and Fore River] is expected to yield $165 million, I have not been told what the hedge we executed on just Mystic 8 and 9 will yield to us, (and since we have yet to execute the Fore River hedge, I really have no idea how much of the $165 million is coming in right now).

106.   The Projections were inaccurate in further material ways apart from the failure to disclose the true nature and inherent risks of the hedging strategy. The critical factual assumptions that were false and misleading are discussed herein. However, there was an overarching misrepresentation, which was an attempt to present the Debtors' business as something that it was not, and to mischaracterize the nature of that business. There are two types of power generators: "contract generators" that sell electricity through long-term contracts, which lead to a stable and predictable revenue stream and the ability to virtually lock in a profit so long as operating costs are controlled, and "wholesale generators" that sell electricity and purchase fuel at spot prices, which create an unstable revenue stream with less predictability,

which in turn result in an unstable cash flow, more expensive debt, a higher-risk business model and generally lower valuations. These differences result in a valuation premium for contract generators. K Road falsely portrayed the Debtors as a contract generator by implying that, even though they were wholesale generators, the Hedges made their risk profile similar to the risk profile of contract generators. Thus, in numerous documents, K Road and the Debtors represented that there was a "fixed energy margin" or "contracted margin" which sought to portray an absence of market pricing risks. For example, a K Road Preliminary Financial Model dated December 1, 2006 used such terms as "fixed energy margin," "contracted EBITDA" and "contracted cash available for debt service." K Road and the K Road Insiders' fraudulent conduct was gross and wanton, and involved high moral culpability.

107.    The misstatements that drove the Leveraged Recap Transaction and that were set forth in the Projections were the following:

(a)     At the time of the Leveraged Recap Transaction or shortly thereafter, the prospective energy revenues and fuel costs were completely or almost entirely hedged, and there were minimal operating and market risks.

(b)     There would be a fixed, predictable and stable net energy margin of $163 million through 2010, as a result of the Hedges, that would not be exposed to market dynamics and pricing risks.

(c)     There would be an initially fixed but increasing FCM payment of $3.05/kW-month for 2007, $3.46/kW-month for 2008 and $3.95/kW-month for 2009, which would skyrocket to $6.96/kW-month in 2010 and thereafter, would increase to $9.00/kW-month for the period 2011 to 2017 because of a market shortage of generated power. As a consequence, capacity payments would increase from $101 million in 2007 to $268 million for the period 2011 to 2017, and this gain was built into the valuation calculations.

(d)     Operating and maintenance expenses would decline from $138 million in each of 2005 and 2006 to $101 million in 2007, with only slight increases thereafter.

(e)     Capital expenditures would be limited to $5 million per year in 2007 and each year thereafter.

(f)     As a result of the foregoing, there would be significant excess cash flow. Pursuant to the provisions in the documents evidencing the Credit Facilities, which required that virtually all excess cash flow be applied to pay debt, there would be an immediate and consistent reduction in the First Lien Debt and overall leverage. More specifically, the First Lien Debt would be reduced from $1.13 billion in December 2006 by almost $400 million to $731 million by the end of 2010, and to $74 million by the maturity date in 2013.

(g)     There was short supply of available generating capacity in the relevant capacity market for the New England region that would impact the likely price of power in the energy market after the Hedges expired. The result would be that after the Hedges expired, the FCM payments, the energy margin and the overall value of the Debtors would increase dramatically.

(h)     There would be no unexpected events such as breakdowns, repairs and other contingencies.

108.    Each of these critical assumptions was false, misleading, unjustified and inaccurate based on information known and available prior to and at the closing of the Leveraged Recap Transaction in December 2006, and based on the actual operating results in the period from 2007 to 2010.

109.    The projected reduction of debt by almost $400 million by 2010 through a cash flow sweep feature contained in the credit documents (the "**Cash Sweep**"), the projected expense reduction from $138 million to $101 million, the projected level of capital expenditures of $5 million per year, the projections that forward capacity market prices (which were wholly or largely fixed until 2010) would increase to $9.00/kW-month thereafter, the predictions of a power generating shortage that would increase prices and values, and the absence of any mention of the need for contingent expenses, were all materially wrong, and known to K Road and the K Road Insiders prior to consummation of the Leveraged Recap Transaction to be materially wrong.

110.    A budget prepared contemporaneously by K Road and the K Road Insiders showed expense reductions that were significantly less than those included in the Projections. A

capital expense budget prepared at the same time as the Projections showed projected expenses for 2007 of over $20 million, as compared to only $5 million in the Projections. A document prepared more than one month before the Projections showed material additional market capacity becoming available in 2008 and thereafter, in contrast to the supposed generating capacity shortage discussed in the Projections.

111.    In the Leveraged Recap Transaction, the Debtors, under the domination and control of K Road, actually intended to defraud their creditors by distributing their cash to equity and insiders.  They knew that this cash would not be available to pay either the contemporaneous new debt to the lenders or subsequent unsecured creditors.  The Leveraged Recap Transaction was timed so as to maximize the cash that would be available to distribute to equity because of K Road/Harbinger's knowledge of the Debtors' insolvency and illiquidity in the future.

112.    An additional and critical material omission related to the role of Harbinger. K Road carefully concealed its hedge fund joint venture partner from the independent members of the EBG Board of Directors, the lenders, the Federal Energy Regulatory Commission ("**FERC**"), and the public. While the CIM stated that "K Road purchased 10% of the equity in EBG," the truth was that Harbinger owned nearly 90% of the beneficial interest in those EBG units, when its interests in K Road BG Holdings LLC and K Road Power BG LLC were considered. The CIM touted K Road's "strong track record for purchasing, improving and operating generation assets" and assured lenders that "K Road performs comprehensive management, strategy and administration services for the business and affairs of EBG's unit holders (the "**Owners**") and the Generating Facilities, and acts on behalf of the Owners as their authorized agent in the conduct of the respective day-to-day businesses." But the CIM materially omitted that K Road did not have the discretion to make decisions with regards to EBG/BostonGen; instead, it had agreed

with Harbinger to "cause the directors of EBG appointed by K Road BG LLC not to vote on (a) Asset Transfers, (b) Dividends, (c) Adverse Actions, (d) Capitalization Matters or (e) matters that, to the knowledge of the directors, could reasonably be expected to have an adverse tax impact on a Member or have an adverse impact on the regulatory status of a Member without the consent" of Harbinger. K Road continued to conceal its partnership with Harbinger even after the Leveraged Recap Transaction; it got confidential treatment for its application to FERC, and did not disclose even the two Harbinger shell entities as equity owners until they could be slipped into a longer list of new equity owners in March 2007.

**D.      Financial Misrepresentations and Omissions**

113.    On or about December 18, 2006, Ehrenzeller, Director of Finance of EBG and Senior Vice President and CFO of K Road Power, transmitted the Projections to Duff & Phelps in support of the Leveraged Recap Transaction. Ehrenzeller wrote that "the financial projections provided to Duff & Phelps...are the most current financial projections available by the Company. With respect to such projections, I have made such investigation and inquiries as I deemed necessary and prudent therefor." Ehrenzeller also wrote that he had relied on various assumptions supplied by unnamed "outside consultants" and "[h]ad no reason to believe that these assumptions are unreasonable." Instead, he stated that he believed the Projections "provide reasonable estimations of future performance, subject to the uncertainty and approximation inherent in any projections." He did not, however, state the assumptions on which he relied and who provided them, and he stated that he did not hold himself "out as an expert on...the value of assets." As described above, the statements in the Projections were false, misleading, unjustified and inaccurate based on information available and known at the time.

114.   As manager and operator, K Road was involved in the planning, negotiating, and implementation of the Leveraged Recap Transaction. K Road had access to and control of all financial and other information that was necessary to plan, negotiate and implement the Leveraged Recap Transaction, to advise and support the Leveraged Recap Transaction to the Board of Directors, to provide diligence on the Leveraged Recap Transaction, and to solicit interest from prospective financiers and close the transaction. The Projections showed that BostonGen's 2007 EBITDA would reflect a dramatic "hockey stick" increase of over 45% from 2006.   As K Road knew would be the case, BostonGen failed to attain its "hockey stick" growth and, in fact, experienced a decline in EBITDA in 2007.

115.   Significantly, in the spring of 2007, K Road prepared an annual budget that was at variance with the Projections. In particular, that budget showed revenues, fuel, and purchased power would be "variable." This was in direct contradiction to the representations made in the Projections, the CIM and other documents, and representations made to Duff & Phelps and to the Rating Agencies (as defined herein), that there was a fixed energy margin. Similarly, both a proposed 2007 budget issued in December 2006 and a projected cash flow statement forecast for April 2007 through December 2007 showed, contrary to the Projections, that revenue and fuel expenses would be "variable."

116.   A February 2007 budget showed that (a) revenues and fuel and purchased power would be "variable" items, (b) the net energy margin would not be fixed as projected but instead would be approximately $45 million less than predicted, and (c) operating expenses would be almost $130 million, or almost $30 million more than projected and, not surprisingly, much closer to historical results. In short, the Projections were materially inaccurate based on

information that was known and available at the time and that was actually used in a virtually contemporaneous internal budget.

117.   Demonstrating the falsity of the Projections, the Debtors' fortunes declined from the moment the Leveraged Recap Transaction closed. In the first quarter of 2007, which began a little more than a week after the closing of the Leveraged Recap Transaction, the energy margin was $22 million less and EBITDA was $20 million less than represented in the Projections."

**E.      Documents Provided to Prospective Participants in the First Lien Debt, the Second Lien Debt and the Mezzanine Debt Containing Material Misrepresentations and Omissions**

118.   K Road actively solicited parties to participate in the Leveraged Recap Transaction. To this end, it prepared and disseminated certain documents to prospective participants in the First Lien Debt, the Second Lien Debt, and the Mezzanine Debt. These documents included the CIM, a Private Supplement to the CIM dated December 2006 (the "**CIM-PS**"), a Private Investors Supplement to the CIM dated December 4, 2006 (the "**CIM-PIS**"), and a lender's presentation (the "**LP**"). These documents were provided to potential purchasers of the First Lien Debt, the Second Lien Debt and the Mezzanine Debt, and more generally in the marketplace.

119.   A letter signed by Kriegel, as Chairman and CEO of EBG, and as Chairman, President and CEO of K Road, affirmed that the information in the CIM was "complete and correct in all material respects and [did] not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which they were made," and that management projections and forward looking statements were "prepared in good faith based upon assumptions that were reasonable as of the date of the" CIM. These statements were not

true and/or omitted to state material facts for the reasons set forth herein. Each of the K Road Insiders was identified as a K Road representative in the CIM and was a party to such misrepresentations.

120.    Although the CIM referred to K Road as an equity investor with a 10% stake and warrants, the CIM failed to disclose that K Road/Harbinger were interested parties who received more than $100 million as a result of the Leveraged Recap Transaction. The CIM did not disclose that, in an act of incredible chutzpah, K Road was seeking to modify its long-term warrants to make them exercisable immediately. It also did not disclose that K Road "financed" its original investment through its joint venture with Harbinger and that a significant portion of the proceeds of the Leveraged Recap Transaction would be paid to Harbinger.

121.    The CIM stated that the Debtors had entered into hedging transactions, and proposed to enter into additional hedging transactions "so as to provide comfort to prospective lenders . . . that the Company's revenue stream is stable. The company believes the Hedge Transactions will both enhance the Company's borrowing capacity and lessen the Company's risk of default on its indebtedness due to volatile fuel and energy prices." In the same vein, because of the Hedges, the Debtors would have a "stable energy margin" (i.e. the difference between power prices and fuel costs). As discussed herein, these statements were not true.

122.    The CIM-PS, which upon information and belief was prepared by the same persons who prepared the CIM, and was accompanied by a cover letter signed by Kriegel, projected that as a result of the Cash Sweep, the First Lien Debt would decrease from $1.13 billion upon the closing of the Leveraged Recap Transaction to $711 million at the end of 2010. This statement was not based on reasonable assumptions, omitted to state material facts and was false and misleading based on information available at the time it was made and as actual events

proved. For instance, in order to project large paydowns of the loan principal starting in 2010, K Road misstated Hedge revenues (which were not, in any event, even negotiated more than three years out) and projected hockey-stick style jumps in FCM payments in 2010. In reality, once the floor for FCM payments was removed in 2010, there was no reason to assume any revenues on FCM payments, let alone growth.

123.    The CIM-PS included projections that assumed the Hedges would assure a "contracted EBITDA" of $163 million despite the limited hedge coverage and known variability of FCM payments.

124.    The LP was prepared almost exclusively by K Road as Asset Manager, and stated that its professionals had been "intimately involved" with BostonGen, having "acquired and developed the assets, led last year's recapitalization and managed the assets since then." The LP assured investors that long-term Hedges in combination with forward capacity payments "will provide stable cash flow to support increased leverage." This statement was utterly misleading because FCM payments were known to be variable based on competitive market forces, and the Hedges were incomplete. Similarly, the LP cited a stable "net energy margin based on fully-approved FCM payments and long-term commodity hedges," and projected significant deleveraging as a result of the Cash Sweep. Allegedly, these devices would result in approximately $163 million of "pro forma contracted net energy margin." The LP assured prospective lenders that "[w]ith hedge and FCM revenues BostonGen will have substantially all of its net energy margin contracted during the term of the hedges." Because of the way the Hedges actually functioned, these statements were untrue. In addition, the LP suggested that the market was constrained by "import transmission constraints," that a tightening supply and demand balance in the service area would produce "higher spark spreads over time," and that

"high barriers to entry defer new entrants into the Boston load pocket." These statements were not true. As K Road knew and internally acknowledged, there was in fact a potential "oversupply" from new generators being connected to the New England Power Pool ("**NEPOOL**") market. Finally, the attempt by K Road to characterize the Debtors as contract generators with a lower risk profile, and to use words like "stable" margin and "contract" margins, were themselves false and misleading by implying a risk profile for the transaction that bore no resemblance to the actual situation presented by the market risks and incomplete Hedge coverage.

## VIII.   THE LEVERAGED RECAP TRANSACTION

### A.   The Approval Process

125.    The Leveraged Recap Transaction was approved by the EBG Board of Directors based upon the recommendation of K Road and rated for syndication. The K Road Director of Finance, Ehrenzeller, certified the solvency of EBG and BostonGen to the lenders following the Leveraged Recap Transaction with specific reference to the various statutory definitions of insolvency—but in the next statement, while aware of the falsity of his statements, purported to disclaim responsibility: "I do not hold myself out as an expert on, and have not in connection with this Certificate...engaged the services of any expert on asset valuation or appraisal, and any statements made herein as to the value of assets are made to best of my knowledge without having made any special investigation with respect thereto." However, Ehrenzeller, a K Road officer, actually prepared the Projections.

126.    As part of the process of pushing the Leveraged Recap Transaction through, it was necessary to have the debt to be issued be rated by both Moody's Investors Service ("**Moody's**") and Standard & Poor's Rating Services ("**S&P**" and together with Moody's, the

47

"**Rating Agencies**"). Significantly, as was known to K Road, both of the Rating Agencies were provided materially misleading financial information reflected in the Projections, and thus indirectly and unwittingly contributed to the public dissemination of fraudulent, false and misleading information.

127.    The K Road Rating Agency presentation dated November 9, 2006 contained similar misrepresentations and omissions to those disseminated in the CIM, CIM-PS, and LP regarding "highly stable net energy margin," "contracted net energy margin," and a purported "congested Boston load pocket." The debt ratings were therefore fraudulent as well.

**B.      K Road and the K Road Insiders Conceal Their Fraud**

128.    As described elsewhere in this Complaint, K Road and the K Road Insiders took affirmative steps to, or knew that others were taking affirmative steps to, conceal their fraudulent activities. These affirmative steps include, without limitation: (a) preparing and disseminating Projections that differed materially from contemporaneously prepared internal projections, and not disclosing this fact to prospective lenders; (b) describing the Hedges as assuring a net Hedge energy margin and a contracted spread; (c) concealing internal models from the lenders based on purported Hedge confidentiality concerns; (d) informing employees working on the Leveraged Recap Transaction that it was not necessary for them to see the Hedge documents; and (e) failing to inform Duff & Phelps, Navigant, Black & Veatch, S&P and Moody's about each of the above while at the same time knowing that such entities were publicly disseminating materially incorrect information.

**C.      The Leveraged Recap Transaction Is Consummated**

129.    On December 21, 2006, BostonGen entered into two credit facility agreements (the "**First Lien Credit Facility**" and the "**Second Lien Credit Facility**") with Credit Suisse

48

AG, Cayman Islands Branch and Goldman Sachs Credit Partners L.P.: a first lien credit facility in the amount of $1.45 billion (the "**First Lien Debt**") and a second lien credit facility in the amount of $350 million (the "**Second Lien Debt**"). The remaining Debtors other than EBG (the "**Guarantors**") issued guarantees of the First Lien Debt and the Second Lien Debt, and the obligations of BostonGen and its subsidiaries were secured by first and second liens on substantially all of their assets.

130.    Also on December 21, 2006, EBG borrowed $300 million of so-called mezzanine debt on an unsecured basis (the "**Mezzanine Credit Facility**" and, together with the First Lien Credit Facility and the Second Lien Credit Facility, the "**Credit Facilities**"), which provided for payment-in-kind ("**PIK**") interest (the "**Mezzanine Debt**"). The debt in the Credit Facilities was immediately syndicated.

131.    The proceeds of the Credit Facilities were disbursed as follows: (a) BostonGen transferred approximately $708 million to EBG; (b) approximately $800 million was used to refinance existing debt; and (c) approximately $50 million was used to pay fees and expenses incurred in connection with the closing of the Credit Facilities.

132.    On December 26, 2006 and December 28, 2006, EBG disbursed more than $1 billion, consisting of the $708 million that BostonGen had transferred to it, the $300 million of Mezzanine Debt, and certain of its own cash (the "**$1 Billion Redemption**"), as follows: (a) ████████████ in payment of dividends on EBG's members' equity interests (the "**Dividends**"); (b) ████████████ to redeem EBG's members' equity units pursuant to a tender offer (the "**Unit Redemptions**"); and (c) ████████████ in payment for the redemption of warrants held by K Road and certain individuals, including the K Road Insiders and other principals of K Road (the "**Warrant Redemptions**" and, together with the Dividends and the Unit Redemptions, the

"**Transfers**"). A non-exclusive list of the Transferee Defendants who or that received the Transfers, or who or that benefited from the Transfers, as well as the amounts of the Transfers made to or for the benefit of each such Transferee Defendant, is set forth in Exhibit A, which is specifically made a part of this Complaint.

133.    Pursuant to the Dutch auction form of tender offer, each unit holder was offered the option to redeem as many of its units as it desired at a range of predetermined values between $310 and $350. These values bore no relationship to the market value of the units; there were no independent offers in that range. The ultimate $340/unit cost to EBG was always intended to be a windfall to the unit holders. The goal of the Leveraged Recap Transaction was always to "provide liquidity to unit holders," i.e., to loot the company for the benefit of its owners.

134.    The $1 Billion Redemption provided no benefit whatsoever to the Debtors or their creditors, and instead caused substantial damage.

135.    Upon consummation of the Leveraged Recap Transaction, K Road and Harbinger received the following: (a) $90,886,080 in redemption of 267,312 equity units; (b) $50,359,127.13 in exchange for 222,759 warrants redeemed by EBG; and (c) a dividend payment of $3,438,500, for a total of $144,683,707.13. Additionally, prior to the Leveraged Recap Transaction, Kriegel, Sullivan and Tohir received a combined ███████ in exchange for 180,556 warrants purchased by Lehman directly from them, pursuant to a Warrant Purchase Agreement dated April 27, 2006.

136.    As a result of the Leveraged Recap Transaction, K Road and Harbinger received a total of approximately $169,058,767.13 just one year after making their initial investment of $65 million—an approximate 300% return. When the leverage with Harbinger is considered, K Road

turned its $4 million dollar investment into nearly ███████ in less than a year and a half—a

return that had no basis in reality, and certainly was not justified by management performance.

IX.   **THE DEBTORS ARE INSOLVENT UPON THE CONSUMMATION OF THE LEVERAGED RECAP TRANSACTION**

A.   **Balance Sheet Insolvency**

137.   The financial statements that KPMG prepared for the Debtors show the Debtors

as being balance sheet insolvent upon the completion of the Leveraged Recap Transaction.

Specifically, after the Leveraged Recap Transaction, EBG's liabilities exceeded its assets by

$825,949,000, and BostonGen's liabilities exceeded its assets by $535,398,000.[5]

138.   Upon completion of the Leveraged Recap Transaction, both EBG and BostonGen

were insolvent within the meaning of Section 101(32) of the Bankruptcy Code, and analogous

provisions of applicable fraudulent conveyance law, in that the sum of their debts exceeded the

going concern value of their property at fair valuation.

139.   A report issued by S&P dated December 7, 2006 stated that in the event of a

bankruptcy BostonGen would be able to pay only "a meaningful recovery"—somewhere

between 50% to 80%—on the Second Lien Debt. In such event, there would be little or no

recovery on the Mezzanine Debt.

140.   To determine whether the Debtors were insolvent on a discounted cash flow basis,

various adjustments were made to correct the errors in the Projections. Each of these adjustments

reflects information known and available to K Road in December 2006, and does not adjust for

subsequent developments. The equity value of both EBG and BostonGen were negative by

hundreds of millions of dollars. EBG had no earnings and profits in 2006.

---

[5] The Leveraged Recap Transaction closed on or about December 21, 2006, and financial statements are as of December 31, 2006. The figures in the Projections were a negative $826.1 million for EBG and a negative $560 million for BostonGen.

B.      **Unreasonably Small Capital**

141.    Upon the completion of the Leveraged Recap Transaction, the Debtors were engaged in businesses and transactions, or about to engage in businesses or transactions, for which the property remaining was an unreasonably small capital. Moreover, the Debtors had inadequate capital to cover their exposure to hidden or concealed liabilities arising from the Hedges.

142.    The level of the Debtors' capital was based largely on the Projections and the assumptions noted herein. But, in actuality, the assumptions were false and untrue, and the Hedges did not eliminate market risk. The Debtors made no provision for these undisclosed liabilities that resulted in much lower than projected cash flow, no payments of excess cash flow to reduce debt, the need to transfer reserves to satisfy covenants, and ultimately, the certainty that covenants would be breached, which led to bankruptcy.

143.    At no time was the Debtors' capital adequate to pay the principal on the First Lien Debt, the Second Lien Debt and the Mezzanine Debt from cash on hand when each became due in 2013, 2014 and 2016, respectively, nor did the Debtors believe that their capital was adequate. In fact, under the Credit Facilities, only minimal annual principal payments of $11 million were required on the First Lien Debt, no payments were required on the Second Lien Debt, and PIK interest accrued on the Mezzanine Debt. In addition, the First Lien Credit Facility had the Cash Sweep, which required all surplus cash flow to be used to pay down the First Lien Debt. The Debtors showed an ostensible lack of concern regarding the inadequacy of their capital and their inability to pay their debts as they became due because (a) the Projections falsely showed that the business would generate a great deal of surplus cash, especially for a business that had relatively stable operating expenses, (b) the Hedges purportedly immunized them from market pricing

risks, (c) the First Lien Debt was "covenant light" and the Debtors were well above compliance levels for the only financial covenants, such that there was little danger of breaching covenants, (d) there was a projected reduction of the First Lien Debt by almost $1.06 billion by its due date in 2013, which fact, together with the anticipated increase in FCM pricing, would make it easy to refinance the debt, and (e) they anticipated an IPO or other transaction which would pass their problems into other hands. Indeed, K Road misled S&P and Moody's that the major market pricing risks were hedged until 2010 and the FCM rates were fixed through 2009, and that the risks were manageable, even though there was an aggressive financial structure resulting in weak projected financial metrics and potentially large refinancing risks.

144. In reality, the Debtors' capital was far from adequate. The Debtors emerged from the Leveraged Recap Transaction with enough cash to satisfy immediate operating expenses, but K Road and the K Road Insiders knew that Debtors would be unable to satisfy obligations in the future or pay long-term obligations, even though Debtors were able to continue operations for an interim period and would be able to take steps to postpone or delay an inevitable bankruptcy. Results deteriorated as soon as the first quarter of 2007, when cash flows were seriously impacted by the Floating Payments, the projected cash flow and debt reduction never happened. By the third quarter of 2007, the Debtors had to use cash from reserves to satisfy debt and liquidity covenants, in September 2008, the Debtors retained restructuring advisors, and by mid-2009, the Debtors were telling their lenders that they were close to a default and that the Second Lien Debt and the Mezzanine Debt should be converted to equity.

C.    **Debt Incurrence**

145.    Upon the closing of the Leveraged Recap Transaction in December 2006, the Debtors intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

146.    The Debtors knew or should have known that they would be unable to pay the First Lien Debt, the Second Lien Debt and/or the Mezzanine Debt upon maturity. Acting under K Road's domination and control, the Debtors assumed, contrary to fact, that there would be a fixed energy margin that would permit them to pay down almost all of the First Lien Debt by its maturity date. In fact, this assumption was untrue and known to be untrue by K Road at the time. The assumption was based on the Projections, which for the reasons set forth in this Complaint were false and misleading, and the failure to account for the material risks and liabilities from the Hedges, which depleted cash that was supposed to be available and payable.

147.    The documents evidencing the First Lien Debt and the Second Lien Debt required only minimal annual reductions in principal of $11 million on the First Lien Debt and no reductions in principal on the Second Lien Debt. The Projections, although false and misleading, nevertheless failed to evidence an ability to pay the First Lien Debt, the Second Lien Debt, and the Mezzanine Debt upon maturity.  Instead, the Projections were based on the premise that the Debtors should have been able to pay down almost all of the First Lien Debt by maturity and, with such reduced leverage, refinance their remaining debts. Their explanation was that there would be substantial payments on the principal of the First Lien Debt pursuant to the Cash Sweep, which would result in a reduction in First Lien Debt from $1.13 billion at closing, to $731 million by the end of 2010, and to $74 million by the end of 2013. In fact, by the Petition Date, there were no reductions in principal beyond the mandatory annual reductions of $11

million and the total of the First Lien Debt, the Second Lien Debt, and the Mezzanine Debt was

greater than at the time of the closing of the Leveraged Recap Transaction.

## X.   CAUSES OF ACTION

**A.   Claims against The Transferee Defendants, Individually And As Class Representatives, And The Other Class Members**

**COUNT ONE: Avoidance Of The Dividends, The Unit Redemptions And The Warrant Redemptions As Actual Fraudulent Transfers Under Debt. & Cred. Law §§ 276, 278**[6]

148.   The Liquidating Trustee repeats and incorporates by reference each and every

allegation contained in Paragraphs 1 through 147 above as if fully set forth at length herein.

149.   This Count is asserted on behalf of all creditors of EBG within the definition of

"creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law ("**Debt.**

**& Cred. Law**") whose claims have been assigned to the Liquidating Trustee as described in

Paragraph 4, which claims include their own claims and those that had been assigned to them by

prior creditors or their predecessors or successors, by operation of law, or otherwise. This Count

is also asserted on behalf of all creditors of BostonGen within the same definition of "creditor"

whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which

claims include their own claims and those that had been assigned to them by prior creditors or

their predecessors or successors, by operation of law, or otherwise, on the basis that (a) EBG was

a mere conduit for the Transfers and was required to distribute the funds to the Transferee

Defendants and other Class Members as described above, (b) the Transferee Defendants and

other Class Members derived title from EBG within the meaning of Debt. & Cred. Law § 278(1),

(c) BostonGen distributed the funds directly to the Transferee Defendants, or (d) The Debtors

should be substantively consolidated pursuant to applicable principles of bankruptcy law and as

---

[6] Should the Court determine that the law of another jurisdiction applies to this Count or any other Count set forth in this Complaint, the Liquidating Trustee asserts such Count(s) pursuant to the applicable laws of such jurisdiction.

reflected in the provisions in the Plan. Each of these creditors is an unsecured creditor within the meaning of Sections 502(e) and 506(a) of the Bankruptcy Code. Upon information and belief, the assigned claims described herein exceed $800 million.

150.    There are both then-existing and future creditors as to whom the Transfers were actually fraudulent.

151.    K Road, at the direction of Harbinger and with the consent of the Nominating Committee, caused Debtors to transfer the Dividends, the Unit Redemptions, and the Warrant Redemptions to or for the benefit of the Transferee Defendants and other Class Members identified on Exhibit A.

152.    From the K Road offices in New York, K Road conceived and carried out their scheme with actual intent to hinder, delay, or defraud present and future creditors. Such intent can be inferred from the traditional badges of fraud surrounding the Leveraged Recap Transaction and the Transfers.

153.    Each of the Transfers involved numerous badges of fraud including, without limitation, the following:

    (a)    the Transfers occurred at the same time substantial new debts were incurred by the Debtors;

    (b)    the Transfers removed more than $1 billion of liquidity from The Debtors, and such funds were employed for the benefit of holders of equity, thereby transferring financial risk from holders of equity to creditors;

    (c)    the Debtors were rendered insolvent by the Transfers under the Bankruptcy Code and the New York Debtor & Creditor Law, and were left with inadequate capital for their future operations;

    (d)    the Debtors each knew that it could not pay its debts as they became due as a result of the Transfers;

    (e)    the Debtors were balance sheet insolvent as a result of the Transfers;

(f)    the Debtors each knew that, had they been placed in bankruptcy on the date of the Transfers, each could not pay its creditors in full;

(g)    K Road and its officers and directors, including the K Road Insiders and Harbinger, dominated and controlled the Debtors, comprised the senior management of the Debtors, and were significant beneficiaries of the Transfers in an amount exceeding $150 million;

(h)    the Debtors received no value or consideration in exchange for the Transfers;

(i)    the Transfers were made on the basis of the Projections, which were knowingly false and misleading;

(j)    K Road and the K Road Insiders knowingly manipulated the Projections, obscuring the partial absence of the Hedges, and the impact of the Hedge Imperfections;

(k)    K Road and the K Road Insiders knowingly concealed the market risks and contingent liabilities reflected in the Hedge Imperfections;

(l)    the Transfers were made on the basis of the Projections, which were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders;

(m)    the Transfers were made on the entirely unrealistic assumption that, within a few years of the Transfers, an IPO or other "take out" transaction would cure or lessen the financial risks of the Leveraged Recap Transaction and lessen the risks of liability;

(n)    K Road and the K Road Insiders purposely failed to disclose the impact of the Hedges because they feared disclosure would show significant risks, would be inconsistent with Projections, and would jeopardize the closing of the Leveraged Recap Transaction;

(o)    K Road and the K Road Insiders deliberately concealed the existence and influence of their joint-venturer Harbinger;

(p)    K Road and the K Road Insiders knowingly made false and misleading statements that the Hedges would result in an assured net energy margin, would result in a contracted energy margin, and would immunize the Debtors from market risks;

(q)    K Road and the K Road Insiders maintained a separate financial model that was intentionally concealed from creditors, advisors and the Rating Agencies because it contained "confidential information, including details on the hedge program";

     (r)    the Projections were based on an alleged future shortage of generating capacity, which was contradicted by contemporaneous industry reports known to K Road and the K Road Insiders;

     (s)    Harbinger and K Road immediately distributed the proceeds of the Leveraged Recap Transaction through shell LLCs, which they thereafter dissolved; and

     (t)    the Debtors failed to meet the Projections immediately after the Leveraged Recap Transaction up until the filing of the Chapter 11 Cases.

These badges of fraud are collectively defined as the "**Badges of Fraud**."

154.    As a direct and proximate result of the foregoing, each of the Transfers set forth in Exhibit A attached hereto and made a part hereof is an actual fraudulent conveyance and may be recovered by the Liquidating Trustee. The Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the Transfers as actually fraudulent transfers, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees pursuant to Debt. & Cred. Law § 276-a and costs.

### COUNT TWO: Recovery Of The Value Of The Lien Transfers Under Debt. & Cred. Law §§ 276, 278

155.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 154 above as if fully set forth at length herein.

156.    This Count is asserted on behalf of all creditors of EBG within the definition of "creditor" as that term is used in Section 270 of the Debt. & Cred. Law whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior purchasers. It is also asserted on behalf of all creditors of BostonGen within the same definition of "creditor" whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior purchasers on the basis that (a) EBG

58

was a mere conduit for the Transfers described below and was required to distribute the funds to the Transferee Defendants and other Class Members as described above, (b) the Transferee Defendants and other Class Members derived title from EBG within the meaning of Debt. & Cred. Law § 278(1), (c) BostonGen distributed the funds directly to the Transferee Defendants on behalf of EBG, or (d) the Debtors should be substantively consolidated pursuant to applicable principles of bankruptcy law and as reflected in the provisions in the Plan. Each of these creditors is an unsecured creditor within the meaning of Sections 502(e) and 506(a) of the Bankruptcy Code. Upon information and belief, the assigned claims described herein exceed $800 million.

157.    There are both then-existing and future creditors as to whom the Lien Transfers were actually fraudulent.

158.    Each of the Dividends, the Unit Redemptions, and the Warrant Redemptions made to or for the benefit of the Transferee Defendants and other Class Members identified on Exhibit A was made, utilizing the Secured Credit Facilities earmarked for the Leveraged Recap Transaction, by EBG as described above, with actual intent to hinder, delay, or defraud present and future creditors. Such intent can be inferred from the traditional badges of fraud surrounding the Leveraged Recap Transaction and the Transfers.

159.    Each of the Lien Transfers involved the Badges of Fraud.

160.    The Lien Transfers are avoidable pursuant to Debt. & Cred. Law §§ 276.

161.    The Lien Transfers are recoverable from the Transferee Defendants, individually and as Class Representatives, and the other Class Members, for whose benefit the avoidable Lien Transfers were made pursuant to Debt. & Cred. Law §§ 278, plus pre-judgment interest thereon at the applicable rate and post-judgment interest.

59

162.    The Liquidating Trustee is entitled to recover reasonable attorneys' fees pursuant to Debt. & Cred. Law § 276-a and costs.

**COUNT THREE: Avoidance Of The Dividends, The Unit Redemptions And The Warrant Redemptions As Constructive Fraudulent Transfers Under Debt. & Cred. Law §§ 273-275, 278**

163.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 162 above as if fully set forth at length herein.

164.    This Count is asserted on behalf of all creditors of EBG within the definition of "creditor" as that term is used in Section 270 of the Debt. & Cred. Law whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise. This Count is also asserted on behalf of all creditors of BostonGen within the same definition of "creditor" whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise, on the basis that (a) EBG was a mere conduit for the Transfers and was required to distribute the funds to the Transferee Defendants and other Class Members as described above, (b) the Transferee Defendants and other Class Members derived title from EBG within the meaning of Debt. & Cred. Law § 278(1), (c) BostonGen distributed the funds directly to the Transferee Defendants, or (d) The Debtors should be substantively consolidated pursuant to applicable principles of bankruptcy law and as reflected in the provisions in the Plan. Each of these creditors is an unsecured creditor within the meaning of Sections 502(e) and 506(a) of the Bankruptcy Code. Upon information and belief, the assigned claims described herein exceed $800 million.

165.    On or about December 26, 2006 and December 28, 2006, K Road directed the
Debtors to transfer money or property to or for the benefit of each of the Transferee Defendants
and other Class Members. Such Transfers purported to be in payment of a dividend on the equity
membership interest of relevant Transferee Defendants as described above and defined above as
the Dividends in the amount of ████████████, to redeem warrants of relevant Transferee
Defendants as described above and defined above as the Warrant Redemptions in the amount of
████████████ and to redeem the equity membership interests of relevant Transferee
Defendants as described above and defined above as the Unit Redemptions in the amount of
████████████ The total of the Transfers was $1,010,373,358.37.

166.    The Transfers were the final step in a scheme developed by K Road, the K Road
Insiders, the Nominating Committee, and Harbinger. Harbinger owned significant debt and
equity interests in several K Road entities, and stood to gain directly and indirectly from the
fraudulent scheme.   The Nominating Committee owned the majority of the EBG units.   At
Harbinger and the Nominating Committee's urging, K Road embarked on a planned strategy to
extract equity from the Debtors, ultimately culminating in the Leveraged Recap Transaction that
is the basis of this lawsuit. The Nominating Committee consented to K Road's plan, and each
member reaped the benefits of the Leveraged Recap Transaction through immediate or
subsequent transfers. The Leveraged Recap Transaction, however, was based on a fraudulent
scheme to raise money from lenders based on the strength of the falsified Projections, other
misrepresentations to lenders, and fraudulent concealment of the relationship between Harbinger
and K Road. The Transfers were the end-goal of K Road's fraudulent scheme, but K Road's
fraud continued throughout the several steps required to complete the Transfers.

167.    At the time of the Transfers, the Debtors were worth less than a billion dollars. Despite this, K Road, at the direction of Harbinger and with the consent of the Nominating Committee, caused Debtors to borrow nearly $2 billion. K Road immediately transferred over $1 billion to themselves and the other Transferee Defendants. Consequently, the Debtors were insolvent or would be rendered insolvent due to the Defendants' fraudulent scheme, and each of the Transfers pursuant to that scheme was therefore fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

168.    Each of the Transfers was for less than reasonably equivalent value at a time when the Debtors were insolvent, or would be made insolvent thereby. The Transfers furnished no value to EBG or BostonGen. No recipient of the Transfers conveyed fairly equivalent property or discharged an equivalent antecedent debt based on the Transfers. Consequently, the sum of the Debtors' liabilities was greater than the value of their assets. The Transfers were not made in good faith, but rather pursuant to the calculated fraudulent scheme.

169.    At the time of the Transfers, the Debtors were engaged or were about to engage in business or transactions for which their remaining property was an unreasonably small capital, and each of the Transfers was therefore fraudulent as to then-existing creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

170.    At the time of the Transfers, the Debtors intended or believed they would incur debts beyond their ability to pay as they matured, and each of the Transfers was therefore fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

171.    There are both then-existing and future creditors as to whom the Transfers were constructively fraudulent.

172.    As a direct and proximate result of the foregoing, each of the Transfers set forth in Exhibit A attached hereto and made a part hereof is a constructively fraudulent conveyance and may be recovered by the Liquidating Trustee. The Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the Transfers as constructively fraudulent transfers, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees and costs.

### COUNT FOUR: Recovery Of The Value Of The Lien Transfers Under Debt. & Cred. Law §§ 273-275, 278

173.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 172 above as if fully set forth at length herein.

174.    This Count is asserted on behalf of all creditors of EBG within the definition of "creditor" as that term is used in Section 270 of the Debt. & Cred. Law whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successor, by operation of law, or otherwise. It is also asserted on behalf of all creditors of BostonGen within the same definition of "creditor" whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successor, by operation of law, or otherwise, on the basis that (a) EBG was a mere conduit for the Transfers described below and was required to distribute the funds to the Transferee Defendants and other Class Members as described above, (b) the Transferee Defendants and other Class Members

derived title from EBG within the meaning of Debt. & Cred. Law § 278(1), (c) BostonGen distributed the funds directly to the Transferee Defendants on behalf of EBG, or (d) the Debtors should be substantively consolidated pursuant to applicable principles of bankruptcy law and as reflected in the provisions in the Plan. Each of these creditors is an unsecured creditor within the meaning of Sections 502(e) and 506(a) of the Bankruptcy Code. Upon information and belief, the assigned claims described herein exceed $800 million.

175.   On December 21, 2006, BostonGen entered into First Lien Credit Facility and Second Lien Credit Facility (together the "**Secured Credit Facilities**") with Credit Suisse AG, Cayman Islands Branch and Goldman Sachs Credit Partners L.P., constituting the First Lien Debt and the Second Lien Debt. Pursuant to the Secured Credit Facilities, BostonGen and the Guarantors under the Secured Credit Facilities granted liens on substantially all of their assets (the "Lien Transfers").

176.   Subsequently, the proceeds of the Secured Credit Facilities were disbursed to EBG, used to refinance debt, and to pay fees incurred in connection with the closing of the Credit Facilities.

177.   The Credit Facilities expressly contemplated the Leveraged Recap Transaction and required, among other things, that the proceeds of the Secured Credit Facilities be transferred by BostonGen to EBG and used to make the payments to Transferee Defendants as described in this Complaint. EBG was simply a conduit of these funds and did not have discretion to use them for its own purposes.

178.   On or about December 26, 2006 and December 28, 2006, the Debtors transferred money or property to each of the Transferee Defendants and in such amounts as are set forth on Exhibit A, which is expressly made part of this Complaint. Such Transfers purported to be in

payment of a dividend on the equity membership interest of each such Transferee Defendant as described above and defined above as the Dividends in the amount of ████████, ██ to redeem warrants of each such Transferee Defendant as described above and defined above as the Warrant Redemptions in the amount of █████████, and to redeem the units of each such Transferee Defendant as described above and defined above as the Unit Redemptions in the amount of █████████ The total of the Transfers was $1,010,373,358.37.

179.  The Lien Transfers were not for a fair consideration and furnished no value to EBG or BostonGen. The Lien Transfers were not made in good faith.

180.  At the time of the Lien Transfers, each of the Debtors and the Guarantors was insolvent or would be rendered insolvent thereby, and each of the Lien Transfers was therefore fraudulent as to then-existing and future creditors.

181.  At the time of the Lien Transfers, each of the Debtors and the Guarantors was engaged or about to engage in a business or transaction for which its remaining property was an unreasonably small capital, and each of the Lien Transfers was therefore fraudulent as to then-existing creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

182.  At the time of the Lien Transfers, the Debtors intended or believed they would incur debts beyond their ability to pay as they matured, and the Lien Transfers were therefore fraudulent as to then-existing and future creditors.

183.  There are both then-existing and future creditors as to whom the Lien Transfers were fraudulent.

184.    The Debtors understood that the funds received from the Secured Credit Facilities were to be disbursed to the Transferee Defendants, for whose benefit the Secured Credit Facilities were created.

185.    The Lien Transfers are avoidable pursuant to Debt. & Cred. Law §§ 273-275.

186.    The value of the Lien Transfers is recoverable from the Transferee Defendants, individually and as Class Representatives, and the other Class Members, for whose benefit the Secured Credit Facility transfers were made pursuant to Debt. & Cred. Law §§ 278, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT FIVE: Unjust Enrichment

187.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 186 above as if fully set forth at length herein.

188.    This Count is asserted on behalf of all creditors of EBG within the definition of "creditor" as that term is used in Section 270 of the Debt. & Cred. Law whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successor, by operation of law, or otherwise. It is also asserted on behalf of all creditors of BostonGen within the same definition of "creditor" whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successor, by operation of law, or otherwise, on the basis that (a) EBG was a mere conduit for the Transfers described below and was required to distribute the funds to the Transferee Defendants and other Class Members as described above, (b) the Transferee Defendants and other Class Members

derived title from EBG within the meaning of Debt. & Cred. Law § 278(1), (c) BostonGen

distributed the funds directly to the Transferee Defendants on behalf of EBG, or (d) the Debtors

should be substantively consolidated pursuant to applicable principles of bankruptcy law and as

reflected in the provisions in the Plan. Each of these creditors is an unsecured creditor within the

meaning of Sections 502(e) and 506(a) of the Bankruptcy Code. Upon information and belief,

the assigned claims described herein exceed $800 million.

189.   Each of the Transferee Defendants and other Class Members was unjustly

enriched because each received the Transfers set forth in Exhibit A attached hereto and made a

part hereof in exchange for no consideration or value.

190.   K Road and the K Road Insiders were unjustly enriched because they received a

total of approximately ███████████ in the approximately one year after making their initial

investment, thereby transferring their equity risk to creditors. As set forth above, K Road and the

K Road Insiders engaged in self-dealing, prepared and disseminated the false Projections, made

material misrepresentations and omissions, had actual conflicts of interests and took undue

advantage of the Debtors by planning, soliciting funds for, approving and executing the

Leveraged Recap Transaction, and requiring EBG to make the Transfers for no value to EBG,

BostonGen or their creditors.

191.   The unjust enrichment was at the expense of creditors of the Debtors because it

removed assets from the Debtors that should have been available to pay their debts and for which

the Transferee Defendants and other Class Members gave no value or consideration. The unjust

enrichment also transferred financial risk from holders of equity to creditors by removing value,

causing the Debtors to become overleveraged and, ultimately, caused the Debtors' bankruptcy.

67

192.    Allowing the Transferee Defendants, including Class Members, to retain the funds would be unjust because it would reward them for engaging in a high-risk transaction that transferred risk from holders of equity to creditors, and created market and financial risks that ultimately have been borne by creditors instead of appropriately borne by holders of equity. In fact, as the Debtors were forced to acknowledge after K Road and the K Road Insiders divested themselves of their interests in the Debtors, the Leveraged Recap Transaction "relied on certain assumptions in key revenue categories that have not materialized," and "[a]ctual and projected performance have deteriorated significantly since [EBG] was recapitalized in December 2006." The Transferee Defendants and other Class Members were unjustly enriched by imposing equity level risks on creditors without accurate disclosure or compensation, and retaining the upside for themselves.

193.    The transfer of risk was reflected in results immediately after the Leveraged Recap Transaction, as is shown above, and the failure by a significant amount to meet the Projections in the very first calendar quarter after the Leveraged Recap Transaction. It was also reflected in the facts that the amount of the projected reduction of debt, which never occurred, was virtually identical to the overestimate of future EBITDA, and that the amount of debt that the Debtors proposed to be converted to equity in 2009 was greater than the total of the Second Lien Debt and the Mezzanine Debt.

194.    There is no adequate remedy at law, as many limited liability company defendants were purportedly cancelled soon after the Leveraged Recap Transaction without reserving assets to pay claims of creditors.

195.    The Debtors were under the domination and control of K Road and were unable to assert their own legal rights.

196.   As a direct and proximate result of the foregoing, this Court should find that the Transferee Defendants, individually and as Class Representatives, and other Class Members have been unjustly enriched, and that the creditors of the Debtors whose claims and causes of action have been assigned to the Liquidating Trust as described in Paragraph 4, have been damaged in an amount to be determined at trial. Equity and good conscience demand the return of these Transfers to the Liquidating Trust, or an award of damages equivalent to the amount by which K Road, the K Road Insiders, and the Transferee Defendants, individually and as Class Representatives, and other Class Members, were unjustly enriched, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT SIX: Constructive Trust

197.   The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 196 above as if fully set forth at length herein.

198.   This Count is asserted on behalf of the Debtors' creditors whose claims and causes of action have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior purchasers.

199.   K Road and the K Road Insiders had a confidential and fiduciary relationship to the Debtors and to any then-existing or future creditors, both before and because of the Leveraged Recap Transaction. The Nominating Committee was privy to confidential information upon which it based its fraudulent scheme. In preparing and disseminating the Projections, K Road and the K Road Insiders made misstatements of fact and omitted to state material facts. The misrepresentations were contained in the Projections prepared by K Road and senior officers of K Road, including the K Road Insiders, which were disseminated to prospective lenders,

Navigant, Duff & Phelps, and the Rating Agencies, and which incorporated the documents

provided to the Board of Directors. Such misstatements and omissions are set forth above and

further include, without limitation:

<ol type="a">
<li>The price of power and cost of fuel were almost completely hedged, such that there was a specified energy margin. This was false because the description of the Hedges and the net revenues they would generate was incomplete (including as a result of the swaption).</li>

<li>Going forward, operating expenses would be reduced from approximately $138.1 million per year to $101 million per year. This was false because it was contradicted by past experience, K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.</li>

<li>Because of (a) and (b), the projected future reductions in debt were not correct.</li>

<li>Going forward, capital expenditures would be $5 million per year. This was false because it was contradicted by past experience. K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.</li>

<li>K Road and the K Road Insiders omitted to state that they had material conflicts of interest in preparing the Projections because they would receive more than $150 million from the Leveraged Recap Transaction.</li>

<li>K Road and the K Road Insiders failed to disclose that K Road's private equity investors had a significant financial interest in the Leveraged Recap Transaction and would receive a significant portion of the proceeds.</li>

<li>K Road and the K Road Insiders omitted to state that upon the closing of the Leveraged Recap Transaction, the Debtors would (i) be insolvent in that their assets exceeded their debts at fair valuation, (ii) have unreasonably small capital for continuing businesses and operations, and (iii) be unable to pay debts existing as a result of the Leveraged Recap Transaction and future operating debts as they became due.</li>

<li>K Road and the K Road Insiders omitted to state that the Projections were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders, and that the lenders were not reviewing internal projections because such projections would reveal information about the Hedges that was highly confidential;</li>

<li>K Road and the K Road Insiders failed to disclose that Duff & Phelps, Navigant, Black & Veatch, and the Rating Agencies were relying on the</li>
</ol>

false and misleading projections, and had not done any independent verification.

(j)     K Road and the K Road Insiders failed to disclose that information about the Hedges and Hedge Imperfections was withheld from various persons as described herein.

(k)     The control role of Harbinger was not disclosed.

200.    K Road and the K Road Insiders knew that each of the above misstatements and omissions was false from the information and knowledge obtained as the Manager of the Debtors' businesses as described above, the management, organization, and supervision of the Leveraged Recap Transaction and dealings with the professionals and advisors to the Debtors in connection with the Leveraged Recap Transaction, negotiations of the actual Hedge documents, and control over the relevant facts and information.

201.    K Road's and the K Road Insiders' misstatements and material omissions that supported the Leveraged Recap Transaction and the Transfers involved the Badges of Fraud.

202.    The representations of K Road and the K Road Insiders constituted a promise that the Projections were reasonable and that K Road and the K Road Insiders believed they were achievable, upon which the creditors relied in extending credit or otherwise becoming creditors of the Debtors. The Leveraged Recap Transaction would not have occurred without such extensions of credit.

203.    However, such representations included misrepresentations and material omissions. Indeed, the Projections were neither reasonable nor achievable, and K Road and the K Road Insiders knew that was so.

204.    K Road and the K Road Insiders knew that creditors and the marketplace generally would rely on the above misrepresentations and omissions in extending credit to The Debtors, and intended to obtain the benefits of such reliance.

71

205.    Creditors, including the creditors described in Paragraph 4, were damaged by such reliance in extending credit to The Debtors and purchasing the debt securities of The Debtors. Such extensions of credit and securities ultimately proved to be worthless.

206.    Each of the Transferee Defendants and other Class Members was unjustly enriched because each received the Transfers set forth in Exhibit A attached hereto and made a part hereof in exchange for no consideration or value.

207.    K Road and the K Road Insiders were unjustly enriched because they received a total of approximately ███████████ in the approximately one year after making their initial investment, thereby transferring their equity risk to creditors. As set forth above, K Road and the K Road Insiders engaged in self-dealing, prepared and disseminated the Projections, which were false, made material misrepresentations and omissions, had actual conflicts of interest and took undue advantage of the Debtors by planning, soliciting funds for, approving and executing the Leveraged Recap Transaction and requiring EBG to make the $1 Billion Redemption for no value to EBG, BostonGen or their creditors.

208.    The unjust enrichment was at the expense of the creditors because it removed assets from the Debtors that should have been available to pay their debts and for which the Transferee Defendants and other Class Members gave no value or consideration. The unjust enrichment also transferred financial risk from holders of equity to creditors by removing value, causing the Debtors to become overleveraged and, ultimately, caused the Debtors' bankruptcy.

209.    The retention of the funds paid to the Transferee Defendants, including Class Members, would be unjust because it would reward them for engaging in a high-risk transaction that transferred risk from holders of equity to creditors, and created market and financial risks

that ultimately have been borne by creditors whereas they should have been borne by holders of equity.

210.     There is no adequate remedy at law. Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. K Road fraudulently transferred millions of dollars from insolvent Debtors to several limited liability company defendants in an outright abuse of Delaware's Limited Liability Act. Soon after the Leveraged Recap Transaction, and throughout the years since, Defendants purported to cancel several limited liability company defendants, without reserving assets to pay claims of creditors or obligations as they came due. Defendants manufactured a situation calculated to frustrate the recovery they knew that the Liquidating Trustee would seek.

211.     As a direct and proximate result of the foregoing, this Court should find that the Transferee Defendants, individually and as Class Representatives, and other Class Members have been unjustly enriched, impose a constructive trust over the amounts received by the Transferee Defendants, individually and as Class Representatives, and other Class Members in connection with the Transfers, for the benefit of the creditors whose claims and causes of action have been assigned to the Liquidating Trust as described in Paragraph 4, plus award pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

B.      **Claims Against K Road And The K Road Insiders**

**COUNT SEVEN: Fraud**

212.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 211 above as if fully set forth at length herein.

213.    This Count is asserted on behalf of the Debtors' creditors including the creditors that owned the debt of the Debtors as of the Petition Date, which rights included their own rights and those that had been assigned to them by prior purchasers. All such creditors assigned their claims to Liquidating Trustee as described in Paragraph 4.

214.    K Road and the K Road Insiders conceived of and carried out the fraudulent scheme from K Road's offices in New York. The tortious conduct giving rise to this fraud claim took place, in significant part, in New York.

215.    In preparing and disseminating the Projections, K Road and the K Road Insiders made material misstatements of fact and omitted to state material facts. The misrepresentations were contained in the Projections prepared by K Road and senior officers of K Road, including the K Road Insiders, which were disseminated to prospective lenders, Navigant, Duff & Phelps, and the Rating Agencies and which incorporated the documents provided to the Board of Directors, the CIM and other documents discussed herein. Such misstatements and omissions are set forth above and further include, without limitation:

      (a)    The price of power and cost of fuel were reported to be almost completely hedged, such that there was a specified energy margin. This was false because the representations regarding the Hedges were incomplete.

      (b)    Going forward, operating expenses were reported to be reduced from approximately $138.1 million per year to $101 million per year. This was false because it was contradicted by past experience, K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.

(c)     Because of (a) and (b), the projected future reductions in debt were not correct.

(d)     Going forward, capital expenditures were reported to be $5 million per year. This was false because it was contradicted by past experience. K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.

(e)     K Road and the K Road Insiders omitted to state that they had material conflicts of interest in preparing the Projections because they would receive more than $150 million from the Leveraged Recap Transaction.

(f)     K Road and the K Road Insiders failed to disclose that K Road's private equity investors had a significant financial interest in the Leveraged Recap Transaction and would receive a significant portion of the proceeds.

(g)     K Road and the K Road Insiders omitted to state that upon the closing of the Leveraged Recap Transaction, the Debtors would (i) be insolvent in that their assets exceeded their debts at fair valuation, (ii) have unreasonably small capital for continuing businesses and operations, and (iii) be unable to pay debts existing as a result of the Leveraged Recap Transaction and future operating debts as they became due.

(h)     K Road and the K Road Insiders omitted to state that the Projections were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders, and that the lenders were not reviewing internal projections because such projections would reveal information about the Hedges that was highly confidential;

(i)     K Road and the K Road Insiders failed to disclose that Duff & Phelps, Navigant, Black & Veatch, and the Rating Agencies were relying on the false and misleading projections, and had not done any independent verification.

(j)     K Road and the K Road Insiders failed to disclose that information about the Hedges and Hedge Imperfections was withheld from various persons as described herein.

(k)     The control role of Harbinger was not disclosed.

216.    K Road and the K Road Insiders knew that each of the above misstatements and omissions was false from the information and knowledge obtained as the manager of the Debtors' businesses, the management, organization, and supervision of the Leveraged Recap Transaction and dealings with the professionals and advisors to the Debtors in connection with

the Leveraged Recap Transaction, negotiations of the actual Hedge documents, and control over the relevant facts and information.

217.   K Road and the K Road Insiders intended to defraud then-existing and future creditors, and any individuals or entities that relied on their falsified Projections. K Road's and the K Road Insiders' misstatements and material omissions that supported the Leveraged Recap Transaction and the Transfers involved the Badges of Fraud.

218.   K Road and the K Road Insiders knew that creditors and the marketplace generally would rely on the above misrepresentations and omissions in extending credit to the Debtors, and intended to obtain the benefits of such reliance.

219.   Creditors, including the creditors described in Paragraph 4 above, relied on the misrepresentations and omissions, and were damaged by such reliance in extending credit to the Debtors and purchasing the debt securities of the Debtors. Such extensions of credit and securities ultimately proved to be worthless.

220.   As a direct and proximate result of the foregoing, the Liquidating Trustee is entitled to judgment in his favor and against K Road and the K Road Insiders in an amount to be determined at trial but believed to be in excess of $1 billion, plus pre-judgment interest thereon at the applicable legal rate, post-judgment interest, and reasonable attorneys' fees and costs.

### COUNT EIGHT: Fraudulent Inducement

221.   The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 220 above as if fully set forth at length herein.

222.   This Count is asserted on behalf of the Debtors' creditors, including the creditors that owned the debt of the Debtors as of the Petition Date, which rights included their own rights

and those that had been assigned to them by prior purchasers. All such creditors assigned their

claims to Liquidating Trustee as described in Paragraph 4.

223.    K Road and the K Road Insiders conceived of and carried out the fraudulent

scheme from K Road's offices in New York. The tortious conduct giving rise to the fraudulent

inducement claim took place, in significant part, in New York.

224.    In preparing and disseminating the Projections, K Road and the K Road Insiders

made misstatements of fact and omitted to state material facts. The misrepresentations were

contained in the Projections prepared by K Road and senior officers of K Road, including the K

Road Insiders, which were disseminated to prospective lenders, the Rating Agencies, Navigant,

and Duff & Phelps, and which incorporated the documents provided to the Board of Directors.

Such misstatements and omissions are set above and further include, without limitation:

> (a)    The price of power and cost of fuel were almost completely hedged, such that there was a specified energy margin. This was false because the representations regarding the Hedges were incomplete.
>
> (b)    Going forward, operating expenses would be reduced from approximately $138.1 million per year to $101 million per year. This was false because it was contradicted by past experience and contemporaneous internal documents, K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.
>
> (c)    Because of (a) and (b), the projected future reductions in debt were not correct.
>
> (d)    Going forward, capital expenditures would be $5 million per year. This was false because it was contradicted by past experience and contemporaneous internal documents. K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.
>
> (e)    K Road and the K Road Insiders omitted to state that they had material conflicts of interest in preparing the Projections because they would receive more than $150 million from the Leveraged Recap Transaction.

77

(f)     K Road and the K Road Insiders failed to disclose that Harbinger had a significant financial interest in the Leveraged Recap Transaction and would receive a significant portion of the proceeds.

(g)     K Road and the K Road Insiders omitted to state that upon the closing of the Leveraged Recap Transaction, the Debtors would (i) be insolvent in that their assets exceeded their debts at fair valuation, (ii) have unreasonably small capital for continuing businesses and operations, and (iii) be unable to pay debts existing as a result of the Leveraged Recap Transaction and future operating debts as they became due.

(h)     K Road and the K Road Insiders omitted to state that the Projections were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders, and that the lenders were not reviewing internal projections because such projections would reveal confidential information;

(i)     K Road and the K Road Insiders failed to disclose that Duff & Phelps, Navigant, Black & Veatch, and the Rating Agencies were relying on the false and misleading projections, and had not done any independent verification.

(j)     K Road and the K Road Insiders failed to disclose that information about the Hedges was withheld from various persons as described herein.

(k)     The control role of Harbinger was not disclosed.

225.   K Road and the K Road Insiders knew that each of the above misstatements and omissions was false from the information and knowledge obtained as the manager of the Debtors' businesses as described above, the management, organization, and supervision of the Leveraged Recap Transaction and dealings with the professionals and advisors to the Debtors in connection with the Leveraged Recap Transaction, negotiations of the actual Hedge documents, and control over the relevant facts and information.

226.   K Road's and the K Road Insiders' misstatements and material omissions that supported the Leveraged Recap Transaction and the Transfers involved the Badges of Fraud.

227.   K Road and the K Road Insiders made the misrepresentations and material omissions to induce creditors to rely thereon and to extend credit or otherwise become creditors

of the Debtors. Such extensions of credit were critical to implementing the Leveraged Recap Transaction scheme.

228.    Creditors, including the creditors described in Paragraph 4, relied on, and were justified in relying on such representations based on the nature of the representations, the participation and support of K Road and the K Road Insiders, and those Defendants' access to persons with knowledge and relevant information.

229.    K Road and the K Road Insiders knew that creditors and the marketplace would rely on the above misrepresentations and omissions in extending credit to the Debtors, and intended to obtain the benefits of such reliance.

230.    Creditors, including the creditors described in Paragraph 4, were damaged by such reliance in extending credit to the Debtors and purchasing the debt securities of the Debtors. Such securities ultimately proved to be worthless.

231.    As a direct and proximate result of the foregoing, the Liquidating Trustee is entitled to judgment in his favor and against K Road and the K Road Insiders in an amount to be determined at trial but believed to be in excess of $1 billion, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT NINE: Equitable Fraud

232.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 231 above as if fully set forth at length herein.

233.    The Count is asserted on behalf of the creditors of the Debtors, including the creditors that owned the debt of the Debtors as of the Petition Date, which rights included their own rights and those that had been assigned to them by prior purchasers. All such creditors assigned their claims to the Liquidating Trustee as described in Paragraph 4.

234.   K Road and the K Road Insiders conceived of and carried out the fraudulent scheme from K Road's offices in New York. The tortious conduct giving rise to the equitable fraud claim took place, in significant part, in New York.

235.   In preparing and disseminating the Projections, K Road and the K Road Insiders made misstatements of fact and omitted to state material facts. The misrepresentations were contained in the Projections prepared by K Road and senior officers of K Road, including the K Road Insiders, which were disseminated to prospective lenders, Navigant, Duff & Phelps, and the Rating Agencies and which incorporated in the documents provided to the Board of Directors. Such misstatements and omissions are set forth above and further include, without limitation:

(a)   The price of power and cost of fuel were almost completely hedged, such that there was a specified energy margin. This was false because the representations regarding the Hedges were incomplete.

(b)   Going forward, operating expenses would be reduced from approximately $138.1 million per year to $101 million per year. This was false because it was contradicted by past experience, K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.

(c)   Because of (a) and (b), the projected future reductions in debt were not correct.

(d)   Going forward, capital expenditures would be $5 million per year. This was false because it was contradicted by past experience. K Road and the K Road Insiders had no basis for such statements, and K Road and the K Road Insiders failed to state that they had no basis.

(e)   K Road and the K Road Insiders omitted to state that they had material conflicts of interest in preparing the Projections because they would receive more than $150 million from the Leveraged Recap Transaction.

(f)   K Road and the K Road Insiders failed to disclose that Harbinger had a significant financial interest in the Leveraged Recap Transaction and would receive a significant portion of the proceeds.

    (g)     K Road and the K Road Insiders omitted to state that upon the closing of the Leveraged Recap Transaction, the Debtors would (i) be insolvent in that their assets exceeded their debts at fair valuation, (ii) have unreasonably small capital for continuing businesses and operations, and (iii) be unable to pay debts existing as a result of the Leveraged Recap Transaction and future operating debts as they became due.

    (h)     K Road and the K Road Insiders omitted to state that the Projections were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders, and that the lenders were not reviewing internal projections because such projections would reveal information about the Hedges that was highly confidential.

    (i)     K Road and the K Road Insiders failed to disclose that Duff & Phelps, Navigant, Black & Veatch, and the Rating Agencies were relying on the false and misleading projections, and had not done any independent verification.

    (j)     K Road and the K Road Insiders failed to disclose that information about the Hedges and Hedge Imperfections was withheld from various persons as described herein.

    (k)     The control role of Harbinger was not disclosed.

236.    K Road and the K Road Insiders knew that each of the above misstatements and omissions was false from the information and knowledge obtained as the Manager of the Debtors' businesses as described above, the management, organization, and supervision of the Leveraged Recap Transaction and dealings with the professionals and advisors to the Debtors in connection with the Leveraged Recap Transaction, negotiations of the actual Hedge documents, and control over the relevant facts and information.

237.    K Road's and the K Road Insiders' misstatements and material omissions which supported the Leveraged Recap Transaction and the Transfers involved the Badges of Fraud.

238.    K Road and the K Road Insiders made the misrepresentations and material omissions to induce creditors to rely thereon and to extend credit or otherwise become creditors of the Debtors. The Leveraged Recap Transaction would not have occurred without such extensions of credit.

239.   Creditors, including the creditors described in Paragraph 4, relied on, and were justified in relying on, such representations based on the nature of the representations, the participation and support of K Road and the K Road Insiders, and those Defendants' access to persons with knowledge and relevant information.

240.   K Road and the K Road Insiders knew that creditors and the marketplace generally would rely on the above misrepresentations and omissions in extending credit to the Debtors, and intended to obtain the benefits of such reliance.

241.   Creditors, including the creditors described in Paragraph 4, were damaged by such reliance in extending credit to the Debtors and purchasing the debt securities of the Debtors. Such securities ultimately proved to be worthless.

242.   There is no adequate remedy at law. Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. K Road fraudulently transferred millions of dollars from insolvent Debtors to several limited liability company defendants in an outright abuse of Delaware's Limited Liability Act. Soon after the Leveraged Recap Transaction, and throughout the years since, Defendants purported to cancel several limited liability company defendants, without reserving assets to pay claims of creditors or obligations as they came due. Defendants manufactured a situation calculated to frustrate the recovery they knew that the Liquidating Trustee would seek.

243.   As a direct and proximate result of the foregoing, the Liquidating Trustee is entitled to judgment in his favor and against K Road and the K Road Insiders in an amount to be

determined at trial but believed to be in excess of $1 billion, plus pre-judgment interest thereon

at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

       **COUNT TEN: Alter Ego**

       244.    The Liquidating Trustee repeats and incorporates by reference each and every

allegation contained in Paragraphs 1 through 243 above as if fully set forth at length herein.

       245.    This Count is asserted on behalf of the creditors of the Debtors, including those

creditors that owned the debt of the Debtors as of the Petition Date, which rights included their

own rights and those that had been assigned to them by prior purchasers, all such creditors

having assigned their claims to the Liquidating Trustee as described in Paragraph 4.

       246.    At all times relevant hereto, K Road and the K Road Insiders dominated and

controlled all aspects of the Debtors' businesses, causing the Debtors to have no separate

existence and to act as merely an instrumentality for K Road. K Road also held itself out as being

indistinguishable from the Debtors, operating the Debtors as a single economic entity alongside

K Road.

       247.    K Road and the K Road Insiders used their domination and control to cause the

Debtors to incur extensive additional indebtedness of more than $1 billion and to make the

Transfers in connection with the Leveraged Recap Transaction as set forth in this Complaint. K

Road and the K Road Insiders conceived of and carried out the fraudulent scheme from K Road's

offices in New York. The tortious conduct giving rise to the fraudulent inducement claim took

place, in significant part, in New York.

       248.    K Road and the K Road Insiders caused the Debtors to incur the additional

indebtedness and to make the Dividends, the Warrant Redemptions, and the Unit Redemptions

for the benefit of K Road and the K Road Insiders and to the detriment of the Debtors and their

creditors. K Road and the K Road Insiders dominated and controlled all aspects of the Leveraged

Recap Transaction, and all communications, agreements, documentation, negotiations,

solicitation of credit, distributions and other aspects of the Leveraged Recap Transaction.

249.    The control and domination is illustrated by numerous facts including, without

limitation:

<ol type="a">
<li>K Road totally controlled and operated all of the Debtors' businesses pursuant to the express terms of the Management Agreements and actually exercised the powers and authority granted in those agreements;</li>

<li>virtually all of the senior officers of the Debtors were officers or employees of K Road, including without limitation, the K Road Insiders;</li>

<li>Ehrenzeller, the Senior Vice President and CFO of both K Road and EBG, prepared the Projections that served as a basis for the Leveraged Recap Transaction, and K Road knew the financial results set forth in the Projections had never been obtained and could not be obtained;</li>

<li>officers and employees of K Road, including the K Road Insiders, were identified as officers and employees of the Debtors with no independent oversight or review from officers or employees of the Debtors who had no connection of affiliation with K Road, or with oversight and review that were illusory because K Road itself had direct or indirect responsibility for oversight;</li>

<li>K Road had the power to designate two directors and controlled and dominated the Board of Directors;</li>

<li>K Road and the K Road Insiders controlled and directed the process of obtaining director approval of the Leveraged Recap Transaction, provided the Board of Directors with the Projections prepared by K Road and the K Road Insiders, and controlled the information submitted to and reviewed by the Board of Directors;</li>

<li>K Road gave its own address to Duff & Phelps as the place for any notice to EBG under its retention agreement;</li>

<li>at numerous times, K Road gave the names of the K Road Insiders as persons who could furnish information or answer questions, and gave its own email address for any such requests;</li>

<li>K Road Insiders executed virtually all the documents for the First Lien Debt, Second Lien Debt and Mezzanine Debt;</li>
</ol>

(j)   officers of K Road, including the K Road Insiders, undertook the fraudulent activities described in this Complaint; and

(k)   officers of K Road planned and executed a plan to conceal the material risks of the Leveraged Recap Transaction and the true nature of the Hedges from advisors, the Rating Agencies, and lenders.

250.   In light of K Road's and the K Road Insiders' pervasive domination and control of the Debtors in connection with the Leveraged Recap Transaction, the theoretically separate corporate status of the Debtors should be disregarded. It would be unfair and unjust to permit K Road to avoid liability for the fraudulent actions it took through Debtors. K Road and the K Road Insiders should be held liable for the debts of the Debtors.

251.   As a direct and proximate result of the foregoing, the Liquidating Trustee is entitled to a judgment in his favor and against K Road and the K Road Insiders, finding that K Road and the K Road Insiders were the alter egos of the Debtors, and that as a result, K Road and the K Road Insiders are liable to the Liquidating Trustee for the debts and obligations of the Debtors, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT ELEVEN: Unlawful Distributions In Violation Of Del. Code § 18-607(A)

252.   The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 251 above as if fully set forth at length herein.

253.   This Count is asserted on behalf of the Liquidating Trustee as the successor-in-interest to the Debtors pursuant to the Bankruptcy Code, the Plan, the Confirmation Order and the LT Agreement.

254.   The K Road Insiders exercised pervasive operational and financial control over the Debtors and used their domination and control to cause Debtors to incur additional debt of more than $1 billion and to make the Transfers in connection with the Leveraged Recap

Transaction. K Road and the K Road Insiders conceived of and carried out the fraudulent scheme from K Road's offices in New York.

255.    On or about December 26, 2006 and December 28, 2006, EBG paid the K Road Insiders such amounts, as set forth in Exhibit A, which is expressly made part of this Complaint. Such payments included a dividend as described above and defined above as the Dividends in the amount of ███████████ K Road and the K Road Insiders directed the payment of the Dividends from their offices in New York.

256.    At the time of the Dividends, the K Road Insiders set forth in Exhibit A were members of EBG.

257.    At the time of the Dividends, the K Road Insiders knew or had reason to know that upon payment of the Dividends and completion of the Leveraged Recap Transaction, the Debtors would be rendered insolvent, would have inadequate capital for future business liabilities and would not be able to pay their existing or future debts. The K Road Insiders knew or had reason to know that the Debtors' liabilities would exceed their assets, and that the Debtors would likely file for bankruptcy. The payment of the Dividends provided no benefit to the Debtors whatsoever and caused substantial damage.

258.    As a direct and proximate result of the foregoing, the Dividends set forth in Exhibit A or as shown by the proof is an illegal distribution to the K Road Insiders in violation of Del. Code § 18-607(a) and may be recovered by the Liquidating Trustee from the K Road Insiders pursuant to Del. Code 18-607(b). The Liquidating Trustee requests a judgment in his favor and against the K Road Insiders for the amount specified in Exhibit A or as shown by the proof, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees and costs.

C.       **Against K Road, The K Road Insiders, Harbinger, And The Nominating Committee**

COUNT TWELVE: **Aiding And Abetting Fraud**

259.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 258 above as if fully set forth at length herein.

260.    This Count is asserted on behalf of the Debtors' creditors, including the creditors that owned the debt of the Debtors as of the Petition Date, which rights included their own rights and those that had been assigned to them by prior purchasers. All such creditors assigned their claims to Liquidating Trustee as described in Paragraph 4.

261.    At Harbinger's direction, and with the Nominating Committee's consent, K Road embarked on the scheme to defraud the Debtors' creditors. K Road falsified the Projections, presented the falsified Projections to the lenders and to the Rating Agencies, and misrepresented the Debtors' overall financial strength. Previous Counts and paragraphs address with particularity the overtly tortious actions taken by K Road. Harbinger guided and participated in these actions from the beginning. The Nominating Committee approved of the scheme throughout its planning and performance. K Road, the K Road Insiders, Harbinger, and the Nominating Committee aided, abetted, induced, and participated in K Road's fraudulent scheme. The tortious conduct giving rise to the aiding and abetting claims took place, in significant part, in New York.

262.    Harbinger and the Nominating Committee knew of the frauds and violations committed by K Road and the K Road Insiders. Harbinger owned significant debt and equity interests in several K Road entities, was an alter ego of K Road, was a control person pursuant to their agreements, and stood to gain directly and indirectly from the fraudulent scheme. At Harbinger's urging, K Road embarked on a planned strategy to extract cash from EBG,

87

ultimately culminating in the Leveraged Recap Transaction that is the basis of this lawsuit. The Nominating Committee consented to K Road's plan, and each member reaped the benefits of the Leveraged Recap Transaction through immediate or subsequent transfers.

263.   Harbinger and the Nominating Committee intentionally participated in the furtherance of the joint scheme to defraud. K Road, the K Road Insiders, Harbinger, and the Nominating Committee understood and knew the purposes of the Leveraged Recap Transaction. Harbinger encouraged K Road to raise billions of dollars for K Road/Harbinger's benefit. The Nominating Committee blessed K Road's conduct and approved of their fraudulent transactions. K Road provided Harbinger and the Nominating Committee with confidential information that was not provided to the public, and actively kept secret Harbinger's involvement in the Leveraged Recap Transaction. Harbinger understood the substantial influence it exerted over K Road, and the Nominating Committee understood that K Road could not act without its assent. Harbinger and the Nominating Committee also knew that the Debtors would not be able to generate enough revenue to repay the Credit Facilities. With that knowledge, Harbinger and the Nominating Committee provided material and substantial assistance in connection with, and knowingly participated in, K Road's tortious misconduct.

264.   As a result, K Road, the K Road Insiders, Harbinger, and the Nominating Committee are each jointly and severally liable to the Liquidating Trustee, regardless of the degree of their participation or culpability in the overall scheme. The conspiracy directly and proximately caused harm to Liquidating Trustee's assignors in an amount to be determined at trial, but no less than $1 billion.

265.   The Liquidating Trustee is also entitled to pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT THIRTEEN: Civil Conspiracy

266.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 265 above as if fully set forth at length herein.

267.    This Count is asserted on behalf of the Debtors' creditors whose claims and causes of action have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior purchasers.

268.    As described above, K Road, under the direction and guidance of Harbinger and with the consent of the Nominating Committee, committed torts in furtherance of their scheme to defraud the Debtors' creditors. K Road, the K Road Insiders, Harbinger, and the Nominating Committee conspired to accomplish the fraudulent scheme. The tortious conduct giving rise to the conspiracy claims took place, in significant part, in New York.

269.    K Road, the K Road Insiders, Harbinger, and the Nominating Committee entered into a corrupt agreement between two or more persons. Pursuant to New York law, a formal agreement to defraud is not necessary for a conspiracy to commit fraud, and disconnected acts, when taken together, may establish a conspiracy. Harbinger owned significant debt and equity interests in several K Road entities, was an alter ego of K Road, was a control person by virtue of their agreements, and stood to gain directly and indirectly from the fraudulent scheme. At Harbinger's urging, K Road embarked on a planned strategy to extract cash from EBG, ultimately culminating in the Leveraged Recap Transaction that is the basis of this lawsuit. The Nominating Committee consented to K Road's plan, and each member reaped the benefits of the Leveraged Recap Transaction through immediate or subsequent transfers. Pursuant to New York law, two or more individuals or entities can conspire with each other; K Road, the K Road

Insiders, Harbinger, and the Nominating Committee did so to their benefit, and to the detriment of the Debtors and their creditors.

270.    K Road, the K Road Insiders, Harbinger, and the Nominating Committee performed overt acts in furtherance of their corrupt agreement. At Harbinger's urging, and with the Nominating Committee's consent, K Road embarked on the scheme to defraud the Debtors' creditors. K Road falsified the Projections, presented the falsified Projections to the lenders and to the Rating Agencies, and misrepresented the Debtors' overall financial strength. Previous Counts and paragraphs address with particularity the overtly tortious actions taken by K Road. Harbinger guided and participated in these actions from the beginning. The Nominating Committee approved of the scheme throughout its planning and performance.

271.    K Road, the K Road Insiders, Harbinger, and the Nominating Committee intentionally participated in the furtherance of their scheme to defraud. K Road, the K Road Insiders, Harbinger, and the Nominating Committee understood and knew the purposes of the Leveraged Recap Transaction. Harbinger encouraged K Road to raise billions of dollars for Harbinger's benefit. The Nominating Committee blessed K Road's conduct and approved of their fraudulent transactions. K Road provided Harbinger and the Nominating Committee with confidential information that was not provided to the public, and actively kept secret Harbinger's involvement in the Leveraged Recap Transaction. Harbinger understood the substantial influence it exerted over K Road, and the Nominating Committee understood that K Road could not act without its assent. Harbinger and the Nominating Committee also knew that the Debtors would not be able to generate enough revenue to repay the Credit Facilities. Harbinger and the Nominating Committee are secondarily liable as co-conspirators because they each furthered the overt fraudulent acts of K Road.

272.   As a result, K Road, the K Road Insiders, Harbinger, and the Nominating Committee are each jointly and severally liable to the Liquidating Trustee, regardless of the degree of their participation or culpability in the overall scheme. The conspiracy directly and proximately caused harm to Liquidating Trustee's assignors in an amount to be determined at trial, but no less than $1 billion.

273.   The Liquidating Trustee is also entitled to pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### COUNT FOURTEEN: Concert Of Action

274.   The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 273 above as if fully set forth at length herein.

275.   This Count is asserted on behalf of the Debtors' creditors whose claims and causes of action have been assigned to the Liquidating Trustee as described in Paragraph 4, which claims include their own claims and those that had been assigned to them by prior purchasers.

276.   As described above, K Road, under the direction and guidance of Harbinger, and with the knowledge and encouragement of the Nominating Committee, committed torts in furtherance of their scheme to defraud the Debtors' creditors. The tortious conduct giving rise to the concert of action claims took place, in significant part, in New York.

277.   There was an express or tacit agreement between K Road, the K Road Insiders, Harbinger, and the Nominating Committee to participate in a common plan to commit a tortious act. At Harbinger's urging, K Road embarked on a planned strategy to extract cash from EBG, ultimately culminating in the Leveraged Recap Transaction that is the basis of this lawsuit. The Nominating Committee participated in the strategy, lending aid and encouraging K Road's fraud.

The Nominating Committee ratified or adopted K Road's conduct through their approval of the Leveraged Recap Transaction. K Road, the K Road Insiders, Harbinger, and the Nominating Committee agreed to commit tortious acts in furtherance of the plan. K Road, the K Road Insiders, Harbinger, and the Nominating Committee benefitted directly from the common plan.

278.   Harbinger and the Nominating Committee knew of the frauds and violations committed by K Road and the K Road Insiders. Harbinger owned significant debt and equity interests in several K Road entities, was an alter ego of K Road, a control person by virtue of their agreements, and stood to gain directly and indirectly from the fraudulent scheme. At Harbinger's urging, K Road embarked on a planned strategy to repay K Road's debt obligations to Harbinger through various transactions, ultimately culminating in the Leveraged Recap Transaction that is the basis of this lawsuit. The Nominating Committee consented to K Road's plan, and each member reaped the benefits of the Leveraged Recap Transaction through immediate or subsequent transfers.

279.   K Road, the K Road Insiders, Harbinger, and the Nominating Committee all engaged in tortious conduct in the furtherance of the joint scheme to defraud. K Road, the K Road Insiders, Harbinger, and the Nominating Committee understood and knew the purposes of their common scheme. Through emails, telephone calls, and in-person planning sessions, it is clear that Harbinger and the Nominating Committee actively took part in the fraud or furthered it by cooperation. Harbinger and the Nominating Committee lent aid and encouragement to K Road, and ratified or adopted K Road's acts done for their mutual benefit. Harbinger and the Nominating Committee actively aided and abetted K Road's execution of the scheme. Harbinger encouraged K Road to raise billions of dollars for Harbinger's benefit. The Nominating Committee blessed K Road's conduct and approved of their fraudulent transactions. K Road

provided Harbinger and the Nominating Committee with confidential information that was not provided to the public, and actively kept secret Harbinger's involvement in the Leveraged Recap Transaction.

280.    K Road, the K Road Insiders, Harbinger, and the Nominating Committee each had an equal right to direct or control the other with respect to the fraudulent Leveraged Recap Transaction. K Road made the day-to-day decisions and directed the performance of the fraudulent scheme. Harbinger was an alter ego and control person of K Road as a consequence of its agreements with K Road. The Nominating Committee understood that the Leveraged Recap Transaction could not go forward without its assent. These checks and balances resulted in a concerted, organized scheme to defraud the Debtors and their creditors.

281.    As a result, K Road, the K Road Insiders, Harbinger, and the Nominating Committee are each jointly and severally liable to the Liquidating Trustee, regardless of the degree of their participation or culpability in the overall scheme. The conspiracy directly and proximately caused harm to Liquidating Trustee's assignors in an amount to be determined at trial, but no less than $1 billion.

282.    The Liquidating Trustee is also entitled to pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

**D.    Against Harbinger**

### COUNT FIFTEEN: Alter Ego/ Veil Piercing

283.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 282 above as if fully set forth at length herein.

284.    This Count is asserted on behalf of the creditors of the Debtors, including those creditors that owned the debt of the Debtors as of the Petition Date, which rights included their

own rights and those that had been assigned to them by prior purchasers, all such creditors having assigned their claims to the Liquidating Trustee as described in Paragraph 4.

285.    At all times relevant hereto, Harbinger dominated and controlled K Road's business, causing K Road to have no separate existence and to act as merely an instrumentality for Harbinger.

286.    Kagan acted as an agent of each Harbinger entity, and acted to benefit each Harbinger entity, without regard to corporate formalities when exercising his control of K Road and communicating with the K Road Insiders.

287.    Harbinger used its domination and control to cause K Road to manage the Debtors for Harbinger's benefit and to cause the Debtors to enter into the Leveraged Recap Transaction.

288.    This domination and control is evidenced by agreements between Harbinger and K Road, consisting of LLC Agreements, a Subscription Agreement, and a Convertible Note, as well as the parties' course of conduct. K Road and Harbinger considered themselves as part of one unified joint venture, such that whenever K Road acted, Harbinger acted as well.

289.    In light of Harbinger's pervasive domination and control of the Debtors in connection with the Leveraged Recap Transaction, the theoretically separate corporate status of K Road and Harbinger should be disregarded. It would be unfair and unjust to permit Harbinger to avoid liability for the fraudulent actions it took through K Road, when it caused the K Road entities to be created for the purpose of concealing Harbinger's control from the Nominating Committee. Harbinger should be held legally liable for the debts and unlawful actions of K Road.

290.    As a direct and proximate result of the foregoing, the Liquidating Trustee is entitled to a judgment in his favor and against Harbinger, finding that K Road and the K Road Insiders were the alter egos of the Debtors, piercing the corporate veil between K Road and Harbinger, and that as a result, Harbinger is liable to the Liquidating Trustee for the debts and obligations of K Road, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

### Discovery Rule

291.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 290 above as if fully set forth at length herein.

292.    The creditors of the Debtors were unaware of the facts constituting the causes of action described above until the Debtors' bankruptcy exposed their internal documents. Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. Defendants manufactured a situation calculated to frustrate the discovery of their fraudulent conduct.

293.    Furthermore, K Road managed the Debtors from its office in New York, not the BostonGen headquarters in Massachusetts. The K Road Insiders communicated with each other and their consultants, attorneys, and other advisors via their own kroadpower.com domain, which was not hosted on the BostonGen servers.  The Debtors and their creditors had no access to those documents until 2012, when K Road made a limited document production in the Liquidating Trustee's Rule 2004 examination. Further discovery will doubtless expose more details of the

fraud. The Liquidating Trustee pleads that the statute of limitations was tolled or that the claims asserted herein did not accrue until some point after the Petition Date.

## **Equitable Tolling**

294.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 293 above as if fully set forth at length herein.

295.    The creditors of the Debtors, and their assignee, the Liquidating Trustee, have pursued their rights diligently, but had no access to the Debtors' internal documents until after the bankruptcy filing and bankruptcy discovery process. The creditors of The Debtors were unaware of the facts constituting the causes of action described above due to K Road's extraordinary efforts to conceal those facts. Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. Defendants manufactured a situation calculated to frustrate the discovery of their fraudulent conduct. Further, the documents and information that would have put creditors of the Debtors, and their assignee, the Liquidating Trustee on notice of K Road's fraud were self-concealing, due to their confidential nature and K Road's active concealment.

296.    The Liquidating Trustee pleads equitable tolling of the applicable statutes of limitation until the discovery, after the Debtors' bankruptcy, of the facts constituting these causes of action.

## **PRAYER FOR RELIEF**

WHEREFORE, the Liquidating Trustee respectfully requests that this Court enter

judgment in favor of the Liquidating Trustee as follows:

a.      on Count One, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, avoiding each of the Transfers set forth in
Exhibit A, recovering the same from the Transferee Defendants and other Class Members
and preserving them for the benefit of the Liquidating Trust, and awarding pre-judgment
interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and
costs;

b.      on Count Two, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, avoiding each of the Transfers set forth in
Exhibit A, recovering the same from the Transferee Defendants and other Class Members
and preserving them for the benefit of the Liquidating Trust, and awarding pre-judgment
interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and
costs;

c.      on Count Three, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, determining that the Lien Transfers are
avoidable and their value may be recovered from the Transferee Defendants and other
Class Members in the amounts set forth in Exhibit A as shown by the proof, preserving
the Transfers for the benefit of the Liquidating Trust, and awarding pre-judgment interest
at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

d.      on Count Four, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, determining that the Lien Transfers are
avoidable and their value may be recovered from the Transferee Defendants and other
Class Members in the amounts set forth in Exhibit A as shown by the proof, preserving
the Transfers for the benefit of the Liquidating Trust, and awarding pre-judgment interest
at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

e.      on Count Five, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, determining that the Transferee
Defendants and other Class members have been unjustly enriched, and that the creditors
of the Debtors whose claims and causes of action have been assigned to the Liquidating
Trust, have been damaged in an amount to be determined at trial but believed to be in
excess of $1 billion, and awarding such damages, together with pre-judgment interest at
the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

f.      on Count Six, against the Transferee Defendants, individually and as Class
Representatives, and the other Class Members, determining that the Transferee
Defendants and other Class members have been unjustly enriched and impose a
constructive trust over the amounts received by the Transferee Defendants, individually
and as Class Representatives, and other Class Members in connection with the Transfers,

for the benefit of the creditors of the Debtors whose claims and causes of action have been assigned to the Liquidating Trust, plus award prejudgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

g.    on Count Seven, against K Road and the K Road Insiders, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with prejudgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

h.    on Count Eight, against K Road and the K Road Insiders, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with prejudgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

i.    on Count Nine, against K Road and the K Road Insiders, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

j.    on Count Ten, against K Road and the K Road Insiders, determining that K Road and the K Road Insiders were the alter egos of the Debtors, and that as a result, K Road and the K Road Insiders are liable to the Liquidating Trustee for the debts and obligations of the Debtors, and awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

k.    on Count Eleven, against the K Road Insiders, awarding damages in the amount of the Dividends to the K Road Insiders, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

l.    on Count Twelve, against K Road, the K Road Insiders, Harbinger, and the Nominating Committee, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with prejudgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

m.    on Count Thirteen, against K Road, the K Road Insiders, Harbinger, and the Nominating Committee, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

n.    on Count Fourteen, against K Road, the K Road Insiders, Harbinger, and the Nominating Committee, awarding damages in an amount to be determined at trial but believed to be in excess of $1 billion, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

o.    on Count Fifteen, against Harbinger, determining that Harbinger was the alter ego of K Road, and that as a result, Harbinger is liable to the Liquidating Trustee for the debts and obligations of K Road, and awarding damages in an amount to be determined at trial but

believed to be in excess of $1 billion, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

p.      Certification of the Class pursuant to Civil Rule 23(a) and 23(b)(1)(B) and 23(b)(3), on behalf of the proposed defendant Class for Counts One through Seven and Count Seventeen, and designation of the proposed Class Representatives as representatives of this Class, and appointing or designating Class Counsel to the defendant Class.

q.      finding Harbinger jointly and severally liable with K Road;

r.      finding the Nominating Committee jointly and severally liable with K Road;

s.      awarding to the Liquidating Trustee the reasonable attorneys' fees and costs incurred in prosecuting this adversary proceeding;

t.      because their fraudulent conduct was gross and wanton, and involved high moral culpability, granting the Liquidating Trustee punitive damages against K Road and the K Road Insiders; and

u.      granting to the Liquidating Trustee such other and further relief as the Court deems just and proper.

Dated: August 1, 2013                      Respectfully submitted,

                                           /s/ *G. Michael Gruber*
                                           G. Michael Gruber
                                           Brian Hail
                                           Jeffrey R. Erler
                                           Allison Jacobsen
                                           Michael J. Lang
                                           Laura M. Fontaine
                                           William S. Richmond
                                           **GRUBER HURST JOHANSEN HAIL SHANK LLP**
                                           1445 Ross Avenue, Suite 2500
                                           Dallas, TX 75202
                                           Telephone:     (214) 855-6800
                                           Facsimile:     (214) 855-6808
                                           Email:  mgruber@ghjhlaw.com
                                                   bhail@ghjhlaw.com
                                                   jerler@ghjhlaw.com
                                                   ajacobsen@ghjhlaw.com
                                                   mlang@ghjhlaw.com
                                                   lfontaine@ghjhlaw.com
                                                   brichmond@ghjhlaw.com


                                           *ATTORNEYS FOR PLAINTIFF*
                                           *MARK HOLLIDAY, the Liquidating Trustee of*
                                           *the BosGen Liquidating Trust, except as to claims*
                                           *against Defendants Highland Capital*
                                           *Management LP and Highland Crusader Offshore*
                                           *Partners LP*

                                           and

                                           Jeffrey S. Levinger
                                           **LEVINGER PC**
                                           1445 Ross Avenue, Suite 2500
                                           Dallas, Texas 75202
                                           Telephone: (214) 855-6817
                                           Facsimile: (214) 855-6808
                                           Email: jlevinger@levingerpc.com

                                           *ATTORNEY FOR PLAINTIFF*
                                           *MARK HOLLIDAY, the Liquidating Trustee of*
                                           *the BosGen Liquidating Trust, as to claims against*
                                           *Defendants Highland Capital Management LP*
                                           *and Highland Crusader Offshore Partners LP*

                                                        100

## CERTIFICATE OF SERVICE

I, William S. Richmond, hereby certify that on the first day of August 2013, a copy of the foregoing First Amended Complaint was served (1) electronically on parties who have filed a notice of appearance and agreed to such service, (2) on such domestic defendants susceptible to service by U.S. Mail and have not agreed to alternative service, and (3) via hand-delivery on all other defendants.  Notice of this filing will be sent to the parties through the Court's Electronic Case Filing System.

*/s/ William S. Richmond*

# EXHIBIT A

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | UNIT REDEMPTIONS | DIVIDENDS | WARRANT REDEMPTIONS | TOTAL TRANSFERS |
|---|---|---|---|---|---|---|
| EX Orbit Group, Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ▮ | ▮ | | |
| K Road BG LLC | Delaware | 295 Madison Avenue, 37th Floor<br>New York, NY 10017 | ▮ | | ▮ | ▮ |
| D.E. Shaw Laminar Portfolios LLC | Delaware | 1166 Avenue of the Americas<br>Ninth Floor<br>New York, NY 10036<br><br>or c/o its registered agent,<br>The Corporation Trust Company Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | ▮ | ▮ | | ▮ |
| Satellite Senior Income Fund LLC | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022<br><br>or c/o its registered agent, Corporation Service Company<br>2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ▮ | | | ▮ |
| Anchorage Capital Master Offshore II, Ltd. | Cayman Islands | 610 Broadway, 6th Floor<br>New York NY 10012 | ▮ | ▮ | | ▮ |
| CMI Holdings Investments Ltd. | British Virgin Islands | 40 West 57th Street, 26th Floor<br>New York, NY 10019 | ▮ | ▮ | | ▮ |
| The Raptor Global Portfolio Ltd. c/o Tudor Investment Corporation | Cayman Islands | 1275 King Street<br>Greenwich, CT 06831<br><br>or The Raptor Global Portfolio Liquidating Trust<br>c/o Wilmington Trust Company<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, Delaware 19890 | ▮ | ▮ | | ▮ |
| Taconic Capital Partners 1.5 LP | Delaware | 450 Park Avenue, 8th Floor<br>New York NY 10022 | ▮ | ▮ | | ▮ |
| Boston Generating Offshore Holdings Ltd. Go Stonehill Capital Management LLC | Cayman Islands | 885 Third Avenue, 30th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>Walkers Corporate Service Limited PO Box<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005 CAYMAN ISLANDS | | | | |
| Morgan Stanley & Co., LLC f/k/a Morgan Stanley & Co., Inc. | Delaware | 1585 Broadway<br>New York, NY 10036<br><br>or c/o its registered agent,<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | ▮ | ▮ | | ▮ |
| Goldman Sachs & Co. | | 200 West Street<br>New York, NY 10282 | ▮ | ▮ | | ▮ |
| Stonehill Institutional Partners, LP | Delaware | 885 Third Avenue, 30th Floor<br>New York, NY 10022 | ▮ | ▮ | | ▮ |
| William Kriegel | | Business:<br>▮<br><br>▮ | | | ▮ | ▮ |
| Trade Claim Acquisition LLC | Delaware | 120 West 45th Street<br>39th Floor<br>New York, NY 10036 | | ▮ | | ▮ |
| J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc. | Delaware | 338 Madison Avenue<br>New York, NY 10179<br><br>or c/o its registered agent,<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | | ▮ | | ▮ |

| Name | Jurisdiction | Address | | | |
|---|---|---|---|---|---|
| | | [Seven Mile Beach]<br>New York, NY 10010 | | | |
| Credit Suisse Securities (USA) LLC & Credit Suisse (USA), Inc | Delaware | or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ▇ | | |
| Seneca Capital International Ltd. | Cayman Islands | 590 Madison Avenue, 28th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>Maples Corporate Services Limited<br>PO Box 309<br>Ugland House, South Church Street George Town<br>Grand Cayman KY1-1104<br>CAYMAN ISLANDS | ▇ | | |
| William Kriegel as nominee for Nicholas Donahue, Mark Friedland, Anthony Corso, Daniel O'Shea, Scott Silverstein & Paul Ehrenzeller | | Business:<br>295 Madison Avenue, 37th Floor<br>New York, NY 10017<br><br>Home:<br>532 W 22nd Street<br>New York, NY 10011 | | ▇ | ▇ |
| Greenwich International Ltd. | Bermuda | 600 Washington Boulevard<br>Stamford, CT 06901 | | | ▇ |
| Seneca Capital LP | Delaware | 590 Madison Avenue, 28th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>The Prentice-Hall Corporation System, Inc.<br>2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ▇ | | |
| DB Holdings (New York), Inc. | New York | 60 Wall Street<br>New York, NY 10005<br><br>or c/o its registered agent,<br>CT Corporation System<br>111 Eighth Avenue<br>New York, NY 10011 | ▇ | ▇ | |
| Barry F. Sullivan | | Home:<br>▇ | | ▇ | ▇ |
| Lonqacre Master Fund, Ltd. | Cayman Islands | 810 Seventh Avenue, 22nd Floor<br>New York, NY 10019<br><br>or c/o its registered agent,<br>Admiral Administration Limited<br>PO Box 32021<br>90 Fort Street<br>George Town<br>Grand Cayman<br>CAYMAN ISLANDS | ▇ | ▇ | ▇ |
| The Tudor BVI Global Portfolio LP f/k/a The Tudor BVI Global Portfolio Ltd. Go Tudor Investments Corporation | Cayman Islands | 1275 King Street<br>Greenwich, CT 06831<br><br>or c/o its registered agent,<br>Maples Corporate Services Limited<br>PO Box 309 Ugland House<br>South Church Street<br>George Town<br>Grand Cayman KY1-1104<br>CAYMAN ISLANDS | ▇ | | ▇ |
| David L. Tohir | | Home:<br>▇ | | ▇ | ▇ |
| Epic Distressed Debt Holdings, Inc | Delaware | c/o Citigroup Alternative Investments<br>399 Park Avenue, 7th Floor<br>New York, NY 10022 | ▇ | | ▇ |
| Castlerigg Partners, LP | Delaware | 40 West 57th Street, 26th Floor<br>New York, NY 10019 | ▇ | | ▇ |
| Tudor Proprietary Trading LLC | Delaware | 1275 King Street<br>Greenwich, CT 06831<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ▇ | ▇ | |
| Highland Crusader Offshore Partners, LP | Bermuda | 31 Victoria Street<br>Hamilton HM10, Bermuda<br><br>Or<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | ▇ | ▇ | ▇ |

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | | | | |
|---|---|---|---|---|---|---|
| Scottwood Fund, Ltd. c/o Scottwood Capital Management LLC | Cayman Islands | 45 Park Avenue, 20th Floor New York, NY 10169<br><br>or c/o its registered agent, Ogler Fiduciary Services (CAYMAN) Limited PO Box 89 Nexus Way Camana Bay Grand Cayman KY1-9007 CAYMAN ISLANDS | ▆ | ▆ | | ▆ |
| GK Debt Opportunity Fund Ltd. | | 910 Sylvan Avenue Suite 100 Englewood Cliffs, New Jersey 07632 | ▆ | ▆ | | ▆ |
| Mason Capital Ltd. | Cayman Islands | 110 East 59th Street, 30th Floor New York, NY 10022<br><br>or c/o its registered agent, Walkers Corporate Services Limited PO Box 87 Mary Street George Town Grand Cayman KY1-9005 CAYMAN ISLANDS | ▆ | ▆ | | ▆ |
| Epic Distressed Debt Opportunity Fund LP | Delaware | c/o Citigroup Alternative Investments 399 Park Avenue, 7th Floor New York, NY 10022 | ▆ | | | ▆ |
| Latigo Master Fund, Ltd. c/o Latigo Partners, LP | Cayman Islands | 590 Madison Avenue 9th Floor New York, NY 10022 | ▆ | ▆ | | ▆ |
| Cedarview EBG Holdings Ltd. | Cayman Islands | One Penn Plaza, 45th Floor New York, NY 10119 | ▆ | ▆ | | ▆ |
| J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc. as successor in interest to Bear Stearns & Co. Inc. | Delaware | 338 Madison Avenue New York, NY 10179<br><br>or c/o its registered agent, The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, DE 19801 | | ▆ | | ▆ |
| Longacre Capital Partners (QP) LP | Delaware | 810 Seventh Avenue, 22nd Floor New York, NY 10019<br><br>or c/o its registered agent, Corporation Service Company 80 State Street Albany, NY 12207-2543 | ▆ | ▆ | | ▆ |
| Guggenheim Portfolio Co. XII, LLC | Delaware | 135 East 57th Street, 9th Floor New York, NY 10022<br><br>or c/o its registered agent, LexisNexis Document Solutions, Inc. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ▆ | ▆ | | ▆ |

## Subsequent Transferees

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL SUBSEQUENT TRANSFER |
|---|---|---|---|
| Power Management Financing, LLC | Delaware | c/o Harbert Management Corporation Concord Center 2100 Third Avenue North, Suite 600 Birmingham, AL 35203 | ▆ |
| Boston Harbor Power LLC | Delaware | c/o Harbert Management Corporation Concord Center 2100 Third Avenue North, Suite 600 Birmingham, AL 35203<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ▆ |
| William Kriegel | | Business:<br>▆▆▆▆▆▆▆▆<br><br>Home:<br>▆▆▆▆▆▆▆ | ▆ |

| Name | Jurisdiction | Address | |
|---|---|---|---|
| Nicholas Donahue | | Home: ▬▬▬▬▬<br><br>Business: ▬▬▬▬▬ | ▬▬▬ |
| Mark Friedland | | Home: ▬▬▬▬▬<br><br>Business: ▬▬▬▬▬ | ▬▬▬ |
| Anthony Corso | | Business:<br>Hudson Capital Group<br>One Penn Plaza, Suite 2505<br>New York, NY 10119 | ▬▬▬ |
| Barry Sullivan | | Home: ▬▬▬▬▬ | |
| Daniel O'Shea | | Business: ▬▬▬▬▬ | ▬▬▬ |
| Scott Silverstein | | Business: ▬▬▬▬▬ | ▬▬▬ |
| David Tohir | | Home: ▬▬▬▬▬ | ▬▬▬ |
| Paul Ehrenzeller | | Business: ▬▬▬▬▬ | ▬▬▬ |
| Harbinger Capital Partners Master Fund I, Ltd. | Cayman Islands | c/o its registered agent,<br>Ogier Fiduciary Services (CAYMAN) Limited<br>PO Box<br>89 Nexus Way<br>Camana Bay<br>Grand Cayman, KY1-9007<br>CAYMAN ISLANDS | ▬▬▬ |
| Satellite Asset Management LP | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ▬▬▬ |
| D.E. Shaw & Co. LP | Delaware | 1166 Avenue of the Americas<br>Ninth Floor<br>New York, NY 10036 | |
| Anchorage Capital Group, LLC f/k/a Anchorage Advisors LLC | Delaware | 610 Broadway, 6th Floor<br>New York, NY 10012<br><br>or c/o its registered agent,<br>Walkers Corporate Service Delaware Ltd.<br>200 Bellevue Parkway, Suite 170<br>Wilmington, DE 19809 | ▬▬▬ |
| Sandell Asset Management Corporation | Cayman Islands | 40 West 57th Street, 26th Floor<br>New York, NY 10019<br><br>or c/o its registered agent,<br>Walkers Corporate Service Limited<br>PO Box<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman, KY1-9005<br>CAYMAN ISLANDS | ▬▬▬ |
| Tudor Investment Corporation | Delaware | 1275 King Street<br>Greenwich, CT 06831<br><br>or c/o its registered agent,<br>Corporation Service Company<br>80 State Street<br>Albany, NY 12207-2543 | ▬▬▬ |
| Stonehill Capital Management LLC | Delaware | 885 Third Avenue, 30th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>United Corporate Services, Inc.<br>10 Bank Street, Suite 560<br>White Plains, NY 10606 | ▬▬▬ |

| | | | |
|---|---|---|---|
| | | 1155 Mark.... suite 800<br>Dallas, TX 75240 | |
| Highland Capital Management LP | Delaware | or c/o its registered agent,<br>CT Corporation System<br>111 Eighth Avenue<br>New York, NY 10011 | ■ |
| Scottwood Capital Management LLC | Delaware | 1 Pickwick Plaza<br>Greenwich, CT 06830<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Onyx Credit Partners, LLC f/k/a GK Capital LLC | Delaware | 910 Sylvan Avenue, Suite 100<br>Englewood Cliffs, NJ 07632<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Mason Capital Management LLC | Delaware | 110 East 59th Street, 30th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Latigo Partners LP | Delaware | 590 Madison Avenue<br>New York, NY 10022<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Cedarview Capital Management LP | Delaware | One Penn Plaza, 45th Floor<br>New York, NY 10119<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Citigroup Alternative Investments *as successor in interest to* Epic Asset Management LLC | Delaware | 399 Park Avenue, 7th Floor<br>New York, NY 10022<br><br>or c/o its registered agent, CT Corporation System<br>111 Eighth Avenue<br>New York, NY 10011 | ■ |
| RBS Holdings USA Inc. f/k/a Greenwich Capital Holdings, Inc. | Delaware | 600 Washington Boulevard<br>Stamford, CT 06901<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | ■ |
| Satellite Overseas Fund, Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| The Apogee Fund, Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Fund IV, LP | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Overseas Fund V Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Overseas Fund VI, Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Overseas Fund VIII, Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Overseas Fund IX Ltd. | Cayman Islands | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Fund I LP | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |
| Satellite Fund II, LP | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | ■ |

# EXHIBIT B

After Restructure, 12/2006

# K Road EBG Investment - Structure Chart



** William Kriegel, Barry Sullivan and David Tohir own 28.7884615%, 11.5153846%, 9.5961538%,
respectively, of the membership interests in K Road BG MM LLC

(Dec. 2006)

22059488v2

CONFIDENTIAL

KR-0000403