Philip D. Anker
Alan E. Schoenfeld
Allison Hester-Haddad
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8890
*Attorneys for Credit Suisse Securities (USA) LLC;*
*Credit Suisse (USA), Inc.; D. E. Shaw & Co., L.P.;*
*D. E. Shaw Laminar Portfolios, L.L.C.; Goldman,*
*Sachs & Co.; J.P. Morgan Securities LLC; Mason*
*Capital Ltd.; Mason Capital Management LLC;*
*Morgan Stanley & Co. LLC; RBS Holdings USA, Inc.;*
*and Taconic Capital Partners 1.5 LP.*

*Additional counsel listed on signature block*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
                                              :      Chapter 11
                                              :
In re                                         :
BOSTON GENERATING LLC, et al.,                :      Case No. 10-14419 (SCC)
                                              :
                      Debtors.                :      Jointly Administered
                                              :
----------------------------------------------------------------x
                                              :
MARK HOLLIDAY, the Liquidating Trustee        :
of the BosGen Liquidating Trust,              :
                                              :      Adversary Proceeding
          Plaintiff,                          :
                                              :      No. 12-01879 (SCC)
-versus-                                      :
                                              :
K ROAD POWER MANAGEMENT, LLC, et al.,         :
                                              :
                      Defendants.             :
----------------------------------------------------------------x
```

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**
**COUNTS ONE THROUGH SIX OF THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................4

    A.    The Leveraged Recap Transaction..................................................4

    B.    Subsequent Operations.....................................................................7

    C.    Bankruptcy Proceedings ...................................................................7

    D.    The Trustee's Amended Complaint .................................................10

ARGUMENT .............................................................................................................11

I.    All Of The Trustee's Claims Are Time-Barred .................................................11

    A.    The Trustee's Claims Are Barred By The Three-Year Statute Of Repose For Distributions From A Delaware LLC To Its Members .................................12

        1.    The Delaware Statute Of Repose Applies ................................12

        2.    The Delaware Statute Bars Each Of The Trustee's Claims ......................15

        3.    Neither The Discovery Rule Nor Equitable Tolling Applies....................16

    B.    The Trustee Cannot Take Advantage Of New York's Six-Year Statute Of Limitations .................................................................................................17

        1.    The Trustee Has Failed To Plead His Entitlement To New York's Statute Of Limitations..........................................................................17

        2.    The Trustee Has Failed To Plead His Entitlement To Equitable Tolling Or The Discovery Rule .................................................................20

II.    The Trustee's Claims Fail As A Matter Of Substantive Bankruptcy Law ......................23

    A.    The Transfers Are Exempt From Avoidance Under Section 546(e)'s Safe Harbor ...........................................................................................................23

        1.    The Payments To EBG's Members Were Settlement Payments Or Payments In Connection With A Securities Contract...............................24

        2.    The Trustee's Attempt To Evade The Safe Harbor Fails .........................30

    B.    Counts Two And Four Also Must Be Dismissed Because The Trustee May Not Recover The "Value" Of Transfers Of Non-Possessory Liens......................37

III.    The Trustee's Causes Of Action For Unjust Enrichment And Constructive Trust Fail As A Matter Of Law ..............................................................................................39

    A.    Unjust Enrichment ...........................................................................39

    B.    Constructive Trust.............................................................................41

IV.    To The Extent The Trustee Seeks To Recover On Behalf Of The First-Lien, Second-Lien, And Mezzanine Lenders, And Their Successors, He Is Estopped From Doing So.................................................................................................................43

V.    The Trustee Is Barred From Suing Dissolved Corporate Entities .....................................47

i

CONCLUSION.................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*,
No. 05 Civ. 6701, 2010 WL 743839 (S.D.N.Y. Mar.3, 2010) ...............................................48

*Ambriz Trading Corp. v. URALSIB Fin. Corp.*,
No. 11 Civ. 4420, 2011 WL 5844115 (S.D.N.Y. Nov. 21, 2011) ..........................................49

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010).....................................................................................41

*AP Servs. LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)..............................................................................28, 31, 35, 36

*Arizona v. United States*,
132 S. Ct. 2492 (2012).............................................................................................................31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................................4

*Bartfield v. Murphy*,
578 F. Supp. 2d 638 (S.D.N.Y. 2008).....................................................................................39

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
--- F. Supp. 2d ----, 2013 WL 2452169 (S.D.N.Y. June 6, 2013)..........................................42

*Chadirjian v. Kanian*,
123 A.D.2d 596 (N.Y. App. Div. 1986) ..................................................................................41

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
516 N.E.2d 190 (N.Y. 1987)...................................................................................................41

*CML V, LLC v. Bax*,
28 A.3d 1037 (Del. 2011) .................................................................................................39, 41

*Contemporary Indus. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ......................................................................... 27, 32, 34-35, 36

*Cordts-Auth v. Crunk, LLC*,
815 F. Supp. 2d 778 (S.D.N.Y. 2011).....................................................................................42

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993).................................................................................................................31

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008)...................................................................43

*Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*,
    C.A. No. 6894-VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013) .......................................49

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
    341 B.R. 451 (Bankr. S.D.N.Y. 2006).................................................28

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011).................................................................. passim

*FDIC v. Porco*,
    552 N.E.2d 158 (N.Y. 1990)...............................................................40

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
    712 F.3d 136 (2d Cir. 2013)...............................................................17

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
    639 F.3d 557 (2d Cir. 2011)...............................................................15

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc.
    v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ........................................4

*Freeman v. Williamson*,
    890 N.E.2d 1127 (Ill. Ct. App. 1st Dist. 2008) ........................................13

*Global Fin. Corp. v. Triarc Corp.*,
    715 N.E.2d 482 (N.Y. 1999)...............................................................19

*Gluck v. Amicor, Inc.*,
    487 F. Supp. 608 (S.D.N.Y. 1980)......................................................19

*Gordon & Co. v. Ross*,
    63 F. Supp. 2d 405 (S.D.N.Y. 1999)...................................................19

*Grace v. Bank Leumi Trust Co.*,
    443 F.3d 180 (2d Cir. 2006)...............................................................37

*Hillman v. Maretta*,
    133 S. Ct. 1943 (2013).......................................................................31

*HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*,
    No. 07-cv-553A(L), 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009), *aff'd*, 634 F.3d 678
    (2d Cir. 2011)....................................................................................46

*In re Adelphia Recovery Trust*,
   634 F.3d 678 (2d Cir. 2011).................................................................................44, 46

*In re Adler, Coleman Clearing Corp.*,
   263 B.R. 406 (S.D.N.Y. 2001)...........................................................................25

*In re Allou Distribs., Inc.*,
   446 B.R. 32 (Bankr. E.D.N.Y. 2011)..................................................................22

*In re Best Prods. Co.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ..................................44

*In re Burns,*
   322 F.3d 421 (6th Cir. 2003) .............................................................................38

*In re CD Liquidation Co., LLC*,
   462 B.R. 124 (Bankr. D. Del. 2011) ...................................................................40

*In re Centennial Textiles, Inc.*,
   220 B.R. 165 (Bankr. S.D.N.Y. 1998)..................................................................37

*In re Century City Doctors Hosp., LLC*,
   466 B.R. 1 (Bankr. C.D. Cal. 2012).......................................................12, 13, 16

*In re Citadel Indus., Inc.*,
   423 A.2d 500 (Del. Ch. 1980).......................................................................47, 49

*In re Derivium Capital LLC*,
   716 F.3d 355 (4th Cir. 2013) .............................................................................27

*In re Die Fliedermaus LLC*,
   323 B.R. 101 (Bankr. S.D.N.Y. 2005)....................................................12, 13, 15

*In re Dunn*,
   Nos. CC-05-1406, CC-06-1046, 2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006) ............44

*In re Enron Corp.*,
   379 B.R. 425 (S.D.N.Y. 2007)...........................................................................47

*In re Fairfield Sentry Ltd. Litig.*,
   458 B.R. 665 (S.D.N.Y. 2011)...........................................................................14

*In re Farmer*,
   209 B.R. 1022 (Bankr. M.D. Ga. 1997).................................................................38

*In re Heritage Org., L.L.C.*,
   413 B.R. 438 (Bankr. N.D. Tex. 2009)..................................................................15

*In re Hydrogen, L.L.C.*,
  431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................................4

*In re Kaiser Steel Corp.*,
  952 F.2d 1230 (10th Cir. 1991) ........................................................................26

*In re Kingsley*,
  518 F.3d 874 (11th Cir. 2008) ..........................................................................37

*In re Koreag, Controle et Revision S.A.*,
  961 F.2d 341 (2d Cir. 1992) ....................................................................... 14, 17-18

*In re Lehman Bros. Holdings Inc.*,
  469 B.R. 415 (Bankr. S.D.N.Y. 2012) ...............................................................29

*In re Loranger Mfg. Corp.*,
  324 B.R. 575 (Bankr. W.D. Pa. 2005) ...............................................................28

*In re Mediators, Inc.*,
  190 B.R. 515 (S.D.N.Y. 1995) ..........................................................................21

*In re Motel 6 Sec. Litig.*,
  Nos. 93-2183, 93-2866, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) ............... 40-41

*In re Old CarCo, LLC*,
  454 B.R. 38 (Bankr. S.D.N.Y. 2011) ...................................................................7

*In re Plassein Int'l Corp.*,
  366 B.R. 318 (Bankr. D. Del. 2007), *aff'd*, 590 F.3d 252 (3d Cir. 2009) ...............28

*In re Pruitt*,
  401 B.R. 546 (Bankr. D. Conn. 2009) ...............................................................31

*In re QSI Holdings, Inc.*,
  571 F.3d 545 (6th Cir. 2009) ......................................................................26, 46

*In re Quebecor World (USA) Inc.*,
  453 B.R. 201 (Bankr. S.D.N.Y. 2011), *aff'd*, 719 F.3d 94 (2d Cir. 2013) ..............26

*In re Quebecor World (USA) Inc.*,
  719 F.3d 94 (2d Cir. 2013) ...................................................................... passim

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................4

*In re Refco Sec. Litig.*,
  890 F. Supp. 2d 332 (S.D.N.Y. 2012) ...........................................................44, 47

vi

*In re Refco Sec. Litig.*,
No. 09 Civ. 2885, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ..............................27, 28, 45

*In re Resorts Int'l, Inc.*,
181 F.3d 505 (3d Cir. 1999)...................................................................................26, 27

*In re Schmiel*,
319 B.R. 520 (Bankr. E.D. Mich. 2005) ........................................................................38

*In re SeaQuest Diving, LP*,
579 F.3d 411 (5th Cir. 2009) ......................................................................................26

*In re Sickels*,
392 B.R. 423 (Bankr. N.D. Iowa 2008) .........................................................................38

*In re Straightline Invs., Inc.*,
525 F.3d 870 (9th Cir. 2008) ......................................................................................37

*In re Tougher Indus., Inc.*,
No. 06-12960, 2013 WL 5592902 (Bankr. N.D.N.Y. Oct. 10, 2013) ...................................28

*In re Tribune Co. Fraudulent Conveyance Litig.*,
--- B.R. ----, 2013 WL 5311439 (S.D.N.Y. Sept. 23, 2013) ..............................................33

*In re Tristar Esperanza Props., LLC*,
488 B.R. 394 (B.A.P. 9th Cir. 2013).............................................................................26

*In re Trout*,
609 F.3d 1106 (10th Cir. 2010) ..................................................................................38

*In re U.S. Mortg. Corp.*,
492 B.R. 784 (Bankr. D.N.J. 2013) .......................................................................32, 35, 36

*In re Young*,
384 B.R. 94 (Bankr. D.N.J. 2008) ...............................................................................16

*Ins. Co. of N. Am. v. ABB Power Generation, Inc.*,
690 N.E.2d 1249 (N.Y. 1997).....................................................................................18

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011)...........................................................................14

*Int'l Shoe Co. v. Pinkus*,
278 U.S. 261 (1929)..................................................................................................31

*Interactive Corp. v. Vivendi Universal, S.A.*,
No. Civ. A. 20260, 2004 WL 1572932 (Del. Ch. June 30, 2004) ..........................................16

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
    913 F.2d 846 (10th Cir. 1990) ...................................................................26, 32

*Katz v. Goodyear Tire & Rubber Co.*,
    737 F.2d 238 (2d Cir. 1984)................................................................................20

*Kaufman v. Cohen*,
    307 A.D. 2d 113 (N.Y. App. Div. 2003) .............................................................22

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir.1991)................................................................................48

*Kwon v. Yun*,
    No. 05 Civ. 1142, 2008 WL 190058 (S.D.N.Y. Jan. 22, 2008).............................48

*Lane v. Eggleston*,
    284 F. 743 (5th Cir.1922) ..................................................................................44

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)........39

*Mahmood v. Research in Motion Ltd.*,
    No. 11 Civ. 5345, 2012 WL 242836 (S.D.N.Y. Jan. 24, 2012).............................22

*Maslan v. Am. Airlines, Inc.*,
    885 F. Supp. 90 (S.D.N.Y. 1995)........................................................................20

*Matthew v. Laudamiel*,
    No. C.A. 5957-VCN, 2012 WL 605589 (Del. Ch. Feb. 21, 2012) .........................48

*Metro Commnc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
    854 A.2d 121 (Del. Ch. 2004)............................................................................48

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y. 1995).......................................................................7

*Mostel v. Petrycki*,
    885 N.Y.S.2d 397 (N.Y. Sup. Ct. 2009) ..............................................................15

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
    612 F.3d 97 (2d Cir. 2010)................................................................................31

*Neshewat v. Salem*,
    365 F. Supp. 2d 508 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006)........37

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
    277 B.R. 20 (S.D.N.Y. 2002)..............................................................................18

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
    344 B.R. 340 (W.D. Pa. 2006) .................................................................24

*Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv.
    Co. of Del., Inc.)*,
    274 B.R. 71 (D. Del. 2002) ........................................................24, 32, 35, 36

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ...................................................................14

*Pearl v. City of Long Beach*,
    296 F.3d 76 (2d Cir. 2002) ...................................................................21

*Peterson v. Somers Dublin Ltd.*,
    729 F.3d 741 (7th Cir. 2013) .................................................................29

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013) ...................................................................17

*Portfolio Recovery Assocs., LLC v. King*,
    927 N.E.2d 1059 (N.Y. 2010) .................................................................19

*QSI Holdings, Inc. v. Alford*,
    382 B.R. 731 (W.D. Mich. 2007), *aff'd*, 571 F.3d 545 (6th Cir. 2009) ..................................46

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) (Lynch, J.) ..........................................40, 41

*Redtail Leasing, Inc. v. Bellezza*,
    No. 95 Civ. 5191, 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) ...........................................40

*Reyes v. Reyes*,
    No. 11 Civ. 2536, 2012 WL 4058037 (E.D.N.Y. Sept. 14, 2012).........................................41

*Silva v. Toll Brothers' Inc.*,
    No. 97 Civ. 741, 1998 WL 898307 (S.D.N.Y. Dec. 23, 1998)...............................................20

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...............................................33

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir. 1993)...................................................................40

*Strauss v. Credit Lyonnais, S.A.*,
    No. 06-0702, 2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007) ...............................................21, 22

*Stuart v. Am. Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998).....................................................................18

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
404 U.S. 6 (1971) ................................................................................................29

*Tanges v. Heidelberg N. Am., Inc.*,
710 N.E.2d 250 (N.Y. 1999) ................................................................................14

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
892 F. Supp. 2d 805 (N.D. Tex. 2012) ...................................................24, 35, 36

*U.S. Bank National Association v. Verizon Communications, Inc.*,
479 B.R. 405 (N.D. Tex. 2012)..............................................................44, 45, 47

*United States v. Nouri*,
711 F.3d 129 (2d Cir. 2013), *cert. denied sub nom. Martin v. United States*, No. 13-
5554, 2013 WL 3939527 (Oct. 7, 2013) .............................................................29

*Urbont v. Sony Music Entm't*,
863 F. Supp. 2d 279 (S.D.N.Y. 2012)..................................................................22

*US Bank Nat'l Ass'n v. Gestetner*,
103 A.D. 3d 962 (N.Y. App. Div. 2013) ..............................................................22

*Von Hoffmann v. Prudential Ins. Co.*,
202 F. Supp. 2d 252 (S.D.N.Y. 2002)..................................................................21

*Whyte v. Barclays Bank PLC*,
494 B.R. 196 (S.D.N.Y. 2013).................................................................31, 33, 34

*Williams v. Infra Commerc Anstalt*,
131 F. Supp. 2d 451 (S.D.N.Y. 2001)..................................................................18

*Williamson v. Culbro Corp. Pension Fund*,
41 A.D.3d 229 (N.Y. App. Div. 1st Dep't 2007), *leave to appeal denied*, 883 N.E.2d
370 (2008) ............................................................................................................13

*Wood v. Coastal States Gas Corp.*,
401 A.2d 932 (Del. 1979) ....................................................................................41

## CONSTITUTIONS

U.S. Const. art. VI, § 2..............................................................................................31

## STATUTES

11 U.S.C. § 101(6) ....................................................................................................28

11 U.S.C. § 101(49)(A)..............................................................................................26

11 U.S.C. § 101(51A) .................................................................................................25

11 U.S.C. § 544 ................................................................................................. passim

11 U.S.C. § 546 ................................................................................................. passim

11 U.S.C. § 741(7)(A) ...........................................................................................29

28 U.S.C. 1334 .......................................................................................................17

Del. Code Ann. tit. 6, § 15-101(4) .......................................................................16

Del. Code Ann. tit. 6, § 18-607(c) ..................................................................12, 13

Del. Code Ann. tit. 6, § 18-803(b) .......................................................................48

Del. Code Ann. tit. 6, § 1309 ...............................................................................20

Mass. Gen. Laws Ann. ch. 109A, § 10 ................................................................20

New York Debtor & Creditor Law § 273 .........................................................35, 37

New York Debtor & Creditor Law § 274 .........................................................35, 37

New York Debtor & Creditor Law § 275 .........................................................35, 37

New York Debtor & Creditor Law § 276 .........................................................35, 37

New York Debtor & Creditor Law § 278 .........................................................35, 37

N.Y. C.P.L.R. § 202 ..............................................................................................20

N.Y. Ltd. Liab. Co. Law § 102(i) .........................................................................16

N.Y. Ltd. Liab. Co. Law § 508(c) .........................................................................15

Or. Rev. Stat. § 95.280 .........................................................................................19

Tex. Bus. Orgs. Code Ann. § 101.206 .................................................................15

**RULES**

Fed. R. Bankr. P. 7012(b) .......................................................................................1

Fed. R. Civ. P. 4 ...................................................................................................49

Fed. R. Civ. P. 12(b) .........................................................................................1, 49

**OTHER AUTHORITIES**

5 *Collier on Bankruptcy* § 548.01 (15th ed. rev. 2009) .................................................................43

The undersigned Defendants—who are named in the Amended Complaint solely because they received distributions from the Debtors (the "Moving Defendants")—respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6) as incorporated in Fed. R. Bankr. P. 7012(b), to dismiss Counts One through Six of the Amended Complaint filed by Mark Holliday, the Liquidating Trustee of the BosGen Liquidating Trust (the "Trustee").

## PRELIMINARY STATEMENT

This lawsuit arises from a leveraged recapitalization involving EBG Holdings LLC ("EBG") and its subsidiaries (collectively, with EBG, the "Debtors").[1]  That transaction was financed by more than $2 billion in loans from some of the world's most sophisticated lenders. The lenders' credit agreements required the Debtors to use the loan proceeds to make distributions to EBG's members, including the Moving Defendants.  Yet EBG's lenders (or their assignees), through a litigation trustee, now seek to unwind those distributions that the lenders not only knowingly financed but required EBG to make.  Putting aside the far-fetched premise of the Trustee's suit—that the transfers rendered the Debtors insolvent, even though another leading company agreed to acquire them for more than one billion dollars approximately *six months* after the recapitalization closed, and the Debtors were able to continue their business operations for nearly *four years* following the transaction before filing for chapter 11 protection in August 2010—his claims fail for five independent reasons.

*First*, all of the claims are time-barred—by a matter of several years.  Those claims seek to avoid and recover distributions made in December 2006 by a Delaware limited liability company (EBG) to its members, including the Moving Defendants.  Delaware, like New York,

---

[1] The Debtors are EBG, its wholly-owned subsidiary Boston Generating, LLC, and Boston Generating, LLC's subsidiaries Mystic I, LLC, Mystic Development, LLC, Fore River Development, LLC, BG New England Power Services, Inc., and BG Boston Services, LLC.

has enacted a specific statute of repose that extinguishes entirely after three years an LLC

member's liability under *any law* for distributions it received from the company.  That specific

statute of repose, not the more general statute of limitations for fraudulent transfer and similar

claims under the law of New York (or any other state), determines the timeliness of the Trustee's

action.  Under the applicable statute of repose, the Trustee's action is plainly not timely; it was

not filed until nearly six years after the EBG made the distributions at issue, almost three years

after the period of repose had run and extinguished any liability the members may have had.

Even if the Delaware LLC statute of repose did not defeat the Trustee's claims—which it

does—his fraudulent-transfer claims are still time-barred because the Trustee has not pled any

facts showing his entitlement to New York's six-year statute of limitations for such claims.  To

the extent the Trustee purports to sue standing in the shoes of non-resident creditors whose

alleged injuries accrued in their states of residence, his fraudulent-transfer claims are barred by

those states' statutes of limitations whenever—as is common—those limitations periods are

shorter than New York's six years.  The Trustee's conclusory assertion that he is entitled to the

benefit of either the discovery rule or equitable tolling does not render his claims timely, because

neither the discovery rule nor equitable tolling applies to the Delaware statute of repose, and, in

all events, his claims cannot be tolled as to innocent defendants like the Moving Defendants

here.

*Second*, the claims are barred under black-letter substantive bankruptcy law.  As an initial

matter, each of the Trustee's claims is barred by the safe harbor enshrined in § 546(e) of the

Bankruptcy Code, which protects "settlement payment[s]" and payments "in connection with a

securities contract" from avoidance and recovery.  Under the well-established law of conflict

preemption, the Trustee cannot evade the federal safe harbor by pleading his causes of action on

2

behalf of the Debtors' creditors under state law (Counts One through Six).  Nor can the Trustee recover from the Moving Defendants the value of the liens granted by the Debtors to their lenders (Counts Two and Four), because the proper remedy where a non-possessory lien is avoidable as a fraudulent transfer is the avoidance of the lien itself in the hands of the lender— not the recovery of the supposed value of that lien from third parties (let alone the recovery of that value for the benefit of the lenders that received the lien in the first place).

*Third*, in addition to being barred by the safe harbor, the Trustee's claims for unjust enrichment and constructive trust (Counts Five and Six) fail as a matter of law.  Among other fatal flaws in these claims, the Debtors' creditors, in whose shoes the Trustee purports to sue for the quasi-contract remedy of unjust enrichment, lack standing to sue for alleged injuries that EBG incurred directly and that they suffered, if at all, only indirectly.  Moreover, those creditors never had any contractual or other relationship with the Moving Defendants, and the Trustee does not and cannot allege any of the necessary elements of fiduciary relationship to sustain a constructive-trust claim.

*Fourth*, virtually all of the claims of the creditors for which and in whose shoes the Trustee has brought this action are held by the same lenders (or their assignees) who not only agreed to, but required, the very transfers that the Trustee now seeks to avoid and recover. Under settled law, those creditors consented to and ratified the distributions, and the Trustee— claiming to sue for them—may not now avoid those distributions as fraudulent transfers.

*Finally*, to the extent the Trustee purports to sue corporate entities that no longer exist, he is barred from doing so.  Under the law applicable to each such Defendant, a canceled corporation is not amenable to suit.  This action must be dismissed as to each of them for this reason as well.

## STATEMENT OF FACTS[2]

### A.    The Leveraged Recap Transaction

EBG, a Delaware limited liability company, Am. Compl. ¶ 72, constituted with its

subsidiaries "a wholesale power generation company that own[ed] and operate[d] three electric

generating facilities located in the Boston metropolitan area," Decl. of Jeff Hunter in Support of

Chapter 11 Petitions and First Day Pleadings ¶¶ 1, 6 ("Hunter Decl."), *In re Boston Generating,*

*LLC*, No. 10-14419 (Bankr. S.D.N.Y. Aug. 18, 2010), ECF No. 2.  In October 2006, EBG's

Board of Directors approved a leveraged recapitalization composed of a $925 million tender

offer, the redemption of outstanding warrants, and the distribution of $35 million in dividends to

holders of LLC interests in EBG.  Am. Compl. ¶¶ 125, 129-132.

To effectuate the tender offer, EBG sent an offer to purchase to its members (the "Offer

to Purchase").  Am. Compl. ¶ 133.  The Offer to Purchase provided that EBG would purchase for

cash up to $925 million of outstanding Class A and Class B membership units in EBG.  Offer to

Purchase 1 (Nov. 16, 2006) (Declaration of Alan E. Schoenfeld ("Schoenfeld Decl."), Exh. 1).

Pursuant to the Offer to Purchase, members tendered their units by submitting a Letter of

Transmittal along with required documentation to The Bank of New York, the depositary

identified in the Offer to Purchase, no later than December 14, 2006.  *Id.* at 1, 4.  After that date,

EBG determined the purchase price for properly tendered units and accepted—*i.e.*, purchased

---

[2] This recitation of facts is, for purposes of this motion only, drawn from the Amended Complaint and the documents referenced therein, or from the record of the proceedings in the Debtors' bankruptcy cases and this adversary proceeding.  On a motion to dismiss, the Court generally must accept as true all well-pleaded factual allegations; however, it need not accept conclusory allegations that are contradicted or rendered implausible by, more specific allegations in the Amended Complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may take judicial notice of filings from the Debtors' bankruptcy cases, as well as the filings in this and related litigation pending in this Court.  *See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).  The Court may also consider documents referenced in the Amended Complaint.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 623 (S.D.N.Y. 2007); *see also In re Hydrogen, L.L.C.*, 431 B.R. 337, 345 (Bankr. S.D.N.Y. 2010) ("In addition to the complaint, the court may also consider (1) any document incorporated by reference in the complaint; (2) any document the plaintiff has in his possession or had knowledge of and upon which he relied in bringing suit; and (3) facts of which judicial notice may be taken." (internal citations and quotation marks omitted)).

and redeemed—those units.  *Id.* at 19.  EBG deposited the aggregate purchase price with The

Bank of New York, which, pursuant to the Offer to Purchase, acted "as agent for tendering

[m]embers for the purpose of receiving payment from [EBG] and transmitting payment to the

tendering [m]embers."  *Id.*

      The Debtors were able to raise nearly $2 billion to finance the leveraged recapitalization.

In particular, EBG and/or its subsidiary Boston Generating LLC ("Boston Generating") entered

into three credit facilities in December 2006 for the purpose of funding the transaction (the

"Credit Facilities").  Am. Compl. ¶¶ 129-130.  First, Boston Generating entered into a $1.45

billion first-lien credit and guaranty agreement secured by first priority liens on and security

interests in substantially all of the properties and assets owned directly by Boston Generating and

its subsidiaries.  *Id.* ¶ 129; *see also* $1,450,000,000 First Lien Credit and Guaranty Agreement

(dated as of Dec. 21, 2006) § 1.01, at 6 (Schoenfeld Decl., Exh. 2).  Second, Boston Generating

also entered into a $350 million second-lien credit and guaranty agreement, secured by second

priority liens on and security interests in all of the same collateral.  Am. Compl. ¶ 129.  In the

second-lien agreement, the second-lien lenders acknowledged their subordination to the first-lien

lenders.  *See* $350,000,000 Second Lien Credit and Guaranty Agreement (dated as of Dec. 21,

2006) § 1.01, at 23 (Schoenfeld Decl., Exh. 3).  Finally, EBG borrowed $300 million in

unsecured mezzanine debt pursuant to a term-loan facility.  Am. Compl. ¶ 130.  That agreement

recognized the first and second liens granted under the other Credit Facilities.  $300,000,000

Mezzanine Credit Agreement (dated as of Dec. 21, 2006) 1, 14, 46-47 (Schoenfeld Decl., Exh.

4).  (The three credit agreements will hereinafter be referred to as the "Credit Agreements.")

      All three Credit Agreements required that the Debtors use the loan proceeds to fund the

distributions the Trustee now seeks to undo.  As the Amended Complaint alleges, "The Credit

Facilities expressly contemplated the Leveraged Recap Transaction and required, among other things, that the proceeds of the Secured Credit Facilities be transferred by BostonGen to EBG and used to make the payments to the Transferee Defendants as described in this Complaint." Am. Compl. ¶¶ 177;[3] *see also* First Lien Credit Agreement § 2.14(a) (Schoenfeld Decl., Exh. 2) (credit facility proceeds "shall be available (and the Borrower agrees that it shall use such proceeds) solely … (iii) to fund the Distribution and the Tender Offer of EBG Holdings …."); Second Lien Credit Agreement § 2.14(a) (Schoenfeld Decl., Exh. 3) (same); Mezzanine Credit Agreement § 2.13 (Schoenfeld Decl., Exh. 4) (same).

As provided for in the Credit Agreements, EBG and the other Debtors used a portion of the loan proceeds to refinance (*i.e.*, pay down) approximately $800 million in existing debt and to pay approximately $50 million in fees and expenses incurred in connection with the closing of the credit facilities. Am. Compl. ¶ 131. For the express purpose of facilitating the leveraged recapitalization, Boston Generating, the borrower under the first-lien and second-lien facilities, transferred an additional approximately $708 million of borrowed funds to EBG. This was a restricted transaction in which EBG was required immediately to use the proceeds it received to fund the leveraged recapitalization. *Id.* ¶¶ 149, 156, 164, 174 ("EBG was a mere conduit for the Transfers … and was required to distribute the funds to the Transferee Defendants and other Class Members."); *id.* ¶ 177 ("EBG was simply a conduit of [the $708 million] and did not have discretion to use [the funds] for its own purposes.").

As contemplated and required by the Credit Agreements, in December 2006 EBG disbursed more than $1 billion, consisting of the $708 million that Boston Generating had

---

[3] The Amended Complaint defines "Transferee Defendants" to be those defendants, among others, "who or that received a transfer or distribution pursuant to the Leveraged Recap Transaction." Am. Compl. ¶ 5. The list of Transferee Defendants is set forth as Exhibit A to the Amended Complaint. The Moving Defendants are the subset of Transferee Defendants who are named only in Counts One through Six of the Amended Complaint, and against whom the Amended Complaint makes no allegations of misconduct.

transferred to it, the $300 million of mezzanine debt, and a small amount of its own cash ($2,373,358), to its own members in payment (1) for the purchase of those members' equity units pursuant to the tender offer; (2) for the redemption of warrants held by some of the members; and (3) of dividends on those members' equity interests. Am. Compl. ¶ 132.

### B.    Subsequent Operations

Although the Trustee now claims that the Debtors were insolvent when the leveraged recapitalization occurred in December 2006, Am. Compl. ¶¶ 137-147, the Debtors continued to operate and pay their debts for years after the transaction closed. Indeed, the Debtors were able in June 2007 to effect a sale by merger to another major company, becoming a wholly owned subsidiary of US Power Generating Company ("US Power"). Hunter Decl. ¶ 10.[4]

### C.    Bankruptcy Proceedings

It was not until August 2010—nearly four years after the transaction that allegedly (though implausibly) rendered the company insolvent, and following convulsions in the energy marketplace caused by the global financial crisis—that EBG and its subsidiaries, including Boston Generating, were required to file for chapter 11 protection. Am. Compl. ¶ 72

As of the petition date, the Debtors' total outstanding indebtedness included approximately $1.1 billion under the first-lien facility, $350 million under the second-lien

---

[4] Though immaterial to the instant motion, this Court need not credit the Trustee's implausible allegation that the leveraged recapitalization left the Debtors insolvent. Courts regularly reject as implausible a plaintiff's allegation that a leveraged transaction rendered a debtor insolvent where the debtor was able to continue as a viable company for years thereafter. *See generally MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."). This is especially true where—as here—sophisticated lenders funded the transaction and a leading company, US Power, acquired the Debtors after the transaction. Hunter Decl. ¶ 10. *See MFS/Sun Life*, 901 F. Supp. at 939 ("Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets."); *In re Old CarCo, LLC*, 454 B.R. 38, 50-51 (Bankr. S.D.N.Y. 2011) ("[A]s a general matter, the Trust's theory is implausible because of the participation of third-parties, which parties placed substantial amounts of capital at risk dependent upon the performance of CarCo.").

facility, and $422 million under the mezzanine facility.  Hunter Decl. ¶¶ 28-35.  Notably, the

Debtors had virtually no other debt, and certainly none that predated the leveraged

recapitalization.  *See* Disclosure Statement for Second Amended Joint Plan of Liquidation § I.A.,

*In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y.), ECF No. 868 (approved July

20, 2011 (ECF No. 865) ("Disclosure Statement").  Indeed, as noted, that recapitalization, which

the Trustee claims the Debtors incurred for the purpose of hindering, delaying, and defrauding

their creditors, in fact resulted in precisely the opposite: the refinancing—*i.e.*, repayment—of the

Debtors' pre-existing borrowings.  *See supra* Section A.

Most of Boston Generating's assets were sold during the bankruptcy case.  *See* Order

Authorizing Sale of Substantially All Assets of the Debtors, *In re Boston Generating, LLC*, No.

10-14419 (Bankr. S.D.N.Y. Nov. 24, 2010), ECF No. 494.  A liquidating plan (the "Plan") was

subsequently confirmed, under which the first-lien creditors received $1,005,902,449.94 of the

sale proceeds in satisfaction of virtually all of their claims.  Disclosure Statement § III.F.; *see

also* First Modification to Second Amended Joint Plan of Liquidation § 502, *In re Boston

Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Aug. 26, 2011), ECF No. 904.  They were left

with a deficiency claim in the amount of only $25,000,000.  The second-lien lenders received no

proceeds directly from the sale; their liens were set aside, and they were granted a claim in the

amount of $346,500,000.  *See, e.g.*, Disclosure Statement § I.A., at 6, 9 n.8; Second Amended

Joint Plan of Liquidation § 3.02.3, *In re Boston Generating, LLC*, No. 10-14419 (Bankr.

S.D.N.Y. July 31, 2011), ECF No. 867 (confirmed Aug. 31, 2011 (ECF No. 915)) (the "Plan").

The mezzanine lenders also received nothing from the sale proceeds, and were granted a claim in

the amount of $426,911,566.  Disclosure Statement §§ I.A., at 9-10 n.8; III.F.  All three tranches

of lenders voted to accept the Plan.  *See* Decl. of Jeffrey S. Stein of the Garden City Group, Inc.

8

Certifying the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the Second Amended Joint Plan of Liquidation ¶¶ 3, 14, *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Aug. 24, 2011), ECF No. 898; *see also* Order Confirming Second Amended Joint Plan of Liquidation 6, *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Aug. 31, 2011), ECF No. 915.

The Plan created a liquidating trust to pursue claims on behalf of the Debtors' unpaid general unsecured creditors. *See, e.g.*, Plan §§ 7.02, 8.01. Those creditors, whose claims are set forth in Class 4B of the Plan, consist overwhelmingly of the lenders (or their successors) who financed the leveraged recapitalization in the first place. The Plan estimates that there are $820,571,000 in Class 4B general unsecured claims, consisting of (1) the $25,000,000 deficiency claim of the first-lien lenders, (2) the $346,500,000 claim of the second-lien lenders, (3) the mezzanine lenders' claim of $426,911,566, and (4) miscellaneous other claims totaling only approximately $22 million. Disclosure Statement § I.A. In other words, approximately 97% of the claims of creditors for which and in whose shoes the Trustee has brought this action are held by the same lenders (or their assignees) who not only consented to, but required, the transfers that the Trustee now seeks to avoid and recover.

The Trust's assets consist of, among other things, (1) all of the Debtors' causes of action and (2) causes of action, if any, of Class 4B claim holders to the extent those creditors purported to assign those causes of action to the Trust. The Trustee asserts that all Class 4B holders, in fact, assigned all of their causes of action related to the leveraged recapitalization to the Trust. Am. Compl. ¶ 4; *see also* Plan § 7.02. Any proceeds recovered in this action (net of the Trust's costs and the Trustee's and his counsel's fees) will be distributed to the holders of Class 4B

claims under the Plan—*i.e.*, overwhelmingly to the lenders who financed the leveraged

recapitalization in the first place.

###        D.        The Trustee's Amended Complaint

Craig R. Jalbert, the first Liquidating Trustee in this case, commenced this action in

August 2012—nearly six years after the leveraged recapitalization closed—by filing the original

complaint in this adversary proceeding (the "Original Complaint").  After that filing, Mr. Jalbert

was succeeded as Trustee by Mark Holliday.  *See* Notice of Appointment and Acceptance of

Successor Liquidating Trustee, No. 12-1879 (Bankr. S.D.N.Y. May 6, 2013), ECF No. 76.  Mr.

Holliday brings his Amended Complaint asserting six causes of action to avoid and recover the

distributions that the Moving Defendants received as a result of, or in exchange for, their

membership interests.  Am. Compl. ¶¶ 148-211.[5]

The centerpiece of the Amended Complaint is four fraudulent-transfer claims in which

the Trustee purports to sue *not* as the successor to the Debtors' bankruptcy estate, but rather as

the assignee of the Debtors' creditors that financed the leveraged recapitalization and assigned

whatever claims they had to the Trustee.  Am. Compl.  ¶¶ 149, 156, 164, 174.  In these counts,

the Trustee seeks to avoid and recover the cash distributions made by EBG to its members as

actual (Count 1) or constructive (Count 3) fraudulent transfers under state law.  Again asserting

both actual (Count 2) and constructive (Count 4) fraudulent-transfer claims, the Trustee also

seeks to avoid and recover from the Moving Defendants the "value" of the liens granted to the

lenders pursuant to the credit facilities—even though those liens were granted not to the Moving

---

[5] The Trustee's remaining causes of action, brought against various defendant entities and individuals affiliated with
K Road, Harbinger, and the Nominating Committee, are addressed in the separate motions to dismiss filed by those
defendants.

Defendants, but rather to the lenders who financed the transaction and on whose behalf and in whose shoes the Trustee is suing.

The Trustee also asserts claims for unjust enrichment (Count 5) and constructive trust (Count 6), seeking to recover the same distributions from the former members of EBG as he also seeks to recover through his fraudulent-transfer claims. Am. Compl. ¶¶ 187-211. As with his fraudulent transfer claims, the Trustee purports to bring these common law claims, not as successor to the Debtors, but rather standing in the shoes of the Debtors' creditors. *See id.* ¶¶ 188, 198.

Finally, recognizing the untimeliness of his claims under ordinary periods of limitations and repose, the Trustee now pleads that he is entitled to the protections of the discovery rule and/or equitable tolling. Am. Compl. ¶¶ 291-296. In conclusory terms, the Trustee alleges that the limitations period pertinent to each of his claims was tolled, or that his claims did not accrue, "until the discovery, after the Debtors' bankruptcy, of the facts constituting these causes of action." *Id.* ¶¶ 293, 296.

## ARGUMENT

### I.      All Of The Trustee's Claims Are Time-Barred

Each of the transfers the Trustee seeks to avoid is a distribution from EBG—a Delaware limited liability company—to its members. Each transfer is thus subject to the three-year statute of repose that, under the Delaware Limited Liability Company Law, extinguishes members' liability for any and all causes of action to recover distributions received from the LLC. Because the Trustee brought this action nearly six years after the alleged transfers, each of his causes of action is time-barred. And even were that not the case, the Trustee has failed to plead facts

sufficient to entitle him to New York's six-year statute of limitations for his claims.  Neither the

discovery rule nor equitable tolling saves the Trustee's claims from the applicable time bars.

### A.    The Trustee's Claims Are Barred By The Three-Year Statute Of Repose For Distributions From A Delaware LLC To Its Members

#### 1.    The Delaware Statute Of Repose Applies

Delaware law provides a three-year statute of repose for any claims to recover

distributions made by LLCs to their members.  The Delaware Limited Liability Company Law—

pursuant to which EBG was created, and which the Trustee himself pleads applies to

distributions made by EBG (*see* Am. Compl. ¶¶ 252-258)—provides that "a member who

receives a distribution from a limited liability company *shall have no liability under this chapter*

*or other applicable law* for the amount of the distribution *after the expiration of 3 years from the*

*date of the distribution*[.]"  Del. Code Ann. tit. 6, § 18-607(c) (emphasis added).

The statute means what it says.  It completely extinguishes after three years an LLC

member's liability—under any and all laws, on claims brought by the LLC or its creditors—for

distributions made to a member of the LLC.  Indeed, courts have repeatedly recognized that the

statute limits a member's liability for distributions from an LLC, regardless of whether the claim

to recover those distributions is made by the LLC, its representative, or its creditors (or their

representative), regardless of the nature of the claim asserted, and regardless of the theory of

liability under which the claims are brought.  *See, e.g.*, *In re Century City Doctors Hosp., LLC*,

466 B.R. 1, 15 (Bankr. C.D. Cal. 2012) (applying parallel provision in Delaware Limited

Partnership Act to California and Delaware fraudulent-transfer claims brought by trustee

standing in shoes of creditors); *In re Die Fliedermaus LLC*, 323 B.R. 101, 108-09 & n.5 (Bankr.

S.D.N.Y. 2005) (fraudulent-transfer and other claims brought by Chapter 7 trustee subject to

three-year limitations period under "nearly identical" New York LLC law provision).  As one

court put it, interpreting the identically worded Delaware limited partnership law, the statute "is unambiguous":

> [A] limited partner is not liable for any distribution received from a limited partnership, regardless of whether that distribution violated section 17-607(a) or 'other applicable law,' if more than three years have passed since the distribution…. *Section 17-607(c) states that a limited partner 'shall have no liability under this chapter or other applicable law' (6 Del. Code Ann. tit. 6, § 17-607(c) (1999)), making clear that no matter what the basis for liability might be, the three-year expiration period applies.*

*Freeman v. Williamson*, 890 N.E.2d 1127, 1132 (Ill. Ct. App. 1st Dist. 2008) (emphasis added).[6]

Accordingly, courts have held that the three-year limitation period specified in the LLC law supersedes any other, longer limitation period, including under fraudulent-transfer law. *See also Fliedermaus*, 323 B.R. at 108 ("On its face, this provision appears to provide a special limitations or look-back period for any State-based action to recover a 'wrongful distribution' pursuant to § 544(b), whether under the LLCL or other State law."); *see also Century City Doctors Hosp.*, 466 B.R. at 16 ("The court concludes that § 17-607(c)'s three-year bar trumps DUFTA's four-year statute of limitations in the context of an alleged wrongful distribution by a limited partnership organized under Delaware law. A contrary reading would offend the plain, unambiguous text of the statute."); *Williamson v. Culbro Corp. Pension Fund*, 41 A.D.3d 229 (N.Y. App. Div. 1st Dep't 2007), *leave to appeal denied*, 883 N.E.2d 370 (2008) (holding nearly identical statute of limitations governing limited partnerships was intended to override the

---

[6] The views of respected commentators are in accord. *See* Lubaroff & Altman, Lubaroff & Altman on Delaware Limited Partnerships § 6.10, at 6-22 (supp. 2001) (describing parallel provision in Delaware Limited Partnership Act (§ 17-607(c)) as "attempt[ing] to provide a definite point in time that a limited partner will have certainty that a *limited partnership, a general partner or a creditor of the limited partnership cannot compel it to return a distribution made to it*" (emphasis added)); 1 Walker, New York Practice Series–New York Limited Liability Companies and Partnerships: A Guide to Law and Practice § 7:11 (2013) (describing parallel provision in New York Limited Liability Company Law: "A member who knowingly receives a wrongful distribution *is not liable to the LLC or to creditors after three years* from the date of distribution." (emphasis added)).

13

limitations periods of all other applicable law, including that applicable to a claim of unjust

enrichment).

These decisions flow from the plain language of the statute, which provides that once

three years have passed following a distribution to a member of a Delaware LLC without the

commencement of any action challenging that distribution, the member shall have "no liability"

under any "law."  By enforcing the three-year statute of repose in the statute that specifically

addresses distributions to a member of a Delaware LLC over longer limitations periods in

general fraudulent transfer statutes, these cases honor the "basic tenet of statutory interpretation

that a statute which addresses the matter in specific terms controls over a statute which addresses

the issue in general terms."  *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 680 (S.D.N.Y. 2011)

(internal quotation marks omitted).

Moreover, the Delaware law is a statute of repose, not merely a statute of limitations.[7]

This is significant because, under New York's choice-of-law principles, which this Court must

apply,[8] statutes of repose are substantive and not merely procedural.  *See Tanges v. Heidelberg*

*N. Am., Inc.*, 710 N.E.2d 250, 253 (N.Y. 1999) (applying New York choice-of-law principles and

determining that Connecticut's statute of repose governs).  The Delaware statute thus

extinguishes any liability that the members of a Delaware LLC might otherwise have under New

York law.  Indeed, a New York court has applied the Delaware statute and its New York analog

to bar fraudulent-transfer claims brought under the New York Debtor & Creditor Law against

members of a Delaware LLC, holding that the special limitations statute "overrides the limitation

---

[7] As the Second Circuit has explained, "a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period.  Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit."  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004); *see also Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 380-81 (S.D.N.Y. 2011) ("The statute of repose is meant 'to serve as a cutoff,' extinguishing a defendant's liability to a plaintiff who has failed to assert a claim within the limitations period.").

[8] *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992), discussed *infra* Section I.B.

14

period applicable to any claim brought under the DCL with regard to distributions made by a limited liability company to a member." *Mostel v. Petrycki*, 885 N.Y.S.2d 397, 399 (N.Y. Sup. Ct. 2009) (withdrawal of capital investment by managing member of Delaware LLC subject to the three-year limitations period set forth in the Delaware Limited Liability Company Law, not the six-year period set forth in New York's fraudulent-transfer law).[9]

## 2.    The Delaware Statute Bars Each Of The Trustee's Claims

The Moving Defendants were EBG's members—*i.e.*, each was a holder of interests in EBG, a Delaware limited liability company—and the payments that the Trustee seeks to recover were "distributions." As the Amended Complaint itself alleges, EBG made the payments in respect of each Moving Defendant's status as a member of EBG. *See, e.g.*, Am. Compl. ¶ 165 ("Such Transfers purported to be in payment of a dividend on the equity membership interest of relevant Transferee Defendants …, to redeem warrants of relevant Transferee Defendants … and to redeem the equity membership interests of relevant Transferee Defendants[.]"); *see also id.* ¶ 132 ("EBG disbursed more than $1 billion … in payment of dividends on EBG's members'

---

[9] The Moving Defendants are aware of one decision in which a court declined to apply section 18-607(c) to distributions from a Delaware LLC in a fraudulent-conveyance action brought under Texas law. *In re Heritage Org., L.L.C.*, 413 B.R. 438 (Bankr. N.D. Tex. 2009). Even if *Heritage* was correctly decided—and the Moving Defendants believe that it was not—it is readily distinguishable. The court's ruling turned on a perceived conflict between Texas's four-year statute of limitations for fraudulent-conveyance claims and Delaware's three-year statute of repose for distributions to LLC members. Critically, Texas did not have a shorter statute of repose for claims seeking to set aside distributions by an LLC to its members. *See* Tex. Bus. Orgs. Code Ann. § 101.206 (omitting limitation period for recovery of prohibited LLC distributions). Accordingly, the court held that the creditor-protection policy manifest in Texas's fraudulent-transfer law took precedence and that statute's longer limitations period governed. *Heritage*, 413 B.R. at 461-63. In this case, in contrast, there is no conflict between New York and Delaware law. New York has a "nearly identical" provision to the Delaware statute, also establishing a three-year statute of repose for distributions to members of a New York LLC. *See Fliedermaus*, 323 B.R. at 109 n.5; *see* NY Ltd. Liab. Co. Law § 508(c) (A "member who receives a wrongful distribution from a limited liability company shall have no liability under this article or other applicable law for the amount of the distribution after the expiration of three years from the date of the distribution"). Thus, in both Delaware and New York, distributions to LLC members are subject to a specific three-year limitations period that overrides the limitations period under other, more general laws of the state. That is, like Delaware—and unlike Texas—New York's policy is to protect distributions to LLC members through a three-year statute of repose, notwithstanding the longer limitation period generally available for fraudulent-transfer claims. Enforcing Delaware law in this case, therefore, will do no violence to New York's policy interests. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (explaining no choice of law analysis is necessary where the laws of the two possible forums do not conflict).

15

equity interests …, [and] redeem EBG's members' equity units pursuant to a tender offer[.]").

The payments were thus "distributions" within the meaning of the statute. *See Interactive Corp.*

*v. Vivendi Universal, S.A.*, No. Civ. A. 20260, 2004 WL 1572932, *3 (Del. Ch. June 30, 2004)

(distributions include the "payment of cash or property to a partner out of earnings or as an

advance against future earnings, or a payment of the partners' capital in partial or complete

liquidation of the partner's interest"); *Century City Doctors Hosp.*, 466 B.R. at 14 (same); *In re*

*Young*, 384 B.R. 94, 101 (Bankr. D.N.J. 2008) (defining "distribution" for purposes of the

identically worded New Jersey Limited Liability Company Act:  "The typical nature of a

distribution is the distribution of profits or the return of capital").[10]

The Delaware statute of repose, therefore, extinguished EBG members' liability for the

distributions made as part of the December 2006 leveraged recapitalization no later than

December 2009, nearly a year before the Debtors went into bankruptcy, and more than two and a

half years before the Trustee filed the Original Complaint in August 2012.  Each of the Trustee's

claims against the Moving Defendants is barred.

### 3.    Neither The Discovery Rule Nor Equitable Tolling Applies

Neither the discovery rule nor equitable tolling saves the Trustee's claims, because

neither form of relief applies to statutes of repose.  As the Second Circuit recently observed,

statutes of repose "run without interruption once the necessary triggering event has occurred,

*even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or*

*could not yet have, discovered that she has a cause of action.*"  *Fed. Hous. Fin. Agency v. UBS*

---

[10] While the Delaware LLC law does not define "distribution," New York's "nearly identical" LLC law defines the term to mean "the transfer of property by a limited liability company to one or more of its members in his or her capacity as a member."  NY Ltd. Liab. Co. Law § 102(i); *see also* Del. Code Ann. tit. 6, § 15-101(4) (Delaware Revised Uniform Partnership Act, defining the term "distribution" to mean "a transfer of money or other property from a partnership to a partner in the partner's capacity as a partner or to a transferee of all or a part of a partner's economic interest").

*Americas Inc.*, 712 F.3d 136, 140 (2d Cir. 2013) (emphasis added; internal quotation marks

omitted); *see also Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013)

("[S]tatutes of repose create a substantive right in those protected to be free from liability after a

legislatively-determined period of time…. For instance, a statute of repose may bar a claim even

before the plaintiff suffers injury, leaving her without any remedy. And, as most important here,

a statute of repose is subject only to legislatively created exceptions, and not to equitable

tolling.") (internal alterations, quotation marks, and citations omitted)). Thus, even if the

Amended Complaint adequately pleaded entitlement to the discovery rule or equitable tolling—

and it does not (*see infra* Section I.B.2)—neither doctrine could save the Trustee's claims from

the Delaware statute of repose.

### B.    The Trustee Cannot Take Advantage Of New York's Six-Year Statute Of Limitations

#### 1.    The Trustee Has Failed To Plead His Entitlement To New York's Statute Of Limitations

Even if all of the Trustee's claims were not barred by the three-year statute of repose, his

fraudulent-transfer claims are also time-barred for a second, independent reason. The Trustee

necessarily assumes that those claims are subject to New York's six-year statute of limitations

for fraudulent transfer—the only potentially applicable statute of limitations that would allow

claims arising from December 2006 transfers to be timely brought in August 2012. But the

Trustee has failed to plead facts showing that New York's statute of limitations applies. The

claims must therefore be dismissed.

The Trustee has invoked this Court's jurisdiction under 28 U.S.C. § 1334. Am. Compl.

¶ 35. A federal court exercising such bankruptcy jurisdiction must apply the choice-of-law rules

of the forum state (here, New York) to determine the applicable statute of limitations for

fraudulent-transfer claims. *See In re Koreag*, 961 F.2d at 350 (federal court sitting in bankruptcy

17

jurisdiction must apply forum state's choice of law rules when state law determines the underlying rights and obligations).

"New York courts generally apply New York's statute of limitations even when the injury giving rise to the action occurred outside New York.  This general rule, however, is subject to a traditional statutory exception, New York's 'borrowing statute.'"  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).  Under New York's borrowing statute, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued."  *Id.* (citing N.Y. C.P.L.R. § 202); *see also Ins. Co. of N. Am. v. ABB Power Generation, Inc*., 690 N.E.2d 1249, 1253 (N.Y. 1997) ("Only where the cause of action accrues in favor of a New York resident is this rule rendered inapplicable.").

Accordingly, in cases like this one, fraudulent-transfer actions brought under the New York Debtor & Creditor Law may be subject to limitations periods specified under the laws of other states that are shorter than the six years New York generally provides.  *See Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 29-30 (S.D.N.Y. 2002) (applying New Jersey's four-year statute of limitations to NY DCL fraudulent transfer claims because debtor had its principal place of business in New Jersey); *see also Williams v. Infra Commerc Anstalt*, 131 F. Supp. 2d 451, 455-56 (S.D.N.Y. 2001) (fraudulent conveyance action brought under New York law barred by either Florida or Delaware four-year statute of limitations because petitioner was Delaware entity acting as receiver for entity resident in both Delaware and Florida).

Here, the requirements for application of New York's borrowing statute—and the shorter limitation periods prescribed under the laws of other states—are met. As to Counts One through Four, in which he purports to sue in the shoes of the Debtors' creditors, the Trustee is the resident of the state of each assigning creditor at the time of the alleged fraudulent transfer. *Gluck v. Amicor, Inc.*, 487 F. Supp. 608, 612 (S.D.N.Y. 1980) (applying borrowing statute to claims brought by trustees for litigation trusts, because claims had accrued in favor of nonresident assignors that had assigned the claims to the litigations trusts); *see also Portfolio Recovery Assocs., LLC v. King*, 927 N.E.2d 1059, 1061 (N.Y. 2010) (for purposes of applying borrowing statute, plaintiff, "as the assignee of Discover, is not entitled to stand in a better position than that of its assignor").[11]  To the extent the Trustee purports to stand in the shoes of creditors that do not reside in New York, the Trustee's causes of action did not arise in New York. Instead, any injury underlying the Trustee's claims accrued in the injured party's state of residence. *See Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."); *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999) ("For purposes of the New York borrowing statute, a cause of action accrues where the injury is sustained rather than where the defendant committed the wrongful acts.").

The borrowing statute is meant to dissuade precisely what the Trustee is seeking to do here: "forum shopping by nonresidents attempting to take advantage of a more favorable statute of limitations in this state." *King*, 927 N.E.2d at 1062.  Accordingly, "[w]ith respect to the borrowing statute, … New York law appears to place the burden of proving residency upon the

---

[11] The Trustee is himself a resident of Oregon, and thus has no personal claim to application of New York law. *See* Appointment and Acceptance of Successor Liquidating Trustee for the BosGen Liquidating Trust, *In re Boston Generating, LLC, et al.*, No. 10-14419 (Bankr. S.D.N.Y. Apr. 9, 2013), ECF No. 1137.  Fraudulent-transfer claims are subject to a four-year statute of limitations under Oregon law. *See* Or. Rev. Stat. § 95.280.

19

party seeking to take advantage of the New York statute." *Katz v. Goodyear Tire & Rubber Co*.,
737 F.2d 238, 243 (2d Cir. 1984) (plaintiff " had the burden of proving that he was domiciled in
New York … at the time of the accident"); *see Silva v. Toll Brothers' Inc*., No. 97 Civ. 741, 1998
WL 898307, at *2 (S.D.N.Y. Dec. 23, 1998) (plaintiff had "the burden of establishing [her]
residency in order to take advantage of the borrowing statute"; if she is " unable to establish that
[she] was a resident of New York at the time of the accrual of the claim, she would face the
shorter of the two statutes of limitations under CPLR 202").[12]

The Trustee was therefore required to plead, on behalf of each creditor in whose shoes he
purports to stand, entitlement to New York's six-year statute of limitations.  Because the
Amended Complaint fails to identify any of the Debtors' creditors that purported to assign their
claims to the Trustee (much less the residence of any such creditor), the Trustee has failed to
plead any facts showing that New York's six-year statute of limitations applies to each of the
fraudulent-transfer claims assigned to the Trust.  This failure is consequential, as many states
have statutes of limitations for fraudulent transfer claims that are substantially shorter than New
York's—and thus would bar these creditors' claims as untimely.  *See, e.g.*, Del. Code Ann. tit. 6,
§ 1309 (four years); Mass. Gen. Laws Ann. ch. 109A, § 10 (four years).  These claims should be
dismissed unless the Trustee can demonstrate his entitlement to New York's six-year statute of
limitations for each claim of each assigning creditor.

### 2.    The Trustee Has Failed To Plead His Entitlement To Equitable Tolling Or The Discovery Rule

Again, neither equitable tolling nor the discovery rule saves the Trustee's claims from
untimeliness as to the Moving Defendants.  As an initial matter, equitable tolling is inapplicable

---

[12] District court decisions that have placed the burden on the defendant, *see, e.g.*, *Maslan v. Am. Airlines, Inc*., 885
F. Supp. 90, 93 (S.D.N.Y. 1995), conflict with the controlling holding of the Second Circuit that "initially [the
plaintiff] had the burden of proving [residency]," *Katz*, 737 F.2d at 243.

to state-law claims—*i.e.*, the Trustee's fraudulent-transfer, unjust-enrichment, and constructive-

trust claims—and thus cannot save the Trustee's claims from untimeliness. *See, e.g.*, *Von*

*Hoffmann v. Prudential Ins. Co*., 202 F. Supp. 2d 252, 264 (S.D.N.Y. 2002). In all events,

equitable tolling is available only upon a showing that, among other things, "the defendant

concealed from plaintiff the existence of plaintiff's cause of action." *In re Mediators, Inc.*, 190

B.R. 515, 524 (S.D.N.Y. 1995). Because equitable tolling depends upon the *defendant's*

misconduct, allegations of fraudulent concealment by a third party do not state a claim against an

innocent defendant. *Id*. (no equitable tolling where plaintiff could not show that defendant either

actively participated in the concealment or that defendant's participation was self concealing).

The statute of limitations is not "tolled for a blameless defendant." *Strauss v. Credit Lyonnais,*

*S.A.*, No. 06-0702, 2007 WL 2296832 at *8 (E.D.N.Y. Aug. 6, 2007) ("[P]laintiffs have alleged

no conduct on the part of [defendant] … alleging only that the activities were 'inherently self-

concealing.' Since the Second Circuit requires some affirmative act by defendants to invoke

[equitable tolling] and plaintiffs have alleged no such act, I conclude that plaintiffs have failed to

plead facts which demonstrate that equitable tolling … should apply."). While the Amended

Complaint alleges misconduct by other defendants, it is devoid of any allegations of misconduct

by any Moving Defendant. To the contrary, each is named as a defendant merely by virtue of its

"recei[pt of] a transfer or distribution pursuant to the Leveraged Recap Transaction." Am.

Compl. ¶ 5. That is insufficient to entitle the Trustee to the "extraordinary" relief of equitable

tolling. *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002).

The same analysis applies to the Trustee's assertion of the discovery rule. The

"discovery rule was crafted specifically for claims of fraud because, in such circumstances, *a*

*defendant's deceptive conduct* may prevent a plaintiff from even knowing that he or she has been

21

defrauded." *Urbont v. Sony Music Entm't*, 863 F. Supp. 2d 279, 284-85 (S.D.N.Y. 2012)

(emphasis added; internal quotation marks omitted).  The Trustee has not alleged any deceptive

conduct by any of the Moving Defendants, and therefore the statute of limitations on his claims

cannot be extended as to these "blameless defendants." *Strauss*, 2007 WL 2296832, at *8 n.20.

And even if the Trustee could benefit from the discovery rule as to any of the Moving

Defendants, the rule could not apply to the Trustee's claims for fraudulent transfer, unjust

enrichment, or constructive trust.[13]

Moreover, the Amended Complaint alleges that the key facts were known at the time of

the transfer.  For example, the Trustee alleges that the debtors were "balance sheet insolvent

upon the completion of the Leveraged Recap Transaction," and that this fact was evident from

contemporaneous financial projections.  *See* Am. Compl. ¶ 137.  The Trustee further alleges that

even before that transaction was completed, there was speculation that "in the event of a

bankruptcy BostonGen would be able to pay only 'a meaningful recovery'—somewhere between

50% and 80%—on the Second Lien Debt," and there would be "no recovery on the Mezzanine

Debt." *Id*. ¶ 139.  These facts are among the principal "badges of fraud" alleged in the Trustee's

claims for actual fraudulent transfer.  *See id.* ¶¶ 153, 159.  Because on the Trustee's own

allegations these facts were all known at the time of the challenged transfers, there is no basis to

find that claims arising from those transfers accrued any later than the transfers themselves.

---

[13] *See US Bank Nat'l Ass'n v. Gestetner*, 103 A.D. 3d 962, 963 (N.Y. App. Div. 2013) (discovery rule does not
apply to claims in equity, including unjust enrichment); *Mahmood v. Research in Motion Ltd.*, No. 11 Civ. 5345,
2012 WL 242836, at *4 (S.D.N.Y. Jan. 24, 2012) ("[T]he statute of limitations in New York for claims for unjust
enrichment ... is not subject to the discovery rule."); *Kaufman v. Cohen*, 307 A.D. 2d 113, 127 (N.Y. App. Div.
2003) (constructive trust claim "run[s] upon occurrence of the wrongful act giving rise to a duty of restitution, and
not from the time when the facts constituting the fraud are discovered"); *In re Allou Distribs., Inc.*, 446 B.R. 32, 67
(Bankr. E.D.N.Y. 2011) (discovery rule "applicable to actual fraud claims does not apply to constructive fraud
claims").

Accordingly, even if the Delaware statute of repose did not bar the Trustee's claims, they would be untimely and subject to dismissal.

## II.    The Trustee's Claims Fail As A Matter Of Substantive Bankruptcy Law

In addition to being untimely, all of the Trustee's claims fail under black-letter bankruptcy law.  *First*, each of the Trustee's claims is barred by the safe harbor codified in § 546(e), which protects "settlement payment[s]" and payments "in connection with a securities contract" from avoidance and recovery.  The Trustee's efforts to circumvent the safe harbor—by pleading his causes of action on behalf of the Debtors' creditors under state law (Counts One through Six)—run afoul of well-established precedent.  *Second*, the Trustee cannot recover from the Moving Defendants the value of the liens granted by the Debtors to their lenders (Counts Two and Four) because the remedy provided under the law where a non-possessory lien is avoidable as a fraudulent transfer is the avoidance of the lien itself, not the recovery of the supposed value of that lien from third parties (let alone the recovery of that value for the benefit of the lenders that received the lien in the first place).

### A.    The Transfers Are Exempt From Avoidance Under Section 546(e)'s Safe Harbor

Congress enacted § 546(e) of the Bankruptcy Code to prevent the exact claims the Trustee asserts here.  Relying on state fraudulent-transfer law, the Trustee seeks to avoid and recover hundreds of millions of dollars paid to members of EBG in connection with the redemption of their interests in the limited liability company.  These were paradigmatic "settlement payment[s]" or payments "in connection with a securities contract"; they are subject to § 546(e)'s safe harbor, and they are unavoidable.  To the extent the Trustee seeks to evade § 546(e)'s safe harbor by purporting to stand in the shoes of the Debtors' creditors and pleading

his causes of action under state law, those claims are preempted because they would frustrate

federal law: § 546(e).

### 1.    The Payments To EBG's Members Were Settlement Payments Or Payments In Connection With A Securities Contract

Section 546(e) establishes "limitations on avoiding powers," including an absolute "safe

harbor" protecting a settled securities transaction or a transfer in connection with a securities

contract from being unwound under state law as either a constructive or actual fraudulent transfer

when a party to the transaction files for bankruptcy protection.[14]  The statute provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a … settlement payment … made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract … except under section 548(a)(1)(A).

This provision reflects Congress' judgment that, once a debtor files for bankruptcy and

except where actual fraud can be shown under § 548(a)(1)(A), the avoiding powers must not be

permitted to unwind payments made to or from brokers and other financial institutions in

connection with the purchase and sale of securities, lest such unwinding throw the nation's

financial markets into turmoil.  *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651

F.3d 329, 334 (2d Cir. 2011) (Congress enacted § 546(e) to "minimiz[e] the displacement caused

---

[14] While the safe harbor carves out claims for intentionally fraudulent transfers brought under federal law (section 548(a)(1)(A)), the Trustee makes no claim under that section (presumably because the two-year reach-back for such a claim has long since passed).  Section 546(e) undoubtedly applies to both constructive and intentional fraudulent transfer claims brought under state law.  *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 892 F. Supp. 2d 805, 817 (N.D. Tex. 2012) (rejecting argument that 546(e) does not apply to state fraudulent-transfer claims; "The fact that Congress did expressly exclude Section 548(a)(1)(A) implies that it did not want to exclude state 'actual intent' fraudulent transfer claims."); *see also Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 370 (W.D. Pa. 2006) ("[I]f Congress had intended to exempt from § 546(e)'s protection allegations of actual fraud under state law fraudulent transfer theories, it could have easily done so."); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del., Inc.)*, 274 B.R. 71, 98 (D. Del. 2002) (finding it "clear" that Congress did not intend to exempt from Section 546(e) state-law fraudulent transfer claims brought under § 544).

24

in the commodities and securities markets in the event of a major bankruptcy affecting those

industries …. The safe harbor limits this risk[.]" (internal citations omitted)).

Consistent with its manifest purpose, courts—including the Second Circuit—have

interpreted § 546(e) broadly. *See, e.g.*, *Enron*, 651 F.3d at 336 (rejecting limitation on § 546(e)

because the proffered "reading of the statute would result in commercial uncertainty and

unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and

predictability are at a premium"); *In re Quebecor World (USA) Inc.*, 719 F.3d 94, 100 (2d Cir.

2013); ("A clear safe harbor for transactions made through these financial intermediaries

promotes stability in their respective markets and ensures that otherwise avoidable transfers are

made out in the open, reducing the risk that they were made to defraud creditors."); *see also In re

Adler, Coleman Clearing Corp.*, 263 B.R. 406, 477 (S.D.N.Y. 2001) ("The intent to reach

broadly to encompass all aspects of securities industry practices is manifested in the language of

the statute.").

Under the plain wording of the statute, the payments made to EBG's members fall

squarely in § 546(e)'s safe harbor as unavoidable (1) "settlement payment[s] … made by or to …

[a] stockbroker, financial institution, financial participant, or securities clearing agency," (2)

transfers made by or to such entities "in connection with a securities contract," or (3) both.

> a)      **The Transfers Fall Squarely Within The Safe Harbor For
>         "Settlement Payments"**

>> (i)      **The Transfers Were "Settlement Payments"**

The Bankruptcy Code defines "settlement payment" expansively, as "a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment, a net settlement payment, or any other similar

payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A). Consistent with

25

the expansive reading generally afforded § 546(e)'s limitation on avoiding powers, courts construe this definition "extremely broad[ly]." *Enron*, 651 F.3d at 334 (quoting *In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir. 2009)); *see also In re Quebecor World (USA) Inc.*, 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011) ("[A] settlement payment, quite simply, is a 'transfer of cash … made to complete [a] securities transaction.'" (quoting *Enron*, 651 F.3d at 334)), *aff'd*, 719 F.3d 94 (2d Cir. 2013); *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990). Thus, as the Second Circuit has held, a settlement payment comprises any "transfer of cash … made to complete [a] securities transaction," including payments made to acquire or redeem securities, as in leveraged buyouts and similar transactions. *Enron*, 651 F.3d at 337-39 (settlement payment includes "payments made to redeem tradeable debt securities"); *see also, e.g.*, *QSI Holdings*, 571 F.3d at 550; *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 (10th Cir. 1991).

This expansive definition applies to transactions involving LLC membership interests. Such interests are securities under the Bankruptcy Code. *See* 11 U.S.C. § 101(49)(A); *see also In re SeaQuest Diving, LP*, 579 F.3d 411, 418 (5th Cir. 2009) ("Jones's LLC interest either qualifies as a 'transferable share' [under 11 U.S.C. § 101(49)(A)(viii)] or falls within the broad residual category [11 U.S.C. § 101(49)(A)(xiv)]."); *In re Tristar Esperanza Props., LLC*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013) ("[A]n interest of a member in an LLC is a 'security[.]'").

By his own admission, the "Transfers" that the Trustee seeks to avoid consist principally of redemptions and repurchases of the Moving Defendants' LLC membership interests, and dividends made in contemplation of and in connection with those redemptions as part of a single, integrated transaction settling EBG's repurchase of outstanding membership interests. *See, e.g.*, Am. Compl. ¶ 132. The Second Circuit has held that such payments, made by a company to

redeem securities, are "settlement payments" within the meaning of § 546(e). *Enron*, 651 F.3d at

336; *see also QSI Holdings, Inc*., 57l F.3d at 549-50 ("underscor[ing] the breadth of the §546(e)

exemption" and treating transfers as qualifying "settlement payments"); *Contemporary Indus. v.

Frost*, 564 F.3d 981, 986 (8th Cir. 2009) (same); *cf. In re Derivium Capital LLC*, 716 F.3d 355,

364-65 (4th Cir. 2013) (commission paid to stockbroker protected as "settlement payment"

because "Section 546(e)'s plain language, viewed through the lens of its legislative intent, does

not exclude commissions and fees commonly paid to stockbrokers as part of setting a regular

securities transaction").

### (ii)    The Transfers Were Made "By" Or "To" A "Financial Institution"

The one other requirement of § 546(e) is also easily met here.  The settlement payments

were made both "by" and "to" covered participants, for at least two independent reasons—either

of which, standing alone, suffices to satisfy the statutory requirement.

*First,* the transfers were made from EBG "to" The Bank of New York—a financial

institution[15]—which acted "as agent for tendering [m]embers for the purpose of receiving

payment from [EBG]."  Offer to Purchase 19 (Schoenfeld Decl., Exh. 1).  It is well-settled in this

Circuit that settlement payments that pass through a bank acting as a depository or paying agent,

which then passes on the funds to selling security holders, are made "to" a financial institution

for purposes of § 546(e).  *Enron*, 651 F.3d at 338 (payments made through "financial

intermediaries who serve[] only as conduits" and do not take title qualify as settlement payments

protected by § 546(e)); *see also In re Resorts Int'l*, 181 F.3d at 516 (payments made through

debtor's bank to shareholders were "settlement payments" protected by section 546(e)).  Indeed,

---

[15] The Court can take judicial notice that The Bank of New York is a financial institution within the meaning of
§ 546(e).  *See In re Refco Sec. Litig.*, No. 09 Civ. 2885, 2009 WL 7242548, at *6-8 (S.D.N.Y. Nov. 13, 2009)
(taking judicial notice that The Bank of New York is a financial institution), *adopted*, 2010 WL 5129072 (S.D.N.Y.
Jan. 12, 2010).

the Second Circuit confirmed this rule of law only a few months ago.  *See Quebecor*, 719 F.3d at

98 ("In *Enron*, we … concluded that the absence of a financial intermediary that takes title to the

transacted securities during the course of the transaction is [not] a proper basis on which to deny

safe-harbor protection." (internal quotation marks omitted)).

*Second*, while it is sufficient that the transfers were made "to" The Bank of New York,

the transfers were also made "by" that same financial institution "to" each of the Moving

Defendants' own banks (also financial institutions):  Pursuant to the terms of the Offer to

Purchase, The Bank of New York acted "as agent for tendering [m]embers for the purpose of …

transmitting payment to the tendering [m]embers."  Offer to Purchase 19.  These payments, from

the Debtors' financial institution to the selling interest-holders' own financial institutions, also

satisfy the statutory requirement.[16]  *See In re Plassein Int'l Corp.*, 366 B.R. 318, 323-25 (Bankr.

D. Del. 2007) (same), *aff'd*, 590 F.3d 252 (3d Cir. 2009); *In re Loranger Mfg. Corp.*, 324 B.R.

575, 585-86 (Bankr. W.D. Pa. 2005) (same).[17]

---

[16] Even had the payments been made directly from EBG to its members, the "by" and "to" requirements of § 546(e) would be satisfied to the extent such payments were made by wire transfer or check.  *See AP Servs. LLP v. Silva*, 483 B.R. 63, 69 (S.D.N.Y. 2012) ("LBOs in which payments were made directly to shareholders' bank accounts via wire transfer fell within Section 546(e)."), *appeal heard* No. 12-4875 (2d Cir. May 22, 2013); *In re Tougher Indus., Inc.*, No. 06-12960, 2013 WL 5592902, at*5-6 (Bankr. N.D.N.Y. Oct. 10, 2013) (same).

[17] Though the Court need not concern itself with the question, the alleged transfers are covered by the safe harbor for the additional, independent reason that they were made "to" each of the Moving Defendants, many of which themselves fall within one of the categories of financial participants covered by § 546(e).  *See Enron*, 651 F.3d at 339-40 (construing "financial institution" broadly to effectuate purposes of § 546(e)).  For example, the Moving Defendants include Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, and Morgan Stanley & Co. LLC—each a well-known financial institution, serving variously as, among other things, a "stockbroker" and/or a "commodity broker" within the meaning of the statute.  *See, e.g.*, 11 U.S.C. § 101(6), (53A)).  The Court can take judicial notice that these entities are financial institutions, stockbrokers, and or commodity brokers.  *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006) (taking judicial notice that Chase Manhattan Bank was a financial institution for purposes of § 546(e)); *Refco*, 2009 WL 7242548, at *6-8 (same, with respect to The Bank of New York); Credit Suisse Group AG Form 6-K, § 1.1.1 (Oct. 3, 2013) (identifying Credit Suisse Securities (USA) LLC as a broker dealer); The Goldman Sachs Group, Inc. Form 10-Q, at 94 (Aug. 8, 2013) (identifying Goldman, Sachs & Co. as a broker dealer"); *In the Matter of J.P. Morgan Securities LLC, et al.*, File No. 812-14094, at 5 (S.E.C. Jan. 9, 2013) (identifying J.P. Morgan Securities LLC as a broker dealer); Morgan Stanley Form 10-Q, at 87 (Aug. 2, 2013) (identifying Morgan Stanley & Co. as a broker dealer).

Because the transfers were thus settlement payments made by and/or to covered participants, they are protected by the safe harbor and thus unavoidable by the Trustee.

> **b)**  **The Transfers Also Fall Squarely Within The Safe Harbor For Payments "In Connection With A Securities Contract"**

The transfers are unavoidable for a second, independent reason:  They were each payments made "in connection with a securities contract."  The Bankruptcy Code defines "securities contract" broadly to mean, among other things, "a contract for the purchase, sale, or loan of a security … including any repurchase," as well as "any other agreement or transaction that is similar to" such a contract.  11 U.S.C. § 741(7)(A)(i) & (vii); *see also In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012) ("The plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements."); *Quebecor*, 719 F.3d at 98-100 (applying "securities contract" safe harbor).  Likewise, courts have construed the phrase "in connection with" broadly to mean "related to."  *Lehman Bros.*, 469 B.R. at 442; *see also Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 747 (7th Cir. 2013) (applying §546(e) to bar trustee's avoidance claims, and finding that "'in connection with' … is more than comprehensive enough to cover the Funds' redemption of the investors' shares").[18]

The transfers the Trustee seeks to avoid were, as the Amended Complaint makes plain, made in connection with—they "related to"—a contract for the purchase of LLC membership interests in EBG, namely the Offer to Purchase.  Pursuant to the Offer to Purchase, EBG

---

[18] Cases construing the term "in connection with" as used in other federal statutes are in accord.  *See, e.g.*, *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) ("in connection with" interpreted to mean "touching" a sale or purchase of a security); *United States v. Nouri*, 711 F.3d 129, 143 (2d Cir. 2013) ("in connection with" requirement is "broad" and "easily satisfied"), *cert. denied sub nom. Martin v. United States*, No. 13-5554, 2013 WL 3939527 (Oct. 7, 2013).

members tendered their membership interests, which were purchased by EBG.  And the tender

offer was part of an integrated transaction—which the Complaint describes as a singular

"Leveraged Recap Transaction"—that comprised the tender offer, the redemption of warrants,

and the payment of a dividend.  *See* Am. Compl. ¶¶ 132-33 (describing Offer to Purchase as

basis for leveraged recapitalization and the related transactions).  These transactions thus

occurred pursuant to a "contract for the purchase, sale, or loan of a security," and also fall within

the catch-all provision of the Bankruptcy Code's definition of "securities contract," which

extends § 546(e)'s safe harbor to transfers made in connection with "any other agreement or

transaction that is similar to," among other things, "a contract for the purchase, sale, or loan of a

security."  *See Quebecor*, 719 F.3d at 98 (transfers were "in connection with a securities

contract" because "QWUSA transferred funds to appellee's trustee CIBC Mellon, in the amount

and manner prescribed by the [Note Purchase Agreements] for purchasing the Notes").

Finally, for the same reasons enumerated above, each of these payments was made "by"

and/or "to" a financial institution that falls within the statute's expansive coverage.  For this

independent reason as well—that the payments were made "in connection with a securities

contract"—the transfers the Trustee seeks to avoid are protected by the safe harbor of § 546(e).

### 2.    The Trustee's Attempt To Evade The Safe Harbor Fails

The Trustee himself evidently recognizes that the transfers fall within the safe harbor of

§ 546(e).  It is presumably for that very reason that he purports to bring Counts One through

Four not as successor to the bankruptcy estate under § 544—in which case the claims would

plainly be barred by § 546(e)—but rather as assignee of the lenders themselves under state

fraudulent-transfer law.  But this effort to circumvent the safe harbor fails.  Were the Trustee

able to use state law to evade § 546(e), federal law would be frustrated.  Under the well-

30

established law of conflict preemption, all of his state-law claims against the Moving Defendants (Counts One through Six) are preempted.

Under the Supremacy Clause, state laws that interfere with federal law are preempted. U.S. Const. art. VI, § 2. As a result, it is "well-settled … that a state law is preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (internal quotations omitted). "Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010).

Late last Term, the Supreme Court confirmed the black-letter principles of implied conflict preemption law that apply here. Congress undoubtedly "has the power to pre-empt state law expressly." *Hillman v. Maretta*, 133 S. Ct. 1943, 1949 (2013). But state law is also "pre-empted to the extent of any conflict with a federal statute. Such a conflict occurs … when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1949 (internal citations and quotation marks omitted).[19]

The Trustee's state-law claims stand as an obstacle to the achievement of the full purposes of § 546(e). Congress enshrined in § 546(e) a federal safe harbor intended to bar the avoidance and recovery (except under § 548(a)(1)(A), which the Trustee cannot and does not

---

[19] There is no presumption against preemption in the field of bankruptcy because "there is a history of significant federal presence in this area of regulation." *Whyte v. Barclays Bank PLC*, 494 B.R. 196, 200 n.6 (S.D.N.Y. 2013) (citing *United States v. Locke*, 529 U.S. 89, 108 (2000)), *appeal pending*, No. 13-2653 (2d Cir.). Indeed, an even stronger form of implied preemption—field preemption—bars the Trustee's claims. Field preemption applies where "federal law so thoroughly occupies a legislative field 'as to make the reasonable inference that Congress left no room for the States to supplement it.'" *Silva*, 483 B.R. at 71 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Courts have regularly determined that bankruptcy is one such field: "The 'dominant' federal interest that precipitates field preemption in the bankruptcy arena is nothing less than the primary constitutional imperative under the Bankruptcy Clause—uniformity." *In re Pruitt*, 401 B.R. 546, 553 (Bankr. D. Conn. 2009). Where field preemption applies, "the national purpose to establish uniformly necessarily excludes state regulation." *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929). No conflict or frustration analysis is required. Here, because conflict preemption so clearly applies, the Moving Defendants do not address at length field preemption.

seek to invoke, *see supra* n.14) of settlement payments where, as here, the debtor files for

bankruptcy. And, by its terms, that safe harbor bars state law claims that a bankruptcy trustee—

the statutory "successor" to the "creditors"—could otherwise invoke. 11 U.S.C. § 544.

Congress so acted in order to ensure finality and stability in the nation's financial

markets. *See Contemporary Indus.*, 564 F.3d at 986-87; *Hechinger*, 274 B.R. at 88; *In re U.S.*

*Mortg. Corp.*, 492 B.R. 784, 805 (Bankr. D.N.J. 2013). Congress "enacted § 546(e)'s safe

harbor in 1982 as a means of 'minimiz[ing] the displacement caused in the commodities and

securities markets in the event of a major bankruptcy affecting those industries." *Quebecor*, 719

F.3d at 100 (quoting *Enron*, 651 F.3d at 334). "If a firm is required to repay amounts received in

settled securities transactions, it could have insufficient capital or liquidity to meet its current

securities trading obligations, placing other market participants and the securities markets

themselves at risk." *Id.* (quoting *Enron*, 651 F.3d at 334). "By restricting a bankruptcy trustee's

power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe

harbor stands at the intersection of two important national legislative policies on a collision

course—the policies of bankruptcy and securities law." *Enron*, 651 F.3d at 334 (internal

quotation marks omitted). Congress precluded the assertion of state-law fraudulent transfer

claims where the debtor files for bankruptcy and the transfers implicate the securities markets

because it determined that, in such circumstances, the states' interest in protecting creditors

through fraudulent-transfer law must give way to the federal policy of "protect[ing] the nation's

financial markets from the instability caused by the reversal of settled securities transactions."

*Kaiser Steel Corp.*, 913 F.2d at 848 (citation omitted).

These "patent purpose[s] and intended effects" of the safe harbor "would be totally

undercut if, at the same time that a trustee in bankruptcy was prohibited from avoiding

32

[settlement payments or payments in connection with securities contracts], a Chapter 11 'litigation trustee' could hold … avoidance actions in abeyance for eventual litigation as the mere assignee of creditors' claims." *Whyte*, 494 B.R. at 200.

*Whyte* is directly on point.  There, as here, the debtor's plan created a litigation trust that purported to receive the assignment of both the bankruptcy estate's avoidance and other causes of action and creditor claims.  There, as here, the litigation trustee brought fraudulent-transfer claims seeking to avoid and recover safe-harbored payments, but argued that the safe harbor that would otherwise apply (§ 546(g)) did not bar the claims because the trustee was suing under state law as assignee of the creditors, not under § 544(b) of the Bankruptcy Code as successor to the debtor's bankruptcy estate.[20]  Rejecting this argument, the district court held that § 546 preempted those state-law claims:

> The trouble with this clever argument is that it would, in effect, render section 546(g) a nullity.  But such an absurd result is here avoided, because under well-established principles of federal preemption, section 546(g) impliedly preempts the Trustee's attempt to resuscitate fraudulent avoidance claims as the assignee of certain creditors where, as here, she would be expressly prohibited by section 546(g) from asserting those claims as assignee of the debtor-in-possession's rights (or, indeed, as the functional equivalent of a bankruptcy trustee).

*Whyte*, 494 B.R. at 199.

*Whyte* is no aberration.  Indeed, another judge in this District recently cited *Whyte* with approval.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, --- B.R. ----, 2013 WL 5311439 (S.D.N.Y. Sept. 23, 2013), *appeal docketed*, No. 13-3992 (2d Cir.).  *Tribune* involved suits by individual creditors asserting state-law fraudulent transfer claims.  While the district court held that § 546(e) did not preempt the claims brought by the creditors themselves, it distinguished a

---

[20] Sections 546(g) and 546(e) enshrine materially identical safe harbors.  *See, e.g.*, *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) (relying on § 546(g) case law to interpret identical language in § 546(e)).  The only difference is that § 546(g) concerns swaps while § 546(e) concerns securities transactions and contracts.

case—like *Whyte* and this one—in which the plaintiff is a litigation trustee, appointed under the

plan, who purportedly obtains the assignment of both bankruptcy estate and creditor claims.  In

such a scenario, the district court agreed that it would be "impermissible … to allow" a trustee

who is a "'creature of a Chapter 11 plan'" to "avoid the transaction 'by way of a state fraudulent

conveyance action,'" because such an action "'would stand as a major obstacle to the purpose

and objectives of' the [applicable safe harbor] in Section 546[]."  *Id*. at *6.  The plaintiff

litigation trustee "could not simply take off its [bankruptcy] trustee hat, put on its creditor hat,

and file an avoidance claim that Section 546(g) prohibited the trustee from filing."  *Id*.

        That is precisely what the Trustee is seeking to do here.  Like the trustee in *Whyte*, the

Trustee is "a creature of a Chapter 11 plan," which purported to make him both the assignee of

bankruptcy estate claims and creditor claims.  *See* Plan §§ 7.02, 8.01.  Permitting the Trustee to

pursue the creditor claims free and clear of the safe harbors would frustrate the purpose of

Section 546(e).  Those claims are therefore barred under the principles enunciated in *Whyte* and

*Tribune*.

        The claims here are also contrary to a long line of cases applying the same logic as did

*Whyte* and *Tribune*.  In those other cases, creditors' committees or litigation trusts have

unsuccessfully sought to evade § 546(e), albeit in a slightly different way than the Trustee

attempts here.  They have brought unjust enrichment claims, or other claims not based on

fraudulent transfer law, which they have argued are not avoidance claims under § 544(b) and

hence are not subject to § 546(e).  The courts have routinely held that § 546(e) preempts such

claims because they would thwart the safe harbor.  *See Contemporary Indus.*, 564 F.3d at 988

(state-law unjust enrichment and other claims seeking recover of shareholder distributions are

preempted because they "would wholly frustrate the purpose behind" § 546(e); "Allowing

recovery on these [state-law] claims would render the § 546(e) exemption meaningless."); *Silva*, 483 B.R. at 71 ("The Court could not permit the unjust enrichment claim to go forward without frustrating the purpose of Section 546(e)."); *Hechinger*, 274 B.R. at 96 (when a state-law claim "effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption [of section 546(e) [and] … implicate[s] the same concerns regarding the unraveling of settled securities transactions"); *Verizon*, 892 F. Supp. 2d at 825 (under conflict preemption, recovery through unjust enrichment claims for payments that would otherwise be barred by section 546(e) would "render Section 546(e) meaningless"); *U.S. Mortg. Corp.*, 492 B.R. at 817 ("[C]ircumventing the provisions of § 546(e) by merely re-labeling claims but seeking essentially the same relief frustrates the purpose of § 546(e).").[21]

These decisions apply fully here. Counts One and Three seek to avoid the transfers as constructively and actually fraudulent under New York Debtor & Creditor Law §§ 273-275, 278; Counts Two and Four seek recovery of the value of lien transfers pursuant to the first-lien and second-lien Credit Facilities under §§ 273-276, 278 of that same state law. No doubt understanding the impediment that § 546(e) poses to his case, the Trustee has purported to "abandon" these claims on behalf of the Debtors (Am. Compl. ¶ 76) so that he—the same Trustee—may bring those claims as supposed assignee of the Debtors' creditors, asserting the claims on their behalf. Through his state-law fraudulent transfer claims, the Trustee thus seeks to unwind hundreds of millions of dollars in transfers made by the Debtors to holders of EBG securities (*i.e.*, LLC membership interests)—paradigmatic settlement payments and payments made in connection with securities contracts covered by § 546(e). The Trustee's action is of the

---

[21] The question whether state-law fraudulent-transfer claims like those brought by the Trustee in this case are preempted by § 546(e) is also presented in *Weisfelner v. Fund 1*, No. 10-4609 (Bankr. S.D.N.Y.) (Gerber, J.) (motion to dismiss argued May 12, 2011). The Moving Defendants will bring any pertinent decision in that case to this Court's attention as soon as it is issued.

precise type that Congress contemplated in enacting § 546(e), and vindication of the Trustee's claims would conflict with, pose an obstacle to, frustrate, and otherwise render meaningless the statute's protections.  The Trustee's fraudulent-transfer claims are accordingly barred.[22]

This same analysis also applies to Counts Five and Six, in which the Trustee seeks to recover transfers through claims of unjust enrichment and constructive trust.  Regardless of their labels, these causes of action "are all based on the same operative facts and seek effectively the same relief—the avoidance and recovery of the transfers of the funds used to make the transfers" that would otherwise be protected by § 546(e).  *U.S. Mortg. Corp.*, 492 B.R. at 817; *see also Silva*, 483 B.R at 71 (state-law claim preempted because it "seeks to recover the same payments … held … unavoidable under § 546(e)").  Indeed, the courts have routinely found that such state law claims to recover settlement payments, however they are styled, are preempted by § 546(e). *See Contemporary Indus. Corp*, 564 F.3d at 988 (unjust enrichment and illegal shareholder distributions); *Silva*, 483 B.R. at 71 (unjust enrichment); *Verizon*, 892 F. Supp. 2d at 824-25 (unjust enrichment); *Hechinger*, 274 B.R. at 96 (unjust enrichment); *U.S. Mortg. Corp.*, 492 B.R. at 817 (civil conspiracy).

This Court should reach the same result.  A plaintiff cannot circumvent Congress' policy judgment to protect settlement payments and payments in connection with a securities contract from attack under state law where, as here, the debtor has filed for bankruptcy.  The Trustee's state-law claims—for fraudulent transfer, unjust enrichment and constructive trust—are all preempted by § 546(e).

---

[22] This Court's recent decision in *O'Connell v. Pension Financial Services, Inc. (In re Arbco Management, LLP)*, --- B.R. ----, 2013 WL 5346090 (Bankr. S.D.N.Y. Sept. 26, 2013), is inapposite.  The question in that case was whether the complaint adequately alleged the transferees' actual knowledge of the debtor's Ponzi scheme, such that the safe harbor of § 546(e) would not apply.  *See id.* at *7-8.  The Amended Complaint does not allege that this case involves a Ponzi scheme, nor does it allege that there were no actual securities contracts or settlement payments.  And the Amended Complaint does not allege that the Moving Defendants had actual knowledge of any type of underlying fraud whatsoever.  There are thus no factual issues precluding the granting of this motion to dismiss.

**B.      Counts Two And Four Also Must Be Dismissed Because The Trustee May Not Recover The "Value" Of Transfers Of Non-Possessory Liens**

Suing under New York Debtor & Creditor Law §§ 273-276 and 278, the Trustee seeks to recover from the Moving Defendants the "value" of the liens that were granted by the Debtors to the first-lien and second-lien lenders as collateral for the loans they made to the Debtors to finance the distributions to the Moving Defendants.  In addition to being preempted under § 546(e), *see supra* Section II.A.2, these counts fail because there is no basis in fraudulent-transfer law to allow the Trustee to recover from third parties the value of non-possessory liens granted by the Debtors to its lenders.  Rather, the law is clear that the remedy for the allegedly fraudulent transfer of a non-possessory lien is to avoid the lien in the hands of the lender that received it.

The goal of fraudulent-transfer law is "to restore the estate to the financial condition that would have existed had the transfer never occurred."  *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008); *see also In re Straightline Invs., Inc.*, 525 F.3d 870, 883 (9th Cir. 2008); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998).  Consistent with that purpose, the creditor's remedy in a fraudulent-conveyance action is generally "to rescind, or set aside, the alleged fraudulent transfer, and cause the transferee to return the transferred property to the transferor."  *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006); *see also Neshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005) (remedy for fraudulent conveyance is generally "limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance"), *aff'd*, 194 F. App'x 24 (2d Cir. 2006).

Counts Two and Four do not seek to set aside the grant of any liens from the lien holders; instead, the Trustee seeks to recover a *monetary judgment* from EBG's former members.  There is no basis for such relief.  Rather, where, as here, the alleged fraudulent transfer is of a non-

37

possessory lien—in this case, the first and second liens—avoidance of the lien itself "serves the purpose of returning the 'property' to its pretransfer status, *i.e.*, no lien before the transfer; no lien after the avoidance." *In re Farmer*, 209 B.R. 1022, 1025 (Bankr. M.D. Ga. 1997). With the lien avoided and the estate relieved of that burden, no further recovery is necessary or appropriate. *See In re Burns,* 322 F.3d 421, 425, 428 (6th Cir. 2003) ("[R]ecovery is necessary only when the remedy of avoidance is inadequate" and in cases regarding non-possessory liens, "trustees will generally not have to seek recovery."); *In re Trout*, 609 F.3d 1106, 1111 (10th Cir. 2010) (same); *In re Schmiel*, 319 B.R. 520, 530 (Bankr. E.D. Mich. 2005) (recovery is not necessary where the lien has been avoided because "the transferred interest was not possessory in the hands of the transferee so no further action is required by the Trustee"); *In re Sickels*, 392 B.R. 423, 425 (Bankr. N.D. Iowa 2008) ("The avoidance of the lien restores Debtors' financial condition to the state it would have been had the mortgage never existed.").

Here, allowing the Trustee to sue the Moving Defendants for the "value" of the liens granted to the lenders would be especially perverse. The Trustee is suing for the benefit of— indeed, standing in the shoes of—the very lenders that received the liens, or their assignees.

As for the first lien, its grant certainly did not harm the first-lien lenders themselves. And while that grant may have reduced the ultimate recovery of the second-lien lenders and the mezzanine lenders, those creditors agreed at the outset to the grant of the first lien (and their own subordination to the first lien lenders). The second-lien and mezzanine lenders never challenged the grant of the first lien (or their subordination) in the Debtors' bankruptcy case. To the contrary, they agreed in the Plan to the recognition of the first lien and to the payment of more than $1 billion to the first-lien lenders. *See supra* pp.8-9.

As for the second lien, under the Plan, the second-lien lenders' liens were set aside because they had no value. *See, e.g.*, Disclosure Statement § I.A. (Class 2 Claims); Plan § 3.02.3. The grant of those worthless second liens in no way depleted the estate or harmed any unsecured creditors. It would accordingly be an impermissible windfall for the Trustee to recover any money judgment for the supposed "value" of that lien. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) ("[I]t is hornbook law that 'a conveyance cannot be fraudulent as to creditors … if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors."), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

## III.    The Trustee's Causes Of Action For Unjust Enrichment And Constructive Trust Fail As A Matter Of Law

The Trustee's causes of action for unjust enrichment and constructive trust are barred by the safe harbor enshrined in § 546(e). *See supra* Section II.A. But even if they were not, these causes of action fail as a matter of law.

### A.    Unjust Enrichment

As an initial matter, the unjust-enrichment claim must be dismissed for lack of standing. The Trustee purports to bring the claim on behalf of the debtors' creditors. Am. Compl. ¶ 188. EBG was organized as a Delaware LLC, and thus the rights of its creditors to sue are governed by Delaware law. *See, e.g.*, *Bartfield v. Murphy*, 578 F. Supp. 2d 638, 645 (S.D.N.Y. 2008). Under black-letter Delaware law, creditors do not have standing to sue for alleged harm that occurred directly to the debtor, and only indirectly to the creditors. *See CML V, LLC v. Bax*, 28 A.3d 1037, 1041-43 (Del. 2011). The Trustee alleges that EBG's members were unjustly enriched through the distributions they received in the leveraged recapitalization. *See* Am

39

Compl. ¶ 188. If anyone was directly harmed by such unjust enrichment, it was EBG, which made the distributions to its members; the creditors were harmed indirectly, if at all. *See, e.g.*, *In re CD Liquidation Co., LLC*, 462 B.R. 124, 133 (Bankr. D. Del. 2011) ("As the party who paid the money (and to whom the money originally belonged), [the debtor] was injured by any purported unjust enrichment.").[23] Delaware courts have dismissed unjust-enrichment claims where, as here, the plaintiff was injured, if at all, only indirectly. *See, e.g.*, *id.* at 128-30 (dismissing shareholder's unjust-enrichment claim as derivative). The same analysis applies here. The Trustee—standing, as he purports to do in asserting his unjust-enrichment claim, in the shoes of the creditors—lacks standing.

The Trustee's unjust-enrichment claim also fails as a matter of contract and quasi-contract law. "Unjust enrichment is a quasi-contractual remedy." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 333 (S.D.N.Y. 2003) (Lynch, J.). It is available only "as an alternative to contract, where a contractual relationship has legally failed." *Id.* at 334. Put differently, the remedy is *not* available where there was no prior relationship between the plaintiff and defendant. *See id.* (dismissing unjust enrichment claim where "[n]o contractual or quasi-contractual relationship is alleged to have existed between plaintiffs and [defendants]"); *see also Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997) ("[A]n unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant."); *In re Motel 6 Sec. Litig.*, Nos. 93-2183, 93-2866, 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997) ("The

---

[23] If the funds paid to the Moving Defendants instead belonged to the creditors, then the Trustee's fraudulent-transfer claims in Counts 1 and 2 would fail for yet another reason: They would not have entailed a transfer of property *of the debtor*. *See FDIC v. Porco*, 552 N.E.2d 158, 159-60 (N.Y. 1990); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993).

requirements [of unjust enrichment] clearly contemplate that a defendant and plaintiff must have had some type of direct dealings or an actual, substantive relationship.").

Here, the Trustee has not alleged any prior dealings between the creditors in whose shoes he purports to stand and the Moving Defendants.  His claim for unjust enrichment, therefore, fails as a matter of law.  *See Reading Int'l, Inc*., 317 F. Supp. 2d at 334 (finding no unjust enrichment claim as plaintiffs have "not alleged that they had a contractual or quasi-contractual relationship with defendants, and in fact have alleged no prior course of business dealings with defendants whatsoever").[24]

### B.    Constructive Trust

The Trustee's purported cause of action for constructive trust should be dismissed for the elemental reason that "[c]onstructive trust … is not a cause of action; it is a remedy to rectify fraud and prevent unjust enrichment."  *Reyes v. Reyes*, No. 11 Civ. 2536, 2012 WL 4058037, at *9 (E.D.N.Y. Sept. 14, 2012) (internal quotation marks omitted); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 419 (S.D.N.Y. 2010) ("A constructive trust is a remedy, not a cause of action, and is to be imposed only in the absence of an adequate remedy of law.") (internal quotation marks omitted).

---

[24] Even if the Trustee did have standing to sue the Moving Defendants for unjust enrichment, the claim would be barred because "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co*., 516 N.E.2d 190, 193 (N.Y. 1987).  The transfers the Trustee seeks to recover were made to the Moving Defendants pursuant to valid and enforceable written contracts (albeit ones to which the Debtors' creditors were strangers)—the Offer to Purchase, pursuant to which the tender offer payments were made, and the EBG limited liability company agreement, pursuant to which the dividends were distributed to EBG's members.  The existence of these agreements precludes recovery in quasi-contract. *See, e.g.*, *Chadirjian v. Kanian*, 28 A.3d.D.2d 596, 598 (N.Y. App. Div. 1986) (affirming grant of summary judgment on unjust-enrichment claim arising from stock repurchase in light of agreement "which explicitly covers the same specific subject matter for which the implied agreement is sought"); *Wood v. Coastal States Gas Corp*., 401 A.2d 932, 942 (Del. 1979) (because shareholders' right to receive dividends was set forth in a written contract, they could not recover under an unjust enrichment theory independent of the contract).

Even were constructive trust a freestanding cause of action, the Trustee's claim fails because he does not and cannot allege any of the necessary elements:  "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment." *Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 797 n.14 (S.D.N.Y. 2011) (citing *Pereira v. Glicker*, 876 N.Y.S.2d 910, 911 (N.Y. App. Div. 2009)), *aff'd*, 479 F. App'x 375 (2d Cir. 2012).  First, the Amended Complaint fails to allege that the Moving Defendants had any confidential or fiduciary relationship with the Debtors, let alone with their creditors, in whose shoes the Trustee purports to sue.  Am. Compl. ¶198.  While the Trustee alleges that K Road and the K Road Insiders were fiduciaries of the Debtors, and that the Nominating Committee "was privy to confidential information," *id.* ¶ 199, he conspicuously makes no analogous allegation as to the Moving Defendants—with respect to either the Debtors or to the Debtors' creditors.  Second, the Amended Complaint also fails to allege that the Moving Defendants made any promise to the Debtors or their creditors.  Third, the Trustee likewise does not allege that the Debtors or their creditors made any transfer in reliance on any such nonexistent promise.  And, finally, for the reasons discussed above, the Amended Complaint fails to state a claim for unjust enrichment.  *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, --- F. Supp. 2d ----, 2013 WL 2452169, at *20 (S.D.N.Y. June 6, 2013) (dismissing constructive-trust claim where unjust-enrichment claim was dismissed).

Accordingly, the Trustee's claim for constructive trust fails as a matter of law.  *See BNP Paribas Mortg. Corp.*, 2013 WL 2452169, at *20; *Cordts-Auth*, 815 F. Supp. 2d at 797 n.14.

**IV.    To The Extent The Trustee Seeks To Recover On Behalf Of The First-Lien, Second-Lien, And Mezzanine Lenders, And Their Successors, He Is Estopped From Doing So**

The Trustee has chosen to stand in the shoes of the Debtors' creditors—the first-lien, second-lien, and mezzanine lenders, and their successors—in a transparent effort to evade the safe harbor of § 546(e).  He cannot do that, for the reasons discussed above.  *See supra* Section II.A.[25]  But, even if he could, his claims on behalf of those creditors would fail:  To the extent the Trustee seeks to avoid the transfers standing in the shoes of "individual creditors" who "assigned [their claims] to the Liquidating Trust pursuant to the Plan," Am. Compl. ¶ 76, and who participated in—indeed, required—the leveraged recapitalization that the Trustee now seeks to set aside, he is estopped from doing so because those creditors themselves would be estopped from avoiding the transfers.

The defining purpose of fraudulent-transfer law is to prevent a debtor from transferring its assets to third parties in order to defraud its creditors, who would otherwise be able to look to those assets for repayment of their claims.  *See Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (the "object" of New York fraudulent-transfer law "is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment"); 5 *Collier on Bankruptcy* § 548.01 (15th ed. rev. 2009) ("A fraudulent transfer can essentially be defined as an act which has the effect of improperly placing assets beyond the reach of creditors.").  That rationale has no application where a creditor authorizes the debtor to transfer the assets in question to third parties—much less when a creditor *requires* the debtor to do so.  It is thus well established that an allegedly fraudulent transfer cannot be avoided for the benefit of creditors who authorized,

---

[25] The Trustee also lacks Article III standing to sue for the reasons set forth in Section IV.B of the Brief of K Road Power Management, LLC, *et al.*, in which the Moving Defendants join and which the Moving Defendants incorporate by reference.

consented to or ratified the transfer at issue. *See, e.g.*, *In re Best Prods. Co.*, 168 B.R. 35, 57

(Bankr. S.D.N.Y. 1994) ("A fraudulent transfer … can be ratified by a creditor who is then

estopped from seeking its avoidance."), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *see also In re Adelphia

Recovery Trust*, 634 F.3d 678, 691-92 (2d Cir. 2011); *In re Dunn*, Nos. CC-05-1406, CC-06-

1046, 2006 WL 6810930, at \*8 (B.A.P. 9th Cir. Oct. 31, 2006) ("A creditor who ratifies or

participates in a fraudulent transfer may be estopped from attacking the transfer."); *Lane v.

Eggleston*, 284 F. 743, 745 (5th Cir. 1922) (creditor cannot "avoid [a transfer], after he has

voluntarily assented to it").

That reasoning applies, too, to a litigation trustee who sues on behalf of such creditors.

Because such a trustee merely stands in the shoes of the creditors as their assignee, he has no

greater rights than the assignors—that is, where the assigning creditors are subject to a defense

that bars their claim (*e.g.*, estoppel), so too is the trustee. *See, e.g.*, *In re Refco Sec. Litig.*, 890 F.

Supp. 2d 332, 353 (S.D.N.Y. 2012).

Courts have applied this rule of law to bar fraudulent-transfer actions brought for the

benefit of lenders that authorized the transfers at issue through their participation in the

challenged transaction. A recent example is illustrative. *U.S. Bank National Association v.

Verizon Communications, Inc.*, 479 B.R. 405 (N.D. Tex. 2012), arose out of Verizon's spin-off

of its domestic directories business into a separate company called Idearc. Banks and

bondholders had "made loans to Idearc for the express purpose of financing Idearc's acquisition

of Verizon's yellow pages business." *Id.* at 410 (internal quotation marks omitted). Indeed,

"[u]nder the terms of the spin-off agreement, these lenders 'required' that their loans to Idearc be

used to pay Verizon for the yellow pages business." *Id.* Idearc subsequently filed for

bankruptcy, and a plan was confirmed under which U.S. Bank was appointed the trustee for a

44

litigation trust whose beneficiaries were the banks and bondholders that had financed the spin-

off.  U.S. Bank filed suit to avoid and recover the payments made to Verizon in the spin-off as

alleged fraudulent transfers.  Relying on the principle that "fraudulent transfers are not voidable

where the benefit would run to a creditor that ratified the transfer" (*id.* at 411 (alterations

omitted)), the court held that the trustee was barred from suing standing in the shoes of the banks

and bondholders:

> Because of their participation in the alleged fraudulent transfers, Idearc's banks
> and bondholders would have been barred from bringing fraudulent transfer claims
> on the date Idearc filed its bankruptcy petition….  [T]he banks and bondholders
> not only knew that their loans would be used to pay Verizon; they not only
> *consented* that their loans be used to pay Verizon; they *required* that their loans be
> used to pay Verizon.

*Id.* (internal quotation marks omitted).  The court rejected the trustee's argument that, because

the banks and bondholders were allegedly "duped" or "tricked" by the defendants regarding the

nature of the spin-off transaction, estoppel did not apply.  This allegation did not matter; all that

mattered was that "Idearc's banks and bondholders did have 'full knowledge' of the transfers

from Idearc to Verizon.  Indeed, the banks and bondholders themselves required Idearc to make

those transfers."  *Id.*[26]

Numerous other cases are in accord.  *See, e.g.*, *Refco*, 2009 WL 7242548, at *11 ("Any

realistic assessment … leads to the conclusion that Refco was heavily involved in structuring the

transaction for the purchase of PlusFunds shares….  The Credit Agreement provides that the

funds from Refco could be used only for the purchase of PlusFunds shares….  Refco was thus

---

[26] To be sure, the court in *Verizon* permitted the litigation trust to proceed with the fraudulent-transfer claims
because, as of the petition date, there had been at least one creditor of the debtor that had not ratified the transfers at
issue there.  But in that case the trust was suing under § 544 of the Bankruptcy Code as the representative of and
successor to the bankruptcy estate.  It therefore could take advantage of the rule applicable to such a representative
that, as long as one unsecured creditor of the debtor could have set aside the transfers on the petition date to satisfy
its claim, the bankruptcy estate can set aside the entire amount of the transfer for the benefit of all creditors of the
debtor.  *See Verizon*, 479 B.R. at 412.  Here, as noted, the Trustee has disclaimed that he is suing under § 544
precisely because any such claim would be barred by § 546(e).

intimately involved with and voluntarily participated in what the Plaintiff readily asserts was a

fraudulent transaction…. Therefore, Refco cannot be the triggering creditor, because it was a

material participant in the alleged fraudulent transaction."); *HSBC Bank USA, Nat'l Ass'n v.

Adelphia Commc'ns Corp*., No. 07-cv-553A(L), 2009 WL 385474, at *6-7 (W.D.N.Y. Feb. 12,

2009) (fraudulent transfers not voidable where the benefit would run to a creditor that ratified the

transfer), *aff'd*, 634 F.3d 678 (2d Cir. 2011) ; *cf. Crescent Res. Litig. Trust ex rel. Bensimon v.

Duke Energy Corp.*, --- F. Supp. 2d ----, 2013 WL 5532162, at *13 (W.D. Tex. Oct. 4, 2013)

(same); *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 742 (W.D. Mich. 2007) ("[O]ne of the

creditors seeking the benefit of avoidance in fact provided financing for the LBO of [the debtor],

and thus would have been fully aware of the financial context of the LBO. This undermines any

argument that the equities rest with creditors as opposed to the approximately 170 shareholders,

many of whom are mid- and lower-level [] employee-shareholders, whose stock payments would

be voided in favor of the creditors." (internal citation omitted)), *aff'd*, 571 F.3d 545 (6th Cir.

2009).

Virtually all—97% in dollar amount—of the unpaid creditors of the Debtors in whose

stead the Trustee purports to sue are, as in *Verizon*, the lenders who financed the transaction

challenged here. Am. Compl. ¶ 76 (trustee seeks recovery on behalf of "the holders of the First

Lien and Second Lien Debt …, the holders of the Mezzanine Debt …, and [] all other general

unsecured creditors of the Debtors"). There is no dispute that these creditors agreed that their

loans would be used by EBG to make the challenged transfers to the Moving Defendants.

Indeed, the creditors so *required*: The Amended Complaint affirmatively pleads that the lenders

provided the financing knowing full well—indeed mandating—that EBG would use the funds to

pay the Moving Defendants for their EBG membership interests. *See, e.g.*, Am. Compl. ¶ 177

46

("The Credit Facilities *expressly contemplated* the Leveraged Recap Transaction and *required*, amongst other things, *that the proceeds of the Secured Credit Facilities be transferred by BostonGen to EBG and be used to make the payments to Transferee Defendants* as described in this Complaint." (emphasis added)).[27]

Application of the relevant precedent is thus straightforward:  Because none of these lenders could have avoided the distributions at issue under fraudulent-transfer law, neither can the Trustee standing in their shoes.  Thus, Counts One through Six of the Amended Complaint must be dismissed to the extent—and that extent is 97% or more—that the Trustee purports to bring suit as assignee of the lenders (or their successors) under any of the three Credit Facilities.

## V.    The Trustee Is Barred From Suing Dissolved Corporate Entities

Finally, to the extent the Trustee purports to sue corporate entities that are no longer in existence, the claims against those defendants are barred for an additional reason:  Those entities have not been (and cannot be) served with the Amended Complaint and are not amenable to suit. The claims against them must be dismissed.

"At common law, the dissolution of a corporation abruptly ended its existence, thus abating all pending actions by and against it and terminating its capacity thereafter to sue or be sued.  Thus, statutory authority is necessary to prolong the life of a corporation past its date of dissolution."  *In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch. 1980).  Accordingly, the

---

[27] For purposes of this standing rule, it is immaterial that the current holders of the debt may be different from the initial creditors who participated in the first-lien, second-lien, and mezzanine Credit Facilities.  *See* Credit Agreements § 9.07 (providing for "Assignments and Participations").  "[A]n assignee stands in the shoes of the assignor and thus acquires no greater rights than its assignor."  *Refco Sec. Litig.*, 890 F. Supp. 2d at 354 (internal quotation marks omitted)).  Likewise, "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor."  *In re Enron Corp.*, 379 B.R. 425, 435-36 (S.D.N.Y. 2007).  The current holders of the debt are thus subject to any and all defenses—including ratification and estoppel—that would have barred the claims of the initial lenders.  *See Verizon*, 479 B.R. at 412.

47

Trustee may sue a dissolved corporation only if there is express statutory authority for him to do so.  There is not.

For example, the Trustee purports to sue Trade Claim Acquisition, LLC ("Trade Claim Acquisition").  Am. Compl. ¶ 45, Ex. A.  But that Delaware LLC was canceled in 2010.  *See* Schoenfeld Decl., Exh. 5.[28]  Under the Delaware Limited Liability Company Act, a Delaware LLC that has been issued its certificate of cancellation from the Secretary of State cannot be sued.  Del. Code Ann. tit. 6, § 18-803(b) ("Upon dissolution of a limited liability company and *until the filing of certificate of cancellation* ... the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits." (emphasis supplied)); *see also Kwon v. Yun*, No. 05 Civ. 1142, 2008 WL 190058, at *1 (S.D.N.Y. Jan. 22, 2008) ("Under Delaware law, a limited liability company['s] ... capacity to sue or be sued ... continues ... [only] ... *until the filing of a certificate of cancellation*" (quotations and citations omitted) (emphasis supplied)); *Matthew v. Laudamiel*, No. C.A. 5957-VCN, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("The persons winding up an LLC's affairs may prosecute and defend suits on the LLC's behalf until the filing of the certificate of cancellation.  After the certificate of cancellation has been filed, suits generally may not be brought by or against an LLC."); *Metro Commnc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004) ("[Section] 18-803(b) of the LLC Act provides that suit generally may be brought by or against a limited liability company *only until the certificate of cancellation is filed*." (emphasis supplied)).  The same holds true for putative Moving Defendant Epic Distressed Debt Holdings, Inc., a Delaware corporation that was

---

[28] The certificate of cancellation for Trade Claim Acquisition was filed with the Delaware Secretary of State.  This Court may take judicial notice of that document as a public filing.  See, e.g., *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*, No. 05 Civ. 6701, 2010 WL 743839, at *4 (S.D.N.Y. Mar.3, 2010) (taking judicial notice of document on file with California Secretary of State).

dissolved as of September 3, 2009.  *See* Schoenfeld Decl., Exh. 6; *Citadel Indus.*, 423 A.2d at 503.

Similarly, the Trustee has sued Greenwich International, Ltd. ("Greenwich") and Cedarview EBG Holdings, Ltd. ("Cedarview EBG"), but they, too, are canceled corporations— Bermudan and Cayman Islands companies, respectively, that were dissolved and stricken from the companies registers years before the Trustee filed his complaint.  *See* Schoenfeld Decl., Exhs. 7 & 8; *see also supra* n.28.  Under applicable law, those entities also cannot be sued.  *Cf. Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, C.A. No. 6894-VCP, 2013 WL 1200273, at *11 (Del. Ch. Mar. 26, 2013) ("Under British Virgin Islands' law, a company that has been struck from the BVI Register cannot (1) commence legal proceedings, (2) carry on business or deal with its assets, or (3) defend any legal proceedings.").[29]

Thus, this action must be dismissed as against Trade Claim Acquisition, Greenwich, Cedarview EBG, Epic Distressed Debt Holdings, Inc., and all other dissolved entities that, under the applicable law of the jurisdiction of their incorporation, are no longer subject to suit.[30]

---

[29] The Trustee also purports to sue Longacre Master Fund, Ltd., but only served process pursuant to Article 5 of the Hague Convention on that Cayman Islands entity on October 4, 2013—more than 400 days after the complaint was filed and almost 17 weeks after this Court's extended deadline for service had passed.  *See* ECF No. 80 (extending service deadline through June 7, 2013).  While the Trustee filed an Affidavit of Service indicating that process was served on June 27, 2013, *see* ECF No. 99, such service was apparently not effected pursuant to Article 5 of the Hague Convention and was, in any event, untimely.  The Trustee did not even submit his request for service under the Hague Convention until June 20, 2013, more than 300 days after the Complaint was filed and nearly two weeks after the extended deadline had passed.  *See* Schoenfeld Decl., Exh. 9 (request for service in accordance Article 5 of the Hague Convention, dated June 20, 2013).  The Trustee's dilatory conduct in effecting service on Longacre does not meet even the "flexible due diligence" standard that governs service on foreign entities.  *See Ambriz Trading Corp. v. URALSIB Fin. Corp.*, No. 11 Civ. 4420, 2011 WL 5844115, at *5 (S.D.N.Y. Nov. 21, 2011).  The complaint should accordingly be dismissed as to Longacre pursuant to Fed. R. Civ. P. 4 and 12(b)(5).

[30] Trade Claim Acquisition and Greenwich informed the Trustee's counsel of the companies' cancellation and provided the relevant documents.  *See* Schoenfeld Decl. Exhs. 10 & 11.  The Trustee has, nevertheless, declined to dismiss this action against Trade Claim Acquisition and Greenwich, necessitating this request for judicial intervention.

## CONCLUSION

For the foregoing reasons, Counts One through Six of the Trustee's Amended Complaint should be dismissed.

Dated: November 1, 2013                    Respectfully submitted,

SHEARMAN & STERLING LLP                    WILMER CUTLER PICKERING
                                              HALE AND DORR LLP

/s/ Richard F. Schwed                      /s/ Philip D. Anker
Richard F. Schwed                          Philip D. Anker
rschwed@shearman.com                       philip.anker@wilmerhale.com
Edward G. Timlin                           Alan E. Schoenfeld
edward.timlin@shearman.com                 alan.schoenfeld@wilmerhale.com
599 Lexington Avenue                       7 World Trade Center
New York, New York 10022                   250 Greenwich Street
(212) 848-4000                             New York, New York 10007
                                           (212) 230-8800
*Attorneys for The Raptor Global Portfolio*
*Ltd.; The Tudor BVI Global Portfolio L.P.;*   Allison Hester-Haddad
*and Tudor Proprietary Trading, L.L.C.*        allison.hester-haddad@wilmerhale.com
                                           1875 Pennsylvania Avenue, NW
                                           Washington, DC 20006
                                           (202) 663-6000

                                           *Attorneys for Credit Suisse Securities (USA)*
                                           *LLC; Credit Suisse (USA), Inc.; D. E. Shaw &*
                                           *Co., L.P.; D. E. Shaw Laminar Portfolios,*
                                           *L.L.C.; Goldman, Sachs & Co.; J.P. Morgan*
                                           *Securities LLC; Mason Capital Ltd.; Mason*
                                           *Capital Management LLC; Morgan Stanley &*
                                           *Co. LLC; RBS Holdings USA, Inc.; and*
                                           *Taconic Capital Partners 1.5 LP.*

SCHULTE ROTH & ZABEL LLP                   AKIN GUMP STRAUSS HAUER & FELD LLP

/s/ Adam C. Harris                         /s/ Sean E. O'Donnell
Adam C. Harris                             Sean E. O'Donnell
adam.harris@srz.com                        sodonnell@akingump.com
David M. Hillman                           Robert H. Pees
david.hillman@srz.com                      rpees@akingump.com
William H. Gussman, Jr.                    Jessica L. Oliff
bill.gussman@srz.com                       joliff@akingump.com
Erik Schneider                             Jennifer Hildebrand
erik.schneider@srz.com                     jhildebrand@akingump.com

50

919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Cedarview Capital Management
LP; Citigroup Alternative Investments LLC, as
successor in interest to Epic Asset
Management LLC; Epic Distressed Debt
Opportunities Fund Ltd.; Longacre Capital
Partners (QP) LP; and Longacre Master Fund,
Ltd.*

One Bryant Park
Bank of America Tower
New York, New York 10036
(212) 872-1000

*Attorneys for Highland Capital Management
LP; Highland Crusader Offshore Partners LP;
Onex Credit Partners, LLC f/k/a GK Capital,
LLC; and GK Debt Opportunity Fund, Ltd. for
all counts and points except as to counts and
points relating to 11 U.S.C. § 546(e).*

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

/s/ Thomas R. Slome
Thomas R. Slome
tslome@msek.com
Kevin Schlosser
kschlosser@msek.com
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
(516) 741-6565

*Attorneys for Highland Capital Management
LP; Highland Crusader Offshore Partners LP;
Onex Credit Partners, LLC f/k/a GK Capital,
LLC; and GK Debt Opportunity Fund, Ltd. for
the counts and points relating to 11 U.S.C.
§ 546(e).*

51

## <u>CERTIFICATE OF SERVICE</u>

I, Philip D. Anker, hereby certify that on this 1st day of November 2013, a copy of the

foregoing Memorandum was filed electronically with the Clerk of Court through the Court's

CM/ECF system, thus serving all registered parties.

/s/ Philip D. Anker
Philip D. Anker
