Portions of this Memorandum of Law citing or referencing redacted allegations contained in the First Amended Complaint have been redacted herein in accordance with an Order of the Court dated August 14, 2012 [Bankruptcy Case No. 10-14419, Docket No. 1036] and an Order of the Court dated December 10, 2012 [Adversary Proceeding No. 12-1879, Docket No. 26].

**Hearing Date:  March 11, 2014 at 10:00 a.m.**
**Opposition Dealine:  January 10, 2014**
**Reply Deadline:  February 28, 2014**

Tibor L. Nagy, Jr.
Jason S. Lapkin
Stephanie M. Suarez
DONTZIN NAGY & FLEISSIG LLP
980 Madison Avenue, Second Floor
New York, New York  10017-2024
Telephone: (212) 717-2900
Facsimile:  (212) 717-8088

Dean A. Ziehl
Maria A. Bove
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York  10017-2024
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777

*Attorneys for Defendants Harbinger Capital Partners, LLC,*
*Boston Harbor Power LLC, Power Management Financing*
*LLC, Harbert Distressed Investment Master Fund, Ltd.,*
*and Harbinger Capital Partners Master Fund I, Ltd.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| BOSTON GENERATING, LLC, *et al.* | Case No. 10-14419 (SCC) |
| Debtors. | |
| | Adv. Pro. No. 12-01879 (SCC) |
| MARK HOLLIDAY, the Liquidating Trustee of the BosGen Liquidating Trust, | |
| Plaintiff, | |
| v. | |
| K ROAD POWER MANAGEMENT LLC, *et al.* | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE HARBINGER DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... IV

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   BACKGROUND ........................................................................................ 5

    A.    K ROAD IS HIRED TO "REVAMP" EBG AND INCREASE PROFITABILITY .................... 5

    B.    HARBINGER PROVIDES FINANCING FOR THE K ROAD DEFENDANTS' $65 MILLION INVESTMENT IN EBG ........................................................................................ 6

    C.    K ROAD IS GIVEN 2 OF THE 7 SEATS ON EBG'S BOARD SO THAT ULTIMATE CONTROL OF THE COMPANY REMAINED IN THE BOARD'S—AND NOT IN K ROAD INVESTOR'S—HANDS ...................................................................................... 7

    D.    K ROAD MANAGER BECOMES ASSET MANAGER FOR EBG'S SUBSIDIARY BUSINESSES ......................................................................................................... 8

    E.    HARBINGER IS GIVEN A MINORITY MEMBERSHIP INTEREST IN K ROAD HOLDINGS, THE PARENT OF K ROAD INVESTOR, SO THAT ULTIMATE CONTROL OF K ROAD INVESTOR REMAINED WITH K ROAD .............................................. 9

    F.    EBG SUCCESSFULLY CONDUCTS THE RECAP ALLOWING UNIT HOLDERS TO (PARTIALLY) GET OUT OF THE BUSINESS ............................................................. 11

        1.   EBG And BostonGen Enter Into Three Credit Facilities To Finance The Debt ............................................................................................................. 12

        2.   The Use Of The Proceeds From The Recap Was Fully Disclosed In The CIM ............................................................................................................. 12

        3.   K Road Investor's Participation In The EBG Tender Offer And Harbinger's Distribution ....................................................................... 12

    G.    USPG ACQUIRES EBG AND HARBINGER RETAINS SIGNIFICANT EQUITY INTEREST IN USPG ......................................................................................... 13

    H.    EBG OPERATES FOR NEARLY FOUR YEARS AFTER THE RECAP, CONTINUES TO SERVICE ITS DEBT, AND FALTERS ONLY AFTER DRAMATIC CHANGES IN THE MARKET AT LARGE ........................................................................................ 14

    I.    THE TRUSTEE'S AMENDED COMPLAINT CONTAINS FEWER FACTS AND MORE CONCLUSORY ALLEGATIONS THAN THE ORIGINAL ............................................. 14

        1.   The Trustee Conducts Rule 2004 Discovery And Learns All It Currently Knows About Harbinger Before The Original Complaint Is Filed................... 15

        2.   The Trustee Files The Original Complaint In This Adversary Proceeding Naming The K Road Defendants As The Mastermind Behind The Alleged Scheme To Defraud ................................................................................... 16

        3.   The Trustee Adds Conclusory Allegations About Harbinger To Its Amended Complaint .................................................................................. 17

    J.    THE IMPLAUSIBLE RECAP FRAUD SCHEME ALLEGED IN THE AMENDED COMPLAINT ..................................................................................................... 18

1.   The K Road Defendants Allegedly Devise A Scheme To Defraud "Any Potential Counterparty" ............................................................... 20

2.   The K Road Defendants Allegedly Create Fraudulent Projections ................... 20

3.   The K Road Defendants, Through Purported Domination And Control, Allegedly Force EBG To Make Misrepresentations And Omissions ............... 21

4.   Under The K Road Defendants' Purported Domination And Control, EBG Allegedly Disseminates The Misleading Projections To Third Parties And To EBG's Board ......................................................... 22

5.   Using The Projections, The K Road Defendants Allegedly Deceive The Rating Agencies Into Issuing Incorrect Ratings ................................. 23

6.   Once The Recap Is Approved And Consummated, The K Road Defendants Allegedly Direct EBG And BostonGen To Distribute The Cash For The Equity Holders' Benefit ........................................................ 23

7.   The Amended Complaint Does Not Even Attempt To Allege That Harbinger Participated In Any Of The K Road Defendants' Purported Fraudulent Conduct ............................................................... 24

III.   LEGAL STANDARD ............................................................................. 24

A.   STANDARD OF REVIEW ............................................................... 24

B.   DOCUMENTS TO BE CONSIDERED ON A MOTION TO DISMISS ................ 25

IV.   THE TRUSTEE'S FRAUD-BASED CLAIMS AGAINST THE HARBINGER DEFENDANTS (COUNTS 12-15) SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 9(B) ........................................................... 25

A.   RULE 9(B) REQUIRES THE TRUSTEE TO PLEAD ALL OF HIS FRAUD-BASED CLAIMS WITH PARTICULARITY ................................................ 26

1.   The Additional Elements Of The Trustee's Aiding And Abetting Fraud Claim (Count 12) Also Must Be Pled With Particularity ................... 26

2.   The Additional Elements Of The Trustee's Civil Conspiracy And Concert Of Action To Commit Fraud Claims (Counts 13 & 14) Also Must Be Pled With Particularity ............................................................... 27

B.   THE AMENDED COMPLAINT DOES NOT CONTAIN ANY NON-CONCLUSORY ALLEGATIONS ABOUT HARBINGER AND PLAINLY FAILS TO COMPLY WITH RULE 9(B) ................................................................................. 29

C.   THE TRUSTEE'S CONCLUSORY ALLEGATIONS CONCERNING CORPORATE FORMS ARE ALSO DEFICIENT ........................................................ 31

V.   ALL OF THE CLAIMS AGAINST THE HARBINGER DEFENDANTS SHOULD BE DISMISSED AS IMPLAUSIBLE ...................................... 32

A.   USPG'S SUBSEQUENT PURCHASE OF EBG RENDERS THE TRUSTEE'S CENTRAL CLAIM THAT THE RECAP WAS FRAUDULENT IMPLAUSIBLE ................... 32

B.   THE ADMITTED ROLES OF CREDIT SUISSE AND GOLDMAN FURTHER RENDER THE TRUSTEE'S PURPORTED FRAUDULENT SCHEME IMPLAUSIBLE .......... 34

C.      THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT THE
HARBINGER DEFENDANTS CONTROLLED ANY OTHER PARTIES OR AIDED,
ABETTED, OR CONSPIRED WITH ANYONE ................................................................. 35

VI.     **THE TRUSTEE FAILS TO ALLEGE EITHER REASONABLE RELIANCE
OR LOSS CAUSATION ........................................................................................... 36**

A.      THE TRUSTEES' ASSIGNEES ARE ALL SOPHISTICATED INVESTORS AND COULD
NOT REASONABLY HAVE RELIED UPON ANY OF THE ALLEGED
MISREPRESENTATIONS AND OMISSIONS .................................................................... 37

B.      HARBINGER'S ROLE AS AN INDIRECT EBG INVESTOR WAS NEITHER MATERIAL
NOR THE CAUSE OF ANY OF THE ALLEGED DAMAGES.......................................... 40

VII.    **THE AMENDED COMPLAINT FAILS TO ALLEGE THAT THIS IS AN
"EXCEPTIONAL CASE" REQUIRING THE COURT TO PIERCE THE
CORPORATE VEIL .............................................................................................. 41**

VIII.   **THE TRUSTEE'S CLAIMS AGAINST POWER MANAGEMENT IN
COUNTS 12-15 ARE BARRED BECAUSE IT WAS DISSOLVED IN
OCTOBER 2009.................................................................................................... 43**

IX.     **THE TRUSTEE'S CLAIMS AGAINST THE HARBINGER DEFENDANTS
SHOULD ALSO BE DISMISSED FOR THE REASONS SET FORTH IN
THE TRANSFEREE DEFENDANTS' BRIEF ........................................................... 43**

X.       **CONCLUSION ...................................................................................................... 44**

# TABLE OF AUTHORITIES

## CASES

*@Wireless Entm't, Inc. v. AI Consulting, LLC*, No. 05-CV-6176, 2006 WL 3370696
(W.D.N.Y. Oct. 30, 2006).................................................................................................. 29

*Abraham v. Am. Home Mortg. Serv'g, Inc.*, No. 12-cv-4686, 2013 WL 2285205
(E.D.N.Y. May 23, 2013) ................................................................................................ 29

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444
n.40, *on reconsideration in part*, 888 F. Supp. 2d 478 (S.D.N.Y. 2012) ................................ 28

*Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................................................ 27

*Adler v. Berg Harmon Ass'n*, 790 F. Supp. 1222 (S.D.N.Y. 1992)............................................... 40

*Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327 (S.D.N.Y. 2010)..................................... 28

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)................................................................... 25, 33, 35

*Ashland v. Morgan Stanley & Co., Inc.*, 652 F.3d 333 (2d Cir. 2011) ........................................ 40

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 25, 33, 35

*BH S&B Holdings LLC v. Bay Harbour Master Ltd.*, 420 B.R. 112 (Bankr.
S.D.N.Y. 2009) ............................................................................... 26, 27, 31, 42, 43

*Borgognone v. Patricia's Pizza & Pasta II, Inc.*, No. 10 Civ. 0841, 2010 WL 4455820
(S.D.N.Y. Nov. 3, 2010) ................................................................................................. 31

*Chapin Home for the Aging v. McKimm*, No. 11 Civ. 667, 2013 WL 948110 (E.D.N.Y.
Mar. 11, 2013).................................................................................................................. 28

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991).............. 28

*Cortec Indus. v. Sum Holding, L.P.,* 949 F.2d 42 (2d Cir. 1991) .................................................. 6

Cresswell v. Sullivan & Cromwell, 704 F. Supp. 392 (S.D.N.Y. 1989) ..................................... 41

*DiFolco v. MSNBC Cable LLC*, 662 F.3d 104 (2d Cir. 2010)...................................................... 26

*DynCorp v. GTE Corp.*, 215 F.Supp.2d 308 (S.D.N.Y. 2002) ..................................................... 40

*Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996) .......................................... 41

*Filler v. Hanvit Bank*, 156 Fed. App'x 413 (2d Cir. 2005)..................................................... 27, 28

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349
(S.D.N.Y. 2007) ............................................................................................................... 28

*Graham v. Barriger*, 699 F.Supp.2d 612 (S.D.N.Y. 2009) ......................................................... 41

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F.Supp.2d 228 (S.D.N.Y.
1999) ........................................................................................................................... 38, 40

*Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (N.Y. 1989)........................................................... 28

*In re Allou Distrib., Inc.*, 387 B.R. 365 (Bankr. E.D.N.Y. 2008)........................................... 27, 30

*In re Citigroup ERISA Litig.*, 662 F.3d 128 (2d Cir. 2011) ........................................................ 26

*In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003).............. 32

*In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198 (S.D.N.Y. 2012) ........... 26

*In re Global Crossing, Ltd. Securities Litigation*, 2005 WL 1881514 (S.D.N.Y. Aug. 5,
2005) ............................................................................................................................. 37

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................. 31

*In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (S.D.N.Y. 2011) ............................................. 4

*In re Lyondell Chem. Co. v. UBS Sec. LLC*, 491 B.R. 41 (Bankr. S.D.N.Y. 2013) .................... 25

*In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897 (Bankr. S.D.N.Y.
Oct. 1, 2013) ................................................................................................................... 9

*In re Old CarCo LLC*, 454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd*, 509 Fed.
App'x 77 (2d Cir. Jan. 30, 2013) .............................................................................. 4, 25, 35

*In re St. Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. 587 (Bankr. S.D.N.Y. 2010) ............... 9

*Kassman v. KPMG LLP*, 925 F. Supp. 2d 453 (S.D.N.Y. 2013) .................................................. 25

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) .......................................... 32

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ...................................................... 29

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ...................................................... 43

*Kwon v. Yun*, No. 05 Civ. 1142, 2008 WL 190058 (S.D.N.Y. Jan. 22, 2008) ........................... 44

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387
(S.D.N.Y. 2010) ......................................................................................................... 28, 31

*Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377 (D. Del. 2012) ............................................... 42

*Matthew v. Laudamiel*, No. C.A. 5957-VCN, 2012 WL 605589 (Del. Ch. Feb. 21, 2012) ......... 44

*McCall v. Chesapeake Energy Corp.*, 509 Fed. App'x 62 (2d Cir. 2013) ................................... 29

*Meisel v. Grunberg*, 651 F. Supp. 2d 98 (S.D.N.Y. 2009) ....................................................... 29

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913
(S.D.N.Y. 1995) ............................................................................................................ 35

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260 (D. Del. 1989) .................................... 42

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 376
(S.D.N.Y. 2012) ......................................................................................................... 42, 43

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, No. 10-CV-4145, 2013 WL
5434638 (S.D.N.Y. 2013) ........................................................................................... 42, 43

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ............................................. 30

Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011 (2d Cir. 1989).............. 40

*RSL Com Primecall, Inc. v. Beckoff*, No. 01-11457, 2003 WL 22989669 (Bankr.
S.D.N.Y. Dec. 11, 2003) ............................................................................................. 27, 31

*Schwartz v. Soc'y of the N.Y. Hosp.*, 199 A.D.2d 129 (N.Y. App. Div. 1st Dep't 1993) ............ 29

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999) ............ 27

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202 (S.D.N.Y. 2012)............. 14, 37

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F.Supp.2d 485 (S.D.N.Y. 2003)......... 40

*United Feature Syndicate, Inc. v. Miller Feature Syndicate, Inc.*, 216 F. Supp. 2d 198
  (S.D.N.Y. 2002) ................................................................................................................ 32, 33

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560 (E.D.N.Y. 2011) .................................... 26

RULES

6 Del. Code § 18-803(b) ................................................................................................................ 44

Defendants Harbinger Capital Partners, LLC ("HCP"), Boston Harbor Power LLC ("Boston Harbor"), Power Management Financing LLC ("Power Management")[1], Harbert Distressed Investment Master Fund, Ltd. (the "Distressed Investment Fund"), and Harbinger Capital Partners Master Fund I, Ltd. (the "Master Fund") (collectively, the "Harbinger Defendants" or "Harbinger"), respectfully submit this Memorandum of Law in support of their Motion (the "Motion") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, to dismiss the First Amended Complaint (the "Amended Complaint"), dated August 1, 2013, filed by Mark Holliday as Liquidating Trustee of the BostonGen Liquidating Trust (the "Trustee").[2]

## I.    PRELIMINARY STATEMENT

This case is a misguided attempt by the Trustee and what is now his third set of contingent-fee lawyers to use conclusory pleading to conjure a fraud claim from what is nothing more than a recapitalization (the "Recap") that was followed by the 2008 financial crisis and a subsequent bankruptcy. The barebones and legally defective nature of the Trustee's pleading is nowhere more apparent than with respect to the Harbinger Defendants. Apart from its recitations, the Amended Complaint at bottom alleges only one specific act by the Harbinger Defendants: in 2005, Defendant HCP—through two special purpose vehicles ("SPVs"), Boston Harbor and Power Management—provided financing to Defendant K Road BG LLC ("K Road Investor") in the amount of $61 million. ¶ 79. That is it. The Amended Complaint contains no non-conclusory allegations of any other acts—or of any statements of any sort to anyone at all—by any Harbinger Defendant. The Trustee fails to state any claim against the Harbinger Defendants—much less one for fraud.

---

[1]    As set forth in Part VIII, *infra*, Power Management was dissolved on October 7, 2009.

[2]    Unless otherwise noted, (i) all paragraph references correspond to the Amended Complaint, (ii) any capitalized term not defined herein has the same definition ascribed to the term in the Amended Complaint, and (iii) all emphasis in quotations was added by the Harbinger Defendants.

The Trustee's failure to assert any competent allegations of fraud is hardly surprising, given the undisputed facts underlying the Recap. In 2005, the K Road Defendants (or "K Road") were hired by EBG to help "revamp" the company and increase profitability, the result of which would help "get the [EBG] unit holders out of the business." ¶¶ 78-9. As part of their retention agreement, the K Road Defendants purchased $65 million in EBG equity. *Id.* Through its SPVs, the Distressed Investment Fund, which specialized in distressed debt financing, invested alongside K Road to help to finance that $65 million capital contribution. *Id.*, ¶ 70. Less than two years later, K Road accomplished what it was hired to do: that revamping allowed EBG investors the option of partially redeeming their investments (*i.e.*, "get[ting] the unit holders out of the business") (¶¶ 129-32), in June 2007, Astoria Energy/Madison Dearborn Partners (reorganized as U.S. Power Generating Co. or "USPG") acquired EBG's equity in a merger at a price of over $1.2 billion. *See* Part II(G), *infra.* The K Road and Harbinger Defendants both indirectly retained equity in EBG after the December 2006 Recap and were issued USPG shares after the June 2007 acquisition of EBG—and, as explained below, in 2008, Harbinger purchased additional shares of USPG (the new parent company of EBG and BostonGen). *See id.* Following the Recap, EBG and BostonGen continued to operate and pay their debts as they came due for nearly four years. ¶ 72.

How does any of that amount to a fraud? The Amended Complaint does not answer that fundamental question, at least not with any competent factual allegations. Instead, the Trustee relies on bald assertions that are both conclusory and totally implausible. The Trustee claims that the entire Recap was a massive $2 billion fraud in which the K Road Defendants, acting in concert with the Harbinger Defendants, duped all of EBG's admittedly sophisticated creditors, as well as the admittedly sophisticated syndicators, consultants, and ratings agency analysts involved in the Recap. How did the K Road and Harbinger Defendants pull off this massive fraud? The K Road Defendants allegedly "dominated and controlled" EBG's board of directors (the "EBG Board"), a

board on which they held only 2 of the 7 seats, and allegedly caused EBG to issue "misrepresentations." ¶¶ 86, 93. How were the Harbinger Defendants involved? Either Harbinger "dominated and controlled" K Road or, alternatively, Harbinger allegedly "conspired" with K Road. ¶¶ 285, 269, 277. How were all of the admittedly sophisticated parties here fooled by K Road? They supposedly "relied" blindly on the "misrepresentations." ¶¶ 218-19. What were these misrepresentations? They consisted of "projections" of EBG's "sunny future" that were "misleading." ¶¶ 3, 94-117. What was misleading about the projections? They purportedly failed to disclose "intrinsic risks" in the energy market. ¶¶ 94-6. K Road and Harbinger also failed to disclose that they were "conspiring" together. ¶ 112.

Based on his conclusory pleading, the Trustee asserts the following claims against the Harbinger Defendants: (i) aiding and abetting fraud (Count 12); (ii) civil conspiracy to defraud (Count 13); (iii) participation in concerted action to defraud (Count 14); and (iv) acting as the "alter ego" of K Road in the K Road Defendants' alleged fraud (Count 15). The Trustee's claims against the Harbinger Defendants suffer from glaring legal defects, each of which warrants dismissal.

First, the Trustee's allegations do not even remotely comply with Rule 9(b). The Amended Complaint alleges that the Harbinger Defendants, all of which are corporate entities, "acted through former investment officer Howard Kagan." ¶ 80. Yet the Trustee fails to allege *any* statement, omission or conduct *at all* by Kagan, who is mentioned in only two paragraphs (*see id.* and ¶ 286)—much less the particularized factual allegations required to state the fraud-based claims the Trustee asserts against the Harbinger Defendants. The Trustee's claims against the Harbinger Defendants, all of which sound in fraud, should be dismissed for this reason alone.

Second, and for the reasons set forth in the K Road Defendants' concurrently-filed motion to dismiss, the Amended Complaint also fails to state a claim for fraud against the K Road

Defendants.  For example, the Amended Complaint fails to adequately allege falsity, knowledge of falsity, materiality, loss causation, reasonable reliance, or intent to defraud.  The Trustee's failure to state a claim for fraud against the K Road Defendants is fatal to his claims against the Harbinger Defendants because all of his claims against the Harbinger Defendants derive from and depend upon the K Road Defendants' alleged fraud.  ¶¶ 264, 272, 281, and 289.  Rather than restate the K Road Defendants' arguments, the Harbinger Defendants hereby respectfully join in and incorporate the K Road Defendants' brief.

Third, all of the Trustee's claims against the Harbinger Defendants should be dismissed as implausible.  The Trustee's central claim that the Recap rendered EBG insolvent is implausible given EBG's merger/acquisition shortly after the Recap at a substantially *higher* valuation than the valuation ascribed by the Trustee and its continued operations for nearly 4 years without any events of default.  *See, e.g.*, *In re Old CarCo LLC*, 454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd*, 509 Fed. App'x 77 (2d Cir. Jan. 30, 2013) (dismissing fraud claim because subsequent acquisition rendered implausible trustee's claim that recapitalization transaction was fraudulent).  As this Court has already observed, a contemporaneous market price (*e.g.*, the $1.2 billion equity purchase price paid by USPG in June 2007)—rather than the Trustee's hindsight valuation, in which it is claimed that EBG's and BostonGen's equity value "were negative by hundreds of millions of dollars" in December 2006 (¶ 140)—is the "best indicator of enterprise value."[3]  Also implausible is the Trustee's bald assertion that Harbinger "dominated and controlled" the sophisticated K Road Defendants, whose only connection to Harbinger was obtaining financing from the Distressed Investment Fund for the EBG investment.  Sophisticated executives who are called in to "revamp"

---

[3]    Opinion Granting Debtors' Motion Seeking Authority To Sell, Pursuant to 11 U.S.C. § 363, Substantially All of the Debtor's Assets, dated December 3, 2010 [Docket No. 536] (the "December 2010 Order") at 37; *see also In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 187 (S.D.N.Y. 2011) (finding that "the hindsight valuation performed by [trustee's and creditors'] experts" did not, inter alia, "take into consideration the judgments of those actively participating in the market in September 2008 and the real world events and unique circumstances of that market").

4

a company do not just suddenly let themselves be dominated and controlled by entities like the Harbinger Defendants—and the Amended Complaint offers nothing more than its own say-so to suggest otherwise.

Finally, the Trustee's claims against the Harbinger Defendants also should be dismissed because they are untimely under Delaware's controlling statute of repose. And Counts 1 through 6 also should be dismissed for the reasons set forth in the Transferee Defendants' concurrently-filed motion to dismiss, which Harbinger respectfully joins and incorporates herein by reference.

## II.    BACKGROUND

Though the Harbinger Defendants dispute many of the Trustee's allegations, for purposes of this motion, the Amended Complaint's well-pleaded, non-conclusory allegations are assumed to be true. Even under that assumption, the Trustee's purported fraudulent "Recap" scheme strains reason and lacks well-pled factual allegations essential to the Trustee's claims.

### A.    K Road Is Hired To "Revamp" EBG And Increase Profitability

The Trustee alleges that, between 2000 and 2002, the K Road Defendants managed EBG. ¶ 77. In 2002, Exelon bought EBG; following Exelon's purchase, the K Road Defendants left the company. *Id.* During Exelon's tenure, EBG was poorly managed, so, by late 2004, EBG was in "financial distress." ¶¶ 77-8. As a result, EBG's lenders, which consisted predominantly of financial institutions and hedge funds, took control of the company and sought to re-enlist the K Road Defendants. *Id.* Their selection was no coincidence. EBG's new equity holders (its former lenders) believed that the K Road Defendants were best suited to "revamp" the company—with two objectives. ¶ 79. First, EBG's equity holders hoped the K Road Defendants could make the company a more profitable acquisition target. *Id.* Their second, "more important" expectation was that, if the K Road Defendants were successful, it would enable EBG's equity holders to initiate a profitable liquidity event and facilitate an exit strategy.

In connection with resuming managerial functions for the businesses, EBG required the K Road Defendants (through K Road Investor, the K Road entity that invested directly in EBG) to contribute $65 million of capital to the enterprise (*id.*), which was approximately 10% of EBG's then-indicative value. ¶ 82.

## B.    Harbinger Provides Financing For The K Road Defendants' $65 Million Investment In EBG

The K Road Defendants decided to obtain financing for the $65 million capital contribution to EBG. ¶¶ 79, 82. The Trustee maintains that the K Road Defendants fraudulently failed to disclose this decision. *See, e.g.*, ¶¶ 29, 80, 112. But nothing in the K Road Defendants' agreement with EBG (the "<u>LLC Agreement</u>")[4] prohibited them from obtaining financing or required them to disclose their loan or their lender if they did. *Id.* Nor does the Amended Complaint allege any facts establishing why such financing was improper—or even unexpected—in any way. *See id.* The K Road Defendants even asked Credit Suisse First Boston ("<u>Credit Suisse</u>")—affiliates of which acted as the counterparty to the purportedly fraudulent Hedges and as a lead arranger and bookrunner for the allegedly fraudulent Recap—to help them locate a "backer" to finance this $65 million capital contribution. ¶¶ 97-101, 175.

At the time the K Road Defendants sought this financing, the predecessor of prominent investment adviser HCP was serving as the asset manager for the Distressed Investment Fund.[5] As the name suggests, the Distressed Investment Fund was an investment vehicle with a specific mandate: to invest in distressed (and potentially undervalued) assets. *Id.* Consequently, because

---

[4]    The LLC Agreement is attached at Exhibit 2 to the Declaration of Tibor L. Nagy, Jr. (the "Nagy Decl."). Because the Trustee relied upon the terms of the LLC Agreement, as well as the <u>Original LLC Agreement</u>, the <u>Investment Agreement</u>, the <u>K Road Holdings Agreement</u>, the <u>K Road Financing Agreement</u>, the <u>Subscription Agreement</u>, the <u>Note Agreement</u>, and the <u>CIM</u> (all defined herein and attached to the Nagy Decl.) in bringing his claims (*see, e.g.*, ¶¶ 1-3, 24-7, 29-33, 68-70, 79-83, 85-90, 93-147, 150-3, 157-9, 165-72, 175-85, 199, 215, 224, 235, 262-3, 269, 271, 279-80, and 285-90), this Court may consider these documents in connection with this motion to dismiss. *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

[5]    The Distressed Investment Fund was later reorganized as the Master Fund. *See* ¶ 70.

EBG was precisely such a distressed and potentially undervalued investment, Credit Suisse introduced the K Road Defendants to Harbinger.

## C.    K Road Is Given 2 Of The 7 Seats On EBG's Board So That Ultimate Control Of The Company Remained In The Board's—And Not In K Road Investor's—Hands

To memorialize the K Road Defendants' $65 million investment, K Road Investor and EBG entered into an <u>Investment Agreement</u>.[6] Subsequently, K Road Investor entered into EBG's amended and restated <u>LLC Agreement</u> on October 11, 2005, under which K Road Investor obtained equity units comprising a 9.9% membership interest in EBG. ¶ 82.[7] At the time K Road Investor joined EBG, EBG's membership consisted of 17 financial institutions, financial services firms, and investors, which collectively held 90.1% of EBG's remaining equity units. *Id.*

Pursuant to the LLC Agreement, all of EBG's "business and affairs" were managed by and under the direction of the EBG Board. LLC Agreement § 5.1. Following an interim period, the EBG Board would be composed of 7 directors, each with 1 vote. *Id.* § 5.2(a)(iii). K Road Investor was to designate only 2 of the 7 directors—1 of whom was to act as EBG's CEO. *Id.* § 5.2(a)(i). The remaining 5 directors were selected by the <u>Nominating Committee</u>, which consisted of 4 sophisticated hedge funds: (i) Anchorage Capital Master Offshore, Ltd. ("<u>Anchorage</u>"); (ii) Satellite Asset Management, L.P. ("<u>Satellite</u>"); (iii) Stonehill Institutional Partners, L.P.; and (iv) Sandell Asset Management Corp. ("<u>Sandell</u>"). ¶ 30; *see also* LLC Agreement at Schedule B.

The Nominating Committee election procedure and criteria (also established in the LLC Agreement) required that each of the remaining directors be an independent director (the "<u>Independent Directors</u>"). *See id.* at Schedule C.

Following the October 2005 K Road recapitalization, EBG's ownership structure (with number of membership units held) was as follows:

---

[6]    The Investment Agreement is attached at Exhibit 3 to the Nagy Decl.

[7]    *See also* LLC Agreement at Schedule A-1.



*See id.* at Schedule A-1. Notably, three of the largest EBG investors and members of the Nominating Committee (Anchorage, Satellite, and Sandell) were not listed as EBG unit holders in the LLC Agreement, as their beneficial interests were held in the name of a nominee. *Compare id. with* Amended Complaint at Ex. A.

**D.    K Road Manager Becomes Asset Manager for EBG's Subsidiary Businesses**

Separately, but alongside K Road Investor's investment in EBG, a different K Road entity ("K Road Manager") entered into a Management and Operation Agreement with EBG's various subsidiaries, including BostonGen (the "Management Agreement"). ¶ 83. Under it, K Road Manager became project manager and assumed control over the operational aspects of the day-to-

day businesses of BostonGen and its subsidiaries. ¶¶ 83-4. Harbinger did not have—and is not alleged to have had—any connection to K Road Manager.

**E.    Harbinger Is Given A Minority Membership Interest In K Road Holdings, The Parent Of K Road Investor, So That Ultimate Control of K Road Investor Remained With K Road**

Utilizing a practice common in financing transactions to limit investor liability, the Distressed Investment Fund's indirect investment in EBG was structured through SPVs. ¶ 79. Given EBG's distressed financial situation in late 2005 (*see* ¶¶ 78-9), the SPVs enabled the Distressed Investment Fund to participate in EBG's potential turn-around without exposing its other, unrelated investments to liability.

There was nothing unusual about the relationship between Harbinger and the K Road Defendants or either's use of these SPVs to facilitate the investment, nor does the Amended Complaint allege that there was. In fact, both EBG (organized as a holding company for BostonGen) and BostonGen (organized as a holding company for various subsidiaries) were themselves SPVs.[8]

Harbinger's $61 million investment in EBG was divided into two separate investments. First, Boston Harbor made a $31.85 million equity subscription into K Road Holdings LLC ("K Road Holdings") (entitling it to a 49% membership interest in that entity).[9] (K Road Holdings was

---

[8]    *See, e.g.*, EBG's Limited Liability Company Agreement, dated May 24, 2004 (the "Original LLC Agreement"), at § 2.06(a). The Original LLC Agreement is attached at Exhibit 4 to the Nagy Decl. *See also* Declaration of Jeff Hunter, Manager, Executive Vice President and Chief Financial Officer of EBG Holdings, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, dated August 18, 2010 [Docket No. 2] (the "Hunter Declaration") at Exhibit A.

In dismissing the Amended Complaint, the Court "is empowered to take judicial notice" of the docket of the underlying bankruptcy proceeding. *In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013); *see also In re St. Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010) (same).

[9]    *See* K Road Holdings Subscription Agreement, dated September 26, 2005 (the "Subscription Agreement"), attached at Exhibit 5 to the Nagy Decl.

9

K Road Investor's parent and was formed to hold K Road Investor's EBG membership.) [10]
Second, Power Management purchased a $29.15 million convertible note (the "Convertible Note")
issued by K Road Power BG LLC ("K Road Financing", the parent of "K Road Managing
Member"). [11]

All of Harbinger's rights as a member of K Road Holdings were set forth in the K Road
Holdings Agreement: Boston Harbor's *minority*, 49% membership interest in K Road Holdings
gave it no affirmative ability to control the company (or its wholly-owned subsidiary, K Road
Investor); as a debt investor in K Road Financing, Power Management had no membership interest
in K Road Holdings and no affirmative rights under the K Road Holdings Agreement. [12]  Instead,
K Road Managing Member became the "Managing Member" of K Road Holdings.  As provided
in the K Road Holdings Agreement: "The business and affairs of the Company shall be managed
exclusively by [K Road] Managing Member, and no other member [*e.g.*, Boston Harbor] shall
have the power, authority or right to bind the Company." [13]

The various interrelationships between these K Road and Harbinger entities is graphically
summarized as follows:

---

[10]      *See* K Road Holdings' Amended and Restated Limited Liability Company Agreement, dated October 6, 2005
(the "K Road Holdings Agreement") at § 1.5.  The K Road Holdings Agreement is attached at Exhibit 6 to the Nagy
Decl.

[11]      *See* 8% Convertible Note Purchase Agreement, dated September 26, 2005 (the "Note Agreement"), attached
at Exhibit 7 to the Nagy Decl.  *See also* Amended Complaint at Exhibit B.

[12]      *See* K Road Financing Amended and Restated Limited Liability Company Agreement, dated October 6, 2005
(the "K Road Financing Agreement"), at Exhibit A.  The K Road Financing Agreement is attached at Exhibit 8 to the
Nagy Decl.

[13]      K Road Holdings Agreement § 2.1(a).



*See also* Amended Complaint at Ex. B.

**F.    EBG Successfully Conducts The Recap Allowing Unit Holders To (Partially) Get Out Of The Business**

Approximately 14 months after K Road's investment, EBG was positioned to conduct the Recap, thereby allowing EBG unit holders to get up to 40% of their investments "out of the business" through a tender offer to repurchase membership units (the "Tender Offer"). *See* ¶¶ 129-31, 79.  As part of this transaction, EBG and BostonGen borrowed approximately $2 billion in cash, secured by first and second liens on its assets and the assets of its subsidiaries.  ¶ 1.  EBG then used almost $1 billion of this borrowed cash "to redeem equity interests [units] in EBG, redeem warrants, and pay a dividend to equity." *Id.*  The balance of approximately ██████████

was used to retire existing debt, provide working capital, and pay transaction costs. ¶ 131; *see also*
Confidential Information Memorandum ("CIM") at 25.[14]

### 1.    EBG And BostonGen Enter Into Three Credit Facilities To Finance The Debt

To facilitate the Recap, EBG retained affiliates of Credit Suisse and The Goldman Sachs
Group, Inc. ("Goldman") to act as joint lead arrangers and bookrunners (the "Syndicators"). *Id.*
at 24. The Syndicators initially funded and arranged for EBG and BostonGen to enter into 3
separate credit facilities (the "Credit Facilities"). *Id.*; *see also* ¶ 129. Subsequently, the
Syndicators marketed these Credit Facilities, using the CIM and other promotional materials, and
sold "pieces" of the Credit Facilities to "sophisticated and experienced" lenders in the form of debt
instruments. ¶ 130; *See also* CIM at 4.

### 2.    The Use Of The Proceeds From The Recap Was Fully Disclosed In The CIM

As the CIM explained to prospective lenders, in addition to allocating over ██████████
towards refinancing existing debt facilities and providing working capital for the underlying
businesses, ████████ of the Recap's proceeds were specifically earmarked to underwrite the
Tender Offer to repurchase up to 40% of the outstanding EBG units from members on a *pro rata*
basis and at a price to be determined in a "Dutch auction." ¶ 132; *see also* CIM at 24-5. It is
undisputed that the Recap proceeds were, in fact, used as the CIM described.

### 3.    K Road Investor's Participation In The EBG Tender Offer And Harbinger's Distribution

K Road Investor tendered units, and, after the Recap was consummated, received a total of
$144,683,707.13: (i) $90,866,080 in redemption of 267,312 equity units, equal to approximately
40% of K Road Investor's unit ownership (*see* LLC Agreement at Schedule A-1); (ii)
$50,359,127.13 in exchange for 222,759 warrants that the K Road Defendants had received; and (iii)

---

[14]    A copy of the CIM is attached as Exhibit 9 to the Nagy Decl.

a dividend payment of $3,438,500.    ¶ 135.    Shortly after receiving the redemption proceeds,

pursuant to the terms of the agreements between the K Road Defendants and the Harbinger

Defendants, the K Road Defendants transferred a total of ███████████ in Recap proceeds to the

two Harbinger SPVs: (1) ███████████ to Power Management[15]; and (2) ███████████ to

Boston Harbor.    ¶ 28, 68-9.

**G.      USPG Acquires EBG And Harbinger Retains Significant Equity Interest In USPG**

According to the Trustee, the Recap was a fraudulent transaction that immediately rendered

EBG "insolvent."    ¶¶ 137-40.    But the Amended Complaint's non-conclusory factual allegations

tell a different story.

In January 2007, *less than one month after the Recap was completed*, USPG offered to pay

over $1.2 billion to acquire EBG's equity.[16]    Five months later, in June 2007, USPG acquired EBG

and combined it with USPG's other energy holdings.    *See id.* at 9.    As described in USPG's Form

S-1, the group planned to publicly float its equity through an IPO.    *Id.*    Notably, 2 of the 4

investment banks retained to lead underwrite USPG's IPO were also affiliates of Credit Suisse and

Goldman—the very same firms that served as Syndicators of the Recap.    *See, e.g., id.* at 178.

After the June 2007 acquisition of EBG, Harbinger reinvested $4.5 million in EBG through

Boston Harbor's purchase of additional shares of USPG's private equity.[17]    By the time USPG

filed its Form S-1 in August 2008, the Harbinger Defendants had amassed a substantial position

in USPG (EBG's parent), equal to 7.3% of all of USPG's outstanding shares.    *See* Form S-1 at

158.    In fact, the Form S-1 listed the Harbinger Defendants as USPG's third largest investor,

holding over 5.5 million USPG shares.    *Id.*    Thus, according to the Amended Complaint, the

---

[15]      On October 7, 2009, Power Management was dissolved.    *See* Certification of Cancellation of Power Management, attached at Exhibit 10 to the Nagy Decl.

[16]      *See* USPG Form S-1, as filed with the Securities and Exchange Commission ("SEC") on August 12, 2008 ("Form S-1") at F-34.    A copy of Form S-1 is attached at Exhibit 11 to the Nagy Decl.

[17]      *See* Nagy Decl. at Ex. 1.

Harbinger Defendants had tens of millions of dollars of their own money invested in the very company that they purportedly helped to render "insolvent." ¶ 138.

## H.    EBG Operates For Nearly Four Years After The Recap, Continues To Service Its Debt, And Falters Only After Dramatic Changes In The Market At Large

In the three-and-a-half years between the Recap and August 18, 2010, the day EBG and BostonGen petitioned for Chapter 11 relief, both companies continued to service their debt—never once defaulting under any of the Credit Facilities. ¶ 72; *see also* December 2010 Order at 8. Nor, importantly, did EBG require any debtor-in-possession financing when it filed for Chapter 11 relief. *Id.* At the same time, the market at large—and the energy market in particular—suffered crashes that widely have been recognized as unprecedented. *See also* Hunter Declaration at ¶ 18.[18]

## I.    The Trustee's Amended Complaint Contains Fewer Facts And More Conclusory Allegations Than The Original

On August 17, 2012, the Trustee filed the original complaint (the "Original Complaint") in this adversary proceeding; just under one year later, the Amended Complaint was filed.

Contrary to the way deficient pleadings typically are remedied (consistent with the law and common sense), the Trustee's Amended Complaint contains *fewer* facts and more purely conclusory allegations than the Original Complaint. By comparison, the Amended Complaint is approximately 50 pages *shorter* than the Original Complaint and contains 80 *fewer* citations to underlying source documents. Although the Amended Complaint was filed 12 months later, the Trustee's newfound claims against the Harbinger Defendants were not the result of some new factual information the Trustee obtained. Instead, the Trustee already had *all* of the factual information he currently has about Harbinger *before* the Original Complaint was filed. The new

---

[18]    In addition, the Court may take judicial notice of the circumstances surrounding and effects of the global financial crisis of 2008. *See, e.g., Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 205 n.1 (S.D.N.Y. 2012) (taking judicial notice of "the events constituting the financial crisis that occurred in fall 2008").

Trustee apparently has chosen to add purely conclusory allegations about the Harbinger Defendants for reasons having no foundation in the factual record in this case.

### 1.    The Trustee Conducts Rule 2004 Discovery And Learns All It Currently Knows About Harbinger *Before* The Original Complaint Is Filed

In March 2012, almost 5 months before the Original Complaint was filed, the former Trustee began to conduct Bankruptcy Rule 2004 discovery in anticipation of bringing an adversary proceeding.[19]  In particular, the Trustee sought, and this Court granted, the Trustee's motion to serve discovery requests on the K Road Defendants.  *Id.*  Following entry of the Court's March 30, 2012 order, the Trustee obtained from the K Road Defendants over 200,000 pages of documents relating to EBG, the Recap, and the K Road Defendants' investment in EBG.[20]  As a result of that production, thus, the Trustee knew—no later than May 4, 2012—that Harbinger provided funding for the K Road Defendants' October 2005 EBG subscription, and that Harbinger was a subsequent transferee of Recap proceeds.

On May 4, 2012, the Trustee moved this Court for additional Rule 2004 discovery directly from the Harbinger Defendants.[21]  As explained in the Trustee's motion:

> The Liquidating Trustee has filed the present motion seeking a Bankruptcy Rule 2004 examination of Harbert because he has just learned, from documents that K Road produced, that [REDACTED].  This fact was a surprise because nowhere during the Liquidating Trustee's investigation to date, and in none of the documents reviewed in connection with the Recap Transaction, has he seen any mention of any Harbert entity.  Moreover, he has not seen any mention of such a Harbert entity

---

[19]    *See, e.g.*, Order Authorizing Examinations Pursuant to Rule 2004 of the Federal Rule of Bankruptcy Procedure, dated March 30, 2012 [Docket No. 993].

[20]    *See* Objection of Certain Defendants to the Liquidating Trustee's Motion To Unseal the Complaint, dated October 16, 2012 [Adv. Proc. No. 12-1879, Docket No. 9] at ¶ 10.

In addition to the 200,000 pages of discovery obtained from the K Road Defendants (*see id.*), the Trustee had already been provided with access to 4 million pages of documents from USPG and EBG.  *See* Motion of Craig R. Jalbert, the Liquidating Trustee of the BosGen Liquidating Trust, For Approval of the Stipulation Governing Transfer of Certain Documents and Electronically Stored Information to the Liquidating Trustee, dated October 7, 2011 [Docket No. 946] at ¶ 5.

[21]    *See* Fourth Omnibus Motion of Craig R. Jalbert, Liquidating Trustee of the BostonGen Liquidating Trust, for Entry of an Order Authorizing Examinations Pursuant to Rule 2004 of the Federal Rule of Bankruptcy Procedure, dated May 4, 2012 (the "Fourth Omnibus Motion") [Docket No. 1000].  Harbert Management Corporation ("Harbert") was HCP's predecessor.  *See* Nagy Decl. at ¶ 2.

in connection with K Road's original investment in EBG or its continuing management of the Debtors from late 2005 to mid-2007.

*The Liquidating Trustee thus seeks to examine Harbert to obtain more information regarding potential Causes of Action that may exist against one or more of the Harbert entities* involving (a) [REDACTED], (b) the role that Harbert played, if any, in the making of any decisions to consider and carry out the Recap Transaction, and in the various decisions relating to the implementation of such decisions, (c) the role that Harbert played, if any, in the negotiation of the documents and agreements executed in connection with the Recap Transaction, (d) the relationship between Harbert and K Road in the management of the Debtors and in matters relating to their management, (e) the agreements between Harbert and K Road, and (f) any other matters relating to the relationship, actions and transactions of Harbert with or concerning the Debtors. *Such information has obvious relevance to potential Causes of Action that the Liquidating Trust may have against Harbert.*

Fourth Omnibus Motion at ¶¶ 16-7.  The Trustee's motion was granted on May 24, 2012.[22]

The Trustee, however, never followed through or examined any of the Harbinger Defendants.[23]  In fact, once informed that one of the Harbinger Defendants was purchasing USPG shares, the Trustee's former counsel broke off communications with the Harbinger Defendants.[24] The Trustee, therefore, had all of the information he currently has (or wanted) about the Harbinger Defendants' involvement with and participation in the Recap "fraud" by no later than May 2012.

**2.     The Trustee Files The Original Complaint In This Adversary Proceeding Naming The K Road Defendants As The Mastermind Behind The Alleged Scheme To Defraud**

On August 17, 2012, the (former) Trustee initiated this adversary proceeding by filing the Original Complaint.  In that pleading, the Trustee complained that the K Road Defendants "controlled, managed and dominated EBG" for the purpose of defrauding EBG's and BostonGen's creditors:

[The K Road] Defendants decided to "cash out" a significant portion of their investment and that of some of EBG's other equity unit holders, redeem their warrants and pay a dividend to all holders, but EBG did not have the funds

---

[22]     *See* Order Authorizing Examinations Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, dated May 24, 2012 [Docket No. 1014].

[23]     *See* Nagy Decl. at ¶ 2.

[24]     *See id.*; *see also id.* at Ex. 1.

necessary to do so.  Accordingly, [the K Road] Defendants caused EBG and its subsidiary [BostonGen] to borrow an aggregate of almost $2 billion, and to use more than $1 billion to repurchase equity interests in EBG, redeem warrants and pay a dividend to equity . . . Although EBG, BostonGen and the subsidiaries of BostonGen that guaranteed the obligations [] supposedly had the financial wherewithal to borrow the funds and pay their debts, the projections prepared and disseminated to support the [Recap] were inaccurate, unwarranted, misleading and fatally flawed based on contemporaneously prepared internal budgets that were inconsistent with those projections, then-available information and in the actual event.

Original Complaint ¶ 1.

Despite the Trustee's access to all of the Rule 2004 documents and awareness of the existence and identity of the Harbinger Defendants and their role as K Road's funding source, the Original Complaint *nowhere* suggested that the Harbinger Defendants had *any* role in the alleged Recap fraud.  The Harbinger Defendants were named only as subsequent transferee defendants. *See id.* ¶ 77.

### 3.    The Trustee Adds Conclusory Allegations About Harbinger To Its Amended Complaint

On August 1, 2013, the (new and current) Trustee filed his Amended Complaint.  For the first time, the Trustee alleges that Harbinger—and not only the K Road Defendants—was behind the alleged Recap fraud.  *Compare* ¶ 1 *with* Original Complaint ¶ 1.  According to the Amended Complaint, Harbinger "used its domination and control to cause K Road to manage the Debtors for Harbinger's benefit and to cause the Debtors to enter into the [Recap]."  ¶ 287.  What is the factual basis for this new theory?

The Amended Complaint does not answer that basic question.  Instead, the Trustee appears to simply have inserted the word "Harbinger" into the Original Complaint's various prior allegations regarding the K Road Defendants, as illustrated below:

| Original Complaint | Amended Complaint |
|---|---|
| "Upon the October 2005 restructuring and execution of the Management Agreement and the LLC Agreement, K Road became an "insider" of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, a controlling person under applicable state corporate and securities laws, and a manager of the Debtors' businesses." ¶ 89. | "Upon the execution of the Management Agreement and the LLC Agreement, K Road/*Harbinger* became an "insider" of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, a controlling person under applicable state corporate and securities laws, and a manager of the Debtors' businesses." ¶ 84. |
| "In short, K Road ran the businesses." ¶ 90. | "In short, K Road/*Harbinger* ran the businesses." ¶ 85. |
| "K Road and its officers and directors, including the K Road Insiders, dominated and controlled EBG and BostonGen, comprised the senior management of EBG and BostonGen, and were significant beneficiaries of the Transfers in an amount exceeding $150 million." ¶ 221(g). | "K Road and its officers and directors, including the K Road Insiders *and Harbinger*, dominated and controlled the Debtors, comprised the senior management of the Debtors, and were significant beneficiaries of the Transfers in an amount exceeding $150 million." ¶ 153(g). |

Notably, between the filing of the two complaints, discovery produced *no new evidence* about the Harbinger Defendants' ostensible involvement in the alleged fraud. No new documents about the Harbinger Defendants had surfaced, and the Trustee learned no new facts about the relationship between the Harbinger Defendants and the K Road Defendants. All that changed between the filing of the Original Complaint and the Amended Complaint was:

(i)     A new Trustee was appointed on April 3, 2013 (¶ 73);

(ii)    The Trustee's contingent-fee counsel changed yet again; and

(iii)   There were additional news stories about the SEC's unrelated "civil fraud charges" against Harbinger and its principal, Philip Falcone. ¶ 80.

## J.    The Implausible Recap Fraud Scheme Alleged In The Amended Complaint

The fraudulent scheme alleged in the Amended Complaint has four parts: the K Road Defendants' "domination and control" of EBG's Board; the Harbinger Defendants' "domination and control" and/or "conspiring" with the K Road Defendants; the K Road Defendants' transmission of purportedly misleading projections to the admittedly sophisticated Syndicators,

consultants, and ratings agencies involved with the Recap; and those sophisticated parties' dissemination of the CIM, the Private Supplement to the CIM ("CIM-PS"), and their ratings, all of which the Trustee assumes were sent to and relied upon by the sophisticated lenders (in both the primary and secondary markets) whose claims the Trustee is asserting here.  *See, e.g.*, ¶¶ 202, 204-5, and 217-9.

For the Court's convenience, the alleged fraudulent scheme is graphically depicted as follows:



The Amended Complaint's allegations concerning this purported fraud, which are summarized below, are both conclusory and facially implausible.  As previously noted, the

Harbinger Defendants dispute many of the Trustee's allegations; in addition, many of the allegations upon which the following summary is premised are either contradicted by the Amended Complaint itself or by documents upon which the Trustee has purportedly based his claims. Nevertheless, the following digest is incorporated for illustrative purposes.

1.    **The K Road Defendants Allegedly Devise A Scheme To Defraud "Any Potential Counterparty"**

Almost immediately after investing in EBG in October 2005, both Harbinger and the K Road Defendants "predicted [a] wholesale energy market decline" and "became anxious to exit their investment" through a "liquidity event." ¶¶ 1, 88.  The difficulty was that the K Road Defendants allegedly knew EBG's future prospects were dim and that "BostonGen was at the mercy of market forces." ¶ 91.  As such, any liquidation at fair value would not have satisfied Harbinger's alleged demand for "a high and rapid return on its investment." ¶ 88.  The K Road Defendants therefore decided to "extract[] any possible liquidity," and then to "spin BostonGen's problems into someone else's hands"—a plan that would allegedly require "concealing" EBG's "true prospects *from any potential counterparty* . . . including new lenders." ¶ 92.  To accomplish this objective, the K Road Defendants allegedly "devised a scheme [to] falsely pump up the value of [EBG], to leverage [EBG] based on these false values." ¶ 1.

Only the illusion of creditworthiness would "justify the increased leverage" demanded for a high payout, so "K Road had to establish a value for [EBG] far higher than their past performance or a reasonable forward outlook would support." ¶ 2.  To do so, the K Road Defendants allegedly prepared a document in which they incorporated "misleading and unreasonable" assumptions about EBG's future financial prospects (the "<u>Projections</u>"). ¶ 93.

2.    **The K Road Defendants Allegedly Create Fraudulent Projections**

Although the K Road Defendants allegedly prepared the Projections to "justify the [Recap] and its risks" by misrepresenting these "risks" as "tolerable" and ones that "should be assumed"

(¶ 104), EBG subsequently used the same Projections "to market BostonGen" to potential lenders "as an entity possessing the stable cash flow necessary to service the major new debt load required for the [Recap]."  ¶ 96.  In marketing the Recap, both EBG and BostonGen "intended to defraud their creditors," knowing that any cash they borrowed and then distributed to unit holders "would not be available to pay either the contemporaneous new debt to the lenders or subsequent unsecured creditors." ¶ 111.

### 3. The K Road Defendants, Through Purported Domination And Control, Allegedly Force EBG To Make Misrepresentations And Omissions

To initiate and then consummate the Recap, both EBG and BostonGen would have had to have been complicit in the K Road Defendants' alleged scheme.  For example, EBG and BostonGen would be required to enter into various agreements with third-party consultants and organizers and make representations as to their businesses.  As such, the K Road Defendants needed to be able to manipulate EBG and BostonGen to do as they pleased.  According to the Trustee, the K Road Defendants accomplished this by taking complete command of their corporate identities.  EBG and BostonGen are alleged to have become the K Road Defendants' "puppets":

> [The K Road Defendants] dominated and controlled all aspects of the [EBG's and BostonGen's] businesses, causing [EBG and BostonGen] to have no separate existence and to act as merely an instrumentality for K Road.  K Road also held itself out as being indistinguishable from [EBG and BostonGen], operating [EBG and BostonGen] as a single economic entity alongside K Road.

¶ 246; *see also* ¶ 195.

In addition to the businesses themselves, the K Road Defendants also allegedly "controlled and dominated [EBG's] Board of Directors."  ¶ 249(e).  Although it recognizes that "K Road had the power to designate two directors" to EBG's Board, the Amended Complaint also appears to suggest that the K Road Defendants' power over EBG's Board stemmed from the Nominating Committee—that is, the committee responsible for electing the five independent members of EBG's Board.  *See* Part II(C), *supra*.  Although the Nominating Committee is claimed to have had

the necessary influence to stem "EBG's dissemination of false information" (¶ 31), the Trustee alleges that it did not because it, too, was complicit in the fraudulent Recap scheme. *Id.* ("[The Nominating Committee] knew that EBG, through K Road, had provided false information for the use of the lenders, yet did not disclose K Road's fraud." ¶ 32. According to the Amended Complaint, the Nominating Committee "consented to K Road's plan," "approved of the scheme throughout its planning and performance," and "blessed K Road's conduct and approved of their fraudulent transactions." ¶¶ 166-7, 261-3, 269-71, and 278-9.

> **4.    Under The K Road Defendants' Purported Domination And Control, EBG Allegedly Disseminates The Misleading Projections To Third Parties And To EBG's Board**

Having allegedly prepared the misleading Projections, usurped EBG's and BostonGen's corporate identities, and high-jacked the EBG Board, the next step in the K Road Defendants' scheme was to "cloak the [Recap] transaction in legitimacy." ¶ 2. To this end, EBG, acting "through K Road," retained 4 experienced financial firms (the "<u>Consultants</u>") "to provide consulting services and opinions to support the [Recap] transaction desired by K Road and Harbinger."[25] *Id.* The K Road Defendants then allegedly caused EBG to provide the fraudulent Projections to the Consultants. *Id.*[26]

EBG also provided the same "misleading" Projections to the Syndicators—*i.e.*, affiliates of Credit Suisse and Goldman. ¶ 97.[27] The Syndicators then incorporated the Projections' misrepresentations and omissions into their own promotional materials (*i.e.*, the CIM, the CIM-PS, and the <u>Lenders Presentation</u>), which they used to market and sell the Recap to prospective lenders. ¶ 118.

---

[25]    The Consultants were: (i) Lehman Brothers, Inc.; (ii) Duff & Phelps, LLC; (iii) Navigant Consulting, Inc.; and (iv) Black & Veatch Corporation. *Id.*

[26]    *See also* ¶¶ 104-5, 113, 115, 128, 199, 199(i), 215, 215(i), 224, 224(i), 235, 235(i), and 270.

[27]    *See also* ¶¶ 3, 31, 98-100, 104, 112, 118-9, 124, *et al.*

Although it is alleged that EBG's Board was equally under the K Road Defendants' domination and control, the Independent Directors still had to approve the proposed Recap transaction. ¶ 125. The K Road Defendants therefore provided these directors with the same "misleading" Projections they used to deceive the Consultants and Syndicators (¶¶ 97, 104, 114, 199, 215, 224, and 235); as such, K Road is claimed to have lulled the Independent Directors into a false sense of security about the transaction's underlying risks. *See* ¶ 249(f) ([The K Road Defendants] "controlled and directed the process of obtaining director approval of the [Recap].").

5.     **Using The Projections, The K Road Defendants Allegedly Deceive The Rating Agencies Into Issuing Incorrect Ratings**

The final step in the K Road Defendants' alleged ploy was to trick Moody's Investment Service and Standard & Poor's Rating Services (together, the "Ratings Agencies"), which the K Road Defendants knew would "rate" the debt instruments issued by EBG and BostonGen. ¶ 126 ("[I]t was necessary to have the debt to be issued be rated by [the Ratings Agencies]"). If the Ratings Agencies suspected EBG and BostonGen were not creditworthy, the fraudulent scheme would not succeed. Therefore, the K Road Defendants allegedly caused EBG to provide the Ratings Agencies with "materially misleading financial information reflected in the Projections, and thus indirectly . . . contributed to the public dissemination of fraudulent, false and misleading information." *Id.*; *see also* ¶¶ 104, 127, 215, 224, and 235.

6.     **Once The Recap Is Approved And Consummated, The K Road Defendants Allegedly Direct EBG And BostonGen To Distribute The Cash For The Equity Holders' Benefit**

As a result of the K Road Defendants' alleged plan, the Projections' misrepresentations and omissions were ultimately "disseminated to prospective lenders" (¶ 215), and these creditors—and the marketplace at large—supposedly relied on the Projections' misrepresentations and omissions when they extended credit to EBG by purchasing the debt instruments. ¶¶ 218-9. Then, after EBG and BostonGen entered into the Credit Facilities and received borrowed funds,

the K Road Defendants caused BostonGen to transfer cash to EBG and, in turn, caused EBG to

transfer all Recap proceeds for the K Road Defendants' and the other equity holders' benefit.

¶ 165.

> **7.    The Amended Complaint Does Not Even Attempt To Allege That Harbinger Participated In Any Of The K Road Defendants' Purported Fraudulent Conduct**

The Amended Complaint sets forth the alleged facts comprising the purported fraud in

Paragraphs 94 through 147.  But not one of those paragraphs identifies any statement, omission or

act by any Harbinger Defendant.  *See* ¶¶ 94-147.  Instead, because the Trustee has adduced no

evidence of any fraudulent acts by any Harbinger Defendants, the Amended Complaint mentions

Harbinger only in its preliminary sections and in the counts asserted against Harbinger.  *See, e.g.*,

¶¶ 1, 285.  Thus, according to his own pleading, the Trustee is not aware of any actual participation

by any Harbinger Defendant in the alleged fraud.

## III.    LEGAL STANDARD

### A.    Standard Of Review

In order to defeat a motion to dismiss, "a plaintiff must generally plead sufficient facts 'to

state a claim to relief that is plausible on its face.'"  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453,

461 (S.D.N.Y. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In

re Lyondell Chem. Co. v. UBS Sec. LLC*, 491 B.R. 41, 45 (Bankr. S.D.N.Y. 2013) ("the Court

accepts the allegations of the . . . Complaint as true, subject to the limits imposed under the

Supreme Court's decisions in *Twombly* and *Iqbal*").  "The plausibility standard . . . asks for more

than a *sheer possibility* that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  Pleadings that are "no more than conclusions[] are not entitled to the assumption of

truth."  *Id.* at 679.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Id.* at 678; *see also generally In re Old CarCo*, 454 B.R.

38 (dismissing complaint for failure to plead non-conclusory factual allegations sufficient to support claims).

## B.    Documents To Be Considered On A Motion To Dismiss

On a motion to dismiss, the Court "may consider documents incorporated by reference in the complaint and documents upon which the complaint 'relies heavily.'" *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011) (quoting *DiFolco v. MSNBC Cable LLC*, 662 F.3d 104, 111 (2d Cir. 2010)).  These include:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the [SEC], and (5) facts of which judicial notice may properly be taken under Rule 2012 of the Federal Rules of Evidence.

*In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 208 (S.D.N.Y. 2012) (quoting *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (alteration in original)).  Moreover, to the extent that any such documents "contain statements that contradict allegations in [the] complaint, the documents control and the court need not accept as true the allegations in the complaint."  *BH S&B Holdings LLC v. Bay Harbour Master Ltd.*, 420 B.R. 112, 132 (Bankr. S.D.N.Y. 2009).

## IV.    THE TRUSTEE'S FRAUD-BASED CLAIMS AGAINST THE HARBINGER DEFENDANTS (COUNTS 12-15) SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 9(B)

The Trustee is required to plead his fraud-based claims against Harbinger (Counts 12 through 15) with particularity.  The Amended Complaint does not even remotely satisfy that requirement.  Each of the Trustee's fraud-based claims should be dismissed for this reason alone.

## A.    Rule 9(b) Requires The Trustee To Plead All Of His Fraud-Based Claims With Particularity

Under Rule 9(b), any plaintiff claiming fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 51 (2d Cir. 1995)).

Where a plaintiff makes fraud-based allegations against multiple defendants, Rule 9(b) "requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act." *Sec. Inv. Prot. Corp.*, 234 B.R. at 310. Where, as here, a plaintiff's claims are vague, conclusory, lack specificity about the time and place of any allegedly fraudulent acts, and fail to identify with particularity which defendant is responsible for which alleged act, the claims sounding in fraud should be dismissed under Rule 9(b). *See RSL Com Primecall, Inc. v. Beckoff*, No. 01-11457, 2003 WL 22989669, at *6, *17 (Bankr. S.D.N.Y. Dec. 11, 2003); *see also Bay Harbour Mgmt. LLC*, 282 Fed. App'x at 77 (dismissing common law fraud claim where plaintiffs had "failed to plead facts[] with the particularity required by [Rule 9(b)]").

### 1.    The Additional Elements Of The Trustee's Aiding And Abetting Fraud Claim (Count 12) Also Must Be Pled With Particularity

Here, the Trustee has alleged that the Harbinger Defendants "aided and abetted" the K Road Defendants' alleged fraud.  ¶¶ 261-5.  To succeed on this secondary liability theory, the Trustee must sufficiently allege: (1) that the K Road Defendants committed fraud; (2) that the Harbinger Defendants had knowledge of the K Road Defendants' fraud; and (3) that the Harbinger Defendants provided substantial assistance to the K Road Defendants in committing the fraud. *In re Allou Distrib., Inc.*, 387 B.R. 365, 406 (Bankr. E.D.N.Y. 2008).  "With respect to the knowledge

requirement, New York courts require that the alleged aider and abettor have 'actual knowledge' of the underlying fraud." *Filler v. Hanvit Bank*, 156 Fed. App'x 413, 417 (2d Cir. 2005). To plead "substantial assistance," a complaint must allege that defendant's conduct "proximately caused" the plaintiff's injury. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 370-1 (S.D.N.Y. 2007). Importantly, the burden of proof for an aiding and abetting fraud claim is clear and convincing evidence. *See, e.g.*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444 n.40, *on reconsideration in part*, 888 F. Supp. 2d 478 (S.D.N.Y. 2012).

Moreover, because the existence of an underlying fraud is a prerequisite to the successful pleading of a secondary liability claim for aiding and abetting fraud, Rule 9(b)'s heightened pleading standard applies to underlying fraud allegations and to *all* of the additional elements of secondary liability. *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010) ("A claim alleging fraud, or aiding and abetting fraud, must satisfy also Rule 9(b)"); *Filler*, 156 Fed. App'x at 417 (affirming dismissal of claim where "plaintiffs have failed to plead with particularity defendants' aiding and abetting of that fraud").

## 2. The Additional Elements Of The Trustee's Civil Conspiracy And Concert Of Action To Commit Fraud Claims (Counts 13 & 14) Also Must Be Pled With Particularity

Both conspiracy and concert of action are theories "for imposing joint and several liability 'on the part of all defendants having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act.'" *Chapin Home for the Aging v. McKimm*, No. 11 Civ. 667, 2013 WL 948110, at *4 (E.D.N.Y. Mar. 11, 2013) (quoting *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 506 (N.Y. 1989)).

To establish a *prima facie* case for civil conspiracy to commit fraud, a plaintiff must allege not only the underlying fraud, but also "(a) a corrupt agreement between two or more persons, (b)

an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 355 (S.D.N.Y. 2010) (quoting *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991)).  New York law requires a plaintiff to provide "more than a conclusory allegation of conspiracy or common purpose" in order to successfully plead a cause of action for civil conspiracy. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 120 (S.D.N.Y. 2009) (quoting *Schwartz v. Soc'y of the N.Y. Hosp.*, 199 A.D.2d 129, 130 (N.Y. App. Div. 1st Dep't 1993)).  The elements of concerted action liability are essentially the same. *Abraham v. Am. Home Mortg. Serv'g, Inc.*, No. 12-cv-4686, 2013 WL 2285205, at *12 (E.D.N.Y. May 23, 2013).[28]

Neither civil conspiracy nor concert of action is recognized as an independent tort. *See, e.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy").[29]  Consequently, both claims must fail when the underlying claim—here, the fraud claim against the K Road Defendants—is not sufficiently pled. *McCall v. Chesapeake Energy Corp.*, 509 Fed. App'x 62, 65 (2d Cir. 2013) ("Because the claims that could have provided a basis for the civil conspiracy claim were dismissed, this claim must also fail as a matter of law"); *see also Abraham*, 2013 WL 2285205 at *12 ("If all of the underlying torts of which defendants are accused are dismissed, a claim for concerted-action liability must also fail as a matter of law") (internal quotation omitted).

---

[28]    According to the *Abraham* court, "[u]nder New York law, '[t]he elements of concerted-action liability are (1) an express or tacit agreement to participate in a common plan or design to commit a tortious act, (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort.'" *Id.* 2013 WL 2285205 at *12 (quoting *@Wireless Entm't, Inc. v. AI Consulting, LLC*, No. 05-CV-6176, 2006 WL 3370696, at *8 (W.D.N.Y. Oct. 30, 2006)).

[29]    *See also Abraham*, 2013 WL 2285205 at *12 (holding that where a plaintiff is unable to plead the underlying tort with the requisite specificity, "a claim for concerted action liability 'must also fail as a matter of law.'") (quoting *McCall v. Chesapeake Energy Corp.*, 509 Fed. App'x 62, 65 (2d Cir. 2013)).

Furthermore, even if the Trustee could adequately plead an underlying fraud, his conspiracy and concert of action claims still cannot survive because he is required—but has failed to—adequately allege that the Harbinger Defendants "engaged in any 'independent culpable behavior' connecting [them] to the underlying fraud alleged." *Meisel*, 651 F. Supp. 2d at 121 (citing *Schwartz*, 199 A.D.2d at 130); *see also Abraham*, 2013 WL 2285205 at *12 (dismissing concert of action claim where plaintiff failed to demonstrate that defendant had engaged in any specific "tortious conduct" in furtherance of underlying tort).[30]

**B.    The Amended Complaint Does Not Contain Any Non-Conclusory Allegations About Harbinger And Plainly Fails To Comply With Rule 9(b)**

The Amended Complaint contains *no* non-conclusory allegations about any of the Harbinger Defendants.    According to the Trustee, the only natural person associated with Harbinger who supposedly "acted" on Harbinger's behalf is its former investment officer Howard Kagan ("Kagan").  ¶ 80.  But the Amended Complaint is silent about any "conduct" by Kagan and fails to identify even a single "act" by him:

- there are no statements uttered by Kagan;

- there are no words written by Kagan;

- there are no decisions made by Kagan; and

- there is *no conduct of any kind whatsoever* attributed to Kagan.

*See* ¶¶ 80, 286.  The Amended Complaint mentions Kagan only twice.  These allegations are reproduced in their entirety below:

(i)    "Harbinger acted through former investment officer Howard Kagan" (¶ 80); and

---

[30]    Additionally, as explained in the Nominating Committee's Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint (the "NomCom Mem."), at pp. 23-24, the Trustee's conspiracy claim must also be dismissed because it is duplicative of the aiding and abetting claim. *See In re Allou Distrib.*, 446 B.R. at 60; *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *14 (S.D.N.Y. Mar. 6, 2002).  Rather than repeat the Nominating Committee's arguments, the Harbinger Defendants respectfully join in and incorporate the Nominating Committee's brief by reference.

(ii)    "Kagan acted as an agent of each Harbinger entity, and acted to benefit each Harbinger entity, without regard to corporate formalities when exercising his control of K Road and communicating with the K Road Insiders" (¶ 286).

The Trustee literally devotes more space in the Amended Complaint to discussing an entirely unrelated civil action that the SEC brought against Harbinger in 2012 than he does to articulating any alleged facts about Kagan or any Harbinger Defendant.  *See, e.g.*, ¶¶ 79 n. 2, 80.

What fraudulent statements or omissions did Kagan make?  When and how did Kagan agree that the Harbinger Defendants would aid and abet the K Road Defendants' alleged fraud?  What actions did Kagan undertake to aid and abet them?  What "substantial assistance" did Kagan provide?[31]  And how did Kagan "dominate and control" the K Road Defendants or anyone else?  These are threshold questions that the Amended Complaint must answer with competent factual allegations.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (requiring "the who, what, when, where, and how" of the alleged fraud) (quotation omitted).  The Amended Complaint provides no answers at all.

Instead, the Trustee does nothing more than occasionally tack on the word "Harbinger" to his conclusory allegations of fraud.  *Compare, e.g.*, Original Complaint ¶¶ 89, 90, and 221(g) *and* ¶¶ 84, 85, and 153(g).  This conclusory "tack-on" pleading fails to withstand Rule 9(b) scrutiny.  *See Bay Harbour Mgmt. LLC*, 282 Fed. App'x at 77 (dismissing common law fraud claim where plaintiffs had "failed to plead facts[] with the particularity required by [Rule 9(b)]"); *Marketxt Holdings Corp.*, 693 F. Supp. 2d at 393 (noting that "plaintiff has not alleged most of the necessary elements [of the aiding and abetting fraud claim] with sufficient particularity under Rule 9(b)" and dismissing the claim); *Borgognone v. Patricia's Pizza & Pasta II, Inc.*, No. 10 Civ. 0841, 2010 WL 4455820, at *2 (S.D.N.Y. Nov. 3, 2010) (dismissing counterclaim for fraud where

---

[31]    As explained by the Nominating Committee, silence cannot constitute substantial assistance.  *See* NomCom Mem. at 17-8.

"[counterclaim-plaintiffs] allege no facts—as distinguished from bald conclusions—to suggest that [counterclaim-defendant] . . . knowingly misrepresented his then-current state of mind."); *RSL Com Primecall*, 2003 WL 22989669 at *7 (dismissing constructive fraud and aiding and abetting constructive fraud claims on the grounds that "[s]imply stating that [one defendant] was 'insolvent from inception' and that Defendants—all eighteen of them—are somehow culpable does not comport with the requirements of Rule 9(b)").

## C.    The Trustee's Conclusory Allegations Concerning Corporate Forms Are Also Deficient

Part of the Trustee's purported fraudulent scheme is that corporate forms repeatedly were disregarded and that multiple defendants were mere shams or alter egos of other defendants.[32] Like the Trustee's fraud claims themselves, these allegations all must be pled with particularity under Rule 9(b). *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 425 (S.D.N.Y. 2003) ("Where the veil-piercing claims are based on allegations of fraud, however, the heightened pleading standard of Rule 9(b) is the lens through which those allegation must be examined."); *United Feature Syndicate, Inc. v. Miller Feature Syndicate, Inc.*, 216 F. Supp. 2d 198, 223 (S.D.N.Y. 2002) ("a claimant must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b) to the extent that its veil-piercing claim rests on allegations of fraud"). As with his underlying fraud claims, the Trustee fails to plead these claims with particularity. Instead, he repeatedly relies on conclusory allegations. *See, e.g.*, ¶¶ 285-6 ("At all times relevant hereto, Harbinger dominated and controlled K Road's business, causing K Road to have no separate existence and to act as merely an instrumentality for Harbinger.)"

The Trustee's bald allegations of domination and control, and that corporate forms were misused and should be disregarded, are so deficient that they fail under both the Rule 9(b) standard

---

[32]    *See, e.g.*, ¶¶ 70, 79-80, 82, 84-5, 88, 90, 111-2, 120, 153(g), 153(o), 166, and 285-90.

that applies to them and even under basic notice pleading standards. *See, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 195 (2d Cir. 2010) ("[C]onclusory allegation[s] do[] not satisfy the *Iqbal* requirement to plead facts that plausibly support an inference that would justify disregard of the corporate form or a finding of an agency relationship."); *see also In re Currency Conversion,* 265 F. Supp. at 426 (holding that "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard" of Rule 8(a) and that "[t]he unadorned invocation of dominion and control is simply not enough" to meet the pleading requirements of Rule 9(b)); *United Feature Syndicate*, 216 F. Supp. 2d at 224 ("Without particularized allegations indicating the circumstances of the [individual defendants'] allegedly fraudulent use of [the corporate defendant's] corporate form . . . [plaintiff]'s veil-piercing claim must be dismissed.") (internal quotations, alterations omitted).

The Amended Complaint's fraud-based claims against the Harbinger Defendants (Counts 12 through 14), including its conclusory allegation that corporate forms should be disregarded (Count 15), should be dismissed for failure to comply with Rule 9(b).

## V.    ALL OF THE CLAIMS AGAINST THE HARBINGER DEFENDANTS SHOULD BE DISMISSED AS IMPLAUSIBLE

The Trustee also was required, and also failed, to plead facts sufficient to render his claims plausible. *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 570). All of the Trustee's claims against the Harbinger Defendants should be dismissed for this second, independent reason.

### A.    USPG's Subsequent Purchase Of EBG Renders The Trustee's Central Claim That The Recap Was Fraudulent Implausible

It is undisputed that, shortly after the Recap, USPG acquired EBG's equity for $1.2 billion. *See* Form S-1 at F-34. That transaction renders the Trustee's claim that the Recap was a fraud utterly implausible. The Trustee's claims are all premised on the assumption that the Recap rendered EBG insolvent, that the K Road Defendants somehow hid that fact from everyone, and

that both the K Road Defendants and the Harbinger Defendants knew of EBG's "insolvency and

illiquidity in the future." ¶ 111. But that assumption is implausible. The Trustee consciously

ignores the fact that Harbinger continued to purchase shares of USPG (the parent of soon-to-be-

insolvent EBG) after the Recap—a fact specifically communicated to the Trustee's former counsel

in August 2012.[33] By August 2008, the Harbinger Defendants had amassed over 7% of USPG's

shares. *See* Form S-1 at 158. The Trustee's assumption is also implausible in the context of the

market realities in which the Recap and subsequent USPG acquisition actually occurred. As this

Court has already observed:

> It is generally accepted [] that absent a showing that there has been a clear market
> failure, the behavior in the marketplace is the best indicator of enterprise value.
> *See, e.g.*, *In re Chemtura Corp.*, 2010 WL 4272727 at *16 n.106; *Bank of America
> Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership*, 526 U.S. 434, 457
> (1999) (acknowledging "the best way to determine value is exposure to a market"
> rather than a determination by a bankruptcy judge); *In re Granite Broad. Corp.*,
> 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("there is no dispute that in many
> circumstances the best evidence of value is what a third party is willing to pay in
> an arm's length transaction"); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633
> (3d. Cir. 2007) ("[a]bsent some reason to distrust it, the market price is 'a more
> reliable measure of the stock's value than the subjective estimates of one or two
> expert witnesses.'" . . . As Chief Judge Gonzalez noted in *Chrysler*, "the true test
> of value is the sale process itself." *In re Chrysler LLC*, 405 B.R. at 98.

December 2010 Order at 37. Here, USPG performed 5 months of due diligence on EBG (*i.e.*,

between its January 2007 offer and the closing of the EBG merger on June 1, 2007); KPMG LLP

audited both USPG's and EBG's financial statements for December 31, 2007, and was unable to

detect any deficiencies; and Harbinger continued to purchase USPG shares. *See, e.g.*, Form S-1 at

1, 185, F-18, F-78, 158.[34] The notion that the Recap that immediately preceded that acquisition

---

[33]    *See* Nagy Decl. at Ex. 1.

[34]    It is equally implausible that USPG, which itself employed "derivative instruments to reduce the risks
inherent in our business" (*id.* at 19), would have been "fooled" by the purportedly misrepresented Hedges. *See, e.g.*,
¶¶ 97-101.

rendered worthless the assets for which USPG paid over a billion dollars is utterly implausible—

and the Amended Complaint alleges no facts to suggest otherwise.

In dismissing a similar action as implausible, former Chief Judge Gonzalez explained:

> Indeed, the [Trust's] allegations are implausible in the context of the involvement
> of [a third party purchaser], who paid billions of dollars in the transaction . . . The
> Trust's allegations would require an inference that all of these parties were led
> astray. It is implausible that these sophisticated parties, who had access to the same
> financial information [], would invest and rely on the wherewithal of [the target
> company] if it had been stripped of its assets and were unable to sustain its
> operations.

*In re Old CarCo*, 454 B.R. at 59-60; *see also MFS/Sun Life Trust-High Yield Series v. Van Dusen*

*Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable

so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy

of capital as of the date of the buyout"). The same is true here, and the same conclusion follows.

**B.    The Admitted Roles Of Credit Suisse And Goldman Further Render The Trustee's
Purported Fraudulent Scheme Implausible**

The notion that K Road—with or without the Harbinger Defendants' purported

assistance—duped numerous sophisticated parties is implausible on its face; here, once again, the

far more "likely explanation[]" is that no fraud actually occurred. *Iqbal*, 556 U.S. at 681; *see also*

*In re Old CarCo*, 454 B.R. at 59 (rejecting as implausible "allegations that ignore the

contemporaneous market information concerning the involvement of other sophisticated parties in

the transactions"). At a minimum, the Trustee was required to plead non-conclusory *facts* to make

this allegation plausible. *Twombly,* 550 U.S. at 555. He has now failed to do so—twice.

The Trustee's claims become even harder to fathom with respect to Goldman, an affiliate

of which disseminated the CIM and CIM-PS containing the Projections' alleged

misrepresentations, and then—by the Trustee's logic—furnished the document to the investing

public without any concern for its own potential liability. *See* CIM at 1. Furthermore, with respect

to the affiliate of Credit Suisse (Goldman's co-Syndicator), the Trustee's allegations border on the

frivolous.  Not only was one Credit Suisse affiliate a Syndicator that furnished the CIM to lenders, but another affiliate was the *counterparty to the Hedges* (¶¶ 97-100), the "centerpiece" misrepresentation alleged in the Amended Complaint.  ¶ 94.  In the words of the Amended Complaint, the Projections made it seem that: (i) the risks associated with "revenues and fuel costs were *completely or almost entirely hedged*"; (ii) "*there were minimal operating and market risks*"; and (iii) there was "a fixed, predictable and stable net energy margin of $163 million through 2010, as a result of the Hedges, that *would not be exposed to market dynamics and pricing risks*."  ¶ 107.  Certainly Credit Suisse understood the Hedges.  It defies reason to assert that Credit Suisse *knowingly* misrepresented "a material hidden liability with a significant negative impact on cash flow . . . ."  ¶ 97.

**C.    The Amended Complaint Fails To Plausibly Allege That The Harbinger Defendants Controlled Any Other Parties Or Aided, Abetted, Or Conspired With Anyone**

According to the Amended Complaint, Harbinger participated in the Recap scheme through its purported "domination" and "control" of the K Road Defendants.  *See, e.g.*, ¶ 287 ("Harbinger used its domination and control to cause K Road to manage [EBG] for Harbinger's benefit and to cause the Debtors to enter into the Leveraged Recap Transaction.").  In addition to failing to plead this claim with specificity, the barebones allegation that the Harbinger Defendants somehow dominated or controlled the K Road Defendants, sophisticated parties to which the Harbinger Defendants had provided only financing, is implausible on its face.  Why would the sophisticated K Road Defendants allow themselves to be controlled by Harbinger?

The Trustee provides no answer to that question.  And the very document on which the Trustee relies to try to show Harbinger's purported control of K Road actually refutes any such domination.  Specifically, the Trustee asserts that, under Section 2.11 of the K Road Holdings Agreement, Harbinger purportedly stripped K Road of all "discretion to make decisions" concerning EBG.  ¶ 91.  But neither Section 2.11 of the K Road Holdings Agreement, nor any

other provision in any agreement between K Road and Harbinger, establishes any sort of domination or control.[35] In fact, Section 2.11 of the K Road Holdings Agreement is not a "control" provision at all. It is, instead, a standard *negative covenant*, requiring only that the K Road Defendants seek Boston Harbor's "consent" before casting its EBG Board votes in *five specific circumstances. See* ¶ 112. Section 2.11 establishes that, if anything, Harbinger had no ability to dominate or control K Road—or, for that matter, EBG. Instead, Harbinger's purported "control" was expressly limited to the negative covenant set forth in Section 2.11.

Thus, the Trustee's bald allegations of domination and control not only fail to comply with Rule 9(b) (as set forth above), they also defy common sense and are contradicted by the very documents that the Trustee relies upon to make the claim. The Trustee's fraud claims against Harbinger, which depend upon these conclusory allegations of domination and control, therefore should be dismissed as implausible for this second independent reason. *See Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 230 (S.D.N.Y. 2012) (dismissing as implausible unsupported claim of *de facto* "control" of one company by another in light of, *inter alia*, explicit contractual language to the contrary); *see also In re Global Crossing, Ltd. Securities Litigation*, 2005 WL 1881514, at *9 (S.D.N.Y. Aug. 5, 2005) (rejected claim of "substantial control" based on right to veto "certain specific extraordinary transactions").

## VI.    THE TRUSTEE FAILS TO ALLEGE EITHER REASONABLE RELIANCE OR LOSS CAUSATION

The creditors whose claims are actually being asserted in this lawsuit are all admittedly sophisticated investors. *See, e.g.*, CIM at 4. The Trustee's fraud-based claims all fail because the Trustee could not and did not allege reasonable reliance on any purported misrepresentation or omission. And, with respect to the Trustee's claim that the K Road Defendants' alleged failure to

---

[35]    *See, generally*, Nagy Decl. at Ex. 4-8.

36

disclose that they obtained financing from Harbinger was somehow fraudulent, that claim fails for the additional reason that the alleged omission admittedly did not cause any of the damages here. In particular, the Harbinger Defendants' capital contribution did not cause EBG to become insolvent.

### A.     The Trustees' Assignees Are All Sophisticated Investors And Could Not Reasonably Have Relied Upon Any Of The Alleged Misrepresentations And Omissions

According to the Amended Complaint, the Projections misrepresented EBG's future financial profitability by asserting that management would do certain things to cut costs (*e.g.*, make certain expense reductions, reduce levels of capital expenditures), when, in reality, the K Road Defendants had no such plans.  ¶¶ 109-10.  Similarly, the K Road Defendants supposedly failed to reveal information about the "intrinsic risks" in the energy business (*i.e.*, "risks posed by the short and long-term fluctuation of the market price for electricity due to changes in *supply and demand*, risks posed by *exposure to volatile commodities markets*, regulatory and related risks posed by *the functioning of the highly complex energy markets* and operational risks, such as *equipment failures and forced outages*").  ¶ 95.  By excluding this information, the Trustee contends that the K Road Defendants implied that EBG was immune to the "intrinsic risks" of both the energy market and the larger financial market.  In the words of the Amended Complaint, the Projections made it seem that: (i) the risks associated with "revenues and fuel costs were *completely or almost entirely hedged*"; (ii) "*there were minimal operating and market risks*"; and (iii) there was "a fixed, predictable and stable net energy margin of $163 million through 2010, as a result of the Hedges, that *would not be exposed to market dynamics and pricing risks*."  ¶ 107.

As a matter of law, none of these alleged misrepresentations and omissions is actionable because they were all made to admittedly sophisticated investors.  *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F.Supp.2d 228, 259 (S.D.N.Y. 1999) (noting that sophisticated parties have a duty "to make affirmative efforts to protect themselves from misrepresentations, and cannot

be heard to complain when they fail to make diligent inquiries.") (internal citation omitted).

According to the Amended Complaint, the K Road Defendants' alleged misrepresentations about

the businesses' "prospects" and their omissions about "intrinsic risks" defrauded recipients of the

CIM (the "<u>Recipients</u>").    ¶ 118.    But these Recipients were admittedly "sophisticated and

experienced" investors who were expressly advised in the CIM to perform an "independent

evaluation and analysis" prior to making any investment:

> The Recipient represents that it is ***sophisticated and experienced*** in extending
> credit to entities similar to the Company. *The information and data contained
> herein are not a substitute for the Recipient's independent evaluation and analysis*
> and should not be considered as a recommendation by the Lead Arrangers or any
> of their respective affiliates that any Recipient enter into the Facility.

CIM at 4.  In addition to disclaiming the completeness of the contents of the CIM, and advising

prospective lenders to perform their own "independent investigation and analysis of the [Credit

Facilities] . . . and the creditworthiness of [EBG/BostonGen]" (*id.*), the CIM also warned:

> The [CIM] includes certain statements, estimates, forecasts and projections
> provided by the Company's management with respect to the anticipated future
> performance of [EBG/BostonGen].  Such statements, estimates, forecasts and
> projections reflect various assumptions by [EBG/BostonGen] management
> concerning anticipated results.  Such assumptions, some of which are described
> herein, involve judgments with respect to, among other things, future business,
> economic and competitive conditions (including inflation rates and financial
> market conditions), future business decisions, and other factors, which may not
> prove to be correct.  Such assumptions are also inherently subject to significant
> business, economic and competitive uncertainties and contingencies that are
> beyond [EBG/BostonGen's] control.  Consequently, there can be no assurance that
> the projected results described herein will be realized.  These statements, estimates,
> forecasts and projections and the assumptions underlying them are based on matters
> as they exist as of the date hereof and not as of any future date, and will not be
> updated or otherwise revised to reflect information that subsequently becomes
> available, or circumstances existing or changes occurring after the date hereof,
> including changes in general economic or industry conditions.  Actual results may
> vary materially from the projected results contained herein.

*Id.*

The lack of reasonable reliance is particularly glaring here, where the alleged

misrepresentations and omissions all concern "intrinsic" market risks, such as "market dynamics"

and "pricing risks," and the CIM specifically warned of potential "changes in general economic or industry conditions." *Ashland v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 335 (2d Cir. 2011) (rejecting reasonable reliance claim by sophisticated investors in light of publicly-available information about "risks"); *see also DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 322 (S.D.N.Y. 2002) ("Sophisticated parties to major transactions cannot avoid [] disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties."); *Adler v. Berg Harmon Ass'n*, 790 F. Supp. 1222, 1231 (S.D.N.Y. 1992) ("In view of all of the [] warnings and other cautionary language contained in the [offering materials] . . . sophisticated investors . . . cannot have reasonably relied on statements in the offering materials as an accurate forecast of the future performance of their investments.").  It is well established that sophisticated investors cannot reasonably rely on such alleged misrepresentations or omissions—particularly where, as here, they were told to do their own due diligence.  *See, e.g.*, *Granite Partners, L.P.*, 58 F.Supp.2d at 259; *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F.Supp.2d 485, 498 (S.D.N.Y. 2003) (dismissing plaintiffs' misrepresentation claims because disclaimer language in investment subscriptions "preclude [Plaintiffs] from establishing essential elements of those claims, namely . . . that any reliance by Plaintiffs on misrepresentations by the Defendants was reasonable."); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) ("Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable.").

39

**B.      Harbinger's Role As An Indirect EBG Investor Was Neither Material Nor The
Cause Of Any Of The Alleged Damages**

The Trustee likewise cannot state a claim for fraud based on the K Road Defendants'
alleged failure to disclose Harbinger's role in financing the EBG investment because that alleged
omission was neither material nor the cause of any of the claimed damages.

To be material, the omitted information must "go to the essential factual essence of the
transaction." *Cresswell v. Sullivan & Cromwell,* 704 F. Supp. 392, 408 (S.D.N.Y. 1989). The
Trustee does not plead any facts that establish that Harbinger's provision of financing was material
to any creditor's decision to purchase EBG's or BostonGen's debt. Instead, the Trustee does
nothing more than make the conclusory assertion that this financing was material. ¶ 112. But that
mere conclusory allegation fails to establish materiality. *See, e.g., Graham v. Barriger*, 699
F.Supp.2d 612, 626 (S.D.N.Y. 2009) (dismissing claim where only allegations set forth regarding
alleged misstatements were "conclusory"). Harbinger's provision of financing to K Road was, at
most, an incidental background fact that had no actual significance to the Recap (which occurred
a year later), and did not cause and did not have the potential to cause financial harm to any lenders.
As a matter of law, Harbinger's provision of financing was not material. *Cf. Feinman v. Dean
Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) ("Cases in which we have refused to find
that  representations  were not material as  a matter of law have  involved  misstatements  or
omissions that did, or at least had the potential to, cause the plaintiff financial harm.").

The Trustee also did not (and could not) allege that this omission caused any of his claimed
damages. It is undisputed that K Road's nondisclosure of Harbinger's role did not cause EBG's
insolvency. To the contrary, as this Court itself has previously observed, EBG's insolvency was
caused by "low fuel prices, eroding demand, and a significant surplus of supply [that] put
downward pressure on margins in the energy, capacity, and ancillary service markets in New

England." [36]   This Court explained: "This new uneconomic supply, combined with eroding demand, has created a significant surplus of future capacity which is depressing market prices and reducing [EBG's] revenue." *Id.* Thus, it was economic factors, rather than the K Road Defendants' alleged failure to disclose Harbinger's role in financing the EBG investment, that led to EBG's insolvency.

## VII. THE AMENDED COMPLAINT FAILS TO ALLEGE THAT THIS IS AN "EXCEPTIONAL CASE" REQUIRING THE COURT TO PIERCE THE CORPORATE VEIL

In Count 15, the Trustee asserts a boilerplate alter ego, veil-piercing claim against Harbinger. ¶¶ 283-90. This claim not only fails to comply with Rule 9(b) and is implausible under *Twombly* and its progeny (*see* Parts IV and V, *supra*), it further fails because the Trustee has not alleged any exceptional circumstances warranting veil-piercing here.

It is well established that, generally, "the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable." *BH S&B Holdings LLC*, 420 B.R. at 133. The Trustee offers no allegation—let alone a plausible allegation—to show that this is "the exceptional case" warranting veil piercing, and as the party who wishes the court to disregard the corporate form, the Trustee "faces a heavy burden." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, No. 10-CV-4145, 2013 WL 5434638, at *7 (S.D.N.Y. 2013) ("*Nat'l Gear & Piston II*"). And it is well established that "[d]isregard of the corporate entity is appropriate only in exceptional circumstances." *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012) (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989)). The Trustee's threadbare recitation that it would be "unfair and unjust" for Harbinger to avoid liability (¶ 289) does not pass muster.

---

[36]   December 2010 Order at 7. Notably, the causes of EBG's bankruptcy cited in the December 2010 Order constitute the Court's findings of fact pursuant to Bankruptcy Rule 7052, and are made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

Under Delaware law, to pierce the corporate veil and establish alter-ego liability, a plaintiff must show: (1) that the parent and subsidiary "operated as a single economic entity;" and (2) that an "overall element of injustice or unfairness is present." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 376 (S.D.N.Y. 2012). With respect to the first requirement, courts consider numerous factors: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of the debtor corporation at the time; (5) siphoning off of the corporation's funds by the dominant parent; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant parent. *Id.* Of these, the Trustee does not even offer any allegations regarding the first 6 of these factors. And as for the last, the Trustee offers only conclusory, boilerplate allegations, which are insufficient to survive even the motion to dismiss stage. *BH S&B Holdings*, 420 B.R. at 134 ("[A]t the motion to dismiss stage, it is insufficient to make conclusory allegations of mere domination or control by one entity over another") (internal quotation, alteration omitted).

For the second requirement, overall injustice or unfairness, "a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form . . . [i]n other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice." *Nat'l Gear & Piston II*, 2013 WL 5434638 at *10. Apart from advancing the circular argument that "[i]t would be unfair and unjust to permit Harbinger to avoid liability for the fraudulent actions it took through K Road . . . " (¶¶ 250, 289), the Amended Complaint does not even try to allege some independent fraud regarding the corporate form itself.

Count 15 should, therefore, be dismissed.

## VIII.   THE TRUSTEE'S CLAIMS AGAINST POWER MANAGEMENT IN COUNTS 12-15 ARE BARRED BECAUSE IT WAS DISSOLVED IN OCTOBER 2009

The Trustee's claims against Power Management are barred. Power Management was dissolved on October 7, 2009.[37]   Under the Delaware Limited Liability Company Act ("DLLCA"), a Delaware LLC that has been issued its certificate of cancellation from the Secretary of State cannot be sued.  *See* 6 Del. Code § 18-803(b); *see also Kwon v. Yun*, No. 05 Civ. 1142, 2008 WL 190058, at *2 (S.D.N.Y. Jan. 22, 2008) (noting a lack of "authority for the proposition that a defunct corporation or LLC can be revived by a plaintiff's bringing suit against it"); *Matthew v. Laudamiel*, No. C.A. 5957-VCN, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("The persons winding up an LLC's affairs may prosecute and defend suits on the LLC's behalf until the filing of the certificate of cancellation.  After the certificate of cancellation has been filed, suits generally may not be brought by or against an LLC.").

Thus, the Trustee's claims against Power Management must be dismissed.

## IX.   THE TRUSTEE'S CLAIMS AGAINST THE HARBINGER DEFENDANTS SHOULD ALSO BE DISMISSED FOR THE REASONS SET FORTH IN THE TRANSFEREE DEFENDANTS' BRIEF

For the reasons set forth in the Transferee Defendants' brief, which the Harbinger Defendants respectfully adopt in its entirety, the Trustee's claims against the Harbinger Defendants as Transferees (Counts 1 through 6): (1) are barred by the Delaware statute of repose and the applicable statutes of limitations, and cannot be saved from untimeliness by equitable tolling or the discovery rule; (2) run afoul of Bankruptcy Code Section 546(e)'s safe harbor; (3) fail as a matter of law because the Trustee cannot recover from third parties the value of non-possessory liens that the Debtors granted to their lenders; (4) assert claims for unjust enrichment and constructive trust for which the Trustee has no standing; and (5) fail to establish any viable

---

[37]       *See* Nagy Decl. at Ex. 10.  The Court can take judicial notice of the certificate of cancellation.  *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

fiduciary relationship to support the Trustee's constructive trust claim.  *See generally* Memorandum of Law in Support of Transferee Defendants' Motion to Dismiss.[38]

## X.    CONCLUSION

The Trustee "tacked on" the Harbinger Defendants to an already-defective pleading and fails to allege any statement, omission or action that can even remotely suffice to state a claim. The Amended Complaint should be dismissed with prejudice.

Dated:    November 1, 2013          Respectfully submitted,
          New York, New York

                                    DONTZIN NAGY & FLEISSIG LLP

                                    ___*/s/ Tibor L. Nagy, Jr.*_____
                                    Tibor L. Nagy, Jr.
                                    Jason S. Lapkin
                                    Stephanie M. Suarez
                                    980 Madison Avenue, Second Floor
                                    New York, New York  10075
                                    Telephone: 212-717-2900
                                    Facsimile:  212-717-8088

                                              - and -

                                    PACHULSKI STANG ZIEHL & JONES LLP
                                    Dean A. Ziehl
                                    Maria A. Bove
                                    780 Third Avenue, 36th Floor
                                    New York, New York  10017
                                    Telephone:  (212) 561-7700
                                    Facsimile:  (212) 561-7777

---

[38]    To the extent that the Trustee might attempt to avoid dismissal by citing the conclusory factual allegations in these claims referencing Harbinger, that effort would be futile for the reasons stated in Parts IV and V of this brief.