William T. Reid, IV
Gregory S. Schwegmann
Brandon V. Lewis
**REID COLLINS & TSAI LLP**
810 Seventh Avenue, Suite 410
New York, NY 10019
Tel: 212.344.5200
Fax: 212.344.5299
wreid@rctlegal.com
gschwegmann@rctlegal.com
blewis@rctlegal.com

Joshua L. Hedrick
Laura M. Fontaine
**HEDRICK KRING PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, TX 75201
Tel: 214.880.9600
Fax: 214.481.1844
josh@hedrickkring.com
laura@hedrickkring.com

*Attorneys for Plaintiff*
*Mark Holliday, the Liquidating*
*Trustee of the BosGen Liquidating Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re | : |  |
| BOSTON GENERATING LLC, *et al.*, | : | Case No. 10-14419 (SCC) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : |  |
| MARK HOLLIDAY, the Liquidating Trustee | : |  |
| of the BosGen Liquidating Trust, | : |  |
|  | : | Adv. Proc. No. 12-01879 (MEW) |
| Plaintiff, | : |  |
|  | : |  |
| -versus- | : |  |
|  | : |  |
| EX ORBIT, LTD., D.E. SHAW LAMINAR | : |  |
| PORTFOLIOS, LLC, SATELLITE SENIOR | : |  |
| INCOME FUND, LLC, ANCHORAGE CAPITAL | : |  |

MASTER OFFSHORE II, LTD., CMI HOLDINGS :
INVESTMENTS LTD., THE RAPTOR, GLOBAL :
PORTFOLIO LTD., TACONIC CAPITAL        :
PARTNERS 1.5 LP, BOSTON GENERATING     :
OFFSHORE HOLDINGS LTD., MORGAN         :
STANLEY & CO., LLC, GOLDMAN            :
SACHS & CO., STONEHILL INSTITUTIONAL   :
PARTNERS, LP, TRADE CLAIM             :
ACQUISISTION, LLC, J.P. MORGAN        :
SECURITIES LLC, CREDIT SUISSE         :
SECURITIES (USA) LLC, CREDIT          :
SUISSE (USA), INC., SENECA CAPITAL    :
INTERNATIONAL TLD., GREENWICH         :
INTERNATIONAL LTD., SENECA            :
CAPITAL LP, DB HOLDINGS INC.,         :
LONGACRE MASTER FUND, LTD.,           :
THE TUDOR BVI GLOBAL PORTFOLIO LP,    :
EPIC DISTRESSED DEBT HOLDINGS, INC.,  :
CASTLERIGG PARTNERS, LP, TUDOR        :
PROPRIETARY TRADING LLC, HIGHLAND     :
CRUSADER OFFSHORE PARNTERS, LP,       :
SCOTTWOD FUND, LTD., GK DEBT          :
OPPORTUNITY FUND, LTD., MASON         :
CAPITAL LTD., EPIC DISTRESSED DEBT    :
OPPORTUNITY FUND LP, LATIGO MASTER    :
FUND, LTD., CEDARVIEW EBG HOLDINGS,   :
LTD., J.P. MORGAN SECURITIES LLC,     :
LONGACRE CAPITAL PARTNERS (QP) LP,    :
GUGGENHEIM PORTFOLIO CO. XII LLC,     :
POWER MANAGEMENT FINANCING LLC,       :
BOSTON HARBOR POWER LLC,              :
HARBINGER CAPITAL PARTNERS,           :
HARBERT DISTRESSED INVESTMENT         :
MASTER FUND, LTD, HARBINGER           :
CAPITAL PARTNERS MASTER FUND I, LTD., :
SATELLITE ASSET MANAGEMENT, LP,       :
D.E. SHAW & CO. LP, ANCHORAGE CAPITAL :
GROUP, LL, SANDELL ASSET              :
MANAGEMENT CORPORATION,               :
TUDOR INVESTMENT CORPORATION,         :
STONEHILL CAPITAL MANAGEMENT LLC,     :
SCOTTWOOD CAPITAL MANAGEMENT LLC,     :
ONEX CREDIT PARTNERS, LLC,            :
MASON CAPITAL MANAGEMENT LLC,         :
LATIGO PARNTER LP, CEDARVIEW          :

CAPITAL MANAGEMENT, LP, CITIGROUP   :
ALTERNATIVE INVESTMENTS   :
(AS SUCCESSOR IN INTEREST TO EPIC   :
ASSET MANAGEMENT LLC), RBS HOLDINGS :
USA, INC., SATELLITE OVERSEAR FUND,   :
LTD, THE APOGEE FUND, LTD., SATELLITE   :
FUND IV, LP, SATELLITE OVERSEAS FUND   :
V, LTD., SATELLITE OVERSEAS FUND VI,   :
LTD., SATELLITE OVERSEAS FUND VIII,   :
LTD., SATELLITE OVERSEAS FUND IX, LTD., :
SATELLITE FUND I, LP, SATELLITE FUND II,   :
LP, DOES 1-100,   :
such names being fictitious and unknown to   :
Plaintiff, representing individuals or entities who or :
that may be legal or beneficial owners of   :
membership units and warrants that were   :
repurchased or redeemed in connection with the   :
Leveraged Recap Transaction underlying this   :
action, or who or that benefited from the transfers   :
underlying this action, or who engaged in the acts   :
and conduct described in the Complaint,   :
INDIVIDUALLY AND AS CLASS   :
REPRESENTATIVES OF A CLASS OF   :
SIMILARLY SITUATED INDIVIDUALS   :
OR ENTITIES   :                                          :
                        Defendants.   :
--------------------------------------------------------------x

## THIRD AMENDED COMPLAINT

Plaintiff Mark Holliday, the Liquidating Trustee (the "**Liquidating Trustee**") of the

BosGen Liquidating Trust (the "**Liquidating Trust**" or "**Plaintiff**"), through his undersigned

counsel, as and for his complaint (the "**Complaint**") against the above-captioned defendants (the

"**Defendants**"), alleges as follows:

## I.    PRELIMINARY STATEMENT

1.      This case is brought to recover damages for a $2 billion fraud perpetrated on the

creditors of EBG Holdings LLC ("**EBG**") and its subsidiaries, including Boston Generating LLC

("**BostonGen**," and collectively the "**Debtors**").[1] In 2006, under direction from their secret

principal and self-described "joint-venturer" and "partner" Harbinger (defined below) to cash out

of their joint investment in EBG, K Road (defined below) devised a scheme to falsely pump up

the value of the Debtors, to leverage the Debtors based on these false values, and to extract the

borrowed money of the Debtors and pay it out to themselves, Harbinger, and EBG's other equity

unit holders. With a looming self-predicted wholesale energy market decline, K Road and

Harbinger became anxious to exit their investment.  Because they doubted the prospects for a sale

or IPO of EBG, K Road caused the Debtors to borrow an aggregate amount of almost $2 billion,

and to use more than $1 billion to redeem equity interests in EBG, redeem warrants, and pay a

dividend to equity (the "**Leveraged Recap Transaction**"). The Debtors, who were worth far less

than the previous debt incurred at the time of the Leveraged Recap Transaction, had no chance, or

intention, of ever repaying the debt incurred. Accordingly, K Road, with the encouragement of the

---

[1] The Debtors, along with the last four digits of their federal tax identification numbers, are Boston Generating, LLC (0631), EBG Holdings LLC (3635), Fore River Development, LLC (7933), Mystic I, LLC (3640), Mystic Development, LLC (7940), BG New England Power Services, Inc. (0476), and BG Boston Services, LLC (6921). In accordance with the *Final Cumulative Joint Plan of Liquidation of Boston Generating, LLC et al.* [ECF No. 934] (the "**Plan**"), the Debtors have been dissolved and each of their cases has been closed, except for the jointly administered case bearing Case No. 10-14419 (SCC), which shall remain open and subject to the provisions of Section 7.08 of the Plan. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Nominating Committee (defined below) and under the direction of Harbinger, prepared fraudulent projections by "compartmentalizing" away the day to day operations of the company and began keeping two sets of books.  In doing so, K Road concealed from the creditors the material details of the Debtors' business.

2.      In order to generate the kind of profits that would justify increased leverage, K Road had to establish a value for the Debtors far higher than their past performance or a reasonable forward outlook would support.  K Road sought to cloak the transaction in legitimacy by retaining Lehman Brothers, Inc. ("**Lehman**"), Duff & Phelps, LLC ("**Duff & Phelps**"), Navigant Consulting Inc. ("**Navigant**") and Black & Veatch Corporation ("**Black & Veatch**") to provide consulting services and opinions to support the transaction desired by K Road and Harbinger.  K Road, Harbinger, and the Nominating Committee controlled the output—the opinions—by controlling the input—the Debtors' projections (the "**Projections**"). Each of the consultants acknowledged relying upon the legitimacy of K Road's Projections in forming their opinions.  K Road crafted the Projections to misrepresent the Debtors as a "contract" energy provider, rather than its true status as a "merchant" energy provider. Fundamentally, contract energy providers have fixed, reliable revenue streams, and are attractive to lenders, whereas wholesale energy providers are at the mercy of fluctuating gas and electricity markets. Historically, lenders avoid lending to wholesale market producers or require significantly higher returns, tighter covenants, or collateral guarantees, in the event they provide funding.

3.      The Projections, aside from misrepresenting the function of the Debtors' Hedges (as that term is defined herein), assumed that revenues would increase over the long term, hedge revenues would be steady and immune from market risks, and expenses would dramatically decline, thus enabling the Debtors to service their significantly increased debts. K Road, however,

had no actual internal plan to increase revenues, cut expenses, or otherwise explain this sunny future (as projected) vis-a-vis the actual performance of the Debtors.  The Projections prepared by K Road and disseminated to the consultants, attorneys, and ultimately, the lenders, were fraudulent. K Road knew the Debtors never stood a chance of attaining the performance laid out in the Projections. As alleged herein, William Kriegel, Barry Sullivan and Paul Ehrenzeller (together with David Tohir, Nicholas Donahue, Mark Friedland, Daniel O'Shea, and Scott Silverstein, the "**K Road Insiders**"), played key roles in formulating the Projections, developing the strategy underlying the Leveraged Recap Transaction, and preparing the materials used to induce lending parties to fund, the Rating Agencies (as defined herein) to provide positive support, and the Board to approve it. Each of the K Road Insiders also personally profited from the Leveraged Recap Transaction.

## II.    PARTIES AND RELEVANT THIRD-PARTIES

### A.    The Plaintiff

4.    Plaintiff Mark Holliday is the Successor Liquidating Trustee of the Liquidating Trust established pursuant to a certain Litigating Trust Agreement, dated September 15, 2011, by and between the Plaintiff and, inter alia, non-parties EBG and BostonGen (the "**LT Agreement**"). Pursuant to the LT Agreement, the Liquidating Trustee is the successor to all of the Debtors' rights, title and interests in certain rights, claims, causes of action, and defenses arising from, relating to or in connection with the Leveraged Recap Transaction.  Pursuant to the Plan, the Plaintiff is also the assignee or representative of creditors who hold Class 4B unsecured claims against the Debtors. In that capacity, he is authorized to bring or assert their rights, claims, causes of action and defenses arising from, relating to or in connection with the Leveraged Recap Transaction.

B.    **The Debtors/Transferors**

5.    EBG was a Delaware limited liability company with its principal place of business in New York, New York. EBG served as a holding company and had no operations of its own. Rather, EBG wholly owned and controlled BostonGen.

6.    BostonGen was also a Delaware limited liability company with its principal place of business in New York, New York. BostonGen was also structured as a holding company that held several operating entities, including Mystic I, LLC ("**Mystic I**"), Mystic Development, LLC ("**Mystic Development**"), Fore River Development, LLC ("**Fore River**") and BG Boston Services, LLC ("**BG Boston**") and BG New England Power Services, Inc. ("**BG New England**"). As such, Mystic I, Mystic Development, Fore River, BG Boston and BG New England were direct subsidiaries of BostonGen and indirect subsidiaries of EBG.

C.    **The Transferee Defendants**

7.    Annexed hereto as Exhibit A and made a part hereof is a chart reflecting: (a) the names of those Defendants (each, a "**Transferee Defendant**" and collectively, the "**Transferee Defendants**") (i) who or that received a transfer or distribution pursuant to the Leveraged Recap Transaction; (ii) the class defendants consisting of all persons or entities who, directly or indirectly, through one or more related transfers, received payments or transfers pursuant to or in connection with the Leveraged Recap Transaction; or (iii) who or that benefited from such a transfer or distribution, (b) to the extent available and applicable, the Transferee Defendants' respective states of incorporation and last known addresses; and (c) to the extent available, the amount of the transfer or distribution made to or for the benefit of each of the Transferee Defendants pursuant to the Leveraged Recap Transaction. The Transferee Defendants include the Doe Defendants discussed in Paragraph 29 herein, each a member of the Defendant Class referenced Paragraph 34 hereof.

4

D.    **K Road (Relevant Third-Parties/Former Defendants)[2]**

8.    K Road Power Management, LLC ("**K Road Power**") is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

9.    K Road BG LLC is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

10.    K Road BG Holdings LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

11.    K Road BG Management LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

12.    K Road Holdings LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

13.    K Road Power BG LLC is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

14.    K Road BG MM LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

---

[2] The claims against the entities listed in this section have been dismissed pursuant to the terms of a settlement agreement.

15.    WBD K Road Power BG LLC, is, upon information and belief, a limited liability company organized under Delaware law with its principal place of business located at 295 Madison Avenue, 37th Floor, New York, NY 10017.

16.    The foregoing eight entities (collectively, "**K Road**" or the "**K Road Entities**") dominated and controlled the Debtors, managed the Debtors, personally profited from the transactions at issue in this case, and were closely involved with every aspect of the Leveraged Recap Transaction.

## E.    The K Road Insiders (Relevant Third-Parties/Former Defendants)[3]

17.    William Kriegel ("**Kriegel**"), at all relevant times, was the President, Chairman and CEO of K Road Power and, upon information and belief, held these positions in numerous other K Road Entities. From approximately January 2006 through May 2007, Kriegel was the Chairman and CEO of EBG.

18.    Barry Sullivan ("**Sullivan**"), at all relevant times, was the Vice Chairman and COO of K Road Power, and upon information and belief, held these positions in numerous other K Road Entities. From approximately April 2006 through May 2007, Sullivan was the Vice Chairman and COO of EBG.

19.    David Tohir ("**Tohir**"), at all relevant times, was the Executive Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, Tohir was the President of BostonGen, Fore River, Mystic I, Mystic Development, and BG Boston, and the President and a director of BG New England.

---

[3] The claims against the individuals listed in this section have been dismissed pursuant to the terms of a settlement agreement.

20.     Nicholas Donahue ("**Donahue**"), at all relevant times, was the Senior Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, Donahue was the Treasurer of BostonGen and a director of BG New England.

21.     Mark Friedland ("**Friedland**"), at all relevant times, was the Senior Vice President of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, Friedland was the Senior Vice President of Acquisitions and Restructuring of EBG.

22.     Daniel O'Shea ("**O'Shea**"), at all relevant times, was the Senior Vice President and General Counsel of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, O'Shea was the Senior Vice President, General Counsel and Secretary of EBG.

23.     Scott Silverstein ("**Silverstein**"), at all relevant times, was the Senior Vice President of Regulatory Affairs of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, Silverstein was the Senior Vice President of Regulatory Affairs of EBG.

24.     Paul Ehrenzeller ("**Ehrenzeller**"), at all relevant times, was the Senior Vice President and CFO of K Road Power, and upon information and belief, held this position in numerous other K Road Entities. From approximately April 2006 through May 2007, Ehrenzeller was the Director of Finance of EBG.

25.     The foregoing individuals dominated and controlled the Debtors, managed the Debtors, and were closely involved in the Leveraged Recap Transaction, all as described in this Complaint.

7

F.    **The Nominating Committee**

26.    During the relevant time period, the Debtors were also controlled by a group of

hedge funds holding the majority of the EBG units, and who had previously held BostonGen's

secured debt. These hedge funds, whose affiliates formed the "Nominating Committee" of EBG,

or the group responsible for nominating the non-K Road "independent" directors, were Anchorage

Capital Master Offshore II, Ltd., Satellite Asset Management, L.P., Stonehill Institutional Partners,

L.P., and Sandell Asset Management Corp. (collectively, the "**Nominating Committee**"). While

they represented about 50% of the equity of EBG, this group controlled all of the non-K Road

directors of EBG. The only concern expressed by the Nominating Committee was to maintain its

ability to freely trade EBG units while still controlling the EBG Board of Directors and obtaining

insider information.  As K Road internally acknowledged, the EBG Board of Directors would

approve whatever K Road told them to, as long as the Nominating Committee was in agreement.

The Nominating Committee therefore acted as an upper chamber of the Board of Directors, and

met with K Road in advance of Board of Directors meetings to determine what the Board would

consider, and how the Board would vote.

27.    Communications between K Road and the Nominating Committee primarily

occurred via telephone. On information and belief, this was to avoid leaving a trail that might

implicate Kriegel if the members of the Nominating Committee traded based upon insider

information. On information and belief, based upon interviews with former officers of the Debtors,

the Nominating Committee was provided with internal EBG/BostonGen financial information that

the independent directors of EBG did not receive, and which demonstrated the falsity of the

Projections.  In late October 2006, Kriegel reached out to the Nominating Committee with the

terms of the Leveraged Recap Transaction and a "BG Liquidity Proposal."  K Road also sent its

contacts on the Nominating Committee details of the Hedges not included in the lender materials.

According to K Road, the Nominating Committee had "everything" that K Road did. The Nominating Committee knew that EBG, through K Road, had provided false information for the use of the lenders, yet did not disclose K Road's fraud, because the Nominating Committee, as the largest group of equity holders of EBG, had the most to gain from any "liquidity event" favoring equity. The Nominating Committee had the ability to control EBG's dissemination of false information by voting against the Leveraged Recap Transaction, but nonetheless approved and ratified the Leveraged Recap Transaction by providing the majority unitholder votes in favor of the transaction. After the Leveraged Recap Transaction closed, Harbinger (defined below) thanked K Road for bringing the "major shareholders," e.g., the Nominating Committee, on board with the terms of the Leveraged Recap Transaction.

**G.    Class Representatives**

28.    The Defendants named in Exhibit A are also representatives of a class of individuals who or entities that also benefited, directly or indirectly, from the Leveraged Recap Transaction and/or received contemporaneous or subsequent transfers of money, stock or property of the Debtors from the Transferee Defendants or otherwise in connection with the Leveraged Recap Transaction.

**H.    "Doe" Defendants**

29.    Upon information and belief, there exist numerous individuals who or entities that benefited, directly or indirectly, from the Leveraged Recap Transaction and/or received contemporaneous or subsequent transfers of money, stock, or other property of the Debtors from the Transferee Defendants in connection with the Leveraged Recap Transaction whose identities remain unknown to the Plaintiff. Such Defendants are sued herein as Does 1-100.

### III.    <u>JURISDICTION, VENUE</u>

30.    This adversary proceeding has been commenced to resolve an actual controversy between the Liquidating Trustee and the Defendants.

31.    The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and 1334, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Section 13.01 of the Plan. This adversary proceeding is related to the jointly administered Chapter 11 proceeding pending before the Bankruptcy Court, captioned *In re Boston Generating, LLC et al.* (No. 10-14419) (the "**Chapter 11 Cases**").

32.    Pursuant to Bankruptcy Rule 7008, the Liquidating Trustee states that he hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding.

33.    Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.    <u>DEFENDANT CLASS ALLEGATIONS</u>

34.    Plaintiff also brings this action as a defendant class action pursuant to, *inter alia*, Federal Rules of Civil Procedure 23(a), 23(b)(1)(B), and 23(b)(3), made applicable to this proceeding by Bankruptcy Rule 7023, against a class consisting of all persons who or entities that, directly, or indirectly through one or more intermediate transferors, received payments or transfers pursuant to the Leveraged Recap Transaction (the "**Class**"). As set forth herein, Counts One through Six are asserted as Class claims.

35.    The members of the Class ("**Class Members**") are so numerous that joinder of all members is impractical. The exact number of Class Members is unknown to the Plaintiff at this time, but is sufficiently numerous to make class treatment appropriate for Counts One through Six.

36.    Any claims against and claimed defenses of the named representatives of the Class
(the "**Class Representatives**") are typical of the claims against and alleged defenses of the
unnamed Class Members. The claims against and claimed defenses of each of the Class Members
arise out of the same factual circumstances involving the Leveraged Recap Transaction.

37.    There are numerous questions of law and fact that are common to the unnamed
Class Members, and that predominate over any questions affecting only individual Class Members,
including, but not limited to: (a) each of the allegations relating to insolvency, financial condition
and inability to pay debts set forth herein; (b) each of the allegations relating to the Leveraged
Recap Transaction, funding, and distribution of funds set forth herein; and (c) each of the
allegations relating to actual and constructive fraud set forth herein.

38.    The Class Representatives will fairly and adequately protect and represent the
interests of the unnamed Class Members, such Class Representatives have tens of millions of
dollars at issue, the issues related to liability are virtually identical for the Class Representatives
and Class Members, and the Class Representatives have as much incentive to vigorously defend
against the Plaintiff's claims as any unnamed Class Member would.

## V.    CURRENTLY KNOWN SUBSEQUENT TRANSFEREES

39.    Each of the transferees described below are among those included in the Class as
Class Members.

40.    Satellite Asset Management L.P. managed and/or controlled both Ex Orbit Group,
Ltd. and Satellite Senior Income Fund, LLC at the time of the Leveraged Recap Transaction, and
was responsible for the decisions of Ex Orbit Group, Ltd. and Satellite Senior Income, LLC to
participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged
Recap Transaction proceeds transferred to Ex Orbit Group, Ltd. and Satellite Senior Income Fund,

LLC were subsequently transferred, directly or indirectly, to Satellite Asset Management L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

41.     D.E. Shaw & Co. L.P. managed and/or controlled D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC at the time of the Leveraged Recap Transaction, and was responsible for the decisions of D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to D.E. Shaw Laminar Portfolio LLC and Trade Claim Acquisition LLC were subsequently transferred, directly or indirectly, to D.E. Shaw & Co. L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

42.     Anchorage Capital Group, LLC f/k/a Anchorage Advisors, LLC managed and/or controlled Anchorage Capital Master Offshore II, Ltd. at the time of the Leveraged Recap Transaction, and was responsible for the decision of Anchorage Capital Master Offshore II, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Anchorage Capital Master Offshore II, Ltd. were subsequently transferred, directly or indirectly, to Anchorage Capital Group, LLC f/k/a Anchorage Advisors, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

43.     Sandell Asset Management Corporation managed and/or controlled CMI Holdings Investments, Ltd. and Castlerigg Partners, L.P. at the time of the Leveraged Recap Transaction and was responsible for the decisions of CMI Holdings Investments, Ltd. and Castlerigg Partners, L.P. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to CMI Holdings Investments, Ltd. and

Castlerigg Partners, L.P. were subsequently transferred, directly or indirectly, to Sandell Asset Management Corporation in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

44.    Tudor Investment Corporation managed and/or controlled The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decisions of The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to The Tudor BVI Global Portfolio L.P. f/k/a The Tudor BVI Global Portfolio, Ltd., Tudor Proprietary Trading, LLC and The Raptor Global Portfolio, Ltd. were subsequently transferred, directly or indirectly, to Tudor Investment Corporation in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

45.    Stonehill Capital Management LLC managed and/or controlled Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decisions of Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Stonehill Institutional Partners, L.P. and Boston Generating Offshore Holdings, Ltd. were subsequently transferred, directly or indirectly, to Stonehill Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

46.    Scottwood Capital Management LLC managed and/or controlled Scottwood Fund. Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of

Scottwood Fund. Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Scottwood Fund. Ltd. were subsequently transferred, directly or indirectly, to Scottwood Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

47.    Onex Credit Partners, LLC f/k/a GK Capital, LLC managed and/or controlled GK Debt Opportunity Fund, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of GK Debt Opportunity Fund, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to GK Debt Opportunity Fund, Ltd. were subsequently transferred, directly or indirectly, to Onex Credit Partners, LLC f/k/a GK Capital, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

48.    Mason Capital Management LLC managed and/or controlled Mason Capital Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Mason Capital Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Mason Capital Ltd. were subsequently transferred, directly or indirectly, to Mason Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

49.    RBS Holdings USA, Inc. f/k/a Greenwich Capital Holdings, Inc. wholly owned and/or controlled Greenwich International, Ltd. at the time of the Leveraged Recap Transaction, and on information and belief, some or all of the Leveraged Recap Transaction proceeds transferred to Greenwich International, Ltd. were subsequently transferred, directly or indirectly, to RBS Holdings USA, Inc. f/k/a Greenwich Capital Holdings, Inc. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

50.    Latigo Partners, L.P. managed and/or controlled Latigo Master Fund, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Latigo Master Fund, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Latigo Master Fund, Ltd. were subsequently transferred, directly or indirectly, to Latigo Partners, L.P. in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

51.    Cedarview Capital Management LP managed and/or controlled Cedarview EBG Holdings, Ltd. at the time of the Leveraged Recap Transaction and was responsible for the decision of Cedarview EBG Holdings, Ltd. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Cedarview EBG Holdings, Ltd. were subsequently transferred, directly or indirectly, to Cedarview Capital Management LP in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

52.    Citigroup Alternative Investments LLC as successor in interest to Epic Asset Management, LLC managed and/or controlled Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. at the time of the Leveraged Recap Transaction and was responsible for the decisions of Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. to participate in the Leveraged Recap Transaction. On information and belief, some of the Leveraged Recap Transaction proceeds transferred to Epic Distressed Debt Holdings, Inc. and Epic Distressed Debt Opportunity Fund, L.P. were subsequently transferred, directly or indirectly, to Citigroup Alternative Investments LLC as successor in interest to Epic Asset Management, LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

53.    Satellite Overseas Fund, Ltd., The Apogee Fund, Ltd., Satellite Fund IV, L.P., Satellite Overseas Fund V, Ltd., Satellite Overseas Fund VI, Ltd., Satellite Overseas Fund VII, Ltd., Satellite Overseas Fund VIII, Ltd. and Satellite Overseas Fund IX, Ltd. were each investment funds that held an interest in Ex Orbit Group, Ltd. On information and belief, Leveraged Recap Transaction proceeds transferred to Ex Orbit Group, Ltd. were subsequently transferred, directly or indirectly, to each of Satellite Overseas Fund, Ltd., The Apogee Fund, Ltd., Satellite Fund IV, L.P., Satellite Overseas Fund V, Ltd., Satellite Overseas Fund VI, Ltd., Satellite Overseas Fund VII, Ltd., Satellite Overseas Fund VIII, Ltd. and Satellite Overseas Fund IX, Ltd. in the form of investment repayment and/or on account of their interest in Ex Orbit Group, Ltd.

54.    Satellite Senior Income Fund, LLC was a subsidiary of investment funds Satellite Fund I, L.P. and Satellite Fund II, L.P. at or about the time of the Leveraged Recap Transaction. Satellite Fund I, L.P. and Satellite Fund II, L.P. were beneficial owners of EBG units held by Satellite Senior Income Fund, LLC. On information and belief, Leveraged Recap Transaction proceeds received by Satellite Senior Income Fund, LLC were subsequently transferred, directly or indirectly, to Satellite Fund I, L.P. and Satellite Fund II, L.P. in the form of investment repayment and/or on account of their interest in Satellite Senior Income Fund, LLC.

55.    On or about December 28, 2006, K Road BG LLC transferred $49,490,000.00 of its proceeds from the Leveraged Recap Transaction to or for the benefit of Boston Harbor Power LLC f/k/a Boston Harbor Power Corporation.

56.    On or about December 28, 2006, K Road BG LLC transferred $43,657,084.00 of its proceeds from the Leveraged Recap Transaction to or for the benefit of Power Management Financing LLC f/k/a Power Management Financing Corporation.

57.    Boston Harbor Power LLC and Power Management Financing LLC were indirect, wholly owned subsidiaries of Harbert Distressed Investment Master Fund, Ltd or Harbinger Capital Partners Master Fund I, Ltd., and were managed and controlled by Harbinger Capital Partners, LLC. On information and belief, Leveraged Recap Transaction proceeds received by Boston Harbor Power LLC and Power Management Financing LLC were subsequently transferred, directly or indirectly, to Harbinger Capital Partners Master Fund I, Ltd., Harbert Distressed Investment Master Fund, Ltd., or Harbinger Capital Partners, LLC in the form of investment repayment and/or on account of its interest in Boston Harbor Power LLC and Power Management Financing LLC.

58.    On information and belief, Willow Bend Capital Management LLC entered into a consulting and/or services agreement with Satellite Asset Management L.P. and/or its affiliates, to advise Satellite Asset Management L.P. and/or its affiliates on investments in the energy sector, including the investment of Ex Orbit Group, Ltd. and Satellite Senior Income Fund LLC in EBG. On further information and belief, this agreement entitled Willow Bend Capital Management LLC to a portion of the Leveraged Recap Transaction, and on information and belief, some of the Leveraged Recap Transaction proceeds transferred to Ex Orbit Group, Ltd., Satellite Senior Income Fund, LLC and/or Satellite Asset Management L.P. were subsequently transferred, directly or indirectly, to Willow Bend Capital Management LLC in the form of payment of compensation, investment repayment, commissions, fees or otherwise.

## VI.    BACKGROUND AND STANDING

### A.    Liquidating Trustee

59.    On August 18, 2010 (the "**Petition Date**"), each of the Debtors filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), in the Bankruptcy Court, thereby initiating the Chapter 11 Cases. On

November 24, 2010, the Bankruptcy Court entered an order authorizing the sale of substantially

all of the Debtors' operating assets to Constellation Holdings, Inc. or its nominee. On July 20,

2011, the Debtors filed the Plan, and on August 29, 2011, the Debtors filed the Notice of

Designation of Liquidating Trustee Pursuant to Section 7.02.1 of the Second Amended Joint Plan

of Liquidation of Boston Generating, LLC, in which the Debtors identified Craig R. Jalbert as the

Liquidating Trustee. On August 31, 2011, the Bankruptcy Court entered its order confirming the

Plan (the "**Confirmation Order**"). On September 14, 2011, the Liquidating Trustee and each of

the Debtors executed the LT Agreement, which created the Liquidating Trust and which became

effective on September 15, 2011 (the "**Effective Date**"). Pursuant to the Plan and the LT

Agreement, the Liquidating Trust was established and Craig R. Jalbert was appointed as the

Liquidating Trustee. On April 9, 2013, Mark Holliday was appointed successor Liquidating

Trustee.

      60.     Pursuant to the Plan and the LT Agreement, the Liquidating Trust succeeded to all

of the Debtors' rights, title and interests in the Liquidating Trust Assets, including but not limited

to "the rights, Claims, Causes of Action and defenses arising from, relating to or in connection

with the [Leveraged] Recap Transaction of all of the holders of Allowed Claims in Class 4B who

[did] not make the Non-Contribution Election" when voting in favor of the Plan. Pursuant to the

LT Agreement, the Liquidating Trustee's duties and responsibilities include the investigation and

enforcement of Causes of Action relating to the Leveraged Recap Transaction, and the taking of

"all appropriate action with respect to the Trust Estate, including without limitation, the

investigation, analysis, filing, pursuit and prosecution of Causes of Action."

      61.     In addition, pursuant to the Plan, all creditors in Class 4B assigned various of their

individual causes of action to the Liquidating Trust to be prosecuted by the Liquidating Trustee,

with any proceeds thereof or recoveries therefrom to be distributed to creditors generally pursuant to the Plan. In this regard, the Plan provides that "[i]n consideration of the rights under the Plan and the prosecution of the Causes of Action by the Liquidating Trustee, on the Effective Date, each of the holders of General Unsecured Claims in Class 4B against the Debtors shall be deemed to transfer and assign all rights, Claims, causes of action and defenses arising from, relating to, or in connection with the [Leveraged] Recap Transaction to the Liquidating Trust, except those holders who make the Non-Contribution Election." No creditor made the Non-Contribution Election. The claims and causes of action of such creditors are Liquidating Trust Assets pursuant to the Plan, Confirmation Order and LT Agreement. The Liquidating Trustee is asserting the rights of creditors that were assigned to him pursuant to the Plan, and is prosecuting this adversary proceeding for the benefit of such creditors pursuant to the Plan and the LT Agreement.

62.    In this Complaint, the Liquidating Trustee is not prosecuting any causes of action that formerly belonged to the Debtors or that otherwise vested pursuant to Chapter 5 of the Bankruptcy Code.  Rather, the Liquidating Trustee brings only state-law creditor-claims as the assignee of certain creditors pursuant to the Plan, the Confirmation Order, and the LT Agreement.

63.    By this allegation, the Liquidating Trustee is abandoning avoidance claims belonging to the Debtors to the extent they might otherwise be asserted under Section 544(b) of the Bankruptcy Code against various Defendants who or that received or benefited from distributions or transfers made in connection with the Leveraged Recap Transaction. Instead, the Liquidating Trustee is asserting the claims of individual creditors that were assigned to the Liquidating Trust pursuant to the Plan, as the same are described in Paragraph 4 above. Such creditors include (a) the holders of the First Lien Debt and Second Lien Debt (as that term is defined below), (b) the holders of the Mezzanine Debt (as that term is defined below), and (c) all

other general unsecured creditors of the Debtors (except for those who or that elected to be included in the Convenience Class created under the Plan). This Paragraph shall constitute the notice required by Section 8.02.2 of the Plan.

**B.    EBG / BostonGen**

64.    BostonGen was founded in 2000 and was managed by Kriegel and the K Road Insiders for its then-owners, Sithe Energies, Inc. BostonGen was then sold to Exelon New England Holdings, LLC ("**Exelon**"), and the K Road Insiders temporarily exited the scene. BostonGen had financial difficulties. On February 23, 2004, Exelon entered into a settlement in lieu of foreclosure which resulted in a transfer of the ownership of BostonGen and its properties to EBG, a special purpose entity owned by BostonGen's former lenders.

65.    By late 2004, EBG and BostonGen experienced further financial distress, including events of default under their credit agreement, and sought another restructuring. With EBG and BostonGen in distress, the hedge funds who owned most of the units of EBG sought help from BostonGen's former management: the K Road Insiders.

66.    On information and belief, the equity holders of EBG concluded that Kriegel and his team, as former management, were in the best position to revamp BostonGen's business and, more importantly, get the unit holders out of the business of owning a power company. EBG required K Road to put skin in the game by contributing new equity in exchange for EBG equity interests and long-term warrants. Unbeknownst to the EBG unit holders, however, the K Road Insiders contributed relatively little of their own money and instead secretly funded over 90% of their investment in EBG through their joint venture or partnership with Harbinger Capital Partners, LLC (acting through its alter egos Boston Harbor Power LLC and Power Management Financing LLC (with  Harbert Distressed Investment Master Fund, Ltd. and Harbinger Capital Partners Master Fund I, Ltd., collectively "**Harbinger**")—a predatory hedge fund that carefully concealed

its role in K Road from the rest of EBG's ownership.[4]  Boston Harbor Power LLC and Power

Management Financing LLC were special purpose vehicles for the Harbinger joint venture with K

Road and were openly disparaged as "shell entities" by Harbinger.  The names of these special

purpose entities were deliberately bland so as not to reveal their Harbinger ownership in FERC

disclosures.  Boston Harbor Power LLC and Power Management Financing LLC had no offices,

employees, physical assets, or other separate existence but acted solely through officers of

Harbinger Capital Partners, with Howard Kagan and Philip Falcone signing contracts and

receiving correspondence at the New York offices of Harbinger Capital Partners or via their

@harbert.net or @harbingercap.net domains.  Internal audit papers consolidated Harbinger and K

Road's ownership per IRC Section 382, and K Road and Harbinger treated and referred to the

relationship as a joint venture or "partnership" in internal memoranda allocating the proceeds of

their investment in the Debtors.

68.    In connection with the K Road joint venture in the Debtors, Harbinger acted

through former investment officer Howard Kagan ("**Kagan**").  Kagan and the K Road Insiders

created a web of special purpose entities to structure their investment in EBG, the purpose of which

was to conceal Harbinger's involvement with K Road from EBG's equity owners. These entities

had no existence or purpose except to secretly funnel cash from EBG to the K Road Insiders and

Harbinger.  These entities never held assets but simply passed transfers from the Debtors through

to higher level K Road entities and Harbinger per agreed formulas.

68.    On or about December 15, 2006, Harbinger and K Road entered into a "Written

Consent and Amendment," in which K Road and Harbinger acknowledged that the Leveraged

---

[4] Harbinger made its reputation by predicting the subprime market collapse and betting against securitized subprime mortgages. Here too, it predicted EBG's poor prospects in the wholesale energy market and quickly acted to protect its position with regard to this investment.

Recap Transaction required Harbinger's approval, and which is attached hereto as Exhibit D.  In this agreement, they agreed to the terms on which K Road would tender its units, that K Road would cause the EBG Board of Directors to approve the Leveraged Recap Transaction on the terms dictated by Harbinger, and that K Road would be permitted to cause EBG to amend K Road's warrants so as to make them immediately exercisable.   Philip Falcone signed on behalf of Harbinger.

69.     Harbinger's control of the Debtors was material to potential lenders in the Leveraged Recap Transaction, who would have, at the least, wanted to investigate whether the transaction was proposed to favor the Debtors' interests, or those of Harbinger.  However, the lenders did not know of Harbinger's involvement; all press releases and industry reports prior to the Leveraged Recap Transaction stated that "Kriegel's K Road Power" owned 10% of the Debtors—without any mention of Harbinger.

70.     The agreements between K Road and Harbinger gave Harbinger total control over K Road's actions with respect to EBG and BostonGen. Among its other powers, Harbinger's approval was required for K Road to exercise its board vote at EBG. K Road provided Harbinger with copies of all Debtor board presentations, unaudited financial statements, internal budgets, monthly operations reports (which disclosed breakage, heat rate, forced outages, and other internal data which contradicted the Projections), unitholder materials, and ratings agency presentations, as well as secret access to the data rooms for lenders, prospective purchasers, and unitholders.

71.     The joint venture between K Road and Harbinger ("**K Road/Harbinger**") invested $65 million and obtained a 10% equity interest in EBG as well as warrants to purchase 722,222 additional equity units at an exercise price of $118.78 per unit. $61 million came from Harbinger, and only $4 million from K Road. The propriety of the Leveraged Recap Transaction (involving

borrowings of nearly $2 billion with a redemption at $340 per unit) is contradicted by this implied $650 million valuation of EBG only a year prior.

72.    In connection with the October 2005 BostonGen restructuring, BostonGen, Mystic I, Mystic Development, Fore River and K Road entered into a Management and Operation Agreement effective as of October 11, 2005 (the "**Management Agreement**").

73.    Upon the execution of the Management Agreement and the Amended and Restated Limited Liability Agreement of EBG Holdings LLC (the "**LLC Agreement**")—which K Road executed—K Road/Harbinger became an "insider" of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, a controlling person under applicable state corporate and securities laws, and a manager of the Debtors' businesses. It remained so throughout the period of the Leveraged Recap Transaction and until mid-2007.

**C.    K Road Dominates EBG and BostonGen**

74.    K Road/Harbinger assumed operating control and management of EBG and BostonGen in October 2005. Pursuant to the Management Agreement and the LLC Agreement, K Road had operating and management control over virtually all aspects of the Debtors' businesses. Among other things, K Road was to provide "comprehensive management, administration, operation and maintenance services" for the Debtors' businesses and affairs, and was authorized "to act on behalf of Owner as its authorized agent in the conduct of Owner's day-to-day business." In short, the K Road/Harbinger joint venture ran the businesses.

75.    Under the LLC Agreement, EBG was to be governed by seven board members, including two designated by K Road, one of whom was required to be the Chief Executive Officer of EBG (Kriegel).  All other directors were required to be independent directors.

76.    Directors whom K Road designated could only be removed for cause or by K Road. A number of actions, including those involving interested directors, could be approved by

holders of Class A units, and K Road held all of the Class A units. In addition, K Road was to nominate all senior officers, and it was contemplated that the Board of Directors would be required to appoint members, officers and employees of K Road who were nominated by K Road to serve as officers or as managerial employees of EBG. These provisions thus gave K Road pervasive control over the Debtors' business matters. They were especially significant because although the Management Agreement purported to place limits on the authority of K Road as manager and required the consent of BostonGen and its subsidiaries in respect to certain matters, as a practical matter, directors, officers, and managers of K Road comprised those entities who were responsible for giving such consents. Thus, the consent restriction was no restriction at all.

77.   As soon as K Road was in control of EBG, it began pursuing a "liquidity event." Harbinger, as part of the K Road/Harbinger joint venture, demanded a high and rapid return on its investment, and the Nominating Committee was equally eager to cash out.

78.   The EBG Board of Directors retained Lehman to get money out of the company. Initially, Lehman pursued bidders for the company outright. One prospective buyer considered by the EBG Board in June 2006 was Dynegy, Inc. ("**Dynegy**"), an electric utility company that owned several natural gas-fired plants like those operated by BostonGen. Unbeknownst to Lehman or the independent members of the Board of Directors, Harbinger had initiated the Dynegy bid. Dynegy offered $265 a unit for EBG, with 20% of the offer in cash and 80% in Dynegy stock. The Nominating Committee was dissatisfied with both the price per unit and the amount of cash that would flow immediately to the unit holders. They knew that they needed to get cash out immediately; there were no future gains to be made by holding interests in an entity containing BostonGen. EBG rejected the Dynegy offer and asked for $300 a unit. Dynegy cut off negotiations without a counteroffer

79.    On June 29, 2006, Harbinger, as part of the K Road/Harbinger joint venture, dictated that instead of a sale to Dynegy, K Road pursue a "recap on the debt, adding 2 turns of leverage (another $750mm) and doing a buyback or dutch auction tender . . ." This is indeed what transpired. Although Harbinger's role in the Leveraged Recap Transaction was concealed, the transaction was structured just as Harbinger directed.

80.    Both Harbinger and K Road knew that a transaction had to happen soon. As a merchant seller, BostonGen was at the mercy of market forces—both natural gas and electricity. Moreover, its critical Reliability Must Run ("**RMR**") contracts—which had provided a reliable revenue stream—were terminating due to the planned transition to a forward capacity market ("**FCM**") system in the ISO-NE grid where BostonGen sold its capacity.[5] The outlook for BostonGen was dismal. BostonGen sold into the ISO-NE grid. The ISO-NE's switch to FCM auctions meant more competing capacity and lower prices for merchant electricity providers. Although K Road knew that the FCM transition was being implemented to *encourage* new market entrants and *minimize* capacity payments to merchant providers, in the Projections, K Road represented that it anticipated revenues of $9/kW-Month (possibly rising to as much as $15/kW-Month) under the FCM market—but neglected to mention that in an open auction system, payments could approach *zero* if new capacity were connected to the ISO-NE system. In fact, such capacity was planned, and was anticipated by K Road based upon numerous industry reports (which were in K Road's actual possession) prior to the Leveraged Recap Transaction.

81.    In response to Harbinger's prodding, K Road determined to offload BostonGen's problems into someone else's hands after extracting any possible liquidity. Of course, it could do

---

[5] Unlike RMR contracts, by which the ISO-NE paid merchant generators like BostonGen to keep specific plants running to keep capacity available, FCM auctions are open and transparent. In an FCM auction, any generator can bid its capacity three years out. FCM auctions are therefore more competitive than RMR contracts.

so only by concealing the Debtors' true prospects from any potential counterparty—whether that included new lenders, a potential acquirer, or the IPO market. Tohir acknowledged to Kriegel and Sullivan that K Road had no choice but to enter into a transaction per Kagan's demands because the Debtors had "lost the Fore River RMR and are now in litigation on the Mystic RMR since we failed to settle during settlement talks, neither of which are good news."

82.    Nonetheless, Harbinger demanded more money out of the Leveraged Recap Transaction for itself over its present agreements with K Road:

> "lastly, you may feel that harbinger should just accept the terms as you have presented them, and not adjust the harbinger/kroad deal to reflect what you have crafted with shareholders on the recap structure. but just as you conditioned your working on the recap with the major shareholders on resetting your economic deal so it made sense for you given a dramatically restructured deal, I need to do the same."

The shareholders to whom Harbinger was referring were the Nominating Committee; as the Nominating Committee controlled more than 50% of the votes necessary to conduct the Leveraged Recap Transaction, Kriegel had been tasked with negotiating with the Nominating Committee the proportions of the Debtors' cash which would be allocated among the unitholders, and through what kind of transactions.

83.    K Road ultimately conceived of a combination of warrant redemptions, which benefitted only K Road, a dividend, which was limited by the LLC Agreement to existing profit, and unit redemptions, which were conceived of by the joint counsel for the Debtors and K Road as a method of providing liquidity (cash) to unitholders without the tax or legal consequences of making a distribution. Kriegel called each of the Nominating Committee members to secure their consent (and later vote) to the Leveraged Recap Transaction before presenting Harbinger's proposed board resolutions to the EBG board of directors for their rubber stamp.

84.    K Road and its officers and employees arranged, negotiated, documented, supported, and closed the Leveraged Recap Transaction. In so doing, K Road and its officers and employees prepared or caused the preparation of transaction documents, including the Confidential Information Memorandum (the "**CIM**") and other documents discussed herein, prepared or caused the preparation of the Projections, negotiated and documented or caused the documentation of the Hedges, supervised and directed transaction diligence, provided information and advice to the Board of Directors, and negotiated and documented or caused the documentation of the Credit Facilities (defined below).

## VII.    K ROAD'S MISREPRESENTATIONS AND OMISSIONS

## A.    The Projections

85.    The centerpiece of K Road's efforts to promote the Leveraged Recap Transaction was the set of fundamentally misleading and unreasonable Projections for the financial performance of BostonGen following the Leveraged Recap Transaction. These Projections included projected EBITDA[6] of close to $1 billion during the four-year projection period of 2007 through 2010, inclusive. Thereafter, the EBITDA projections that K Road developed continued to ascend into the stratosphere, growing from a projected $199 million for 2007 (which, in fact, the Debtors missed by $69 million) to a projected $426 million in 2012, with even higher projections for the following years. In fact, EBITDA did not rise—it decreased.

86.    As a merchant seller of electricity into the wholesale market, BostonGen's profitability from operations was subject to market risks intrinsic to that industry—risks posed by the short and long-term fluctuation of the market price for electricity due to changes in supply and demand, risks posed by exposure to volatile commodities markets, regulatory and related risks

---

[6] Earnings Before Interest, Taxes, Depreciation and Amortization or "**EBITDA**" is often relied upon as an indicator of a business entity's intrinsic earning capacity and value.

posed by the functioning of the highly complex energy markets and operational risks, such as equipment failures and forced outages.

87.    To market BostonGen as an entity possessing the stable cash flow necessary to service the major new debt load required for the Leveraged Recap Transaction, K Road needed to portray BostonGen as a "contract" generator, not the "merchant" generator that it actually was. It also needed to conceal the impact that the termination of its RMR agreements, as ISO-NE moved to the FCM system, would have on its revenue.

88.    As a merchant generator, BostonGen typically entered into hedge contracts, which theoretically protect it from fluctuations in its input and output markets.  Pursuant to each set of the contracts implementing the hedging transactions BostonGen entered into near the time of the Leveraged Recap Transaction (the "**Hedges**"), Credit Suisse Energy, LLC ("**CSE**") agreed to make monthly fixed payments (the "**Fixed Payments**") to BostonGen over a period of four years. Such Fixed Payments showed up in the Projections as a guaranteed, contractual "net energy margin" that was reflected in the EBITDA projections year after year. Supposedly, according to the Projections, these alleged Fixed Payments would result in the receipt by BostonGen, like clockwork, of $163 million of "Net Hedged Margin."  The Fixed Payments to BostonGen, however, came at a hefty cost to BostonGen that, unlike the Fixed Payments, did not appear in the Projections. The cost of the Fixed Payments was variable payments (the "**Floating Payments**") from BostonGen to CSE. This was a material hidden liability with a significant negative impact on cash flow, the disastrous consequences of which were concealed from and not disclosed to potential lenders, the independent members of the Board of Directors, and other parties involved in the Leveraged Recap Transaction. In short, K Road committed fraud—it failed to disclose the way the Hedges actually worked.  Contrary to the representations made to lenders, $163 million

represented the theoretical ceiling for net payments to be made to BostonGen, not the Hedges' projected performance.

89.    K Road sold BostonGen as having "contracted EBITDA" via the Hedges, but in truth, BostonGen had not contracted away the variability in its costs. BostonGen may have had a small fixed revenue source, but it still had variable costs which it had not contracted to cover via its variable revenues from spot electricity sales. This was a fundamental lie to lenders.

90.    The amount of Floating Payments was to be calculated pursuant to a formula negotiated between K Road and CSE. CSE's role in the Leveraged Recap Transaction was solely as the designated hedge counterparty. Moreover, in its sole role as hedge counterparty, CSE conducted no due diligence on the operating characteristics of the Debtors' plants, let alone the business as a whole, which might have allowed CSE to generate a truthful set of Projections. Indeed, CSE was never even provided with the Projections.

91.    As pitched to lenders, the contractual formula for the Floating Payments in each set of Hedges would result in a dollar amount closely approximating the gross margins that would be achieved from actual real-life sales of electrical generation by the particular BostonGen power plant to which the Hedge was "tied" or "referenced." Thus, in theory, if, during a given month, the synthetic Floating Payment formula would result in the amount of $1 million due to the Hedge counterparty as a Floating Payment, the actual operations of the BostonGen plant to which that Hedge was "referenced" would generate real life energy margins of $1 million on its sales of electricity. This margin from actual operations would then be available to fund the Floating Payment. Upon payment of the Floating Payment to CSE, the exchange would be complete: the operating energy margin from the sale of electricity would fund the Floating Payment; BostonGen would get the Fixed Payment in return.

92.    However, K Road was using two sets of books.  K Road, by concealing the details

of the Hedges from its consultants and potential lenders, also concealed the reality that the Floating

Payment formula did not, in fact, approximate the actual operating performance (in the past and

foreseeable future) of the BostonGen plants and thus would not produce the money needed to fund

the Floating Payment obligations. K Road had never been able to operate BostonGen in a way that

would optimize the Floating Payments—and it had no plan to do so in the future. For instance,

under the Navigant model, if K Road's internal projected heat rates and gas prices are used, the

Net Hedged Margin does not even approach $163 million.  These internal rates were shared with

Harbinger, but not CSE, the consultants, or the lenders.

93.    The Floating Payments were tied to the efficiency with which BostonGen's power

plants operated. Under a true swap, the Floating Payments could have gone either way—if

BostonGen's performance was high enough, CSE would have paid BostonGen, rather than vice

versa. However, there was a "swaption" feature of the Hedges, which was misrepresented by not

being included in the projected EBITDA. Under the "swaption," CSE could turn off the Hedges if

they became unprofitable to CSE—and CSE of course did exercise that option whenever it was

economic to do so. Therefore, BostonGen either made Floating Payments to CSE, or CSE turned

the Hedges off.  The result of the Hedges was that they did not "hedge" at all because BostonGen

was completely exposed to downside market risk without any upside. The Projections did not

include the impact of the swaption on EBITDA.

**B.**    **Additional Specific Hedge-Related Misrepresentations and Omissions**

94.    The details of why the Hedges failed to replicate BostonGen's actual performance

are set forth below. However, briefly, they include, inter alia:

> (a)    there was a mismatch between the gas and power prices referenced in the
> Hedges, and the gas and power prices BostonGen was subject to in its actual
> operations, and the prices would diverge;

(b)    for the Hedges to be effective, they required BostonGen to attain a historically unachievable level of volume. The formula used to calculate the Floating Payment was fundamentally negative to BostonGen because it gambled that BostonGen could sell at a level it never had and the market never wanted;

(c)    the projected Hedge revenues did not adequately reflect a "take or pay" contract BostonGen had with Distrigas, which resulted in payments for gas for which there were no revenues;

(d)    the Hedges assumed the plants would operate at a significantly lower heat rate than BostonGen's plants had historically operated, which meant actual operating costs were higher and the actual operating margin lower than assumed in the Hedges; this also meant that the Floating Payment under the Hedge would be higher than the gross margins BostonGen could actually generate from operations;

(e)    despite the K Road Insiders' historical experience with the BostonGen plant operations, which included numerous forced outages and breakdowns, the Hedges did not make allowances for forced outages for breakdowns and repairs (apart from one annual shutdown), during which the Floating Payments continued;

(f)    BostonGen had not yet hedged Fore River, and did not even have terms for a hedge for Fore River, but built in assumed stable Hedge revenue for the Fore River plant as a component of the $163 million of Net Hedged Margin throughout 2007; and

(g)    the Hedges assumed that the BostonGen plants, which were originally designed as "base load" plants, had almost perfect flexibility when cycling on and off (i.e. that they could go from zero to full generating capacity when it was profitable to generate electricity and from full capacity to zero when it was unprofitable), but this was simply not the operating reality for the BostonGen facilities.

95.    K Road's non-disclosure of these "Hedge Imperfections" was materially omitted from lender materials, and was a default of the Debtors' covenant that if "any of the representations . . . would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and Projections so that such representations will be correct under those circumstances," and its covenant that the Projections "were prepared in good faith on the basis of assumptions stated

therein, which assumptions were reasonable at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's reasonable best estimate of its future financial performance." Following the Leveraged Recap Transaction, the gross mismatch between the Floating Payment obligations and BostonGen's ability to generate the revenue needed to pay them became evident immediately. As was entirely foreseeable by those intimately familiar with the operations of BostonGen (that is to say, K Road, the K Road Insiders, and the Nominating Committee), BostonGen could not achieve a contracted EBITDA and its revenues remained subject to market risks.

**C.      K Road's Baseless Assumptions**

96.      K Road recognized that the Leveraged Recap Transaction was a high-risk transaction because of the amount of debt proposed to be incurred, and because of the use of the debt to make payments of more than $1 billion to equity unit holders. To justify the transaction and the risks, K Road made a number of factual assumptions about the future which, taken together, purported to establish that the risks were tolerable and should be assumed. These factual assumptions were (a) reflected in the Projections that Ehrenzeller certified, (b) contained in various documents disseminated to prospective lenders and financiers, including those described herein, (c) contained in documents delivered to Duff & Phelps, Navigant and Black & Veatch in connection with opinions requested from those firms, (d) conveyed to the "independent" members of the Board of Directors in connection with their review and approval of the Leveraged Recap Transaction, and (e) provided to S&P and Moody's (both defined below) in connection with ratings that those firms publicly disseminated. The assumptions underlying the Projections were used to make determinations as to the Debtors' solvency, capital adequacy and ability to pay their debts as they became due after the closing of the Leveraged Recap Transaction.

97.    The consultants in turn washed their hands of responsibility by proclaiming their unquestioning reliance on management's Projections as the sole basis for blessing the transactions. K Road withheld from the consultants the documents necessary for an assessment of the Projections, including the Hedge contracts, so Duff & Phelps simply conjured a 20% sensitivity level for management's figures. K Road carefully controlled the dissemination of the Hedge contracts so that anyone who would have been able to point out the errors in the Projections was not privy to the Hedge terms. The K Road Vice President of Asset Optimization, the officer in charge of daily strike price decisions and hedge operations, noted that he had been "compartmentalized" away from knowledge of the "features and nature of the hedge." But he was growing concerned that there was something odd about what K Road was telling the lenders. He had not been made a part of the Leveraged Recap Transaction, and did not know about Harbinger's joint venture, but when he was first given access to the Hedges, he was concerned that nobody knew how to make the Hedges work to match the Projections:

> I know the term is 4 years, and I know that the sum of the fees that the hedges for Mystics, 8 & 9 and Fore River will pay to us is expected to total approximately $165 million per year [give or take]. . . . I became aware of these facts during a presentation we made to the lenders at the W hotel[.]

> But there are some important things that I still have not been informed of.

> While I know that the TOTAL of the hedges on the THREE plants [Mystic 8, Mystic 9, and Fore River] is expected to yield $165 million, I have not been told what the hedge we executed on just Mystic 8 and 9 will yield to us, (and since we have yet to execute the Fore River hedge, I really have no idea how much of the $165 million is coming in right now).

98.    The Projections were inaccurate in further material ways apart from the failure to disclose the true nature and inherent risks of the hedging strategy. The critical factual assumptions that were false and misleading are discussed herein. However, there was an overarching misrepresentation, which was an attempt to present the Debtors' business as something that it was

not, and to mischaracterize the nature of that business. There are two types of power generators: "contract generators" that sell electricity through long-term contracts, which lead to a stable and predictable revenue stream and the ability to virtually lock in a profit so long as operating costs are controlled, and "wholesale generators" that sell electricity and purchase fuel at spot prices, which create an unstable revenue stream with less predictability, which in turn result in an unstable cash flow, more expensive debt, a higher-risk business model and generally lower valuations. These differences result in a valuation premium for contract generators. K Road falsely portrayed the Debtors as a contract generator by implying that, even though they were wholesale generators, the Hedges made their risk profile similar to the risk profile of contract generators. Thus, in numerous documents, K Road and the Debtors represented that there was a "fixed energy margin" or "contracted margin" which sought to portray an absence of market pricing risks. For example, a K Road Preliminary Financial Model dated December 1, 2006 used such terms as "fixed energy margin," "contracted EBITDA" and "contracted cash available for debt service." K Road and the K Road Insiders' fraudulent conduct was gross and wanton, and involved high moral culpability.

99.    The misstatements that drove the Leveraged Recap Transaction and that were set forth in the Projections were the following:

(a)    At the time of the Leveraged Recap Transaction or shortly thereafter, the prospective energy revenues and fuel costs were completely or almost entirely hedged, and there were minimal operating and market risks.

(b)    There would be a fixed, predictable and stable net energy margin of $163 million through 2010, as a result of the Hedges, that would not be exposed to market dynamics and pricing risks.

(c)    There would be an initially fixed but increasing FCM payment of $3.05/kW-month for 2007, $3.46/kW-month for 2008 and $3.95/kW-month for 2009, which would skyrocket to $6.96/kW-month in 2010 and thereafter, would increase to $9.00/kW-month for the period 2011 to 2017 because of a market shortage of generated power. As a consequence, capacity payments would increase from $101 million in 2007 to $268

million for the period 2011 to 2017, and this gain was built into the valuation calculations.

(d)    Operating and maintenance expenses would decline from $138 million in each of 2005 and 2006 to $101 million in 2007, with only slight increases thereafter.

(e)    Capital expenditures would be limited to $5 million per year in 2007 and each year thereafter.

(f)    As a result of the foregoing, there would be significant excess cash flow. Pursuant to the provisions in the documents evidencing the Credit Facilities, which required that virtually all excess cash flow be applied to pay debt, there would be an immediate and consistent reduction in the First Lien Debt (defined below) and overall leverage. More specifically, the First Lien Debt would be reduced from $1.13 billion in December 2006 by almost $400 million to $731 million by the end of 2010, and to $74 million by the maturity date in 2013.

(g)    There was short supply of available generating capacity in the relevant capacity market for the New England region that would impact the likely price of power in the energy market after the Hedges expired. The result would be that after the Hedges expired, the FCM payments, the energy margin and the overall value of the Debtors would increase dramatically.

(h)    There would be no unexpected events such as breakdowns, repairs and other contingencies.

100.    Each of these critical assumptions was false, misleading, unjustified and inaccurate based on information known and available to K Road/Harbinger prior to and at the closing of the Leveraged Recap Transaction in December 2006, and based on the actual operating results in the period from 2007 to 2010.

101.    The projected reduction of debt by almost $400 million by 2010 through a cash flow sweep feature contained in the credit documents (the "**Cash Sweep**"), the projected expense reduction from $138 million to $101 million, the projected level of capital expenditures of $5 million per year, the projections that forward capacity market prices (which were wholly or largely fixed until 2010) would increase to $9.00/kW-month thereafter, the predictions of a power generating shortage that would increase prices and values, and the absence of any mention of the

need for contingent expenses, were all materially wrong, and known to K Road/Harbinger prior to consummation of the Leveraged Recap Transaction to be materially wrong.

102.    A budget prepared contemporaneously by K Road and the K Road Insiders showed expense reductions that were significantly less than those included in the Projections. A capital expense budget prepared at the same time as the Projections showed projected expenses for 2007 of over $20 million, as compared to only $5 million in the Projections.  These budgets were provided to Harbinger in the course of K Road's monthly reports, but not to the lenders or consultants.  A document prepared more than one month before the Projections showed material additional market capacity becoming available in 2008 and thereafter, in contrast to the supposed generating capacity shortage discussed in the Projections.

103.    In the Leveraged Recap Transaction, the Debtors, under the domination and control of K Road/Harbinger, actually intended to defraud their creditors by distributing their cash to equity and insiders.  They knew that this cash would not be available to pay either the contemporaneous new debt to the lenders or subsequent unsecured creditors.  The Leveraged Recap Transaction was timed so as to maximize the cash that would be available to distribute to equity because of K Road/Harbinger's knowledge of the Debtors' insolvency and illiquidity in the future.

104.    An additional and critical material omission related to the role of Harbinger. K Road carefully concealed its hedge fund joint venture partner from the the EBG Board of Directors, the lenders, the Federal Energy Regulatory Commission ("**FERC**"), and the public. While the CIM stated that "K Road purchased 10% of the equity in EBG," the truth was that Harbinger owned nearly 90% of the beneficial interest in those EBG units, when its interests in K Road BG Holdings LLC and K Road Power BG LLC were considered. The CIM touted K Road's "strong track record

for purchasing, improving and operating generation assets" and assured lenders that "K Road performs comprehensive management, strategy and administration services for the business and affairs of EBG's unit holders (the "**Owners**") and the Generating Facilities, and acts on behalf of the Owners as their authorized agent in the conduct of the respective day-to-day businesses." But the CIM materially omitted that K Road did not have the discretion to make decisions with regards to EBG/BostonGen; instead, it had agreed with Harbinger to "cause the directors of EBG appointed by K Road BG LLC not to vote on (a) Asset Transfers, (b) Dividends, (c) Adverse Actions, (d) Capitalization Matters or (e) matters that, to the knowledge of the directors, could reasonably be expected to have an adverse tax impact on a Member or have an adverse impact on the regulatory status of a Member without the consent" of Harbinger. K Road continued to conceal its partnership with Harbinger even after the Leveraged Recap Transaction; it got confidential treatment for its application to FERC, and did not disclose even the two Harbinger shell entities as equity owners until they could be slipped into a longer list of new equity owners in March 2007.

D.    **Financial Misrepresentations and Omissions**

105.    On or about December 18, 2006, Ehrenzeller, Director of Finance of EBG and Senior Vice President and CFO of K Road Power, transmitted the Projections to Duff & Phelps in support of the Leveraged Recap Transaction. Ehrenzeller wrote that "the financial projections provided to Duff & Phelps...are the most current financial projections available by the Company. With respect to such projections, I have made such investigation and inquiries as I deemed necessary and prudent therefor." Ehrenzeller also wrote that he had relied on various assumptions supplied by unnamed "outside consultants" and "[h]ad no reason to believe that these assumptions are unreasonable." Instead, he stated that he believed the Projections "provide reasonable estimations of future performance, subject to the uncertainty and approximation inherent in any projections." He did not, however, state the assumptions on which he relied and who provided

them, and he stated that he did not hold himself "out as an expert on...the value of assets." As described above, the statements in the Projections were false, misleading, unjustified and inaccurate based on information available and known at the time.

106.    As manager and operator, K Road was involved in the planning, negotiating, and implementation of the Leveraged Recap Transaction. K Road had access to and control of all financial and other information that was necessary to plan, negotiate and implement the Leveraged Recap Transaction, to advise and support the Leveraged Recap Transaction to the Board of Directors, to provide diligence on the Leveraged Recap Transaction, and to solicit interest from prospective financiers and close the transaction. The Projections showed that BostonGen's 2007 EBITDA would reflect a dramatic "hockey stick" increase of over 45% from 2006.   As K Road knew would be the case, BostonGen failed to attain its "hockey stick" growth and, in fact, experienced a decline in EBITDA in 2007.

107.    Significantly, in the spring of 2007, K Road prepared an annual budget that was at variance with the Projections. In particular, that budget showed revenues, fuel, and purchased power would be "variable." This was in direct contradiction to the representations made in the Projections, the CIM and other documents, and representations made to Duff & Phelps and to the Rating Agencies (as defined herein), that there was a fixed energy margin. Similarly, both a proposed 2007 budget issued in December 2006 and a projected cash flow statement forecast for April 2007 through December 2007 showed, contrary to the Projections, that revenue and fuel expenses would be "variable."

108.    A February 2007 budget showed that (a) revenues and fuel and purchased power would be "variable" items, (b) the net energy margin would not be fixed as projected but instead would be approximately $45 million less than predicted, and (c) operating expenses would be

almost $130 million, or almost $30 million more than projected and, not surprisingly, much closer

to historical results. In short, the Projections were materially inaccurate based on information that

was known and available at the time and that was actually used in a virtually contemporaneous

internal budget.

109.    Demonstrating the falsity of the Projections, the Debtors' fortunes declined from

the moment the Leveraged Recap Transaction closed. In the first quarter of 2007, which began a

little more than a week after the closing of the Leveraged Recap Transaction, the energy margin

was $22 million less and EBITDA was $20 million less than represented in the Projections.

**E.    Documents Provided to Prospective Participants in the First Lien Debt, the Second
Lien Debt and the Mezzanine Debt Containing Material Misrepresentations and
Omissions**

110.    K Road actively solicited parties to participate in the Leveraged Recap Transaction.

To this end, it prepared and disseminated certain documents to prospective participants in the First

Lien Debt, the Second Lien Debt, and the Mezzanine Debt (all defined below). These documents

included the CIM, a Private Supplement to the CIM dated December 2006 (the "**CIM-PS**"), a

Private Investors Supplement to the CIM dated December 4, 2006 (the "**CIM-PIS**"), and a lender's

presentation (the "**LP**") (collectively, the "**Lender Materials**"). The Lender Materials were

provided to potential purchasers of the First Lien Debt, the Second Lien Debt and the Mezzanine

Debt, and more generally in the marketplace.  All Lender Materials were received and relied upon

by the initial lenders prior to the Leveraged Recap Transaction.

111.    A letter signed by Kriegel, as Chairman and CEO of EBG, and as Chairman,

President and CEO of K Road, affirmed that the information in the CIM was "complete and correct

in all material respects and [did] not contain any untrue statement of a material fact or omit to state

a material fact necessary in order to make the statements contained therein not materially

misleading in light of the circumstances under which they were made," and that management

projections and forward looking statements were "prepared in good faith based upon assumptions

that were reasonable as of the date of the" CIM. These statements were not true and/or omitted to

state material facts for the reasons set forth herein. Each of the K Road Insiders was identified as

a K Road representative in the CIM and was a party to such misrepresentations.

112.    Although the CIM referred to K Road as an equity investor with a 10% stake and

warrants, the CIM failed to disclose that K Road/Harbinger were interested parties who would

receive more than $100 million as a result of the Leveraged Recap Transaction. The CIM did not

disclose that, in an act of incredible chutzpah, K Road was seeking to modify its long-term warrants

to make them exercisable immediately. It also did not disclose that K Road "financed" its original

investment through its joint venture with Harbinger and that a significant portion of the proceeds

of the Leveraged Recap Transaction would be paid to Harbinger.

113.    The CIM stated that the Debtors had entered into hedging transactions, and

proposed to enter into additional hedging transactions "so as to provide comfort to prospective

lenders . . . that the Company's revenue stream is stable. The company believes the Hedge

Transactions will both enhance the Company's borrowing capacity and lessen the Company's risk

of default on its indebtedness due to volatile fuel and energy prices." In the same vein, because of

the Hedges, the Debtors would have a "stable energy margin" (i.e. the difference between power

prices and fuel costs). As discussed herein, these statements were not true.

114.    The CIM-PS, which upon information and belief was prepared by the same persons

who prepared the CIM, and was accompanied by a cover letter signed by Kriegel, projected that

as a result of the Cash Sweep, the First Lien Debt would decrease from $1.13 billion upon the

closing of the Leveraged Recap Transaction to $711 million at the end of 2010. This statement

was not based on reasonable assumptions, omitted material facts and was false and misleading

based on information available at the time it was made and as actual events proved. For instance, in order to project large paydowns of the loan principal starting in 2010, K Road misstated Hedge revenues (which were not, in any event, even negotiated more than three years out) and projected hockey-stick style jumps in FCM payments in 2010. In reality, once the floor for FCM payments was removed in 2010, there was no reason to assume any revenues on FCM payments, let alone growth.

115.    The CIM-PS included projections that assumed the Hedges would assure a "contracted EBITDA" of $163 million despite the limited hedge coverage and known variability of FCM payments.

116.    The LP was prepared almost exclusively by K Road as Asset Manager, and stated that its professionals had been "intimately involved" with BostonGen, having "acquired and developed the assets, led last year's recapitalization and managed the assets since then." The LP assured investors that long-term Hedges in combination with FCM payments "will provide stable cash flow to support increased leverage." This statement was utterly misleading because FCM payments were known to be variable based on competitive market forces, and the Hedges were incomplete. Similarly, the LP cited a stable "net energy margin based on fully-approved FCM payments and long-term commodity hedges," and projected significant deleveraging as a result of the Cash Sweep. Allegedly, these devices would result in approximately $163 million of "pro forma contracted net energy margin." The LP assured prospective lenders that "[w]ith hedge and FCM revenues BostonGen will have substantially all of its net energy margin contracted during the term of the hedges." Because of the way the Hedges actually functioned, these statements were untrue. In addition, the LP suggested that the market was constrained by "import transmission constraints," that a tightening supply and demand balance in the service area would produce

"higher spark spreads over time," and that "high barriers to entry defer new entrants into the Boston load pocket." These statements were not true. As K Road knew and internally acknowledged, there was in fact a potential "oversupply" from new generators being connected to the New England Power Pool ("**NEPOOL**") market. Finally, the attempt by K Road to characterize the Debtors as contract generators with a lower risk profile, and to use words like "stable" margin and "contract" margins, were themselves false and misleading by implying a risk profile for the transaction that bore no resemblance to the actual situation presented by the market risks and incomplete Hedge coverage.

## VIII.    THE LEVERAGED RECAP TRANSACTION

### A.    The Approval Process

117.    The Leveraged Recap Transaction was approved by the EBG Board of Directors based upon the recommendation of K Road, per the terms to which K Road/Harbinger had previously agreed, and the Debtors' loans were rated for syndication. The K Road Director of Finance, Ehrenzeller, certified the solvency of EBG and BostonGen to the lenders following the Leveraged Recap Transaction with specific reference to the various statutory definitions of insolvency—but in the next statement, while aware of the falsity of his statements, purported to disclaim responsibility: "I do not hold myself out as an expert on, and have not in connection with this Certificate...engaged the services of any expert on asset valuation or appraisal, and any statements made herein as to the value of assets are made to best of my knowledge without having made any special investigation with respect thereto." However, Ehrenzeller, a K Road officer, actually prepared the Projections.

118.    As part of the process of pushing the Leveraged Recap Transaction through, it was necessary to have the debt to be issued be rated by both Moody's Investors Service ("**Moody's**") and Standard & Poor's Rating Services ("**S&P**" and together with Moody's, the "**Rating**

42

Agencies"). Significantly, as was known to K Road, both of the Rating Agencies were provided materially misleading financial information reflected in the Projections, and thus indirectly and unwittingly contributed to the public dissemination of fraudulent, false and misleading information.

119.    The K Road Rating Agency presentation dated November 9, 2006 contained similar misrepresentations and omissions to those disseminated in the CIM, CIM-PS, and LP regarding "highly stable net energy margin," "contracted net energy margin," and a purported "congested Boston load pocket." The debt ratings were therefore fraudulent as well.

## B.    K Road and the K Road Insiders Conceal Their Fraud

120.    As described elsewhere in this Complaint, K Road and the K Road Insiders took affirmative steps to, or knew that others were taking affirmative steps to, conceal their fraudulent activities. These affirmative steps include, without limitation: (a) preparing and disseminating Projections that differed materially from contemporaneously prepared internal projections, and not disclosing this fact to prospective lenders; (b) describing the Hedges as assuring a net Hedge energy margin and a contracted spread; (c) concealing internal models from the lenders based on purported Hedge confidentiality concerns; (d) informing employees working on the Leveraged Recap Transaction that it was not necessary for them to see the Hedge documents; and (e) failing to inform Duff & Phelps, Navigant, Black & Veatch, S&P and Moody's about each of the above while at the same time knowing that such entities were publicly disseminating materially incorrect information.

121.    CSE, the Hedge counterparty, was not a participant in the Leveraged Recap Transaction, and was never provided with the Lender Materials or Projections, and could therefore not have alerted any Lender, including its presumed affiliate Credit Suisse AG (Cayman Islands

Branch)7 to the fraud.  CSE and Credit Suisse AG (Cayman Islands Branch) had separate employees, offices, and informational walls.  Even if CSE had received the Lender Materials, however, K Road was careful to conceal the internal data that contradicted the Projections from CSE.  Shortly after the Leveraged Recap Transaction closed, on January 12, CSE requested a tour of the Mystic 8/9 facility, launching a flurry of nervous e-mails amongst the K Road Insiders.  Mark Friedland eventually decided to send Tony Corso, the only K Road officer not involved in negotiating the Hedges or drafting materials for the Leveraged Recap Transaction, to supervise the tour, but warned "I share Paul [Hamilton's] concerns regarding the desire to see the plants when the Hedge is financial.  However, they may simply be exercising friendly customer relations.  The visit is fine, but we should be careful not to discuss specific operating characteristics, such as ramp time, day ahead operations, or real time operations – especially in light of today's discussions."

C.    **The Leveraged Recap Transaction Is Consummated**

122.    On December 21, 2006, BostonGen entered into two credit facility agreements (the "**First Lien Credit Facility**" and the "**Second Lien Credit Facility**") (attached hereto as Exhibits E and F, respectively) with Credit Suisse AG, Cayman Islands Branch and Goldman Sachs Credit Partners L.P. (the **Initial Lenders**"): a first lien credit facility in the amount of $1.45 billion (the "**First Lien Debt**") and a second lien credit facility in the amount of $350 million (the "**Second Lien Debt**"). The remaining Debtors other than EBG (the "**Guarantors**") issued guarantees of the First Lien Debt and the Second Lien Debt, and the obligations of BostonGen and its subsidiaries were secured by first and second liens on substantially all of their assets.

123.    Also on December 21, 2006, EBG borrowed $300 million of so-called mezzanine debt on an unsecured basis (the "**Mezzanine Credit Facility**" (attached hereto as Exhibit G) and,

---

[7] Then called Credit Suisse, Cayman Islands Branch.

together with the First Lien Credit Facility and the Second Lien Credit Facility, the "**Credit Facilities**"), which provided for payment-in-kind ("**PIK**") interest (the "**Mezzanine Debt**"). The debt in the Credit Facilities was immediately syndicated, and the list of initial participants in the syndication (the "**Lenders**") is attached hereto as Exhibit B (the First Lien Credit Facility Lenders and Second Lien Credit Facility Lender) and Exhibit C (the Mezzanine Credit Facility Lenders).

124.    The proceeds of the First Lien Credit Facility and Second Lien Credit Facility were disbursed as follows: (a) BostonGen transferred approximately $708 million to EBG (the "**BG Transfer**"); (b) approximately $800 million was used to refinance existing debt; and (c) approximately $50 million was used to pay fees and expenses incurred in connection with the closing of the Credit Facilities. *See* Funds Flow Memorandum attached hereto as Exhibit H.

125.    On December 26, 2006 and December 28, 2006, EBG disbursed more than $1 billion, consisting of the $708 million that BostonGen had transferred to it, the $300 million of Mezzanine Debt, and certain of its own cash (the "**$1 Billion Redemption**"), as follows: (a) $34,996,291.24 in payment of dividends on EBG's members' equity interests (the "**Dividends**"); (b) $925,017,940 to redeem EBG's members' equity units pursuant to a tender offer (the "**Unit Redemptions**"); and (c) $50,359,127.13 in payment for the redemption of warrants held by K Road and certain individuals, including the K Road Insiders and other principals of K Road (the "**Warrant Redemptions**" and, together with the Dividends and the Unit Redemptions, the "**EBG Transfers**"). A non-exclusive list of the Transferee Defendants who or that received the EBG Transfers, or who or that benefited from the EBG Transfers, as well as the amounts of the EBG Transfers made to or for the benefit of each such Transferee Defendant, is set forth in Exhibit A, which is specifically made a part of this Complaint.

126.    Pursuant to the Dutch auction form of tender offer that Harbinger had required, each unit holder was offered the option to redeem as many of its units as it desired at a range of predetermined values between $310 and $350. These values bore no relationship to the market value of the units; there were no independent offers in that range. The ultimate $340/unit cost to EBG was always intended to be a windfall to the unit holders. The goal of the Leveraged Recap Transaction was always to "provide liquidity to unit holders," i.e., to loot the company for the benefit of its owners.

127.    The $1 Billion Redemption provided no benefit whatsoever to any of the Debtors or their respective creditors, and instead caused substantial damage.

128.    Upon consummation of the Leveraged Recap Transaction, K Road and Harbinger received the following: (a) $90,886,080 in redemption of 267,312 equity units; (b) $50,359,127.13 in exchange for 222,759 warrants redeemed by EBG; and (c) a dividend payment of $3,438,500, for a total of $144,683,707.13. Additionally, prior to the Leveraged Recap Transaction, Kriegel, Sullivan and Tohir received a combined $24,375,060 in exchange for 180,556 warrants purchased by Lehman directly from them, pursuant to a Warrant Purchase Agreement dated April 27, 2006.

## IX.    THE DEBTORS ARE INSOLVENT UPON THE CONSUMMATION OF THE LEVERAGED RECAP TRANSACTION

### A.    Balance Sheet Insolvency

129.    The financial statements that KPMG prepared for the Debtors show the Debtors as being balance sheet insolvent upon the completion of the Leveraged Recap Transaction.

Specifically, after the Leveraged Recap Transaction, EBG's liabilities exceeded its assets by $825,949,000,[8] and BostonGen's liabilities exceeded its assets by $535,398,000.[9]

130.    At the time of the Leveraged Recap Transaction, based upon the ownership structure of the organization, EBG's primary asset was its ownership interests in BostonGen and its largest liability consisted of the $300 million Mezzanine Debt. But, from a balance sheet perspective, BostonGen's assets and liabilities rolled up to EBG. Thus, if BostonGen was insolvent, EBG was also necessarily insolvent.  Similarly, BostonGen's assets stemmed primarily from its ownership interests in the operating subsidiaries and its largest liabilities consisted of the First Lien Debt and Second Lien Debt. From a balance sheet perspective, the assets and liabilities of the operating subsidiaries rolled up to BostonGen, and tallying the assets and liabilities of those subsidiaries with BostonGen's First Lien Debt and Second Lien Debt left BostonGen hopelessly insolvent upon the BG Transfer.

131.    Upon completion of the Leveraged Recap Transaction, both EBG and BostonGen were insolvent within the meaning of Section 101(32) of the Bankruptcy Code, and analogous provisions of applicable fraudulent conveyance law, in that the sum of their debts exceeded the going concern value of their property at fair valuation.

132.    A report issued by S&P dated December 7, 2006, stated that in the event of a bankruptcy BostonGen and EBG would be able to pay only "a meaningful recovery"—somewhere between 50% to 80%—on the Second Lien Debt. In such event, there would be little or no recovery on the Mezzanine Debt.

---

[8] The asset values were not depreciated or marked to market.  If the Debtors' assets were valued using K Road's internal projections, the assets were worth even less.

[9] The Leveraged Recap Transaction closed on or about December 21, 2006, and financial statements are as of December 31, 2006. The figures in the Projections were a negative $826.1 million for EBG and a negative $560 million for BostonGen.

133.    To determine whether EBG and BostonGen were insolvent on a discounted cash flow basis, various adjustments were made to correct the errors in the Projections. Each of these adjustments reflects information known and available to K Road in December 2006, and does not adjust for subsequent developments. The equity value of both EBG and BostonGen were negative by hundreds of millions of dollars. EBG had no earnings or profits in 2006.

134.    EBG merged with Astoria Generating Company Holdings LLC ("**Astoria**") on or about February 28, 2007 in an all-stock deal.  The merger was structured such that both EBG and Astoria became wholly owned subsidiaries of a new parent company, US Power Generating Company ("**USPG**").  No cash consideration was given to EBG or any of its members, nor did Astoria Group or USPG subsequently invest any new capital in the Debtors.  The $3 billion dollar valuation of USPG was simply generated by adding the value of the Debtors internally generated by K Road to the value of Astoria.   In any event, USPG took a goodwill impairment of over $250 million less than a year after the merger closed, as it became obvious to the new management that their internal operational results could not be squared with K Road's Projections.  As events would show in bankruptcy, K Road's valuation of EBG was as false as the Projections had been.

135.    K Road and Harbinger planned to make their escape as soon as the merger was completed; in January 2007, Kagan asked Kriegel anxiously, "Would this transaction create a liquidity even [sic] for all our remainin [sic] collective units?"  Kriegel responded "We request that all our shares will have no restriction at IPO and after," attaching a merger term sheet dictating that an IPO be accomplished "as soon as possible."   They planned, therefore, to have no further equity interest in the insolvent companies.  Astoria similarly anticipated an IPO of the Debtors, which would leave its ultimate parent, Madison Dearborn with control over USPG and access to the capital markets through the combined larger entity.  Although USPG registered for an IPO in

2008, no IPO ever closed.  After years of underperformance compared to K Road's Projections, USPG spun the Debtors off in the instant bankruptcy proceeding.

**B.**    **Unreasonably Small Capital**

136.    As a result of the Leveraged Recap Transaction, BostonGen and EBG had engaged in businesses and transactions for which the property remaining was an unreasonably small capital. Indeed, EBG had no operations of its own, so the only way in which it could pay off the Mezzanine Debt was to receive a distribution from BostonGen. But, BostonGen would have been unable to issue such a distribution to EBG because it had insufficient capital to pay its own debts, including the First Lien Debts and Second Lien Debts, among others, as they matured. Moreover, BostonGen also had inadequate capital to cover its exposure to hidden or concealed liabilities arising from the Hedges. In other words, the Leveraged Recap Transaction doomed EBG and BostonGen to failure.

137.    The level of the BostonGen's capital was based largely on the Projections and the assumptions noted herein. But, in actuality, the assumptions were false and untrue, and the Hedges did not eliminate market risk. BostonGen made no provision for these undisclosed liabilities that resulted in much lower than projected cash flow, no payments of excess cash flow to reduce debt, the need to transfer reserves to satisfy covenants, and ultimately, the certainty that covenants would be breached, which led to bankruptcy.

138.    At no time was BostonGen's capital adequate to pay the principal on the First Lien Debt, the Second Lien Debt and the Mezzanine Debt from cash on hand when each became due in 2013, 2014 and 2016, respectively. In fact, under the Credit Facilities, only minimal annual principal payments of $11 million were required on the First Lien Debt, no payments were required on the Second Lien Debt, and PIK interest accrued on the Mezzanine Debt. In addition, the First Lien Credit Facility had the Cash Sweep, which required all surplus cash flow to be used to pay down the First Lien Debt. BostonGen and EBG showed an ostensible lack of concern regarding

49

the inadequacy of their capital and their inability to pay their debts as they became due because (a) the Projections falsely showed that the business would generate a great deal of surplus cash, especially for a business that had relatively stable operating expenses, (b) the Hedges purportedly immunized them from market pricing risks, (c) the First Lien Debt was "covenant light" and BostonGen was well above compliance levels for the only financial covenants, such that there was little danger of breaching covenants, (d) there was a projected reduction of the First Lien Debt by almost $1.06 billion by its due date in 2013, which fact, together with the unreasonable expectation of an increase in FCM pricing, would make it easy to refinance the debt, and (e) they anticipated an IPO or other transaction which would pass their problems into other hands. Indeed, K Road misled S&P and Moody's that the major market pricing risks were hedged until 2010 and the FCM rates were fixed through 2009, and that the risks were manageable, even though there was an aggressive financial structure resulting in weak projected financial metrics and potentially large refinancing risks.

139.    The financial covenants in the Credit Agreements contained extremely high leverage ratios. BostonGen's debt-to-earnings ratio was initially allowed to be as high as 11:1, falling to only 9:1 by 2010. By contrast, at the time of the merger, Astoria's debt-to-earnings ratio was only 4.5:1. The coverage ratios were also relaxed, and tied to interest payments, rather than principal reductions. The interest-to-earnings ratio rose from 1.05:1 to only 1.25:1, allowing BostonGen to operate while paying down minimal principal. The Credit Agreements also allowed BostonGen and EBG to cure covenant defaults with cash payments—something they were ultimately required to do, relaxed covenants notwithstanding.

140.    In sum, EBG's and BostonGen's remaining capital after the Leveraged Recap Transaction was far from adequate. EBG and BostonGen emerged from the Leveraged Recap

Transaction with only enough cash to satisfy immediate operating expenses, but K Road and the K Road Insiders knew that both EBG and BostonGen would be unable to satisfy obligations in the future or pay long-term obligations, even though they were able to continue operations for an interim period and would be able to take steps to postpone or delay an inevitable bankruptcy. Results deteriorated as soon as the first quarter of 2007, when cash flows were seriously impacted by the Floating Payments, the projected cash flow and debt reduction never happened.

141.    The below chart shows BostonGen's actual cash flows compared to those in the Projections:

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Projections | $197.7 mm | $195.3 mm | $187.5 mm | $226.7 mm |
| Actual Operational Cash Flow | $29.2 mm | ($37.2 mm) | $37.6 mm | No statements |

142.    By the third quarter of 2007, the BostonGen had to use cash from reserves— borrowed proceeds of the Leveraged Recap Transaction—to satisfy debt and liquidity covenants. In September 2008, EBG and BostonGen retained restructuring advisors, and by mid-2009, were telling their lenders that they were close to a default and that the Second Lien Debt and the Mezzanine Debt should be converted to equity.

## C.    Debt Incurrence

143.    Upon the closing of the Leveraged Recap Transaction in December 2006, the EBG and BostonGen intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

144.    The EBG and BostonGen knew or should have known that they would be unable to pay the First Lien Debt, the Second Lien Debt and/or the Mezzanine Debt upon maturity. Acting under K Road/Harbinger's domination and control, EBG and BostonGen assumed, contrary to

fact, that there would be a fixed energy margin that would permit them to pay down almost all of

the First Lien Debt by its maturity date. In fact, this assumption was untrue and known to be untrue

by K Road at the time. The assumption was based on the Projections, which for the reasons set

forth in this Complaint were false and misleading, and the failure to account for the material risks

and liabilities from the Hedges, which depleted cash that was supposed to be available and payable.

145.    The documents evidencing the First Lien Debt and the Second Lien Debt required

only minimal annual reductions in principal of $11 million on the First Lien Debt and no reductions

in principal on the Second Lien Debt. The Projections, although false and misleading, nevertheless

failed to evidence an ability to pay the First Lien Debt, the Second Lien Debt, and the Mezzanine

Debt upon maturity.   Instead, the Projections were based on the premise that the EBG and

BostonGen should have been able to pay down almost all of the First Lien Debt by maturity and,

with such reduced leverage, refinance their remaining debts. Their explanation was that there

would be substantial payments on the principal of the First Lien Debt pursuant to the Cash Sweep,

which would result in a reduction in First Lien Debt from $1.13 billion at closing, to $731 million

by the end of 2010, and to $74 million by the end of 2013. In fact, by the Petition Date, there were

no reductions in principal beyond the mandatory annual reductions of $11 million and the total of

the First Lien Debt, the Second Lien Debt, and the Mezzanine Debt was greater than at the time

of the closing of the Leveraged Recap Transaction.

## X.    CAUSES OF ACTION

### A.    Claims against The Transferee Defendants, Individually And As Class Representatives, And The Other Class Members

**COUNT ONE: Avoidance Of The Dividends, The Unit Redemptions And The Warrant Redemptions As Actual Fraudulent Conveyances Under Debt. & Cred. Law §§ 276, 278[10] on behalf of the creditors of EBG**

---

[10] Should the Court determine that the law of another jurisdiction applies to this Count or any other Count set forth in this Complaint, the Liquidating Trustee asserts such Count(s) pursuant to the applicable laws of such jurisdiction.

146.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 145 above as if fully set forth at length herein.

147.    This Count is asserted on behalf of all creditors of EBG within the definition of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law ("**Debt. & Cred. Law**") whose claims have been assigned to the Liquidating Trustee as described in Paragraph 4 (the "**EBG Creditors**"), which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise.

148.    There are both then-existing and future creditors as to whom the EBG Transfers were actually fraudulent.

149.    K Road, at the direction of Harbinger and with the consent of the Nominating Committee, caused BostonGen to transfer $708 million to EBG as a member distribution.

150.    Using the $708 million it received from BostonGen, together with the proceeds from the Mezzanine Credit Facility, K Road, at the direction of Harbinger and with the consent of the Nominating Committee, then caused EBG to transfer the Dividends, the Unit Redemptions, and the Warrant Redemptions to or for the benefit of the Transferee Defendants and other Class Members identified on Exhibit A.

151.    From the K Road offices in New York, K Road conceived and carried out their scheme with actual intent to hinder, delay, or defraud present and future creditors of EBG. Such intent can be inferred from the traditional "badges of fraud" surrounding the Leveraged Recap Transaction and the EBG Transfers.

152.    Each of the Transfers involved numerous badges of fraud including, without limitation, the following:

(a)    the EBG Transfers occurred at the same time substantial new debts were incurred by EBG;

(b)    the EBG Transfers removed more than $1 billion of liquidity from EBG, and such funds were employed for the benefit of holders of equity, thereby transferring financial risk from holders of equity to creditors;

(c)    EBG was rendered insolvent by the EBG Transfers under the New York Debtor & Creditor Law, and it was left with inadequate capital for its future operations;

(d)    EBG knew that it could not pay its debts as they became due as a result of the EBG Transfers;

(e)    EBG was balance-sheet insolvent as a result of the EBG Transfers;

(f)    EGB knew that, had it been placed in bankruptcy on the date of the EBG Transfers, it could not pay its creditors in full;

(g)    K Road and its officers and directors, including the K Road Insiders and Harbinger, dominated and controlled EBG, comprised the senior management of EBG, and were significant beneficiaries of the EBG Transfers in an amount exceeding $150 million;

(h)    EBG received no value or consideration in exchange for the EBG Transfers;

(i)    the EBG Transfers were made on the basis of the Projections, which EBG knew were false and misleading;

(j)    K Road and the K Road Insiders knowingly manipulated the Projections, obscuring the partial absence of the Hedges, and the impact of the Hedge Imperfections;

(k)    K Road and the K Road Insiders knowingly concealed the market risks and contingent liabilities reflected in the Hedge Imperfections;

(l)    the EBG Transfers were made on the basis of the Projections, which were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders;

(m)    the EBG Transfers were made on the entirely unrealistic assumption that, within a few years of the EBG Transfers, an IPO or other "take out" transaction would cure or lessen the financial risks of the Leveraged Recap Transaction and lessen the risks of liability;

(n)    K Road and the K Road Insiders purposely failed to disclose the impact of the Hedges because they feared disclosure would show significant risks,

would be inconsistent with Projections, and would jeopardize the closing of the Leveraged Recap Transaction;

(o)    K Road and the K Road Insiders deliberately concealed the existence and influence of their joint-venture partner Harbinger;

(p)    K Road and the K Road Insiders knowingly made false and misleading statements that the Hedges would result in an assured net energy margin, would result in a contracted energy margin, and would immunize EBG from market risks;

(q)    K Road and the K Road Insiders maintained a separate financial model that was intentionally concealed from creditors, advisors and the Rating Agencies because it contained "confidential information, including details on the hedge program";

(r)    the Projections were based on an alleged future shortage of generating capacity, which was contradicted by contemporaneous industry reports known to K Road and the K Road Insiders;

(s)    Harbinger and K Road immediately distributed the proceeds of the Leveraged Recap Transaction through shell LLCs, which they thereafter dissolved; and

(t)    EBG failed to meet the Projections immediately after the Leveraged Recap Transaction up until the filing of the Chapter 11 Cases.

These badges of fraud are collectively defined as the "**Badges of Fraud**."

153.    As a direct and proximate result of the foregoing, each of the EBG Transfers set forth in Exhibit A attached hereto and made a part hereof is fraudulent as to each EBG Creditor. As such, pursuant to Debt. & Cred. Law §278, the Liquidating Trustee may set aside or annul each of the EBG Transfers as against each of the Transferee Defendants in an amount necessary to satisfy the claims of the EBG Creditors.

154.    Thus, the Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the EBG Transfers as actually fraudulent conveyances, plus pre-judgment interest

thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees pursuant to

Debt. & Cred. Law § 276-a and costs.

### COUNT TWO: Avoidance Of BostonGen's Distribution to EBG As An Actual Fraudulent Conveyance Under Debt. & Cred. Law §§ 276, 278 on behalf of the creditors of BostonGen

155.    The Liquidating Trustee repeats and incorporates by reference each and every

allegation contained in Paragraphs 1 through 154 above as if fully set forth at length herein.

156.    This Count is asserted on behalf of all creditors of BostonGen within the definition

of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law ("**Debt.**

**& Cred. Law**") whose claims have been assigned to the Liquidating Trustee as described in

Paragraph 4 (the "**BostonGen Creditors**"), which claims include their own claims and those that

had been assigned to them by prior creditors or their predecessors or successors, by operation of

law, or otherwise.

157.    Through this cause of action, the Liquidating Trustee is seeking to avoid the BG

Transfer and recover from each of the Transferee Defendants as subsequent transferees of the BG

Transfer.

158.    There are both then-existing and future creditors as to whom the BG Transfer was

actually fraudulent.

159.    K Road, at the direction of Harbinger and with the consent of the Nominating

Committee, caused BostonGen to transfer $708 million to EBG as a member distribution.

160.    Using that $708 million, together with the proceeds from the Mezzanine Credit

Facility, K Road, at the direction of Harbinger and with the consent of the Nominating Committee,

then caused EBG to transfer the Dividends, the Unit Redemptions, and the Warrant Redemptions

to or for the benefit of the Transferee Defendants and other Class Members identified on Exhibit A.

161.    From the K Road offices in New York, K Road conceived and carried out their scheme with actual intent to hinder, delay, or defraud present and future creditors. Such intent can be inferred from the traditional badges of fraud surrounding the Leveraged Recap Transaction and the BG Transfer.

162.    The BG Transfer involved numerous Badges of Fraud including, without limitation, the following:

(a)    the BG Transfers occurred at the same time substantial new debts were incurred by BostonGen;

(b)    The BG Transfer removed more than $700 million of liquidity from BostonGen, and such funds were employed for the benefit of EBG, thereby transferring financial risk from holders of equity to creditors;

(c)    BostonGen was rendered insolvent by the BG Transfer under the New York Debtor & Creditor Law, and was left with inadequate capital for their future operations;

(d)    BostonGen knew that it could not pay its debts as they became due as a result of the BG Transfer;

(e)    BostonGen was balance sheet insolvent as a result of the BG Transfer;

(f)    BostonGen knew that, had it been placed in bankruptcy on the date of the BG Transfer, it could not pay its creditors in full;

(g)    BostonGen received no value or consideration in exchange for the BG Transfer;

(h)    the BG Transfer was made on the basis of the Projections, which BostonGen knew were false and misleading;

(i)    K Road and the K Road Insiders knowingly manipulated the Projections, obscuring the partial absence of the Hedges, and the impact of the Hedge Imperfections;

(k)    K Road and the K Road Insiders knowingly concealed the market risks and contingent liabilities reflected in the Hedge Imperfections;

(l)    the BG Transfer was made on the basis of the Projections, which were inconsistent in material respects with contemporaneous budgets prepared by K Road and the K Road Insiders;

(m)    the BG Transfer was made on the entirely unrealistic assumption that, within a few years of the BG Transfer, an IPO or other "take out" transaction would cure or lessen the financial risks of the Leveraged Recap Transaction and lessen the risks of liability;

(n)    K Road and the K Road Insiders purposely failed to disclose the impact of the Hedges because they feared disclosure would show significant risks, would be inconsistent with Projections, and would jeopardize the closing of the Leveraged Recap Transaction;

(o)    K Road and the K Road Insiders deliberately concealed the existence and influence of their joint-venture partner Harbinger;

(p)    K Road and the K Road Insiders knowingly made false and misleading statements that the Hedges would result in an assured net energy margin, would result in a contracted energy margin, and would immunize BostonGen from market risks;

(q)    K Road and the K Road Insiders maintained a separate financial model that was intentionally concealed from creditors, advisors and the Rating Agencies because it contained "confidential information, including details on the hedge program";

(r)    the Projections were based on an alleged future shortage of generating capacity, which was contradicted by contemporaneous industry reports known to K Road and the K Road Insiders;

(s)    Harbinger and K Road immediately distributed the proceeds of the Leveraged Recap Transaction through shell LLCs, which they thereafter dissolved; and

(t)    BostonGen failed to meet the Projections immediately after the Leveraged Recap Transaction up until the filing of the Chapter 11 Cases.

163.    As a direct and proximate result of the foregoing, the BG Transfer is fraudulent as to each BostonGen Creditor. As such, pursuant to Debt. & Cred. Law § 278, the Liquidating Trustee may set aside or annul the BG Transfer. In addition, pursuant to Debt. & Cred. Law § 278, the Liquidating Trustee may set aside or annul the transfer as against each of the Transferee

Defendants, each of whom subsequently received the proceeds of the BG Transfer, in an amount necessary to satisfy the claims of the BostonGen Creditors.

164.   Thus, the Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the BG Transfer as an actually fraudulent conveyance, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees pursuant to Debt. & Cred. Law § 276-a and costs.

### COUNT THREE: Avoidance Of The Dividends, The Unit Redemptions And The Warrant Redemptions As Constructive Fraudulent Conveyances Under Debt. & Cred. Law §§ 273-275, 278 on behalf of the EBG Creditors.

165.   The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 164 above as if fully set forth at length herein.

166.   This Count is asserted on behalf of all EBG Creditors.

167.   On or about December 26, 2006 and December 28, 2006, K Road directed EBG to transfer money or property to or for the benefit of each of the Transferee Defendants and other Class Members. Such Transfers purported to be in payment of a dividend on the equity membership interest of relevant Transferee Defendants as described above and defined above as the Dividends in the amount of $34,996,291.24, to redeem warrants of relevant Transferee Defendants as described above and defined above as the Warrant Redemptions in the amount of $50,359,127.13, and to redeem the equity membership interests of relevant Transferee Defendants as described above and defined above as the Unit Redemptions in the amount of $925,017,940. The total of the EBG Transfers was $1,010,373,358.37.

168.   The EBG Transfers were the final step in a scheme developed by K Road, the K Road Insiders, the Nominating Committee, and Harbinger. Harbinger owned significant debt and

equity interests in several K Road entities, and stood to gain directly and indirectly from the fraudulent scheme. The Nominating Committee owned the majority of the EBG units. At Harbinger and the Nominating Committee's urging, K Road embarked on a planned strategy to extract equity from EBG, ultimately culminating in the Leveraged Recap Transaction that is the basis of this lawsuit. The Nominating Committee consented to K Road's plan, and each member reaped the benefits of the Leveraged Recap Transaction through immediate or mediate conveyances from EBG. The Leveraged Recap Transaction, however, was based on a fraudulent scheme to raise money from lenders based on the strength of the falsified Projections, other misrepresentations to lenders, and fraudulent concealment of the relationship between Harbinger and K Road. The EBG Transfers were the end-goal of K Road/Harbinger's fraudulent scheme, but K Road's fraud continued throughout the several steps required to complete the EBG Transfers.

169.    As a result of the EBG Transfers, the fair salable value of EBG's assets was less than the amount that would be required to pay its probable liability on its existing debts as they become absolute and matured. Consequently, EBG was insolvent or was rendered insolvent by the EBG Transfers.

170.    Furthermore, EBG did not receive fair consideration for the EBG Transfers, which were made at a time when it was insolvent, or would be made insolvent thereby. The EBG Transfers furnished no value to EBG. No recipient of the EBG Transfers conveyed fairly equivalent property or discharged an equivalent antecedent debt based on the EBG Transfers. Consequently, the EBG Transfers are fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

171.    At the time of the EBG Transfers, EBG was engaged or was about to engage in business or transactions for which its remaining property was an unreasonably small capital, and

each of the EBG Transfers was therefore fraudulent as to then-existing creditors, including those who became creditors in connection with the Leveraged Recap Transaction, as well as fraudulent to creditors who became creditors during the continuation of EBG's business. More specifically, as further described above, as a result of EBG's precarious financial condition, it was doomed to fail. EBG's projections were neither reasonable nor prudent when made; EBG was insolvent or at a minimum it had an extremely high debt to equity ratio; and EBG did not have a reasonable capital cushion.

172.    At the time of the EBG Transfers, EBG intended or believed it would incur debts beyond its ability to pay as they matured, and each of the EBG Transfers was therefore fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction. More specifically, as described above, EBG knew that its projections were fraudulent or, at the very least, neither reasonable nor prudent. Accordingly, EBG knew that it would not be able to pay its debts as they matured.

173.    There are both then-existing and future creditors as to whom the EBG Transfers were constructively fraudulent.

174.    As a direct and proximate result of the foregoing, each of the EBG Transfers set forth in Exhibit A attached hereto and made a part hereof is fraudulent as to each EBG Creditor. As such, pursuant to Debt. & Cred. Law § 278, the Liquidating Trustee may set aside or annul each of the EBG Transfers as against each of the Transferee Defendants in an amount necessary to satisfy the claims of the EBG Creditors.

175.    Thus, the Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the EBG Transfers as constructively fraudulent conveyances, plus pre-judgment

interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees and costs.

### COUNT FOUR: Avoidance Of BostonGen's Distribution to EBG As A Constructive Fraudulent Conveyance Under Debt. & Cred. Law §§ 273-275, 278 on behalf of the BostonGen Creditors.

176.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 191 above as if fully set forth at length herein.

177.    This Count is asserted on behalf of all BostonGen Creditors.

178.    Through this cause of action, the Liquidating Trustee is seeking to avoid the BG Transfer and recover from each of the Transferee Defendants as subsequent transferees of the BG Transfer.

179.    On or about December 26, 2006 and December 28, 2006, K Road directed BostonGen to transfer approximately $708 million to EBG as an LLC membership distribution. EBG subsequently transferred the proceeds of the BG Transfer to or for the benefit of the Transferee Defendants and other Class Members in the form of: (1) a dividend on the equity membership interest of relevant Transferee Defendants as described above and defined above as the Dividends in the amount of $34,996,291.24: (2) warrant redemptions of relevant Transferee Defendants as described above and defined above as the Warrant Redemptions in the amount of $50,359,127.13; and (3) redemptions of the equity membership interests of relevant Transferee Defendants as described above and defined above as the Unit Redemptions in the amount of $925,017,940.

180.    As a result of the BG Transfer, the fair salable value of BostonGen's assets was less than the amount that would be required to pay its probable liability on its existing debts as they

become absolute and matured. Consequently, BostonGen was insolvent or was rendered insolvent by the BG Transfer.

181.    Furthermore, BostonGen did not receive fair consideration for the BG Transfer, which was made at a time when BostonGen was insolvent, or would be made insolvent thereby. Indeed, BostonGen received no value for the BG Transfer. Consequently, the BG Transfer is fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction.

182.    At the time of the BG Transfer, BostonGen was engaged or was about to engage in business or transactions for which its remaining property was an unreasonably small capital, and the BG Transfer was therefore fraudulent as to then-existing creditors, including those who became creditors in connection with the Leveraged Recap Transaction, as well as fraudulent to creditors who became creditors during the continuation of BostonGen's business. More specifically, as further described above, as a result of BostonGen's precarious financial condition, it was doomed to fail. BostonGen's projections were neither reasonable nor prudent when made; BostonGen was insolvent or at a minimum it had an extremely high debt to equity ratio; and BostonGEn did not have a reasonable capital cushion.

183.    At the time of the BG Transfer, BostonGen intended or believed it would incur debts beyond its ability to pay as they matured, and the BG Transfer was therefore fraudulent as to then-existing and future creditors, including those who became creditors in connection with the Leveraged Recap Transaction. More specifically, as described above, BostonGen knew that its projections were fraudulent or, at the very least, neither reasonable nor prudent. Accordingly, BostonGen knew that it would not be able to pay its debts as they matured.

184.    There are both then-existing and future creditors as to whom the BG Transfer was constructively fraudulent.

185.    As a direct and proximate result of the foregoing, the BG Transfer is fraudulent as to each BostonGen Creditor. As such, pursuant to Debt. & Cred. Law §278, the Liquidating Trustee may set aside or annul the BG Transfer. In addition, pursuant to Debt. & Cred. Law § 278, the Liquidating Trustee may set aside or annul the transfer as against each of the Transferee Defendants, each of whom subsequently received the proceeds of the BG Transfer, in an amount necessary to satisfy the claims of the BostonGen Creditors.

186.    Thus, the Liquidating Trustee requests a judgment in his favor and against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, setting aside the BG Transfer as a constructively fraudulent conveyance, plus pre-judgment interest thereof at the applicable rate, post-judgment interest, and reasonable attorneys' fees and costs.

### COUNT FIVE: Unjust Enrichment

187.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 202 above as if fully set forth at length herein.

188.    This Count is asserted on behalf of the EBG Creditors and the BostonGen Creditors. Upon information and belief, the creditor claims described herein exceed $800 million.

189.    Each of the Transferee Defendants and other Class Members was unjustly enriched because each received the Transfers set forth in Exhibit A attached hereto and made a part hereof in exchange for no consideration or value.

190.    As set forth above, K Road and the K Road Insiders engaged in self-dealing, prepared and disseminated the false Projections, made material misrepresentations and omissions, had actual conflicts of interests and took undue advantage of the Debtors by planning, soliciting

funds for, approving and executing the Leveraged Recap Transaction, and requiring both BostonGen and EBG to make the EBG and BG Transfers for no value to EBG, BostonGen or their creditors.

191.    The unjust enrichment was at the expense of the EBG Creditors and BostonGen Creditors because it removed assets from the Debtors that should have been available to pay their debts and for which the Transferee Defendants and other Class Members gave no value or consideration. The unjust enrichment also transferred financial risk from holders of equity to creditors by removing value, causing the Debtors to become overleveraged and, ultimately, caused the Debtors' bankruptcy.

192.    Allowing the Transferee Defendants, including Class Members, to retain the funds would be unjust because it would reward them for engaging in a high-risk transaction that transferred risk from holders of equity to creditors, and created market and financial risks that ultimately have been borne by creditors instead of appropriately borne by holders of equity. In fact, after K Road and the K Road Insiders divested themselves of their interests in the Debtors, the Debtors new management acknowledged that the Leveraged Recap Transaction "relied on certain assumptions in key revenue categories that have not materialized," and "[a]ctual and projected performance have deteriorated significantly since [EBG] was recapitalized in December 2006." The Transferee Defendants and other Class Members were unjustly enriched by imposing equity level risks on creditors without accurate disclosure or compensation and retaining the upside for themselves.

193.    The transfer of risk was reflected in results immediately after the Leveraged Recap Transaction, as is shown above, and the failure by a significant amount to meet the Projections in the very first calendar quarter after the Leveraged Recap Transaction. It was also reflected in the

facts that the amount of the projected reduction of debt, which never occurred, was virtually identical to the overestimate of future EBITDA, and that the amount of debt that the Debtors proposed to be converted to equity in 2009 was greater than the total of the Second Lien Debt and the Mezzanine Debt.

194.    There is no adequate remedy at law, as many limited liability company defendants were purportedly cancelled soon after the Leveraged Recap Transaction without reserving assets to pay claims of creditors.

195.    The Debtors were under the domination and control of K Road and were unable to assert their own legal rights.

196.    As a direct and proximate result of the foregoing, this Court should find that the Transferee Defendants, individually and as Class Representatives, and other Class Members have been unjustly enriched, and that the EBG Creditors and BostonGen Creditors whose claims and causes of action have been assigned to the Liquidating Trust as described in Paragraph 4, have been damaged thereby in an amount to be determined at trial. Equity and good conscience demand the return of the funds received by the Transferee Defendants to the Liquidating Trust, or an award of damages equivalent to the amount by which the Transferee Defendants, individually and as Class Representatives, and other Class Members, were unjustly enriched, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs.

**Discovery Rule**

197.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 196 above as if fully set forth at length herein.

198.    The creditors of the Debtors were unaware of the facts constituting the causes of action described above until the Debtors' bankruptcy exposed their internal documents.

Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. Defendants manufactured a situation calculated to frustrate the discovery of their fraudulent conduct.

199.    Furthermore, K Road managed the Debtors from its office in New York, not the BostonGen headquarters in Massachusetts. The K Road Insiders communicated with each other and their consultants, attorneys, and other advisors via their own kroadpower.com domain, which was not hosted on the BostonGen servers.  The Debtors and their creditors had no access to those documents until 2012, when K Road made a limited document production in the Liquidating Trustee's Rule 2004 examination. Further discovery will doubtless expose more details of the fraud. The Liquidating Trustee pleads that the statute of limitations was tolled or that the claims asserted herein did not accrue until some point after the Petition Date.

## Equitable Tolling

200.    The Liquidating Trustee repeats and incorporates by reference each and every allegation contained in Paragraphs 1 through 199 above as if fully set forth at length herein.

201.    The creditors of the Debtors, and their assignee, the Liquidating Trustee, have pursued their rights diligently, but had no access to the Debtors' internal documents until after the bankruptcy filing and bankruptcy discovery process. The creditors of The Debtors were unaware of the facts constituting the causes of action described above due to K Road's extraordinary efforts to conceal those facts. Defendants are highly sophisticated, and deliberately used their expertise to manipulate the bankruptcy system and state laws to their advantage. K Road actively structured the Leveraged Recap Transaction to conceal discovery of their wrongdoing, and knowingly

postponed the Debtors' collapse until K Road could try to avail itself of statutory limitations periods. Defendants manufactured a situation calculated to frustrate the discovery of their fraudulent conduct. Further, the documents and information that would have put creditors of the Debtors, and their assignee, the Liquidating Trustee on notice of K Road's fraud were self-concealing, due to their confidential nature and K Road's active concealment.

202.    The Liquidating Trustee pleads equitable tolling of the applicable statutes of limitation until the discovery, after the Debtors' bankruptcy, of the facts constituting these causes of action.

203.    The statutes of limitations applicable to the claims alleged by the Liquidating Trustee in Counts One through Five are also equitably tolled from the Petition Date to at least the date upon which the Trustee abandoned the creditors' claims because during that time the creditors were prohibited from asserting their claims.

## Choice of Law

204.    New York law applies to each of the Liquidating Trustee's claims.

205.    At all times relevant to this Complaint, the Debtors' principal place of business was in New York, New York.  K Road's offices were located in New York, which is where they drafted the CIM, CIM-PS, and LP.  These materials were disseminated to the participants in the First Lien Debt, Second Lien Debt, and Mezzanine Debt in New York.  The Lender's Presentation took place in New York.  The documents evidencing the First Lien Debt, Second Lien Debt, and Mezzanine Debt all specify New York law.

206.    The Transfers were made via checks drawn on EBG's bank account in New York and deposited in Defendants' bank accounts, most or all of which were also located in New York.

The two initial lenders, Credit Suisse AG (Cayman Islands Branch) and Goldman Sachs Credit

Partners, L.P. made the loans from their New York offices.

## **PRAYER FOR RELIEF**

WHEREFORE, the Liquidating Trustee respectfully requests that this Court enter

judgment in favor of the Liquidating Trustee as follows:

a.    on Counts One and Three, against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, avoiding each of the EBG Transfers set forth in Exhibit A as fraudulent as to the EBG Creditors, recovering the same from the Transferee Defendants and other Class Members and preserving them for the benefit of the Liquidating Trust, and awarding pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

b.    on Count Two and Four, against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, avoiding the BG Transfer as fraudulent as to the BostonGen Creditors, recovering the same from the Transferee Defendants and other Class Members and preserving them for the benefit of the Liquidating Trust, and awarding pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs

c.    on Count Five, against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, determining that the Transferee Defendants and other Class members have been unjustly enriched at the expense of the EBG and BostonGen Creditors, and that EBG and BostonGen Creditors have been damaged in an amount to be determined at trial but believed to be in excess of $1 billion, and awarding such damages, together with pre-judgment interest at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

d.    as against the Transferee Defendants, individually and as Class Representatives, and the other Class Members, determining that the Transferee Defendants and other Class members have been unjustly enriched and impose a constructive trust over the amounts received by the Transferee Defendants, individually and as Class Representatives, and other Class Members in connection with the EBG and BG Transfers, for the benefit of the EBG and BostonGen Creditors, plus award prejudgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees and costs;

e.    certification of the Class pursuant to Civil Rule 23(a) and 23(b)(1)(B) and 23(b)(3), on behalf of the proposed defendant Class for Counts One through Five, and designation of the proposed Class Representatives as representatives of this Class, and appointing or designating Class Counsel to the defendant Class.

f.    finding that Harbinger Capital Partners, LLC is an alter-ego of Boston Harbor Power LLC and Power Management Financing LLC;

g.    awarding to the Liquidating Trustee the reasonable attorneys' fees and costs incurred in prosecuting this adversary proceeding;

h.    granting to the Liquidating Trustee such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 3, 2019

                              Respectfully submitted,

                              /s/ *William T. Reid, IV*
                              William T. Reid, IV
                              Gregory S. Schwegmann
                              Brandon V. Lewis (admitted *pro hac vice*)
                              **REID COLLINS & TSAI LLP**
                              810 Seventh Avenue, Suite 410
                              New York, NY 10019
                              Tel: 212.344.5200
                              Fax: 212.344.5299
                              wreid@rctlegal.com
                              gschwegmann@rctlegal.com
                              blewis@rctlegal.com

                              Joshua L. Hedrick (admitted *pro hac vice*)
                              Laura M. Fontaine (admitted *pro hac vice*)
                              **HEDRICK KRING PLLC**
                              1700 Pacific Avenue, Suite 4650
                              Dallas, TX 75201
                              Tel: 214.880.9600
                              Fax: 214.481.1844
                              josh@hedrickkring.com
                              laura@hedrickkring.com

                              *Attorneys for Plaintiff*
                              *Mark Holliday, the Liquidating Trustee of the*
                              *BosGen Liquidating Trust*

# EXHIBIT A

Unitholder Transferees

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | UNIT REDEMPTIONS | DIVIDENDS | TOTAL TRANSFERS |
|---|---|---|---|---|---|
| EX Orbit Group, Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | $311,088,100.00 | $4,906,072.96 | $315,994,172.96 |
| D.E. Shaw Laminar Portfolios LLC | Delaware | 1166 Avenue of the Americas Ninth Floor New York, NY 10036 or c/o its registered agent, The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, DE 19801 | $89,762,380.00 | $1,415,614.58 | $91,177,994.58 |
| Satellite Senior Income Fund LLC | Delaware | 10 East 50th Street 21st Floor New York, NY 10022 or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | $83,306,800.00 | $1,313,803.24 | $84,620,603.24 |
| Anchorage Capital Master Offshore II, Ltd. | Cayman Islands | 610 Broadway, 6th Floor New York NY 10012 | $56,639,920.00 | $1,781,211.77 | $58,421,131.77 |
| CMI Holdings Investments Ltd. | British Virgin Islands | 40 West 57th Street, 26th Floor New York, NY 10019 | $32,632,520.00 | $3,430,908.85 | $36,063,428.85 |
| The Raptor Global Portfolio Ltd. c/o Tudor Investment Corporation | Cayman Islands | 1275 King Street Greenwich, CT 06831 or The Raptor Global Portfolio Liquidating Trust c/o Wilmington Trust Company Rodney Square North 1100 North Market Street Wilmington, Delaware 19890 | $26,652,260.00 | $1,008,501.47 | $27,660,761.47 |
| Taconic Capital Partners 1.5 LP | Delaware | 450 Park Avenue, 8th Floor New York NY 10022 | $23,072,400.00 | $485,156.48 | $23,557,556.48 |
| Boston Generating Offshore Holdings Ltd. c/o Stonehill Capital Management LLC | Cayman Islands | 885 Third Avenue, 30th Floor New York, NY 10022 or c/o its registered agent, Walkers Corporate Service Limited PO Box Walker House 87 Mary Street George Town Grand Cayman KY1-9005 CAYMAN ISLANDS | $22,884,040.00 | $412,588.26 | $23,296,628.26 |
| Morgan Stanley & Co., LLC f/k/a Morgan Stanley & Co., Inc. | Delaware | 1585 Broadway New York, NY 10036 or c/o its registered agent, The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, DE 19801 | $19,958,340.00 | $1,523,049.19 | $21,481,389.19 |
| Goldman Sachs & Co. | | 200 West Street New York, NY 10282 | $18,176,400.00 | $710,436.42 | $18,886,836.42 |
| Stonehill Institutional Partners, LP | Delaware | 885 Third Avenue, 30th Floor New York, NY 10022 | $17,387,940.00 | $313,892.73 | $17,701,832.73 |
| Trade Claim Acquisition LLC | Delaware | 120 West 45th Street 39th Floor New York, NY 10036 | $16,771,520.00 | $264,500.00 | $17,036,020.00 |
| J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc. | Delaware | 338 Madison Avenue New York, NY 10179 or c/o its registered agent, The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, DE 19801 | $15,589,680.00 | $616,158.04 | $16,205,838.04 |
| Credit Suisse Securities (USA) LLC & Credit Suisse (USA), Inc | Delaware | Eleven Madison Avenue New York, NY 10010 or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | $14,251,780.00 | $876,113.93 | $15,127,893.93 |
| Seneca Capital International Ltd. | Cayman Islands | 590 Madison Avenue, 28th Floor New York, NY 10022 or c/o its registered agent, Maples Corporate Services Limited PO Box 309 Ugland House, South Church Street George Town Grand Cayman KY1-1104 CAYMAN ISLANDS | $14,602,320.00 | $347,092.77 | $14,949,412.77 |
| Greenwich International Ltd. | Bermuda | 600 Washington Boulevard Stamford, CT 06901 | $10,062,980.00 | $418,968.00 | $10,481,948.00 |

| PARTY or TRANSFEREE | | | UNITS | DIVIDENDS | TOTAL TRANSFERS |
|---|---|---|---|---|---|
| Seneca Capital LP | Delaware | 590 Madison Avenue, 28th Floor New York, NY 10022 or c/o its registered agent, The Prentice-Hall Corporation System, Inc. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | $7,526,240.00 | $178,071.98 | $7,704,311.98 |
| DB Holdings (New York), Inc. | New York | 60 Wall Street New York, NY 10005 or c/o its registered agent, CT Corporation System 111 Eighth Avenue New York, NY 10011 | $6,811,900.00 | $186,779.32 | $6,998,679.32 |
| Longacre Master Fund, Ltd. | Cayman Islands | 810 Seventh Avenue, 22nd Floor New York, NY 10019 or c/o its registered agent, Admiral Administration Limited PO Box 32021 90 Fort Street George Town Grand Cayman CAYMAN ISLANDS | $5,668,820.00 | $757,834.82 | $6,426,654.82 |
| The Tudor BVI Global Portfolio LP f/k/a The Tudor BVI Global Portfolio Ltd. Go Tudor Investments Corporation | Cayman Islands | 1275 King Street Greenwich, CT 06831 or c/o its registered agent, Maples Corporate Services Limited PO Box 309 Ugland House South Church Street George Town Grand Cayman KY1-1104 CAYMAN ISLANDS | $5,571,240.00 | $202,829.18 | $5,774,069.18 |
| Epic Distressed Debt Holdings, Inc | Delaware | c/o Citigroup Alternative Investments 399 Park Avenue, 7th Floor New York, NY 10022 | $5,469,580.00 | $86,258.74 | $5,555,838.74 |
| Castlerigg Partners, LP | Delaware | 40 West 57th Street, 26th Floor New York, NY 10019 | $4,629,100.00 | $486,669.42 | $5,115,769.42 |
| Tudor Proprietary Trading LLC | Delaware | 1275 King Street Greenwich, CT 06831 or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | $2,947,120.00 | $108,804.72 | $3,055,924.72 |
| Highland Crusader Offshore Partners, LP | Bermuda | 31 Victoria Street Hamilton HM10, Bermuda Or 13455 Noel Road, Suite 800 Dallas, Texas 75240 | $2,812,480.00 | $66,521.75 | $2,879,001.75 |
| Scottwood Fund, Ltd. c/o Scottwood Capital Management LLC | Cayman Islands | 230 Park Avenue, 7th Floor New York, NY 10169 or c/o its registered agent, Ogler Fiduciary Services (CAYMAN) Limited PO Box 89 Nexus Way Camana Bay Grand Cayman KY1-9007 CAYMAN ISLANDS | $2,348,040.00 | $211,600.00 | $2,559,640.00 |
| GK Debt Opportunity Fund Ltd. | | 910 Sylvan Avenue Suite 100 Englewood Cliffs, New Jersey 07632 | $2,180,420.00 | $68,770.00 | $2,249,190.00 |
| Mason Capital Ltd. | Cayman Islands | 110 East 59th Street, 30th Floor New York, NY 10022 or c/o its registered agent, Walkers Corporate Services Limited PO Box 87 Mary Street George Town Grand Cayman KY1-9005 CAYMAN ISLANDS | $1,750,660.00 | $416,883.74 | $2,167,543.74 |
| Epic Distressed Debt Opportunity Fund LP | Delaware | c/o Citigroup Alternative Investments 399 Park Avenue, 7th Floor New York, NY 10022 | $1,715,018.45 | $27,481.55 | $1,742,500.00 |
| Latigo Master Fund, Ltd. c/o Latigo Partners, LP | Cayman Islands | 590 Madison Avenue 9th Floor New York, NY 10022 | $1,677,220.00 | $26,450.00 | $1,703,670.00 |
| Cedarview EBG Holdings Ltd. | Cayman Islands | One Penn Plaza, 45th Floor New York, NY 10119 | $1,408,960.00 | $65,849.92 | $1,474,809.92 |

| PARTY or TRANSFEREE | | | PRINCIPAL | DIVIDENDS | TOTAL TRANSFERS |
|---|---|---|---|---|---|
| J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc. as successor in interest to Bear Stearns & Co. Inc. | Delaware | 338 Madison Avenue New York, NY 10179 <br><br> or c/o its registered agent, The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, DE 19801 | | $1,351,684.93 | $1,351,684.93 |
| Longacre Capital Partners (QP) LP | Delaware | 810 Seventh Avenue, 22nd Floor New York, NY 10019 <br><br> or c/o its registered agent, Corporation Service Company 80 State Street Albany, NY 12207-2543 | $1,039,720.00 | $169,602.69 | $1,209,322.69 |
| Guggenheim Portfolio Co. XII, LLC | Delaware | 135 East 57th Street, 9th Floor New York, NY 10022 <br><br> or c/o its registered agent, LexisNexis Document Solutions, Inc. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | $1,129,140.00 | $26,772.69 | $1,155,912.69 |

**Other Transferees**

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL TRANSFER RECIEVED |
|---|---|---|---|
| Power Management Financing, LLC | Delaware | c/o Harbert Management Corporation Concord Center<br>2100 Third Avenue North, Suite 600<br>Birmingham, AL 35203 | $43,657,084.00 |
| Boston Harbor Power LLC | Delaware | c/o Harbert Management Corporation Concord Center<br>2100 Third Avenue North, Suite 600<br>Birmingham, AL 35203<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | $49,490,000.00 |
| William Kriegel | | Business:<br>K Road Power<br>295 Madison Avenue, 37th Floor<br>New York, NY 10017<br><br>Home:<br>532 W 22nd Street<br>New York, NY 10011 | $4,463,843.00 |
| Nicholas Donahue | | Home:<br>35 Easton Road<br>Westport, CT 06800<br><br>Business:<br>Hecate NE Solar LLC<br>c/o Corporate Agents, Inc.<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | $3,400,739.14 |
| Mark Friedland | | Home:<br>7 Iden Avenue<br>Larchmont, NY 10538-2711<br><br>Business:<br>K Road Power<br>295 Madison Avenue, 37th Floor<br>New York, NY 10017 | $3,059,954.55 |
| Anthony Corso | | Business:<br>Hudson Capital Group<br>One Penn Plaza, Suite 2505<br>New York, NY 10119 | $3,414,335.21 |
| Barry Sullivan | | Home:<br>11 Plateau Cir. E<br>Bronxville, NY 10708 | $1,785,537.00 |

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL TRANSFER RECIEVED |
|---|---|---|---|
| Daniel O'Shea | | Business:<br>K Road Power<br>295 Madison Avenue, 37th Floor<br>New York, NY 10017 | $1,510,825.81 |
| Scott Silverstein | | Business:<br>Footprint Power LLC<br>1200 Route 22 East, Suite 2000<br>Bridgewater, NJ 08807 | $1,510,825.81 |
| David Tohir | | Home:<br>52 Reeder Lane<br>New Canaan, CT 06840-3009 | $1,487,948.00 |
| Paul Ehrenzeller | | Business:<br>Footprint Power LLC<br>1200 Route 22 East, Suite 2000<br>Bridgewater, NJ 08807 | $906,540.70 |
| Harbinger Capital Partners Master Fund I, Ltd. | Cayman Islands | c/o its registered agent,<br>Ogier Fiduciary Services (CAYMAN) Limited<br>PO Box<br>89 Nexus Way<br>Camana Bay<br>Grand Cayman, KY1-9007<br>CAYMAN ISLANDS | unknown |
| Harbinger Capital Partners, LLC | Delaware | 450 Park Avenue<br>30th Floor<br>New York, NY 10022 | unknown |
| Harbert Distressed Investment Master Fund, Ltd. | Cayman Islands | 450 Park Avenue<br>30th Floor<br>New York, NY 10022 | unknown |
| Satellite Asset Management LP | Delaware | 10 East 50th Street<br>21st Floor<br>New York, NY 10022 | unknown |
| D.E. Shaw & Co. LP | Delaware | 1166 Avenue of the Americas<br>Ninth Floor<br>New York, NY 10036 | unknown |
| Anchorage Capital Group, LLC f/k/a Anchorage Advisors LLC | Delaware | 610 Broadway, 6th Floor<br>New York, NY 10012<br><br>or c/o its registered agent,<br>Walkers Corporate Service Delaware Ltd.<br>200 Bellevue Parkway, Suite 170<br>Wilmington, DE 19809 | unknown |

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL TRANSFER RECIEVED |
|---|---|---|---|
| Sandell Asset Management Corporation | Cayman Islands | 40 West 57th Street, 26th Floor<br>New York, NY 10019<br><br>or c/o its registered agent,<br>Walkers Corporate Service Limited<br>PO Box<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman, KY1-9005<br>CAYMAN ISLANDS | unknown |
| Tudor Investment Corporation | Delaware | 1275 King Street<br>Greenwich, CT 06831<br><br>or c/o its registered agent,<br>Corporation Service Company<br>80 State Street<br>Albany, NY 12207-2543 | unknown |
| Stonehill Capital Management LLC | Delaware | 885 Third Avenue, 30th Floor<br>New York, NY 10022<br><br>or c/o its registered agent,<br>United Corporate Services, Inc.<br>10 Bank Street, Suite 560<br>White Plains, NY 10606 | unknown |
| Highland Capital Management LP | Delaware | 13455 Noel Road, Suite 800<br>Dallas, TX 75240<br><br>or c/o its registered agent,<br>CT Corporation System<br>111 Eighth Avenue<br>New York, NY 10011 | unknown |
| Scottwood Capital Management LLC | Delaware | 1 Pickwick Plaza<br>Greenwich, CT 06830<br><br>or c/o its registered agent,<br>Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | unknown |

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL TRANSFER RECIEVED |
|---|---|---|---|
| Onyx Credit Partners, LLC f/k/a GK Capital LLC | Delaware | 910 Sylvan Avenue, Suite 100 Englewood Cliffs, NJ 07632<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | unknown |
| Mason Capital Management LLC | Delaware | 110 East 59th Street, 30th Floor New York, NY 10022<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | unknown |
| Latigo Partners LP | Delaware | 590 Madison Avenue New York, NY 10022<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | unknown |
| Cedarview Capital Management LP | Delaware | One Penn Plaza, 45th Floor New York, NY 10119<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | unknown |
| Citigroup Alternative Investments *as successor in interest to* Epic Asset Management LLC | Delaware | 399 Park Avenue, 7th Floor New York, NY 10022<br><br>or c/o its registered agent, CT Corporation System 111 Eighth Avenue New York, NY 10011 | unknown |

| PARTY or TRANSFEREE | JURISDICTION | LAST KNOWN ADDRESS | TOTAL TRANSFER RECIEVED |
|---|---|---|---|
| RBS Holdings USA Inc. f/k/a Greenwich Capital Holdings, Inc. | Delaware | 600 Washington Boulevard Stamford, CT 06901<br><br>or c/o its registered agent, Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | unknown |
| Satellite Overseas Fund, Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| The Apogee Fund, Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Fund IV, LP | Delaware | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Overseas Fund V Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Overseas Fund VI, Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Overseas Fund VIII, Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Overseas Fund IX Ltd. | Cayman Islands | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Fund I LP | Delaware | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |
| Satellite Fund II, LP | Delaware | 10 East 50th Street 21st Floor New York, NY 10022 | unknown |

EXHIBIT B

| First Lien Lenders | |
|---|---|
| **Lender Name** | **Address[1]** |
| ABCLO 2007-1, LTD. | C/O Alliance Bernstein, LP<br>1345 Avenue of the Americas<br>New York, NY 10105 |
| ABN AMRO BANK, NV | Gustav Mahlerlaan 10, 1082 PP Amsterdam, Netherlands |
| AIRLIE CLO 2006 II, LTD. | C/O Airlie Opportunity Capital Management, LP<br>115 East Putnam Avenue<br>Greenwich, CN 06830 |
| AIRLIE CLO 2006-1, LTD. | C/O Airlie Opportunity Capital Management, LP<br>115 East Putnam Avenue<br>Greenwich, CN 06830 |
| AIRLIE CLO 2007-1, LTD. | C/O Airlie Opportunity Capital Management, LP<br>115 East Putnam Avenue<br>Greenwich, CN 06830 |
| ALASKA CBNA LOAN FUNDING, LLC | C/O Citigroup Alternative Investments, LLC<br>731 Lexington Avenue<br>New York, NY 10022-1331 |
| AMHERST CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| APIDOS CDO II | C/O CVC Credit Partners, LLC<br>399 Park Avenue<br>New York, NY 10022 |
| APIDOS CDO III LTD | C/O CVC Credit Partners, LLC<br>399 Park Avenue<br>New York, NY 10022 |
| APIDOS CDO IV LTD | C/O CVC Credit Partners, LLC<br>399 Park Avenue<br>New York, NY 10022 |

---

[1] The addresses listed herein were, based upon the best information available to the Trustee and a reasonable inquiry, the principle place of business of each of the lenders at the time of the loan. This information was determined through a review of public filings. The Trustee does not have personal knowledge of whether any of the addresses listed herein, in fact, constituted the principle place of business of any of the lenders during the relevant time period, and such information must be determined through discovery. As such, nothing herein constitutes an admission by the Trustee with respect to any lender's actual principle place of business.

| | |
|---|---|
| APIDOS CDO V | C/O CVC Credit Partners, LLC<br>399 Park Avenue<br>New York, NY 10022 |
| APIDOS CDO VI (now COA Caerus CLO, Ltd.) | C/O FS COA Management, LLC<br>400 Madison Avenue<br>9th Floor<br>New York, NY 10017-1909 |
| APIDOS QUATTRO | C/O CVC Credit Partners, LLC<br>399 Park Avenue<br>New York, NY 10022 |
| ATLAS LOAN FUNDING (CENT I), LLC | C/O Structured Asset Investors, LLC<br>301 South College Street<br>Charlotte, North Carolina<br>United States 28202 |
| ATLAS LOAN FUNDING (HARTFORD), LLC | C/O Structured Asset Investors, LLC<br>301 South College Street<br>Charlotte, North Carolina<br>United States 28202 |
| ATRIUM V | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| AUGUSTA TRADING, LLC | C/O Bank of America Corporation<br>100 North Tryon Street<br>Charlotte, NC 28202 |
| AVENUE CLO IV, LTD. | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| AVENUE CLO V, LTD. | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| AVENUE CLO VI | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| AVERY POINT CLO, LTD. | C/O Sankaty Advisors, LLC<br>200 Clarendon Street<br>Boston, MA 02116 |
| BALLYROCK CLO 2006-1, LTD. | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| BALLYROCK CLO 2006-2, LTD. | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |

| | |
|---|---|
| BALLYROCK CLO II LIMITED | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| BALLYROCK CLO III, LTD. | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| BANK OF AMERICA, N.A. | C/O Bank of America Corporation<br>100 North Tryon Street<br>Charlotte, NC 28202 |
| BANK OF MONTREAL | C/O BMO Bank of Montreal<br>3 Times Square<br>New York, NY 10036-6520 |
| BANK OF TOKYO-MITSUBISHI UFJ, LTD. | C/O BTMU Securities, Inc.<br>1251 Avenue of the Americas<br>12th Floor<br>New York, NY |
| BATTERY PARK DISTRESSED OPPORTUNITY MASTER FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD LONG SHORT FUND, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD OPPORTUNITY FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BEECHER CBNA LOAN FUNDING, LLC | C/O Babson Capital Management LLC<br>470 Atlantic Avenue<br>10th Floor<br>Boston, Massachusetts 02210 |
| BISMARCK CBNA LOAN FUNDING, LLC | C/O Citigroup Funding, Inc.<br>399 Park Avenue<br>New York, NY 10022 |
| BLACK DIAMOND INTERNATIONAL FUNDING, LTD. | C/O Black Diamond Capital Management, LLC<br>One Sound Shore Drive<br>suite 200<br>Greenwich, CT 06830 |
| BLT 7 LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |

| | |
|---|---|
| BLT V LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| BLUE CROSS OF CALIFORNIA | C/O Wellpoint Health Networks, Inc<br>1 Wellpoint Way<br>Thousand Oaks, CA 91362 |
| BLUE MOUNTAIN CLO III, LTD. | C/O BlueMountain Capital Management LLC<br>280 Park Avenue<br>12th Floor<br>New York, NY 10017 |
| BLUE MOUNTAIN CLO IV, LTD. | C/O BlueMountain Capital Management LLC<br>280 Park Avenue<br>12th Floor<br>New York, NY 10017 |
| BOWERY CBNA LOAN FUNDING, LLC | C/O Citigroup Funding, Inc.<br>399 Park Avenue<br>New York, NY 10022 |
| BRIARCLIFF I CLO, LTD. | C/O KCAP Financial, Inc,<br>295 Madison Avenue<br>6th Floor<br>New York, NY 10017 |
| CANADIAN IMPERIAL BANK OF COMMERCE | C/O CIBC<br>199 Bay Street<br>Toronto, Ontario<br>Canada M5L 1A2 |
| CARLYLE CAPITAL INVESTMENT, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| CARLYLE HIGH YIELD PARTNERS X, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| CARLYLE LOAN INVESTMENT, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| CASTLE HILL I-INGOTS, LTD. | C/O Sankaty Advisors, LLC<br>200 Clarendon Street<br>Boston, MA 02116 |
| CENT CDO 12, LTD. | C/O Columbia Management Investment Advisers, LLC<br>225 Franklin Street<br>Boston, Massachusetts 02110 |

| | |
|---|---|
| CENT CDO 14, LTD. | C/O Columbia Management Investment Advisers, LLC<br>225 Franklin Street<br>Boston, Massachusetts 02110 |
| CENTAURUS LOAN TRUST | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| CHATHAM LIGHT III CLO, LTD. | C/O Sankaty Advisors, LLC<br>200 Clarendon Street<br>Boston, MA 02116 |
| CLEAR LAKE CLO, LTD. | C/O Jefferies Capital Management, Inc.<br>520 Madison Avenue<br>New York, NY 10022 |
| CLYDESDALE CLO 2003, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| CLYDESDALE CLO 2004, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| CLYDESDALE CLO 2005, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| CLYDESDALE CLO 2006, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| CLYDESDALE STRAT CLO I, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| COOKSMILL (now Whistler Funding) | C/O Scotiabank (Ireland) Ltd.<br>IFSC House Custom House Quay<br>Dublin, Ireland |
| COOPERATIEVE CENTRALE | Croeselaan 18<br>PO Box 17100<br>Utrecht,  3500 HG<br>Netherlands |

| | |
|---|---|
| CREDIT GENESIS CLO 2005-1, LTD. | C/O Durham Asset Management L.L.C. 680 Fifth Avenue 22nd Floor New York, NY 10019 |
| CREDIT SUISSE LOAN FUNDING LLC | C/O Credit Suisse (USA), Inc. 11 Madison Avenue New York, NY 10010 |
| CRP V | C/O Oak Hill Advisors, L.P. 1114 Avenue of the Americas 27th Floor New York, NY 10036 |
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH | C/O Credit Suisse (USA), Inc. 11 Madison Avenue New York, NY 10010 |
| CS CAPITAL LLC (BDL) | C/O Credit Suisse (USA), Inc. 11 Madison Avenue New York, NY 10010 |
| DEERFIELD TRIARC TRS HOLDINGS, INC | C/O Deerfield Capital Management, LLC 8700 W. Bryn Mawr Ave 12th Floor Chicago, IL |
| DEL MAR CLO I, LTD. | C/O Caywood-Scholl Capital Management LLC 4350 Executive Drive Suite 125 San Diego, California 92121 |
| DEL MAR CLO II, LTD. | C/O Caywood-Scholl Capital Management LLC 4350 Executive Drive Suite 125 San Diego, California 92121 |
| DIAMOND SPRINGS TRADING, LLC | C/O Bank of America Corporation 100 North Tryon Street Charlotte, NC 28202 |
| DUANE STREET CLO  1 , LTD. | C/O DiMaio Ahmad Capital LLC 245 Park Avenue New York, NY 10167 |
| DUANE STREET CLO II, LTD. | C/O DiMaio Ahmad Capital LLC 245 Park Avenue New York, NY 10167 |
| DUANE STREET CLO III, LTD. | C/O DiMaio Ahmad Capital LLC 245 Park Avenue New York, NY 10167 |

| | |
|---|---|
| DURHAM ACQUISITION CO., LLC | C/O Cerberus Capital Management, L.P.<br>299 Park Avenue<br>Floors 21-23<br>New York, NY 10171 |
| ECO MASTER FUND, LTD. (LND) | C/O EOS Management, L.P.<br>320 Park Avenue, 9th Floor<br>New York, NY 10022 |
| ECR MASTER FUND, LTD. | C/O EOS Management, L.P.<br>320 Park Avenue, 9th Floor<br>New York, NY 10022 |
| EMERSON PLACE CLO, LTD. | C/O Feingold O'Keefe Capital, LLC<br>699 Boylston Street<br>3rd Floor<br>Boston, MA 02116 |
| ENDURANCE CLO I, LTD. | C/O West Gate Horizons Advisors LLC<br>865 S. Figueroa Street<br>Suite 1800<br>Los Angeles, CA 90017 |
| FEINGOLD O'KEEFE CREDIT FUND, LLC | C/O Feingold O'Keefe Capital, LLC<br>699 Boylston Street<br>3rd Floor<br>Boston, MA 02116 |
| FEINGOLD O'KEEFE CV I | C/O Feingold O'Keefee Capital, LLC<br>699 Boylston Street<br>3rd Floor<br>Boston, MA 02116 |
| FEINGOLD O'KEEFFE SELECT OPPORTUNITIES MASTER FUND, L.P. | C/O Feingold O'Keefe Capital, LLC<br>699 Boylston Street<br>3rd Floor<br>Boston, MA 02116 |
| FENWAY CAPITAL, LLC | |
| FIDELITY ADV SERIES II: FAFRHI | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY ADV SERIES II: FASIF | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |

| | |
|---|---|
| FIDELITY CENT INV PORT FRCIP | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY PURITAN TR: FID PUR F | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY SCHOOL STREET TRUST:F | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY SUMMER ST TR FIDELITY | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIRST 2004 I CLO, LTD. | C/O TCW Advisors, Inc.<br>865 South Figueroa Street<br>Los Angeles, California 90017 |
| FIRST 2004 II CLO, LTD. | C/O TCW Advisors, Inc.<br>865 South Figueroa Street<br>Los Angeles, California 90017 |
| FOOTHILL CLO I, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| FRASER SULLIVAN CLO I, LTD. | C/O Fraser Sullivan Investment Management<br>400 Madison Avenue<br>9th Floor<br>New York, NY 10017 |
| FRASER SULLIVAN CLO II, LTD. | C/O Fraser Sullivan Investment Management<br>400 Madison Avenue<br>9th Floor<br>New York, NY 10017 |
| GALE FORCE 3 CLO, LTD. | C/O GSO Capital Partners LP<br>280 Park Ave. 11th Floor<br>New York, NY 10017 |
| GANNETT PEAK CLO I, LTD. | |
| GLENEAGLES CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |

| | |
|---|---|
| GLOBAL LEVERAGED CAPITAL CREDIT OPPORTUNITY FUND I | C/O GLCA Securities, LLC<br>805 Third Avenue<br>20th Floor<br>New York, NY 10022 |
| GOLDMAN SACHS ASSET MGMT CLO, PLC | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| GOLDMAN SACHS CREDIT PARTNERS L.P. | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| GRAND CENTRAL ASSET TR | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, BDC SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, PNT SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, RCG SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, SOLA SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, ZEN SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |

| | |
|---|---|
| GRANT GROVE CLO, LTD. | C/O Tall Tree Investment Management, LLC<br>525 West Monroe Street<br>Suite 1510<br>Chicago, Illinois 60661 |
| GRAYSON CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| GSO DOMESTIC CAPITAL FUNDING, LLC | C/O GSO Capital Partners LP<br>280 Park Ave. 11th Floor<br>New York, NY 10017 |
| HARBOURVIEW CLO 2006-1 | C/O Oppenheimer Funds Inc.<br>6803 South Tuscan Way<br>Englewood, CO 80112 |
| HARTFORD FLOATING RATE FUND | C/O Wellington Management Company, LLP<br>280 Congress Street<br>Boston, Massachusetts 02210 |
| HARTFORD INSTITUTIONAL TRUST | |
| HFR DS RESTORATION MASTER TRUST | |
| HIGHLAND FLOATING RATE ADVANTAGE FUND | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| HYPO PUBLIC FINANCE BANK | C/O DEPFA Bank PLC<br>1 Commons Street<br>Dublin 1<br>Ireland |
| ILLINOIS MUNICIPAL RETIREMENT FUND | C/O IMRF<br>2211 York Road<br>Suite 500<br>Oak Brook, IL 60523 |
| ING INVESTMENT MANAGEMENT CLO II, LTD. | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| ING LEVERAGED INCOME FUND I, LTD | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |

| | |
|---|---|
| ING PRIME RATE TRUST | C/O ING Investment Management, Co.<br>230 Park Avenue<br>New York, NY 10169 |
| ING SENIOR INCOME FUND | C/O ING Investment Management, Co.<br>230 Park Avenue<br>New York, NY 10169 |
| JASPER CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| JAY STREET MARKET VALUE CLO I, LTD. | C/O DiMaio Ahmad Capital LLC<br>245 Park Avenue<br>New York, NY 10167 |
| KEYBANK, NA | C/O KeyBank, NA<br>127 Public Square<br>Cleveland, Ohio 44114 |
| KINGSLAND IV, LTD. | C/O Kingsland Capital Management<br>485 Madison Avenue<br>24th Floor<br>New York, NY 10022 |
| KNIGHT CBNA LOAN FUNDING, LLC | C/O Citigroup Alternative Investments, LLC<br>731 Lexington Avenue<br>New York, NY 10022-1331 |
| LEHMAN COMMERCIAL PAPER, INC. | C/O Lehman Commercial Paper, Inc.<br>3 World Financial Center<br>New York, NY 10285 |
| LIBERTY CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LIBERTYVIEW LOAN FUND, LLC | C/O Libertyview Capital Management, LLC<br>101 Hudson Street<br>Suite 3700<br>Jersey City, NJ 07302 |
| LIGHTPOINT CLO III, LTD. | |
| LIGHTPOINT CLO V, LTD. | |

| | |
|---|---|
| LIGHTPOINT CLO VII, LTD. | |
| LL SAHALEE FUNDING LLC | C/O Wilmington Trust Company<br>1100 N. Market Street<br>Wilmington, DE  19890 |
| LOAN FUNDING IV, LLC | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LOAN FUNDING VII, LLC | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LOAN STAR STATE TRUST | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LONGEVITY FUNDING CLO I, LTD. | |
| MAC CAPITAL, LTD. | C/O TCW Advisors, Inc.<br>865 South Figueroa Street<br>Los Angeles, California 90017 |
| MACKAY SHORT DURATION ALPHA FUND | C/O MacKay Shields LLC<br>1345 Avenue of the Americas<br>42nd Floor<br>New York, NY 10105 |
| MADISON PARK FUNDING IV, LTD. | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| MAINSTAY FLOATING RATE FUND | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| MAINSTAY VP FLOATING RATE PORTFOLIO | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| MCDONNELL LOAN OPPORTUNITY | C/O Mcdonnell Investment Management, LLC<br>1515 W. 22nd St.<br>11th Floor<br>Oak Brook, IL 60523-2007 |

| | |
|---|---|
| METLIFE BANK NATIONAL ASSOCIATION | C/O Metlife, Inc.<br>1095 Avenue of the Americas<br>New York, NY 10036 |
| METLIFE INSURANCE COMPANY OF CONNECTICUT | C/O Metlife<br>1300 Hall Boulevard<br>Bloomfield, CT 06002 |
| METROPOLITAN LIFE INSURANCE COMPANY | C/O Metropolitan Life Insurance Company<br>200 Park Avenue<br>12th Floor<br>New York, NY 1016 |
| METROPOLITAN WEST HIGH YIELD BOND FUND | C/O Metropolitan West Asset Mgmt, LLC<br>865 South Figueroa Street<br>Los Angeles, CA 90017 |
| METROPOLITAN WEST STRATEGIC INCOME FUND | C/O Metropolitan West Asset Mgmt, LLC<br>865 South Figueroa Street<br>Los Angeles, CA 90017 |
| MOUNTAIN CAPITAL CLO IV, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| MOUNTAIN CAPITAL CLO V, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| MOUNTAIN VIEW CLO II, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| MOUNTAIN VIEW CLO III | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| NATIONWIDE LIFE INSURANCE COMPANY | C/O Nationwide Headquarters<br>One Nationwide Plaza<br>Columbus, OH 43215 |
| NAVIGARE FUNDING II CLO, LTD. | |
| NCRAM LOAN TRUST | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |

| | |
|---|---|
| NCRAM SENIOR LOAN TRUST 2005 | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| NEW YORK LIFE INSURANCE & ANNUITY CORPORATION | C/O New York Life Insurance Company<br>51 Madison Avenue<br>Room 207<br>New York, NY 10010 |
| NEW YORK LIFE INSURANCE (GUARANTEED PRODUCTS) | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| NEW YORK LIFE INSURANCE COMPANY | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| NEW YORK LIFE INSURANCE COMPANY | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| NORTHWESTERN MUTUAL LIFE INSURANCE | C/O Northwestern Mutual Life Insurance<br>720 E. Wisconsin Avenue<br>Milwaukee, WI 53202 |
| NORTHWOODS CAPITAL V, LTD. | C/O Northwoods Capital Management, LLC<br>330 Madison Avenue<br>25th Floor<br>New York, NY 10017 |
| NORTHWOODS CAPITAL VI LIMITED | C/O Angelo, Gordon & Co.<br>245 Park Avenue<br>26th Floor<br>New York, NY 10167 |
| NORTHWOODS CAPITAL VII | C/O Angelo, Gordon & Co.<br>245 Park Avenue<br>New York, NY 10167 |
| NYLIM FLATIRON CLO 2003-1, LTD. | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| NYLIM FLATIRON CLO 2004-1, LTD. | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |

| | |
|---|---|
| NYLIM FLATIRON CLO 2005-1, LTD. | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| NYLIM FLATIRON CLO 2006-1, LTD. | C/O New York Life Investment Management LLC<br>51 Madison Avenue<br>16th Floor<br>New York, NY 10010 |
| OCEAN TRAILS CLO I | C/O West Gate Horizons Advisors LLC<br>865 S. Figueroa Street<br>Suite 1800<br>Los Angeles, CA 90017 |
| OCEAN TRAILS CLO II | C/O West Gate Horizons Advisors LLC<br>865 S. Figueroa Street<br>Suite 1800<br>Los Angeles, CA 90017 |
| OCM HIGH YIELD PLUS FUND, L.P. | C/O Oak Tree Capital Management, LP<br>333 South Grand Avenue<br>28th Floor<br>Los Angeles, CA 90071 |
| OPPENHEIMER SENIOR FLOATING RATE | Two World Financial Center<br>225 Liberty Street, 11th Floor<br>New York, NY 10281-1008 |
| OREGON STATE TREASURY | C/O Oregon State Treasury<br>350 Winter Street NE<br>Suite 100<br>Salem, OR 97301 |
| ORIX FINANCE CORP. | C/O Orix USA Corp<br>1717 Main Street<br>Suite 900<br>Dallas, Texas 75201-4687 |
| PARK AVENUE LOAN TRUST | C/O TCW Advisors, Inc.<br>865 South Figueroa Street<br>Los Angeles, California 90017 |
| PIONEER FLOATING RATE TRUST | C/O Pioneer Investment Management Inc.<br>60 State Street<br>13th Floor<br>Boston, MA 02109 |
| PLAINFIELD SPECIAL SITUATIONS MASTER FUND, LTD. | C/O Plainfield Asset Management LLC<br>333 Ludlow Street<br>Stamford, CT 06902 |

| | |
|---|---|
| PREMIUM LOAN TRUST I, LTD. | Neuberger Berman Fixed Income LLC<br>1290 Avenue of the Americas<br>New York City, NY 10104<br>United States |
| PRIMUS CLO I, LTD. | C/O Primus Asset Management, Inc.<br>360 Madison Ave<br>23rd Floor<br>New York, NY 10017 |
| PTRS CBNA LOAN FUNDING, LLC | C/O Citigroup Funding, Inc.<br>399 Park Avenue<br>New York, NY 10022 |
| RACE POINT IV CLO, LTD. | C/O Sankaty Advisors, LLC<br>200 Clarendon Street<br>Boston, MA 02116 |
| RAVEN CREDIT OPPORTUNITIES MASTER FUND, LTD. | C/O Raven Asset Management, LLC<br>110 Greene Street<br>Suite 1102<br>New York, NY 10012 |
| RED RIVER CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| REGATTA FUNDING, LTD. | Napier Park Global Capital (U.S.) L.P.<br>280 Park Avenue, 3rd Floor<br>New York, NY 10017 |
| REGATTA II FUNDING, LTD. | Napier Park Global Capital (U.S.) L.P.<br>280 Park Avenue, 3rd Floor<br>New York, NY 10017 |
| RESTORATION HOLDINGS, LTD. | C/O Restoration Capital Management LLC<br>One Dock Street<br>Suite 304<br>Stamford, CT 06902 |
| RIVERSOURCE BOND SERIES | C/O Columbia Funds Series Trust II<br>225 Franklin Street<br>Boston, Massachusetts 02110 |
| ROCKWALL CDO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| ROSEDALE CLO II, LTD. | C/O Princeton Capital Management, Inc.<br>17 Hulfish Street<br>Suite 500<br>Princeton, NJ 08542 |

| | |
|---|---|
| SANKATY HIGH YIELD PARTNERS II, L.P. | C/O Sankaty Advisors, LLC<br>200 Clarendon Street<br>Boston, MA 02116 |
| SATELLITE SENIOR INCOME FUND II | Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SATELLITE SENIOR INCOME FUND, LLC | Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SEI GLOBAL SERVICES, INC. | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SEI INSTITUTIONAL INTERNATIONAL TRUST | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SEI INSTITUTIONAL MANAGED TRUST | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SEI INSTITUTTIONAL INVESTMENTS TRUST - HIGH YIELD BOND FUND | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SIERRA CLO II, LTD. | |
| SILVERADO CLO 2006-1, LTD. | |
| SILVERADO CLO 2006-II, LTD. | |
| SPIRET IV LOAN TRUST 2003-B | |
| ST. JAMES RIVER CLO, LTD. | |

| | |
|---|---|
| STANFIELD ULTRA, LTD. | |
| STI CLASSIC SEIX FLOATING RATE HIGH INCOME FUND | C/O Seix Investment Advisors, LLC<br>10 Mountainview Road, C-200<br>Upper Saddle River, NJ  07458 |
| STICHTING PENSIOENFONDS ABP | Oude Lindestraat 70<br>Heerlen, Limburg<br>Netherlands 6411 EJ |
| STONE TOWER CDO II, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| STONE TOWER CDO, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| STONE TOWER CLO VI, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| STONE TOWER CLO VII, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| STONE TOWER CREDIT FUNDING I, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| SUMMIT LAKE CLO, LTD. | C/O Jefferies Capital Management, Inc.<br>11100 Santa Monica Blvd.<br>11th Floor<br>Los Angeles, CA 90025 |
| SUNTRUST BANK, INC. | C/O SunTrust Banks, Inc.<br>303 Peachtree Street NE<br>Atlanta, GA 30308 |
| TCW BASS LAKE PARTNERS LP (Now Crescent Alternative Credit Partners, L.P.) | C/O Crescent Capital Group LP<br>1100 Santa Monica Boulevard<br>Suite 2000<br>Los Angeles, California |

| | |
|---|---|
| TCW SENIOR SECURED FLOATING RATE LOAN FUND, L.P. (Now Cresent Senior Secured Floating Rate Loan Fund, LLC) | C/O Crescent Capital Group LP 1100 Santa Monica Boulevard Suite 2000 Los Angeles, California |
| TCW SENIOR SECURED LOAN FUND, L.P. (Now Cresent Secured Floating Rate Loan Fund, LLC) | C/O Crescent Capital Group LP 1100 Santa Monica Boulevard Suite 2000 Los Angeles, California |
| THRACIA, LLC | C/O P. Schoenfeld Asset Management LP 1350 Avenue of the Americas 21st Floor New York, NY 10019 |
| TRS FORE, LLC | C/O Deutsche Bank Americas Holding Corp. 60 Wall Street New York, NY 10005 |
| TRS1, LLC | C/O Deutsche Bank Americas Holding Corp. 60 Wall Street New York, NY 10005 |
| VARIABLE INSURANCE PRODUCTS FUND IV VALUE LEADERS PORTFOLIO | C/O FMR, LLC 245 Summer Street Boston, MA 02210 |
| VELOCITY CLO, LTD. | C/O TCW Advisors, Inc. 865 South Figueroa Street Los Angeles, California 90017 |
| VICTORIA FALLS CLO, LTD. | C/O Jefferies Capital Management, Inc. 11100 Santa Monica Blvd. 11th Floor Los Angeles, CA 90025 |
| VIRGINIA RETIREMENT SYSTEM | C/O Virginia Retirement System 1200 E. Main Street P.O. Box 2500 Richmond, VA 23218 |
| VITESSE CLO, LTD. | C/O TCW Advisors, Inc. 865 South Figueroa Street Los Angeles, California 90017 |
| VS CBNA LOAN FUNDING, LLC | C/O Citigroup Alternative Investments, LLC 731 Lexington Avenue New York, NY 10022-1331 |
| WATCHTOWER CLO I, PLC | C/O Citadel Advisors Holdings, LP 131 South Dearborn Street 32nd Floor Chicago, Illinois 60603 |

| | |
|---|---|
| WATERFRONT CLO 2007-1, LTD. | C/O Grandview Capital Management LLC<br>820 Manhattan Avenue<br>Suite 200<br>Manhattan Beach, California 90266-5556 |
| WAVE CBNA LOAN FUNDING, LLC | C/O Citigroup Alternative Investments, LLC<br>731 Lexington Avenue<br>New York, NY 10022-1331 |
| WELLS CAPITAL MANAGEMENT-18866500 | C/O Wells Capital Management<br>420 Montgomery Street<br>San Fransisco, CA 94163 |
| WEST BEND MUTUAL INSURANCE CO. | C/O, West Bend Mutual<br>1900 S. 18th Avenue<br>West Bend, WI 53095 |
| WG HORIZONS CLO I | C/O West Gate Horizons Advisors LLC<br>865 S. Figueroa Street<br>Suite 1800<br>Los Angeles, CA 90017 |
| WHIPPOORWILL ASSOCIATES, INC. | C/O Whippoorwill Associates, Inc.<br>11 Martine Ave<br>Suite 1150<br>White Plains, NY 10606 |
| WHIPPOORWILL DISTRESSED OPPORTUNITY FUND, L.P. | C/O Whippoorwill Associates, Inc.<br>11 Martine Ave<br>Suite 1150<br>White Plains, NY 10606 |
| WHIPPOORWILL OFFSHORE DISTRESSED OPPORTUNITY FUND, LTD. | C/O Whippoorwill Associates, Inc.<br>11 Martine Ave<br>Suite 1150<br>White Plains, NY 10606 |
| WIND RIVER CLO I, LTD. | C/O THL Credit, Inc.<br>100 Federal Street<br>31st Floor<br>Boston, MA 02110 |
| WIND RIVER CLO II TATE INVSTRS | C/O THL Credit, Inc.<br>100 Federal Street<br>31st Floor<br>Boston, MA 02110 |

| Second Lien Lenders | |
|---|---|
| **Lender Name** | **Address**[2] |
| ABN AMRO BANK, NV | |
| AMHERST CLO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| BANK OF AMERICA, N.A. | C/O Bank of America Corporation<br>100 North Tryon Street<br>Charlotte, NC 28202 |
| BATTERY PARK DISTRESSED OPPORTUNITY MASTER FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD LONG SHORT FUND, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD OPPORTUNITY FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BHCO MASTER, LTD. | C/O BHR Capital, LLC<br>545 Madison Avenue<br>10th Floor<br>New York, NY 10022 |
| BLACK DIAMOND OFFSHORE, LTD. | C/O Carlson Capital, L.P.<br>2100 McKinney Avenue<br>Suite 1600<br>Dallas, Texas 75201 |

---

[2] The addresses listed herein were, based upon the best information available to the Trustee and a reasonable inquiry, the principle place of business of each of the lenders at the time of the loan. This information was determined through a review of public filings. The Trustee does not have personal knowledge of whether any of the addresses listed herein, in fact, constituted the principle place of business of any of the lenders during the relevant time period, and such information must be determined through discovery. As such, nothing herein constitutes an admission by the Trustee with respect to any lender's actual principle place of business.

| | |
|---|---|
| BLT 7 LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| BLUE SQUARE FUNDING SERIES 3, LTD. | C/O Deutsche Bank Trust Co. America, fka Bankers Trust Co<br>60 Wall St, New York, NY 10005 |
| BOWERY CBNA LOAN FUNDING, LLC | C/O Citigroup Funding, Inc.<br>399 Park Avenue<br>New York, NY 10022 |
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM ACCOUNT# SW7Y | C/O California Public Employees' Retirement System<br>400 Q Street<br>Suite 4800<br>Sacramento, CA 95811 |
| CS CREDIT STRATEGIES MASTER FUND, LTD. | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CREDIT SUISSE LOAN FUNDING LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CS CAPITAL LLC (BDL) | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| DOUBLE BLACK DIAMOND OFFSHORE, LTD. | C/O Carlson Capital, L.P.<br>2100 McKinney Avenue<br>Suite 1600<br>Dallas, Texas 75201 |
| ECO MASTER FUND, LTD. | C/O EOS Management, L.P.<br>320 Park Avenue, 9th Floor<br>New York, NY 10022 |
| ECR MASTER FUND, LTD. | C/O EOS Management, L.P.<br>320 Park Avenue, 9th Floor<br>New York, NY 10022 |
| FIDELITY ADV SERIES II: FASIF | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY CENT INV PORT FRCIP | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |

| | |
|---|---|
| FIDELITY PURITAN TR: FID PUR F | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY SCHOOL STREET TRUST:F | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FIDELITY SUMMER ST TR FIDELITY | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| FREESTYLE SPECIAL OPPORTUNITIES FUND, L.P. | C/O Freestyle Fund Mgmt Co, LLC<br>712 Fifth Avenue<br>11th Floor<br>New York, NY 10019 |
| GK DEBT OPPORTUNITY FUND | C/O Onex Senior Credit GP, LLC<br>910 Sylvan Avenue<br>Englewood Cliffs, New Jersey 07632 |
| GMAM INVESTMENT FUNDS TRUST-7 | C/O General Motors Asset Management Corp.<br>1345 Avenue Of The Americas<br>New York, NY 10105 |
| GOLDMAN SACHS CREDIT PARTNERS L.P. | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| GRACIE CAPITAL, L.P. | C/O P&S Capital Partners LLC<br>590 Madison Ave<br>28th Floor<br>New York, NY 10022 |
| GRAND CENTRAL ASSET TRUST | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, BAS SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |

| | |
|---|---|
| GRAND CENTRAL ASSET TRUST, CED SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, DES SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, PNT SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, STK SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GREENWICH INTERNATIONAL, LTD. | |
| HIGHLAND FLOATING RATE ADVANTAGE FUND | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| ILLINOIS MUNICIPAL RETIREMENT FUND | C/O IMRF<br>2211 York Road<br>Suite 500<br>Oak Brook, IL 60523 |
| ING INTERNATIONAL II SENIOR BANK LOANS EURO | C/O ING Investment Management, Co.<br>230 Park Avenue<br>New York, NY 10169 |
| ING INVESTMENT MANAGEMENT CLO II, LTD. | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| ING INVESTMENT MANAGEMENT CLO III, LTD. | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| ING INVESTMENT MANAGEMENT CLO I | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |
| ING LEVERAGED INCOME FUND I, LTD | C/O ING Alternative Asset Management LLC<br>230 Park Avenue<br>New York, NY 10169 |

| | |
|---|---|
| ING PRIME RATE TRUST | C/O ING Investment Management, Co.<br>230 Park Avenue<br>New York, NY 10169 |
| ING SENIOR INCOME FUND | C/O ING Investment Management, Co.<br>230 Park Avenue<br>New York, NY 10169 |
| JAY STREET MARKET VALUE CLO I, LTD. | C/O DiMaio Ahmad Capital LLC<br>245 Park Avenue<br>New York, NY 10167 |
| KNOX CDO, LTD. | C/O Highland Capital Mgmt LP<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LATIGO MASTER FUND, LTD. | C/O Latigo Partners LP<br>590 Madison Avenue<br>9th Floor<br>New York, NY 10022 |
| LL SAHALEE FUNDING LLC | |
| MCDONNELL LOAN OPPORTUNITY | C/O Mcdonnell Investment Management, LLC<br>1515 W. 22nd St.<br>11th Floor<br>Oak Brook, IL 60523-2007 |
| MERCED PARTNERS LIMITED PARTNERSHIP | C/O Global Capital Management, Inc.<br>601 Carlson Parkway<br>Suite 200<br>Minnetonka, MN 55305 |
| METROPOLITAN WEST HIGH YIELD BOND FUND | C/O Metropolitan West Asset Mgmt, LLC<br>865 South Figueroa Street<br>Los Angeles, CA 90017 |
| MOUNTAIN VIEW CLO II, LTD. | C/O Carlyle Investment Management LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| NOMURA US ATTRACTIVE YIELD CORP | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| ORIX FINANCE CORP. | C/O Orix USA Corp<br>1717 Main Street<br>Suite 900<br>Dallas, Texas 75201-4687 |

| | |
|---|---|
| PLAINFIELD SPECIAL SITUATIONS MASTER FUND, LTD. | C/O Plainfield Asset Management LLC<br>333 Ludlow Street<br>Stamford, CT 06902 |
| RAVEN CREDIT OPPORTUNITIES MASTER FUND, LTD. | C/O Raven Asset Management, LLC<br>110 Greene Street<br>Suite 1102<br>New York, NY 10012 |
| SAGITTARIUS FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| SATELLITE SENIOR INCOME FUND II | C/O Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SATELLITE SENIOR INCOME FUND, LLC | C/O Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SEI GLOBAL MASTER FUND PLC | Styne House<br>Upper Hatch Street<br>Dublin 2<br>Ireland |
| SEI GLOBAL MASTER FUND PLC-THE | Styne House<br>Upper Hatch Street<br>Dublin 2<br>Ireland |
| SEI INSTITUTTIONAL INVESTMENTS TRUST - HIGH YIELD BOND FUND | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SEI INSTITUTIONAL MANAGED TRUST | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SPECIAL SITUATIONS INVESTING GROUP, INC. | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| STICHTING PENSIOENFONDS HOOGOVENS | Wijckermolen 202, 1941 JA Beverwijk, Netherlands |

| | |
|---|---|
| STONE TOWER CREDIT FUNDING I, LTD. | C/O Apollo St Debt Advisors LLC<br>9 West 57th Street<br>48th Floor<br>New York, NY |
| STONEHILL OFFSHORE PARTNERS, LTD. | C/O Stonehill Capital Management LLC<br>885 Third Avenue<br>30th Floor<br>New York, NY |
| TAMARACK INTERNATIONAL, LTD. | C/O UBS Tamarack Management, LLC<br>51 West 52nd Street<br>23rd Floor<br>New York, NY 10019 |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA | C/O Office of the Secretary and Chief of Staff<br>1111 Franklin St.<br>12th Floor<br>Oakland, CA 94607 |
| VARDE INVESTMENT PARTNERS, LP | C/O Varde Management, L.P.<br>8500 Normandale Lake Boulevard<br>Suite 1500<br>Minneapolis, Minnesota  55437 |
| VARIABLE INSURANCE PRODUCTS FUND IV VALUE LEADERS PORTFOLIO | C/O FMR, LLC<br>245 Summer Street<br>Boston, MA 02210 |
| WATERFRONT CLO 2007-1, LTD. | C/O Grandview Capital Management LLC<br>820 Manhattan Avenue<br>Suite 200<br>Manhattan Beach, California 90266-5556 |

| Other Creditors | |
|---|---|
| **Name** | **Last Known Mailing Address** |
| CYNTHIA JOHNSON | C/O Commission Against Discrimination<br>One Ashburton Place, Room 601<br>Boston, MA 02108-1524 |
| ALGONQUIN GAS TRANSMISSION LLC | 5400 Westheimer Court<br>Houston, TX 77056<br>United States |
| ISO NEW ENGLAND INC. | 1 Sullivan Rd.<br>Holyoke MA 01040-2481 |

| SPRAGUE ENERGY CORP. | 2 International Dr., Ste. 200 Portsmouth NH 03801 |
|---|---|

EXHIBIT C

| PARTICIPATING LENDERS |
| :---: |
| **EBG MEZZANINE LENDERS** |

| Lender Name | Address[1] |
| --- | --- |
| AG ALPHA CREDIT MASTER, LTD. | C/O Angelo, Gordon & Co.<br>245 Park Avenue<br>26th Floor<br>New York, NY 10167 |
| ANCHORAGE CAPITAL MASTER OFFSHORE, LTD. | C/O Anchorage Capital Group LLC<br>610 Broadway<br>6th Floor<br>New York, NY 10012 |
| BANK OF AMERICA, N.A. | C/O Bank of America Corporation<br>100 North Tryon Street<br>Charlotte, NC 28202 |
| BATTERY PARK DISTRESSED OPPORTUNITY MASTER FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD LONG SHORT FUND, LTD. | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BATTERY PARK HIGH YIELD OPPORTUNITY FUND | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| BLT 7 LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| BLUE CROSS OF CALIFORNIA | C/O Wellpoint Health Networks, Inc<br>1 Wellpoint Way<br>Thousand Oaks, CA 91362 |

[1] The addresses listed herein were, based upon the best information available to the Trustee and a reasonable inquiry, the principle place of business of each of the lenders at the time of the loan. This information was determined through a review of public filings. The Trustee does not have personal knowledge of whether any of the addresses listed herein, in fact, constituted the principle place of business of any of the lenders during the relevant time period, and such information must be determined through discovery. As such, nothing herein constitutes an admission by the Trustee with respect to any lender's actual principle place of business.

1

| Lender Name | Address[1] |
|---|---|
| CREDIT SUISSE LOAN FUNDING LLC | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CS CAPITAL LLC (BDL) | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| CS CREDIT STRATEGIES MASTER FUND, LTD. | C/O Credit Suisse (USA), Inc.<br>11 Madison Avenue<br>New York, NY 10010 |
| EPIC DISTRESSED DEBT OPPORTUNITY FUND, LTD. | C/O Epic GP LLC<br>One Bridge Plaza Ste 265<br>Fort Lee NJ 07024 |
| GMAM INVESTMENT FUNDS TRUST-7 | C/O General Motors Asset Management Corp.<br>1345 Avenue Of The Americas<br>New York, NY 10105 |
| GOLDMAN SACHS CREDIT PARTNERS L.P. | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| GRAND CENTRAL ASSET TRUST, BAS SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, CED SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, DES SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, MAS SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |

| Lender Name | Address[1] |
|---|---|
| GRAND CENTRAL ASSET TRUST, SOLA SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GRAND CENTRAL ASSET TRUST, STK SERIES | C/O Grand Central Asset Trust<br>70 West Madison Street<br>Suite 5710<br>Chicago, IL 60602 |
| GREENWICH INTERNATIONAL, LTD. | |
| HIGHLAND CREDIT OPP CDO, LTD. | C/O Highland Capital Mgmt LLC<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| HIGHLAND FLOATING RATE ADVANTAGE FUND | C/O Highland Capital Mgmt LLC<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| LATIGO MASTER FUND, LTD. | C/O Latigo Partners LP<br>590 Madison Avenue<br>9th Floor<br>New York, NY 10022 |
| MCDONNELL LOAN OPPORTUNITY | C/O Mcdonnell Investment Management, LLC<br>1515 W. 22nd St.<br>11th Floor<br>Oak Brook, IL 60523-2007 |
| NOMURA US ATTRACTIVE YIELD CORP | C/O Nomura Corporate Research & Asset Ma<br>Two World Financial Center<br>Building B<br>New York, NY 10281 |
| PLAINFIELD SPECIAL SITUATIONS MASTER FUND, LTD. | C/O Plainfield Asset Management LLC<br>333 Ludlow Street<br>Stamford, CT 06902 |
| PRESIDENT & FELLOWS OF HARVARD | C/O Harvard Corporation<br>1350 Massachusetts Ave<br>Cambridge, MA 02138 |
| PRESIDENT & FELLOWS (REF HARVARD) | C/O Harvard Corporation<br>1350 Massachusetts Ave<br>Cambridge, MA 02138 |

| Lender Name | Address[1] |
| --- | --- |
| RESTORATION HOLDINGS, LTD. | C/O Restoration Capital Management LLC<br>One Dock Street<br>Suite 304<br>Stamford, CT 06902 |
| SATELLITE SENIOR INCOME FUND II | C/O Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SATELLITE SENIOR INCOME FUND, LLC | C/O Satellite Asset Management LP<br>623 Fifth Avenue<br>19th Floor<br>New York, NY 10022 |
| SEI GLOBAL MASTER FUND PLC-THE | Styne House<br>Upper Hatch Street<br>Dublin 2<br>Ireland |
| SEI INSTITUTIONAL MANAGED TRUST | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SEI INSTITUTTIONAL INVESTMENTS TRUST - HIGH YIELD BOND FUND | C/O SEI Investments Management Corporation<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| SPECIAL SITUATIONS INVESTING GROUP, INC. | C/O Goldman Sachs Group, Inc.<br>85 Broad Street<br>28th Floor<br>New York, NY 10004 |
| STICHTING PENSIOENFONDS HOOGOVENS | Wijckermolen 202, 1941 JA Beverwijk, Netherlands |
| STONEHILL OFFSHORE PARTNERS, LTD. | C/O Stonehill Capital Management LLC<br>885 Third Avenue<br>30th Floor<br>New York, NY |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA | C/O Office of the Secretary and Chief of Staff<br>1111 Franklin St.<br>12th Floor<br>Oakland, CA 94607 |
| VARDE INVESTMENT PARTNERS, LP | C/O Varde Management, L.P.<br>8500 Normandale Lake Boulevard<br>Suite 1500<br>Minneapolis, Minnesota 55437 |

| Lender Name | Address[1] |
|---|---|
| WHIPPOORWILL ASSOCIATES, INC. | C/O Whippoorwill Associates, Inc. 11 Martine Ave Suite 1150 White Plains, NY 10606 |
| WHIPPOORWILL DISTRESSED OPPORTUNITY FUND, L.P. | C/O Whippoorwill Associates, Inc. 11 Martine Ave Suite 1150 White Plains, NY 10606 |
| WHIPPOORWILL OFFSHORE DISTRESSED OPPORTUNITY FUND, LTD. | C/O Whippoorwill Associates, Inc. 11 Martine Ave Suite 1150 White Plains, NY 10606 |

EXHIBIT D

## WRITTEN CONSENT AND AMENDMENT

This Written Consent and Amendment (the "Consent"), dated as of December 15, 2006, is made and entered into by and among K Road Power BG LLC ("KRP BG"), K Road BG Holdings LLC ("KRBGH"), K Road BG MM LLC ("KRBGMM"), WBD K Road Power BG LLC ("WBD"), K Road BG LLC ("K Road BG"), Power Management Financing LLC ("PMF") and Boston Harbor Power LLC ("BHP"). Capitalized terms used herein and not defined herein shall have the meanings given such terms in the Agreements (as defined below).

WHEREAS, EBG Holdings LLC (together with its subsidiaries, "EBG") proposes to effect a series of transactions in which it will: (a) borrow (or issue notes) in principal amount (not including original issue discount and capitalized interest on payment-in-kind notes) of up to $2.3 billion (the "New Financing") and use the proceeds to:

- repay all outstanding principal of, interest on and other amounts due in respect of EBG's then existing indebtedness for borrowed money;

- purchase outstanding membership interests of EBG ("Units") pursuant to a "modified Dutch auction" tender offer (the "Tender Offer");

- purchase a percentage of the outstanding warrants to purchase Units held by K Road BG and/or its officers, directors or employees (the "K Road Warrants") equal to the percentage of outstanding Units purchased pursuant to the Tender Offer, for a price equal to the spread between the price paid for the Units in the Tender Offer and the K Road Warrants exercise price (the "Warrant Repurchase");

- establish any required debt service reserves and approximately $115 million of contingency reserves; and

- pay related costs, fees and expenses;

(b) amend the remaining K Road Warrants to permit "cashless" exercise based on the price per Unit paid in the Tender Offer; (c) amend Section 12.9 of the EBG LLC Agreement (the "Amendment"), as provided by the Action by Written Consent of Members, attached hereto as Exhibit A (the "EBG LLC Consent #1"); (d) make a distribution to members of EBG prior to the purchase of the Units in the Tender Offer in an amount estimated to be equal to EBG's undistributed earnings and profits from the date of EBG's election to be treated as a corporation for tax purposes through December 31, 2006, not to exceed $35 million (the "Special Dividend"); (e) enter into fuel and electricity price hedging transactions, for the purpose of stabilizing the EBG's revenue stream and protecting against significant degradation in such revenue stream (the "Hedge Transactions"), including with parties other than Sempra Energy Trading Corp. (as described in the Action by Written Consent of Members, attached hereto as Exhibit A (the "EBG LLC Consent #2")),(f) pledge assets of EBG (the "Asset Pledges") in connection with (i) the Hedge Transactions and (ii) the New Financing; and (g) agree not to seek recourse against members of EBG in respect of which it pays additional net withholding obligations or tax resulting from the characterization of purchase price paid in the Tender Offer as a dividend , as provided by EBG LLC Consent #2 ((a) though (g) collectively, the "Transactions"), in each case as described and pursuant to the terms set forth in the offer to purchase, and letter of transmittal, each dated as of November 16, 2006 and the supplement to

22351492v5

# EXHIBIT D

the offer to purchase dated as of December 8, 2006 (together, the "Tender Offer Documents"), the Fee Letter, Commitment Letter and Arrangement Letter by and among EBG, Boston Generating, LLC, Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, dated as of November 20, 2006 (including the exhibits thereto, the "Commitment Documents") and the disclosure documents provided to members of EBG in connection with the EBG LLC Consent #1 and EBG LLC Consent #2, (the "Disclosure Document"), copies of which have been furnished to PMF and BHP.

WHEREAS, PMF's consent is required in connection with certain actions by K Road BG and the directors of EBG appointed by K Road BG in connection with the Transactions pursuant to the 8% Convertible Note Purchase Agreement dated as of September 26, 2005, by and among KRP BG, PMF and the Guarantors party thereto (the "Note Purchase Agreement"), and BHP's consent is required in connection with certain aspects of the Transactions pursuant to the Amended and Restated Limited Liability Company Agreement of KRBGH, dated as of October 6, 2005, by and among K Road Holdings LLC ("KRH"), BHP and the Guarantors party thereto (the "KRBGH LLC Agreement" and together with the Note Purchase Agreement, the "Agreements"), including such actions with respect to:

- approval of the Amendment, for which express written consent of PMF is required pursuant to Section 4(j)(3) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.1(b)(iii) of the KRBGH LLC Agreement;

- approval of the borrowing under the New Financing, for which express written consent of PMF is required pursuant to Section 4(j)(10) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.1(b)(x) of the KRBGH LLC Agreement;

- approval of the Special Dividend, for which express written consent of PMF is required pursuant to Section 4(j)(10) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.1(b)(x) of the KRBGH LLC Agreement;

- approval of the Asset Pledges, for which express written consent of PMF is required pursuant to Section 4(j)(10) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.1(b)(x) of the KRBGH LLC Agreement;

- approval of closing the Tender Offer, for which express written consent of PMF is required pursuant to Section 4(j)(10) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.1(b)(x) of the KRBGH LLC Agreement;

- the sale of a portion of the Units owned by K Road BG to EBG pursuant to the Tender Offer (the "Tender"), for which express written consent of PMF is required pursuant to Section 4(j)(7) of the Note Purchase Agreement and

CONFIDENTIAL

KR-0171692

express written consent of BHP is required pursuant to Section 2.1(b)(vii) of the KRBGH LLC Agreement;

- the sale of a portion of the 10% Warrant to EBG in the Warrant Repurchase (the "10% Warrant Sale"), for which express written consent of PMF is required pursuant to Section 4(r) of the Note Purchase Agreement and express written consent of BHP is required pursuant to Section 2.15 of the KRBGH LLC Agreement;

WHEREAS, PMF and BHP each desire to consent to all actions for which their consent is necessary in connection with the Transactions, upon the terms and conditions set forth herein;

WHEREAS, the proceeds to K Road BG from the Tender and the 10% Warrant Sale (the "Proceeds") will be sufficient, based on the minimum tender price, to pay in full categories First through Sixth of Section 3.3(a) of the Amended and Restated Limited Liability Company Agreement of K Road Power BG, dated as of October 6, 2005, by and among KRBGMM, WBD and the Guarantors party thereto (the "KRP BG LLC Agreement") and, therefore, PMF desires to convert the 8% Convertible Note issued pursuant to the Note Purchase Agreement dated October 6, 2005 (the "Note");

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Consent to Amendments of EBG LLC Agreement and Sale. Each of PMF and BHP hereby consent to all actions for which their consent is necessary for the Transactions, subject to satisfaction of each of the following conditions:

1.1    Price and Amount. All of the Units held by K Road BG will be tendered for sale at $310 per Unit and on terms as specified in Section 1.1 of the Offer to Purchase, provided that the Units actually sold shall be sold for the same price as the other Units in the Tender Offer and further provided that each of PMF and BHP hereby acknowledges and agrees that K Road BG may not sell a percentage of its Units exceeding the percentage of all outstanding Units purchased in the Tender Offer.

1.2    Other Terms. The Transactions shall be consummated in all material respects pursuant to the terms described in the Tender Offer Documents, the Commitment Documents and the Disclosure Document.

1.3    Timing. The Special Dividend shall be paid prior to receipt by PMF and BHP of their share of the Proceeds; and the Tender, the 10% Warrant Sale and the distribution to PMF and BHP of their share of the Proceeds shall occur on or prior to December 31, 2006.

1.4    EBG Resolution. A resolution of the Board of Directors of EBG in substantially the form of Exhibit C (the "Resolution") shall have been duly adopted by

3

22351492v5

CONFIDENTIAL                                    KR-0171693

the Board of Directors of EBG and create a valid and enforceable obligation of EBG as to the matters set forth therein.

2.    _Conversion of Note._ As provided herein, the conversion of the Note will occur concurrently with the distribution of its share of the Proceeds to PMF. PMF has delivered to KRP BG, the Note, a duly executed Notice of Conversion in the form set forth hereto as Exhibit B, and a letter of advice from counsel to PMF concluding that approval by the Federal Energy Regulatory Commission pursuant to Section 203 of the Federal Power Act is not required for conversion, each to be held in escrow pending the distribution to PMF of an amount sufficient to require the establishment of an escrow under the Note but for the conversion thereof. Concurrently with such distribution, the foregoing Notice of Conversion, Note and letter of advice shall be released from escrow to KRP BG and thereby the Note will be automatically converted into a 100% Series A Interest of KRP BG without any further action by PMF or KRP BG. If PMF does not receive its distribution by December 31, 2006, the Note and the Notice of Conversion shall be returned to PMF. PMF and BHP hereby consent to the inclusion of their names in any notice filing to the Federal Energy Regulatory Commission deemed necessary by WBD and its affiliates.

3.    _Distribution and Allocation of Units._

3.1    _Distribution of Proceeds._ Consistent with the terms of the KRBGH LLC Agreement and the KRP BG LLC Agreement, the Proceeds will be distributed as follows: 49% of the Proceeds will be distributed to BHP, and the remaining 51% to KRH and thereafter by KRP BG in accordance with the KRP BG LLC Agreement to pay in full categories First through Sixth of Section 3.3 of the KRP BG LLC Agreement, and thereafter applied in accordance with category Seventh without giving effect to any modifications thereto.

3.2    _Amendment to KRP BG LLC Agreement._ KRBGMM, WBD and PMF hereby agree that, effective immediately after the distribution of the Proceeds in accordance with this Consent, the KRP BG LLC Agreement shall be amended as follows:

(a) PMF shall be admitted as a Series A Member; and

(b) clause Seventh of Section 3.3(a) of the KRP BG LLC Agreement is hereby amended to read in its entirety as follows:

Seventh, the remainder, 39.215% to the Series B Members, ratably, based on their respective Capital Contributions, and 60.785% to the Series A Recipients, ratably, based on the Initial Investment of each Series A Recipient.

3.3    _Unrestricted Units._ At such time as any of the Units owned by K Road BG are permitted to be distributed by K Road BG under the EBG LLC Agreement as amended by the Amendment or any subsequent amendment of any material provision of the EBG LLC Agreement (subject to the prior written consent as required by the Note Purchase Agreement and the KRP BG LLC Agreement) (such freely transferable Units held by K Road, the "Unrestricted Units"), such Unrestricted Units shall be deemed "Marketable Securities" as defined in the KRP BG LLC Agreement and the KRBGH

22351492v5

4

CONFIDENTIAL

KR-0171694

LLC Agreement and distributed in kind (i) to KRBGH as the sole member of K Road BG and in turn to the members of KRBGH, BHP and KRH, and (ii) from KRH to KRP BG as its sole member, and in turn to the Series A Recipients and the Series B Member of KRP BG (as each is defined in the KRP BG LLC Agreement), in each case pursuant to the distribution provision of the relevant agreement, as amended, provided that such distributions shall not be made without compliance with all restrictions on transfer contained in the EBG LLC Agreement applicable to transfers of Units generally. For the avoidance of doubt, it is understood that the intention of the foregoing provision is to distribute 80% of all Unrestricted Units to PMF and BHP collectively on the one hand, and 20% of all Unrestricted Units to WBD and its affiliates, on the other hand.

3.4   10% Warrant.  As and when the 10% Warrant and/or any Units issued thereunder become unrestricted under the EBG LLC Agreement and the terms thereof, the 10% Warrant and/or such Units, as applicable, shall be distributed in the same manner provided in Section 3.3 for Unrestricted Units.  PMF hereby consents to the cashless exercise of any portion of the 10% Warrant remaining after the consummation of the Transactions, and K Road BG agrees to cause such cashless exercise promptly upon being permitted to do so.

4.   Miscellaneous Provisions.

4.1   Conditional Consent.  If any of the conditions set forth in Section 1 hereof are not true or become incapable of being satisfied, then this consent shall be deemed of no force and effect.

4.2   EBG Tax Resolution.  K Road BG hereby irrevocably assigns directly to each of PMF and BHP its right to enforce the obligations of EBG to pay taxes and/or withholding which may be incurred by PMF, BHP or their direct or indirect members, in connection with the Tender Offer, as provided for in the Resolution, and agrees to cooperate with PMF and BHP including providing at PMF's or BHP's request any required notices or other documentation to EBG.  K Road BG shall provide PMF and BHP with the opportunity to review and approve in writing of any procedures for the purpose of implementing the Resolution before it, or the directors or officers of EBG appointed by (or affiliated with) K Road BG propose such procedures.

4.3   Prior Notices of Future Consent Requests.  KRP BG and KRBGH shall provide prior notice in writing of any future request for consent required under Section 4(j) or 4(m) of the Note Purchase Agreement (or, upon conversion of the Note, Sections 2.1(b) or 2.11 of the KRP BG LLC Agreement) or Sections 2.1(b) or 2.11 of the KRBGH LLC Agreement, respectively.

4.4   Governing Law.  This Consent shall be governed by, and interpreted in accordance with, the laws of the State of New York, without giving effect to principles of conflict of laws.

22351492v5

CONFIDENTIAL

KR-0171695

4.5     Successors and Assigns. This Consent shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns or heirs and personal representatives.

4.6     Effect of Consent.   This Consent shall apply only to the specific transactions and actions referred to herein and not to any other transactions or actions and shall not be deemed a consent to any other modifications to the EBG LLC Agreement including, without limitation, any further amendments to Section 12.9 of the EBG LLC Agreement regarding transferability of the Warrant and the K Road Units, or any other transactions; any such further amendments of material provisions of the EBG LLC Agreement shall require a new written consent from PMF and BHM as provided by the Agreements.

4.7     Headings.     The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

4.8     Interpretation. In case any one or more of the provisions contained in this Consent shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Consent, and this Consent shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

4.9     Counterparts. This Consent may be executed in two or more counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one Consent.

[Remainder of Page Intentionally Left Blank]

6

22351492v5

CONFIDENTIAL                                                                     KR-0171696

IN WITNESS WHEREOF, the undersigned have duly executed this Consent, all as of the date first written above.

Boston Harbor Power LLC

By: _____
Name:
Title: *Philip Falcone VP*

WBD K Road Power BG LLC

By: _____
Name:
Title:

K Road BG Holdings LLC

By: _____
Name:
Title:

K Road BG LLC

By: _____
Name:
Title:

Power Management Financing LLC

By: _____
Name:
Title: *Philip Falcone VP*

K Road Power BG LLC

By: _____
Name:
Title:

K Road BG MM LLC

By: _____
Name:
Title:

[Signature Page to Written Consent and Amendment]

22351492v5

CONFIDENTIAL

KR-0171697

IN WITNESS WHEREOF, the undersigned have duly executed this Consent, all as of the date first written above.

Boston Harbor Power LLC                    Power Management Financing LLC

By: _____                 By: _____
    Name:                                        Name:
    Title:                                       Title:

WBD K Road  Power BG LLC                    K Road Power BG LLC

By: _____                 By: _____
    Name:                                        Name:
    Title:                                       Title:

K Road BG Holdings LLC                      K Road BG MM LLC

By: _____                 By: _____
    Name:                                        Name:
    Title:                                       Title:

K Road BG LLC

By: _____
    Name:
    Title:

[Signature Page to Written Consent and Amendment]

22351492v5

CONFIDENTIAL

KR-0171698

**Exhibit A**

**EBG LLC Consent**

(attached)

22351492v5

CONFIDENTIAL

KR-0171699

*Exhibit A*
*Consent #1*

## EBG HOLDINGS LLC

Action by Written Consent of Members

Under Section 18-302 of the
Delaware Limited Liability Company Act

The undersigned Members, holding (a) not less than 75% of the Voting Rights of the outstanding Units, and (b) not less than 50% of the Voting Rights of the outstanding Class A Units, of EBG Holdings LLC, a Delaware limited liability company (together with its subsidiaries, the "Company"), issued under the Amended and Restated Limited Liability Company Agreement of EBG Holdings LLC dated as of October 11, 2005, as amended (the "LLC Agreement") and entitled to vote hereon, do hereby adopt the following action by written consent in lieu of a meeting pursuant to Section 18-302(d) of the Delaware Limited Liability Company Act and Section 3.4(g) of the LLC Agreement:

WHEREAS, the Company proposes to effect a leveraged recapitalization in which it will (a) borrow (or issue notes) in principal amount (not including original issue discount and capitalized interest on payment-in-kind notes) of up to $2.3 billion on such terms and conditions, and with such lender or lenders, as may be approved by the Board of Directors of the Company (the "Board"), or a committee of the Board, and use the proceeds to:

- Repay all outstanding principal of, interest on and other amounts due in respect of the Company's then existing indebtedness for borrowed money;

- Purchase outstanding membership interests of the Company ("Units") pursuant to a "modified Dutch auction tender offer," in which

  - Holders of Units will be permitted to select the price, within a range specified by the Company, at which they are willing to sell Units to the Company;

  - The purchase price paid for Units will be the lowest price at which the Company can purchase Units and the K Road Warrants (as defined below) and expend the full amount of such proceeds remaining after repayment of the Company's then existing indebtedness for borrowed money, replacement of existing working capital and letter of credit

22301321v6

CONFIDENTIAL                                                                                                KR-0171700

> facilities, establishment of reserves and payment of costs, fees and
> expenses (or such lesser amount of such proceeds as results in all
> tendered Units being purchased); and
>
> - All Units will be purchased at the same price;

- Purchase a percentage of the outstanding warrants to purchase membership
interests held by K Road BG LLC and/or its officers, directors or employees
("K Road" and such warrants the "K Road Warrants") equal to the percentage
of outstanding Units purchased pursuant to the tender offer (such portion of
the K Road Warrants, the "Eligible K Road Warrants"), for a price equal to
the spread between the price paid for the Units in the tender offer and the K
Road Warrants exercise price;

- Establish any required debt service reserves and approximately $100 million
of contingency reserves; and

- Pay related costs, fees and expenses;

and (b) amend the remaining K Road Warrants to permit "cashless" exercise based on the
price per Unit paid in the tender offer and amend the provisions of the LLC Agreement
relating to transfer of the K Road Warrants (the foregoing transactions described in
clauses (a) and (b), collectively, the "Recapitalization");

WHEREAS, the Recapitalization requires the approval of the holders of 75% of
the Voting Rights of the outstanding Units of the Company, and in order to facilitate the
Recapitalization, the Company needs to enter into the following additional transactions
requiring approval by the holders of 50% of the Voting Rights of the Class A Units of
the Company:

- The maintenance of letters of credit, granting of mortgages on and security
interests in the Company's assets and other credit support arrangements in
connection with hedges of fuel costs, O&M expenses and electricity prices
required to enhance the Company's borrowing capacity, on such terms and
conditions as may be approved by the Board or a committee thereof;

- Prior to the Recapitalization, in connection with the hedge described
above, the amendment of its existing credit facilities and/or entry into new
short term credit facilities, in either case on such terms and conditions as
may be approved by the Board or a committee thereof and borrowing (or
issuance of notes) thereunder in a principal amount (not including original

2

22301321v6

CONFIDENTIAL

KR-0171701

issue discount and capitalized interest on payment-in-kind notes) not to exceed $850 million;

- The granting of mortgages on and security interests in the Company's assets and other credit support arrangements in connection with such short term financing and in connection with the Recapitalization;

- The formation of one or more wholly owned subsidiaries ("Holdco") in connection with such short term financing and the Recapitalization, the contribution of all of the membership interests in Boston Generating LLC to Holdco and (i) the borrowing by Holdco directly in connection with such short term financing and the Recapitalization, (ii) the pledge by Holdco of all of the membership interests in Boston Generating LLC to secure such short term financing and the indebtedness incurred in the Recapitalization, and (iii) the guarantee by Holdco of the indebtedness of Boston Generating LLC and/or its affiliates in connection with such short term financing and the Recapitalization;

(together with the Recapitalization, the "Transactions");

WHEREAS, each Member executing this Consent understands and acknowledges that by signing and returning this Consent such Member is consenting to all of the Transactions (as defined above) described herein and is consenting to management and the Board effecting the Transactions on such terms as they deem necessary and advisable and in the best interests of the Company and the Members, subject only to the limitations expressly set forth in the resolutions below; and

WHEREAS, each Member executing this Consent has been provided with information regarding the Transactions and an opportunity to ask questions of, and such Member has received answers thereto satisfactory to such Member from, the Company and its representatives regarding the Transactions, and such Member has obtained any and all additional information requested by such Member of the Company and its representatives regarding the Transactions.

NOW THEREFORE, IT IS:

3

22301321v6

CONFIDENTIAL                                                                                   KR-0171702

RESOLVED, that the Company be, and it hereby is, authorized and empowered to effect the Transactions, on such terms and conditions as the Board or a committee thereof may approve, provided that without further action by the Members:

- The total amount of indebtedness incurred shall not exceed $2.3 billion;
- The use of proceeds of the borrowing described above shall not be materially changed;
- The price at which the K Road Warrants are purchased shall not vary from that described above; and
- K Road shall not sell in the Recapitalization a percentage of its Units or K Road Warrants exceeding the percentage of all outstanding Units purchased in the Recapitalization;

RESOLVED, that effective upon the consummation of the Recapitalization, the LLC Agreement be amended by adding a definition of "Recapitalization" consistent with the definition of such term as used herein, and by amending Section 12.9 to read in its entirety as follows:

12.9   Restrictions on K Road Transfers.   [75%] Except as set forth in Section 12.7, and until such time as the K Road Management Agreement expires or terminates as provided therein, K Road will not be permitted to, and agrees that it will not (and will not permit its Affiliates to), Transfer all or any portion of the K Road Units, the K Road Warrants, or any Units issued pursuant to the K Road Warrants (collectively, the "Restricted Units"), unless it receives the prior approval of the Board (excluding the votes of Directors appointed or designated by K Road); provided, however, that K Road will be permitted to Transfer Restricted Units to K Road Restricted Transferees, subject to compliance with all other provisions of this Agreement including this Article 12.   If K Road Transfers any Restricted Units to K Road Restricted Transferees pursuant to the preceding sentence, then all of such K Road Restricted Transferees shall remain bound by the restrictions against Transfer of such Restricted Units as set forth in this Section 12.9.  In the case of any such Transferees who are officers, directors and employees of K Road or of a K Road Restricted Transferee, the Board will not unreasonably withhold its approval in the event that any such Transferee officers, directors, and employees desire to Transfer Restricted Units to Family Members for estate planning purposes so long as the provisions of Article 12 are otherwise complied with and so long as each

4

22301321v6

CONFIDENTIAL   KR-0171703

such Transferee Family Member agrees in writing (i) to be bound by all of the terms of this Agreement, and (ii) that such Family Member will not Transfer any Restricted Units to any Person without the prior approval of the Board (excluding the votes of Directors appointed or designated by K Road).   Any transfer, sale, pledge, hypothecation, encumbrance, assignment or other disposition (including any participation, profits interest, or other economic interest) of more than forty-nine percent (49%) of the equity interests in, or conveyance of Control over, (1) K Road, (2) any Affiliate of K Road that holds any of the Restricted Units, or (3) any Person that owns any equity interests in or has Control over K Road and/or any Affiliate of K Road that owns any Restricted Units, shall also be subject to the provisions of this Section 12.9 requiring the prior approval of the Board; provided, however, that no transfer, sale, pledge, hypothecation, encumbrance, assignment or other disposition (including any participation, profits interest, or other economic interest) of forty-nine percent (49%) or less of the equity interests in (1) K Road, (2) any Affiliate of K Road that holds any of the Restricted Units, or (3) any Person that owns any equity interests in or has Control over K Road and/or any Affiliate of K Road that owns any Restricted Units shall be subject to the restrictions set forth in this Section 12.9 unless it otherwise constitutes or involves a conveyance of Control.   Notwithstanding the foregoing, (a) to the extent set forth in the following table, the portion of the K Road Warrants which continues to be held by K Road or any K Road Restricted Transferee after the Recapitalization (the "Remaining K Road Warrants") and the Units issued pursuant to the Remaining K Road Warrants shall no longer be deemed to be Restricted Units from and after the respective dates indicated:

| Date | Aggregate Percentage of Remaining K Road Warrants (and Units Issued or Issuable Thereunder) Released From "Restricted Units" |
|---|---|
| April 1, 2007 | 50.0% |
| April 1, 2008 | 100% |

(b) to the extent set forth in the following table, any other Units which continue to be held by K Road or any K Road Restricted Transferee after the Recapitalization

5

22301321v6

and constituting Restricted Units (the "Remaining K Road Units") shall no longer be deemed to be Restricted Units from and after the respective dates indicated:

| DATE | Aggregate Percentage of Remaining K Road Units Released From "Restricted Units" |
|---|---|
| July 1, 2007 | 10.0% |
| July 1, 2008 | 20.0% |
| July 1, 2009 | 30.0% |
| July 1, 2010 | 40.0% |
| July 1, 2011 | 100.0% |

and (c) any Units, other than Units constituting Restricted Units, that may be acquired by K Road or any Affiliate of K Road from time to time shall not be subject to this Section 12.9.

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to execute and deliver an amendment to the K Road Warrants, or any warrant issued in exchange therefor in accordance with the terms thereof, and such other certificates, forms, instruments, documents and agreements, and to take all such other actions, in the name and on behalf of the Company and all the Members, as such proper officer may deem necessary, appropriate or advisable (a) in order to effectuate the provisions of Section 12.9 of the Operating Agreement, as amended by the foregoing resolutions, and (b) to amend the K Road Warrants so that immediately following the consummation of the Recapitalization, holders thereof shall be entitled to exercise the K Road Warrants in a cashless exercise pursuant to the procedure set forth for a cashless exercise in the event of a Liquidity Event pursuant to Section 1 of

6

22301321v6

CONFIDENTIAL

KR-0171705

the K Road Warrants, provided that for the purpose of making such cashless exercise, the "Current Market Price" shall be deemed to be the price paid for Units in the tender offer.

This Action by Written Consent of Members (this "Consent") may be executed in one or more counterparts, each of which when executed and delivered shall be an original, but all of which shall be deemed to constitute one and the same instrument; provided, however, that none of such counterparts shall be deemed effective until the date on which the Company has received counterparts of this Consent signed by Members holding not less than the requisite percentage of Voting Rights of each Class of outstanding Units entitled to vote hereon in accordance with the terms of the LLC Agreement.

Capitalized terms not otherwise defined in this Consent shall have the meanings assigned to such terms in the LLC Agreement.

*[remainder of page intentionally left blank]*

7

22301321v6

KR-0171706

The undersigned Member hereby certifies, represents, warrants, agrees and acknowledges to the Company pursuant to Section 3.5 of the LLC Agreement that, as of the date hereof, such Member's consent has not been influenced by, made at the direction of or otherwise controlled by any Person other than such Member itself or a Controlled Affiliate of such Member; provided, however, that votes of owners of a Blocker Entity shall be passed through on a pro rata basis to the Company level with respect to voting of the Units held by the Blocker Entity as if such owners of the Blocker Entity owned their proportional shares of the Units held by the Blocker Entity directly and were voting them at the Company level.

IN WITNESS WHEREOF, the undersigned has executed this Consent on the ____ day _____, 2006.

Name of Member:

_____

By_____
Name:
Title:

Number and Class of Units:

_____

8

22301321v6

CONFIDENTIAL

KR-0171707

*Exhibit A*
*Consent #2*

# EBG HOLDINGS LLC

Action by Written Consent of Members

Under Section 18-302 of the
Delaware Limited Liability Company Act

The undersigned Members, holding not less than 50% of the Voting Rights of the outstanding Class A Units of EBG Holdings LLC, a Delaware limited liability company (together with its subsidiaries, the "Company"), issued under the Amended and Restated Limited Liability Company Agreement of EBG Holdings LLC, dated as of October 11, 2005, as amended (the "LLC Agreement") do hereby adopt the following action by written consent in lieu of a meeting pursuant to Section 18-302(d) of the Delaware Limited Liability Company Act and Section 3.4(g) of the LLC Agreement:

WHEREAS, the Company proposes to effect a leveraged recapitalization (the "Recapitalization"), as previously approved by the Members and described in an Offer to Purchase, dated as of November 16, 2006, as supplemented (the "Offer to Purchase");

WHEREAS, in connection with the Recapitalization, the Company and its wholly-owned subsidiary Boston Generating, LLC ("Boston Generating"), have entered into financial hedging transactions with Credit Suisse Energy LLC ("CSE") and may in the future enter into additional financial hedging transactions with other counterparties (together, the "Hedge Transactions"), so as to provide comfort to prospective lenders of the New Financing (as defined in the Offer to Purchase) that the Company's revenue stream is stable;

WHEREAS, the Management and Operation Agreements between K Road BG Management, LLC and Boston Generating and other subsidiaries of the Company contemplate that Sempra Energy Trading Corp. ("Sempra") will be the sole counterparty for hedges entered into to manage market risk;

WHEREAS, the Company had discussions with Sempra and certain other parties regarding the Hedge Transactions, and the Board determined that it was in the best interests of the Company, its subsidiaries and Members that the Company enter into Hedge Transactions with CSE, and the Board may similarly determine in the future that it is advisable to enter to Hedging Transactions with other counterparties;

WHEREAS, the Company proposes, subject to Board approval, to make a pro rata cash distribution (the "Pro Rata Distribution") to all Members prior to the closing of the tender offer pursuant to the Offer to Purchase (the "Offer"), in the aggregate amount of $35,000,000, which amount the Company believes exceeds the Company's earnings and profits for the period from the date of the Company's election to be treated as a corporation for tax purposes through December 31, 2006; accordingly, the Company

22350609v6

CONFIDENTIAL

KR-0171708

believes that no part of the purchase price for the Units in the Offer should be treated as a dividend, but no assurance can be given on this point;

WHEREAS, in order to reduce the impact of uncertain tax consequences on the Members' decision whether or not to tender Units in the Offer, the Company has determined that it is in the best interests of the Company and the Members for the Company to agree to pay, and not seek recourse against Members in respect of, additional net withholding obligations or tax resulting from the characterization of purchase price paid in the Offer as a dividend;

WHEREAS, the LLC Agreement provides that to the extent the Company withholds or makes tax payments on behalf of or with respect to any Member, the Company shall seek recourse against such Member;

WHEREAS, each Member executing this Consent understands and acknowledges that by signing and returning this Consent such Member is consenting to all of the transactions described herein (the "Transactions") and is consenting to management and the Board effecting the Transactions on such terms as they deem necessary and advisable and in the best interests of the Company and the Members, subject only to the limitations expressly set forth in the resolutions below; and

WHEREAS, each Member executing this Consent has been provided with information regarding the Transactions and an opportunity to ask questions of, and such Member has received answers thereto satisfactory to such Member from, the Company and its representatives regarding the Transactions, and such Member has obtained any and all additional information requested by such Member of the Company and its representatives regarding the Transactions.

NOW, THEREFORE, IT IS:

RESOLVED, that the entry into the Hedging Transactions with persons other than Sempra is hereby ratified and approved;

RESOLVED, that if any amount paid in respect of Units purchased in the Offer is treated as a dividend for U.S. federal income tax purposes, the Company shall pay to the relevant taxing authority, and not seek recourse against any Member for, the amount, if any, by which (i) the aggregate amount of U.S. federal, state or local income, withholding or similar tax to which any person receiving distribution treatment with respect to the sale of Units in the Offer (including, in the case of any Member treated as a domestic partnership, such a person holding a direct or indirect interest in such Member) is subject as a result of the Offer and the Pro Rata Distribution exceeds (ii) the aggregate amount of U.S. federal, state or local income, withholding or similar tax to which such person would have been subject as a result of the Offer and the Pro Rata Distribution, assuming that no

2

22350609v6

CONFIDENTIAL

KR-0171709

amount paid for Units in the Offer had been treated as a dividend and that the Pro Rata Distribution had been treated entirely as a dividend;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized, empowered and directed to execute and deliver such certificates, forms, instruments, documents and agreements, and to take all such other actions, in the name and on behalf of the Company and all the Members, as such proper officer may deem necessary, appropriate or advisable in order to carry out the intent of the foregoing resolutions.

This Action by Written Consent of Members (this "Consent") may be executed in one or more counterparts, each of which when executed and delivered shall be an original, but all of which shall be deemed to constitute one and the same instrument; provided, however, that none of such counterparts shall be deemed effective until the date on which the Company has received counterparts of this Consent signed by Members holding not less than the requisite percentage of Voting Rights of each Class of outstanding Units entitled to vote hereon in accordance with the terms of the LLC Agreement.

Capitalized terms not otherwise defined in this Consent shall have the meanings assigned to such terms in the LLC Agreement.

*[remainder of page intentionally left blank]*

3

22350609v6

CONFIDENTIAL                                                                                                     KR-0171710

The undersigned Member hereby certifies, represents, warrants, agrees and acknowledges to the Company pursuant to Section 3.5 of the LLC Agreement that, as of the date hereof, such Member's consent has not been influenced by, made at the direction of or otherwise controlled by any Person other than such Member itself or a Controlled Affiliate of such Member; provided, however, that votes of owners of a Blocker Entity shall be passed through on a pro rata basis to the Company level with respect to voting of the Units held by the Blocker Entity as if such owners of the Blocker Entity owned their proportional shares of the Units held by the Blocker Entity directly and were voting them at the Company level.

IN WITNESS WHEREOF, the undersigned has executed this Consent on the _____ day December, 2006.

Name of Member:

_____

By_____
Name:
Title:

Number and Class of Units:

_____

22350609v6

CONFIDENTIAL

KR-0171711

**Exhibit B**

**NOTICE OF CONVERSION OR INTENT TO CONVERT**

To:     K Road Power BG LLC
        c/o K Road Power Inc.
        330 Madison Avenue, 25th Floor
        Attn: Mr. William Kriegel
        Phone: (212) 351-0510
        Fax: (212) 351-0515

The undersigned hereby irrevocably elects to convert the Note (the "Conversion"), into a Series A Interest of K Road Power BG, LLC equal to 100% according to the conditions of the 8% Convertible Note dated October 6, 2005 (the "Note"). The Note is attached hereto (or evidence of loss, theft or destruction thereof). Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to such terms in the Note Purchase Agreement. The Conversion Date shall be the date of distribution of the Proceeds (as defined in the Written Consent and Agreement, dated December 11, 2006, among the undersigned and other parties thereto (the "Written Consent and Agreement")) as set forth in the Written Consent and Agreement.

In connection with the conversion of the Note, the undersigned hereby represents as of the date written below, as follows:

1.      Certain ERISA Matters. Either (a) the undersigned (x) is a "benefit plan investor" (as such term is defined in the regulations of the U.S. Department of Labor ("DOL") included within 29 C.F.R. section 2510.3-101 (the "DOL Regulations")) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA and (y) so indicates in writing to the Managing Member on or before the Conversion at which the undersigned is admitted to the Company (an "ERISA Partner") or (b) the undersigned is not an ERISA Partner and no part of the funds used by the undersigned to acquire the Conversion Interest constitutes assets of any "employee benefit plan" within the meaning of section 3(3) of ERISA (a "Plan"). If the undersigned is unable to make the representation set forth in clause (a) or (b) of the preceding sentence, then the undersigned has indicated in writing that the undersigned is not an ERISA Partner, but that the funds used by the undersigned to acquire the Conversion Interest constitute (in whole or in part) either (i) Plan assets not subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or (ii) assets allocated to an insurance company general account.

If the undersigned is an insurance company using the assets of the undersigned's general account, then (A) the undersigned is eligible for and meets the requirements of DOL Prohibited Transaction Class Exemption 95-60 with respect to the acquisition and subsequent holding of the Conversion Interest being purchased by the undersigned hereunder and (B) less than 25% of the assets in such account are assets (or represent assets) of "benefit plan investors" as such term is defined in the DOL Regulations. If the Conversion Interest is being acquired by the undersigned as an ERISA Partner or is being acquired using Plan assets, then (1) such acquisition has been duly authorized in accordance with the governing plan documents, and (2) such acquisition and

22351492v5

CONFIDENTIAL

KR-0171712

the subsequent holding of such Conversion Interest do not and will not constitute a "prohibited transaction" within the meaning of section 406 of ERISA or section 4975 of the Code, that is not subject to an exemption contained in ERISA or in the rules and regulations adopted by the DOL thereunder.

The undersigned acknowledges that neither the Managing Member nor any of its affiliates is registered as an "investment adviser" under the U.S. Investment Advisers Act of 1940, as amended from time to time, and that, as a Member, the undersigned will have no right to withdraw from the Company except as may be expressly set forth in the Limited Liability Company Agreement.

2.    Matters Relating to Publicly Traded Companies.    Either (a) the undersigned is not an entity that is treated as a partnership, grantor trust or S corporation for U.S. federal income tax purposes, or (b) the undersigned is such an entity but (i) less than 50% of the undersigned's value will be attributable to the Conversion Interest to be acquired by the undersigned pursuant to this Notice of Conversion or (ii) permitting the Company to satisfy the 100-partner limitation in section 1.7704-1(h)(1)(ii) of the regulations of the U.S. Department of the Treasury (the "Treasury") issued pursuant to the Code is not a principal purpose of the undersigned's beneficial owners investing in the Company through the undersigned, provided that if the undersigned is unable to make either such representation, the undersigned shall have so indicated to the Company in writing at least five Business Days prior to the Conversion Date and shall have provided the Company with evidence (including opinions of counsel), satisfactory in form and substance to the Company, relating to the status of the Company under section 7704 of the Code.

3.    Status as a Non-Natural Person for U.S. Federal Income Tax Purposes.    If the undersigned is any of the following, the undersigned shall so have indicated in writing:  (a) a natural person, (b) a trust any portion of which is treated (under subpart E of part I of subchapter J of chapter 1 of subtitle A of the Code) as owned by a natural person (e.g., a grantor trust) or (c) an entity disregarded for federal income tax purposes and owned (or treated as owned) by a natural person or a trust described in clause (b) hereof (e.g., a limited liability company with a single member).

4.    Compliance with PUHCA and Other Regulatory Matters.    The undersigned is not a Utility Person (as defined in the limited liability agreement of the Company) and as of the Conversion Date, the undersigned's acquisition of the Conversion Interest will not cause a Utility Event (as defined in the limited liability agreement of the Company).

Power Management Financing LLC

By:    _____
    Name:
    Title:

22351492v5

KR-0171713

## Exhibit C

### Resolutions

(attached)

22351492v5

CONFIDENTIAL

## RESOLUTIONS OF

## THE BOARD OF DIRECTORS OF

## EBG HOLDINGS LLC

Under Section 18-404 of the
Delaware Limited Liability Company Act

The undersigned, being a majority of all of the Directors of EBG Holdings LLC, a
Delaware limited liability company (the "Company"), do hereby adopt the following
actions by written consent in lieu of a meeting pursuant to Section 18-404(d) of the
Delaware Limited Liability Company Act and Section 5.9 of the Amended and Restated
Limited Liability Company Agreement of EBG Holdings LLC dated as of October 11,
2005, as amended (the "LLC Agreement"; capitalized terms not otherwise defined herein
being used herein as such terms are defined in the LLC Agreement):

Recapitalization

WHEREAS, the Board of Directors (the "Board") of EBG Holdings LLC
(together with its subsidiaries, the "Company") previously resolved that, subject to
receipt of a solvency certification and a solvency opinion in form and substance
satisfactory to the Board, the Company be authorized and empowered to effect a
leveraged recapitalization (the "Recapitalization") in which the Company will borrow (or
issue notes) in principal amount (not including original issue discount and capitalized
interest on payment-in-kind notes) of up to $2.3 billion on such terms and conditions, and
with such lender or lenders, as may be approved by the Board or a committee of the
Board;

WHEREAS, in connection with the Recapitalization, the Company has caused its
wholly owned subsidiary, Boston Generating, LLC ("Boston Gen"), to enter into fuel and
electricity price hedging transactions with Credit Suisse Energy LLC ("CSE"), for the
purpose of stabilizing the revenue stream of the Company and protecting against
significant degradation in such revenue stream, on the terms and conditions previously
approved by the Board;

Use of Proceeds

WHEREAS, with the proceeds of the borrowing under the Recapitalization, the
Company proposes to (a) repay all outstanding principal of, interest on and other amounts
due in respect of the Company's then existing other indebtedness for borrowed money;
(b) make a distribution to all members of the EBG Holdings LLC (the "Members"), prior
to the purchase of Units in the Offer, of $35,000,000, an amount estimated to be in excess
of the Company's undistributed earnings and profits for the period from the date of the

22346394v10

CONFIDENTIAL

KR-0171715

Company's election to be treated as a corporation for tax purposes through December 31, 2006; (c) purchase a percentage of the outstanding warrants to purchase membership interests held by K Road BG LLC and/or its officers, directors or employees equal to the percentage of outstanding Units purchased pursuant Offer; (d) purchase up to $975,000,000 in value of outstanding membership interests of the Company ("Units") pursuant to the Offer to Purchase dated November 16, 2006, as amended or supplemented from time to time and together with the information incorporated therein (the "Offer"); (e) replace or continue existing working capital and letter of credit facilities; (f) establish any required debt service reserves and approximately $100 million of contingency reserves; (g) pay or pre-pay related costs, fees and expenses; and (h) finance the working capital and other business requirements of the Company and its subsidiaries following the consummation of the Recapitalization (collectively, the "Use of Proceeds");

### First Lien Credit Agreement

WHEREAS, in order to finance the Recapitalization, the Company proposes among other things that Boston Gen enter into the First Lien Credit and Guaranty Agreement (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "First Lien Credit Agreement"), by and among Boston Gen, as Borrower, the Company's wholly owned subsidiaries, BG Boston Services, LLC (BG Boston Services), BG New England Power Services, Inc. ("BG NEPS"), Fore River Development, LLC ("Fore River"), Mystic I, LLC ("Mystic I"), and Mystic Development, LLC ("Mystic Development"), as guarantors (collectively, the "Guarantors"), the Initial Lenders and Synthetic Issuing Bank as defined therein (collectively, the "First Lien Lenders"), Credit Suisse Cayman Islands Branch ("CS") as first lien collateral agent (the "First Lien Collateral Agent"), Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as joint lead arrangers and as joint book running managers, CS as the first lien administrative agent ("First Lien Administrative Agent") hereto, providing, among other things: (i) a senior secured first lien term loan credit facility, in an aggregate principal amount of up to $1,180,000,000 (the "First Lien Term Facility"), (ii) a secured first lien synthetic letter of credit facility in an aggregate principal amount of up to $275,000,000 (the "Synthetic Letter of Credit Facility") and (iii) a secured first lien revolving credit facility in an aggregate principal amount of up to $95,000,000 (the "Synthetic Revolving Credit Facility", and, together with the First Lien Term Facility and the Synthetic Letter of Credit Facility, the "First Lien Facilities").

### First Lien Mortgage

WHEREAS, in connection with the First Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities, the Company shall cause Mystic I, Mystic Development and Fore River, as mortgagors (in such capacity, the "Mortgagors") to enter into first lien mortgages of real property (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise)

2

22346394v10

CONFIDENTIAL

KR-0171716

(the "First Lien Mortgages," and each, a "First Lien Mortgage") by the Mortgagors in favor of the First Lien Collateral Agent as mortgagee for the benefit of, among others, the First Lien Lenders, CSE and certain other secured parties specified in the First Lien Credit Agreement (the "First Lien Secured Parties");

### First Lien Security Agreement

WHEREAS, in connection with the First Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities, the Company shall enter into a First Lien Security Agreement by and among Boston Gen, the Guarantors and the First Lien Collateral Agent (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "First Lien Security Agreement");

### First Lien Pledge Agreement

WHEREAS, in connection with the First Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities, the Company shall enter into a First Lien Pledge Agreement by and among the Company, as pledgor and the First Lien Collateral Agent (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "First Lien Pledge Agreement");

### Second Lien Credit Agreement

WHEREAS, the Company proposes among other things that Boston Gen enter into the Second Lien Credit and Guaranty Agreement (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Second Lien Credit Agreement"), by and among Boston Gen, as borrower, the Guarantors, the Initial Lenders as named therein (the "Second Lien Lenders"), CS, as second lien collateral agent ("Second Lien Collateral Agent"), Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners as joint lead arrangers, and CS as the second lien administrative agent (the "Second Lien Administrative Agent"), providing, among other things, for a senior secured second lien term loan facility in an aggregate principal amount of up to $425,000,000 (the "Second Lien Term Facility");

### Second Lien Mortgage

WHEREAS, in connection with the Second Lien Credit Agreement and as a condition precedent to the borrowings under the Second Lien Term Facility, the Company shall the Mortgagors to enter into second lien mortgages of real property (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Second Lien Mortgages," and each, a "Second Mortgage") by the Mortgagors in favor of the Second Lien Collateral Agent as mortgagee

3

22346394v10

CONFIDENTIAL

KR-0171717

for the benefit of the Second Lien Lenders and certain other secured parties specified in the Second Lien Credit Agreement (the "Second Lien Secured Parties");

### Second Lien Security Agreement

WHEREAS, in connection with the Second Lien Credit Agreement and as a condition precedent to the borrowings under the Second Lien Facilities, the Company shall enter into a Second Lien Security Agreement by and among Boston Gen, the Guarantors and the Second Lien Collateral Agent (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Second Lien Security Agreement");

### Second Lien Pledge Agreement

WHEREAS, in connection with the Second Lien Credit Agreement and as a condition precedent to the borrowings under the Second Lien Facility, the Company enter into a Second Lien Pledge Agreement by and between the Company, as pledgor, and the Second Lien Collateral Agent (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Second Lien Pledge Agreement");

### Intercreditor Agreement

WHEREAS, in connection with the First Lien Credit Agreement and the Second Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities and the Second Lien Facility, respectively, the Company shall enter into a Collateral Agency and Intercreditor Agreement by and among the Company, First Lien Administrative Agent, Second Lien Administrative Agent, First Lien Collateral Agent Second Lien Collateral Agent, CSE and the several lenders and financial institutions from time to time party thereto (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Intercreditor Agreement");

### Security Deposit Agreement

WHEREAS, in connection with the First Lien Credit Agreement and the Second Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities and the Second Lien Facility, respectively, the Company shall cause Boston Gen to enter into a Security Deposit Agreement by and among Boston Gen, the Guarantors, First Lien Collateral Agent, Second Lien Collateral Agent, and U.S. Bank National Association, as depositary (the "Depositary") (in substantially the form of the draft thereof previously distributed to the Board by electronic mail or otherwise) (the "Security Deposit Agreement" and, collectively with the First Lien Mortgage, First Lien Security Agreement, First Pledge Agreement, Second Lien Mortgage, Second Lien

4

22346394v10

CONFIDENTIAL

KR-0171718

Security Agreement, Second Lien Pledge Agreement, Intercreditor Agreement and
Security Deposit Agreement, the "Security Collateral Documents");

### Guarantee

WHEREAS, pursuant to the First Lien Credit Agreement and the Second Lien
Credit Agreement and as a condition precedent to the borrowings under the First Lien
Facilities and Second Lien Facility, the Company and the Guarantors shall guarantee the
obligations of Boston Gen under the First Lien Credit Agreement and Second Lien Credit
Agreement, and grant security interests in, and pledge substantially all of, the equity
interests in and substantially all of the assets of Boston Gen and its subsidiaries pursuant
to the Security Collateral Documents;

### Mezzanine

WHEREAS, the Company proposes among other things to enter into the
Mezzanine Credit Agreement (in substantially the form of the draft thereof previously
distributed to the Board by electronic mail or otherwise) (the "Mezzanine Credit
Agreement"), among EBG Holdings LLC, as Borrower, CS as administrative agent,
Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as joint
lead arrangers and as joint book running managers and the several lenders and financial
institutions from time to time party thereto, providing, among other things, for a senior
unsecured term loan facility in an aggregate principal amount of up to $325,000,000 (the
"Mezzanine Facility");

### Solvency

WHEREAS, in connection with the Recapitalization, pursuant to Section 18-607
of the Delaware Limited Liability Company Act, as amended, the Board desires to
confirm that, at the time of and after giving effect to the Recapitalization, all liabilities of
the Company, other than liabilities to members on account of their limited liability
company interests and liabilities for which the recourse of creditors is limited to specified
property of the Company, will not exceed the fair value of the assets of the Company,
except that the fair value of property that is subject to a liability for which the recourse of
creditors is limited shall be included in the assets of the Company only to the extent that
the fair value of that property exceeds that liability;

WHEREAS, the Board desires to confirm that, under the Delaware Uniform
Fraudulent Transfer Act, as amended, (a) the Recapitalization is not being made with the
actual intent to hinder, delay, or defraud any present or future creditor of the Company,
(b) following the Recapitalization, the Company will not be or be about to be engaging in
a business or transaction for which the remaining assets of the Company would be
unreasonably small, and (c) following the Recapitalization, the Company does not intend

5

22346394v10

CONFIDENTIAL

KR-0171719

to incur, nor believes or reasonably should believe that the Company would incur, debts beyond its ability to pay as they become due;

WHEREAS, the Board has been provided and has reviewed the opinion of the Company's financial advisor, Duff & Phelps LLP, dated December 18, 2006, as to certain matters relating to the solvency of the Company in connection with the Recapitalization;

WHEREAS, the Board has been provided and has reviewed a certificate of the Director of Finance as to as to certain matters relating to the solvency of the Company in connection with the Recapitalization;

WHEREAS, the Board has consulted with the officers of the Company as to the present fair value of the Company's assets;

WHEREAS, based upon the foregoing, the Board has determined that the present book value of the assets does not reflect the present fair value of the assets of the Company;

WHEREAS, the Board, based on the foregoing, believes that a reasonable basis exists for concluding that (a) at the time of and after giving effect to the Recapitalization and consummating the foregoing transactions, all liabilities of the Company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the Company, will not exceed the fair value of the assets of the Company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of that property exceeds that liability, (b) the Recapitalization and foregoing transactions are not being made with the actual intent to hinder, delay, or defraud any present or future creditor of the Company, (c) following the Recapitalization and consummation of the foregoing transactions, the Company will not be or be about to be engaging in a business or transaction for which the remaining assets of the Company would be unreasonably small and (d) following the Recapitalization, the Company does not intend to incur, nor believes nor reasonably should believe that the Company would incur, debts beyond its ability to pay as they become due;

2007 Operating and Capital Budgets

WHEREAS, in connection with the Company's existing financing agreements and in connection with the First Lien Credit Agreement and the Second Lien Credit Agreement and as a condition precedent to the borrowings under the First Lien Facilities and the Second Lien Facility, respectively, the Company shall provide a certified copy of each of an operating budget and a capital budget for Boston Gen and its subsidiaries for fiscal year 2007 (the "2007 Operating and Capital Budgets");

22346394v10

CONFIDENTIAL                                                                KR-0171720

WHEREAS, the Board has determined that the Company's consummation of the transactions described above is appropriate, advisable and in the best interests of the Company and its members;

NOW, THEREFORE, the Board adopts on behalf of the Company and its subsidiaries, the following resolutions in connection with and in furtherance of the foregoing:

First Lien Credit Agreement

RESOLVED, that the form, terms and provisions of the First Lien Credit Agreement, providing among other things for the First Lien Facilities, be, and they hereby are, approved; and that any of the Chief Executive Officer, Director of Finance, any Executive Vice President, any Senior Vice President, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Assistant Secretary of the Company (individually, an "Authorized Officer," and collectively, the "Authorized Officers") be, and each of them hereby is, authorized and empowered to execute and deliver the First Lien Credit Agreement, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so;

First Lien Mortgage

RESOLVED, that the form, terms and provisions of the First Lien Mortgage be, and they hereby are, approved and adopted in all respects; and that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the First Lien Mortgage, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

First Lien Security Agreement

RESOLVED, that the form, terms and provisions of the First Lien Security Agreement be, and they hereby are, approved and adopted in all respects; and that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the First Lien Security Agreement, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in

7

22346394v10

CONFIDENTIAL

KR-0171721

substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### First Lien Pledge Agreement

RESOLVED, that the form, terms and provisions of the First Lien Pledge Agreement be, and they hereby are, approved and adopted in all respects; and that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the First Lien Pledge Agreement, in the name and on behalf of the Company and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### Second Lien Credit Agreement

RESOLVED, that the form, terms and provisions of the Second Lien Credit Agreement, providing among other things for the Second Lien Facility, be, and they hereby are, approved; and that any Authorized Officer of the Company be, and each of them hereby is, authorized and empowered to execute and deliver the Second Lien Credit Agreement, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so;

### Second Lien Mortgage

RESOLVED, that the form, terms and provisions of the Second Lien Mortgage be, and they hereby are, approved and adopted in all respects; and that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the Second Lien Mortgage, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### Second Lien Security Agreement

RESOLVED, that the form, terms and provisions of the Second Lien Security Agreement be, and they hereby are, approved and adopted in all respects; and that any of

8

22346394v10

CONFIDENTIAL

KR-0171722

the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the Second Lien Security Agreement, in the name and on behalf of Boston Gen and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### Second Lien Pledge Agreement

RESOLVED, that the form, terms and provisions of the Second Lien Pledge Agreement be, and they hereby are, approved and adopted in all respects; and that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to execute and deliver the Second Lien Pledge Agreement, in the name and on behalf of the Company and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### Intercreditor Agreement

RESOLVED, that the form, terms and provisions of the Intercreditor Agreement be, and they hereby are approved; and that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed to execute and deliver or to have executed and delivered an acknowledgement of the Intercreditor Agreement, in the name and on behalf of the Company and its subsidiaries, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

### Security Deposit Agreement

RESOLVED, that the form, terms and provisions of the Security Deposit Agreement be, and they hereby are approved; and that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed to execute and deliver or to have executed and delivered an acknowledgement of the Security Deposit Agreement, in the name and on behalf of Boston Gen and its subsidiaries, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so.

9

22346394v10

CONFIDENTIAL

KR-0171723

Guarantee

RESOLVED, that the Company and the Guarantors be, and hereby are, authorized and empowered to guarantee the obligations of Boston Gen under the First Lien Credit Agreement and Second Lien Credit Agreement, and grant security interests in, and pledge substantially all of, the equity interests in and substantially all of the assets of Boston Gen and its subsidiaries pursuant to the Security Collateral Documents;

Mezzanine Credit Agreement

RESOLVED, that the form, terms and provisions of the Mezzanine Credit Agreement, providing among other things the Mezzanine Facility, be, and they hereby are, approved; and that any Authorized Officer of the Company be, and each of them hereby is, authorized and empowered to execute and deliver the Mezzanine Credit Agreement, in the name and on behalf of the Company and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested or required, in substantially such form with such changes and additions as the Authorized Officer executing it may approve, such officer's execution thereof to be conclusive evidence of such approval and of such officer's authority to do so;

2007 Operating and Capital Budgets

RESOLVED, that the 2007 Operating and Capital Budgets be, and hereby are approved; and that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed to deliver or to have delivered certified copies of the 2007 Operating and Capital Budgets, in the name and on behalf of Boston Gen and its subsidiaries, such officer's execution of such certification to be conclusive evidence of such approval;

Incurrence of Indebtedness, Including Letters of Credit

RESOLVED, that any of the Chief Executive Officer, Director of Finance, the Treasurer, any Assistant Treasurer or the Senior Vice President, General Counsel and Secretary of the Company (the "Authorized Borrowing Officers") be, and each of them hereby is, authorized and empowered to cause the Company and its subsidiaries to incur indebtedness of up to $2.1 billion in the aggregate under the First Lien Facilities, the Second Lien Facility and the Mezzanine Facility, including, without limitation, through the issuance of the Synthetic Letters of Credit (as defined in the First Lien Credit Agreement) thereunder, and in connection therewith to execute and deliver as necessary from time to time letter of credit applications and borrowing notices and certificates, including, without limitation, an application for the Synthetic Letters of Credit, in the name and on behalf of the Company and its subsidiaries, attested by the Secretary or any Assistant Secretary, if requested or required, and under the Company's seal, if requested

10

22346394v10

CONFIDENTIAL                                                                 KR-0171724

or required, in such forms as may be required by the First Lien Administrative Agent
under the First Lien Credit Agreement and as the officer executing any of them may
approve, such officer's execution thereof to be conclusive evidence of such approval and
of such officer's authority to do so.

### Use of Proceeds

RESOLVED, that the Company be, and hereby is, authorized to apply the loan
proceeds of the borrowing under the Recapitalization on terms and conditions
substantially similar, and in accordance, with the Use of Proceeds;

### Distribution

RESOLVED, that the Company be, and hereby is, authorized to make a pro rata
cash distribution of $35,000,000 ("Pro Rata Distribution") to all Members of record on
the date immediately preceding the closing of the Offer;

RESOLVED, that if any amount paid in respect of Units purchased in the Offer is
treated as a dividend for U.S. federal income tax purposes, the Company shall pay to the
relevant taxing authority, and not seek recourse against any Member for, the amount, if
any, by which (i) the aggregate amount of U.S. federal, state or local income, withholding
or similar tax to which any person receiving distribution treatment with respect to the sale
of Units in the Offer (including, in the case of any Member treated as a domestic
partnership, such a person holding a direct or indirect interest in such Member) is subject
as a result of the Offer and the Pro Rata Distribution exceeds (ii) the aggregate amount of
U.S. federal, state or local income, withholding or similar tax to which such person would
have been subject as a result of the Offer and the Pro Rata Distribution, assuming that no
amount paid for Units in the Offer had been treated as a dividend and that the Pro Rata
Distribution had been treated entirely as a dividend;

### Bank Accounts

RESOLVED, that the Authorized Officers of the Company be, and each of them
hereby is, authorized and empowered, in the name and on behalf of the Company and/or
its subsidiaries, to open such bank accounts as they deem necessary and advisable in
connection with the transactions contemplated by the foregoing resolutions, and the
execution of any standard form of resolutions or other documentation requested by the
bank(s) in connection with the opening of such accounts be and they hereby are
approved;

### General Authority

RESOLVED, that the Authorized Officers of the Company be, and each of them
hereby is, authorized and empowered, in the name and on behalf of the Company and/or

11

22346394v10

CONFIDENTIAL                                                                      KR-0171725

its subsidiaries, to do and perform, or cause or authorize to be done and performed, any and all such other acts, deeds and things and to make, execute and deliver, or cause to be made, executed and delivered, in the name and on behalf of the Company and/or its subsidiaries, as the case may be, and under seal of any of them, if requested or required, any and all such other agreements, undertakings, powers of attorney, documents, consents, filings or instruments, with such terms and provisions as any such officer may approve, as such Authorized Officer may deem necessary or appropriate to effect the transactions contemplated by the foregoing resolutions, to fulfill the obligations of the Company in connection therewith, or otherwise to carry out the purpose and intent of the foregoing resolutions, the execution, delivery or performance thereof or the taking of any such action to be conclusive evidence of such approval and authority;

RESOLVED, that the Company and its subsidiaries be, and hereby are, authorized to pay all necessary and reasonable costs, fees and expenses incurred in connection with adopting and implementing the foregoing resolutions and consummating the agreements described above, including all fees and expenses of lenders, auditors, attorneys, consultants, engineers and other advisors, and all other expenses, including but not limited to obtaining regulatory approvals and third party consents and ratings, and the Authorized Officers of each of them be, and each of them hereby is, authorized, in the name and on behalf of the Company and/or its subsidiaries, to pay any and all such costs, fees and expenses and to make such other payments as they, or any of them, shall determine to be appropriate in connection with such adoption and implementation, such payment to be conclusive evidence of their determination; and to the extent any such payments have been made to date, such payments are hereby ratified, confirmed and approved;

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officers of the Company to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions;

RESOLVED, that any Authorized Officer be, and hereby is, authorized to execute an Action by Written Consent of the Sole Member of Boston Gen, BG Boston Services, BG NEPS, Fore River, Mystic I, and Mystic Development LLC, authorizing and empowering such companies to effect the transactions contemplated by the foregoing resolutions; and

RESOLVED, that all actions heretofore taken by the Company or any of its subsidiaries or by any officer or director of the Company or any of its subsidiaries in connection with or relating to the subject matter of the foregoing resolutions that are

12

22346394v10

CONFIDENTIAL

KR-0171726

within the authority conferred by the foregoing resolutions are hereby authorized, approved, ratified and confirmed as the acts and deeds of the Company and its subsidiaries, having the same force as if performed pursuant to the direct authorization of the Board.

RESOLVED, that each director hereby waives all notice requirements of the meetings at which these resolutions have been adopted.

13

22346394v10

CONFIDENTIAL

KR-0171727

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director


_____
Kip Horton
Director


_____
William C. Hughes, Jr.
Director


_____
Michael A. Kramer
Director


_____
William V. Kriegel
Director


_____
Barry F. Sullivan
Director


_____
Jerry D. Thurmond
Director


14

22346394v10

CONFIDENTIAL

KR-0171728

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director

_____
Kip Morton
Director

_____
William C. Hughes, Jr.
Director

_____
Michael A. Kramer
Director

_____
William V. Kriegel
Director

_____
Barry F. Sullivan
Director

_____
Jerry D. Thurmond
Director

14

22346394v10

CONFIDENTIAL

KR-0171729

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director


_____
Kip Horton
Director


_____
William C. Hughes, Jr.
Director


_____
Michael A. Kramer
Director


_____
William V. Kriegel
Director


_____
Barry F. Sullivan
Director


_____
Jerry D. Thurmond
Director

14

22346394v10

CONFIDENTIAL

KR-0171730

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director

_____
Kip Horton
Director

_____
William C. Hughes, Jr.
Director

_____
Michael A. Kramer
Director

_____
William V. Kriegel
Director

_____
Barry F. Sullivan
Director

_____
Jerry D. Thurmond
Director

14

22346394v10

CONFIDENTIAL

KR-0171731

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director


_____
Kip Horton
Director


_____
William C. Hughes, Jr.
Director


_____
Michael A. Kramer
Director


_____
William A. Kriegel
Director


_____
Barry F. Sullivan
Director


_____
Jerry D. Thurmond
Director


14

22346394v10

CONFIDENTIAL

KR-0171732

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this Action by Written Consent as of the 18th day December, 2006.

_____
Jeffrey A. Brodsky
Director


_____
Kip Horton
Director


_____
William C. Hughes, Jr.
Director


_____
Michael A. Kramer
Director


_____
William V. Kriegel
Director


_____
Barry F. Sullivan
Director

_____
Jerry D. Thurmond
Director

14

22346394v10

CONFIDENTIAL

KR-0171733

# EXHIBIT E

EXECUTION COUNTERPART

## $1,450,000,000 FIRST LIEN CREDIT AND GUARANTY AGREEMENT

Dated as of December 21, 2006

Among

BOSTON GENERATING, LLC

as Borrower

and

THE GUARANTORS

as Guarantors

and

THE INITIAL LENDERS, SYNTHETIC ISSUING BANKS AND FRONTING BANK
NAMED HEREIN

as Initial Lenders, Synthetic Issuing Banks and Fronting Bank

and

CREDIT SUISSE

as First Lien Collateral Agent

and

CREDIT SUISSE

as Administrative Agent

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as Co-Syndication Agents and as Co-Documentation Agents

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as Joint Lead Arrangers and as Joint Book Running Managers

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

# EXHIBIT E

# TABLE OF CONTENTS

**Section**                                                                    **Page**

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms.................................................................................... 2
SECTION 1.02. Computation of Time Periods; Other Definitional Provisions........................... 36
SECTION 1.03. Accounting Terms............................................................................................ 36

## ARTICLE II

### AMOUNTS AND TERMS OF THE LOANS, SYNTHETIC DEPOSITS,
### REVOLVING CREDIT-LINKED DEPOSITS
### AND THE SYNTHETIC LETTERS OF CREDIT

SECTION 2.01. The Loans, Synthetic L/C Deposits, Revolving Credit-Linked Deposits and
    the Synthetic Letters of Credit........................................................................... 36
SECTION 2.02. Making the Loans............................................................................................ 39
SECTION 2.03. Issuance of and Drawings and Reimbursement Under Synthetic Letters of
    Credit and Matters Relating to Synthetic L/C Deposits...................................... 40
SECTION 2.04. Repayment of Loans ....................................................................................... 48
SECTION 2.05. Termination or Reduction of the Commitments ................................................ 48
SECTION 2.06. Prepayments .................................................................................................... 50
SECTION 2.07. Interest............................................................................................................. 52
SECTION 2.08. Fees ................................................................................................................. 53
SECTION 2.09. Conversion of Loans ....................................................................................... 54
SECTION 2.10. Increased Costs, Etc. ...................................................................................... 55
SECTION 2.11. Payments and Computations............................................................................ 56
SECTION 2.12. Taxes ............................................................................................................... 58
SECTION 2.13. Sharing of Payments, Etc. .............................................................................. 61
SECTION 2.14. Use of Proceeds.............................................................................................. 62
SECTION 2.15. Change of Control Prepayment........................................................................ 62
SECTION 2.16. Evidence of Debt............................................................................................. 63
SECTION 2.17. Duty to Mitigate.............................................................................................. 64
SECTION 2.18. Revolving Credit-Linked Deposit Accounts..................................................... 64

## ARTICLE III

### CONDITIONS TO EFFECTIVENESS AND OF LENDING
### AND ISSUANCES OF SYNTHETIC LETTERS OF CREDIT

SECTION 3.01. Conditions Precedent ...................................................................................... 69
SECTION 3.02. Conditions Precedent to Each Borrowing and Issuance ................................... 76
SECTION 3.03. Determinations Under Section 3.01 ................................................................. 77

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties........................................................................ 77

# ARTICLE V

## COVENANTS

SECTION 5.01. Affirmative Covenants.................................................................................... 85
SECTION 5.02. Negative Covenants ...................................................................................... 88
SECTION 5.03. Reporting Requirements ............................................................................... 96
SECTION 5.04. Financial Covenants....................................................................................... 99

# ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default .......................................................................................... 102
SECTION 6.02. Actions in Respect of the Synthetic Letters of Credit upon Default................ 107

# ARTICLE VII

## THE AGENTS

SECTION 7.01. Authorization and Action................................................................................ 107
SECTION 7.02. Administrative Agent's Reliance, Etc............................................................. 108
SECTION 7.03. Initial Banks and Affiliates ........................................................................... 108
SECTION 7.04. Lender Party Credit Decision........................................................................ 109
SECTION 7.05. Indemnification ............................................................................................ 109
SECTION 7.06. Successor Administrative Agent ................................................................... 111

# ARTICLE VIII

## GUARANTY

SECTION 8.01. Guaranty; Limitation of Liability.................................................................... 111
SECTION 8.02. Guaranty Absolute ....................................................................................... 112
SECTION 8.03. Waivers and Acknowledgments...................................................................... 113
SECTION 8.04. Subrogation .................................................................................................. 114
SECTION 8.05. Subordination ............................................................................................... 115
SECTION 8.06. Continuing Guaranty; Assignments ............................................................... 115

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01. Amendments, Etc. .......................................................................................... 115
SECTION 9.02. Notices, Etc. ................................................................................................. 118
SECTION 9.03. No Waiver; Remedies ................................................................................... 120
SECTION 9.04. Costs and Expenses ...................................................................................... 120
SECTION 9.05. Right of Set-off ............................................................................................ 122
SECTION 9.06. Binding Effect .............................................................................................. 122
SECTION 9.07. Assignments and Participations .................................................................... 122
SECTION 9.08. Execution in Counterparts ............................................................................ 127
SECTION 9.09. No Liability of the Synthetic Issuing Banks ................................................. 127
SECTION 9.10. Confidentiality .............................................................................................. 128
SECTION 9.11. Marshalling; Payments Set Aside ................................................................ 128
SECTION 9.12. Patriot Act Notice ......................................................................................... 129
SECTION 9.13. Hedge Banks ................................................................................................. 129
SECTION 9.14. Intercreditor Agreement ............................................................................... 129
SECTION 9.15. Jurisdiction, Etc. .......................................................................................... 129
SECTION 9.16. Governing Law ............................................................................................. 130
SECTION 9.17. Waiver of Jury Trial ..................................................................................... 130

SCHEDULES

Schedule I - Commitments and Applicable Lending Offices
Schedule 2.03(i) - Existing Letters of Credit
Schedule 4.01(b) - Loan Parties
Schedule 4.01(c) - Subsidiaries
Schedule 4.01(e) - Governmental Approvals and Authorizations
Schedule 4.01(g) - Litigation
Schedule 4.01(o) - Environmental Disclosure
Schedule 4.01(q) - Surviving Debt
Schedule 4.01(r) - Owned Real Property
Schedule 4.01(s) - Leased Real Property
Schedule 4.01(t) - Material Contracts
Schedule 5.01(d) - Insurance
Schedule 5.02(a) - Liens
Schedule 5.02(m) - 2006 Base Capex Amount

EXHIBITS

Exhibit A-1 - Form of Revolving Credit Note
Exhibit A-2 - Form of Synthetic L/C Note
Exhibit A-3 - Form of Term B Note
Exhibit B-1 - Form of Notice of Borrowing
Exhibit B-2 - Form of Notice of Issuance
Exhibit C - Form of Assignment and Acceptance
Exhibit D - Form of First Lien Mortgage
Exhibit E - Form of Solvency Certificate
Exhibit F-1 - Form of Consent and Agreement for Permitted Commodity Hedge and Power Sale Agreements
Exhibit F-2 - Form of Consent and Agreement for Other Material Contracts
Exhibit F-3 - Form of Consent and Agreement for Other Material Contracts with Affiliates
Exhibit G - Form of Intercreditor Agreement
Exhibit H - Form of Security Deposit Agreement
Exhibit I - Form of Annual Budget
Exhibit J - Form of Joinder Agreement
Exhibit K - Form of First Lien Security Agreement
Exhibit L - Form of First Lien Pledge Agreement
Exhibit M - Terms of Subordination
Exhibit N - Form of Closing Date Summary Funds Flow Memo

## FIRST LIEN CREDIT AND GUARANTY AGREEMENT

BOSTON GENERATING, LLC FIRST LIEN CREDIT AND GUARANTY AGREEMENT dated as of December 21, 2006 among BOSTON GENERATING, LLC, a Delaware limited liability company (the "***Borrower***"), the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), the Fronting Bank (as hereinafter defined), the Synthetic Issuing Bank (as hereinafter defined), CREDIT SUISSE, CAYMAN ISLANDS BRANCH ("***CS***"), as first lien collateral agent (together with any successor collateral agent appointed pursuant to Section 7 of the Intercreditor Agreement, the "***First Lien Collateral Agent***") for the First Lien Secured Parties (as hereinafter defined), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-syndication agents (together with any successor co-syndication agents, the "***Co-Syndication Agents***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-documentation agents (together with any successor co-documentation agents, the "***Co-Documentation Agents***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as joint lead arrangers (together with any successor joint lead arrangers, the "***Joint Lead Arrangers***") and as joint lead book running managers (together with any successor joint lead arrangers, the "***Joint Book Running Managers***"), and CS, as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***" and, together with the First Lien Collateral Agent, the "***Agents***") for the Lender Parties (as hereinafter defined).

### PRELIMINARY STATEMENTS:

(1)    The Borrower has requested that the Lender Parties lend to the Borrower up to $1,450,000,000 (comprised of (a) $1,130,000,000 term loan facility, (b) $250,000,000 synthetic letter of credit facility and (c) $70,000,000 synthetic working capital revolving credit facility) to repay all outstanding obligations under the Existing Credit Agreements, pay transaction fees and expenses in connection with the foregoing ("***Transaction Costs***"), provide security in the form of letters of credit to support the working capital needs and obligations of the Borrower and Guarantors and provide funds for ongoing working capital requirements, to fund in part the Distribution and the Tender Offer (each as hereinafter defined) and provide funds for other general corporate purposes of the Borrower and the Guarantors.

(2)    Prior to entering into this Agreement, the Borrower has entered into a certain Initial Commodity Hedge and Power Sale Agreement (as hereinafter defined) dated as of November 20, 2006, with Credit Suisse Energy LLC relating to a total of approximately 1600 MW of generating capacity.

(3)    EBG Holdings has commenced the Tender Offer (as hereinafter defined) for up to $925,000,000 of its Units (as hereinafter defined) to be financed in part with the proceeds from the Facilities (as hereinafter defined).

(4)    EBG Holdings intends to make a pro rata distribution to its unit holders, prior to the purchase of Units in the Tender Offer, in an amount of up to $40,000,000 to be financed in part with the proceeds from the Facilities (the "***Distribution***").

(5)    Simultaneously with the entering into of this Agreement, the Borrower and the Guarantors are entering into that certain Second Lien Credit and Guaranty Agreement, dated as of the date hereof (the "*Second Lien Credit Agreement*"), with each of the banks, financial institutions and other institutional lenders party thereto from time to time (the "*Second Lien Lenders*"), and CS, as Second Lien Collateral Agent and as administrative agent (the "*Second Lien Administrative Agent*"), the proceeds of which shall be used in part to repay in full amounts outstanding under the Existing Credit Agreements.

(6)    The Lender Parties have indicated their willingness to agree to make Loans (as hereinafter defined), issue Synthetic Letters of Credit (as hereinafter defined), make the Synthetic L/C Deposits (as hereinafter defined) and make Revolving Credit-Linked Deposits (as hereinafter defined) subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Accepting Lenders*" has the meaning specified in Section 2.06(c).

"*Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Accumulated Emissions Credits*" has the meaning specified in the Security Deposit Agreement.

"*Adjusted Base Capex Allowance*" means, for any Fiscal Year, $10,000,000 *minus* any amount that was, during the prior Fiscal Year, a Pullback Amount.

"*Adjusted Capex Limit*" means, for any Fiscal Year, the Adjusted Base Capex Allowance *plus* any Carryover Amount for such Fiscal Year *plus* any Pullback Amount for such Fiscal Year.

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lender Parties from time to time.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or

2

officer of such Person. For purposes of this definition, the term "*control*" (including the terms "*controlling*," "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to vote 15% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" has the meaning specified in the recital of parties to this Agreement.

"*Agreement*" means this First Lien Credit and Guaranty Agreement, as amended.

"*Agreement Value*" means, for each Hedge Agreement or Commodity Hedge and Power Sale Agreement, on any date of determination, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement or Commodity Hedge and Power Sale Agreement, as the case may be, in accordance with its terms as if an Early Termination Event has occurred on such date of determination.

"*Applicable Lending Office*" means, with respect to each Lender Party, such Lender Party's Domestic Lending Office in the case of a Base Rate Loan and such Lender Party's Eurodollar Lending Office in the case of a Eurodollar Rate Loan, Synthetic L/C Deposit or Revolving Credit-Linked Deposit.

"*Applicable Margin*" means 1.25% per annum for Base Rate Loans and 2.25% per annum for Eurodollar Rate Loans, Revolving Credit-Linked Deposit and the Synthetic L/C Deposits (including with respect to the calculation of the fees set forth in Section 2.08).

"*Applicable Revolving Credit Percentage*" means, with respect to any Revolving Credit Lender for purposes of Section 2.18 or the calculation of the Revolving Credit Exposure, the percentage of the Revolving Credit Commitments represented by such Revolving Credit Lender's Revolving Credit Commitments.

"*Appropriate Lender*" means, at any time, with respect to (a) any of the Term B Facility or the Revolving Credit Facility, a Lender (including the Fronting Bank) that has a Commitment with respect to such Facility at such time and (b) the Synthetic L/C Facility, the Synthetic L/C Lenders and the Synthetic Issuing Bank.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender Party, (b) an Affiliate of a Lender Party or (c) an entity or an Affiliate of an entity that administers or manages a Lender Party.

"*Asset Sale*" has the meaning specified in the Security Deposit Agreement.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender Party and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "*Eligible Assignee*"), and accepted by

the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"***Auction Date***" means the date of the consummation of the Tender Offer.

"***Available Amount***" of any Synthetic Letter of Credit means, at any time, the maximum amount (whether or not such maximum amount is then in effect under such Synthetic Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Synthetic Letter of Credit) available to be drawn under such Synthetic Letter of Credit at such time (assuming compliance at such time with all conditions to drawing).

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "*Bankruptcy*," as now and hereafter in effect, or any successor statute.

"***Bankruptcy Law***" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"***Base Capex Amount***" means, for each Fiscal Year, $10,000,000; *provided* that the Base Capex Amount for the 2006 Fiscal Year shall be $12,093,000 to be utilized for the Capital Expenditures set forth on Schedule 5.02(m) only.

"***Base Case Projections***" has the meaning specified in Section 3.01(a)(xiii).

"***Base Rate***" means a fluctuating interest rate *per annum* in effect from time to time, which rate per annum shall at all times be equal to the higher of:

      (a)    the rate of interest announced by CS in New York, New York, from time to time, as the prime rate; and

      (b)    ½ of 1% *per annum* above the Federal Funds Rate.

"***Base Rate Loan***" means any Loan that bears interest as provided in Section 2.07(a)(i).

"***Borrower***" has the meaning specified in the recital of parties to this Agreement.

"***Borrowing***" means a Term B Borrowing, a Revolving Credit Borrowing or a Synthetic L/C Borrowing, as the context may require.

"***Budget***" has the meaning specified in Section 5.03(d).

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain

4

closed; *provided* that, when used in connection with a Eurodollar Rate Loan, Synthetic Letter of Credit, Revolving Credit-Linked Deposit or a Synthetic L/C Deposit, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"*Cabot Guaranty*" means the guaranty dated as of January 15, 2000, by Cabot LNG LLC, a Delaware limited liability company, in favor of Mystic Development and Exelon New England Power Marketing Limited Partnership, a limited partnership organized under the laws of Delaware.

"*Call Premium*" shall mean, with respect to any applicable commitment reduction under <u>Section 2.05(a)</u> or any applicable prepayment under <u>Section 2.06(a)</u>, an amount equal to (a) 1.00% of the aggregate amount of such commitment reduction or the aggregate principal amount of such prepayment (as applicable) if such commitment reduction or such prepayment (as applicable) occurs within twelve (12) months of the Effective Date. Any commitment reduction or prepayment made more than twelve (12) months after the Effective Date will not be subject to the Call Premium.

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person *plus* (b) the aggregate principal amount of all Debt (including obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, "*Capital Expenditures*" shall not include: (i) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds, except to the extent that the gross amount of such purchase price exceeds the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be and (ii) expenditures made as a part of a Permitted Development so long as such expenditure is included in the calculation of the aggregate amount of consideration payable for such Permitted Development and is permitted by the terms of this Agreement.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Carryover Amount*" means, for any Fiscal Year, the amount (not to exceed $10,000,000, provided that the Carryover Amount for the 2007 and 2008 Fiscal Years shall also include that portion of the Base Capex Amount for the 2006 Fiscal Year not utilized in the prior year) by which the Adjusted Base Capex Allowance for the prior Fiscal Year *plus* any Carryover Amount as determined during such prior Fiscal Year exceeds Capital Expenditures made in such prior Fiscal Year.

5

"*Cash*" means money, currency or a credit balance in any demand account or deposit account.

"*Cash Equivalents*" has the meaning specified in the Security Deposit Agreement.

"*Casualty Event*" has the meaning specified in the Security Deposit Agreement.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"*Change of Control*" means, at any time after the Auction Date, any "*person*" or "*group*" (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) (other than any such "*person*" or "*group*" holding, directly or indirectly, beneficially or of record, any Equity Interests in EBG Holdings as of the Auction Date) (the "*Proposed Acquiror*") shall have acquired ownership, directly or indirectly, beneficially or of record, of more than 35% on a fully diluted basis of the aggregate voting power represented by the issued and outstanding Equity Interests in EBG Holdings unless (i) such Proposed Acquiror is a Qualified Owner and (ii) each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Facilities (as in effect immediately prior to such acquisition) after giving effect to such acquisition. For the purposes of this definition, a "*person*" or "*group*" shall not include any of the unit holders of EBG Holdings solely by virtue of such unit holders being a party to the limited liability company agreement of EBG Holdings.

"*Closing Date Summary Funds Flow Memo*" has the meaning specified in Section 3.01(l).

"*Co-Documentation Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Co-Syndication Agents*" has the meaning specified in the recital of parties to this Agreement.

"*Collateral*" means all Property (including Equity Interests in any Guarantor) of the Loan Parties, now owned or hereafter acquired, other than Excluded Property.

"*Collateral Agent's Office*" means, with respect to the First Lien Collateral Agent or any successor First Lien Collateral Agent, the office of such Agent as such Agent may from time to time specify to the Borrower and the Administrative Agent.

6

"*Commitment*" means a Term B Commitment, a Revolving Credit Commitment, a Synthetic L/C Deposit Commitment or a Synthetic L/C Issuing Commitment, as the context may require.

"*Commodity Hedge and Power Sale Agreement*" means, with respect to power, electricity, capacity, ancillary services, electric transmission, weather, fuel, fuel transmission, fuel transportation, fuel storage, heat rate options, emissions allowances and emissions credits and, in the case of each of the foregoing, products related thereto, any swap, cap, collar, floor, ceiling, option, future, forward, spot agreement, contract for differences, basis trade, purchase agreement, sale agreement, netting agreement, tolling agreement or any other similar agreement, whether physical or financial, entered into with respect to any commodity or commodity-related product.

"*Commodity Hedge Counterparty*" means any Person that (a) (i) is a commercial bank, insurance company, investment fund or other similar financial institution (including CS) or any Affiliate thereof which is engaged in the business of entering into Commodity Hedge and Power Sale Agreements, (ii) is a public utility or (iii) is in the business of selling, marketing, purchasing, transporting, distributing or storing electric energy, fuel, oil, natural gas or weather-related derivatives, as applicable, and (b) at the time the applicable Permitted Commodity Hedge and Power Sale Agreement is entered into, has a Required Rating.

"*Communications*" has the meaning specified in Section 9.02(b).

"*Comparable Project*" means one or more electric generating facilities that are of a size and scope substantially similar to or greater than the Projects taken as a whole.

"*Confidential Information*" means information that any Loan Party furnishes to any Agent or any Lender Party designated as confidential, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender Party of its obligations hereunder or that is or becomes available to such Agent or such Lender Party from a source other than the Loan Parties that is not, to the best of such Agent's or such Lender Party's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Consolidated Adjusted EBITDA*" means, for any period (without duplication), an amount determined for the Borrower and its Subsidiaries on a Consolidated basis equal to (a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Cash Interest Expense, (iii) provisions for taxes based on income, (iv) Cash proceeds of any Permitted Emissions Sales Gains, (v) total depreciation expense, (vi) total amortization expense, (vii) other non-Cash items reducing Consolidated Net Income for such period, including unrealized losses attributable to the change in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements and accruals for liquidated damages and related late

7

fees associated with the Distrigas Litigation described in Schedule 4.01(g) (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period), *minus* (b) to the extent included in determining Consolidated Net Income, other non-Cash items increasing Consolidated Net Income for such period, including unrealized gains attributable to the changes in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash items in any prior period). For purposes of this definition, Consolidated Adjusted EBITDA for each of the periods ending the last day of each of June, September and December 2006 shall be deemed to be $57,250,000, $57,250,000 and $57,250,000, respectively.

"***Consolidated Cash Interest Expense***" means, for any period, total interest expense (including that portion attributable to Capitalized Leases in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries on a Consolidated basis with respect to all outstanding Debt for Borrowed Money of the Borrower and its Subsidiaries for such period, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net obligations under Hedge Agreements, but excluding, however, (a) any amount for related late fees and interest associated with the Distrigas Litigation described in Schedule 4.01(g), (b) interest payable under the Borrower's fuel oil inventory program permitted pursuant to Section 5.02(b)(v)(B) and (c) interest and fees associated with RMR Revenues subject to refund. For purposes of determining Consolidated Cash Interest Expense for any period ending prior to January 1, 2008, Consolidated Cash Interest Expense shall be deemed to be: (i) for the Fiscal Quarter ending March 31, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarter *multiplied by* (y) four (4), (ii) for the two Fiscal Quarters ending June 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) two (2), (iii) for the three Fiscal Quarters ending September 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) four-thirds (4/3), and (iv) for the four Fiscal Quarters ending December 31, 2007, actual Consolidated Cash Interest Expense for such Fiscal Quarters.

"***Consolidated Net Income***" means, for any period, (a) the net income (or loss) of the Borrower and its Subsidiaries on a Consolidated basis for such period determined in conformity with GAAP, *minus* (b) to the extent otherwise included in Consolidated Net Income, (i) the income of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (ii) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Plan, (iii) (to the extent not included in clauses (i) and (ii) above) any net extraordinary gains or net extraordinary losses and (iv) income attributable to the RMR Agreement (other than Permitted RMR Revenues) *plus* (c) without duplication, Permitted RMR Revenues. In addition, Consolidated Net Income for any period shall reflect expenses associated with long-term service agreements on the

8

basis of equivalent operating hours incurred during such period (instead of on the basis of maintenance work performed during such period as required by GAAP).

"*Consolidated Total Debt*" means, as at any date of determination, the aggregate stated balance sheet amount of all Debt for Borrowed Money of the Borrower and its Subsidiaries determined on a Consolidated basis in accordance with GAAP.

"*Contractual Obligations*" means, as applied to any Person, any provision of any Equity Interests issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"*Control*" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Conversion*," "*Convert*" and "*Converted*" each refer to a conversion of Loans of one Type into Loans of the other Type pursuant to Section 2.09 or 2.10.

"*CS*" has the meaning specified in the recital of parties to this Agreement.

"*Cure Notice*" has the meaning specified in Section 5.04(c)(ii).

"*Debt*" of any Person means, without duplication, (a) Debt for Borrowed Money of such Person, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue (unless being contested in good faith by appropriate proceedings for which reserves and other appropriate provisions, if any, required by GAAP shall have been made) by more than 90 days incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (g) all obligations of such Person in respect of Hedge Agreements and Commodity Hedge and Power Sale Agreements (valued at the Agreement Value thereof), in each case, pursuant to an International Swap Dealers Association agreement, form or other similar arrangement, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right,

9

contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations.

"*Debt for Borrowed Money*" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, and (b) all Synthetic Debt of such Person at such date; *provided* that with respect to each of clause (a) and (b) above, any amounts associated with unutilized and undrawn amounts under the Synthetic L/C Facility and the Revolving Credit Facility shall not be deemed Debt for Borrowed Money.

"*Declining Lender*" has the meaning set forth in Section 2.06(c).

"*Default*" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"*Default Interest*" has the meaning set forth in Section 2.07(b).

"*Depositary*" has the meaning specified in the Security Deposit Agreement.

"*Distribution*" has the meaning set forth in the preliminary statements to this Agreement.

"*Distrigas Guaranty*" means the guaranty dated as of January 15, 2000, by Exelon New England Holdings, LLC, a Delaware limited liability company, in favor of Distrigas of Massachusetts Corporation and its successors.

"*Distrigas Litigation*" means that certain case pending in the Suffolk County, Massachusetts Superior Court (Civil Action No: 05-0764) entitled Distrigas of Massachusetts, LLC v. Mystic Development and Exelon New England, LLC, as described in Schedule 4.01(g).

"*Dollars*" and the sign "*$*" mean the lawful currency of the United States of America.

"*Domestic Lending Office*" means, with respect to any Lender Party, the office of such Lender Party specified as its "*Domestic Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender Party, as the case may be, or such other office of such Lender Party as such Lender Party may from time to time specify to the Borrower and the Administrative Agent.

"*Early Termination Event*" has the meaning specified in the Intercreditor Agreement.

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

"*EBG Holdings*" means EBG Holdings LLC, a Delaware limited liability company.

"*EBG Holdings O&M Costs*" has the meaning specified in the Security Deposit Agreement.

"*EBG Holdings Tax Liabilities*" has the meaning specified in the Security Deposit Agreement.

"*Effective Date*" has the meaning specified in Section 3.01.

"*Eligible Assignee*" means (a) a Lender Party; (b) an Affiliate of a Lender Party; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by (i) the Administrative Agent, (ii) in the case of an assignment of a Synthetic L/C Deposit Commitment, the Synthetic Issuing Bank and (iii) in the case of an assignment of a Revolving Credit-Linked Deposit, the Fronting Bank (each such approval not to be unreasonably withheld or delayed); *provided, however*, that (i) with respect to an assignment of a Synthetic L/C Issuing Commitment, such Eligible Assignee must also be an Eligible Bank and (ii) no Loan Party shall qualify as an Eligible Assignee under this definition.

"*Eligible Bank*" means any bank or financial institution established under the laws of the United States, any State thereof or any other country that is a member of the OECD which has a long term unsecured non-credit enhanced rating of A3 or higher from Moody's and A- or higher from S&P.

"*Eligible Permitted Commodity Hedge and Power Sale Agreement*" means any Permitted Commodity Hedge and Power Sale Agreement entered into by any Loan Party which, at the time such Permitted Commodity and Hedge and Power Sale Agreement is entered into, is structured such that the Commodity Hedge Counterparty's credit exposure and active or projected mark-to-market exposure to the Borrower or any other Loan Party is positively correlated with the price of the relevant commodity (including "spark spread"), including the Initial Commodity Hedge and Power Sale Agreement.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, written notice of non compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"*Environmental Law*" means any Federal, state or local statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Materials, health or natural resources, including, without limitation, those relating to the use,

11

handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Cure*" has the meaning specified in <u>Section 5.04(c)</u>.

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"*Equity Issuance*" has the meaning specified in the Security Deposit Agreement.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 414(b) or (c) of the Internal Revenue Code.

"*ERISA Event*" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"*Eurocurrency Liabilities*" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Eurodollar Lending Office*" means, with respect to any Lender Party, the office of such Lender Party specified as its "*Eurodollar Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender Party (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender Party as such Lender Party may from time to time specify to the Borrower and the Administrative Agent.

"*Eurodollar Rate*" means, for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing, an interest rate *per annum* equal to the rate *per annum* obtained by dividing (a) the rate *per annum* determined by the Administrative Agent by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which had been nominated by the British Bankers' Association as a authorized information vendor for the purpose of displaying such rates) as the London interbank offered rate for deposits in U.S. dollars at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period for a period equal to such Interest Period (*provided* that, if for any reason such rate is not available, the term "*Eurodollar Rate*" shall mean, for any Interest Period, the rate *per annum* determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered to major banks in the London interbank market in London, England at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period) by (b) a percentage equal to 100% *minus* the Eurodollar Rate Reserve Percentage for such Interest Period.

"*Eurodollar Rate Loan*" means a Loan that bears interest as provided in Section 2.07(a)(ii).

"*Eurodollar Rate Reserve Percentage*" for any Interest Period for all Eurodollar Rate Loans comprising part of the same Borrowing, any Interest Period for the Revolving Credit-Linked Deposits or any Investment Period for the Synthetic L/C Deposits means the reserve percentage applicable two Business Days before the first day of such Interest Period or Investment Period, as applicable, under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that

13

includes deposits by reference to which the interest rate on Eurodollar Rate Loans, Revolving Credit-Linked Deposits or Synthetic L/C Deposits is determined) having a term equal to such Interest Period.

"*Event of Eminent Domain*" has the meaning specified in the Security Deposit Agreement.

"*Events of Default*" has the meaning specified in Section 6.01.

"*EWG*" has the meaning specified in Section 4.01(v).

"*Excess Duration Transaction*" has the meaning specified in Section 5.02(l).

"*Excluded Property*" has the meaning specified in the Intercreditor Agreement.

"*Existing Credit Agreements*" means, collectively, (i) the Amended and Restated First Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the First Lien Term Lenders named therein, the Working Capital Lenders named therein, the LC Lenders named therein, the LC-DSR Lenders named therein, CS, as First Lien Administrative Agent and CS, as Collateral Agent and (ii) the Amended and Restated Second Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the Second Lien Lenders named therein, CS, as Second Lien Administrative Agent and CS, as Collateral Agent.

"*Existing Debt*" means Debt of each Loan Party outstanding immediately before the occurrence of the Effective Date.

"*Existing Letters of Credit*" means each letter of credit set forth on Schedule 2.03(j).

"*Facility*" means the Term B Facility, the Synthetic L/C Deposit Facility, the Synthetic L/C Facility or the Revolving Credit Facility, as the context may require.

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate *per annum* equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Fee Letter*" means the fee letter dated November 20, 2006 between the Borrower and CS as Administrative Agent and First Lien Collateral Agent, as amended.

"*FERC*" means the Federal Energy Regulatory Commission and its successors.

14

"***Financial Covenants***" has the meaning specified in <u>Section 5.04(c)</u>.

"***First Lien Collateral Agent***" has the meaning specified in the recital of parties to this Agreement.

"***First Lien Collateral Documents***" means the First Lien Pledge Agreement, First Lien Security Agreement, the Security Deposit Agreement, the First Lien Mortgages, each First Lien Consent and Agreement, each of the collateral documents, instruments and agreements delivered pursuant to <u>Section 5.01(j)</u>, and each other agreement that creates or purports to create a Lien in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties.

"***First Lien Consent and Agreement***" means (a) with respect to the Initial Commodity Hedge and Power Sale Agreement, a consent and agreement in substantially the form attached hereto as <u>Exhibit F-1</u>, and (b) with respect to any Material Contract entered into after the Effective Date, (i) if such Material Contract is a Permitted Commodity Hedge and Power Sale Agreement, a consent and agreement in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties) in substantially the form attached hereto as <u>Exhibit F-1</u> and (ii) in the case of any other such Material Contract, a consent and agreement in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties) in substantially the form attached hereto as <u>Exhibit F-2</u> or, in either case, otherwise in form and substance reasonably satisfactory to the First Lien Collateral Agent and the Administrative Agent.

"***First Lien Debt Service Reserve Requirement***" means (a) on the Effective Date, $53,300,000 and (b) on any date of determination occurring after the Effective Date, an amount equal to 100% of the sum of the reasonably anticipated aggregate scheduled principal pursuant to <u>Section 2.04(a)</u> other than with respect to such principal payable on the Term B Maturity Date, interest and fees (including Participation Fees and other fees payable pursuant to <u>Section 2.08</u>) payable during the following six month period occurring after such date of determination in respect of the Facilities.

"***First Lien Mortgage Policies***" has the meaning specified in Section 3.01(a)(iv)(C).

"***First Lien Mortgages***" has the meaning specified in <u>Section 3.01(a)(iv)</u> and shall include any other deed of trust, trust deed, mortgage, leasehold mortgage or leasehold deed of trust delivered from time to time after the date hereof pursuant to <u>Section 5.01(j)</u>, in each case as amended.

"***First Lien Obligations***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Pledge Agreement***" means that certain First Lien Pledge Agreement substantially in the form attached hereto as <u>Exhibit L</u> and dated as of December 21, 2006 by EBG Holdings in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, as amended.

15

"***First Lien Secured Parties***" has the meaning specified in the Intercreditor Agreement.

"***First Lien Security Agreement***" means that certain First Lien Security Agreement substantially in the form attached hereto as Exhibit K and dated December 21, 2006 by the Borrower and the Guarantors in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, as amended.

"***First Offer***" has the meaning specified in Section 2.06(c).

"***Fiscal Quarter***" means a fiscal quarter of any Fiscal Year.

"***Fiscal Year***" means a fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"***Fore River***" means Fore River Development, LLC, a Delaware limited liability company.

"***Fore River Project***" means a combined-cycle electric generating facility in Weymouth and Quincy, Massachusetts and owned by Fore River with a nominal capacity of 807 MW in operation.

"***FPA***" means the Federal Power Act, as amended.

"***Fronting Bank***" means CS, as the Lender of Revolving Credit Loans.

"***Fund***" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"***Funded Revolving Credit Loan***" has the meaning specified in Section 2.18(c).

"***Funding Account***" has the meaning specified in the Security Deposit Agreement.

"***GAAP***" has the meaning specified in Section 1.03.

"***Governmental Authority***" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

16

"*Granting Lender*" has the meaning specified in <u>Section 9.07(1)</u>.

"*Guaranteed Debt*" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in <u>Section 8.01</u>.

"*Guarantors*" means BG Boston Services, LLC, BG New England Power Services, Inc. and each of the Project Companies and each other Person becoming a party hereto pursuant to <u>Section 5.01(k)</u> by the execution and delivery of a Joinder Agreement substantially in the form attached hereto as <u>Exhibit J</u>.

"*Guaranty*" means the guaranty of the Guarantors set forth in <u>Article VIII</u>.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements but excluding any Commodity Hedge and Power Sale Agreement.

"*Hedge Bank*" means any Person that is a commercial bank, insurance company or other similar financial institution, or any Affiliate thereof, that (a) is engaged in the business of entering into interest rate Hedge Agreements and (b) at the time the applicable Hedge Agreement is entered into, has a Required Rating.

"*Honor Date*" has the meaning specified in Section 2.03(d)(i).

"*Indemnified Costs*" has the meaning specified in Section 7.05.

"*Indemnified Party*" has the meaning specified in Section 9.04(b).

"*Independent Engineer*" means any independent consulting engineer reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Black & Veatch Corporation.

"*Independent Insurance Consultant*" means any independent insurance consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, ARM Tech, a division of AON Risk Services, Inc.

"*Independent Power Market Consultant*" means any independent power market consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Navigant Consulting, Inc.

"*Initial Banks*" means the Administrative Agent, the First Lien Collateral Agent, the Synthetic Issuing Bank, each Co-Syndication Agent, each Co-Documentation Agent, each Joint Book Running Manager and each Joint Lead Arranger.

"*Initial Commodity Hedge and Power Sale Agreements*" means, collectively:

    (a)    the ISDA Master Agreement dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

    (b)    the Schedule to the 1992 ISDA Master Agreement dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

    (c)    two Confirmations to Credit Suisse Energy LLC Re: Financial Put Swaption – Cash Settled dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC; and

    (d)    two Confirmations to Credit Suisse Energy LLC Re: Financial Swap – Cash Settled dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

18

in each case as amended.

"*Initial Extension of Credit*" means the earlier to occur of the initial Borrowing and the initial issuance of a Synthetic Letter of Credit hereunder.

"*Initial Lender Parties*" means the Initial Synthetic Issuing Banks and the Initial Lenders.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Operating Budget*" has the meaning specified in <u>Section 3.01(a)(xiii)</u>.

"*Initial Synthetic Issuing Bank*" means the bank listed on the signature pages hereof as the Initial Synthetic Issuing Bank.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"*Insurance Proceeds*" has the meaning set forth in the Security Deposit Agreement.

"*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement substantially in the form attached hereto as <u>Exhibit G</u>, dated as of December 21, 2006, by and among the Borrower, the Guarantors, EBG Holdings, the First Lien Collateral Agent, the Second Lien Collateral Agent, First Lien Administrative Agent, CS, as Second Lien Administrative Agent, certain Commodity Hedge Counterparties and the other Persons party thereto from time to time, as amended.

"*Interest Coverage Ratio*" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period then ended to (b) Consolidated Cash Interest Expense for such four-Fiscal Quarter period.

"*Interest Period*" means, for each Eurodollar Rate Loan comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Loan or the date of the Conversion of any Base Rate Loan into such Eurodollar Rate Loan, and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months, or, if available to each Appropriate Lender, nine or twelve months or such other period acceptable to the Administrative Agent, as the Borrower may, upon notice received by the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, select; *provided, however,* that:

19

(a)    the Borrower may not select any Interest Period with respect to any Eurodollar Rate Loan under a Facility that ends after any principal repayment installment date for such Facility unless, after giving effect to such selection, the aggregate principal amount of Base Rate Loans and of Eurodollar Rate Loans having Interest Periods that end on or prior to such principal repayment installment date for such Facility shall be at least equal to the aggregate principal amount of Loans under such Facility due and payable on or prior to such date;

(b)    [Reserved]

(c)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, *provided, however,* that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(d)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month; and

(e)    the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than twelve different dates (it being understood that there shall not be more than twelve contracts in respect of Eurodollar Rate Loans in effect at any one time).

"***Interest Rate Determination Date***" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***Investment***" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "***Debt***" in respect of such Person.

"***Investment Period***" means, relative to any Synthetic L/C Deposits earning a Participation Fee, the period beginning on (and including) the date on which such Synthetic L/C Deposit is deposited or on the last day of the preceding Investment Period and ending on (but excluding) the last Business Day of each March, June, September and

20

December; provided, however, that (a) if any such Investment Period would otherwise end on a day which is not a Business Day, such Investment Period shall end on the preceding Business Day and (b) the first Investment Period after the Effective Date shall be comprised of the period beginning on (and including) the Effective Date and ending on March 30, 2007.

"*Joinder Agreement*" means a Joinder Agreement substantially in the form of Exhibit J.

"*Joint Book Running Managers*" has the meaning specified in the recital of parties to this Agreement.

"*Joint Lead Arrangers*" has the meaning specified in the recital of parties to this Agreement.

"*K Road Manager*" means K Road BG Management, LLC, a Delaware limited liability company.

"*L/C Related Documents*" has the meaning specified in Section 2.03(g)(i).

"*Lender Party*" means any Lender, any Fronting Bank or any Synthetic Issuing Bank.

"*Lenders*" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 9.07 for so long as such Initial Lender or Person, as the case may be, shall be a party to this Agreement.

"*Leverage Ratio*" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Total Debt as of such day to (b) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"*Lien*" means, with respect to any Property, (a) any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such Property, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), relating to such Property, and (c) in the case of Equity Interests or debt securities, any purchase option, call or similar right of a third party with respect to such Equity Interests or debt securities. For the avoidance of doubt, "*Lien*" shall not include any netting or set-off arrangements under any Contractual Obligation (other than Contractual Obligations constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms of the Loan Documents.

"*Loan*" means a Term B Loan, a Revolving Credit Loan or a Synthetic L/C Loan, as the context may require.

21

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Intercreditor Agreement, (e) the First Lien Collateral Documents and (f) the Fee Letter, in each case as amended.

"*Loan Parties*" means the Borrower and the Guarantors.

"*Local Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Management and Operation Agreements*" means each of the Management and Operation Agreements each dated as of October 11, 2005 between K Road Manager and each of the Borrower and the Project Companies.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Change*" means any change, occurrence or development (including, without limitation, as a result of regulatory changes applicable to the Borrower or any of its Subsidiaries) that has had or could reasonably be expected to have a Material Adverse Effect.

"*Material Adverse Effect*" means a material adverse effect on (a) the condition (financial or otherwise), business, results or operations of the Borrower and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or the Lender Parties, taken as a whole, under any Loan Document or (c) the ability of the Loan Parties to perform their respective Obligations under the Loan Documents.

"*Material Contract*" means (a) each of the agreements set forth on Schedule 4.01(t), (b) any Permitted Commodity Hedge and Power Sale Agreement with a term in excess of 14 months after the first delivery or settlement thereunder, and (c) any other Contractual Obligation (other than the Loan Documents or any Related Document) entered into after the date hereof by any Loan Party for which breach, nonperformance or cancellation could reasonably be expected to have a Material Adverse Effect.

"*Mezzanine Documents*" means the Credit Agreement dated as of December 21, 2006 among EBG Holdings, the financial institutions and lenders party thereto from time to time and CS, as administrative agent and each of the other Loan Documents referred to therein (other than the Fee Letter referred to therein).

"*Moody's*" means Moody's Investors Services, Inc.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA

22

Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"*Mystic 8&9 Project*" means two (2) combined-cycle electric generating facilities with a combined nominal capacity of 1614 MW in operation in Everett, Massachusetts owned by Mystic Development.

"*Mystic Development*" means Mystic Development, LLC, f/k/a Exelon Mystic Development LLC, a Delaware limited liability company.

"*Mystic I*" means Mystic I, LLC, a Delaware limited liability company.

"*Mystic Station Project*" means an electric generating facility with a nominal capacity of 576 MW in operation in Everett, Massachusetts and owned by Mystic I.

"*Net Cash Proceeds*" has the meaning specified in the Security Deposit Agreement.

"*Non-Consenting Lender*" has the meaning specified in Section 9.01(c).

"*Note*" means a Term Note, a Revolving Credit Note or a Synthetic L/C Note, as the context may require.

"*Notice of Borrowing*" has the meaning specified in Section 2.02(a).

"*Notice of Issuance*" has the meaning specified in Section 2.03(a).

"*Notice of Renewal*" has the meaning specified in Section 2.01(d)(iii).

"*Notice of Termination*" has the meaning specified in Section 2.01(d)(iii).

"*NPL*" means the National Priorities List under CERCLA.

"*Obligation*" means all payment obligations of every nature of each Loan Party from time to time owed to any Agent (including former Agents) or any Lender Party from time to time under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Synthetic Letters of Credit, fees (including Participation Fees and other fees payable pursuant to Section 2.08), expenses, indemnification or otherwise.

"*Offer Period*" has the meaning specified in Section 2.15(a).

"*Other Taxes*" has the meaning specified in Section 2.12(b).

"*Participation Fee*" has the meaning specified in Section 2.08(b)(ii).

23

"***Patriot Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"***PBGC***" means the Pension Benefit Guaranty Corporation (or any successor).

"***Permitted Commodity Hedge and Power Sale Agreement***" means (a) Permitted Trading Activity entered into by any Loan Party and a Commodity Hedge Counterparty, including, without limitation, the Initial Commodity Hedge and Power Sale Agreements and (b) the transactions pursuant to each of the Material Contracts set forth on Part II of Schedule 4.01(t) (as amended, modified or replaced).

"***Permitted Development***" means, after the Effective Date, the development or construction of any electric generating facility; *provided* that at the time any amount is invested (or committed to be invested) in respect of Permitted Developments that exceeds amounts permitted to be invested pursuant to Section 5.02(f)(ix) each of the following conditions are met:

> (a)    the Permitted Development is financed with amounts permitted pursuant to Sections 5.02(b)(iii) and 5.02(f)(viii);

> (b)    the Independent Engineer shall have certified that any such development or construction would not reasonably be expected to materially and adversely impact the operation of the Projects or the efficient generation and distribution of electricity from the Projects (both during and after such development or construction) and shall have confirmed to the Lenders that amounts invested and committed to be invested by the Borrower and the Guarantors are sufficient to pay for all costs associated therewith; and

> (c)    each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Facilities (as in effect immediately prior to giving effect to such Permitted Development).

"***Permitted Development Subsidiary***" means any Subsidiary of a Loan Party created in connection with any Permitted Development.

"***Permitted Emissions Sales Gains***" means gains (determined in accordance with GAAP) from the sales of Accumulated Emissions Credits to the extent such proceeds are deposited into the Revenue Account in accordance with the Security Deposit Agreement.

"***Permitted Encumbrances***" means the Liens and encumbrances of record identified in the First Lien Mortgage Policies as of the Effective Date.

"***Permitted Liens***" means (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business

24

(i) for amounts that are not overdue or (ii) for amounts that are overdue that (A) do not materially adversely affect the use of, and which do not individually or in the aggregate materially affect the value of, the Property to which they relate or (B) are bonded or are being contested in good faith by appropriate proceedings for which reserve and other appropriate provisions, if any, required by GAAP shall have been made; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation, unemployment insurance, social security legislation or other similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens arising from judgments (or the payment of money not constituting a Default under Section 6.01(h)) or securing appeal or other surety bonds related to such judgments; (f) Permitted Encumbrances; and (g) easements, rights-of-way, restrictions, encroachments and other minor defects or irregularities in title and any zoning (or other similar restrictions to, or vested in, any governmental office or agency to control or regulate the use of any Real Property), that individually or in the aggregate do not materially adversely affect the value of said Real Property or materially impair the ability of the Loan Parties to operate the Real Property to which they relate in the ordinary course of business.

"*Permitted RMR Revenues*" means, for any period, funds transferred to the Revenue Account pursuant to Section 3.15(a)(iv) of the Security Deposit Agreement; *provided* that for purposes of determining the applicable Fiscal Quarter to which such funds will be included in Consolidated Net Income, funds transferred within 45 days following any Fiscal Quarter shall be deemed, at the option of the Borrower, to be included (without duplication) in Consolidated Net Income for such Fiscal Quarter or the immediately preceding Fiscal Quarter.

"*Permitted Trading Activity*" means the entry into of any Commodity Hedge and Power Sale Agreement in a manner consistent with Prudent Industry Practice from time to time in support of the marketing and trading related to the Projects or any Permitted Development, whether physical or financial, in each case, to the extent such activity is conducted in the ordinary course of business of the Borrower and the other Loan Parties.

"*Person*" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"*Plan*" means a Single Employer Plan or a Multiple Employer Plan.

"*Platform*" has the meaning specified in Section 9.02(b).

"*Pledged Debt*" has the meaning specified in the First Lien Security Agreement.

"***Preferred Interests***" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

"***Prepayment Account***" has the meaning specified in the Security Deposit Agreement.

"***Prepayment Amount***" has the meaning specified in Section 2.06(c).

"***Pro Rata Share***" of any amount means, (a) with respect to any Revolving Credit Lender at any time and with respect to the Revolving Credit Facility, the product of such amount *times* a fraction the numerator of which is the amount of such Lender's Revolving Credit Commitment at such time and the denominator of which is the aggregate amount of the Revolving Credit Facility at such time, (b) with respect to any Term B Lender at any time and with respect to the Term B Facility, the product of such amount *times* a fraction the numerator of which is the amount of Loans owed to such Term B Lender under the Term B Facility at such time and the denominator of which is the aggregate amount of the Loans then outstanding and owed to all Term B Lenders under the Term B Facility at such time and (c) with respect to any Synthetic L/C Lender at any time and with respect to the Synthetic L/C Facility, the product of such amount *times* a fraction the numerator of which is the amount of the sum of the Synthetic L/C Loans owed to such Synthetic L/C Lender under the Synthetic L/C Facility at such time *plus* the amount of such Synthetic L/C Lender's Synthetic L/C Deposit at such time and the denominator of which is the aggregate amount of the Synthetic L/C Loans then outstanding and owed to all Synthetic L/C Lenders under such Synthetic L/C Facility at such time *plus* the amount of all Synthetic L/C Deposits in respect of such Synthetic L/C Facility at such time.

"***Project Company***" means each of Mystic I, Mystic Development and Fore River (and collectively, the "***Project Companies***").

"***Projects***" means Mystic Station Project, Mystic 8&9 Project, Fore River Project and, if applicable, the Permitted Development.

"***Property***" means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether intangible or tangible.

"***Prudent Industry Practice***" means those practices, methods, equipment, specifications and standards of safety and performance, as are commonly used by electric generating stations in the United States utilizing comparable fuels as good, safe and prudent engineering practices would dictate in connection with the design, construction, operation, maintenance, repair and use of electrical and other equipment, facilities and improvements of such electrical generating stations, with commensurate standards of safety, performance, dependability (including the implementation of procedures that shall

26

not adversely affect the long term reliability of the Projects, in favor of short term performance), efficiency and economy, in each such case as the same may evolve from time to time, consistent with applicable law and considering the state in which a Project is located and the type and size of such Project. *"Prudent Industry Practice"* as defined herein does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

    *"PUHCA"* has the meaning specified in <u>Section 4.01(v)</u>.

    *"Pullback Amount"* means, for any Fiscal Year, the amount (not to exceed $10,000,000) of the Base Capex Allowance for the following Fiscal Year which the Borrower, in its sole discretion, allocates to Capital Expenditures in the current Fiscal Year.

    *"Qualified Owner"* means any Person (including any Person Controlled by such Person) that (a) is a past or present owner of a Comparable Project, (b) has substantial experience as an operator of a Comparable Project or (c) has contracted for the operation of the Projects by K Road Manager or by a Person meeting the requirements of clause (b) of this definition.

    *"Real Properties"* means each item of Property listed on <u>Schedules 4.01(r)</u> and <u>4.01(s)</u> hereto and any other real property subsequently acquired by any Loan Party covered by <u>Section 5.01(j)</u> hereof.

    *"Redeemable"* means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

    *"Register"* has the meaning specified in <u>Section 9.07(e)</u>.

    *"Regulation U"* means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

    *"Related Documents"* means the Initial Commodity Hedge and Power Sale Agreements, the Second Lien Loan Documents, the Mezzanine Documents and the Secured Hedge Agreements.

    *"Related Fund"* means, with respect to any Lender that is a Fund, any other Fund that is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

    *"Repayment Event"* means the satisfaction of the following conditions: (a) the repayment in full in Cash of all of the outstanding principal amount of the Loans and all other Obligations (other than contingent Obligations) due and payable under the Loan

Documents, (b) the termination of all Commitments and (c) the termination and cancellation of all Synthetic Letters of Credit (unless such Synthetic Letters of Credit are cash collateralized on terms, conditions and amounts (but no more than 103.0% of the Available Amount of such Synthetic Letters of Credit) reasonably satisfactory to the Administrative Agent and the Synthetic Issuing Bank).

"*Replacement Commodity Hedge and Power Sale Agreement*" means, with respect to any Initial Commodity Hedge and Power Sale Agreement and the Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s), any Eligible Permitted Commodity Hedge and Power Sale Agreement entered into by any Loan Party after the date hereof: (a) with a termination date that is no earlier than the termination date of the relevant Eligible Permitted Commodity Hedge and Power Sale Agreement it replaces; (b) that is otherwise on terms substantially consistent with, or more favorable to the Loan Parties than, the relevant Eligible Permitted Commodity Hedge and Power Sale Agreement it replaces; and (c) with respect to which the Borrower has delivered to the Administrative Agent amended projections giving pro forma effect to such replacement Eligible Permitted Commodity Hedge and Power Sale Agreement prepared in good faith based on reasonable assumptions in light of the conditions existing at such time and showing to the reasonable satisfaction of the Administrative Agent compliance with Section 5.04 at all times until the earlier of (i) the Term B Maturity Date or (ii) the termination date applicable to such replacement Eligible Permitted Commodity Hedge and Power Sale Agreement.

"*Replacement Material Contract*" shall mean any one or more contracts entered into in replacement of an existing Material Contract (i) with terms taken as a whole, as favorable to the Loan Parties as can be obtained based on market conditions prevailing at such time and (ii) with one or more counterparties (including any guarantor of, or letter of credit or other credit support providers to, such counterparty's obligations) having substantially similar creditworthiness on the date of such replacement as the counterparty to the Material Contract being replaced.

"*Required Lenders*" means, at any time, Lenders owed or holding more than 50% of the sum of (without duplication) (a) the aggregate principal amount of the Loans outstanding at such time *plus* (b) the aggregate Available Amount of all Synthetic Letters of Credit outstanding at such time *plus* (c) the aggregate amount of all Unused Working Capital Commitments at such time *plus* (d) the aggregate amount of the Synthetic L/C Deposits at such time.

"*Required Rating*" means with respect to (a) any Commodity Hedge Counterparty that is described in clause (a)(i) of the definition of "*Commodity Hedge Counterparty*" or any Hedge Bank either (i) the unsecured senior debt obligations of such Person are rated at least A3 by Moody's and at least A- by S&P or (ii) such Person's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement or Secured Hedge Agreement, as the case may be, are guaranteed by (or supported by a letter of credit provided by) a Person whose unsecured senior debt obligations are rated at least A3 by Moody's and at least A- by S&P and (b) any other

28

Commodity Hedge Counterparty either (i) the unsecured senior debt obligations of such Person are rated at least Baa3 by Moody's and at least BBB- by S&P, (ii) such Commodity Hedge Counterparty's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement are guaranteed by a Commodity Hedge Counterparty that is described in clause (a)(ii) of the definition of "Commodity Hedge Counterparty" whose unsecured senior debt obligations are rated at least Baa3 by Moody's and at least BBB- by S&P or (iii) such Commodity Hedge Counterparty's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement are supported by a letter of credit provided by a Person whose unsecured senior debt obligations are rated at least A3 by Moody's and at least A- by S&P.

"*Responsible Officer*" means, as to any Person, any individual holding the position of chairman of the board (if an officer), president, chief executive officer, senior vice president, treasurer, chief financial officer or director of finance.

"*Revenue Account*" has the meaning specified in the Security Deposit Agreement.

"*Revolving Credit Availability Period*" means the period from and including the Effective Date to but excluding the earlier of the Revolving Credit Termination Date and the date of termination of the Revolving Credit Commitments.

"*Revolving Credit Borrowing*" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type made by the Revolving Credit Lenders.

"*Revolving Credit Commitment*" means, with respect to each Revolving Credit Lender, the amount that such Revolving Credit Lender is required hereby to maintain as its Revolving Credit-Linked Deposit, as such amount may be reduced or increased from time to time pursuant to Section 2.05 and Section 2.18(c) and through assignments by or to such Lender pursuant to Section 9.07. The initial amount of each Revolving Credit Lender's Revolving Credit Commitment is set forth in an Assignment Agreement pursuant to which such Lender shall have assumed its Revolving Credit Commitment, as applicable. The aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments is $70,000,000.

"*Revolving Credit Exposure*" means, with respect to any Revolving Credit Lender at any time, its Applicable Revolving Credit Percentage of the outstanding principal amount of the Revolving Credit Loans.

"*Revolving Credit Facility*" means, at any time, the aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments at such time.

"*Revolving Credit Lender*" means any Lender that has a Revolving Credit Commitment.

"*Revolving Credit-Linked Deposit*" means, with respect to each Revolving Credit Lender at any time, amounts actually on deposit in the Revolving Credit-Linked Deposit

29

Account to the credit of such Lender's Revolving Credit-Linked Sub-Account at such time.

"***Revolving Credit-Linked Deposit Account***" means the "Revolving Credit Lenders (Boston Gen) Credit-Linked Deposit Account" established by the Administrative Agent pursuant to Section 2.18(a).

"***Revolving Credit-Linked Sub-Account***" has the meaning set forth in Section 2.18(a).

"***Revolving Credit Loan***" has the meaning specified in Section 2.01(c).

"***Revolving Credit Note***" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender, in substantially the form of Exhibit A-1 hereto, evidencing the aggregate indebtedness of the Borrower to such Lender resulting from the Revolving Credit Loans made by such Lender, as amended.

"***Revolving Credit Termination Date***" means the earlier of (a) December 20, 2013 and (b) the date of termination in whole of the Revolving Credit Commitments pursuant to Section 2.05 or 6.01.

"***RMR Agreement***" means the Cost-of-Service Agreement, effective as of January 1, 2006, among Mystic Development, LLC, Sempra Energy Trading Corp. and ISO New England Inc.

"***RMR Revenues***" has the meaning specified in the Security Deposit Agreement.

"***S&P***" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"***Second Lien Administrative Agent***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Collateral Agent***" has the meaning specified in the Intercreditor Agreement.

"***Second Lien Collateral Documents***" has the meaning specified in the Intercreditor Agreement.

"***Second Lien Credit Agreement***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Lenders***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Loan Documents***" has the meaning specified in the Intercreditor Agreement.

30

"***Second Lien Secured Parties***" has the meaning specified in the Intercreditor Agreement.

"***Second Offer***" has the meaning specified in Section 2.06(c).

"***Secured Hedge Agreement***" means any Hedge Agreement required to be entered into by the Borrower with any Hedge Bank pursuant to Section 5.01(m) and any other Hedge Agreement entered into by the Borrower with any Hedge Bank in the ordinary course of business and consistent with prudent business practice and otherwise permitted under Section 5.02(l), in each case, for purposes of hedging the interest rate exposure associated with the Loan Parties' Obligations under the Loan Documents.

"***Secured Party***" has the meaning specified in the Intercreditor Agreement.

"***Security Deposit Agreement***" means that certain Security Deposit Agreement substantially in the form attached hereto as Exhibit H dated December 21, 2006 by the Borrower, the Guarantors, the First Lien Collateral Agent, the Second Lien Collateral Agent and the Depositary, as amended.

"***Semi-Annual Prepayment Date***" has the meaning specified in the Security Deposit Agreement.

"***Single Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"***Solvent***" and "***Solvency***" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property and assets of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature (taking into account reasonably anticipated prepayments and refinancings) and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"***SPC***" has the meaning specified in Section 9.07(l).

"***Subordinated Obligations***" has the meaning specified in Section 8.05.

31

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Surviving Debt*" means Debt of each Loan Party outstanding after giving effect to the Initial Extension of Credit on the Effective Date (other than Debt secured by the First Lien Collateral Documents and the Second Lien Collateral Documents).

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," the principal amount of all (a) obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Synthetic Issuing Bank*" means the Initial Synthetic Issuing Bank and any Eligible Assignee to which the Synthetic L/C Issuing Commitment hereunder has been assigned pursuant to Section 9.07 so long as such Eligible Assignee expressly agrees to perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Synthetic Issuing Bank and notifies the Administrative Agent of its Applicable Lending Office and the amount of its Synthetic L/C Issuing Commitment (which information shall be recorded by the Administrative Agent in the Register), for so long as such Initial Synthetic Issuing Bank or Eligible Assignee, as the case may be, shall have a Synthetic L/C Issuing Commitment.

"*Synthetic L/C Available Amount*" means, as of any date, the sum (without duplication) of (a) the aggregate amount of the Synthetic L/C Deposit Commitments in effect on such date *less* (b) the Available Amount of Synthetic Letters of Credit issued and outstanding as of such date *less* (c) the Unreimbursed Amount of any Synthetic Letter of Credit as of such date *less* (d) the amount of any drawings under any Synthetic Letter of Credit reimbursed by the Borrower or any amounts deposited in the Synthetic L/C Deposit Accounting, in each case, pursuant to Section 2.03(d) during the 91-day period immediately preceding such date.

32

"*Synthetic L/C Borrowing*" means an extension of credit resulting from a drawing under any Synthetic Letter of Credit which has not been reimbursed on the applicable Honor Date and which amount is funded by reducing the Synthetic L/C Deposits by a like amount, consisting of simultaneous Synthetic L/C Loans having the same Interest Period made by each of the Synthetic L/C Lenders pursuant to Section 2.03(d)(iii).

"*Synthetic L/C Cash Collateral Account*" has the meaning specified in the Security Deposit Agreement.

"*Synthetic L/C Deposit*" has the meaning specified in Section 2.01(b).

"*Synthetic L/C Deposit Commitment*" means, with respect to any Synthetic L/C Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "*Synthetic L/C Deposit Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as such Lender's "*Synthetic L/C Deposit Commitment,*" as such amount may be reduced at or prior to such time pursuant to Section 2.05 or increased at or prior to such time pursuant to Section 2.04(d)(v).

"*Synthetic L/C Deposit Cost Amount*" means, for any Investment Period with respect to the Synthetic L/C Deposits, 0.125%.

"*Synthetic L/C Deposit Facility*" means, at any time, an amount equal to the aggregate amount of the Synthetic L/C Lenders' Synthetic L/C Deposit Commitments at such time, as such amount may be reduced at or prior to such time pursuant to Section 2.05(a).

"*Synthetic L/C Deposit Sub-Account*" means an account established by the Administrative Agent or an Affiliate thereof at CS with the title "*Synthetic L/C Lenders (Boston Gen) Credit-Linked Deposit Account*" pursuant to Section 2.03(e).

"*Synthetic L/C Exposure*" means, as of any date, the sum of (without duplication) (a) the aggregate principal amount of outstanding Synthetic L/C Loans at such time *plus* (b) the Available Amount of all Synthetic Letters of Credit as of such date *plus* (c) the aggregate Unreimbursed Amounts under Synthetic Letters of Credit outstanding as of such date *plus* (d) unless a Repayment Event has occurred, the amount of any drawings under any Synthetic Letter of Credit reimbursed by the Borrower or any amounts deposited in the Synthetic L/C Deposit Account, in each case, pursuant to Section 2.03(d) during the 91-day period immediately preceding such date.

"*Synthetic L/C Facility*" means, at any time, an amount equal to the aggregate amount of the Synthetic Issuing Banks' Synthetic L/C Issuing Commitments at such time, as such amount may be reduced at or prior to such time pursuant to Section 2.05(a).

33

"*Synthetic L/C Issuing Commitment*" means, with respect to the Synthetic Issuing Bank at any time, the amount set forth opposite the Synthetic Issuing Bank's name on Schedule I hereto under the caption "*Synthetic L/C Issuing Commitment*" or, if the Synthetic Issuing Bank has entered into an Assignment and Acceptance, set forth for the Synthetic Issuing Bank in the Register maintained by the Administrative Agent pursuant to Section 9.07(a) as the Synthetic Issuing Bank's "*Synthetic L/C Issuing Commitment*," as such amount may be reduced at or prior to such time pursuant to Section 2.05(a).

"*Synthetic L/C Lender*" means any Lender that has a Synthetic L/C Deposit Commitment.

"*Synthetic L/C Loans*" means loans deemed made by the Synthetic L/C Lenders to the Borrower pursuant to Section 2.03 to reimburse drawings under a Synthetic Letter of Credit, which loans are funded by reducing the Synthetic L/C Deposits by a like amount.

"*Synthetic L/C Maturity Date*" means December 20, 2013.

"*Synthetic L/C Note*" means a promissory note of the Borrower payable to the order of any Synthetic L/C Lender, in substantially the form of Exhibit A-2 hereto, evidencing the aggregate indebtedness of the Borrower to such Lender resulting from the Synthetic L/C Loans made by such Lender, as amended.

"*Synthetic L/C Participation Obligations*" has the meaning specified in Section 2.03(c)(ii).

"*Synthetic Letter of Credit*" has the meaning specified in Section 2.01(d)(ii).

"*Taxes*" has the meaning specified in Section 2.12(a).

"*Tender Offer*" shall mean, collectively, (a) the offer by EBG Holdings to purchase outstanding Units of limited liability company interest in EBG Holdings pursuant to the Offer to Purchase dated as of November 16, 2006 and the related letter of transmittal sent to holders of such Units, as each may be amended and supplemented from time to time and (b) the repurchase of warrants and the cashless exercise of warrants referred to in such Offer to Purchase.

"*Term B Borrowing*" means a borrowing consisting of simultaneous Term B Loans of the same Type made by the Term B Lenders.

"*Term B Commitment*" means, with respect to any Term B Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "*Term B Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(e) as such Lender's "*Term B Commitment*," as such amount may be reduced at or prior to such time pursuant to Section 2.05.

34

"*Term B Facility*" means, at any time, the aggregate amount of the Term B Lenders' Term B Commitments at such time.

"*Term B Lender*" means any Lender that has a Term B Commitment.

"*Term B Loan*" has the meaning specified in Section 2.01(a).

"*Term B Maturity Date*" means December 20, 2013.

"*Term B Note*" means a promissory note of the Borrower payable to the order of any Term B Lender, in substantially the form of Exhibit A-3 hereto, evidencing the indebtedness of the Borrower to such Lender resulting from the Term B Loan made by such Lender, as amended.

"*Terms of Subordination*" means the Terms of Subordination attached hereto as Exhibit M.

"*Title Company*" means Lawyers Title Insurance Corporation.

"*Transaction*" means (a) the entering into of the Initial Commodity Hedge and Power Sale Agreements, (b) the Distribution and the Tender Offer, (c) the entering into of the Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under this Agreement (d) the entering into of the Second Lien Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under the Second Lien Credit Agreement, (e) the entering into of the Mezzanine Documents and (f) the other transactions contemplated by the Transaction Documents.

"*Transaction Costs*" has the meaning set forth in the preliminary statements hereto.

"*Transaction Documents*" means, collectively, the Loan Documents and the Related Documents.

"*Type*" refers to the distinction between Loans bearing interest at the Base Rate and Loans bearing interest at the Eurodollar Rate.

"*UCC Fixture Filing*" has the meaning specified in Section 3.01(a)(iv)(A).

"*Units*" means units of limited liability company interests in EBG Holdings.

"*Unreimbursed Amount*" has the meaning set forth in Section 2.03(d)(i).

"*Unused Revolving Credit Commitment*" means, with respect to any Revolving Credit Lender at any time, (a) such Lender's Revolving Credit Commitment at such time minus (b) the aggregate principal amount of all Revolving Credit Loans made (or

35

participated in) by such Lender (in its capacity as a Revolving Credit Lender) and outstanding at such time.

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"*Withdrawal Liability*" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.  Computation of Time Periods; Other Definitional Provisions.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding."  References in the Loan Documents to any agreement or contract "*as amended*" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03.  Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in effect in the United States from time to time ("*GAAP*"); *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS, SYNTHETIC DEPOSITS, REVOLVING CREDIT-LINKED DEPOSITS AND THE SYNTHETIC LETTERS OF CREDIT

SECTION 2.01.  The Loans, Synthetic L/C Deposits, Revolving Credit-Linked Deposits and the Synthetic Letters of Credit.

(a)    The Term B Loans.  Each Term B Lender severally agrees, on the terms and conditions hereinafter set forth, to make a single advance (a "*Term B Loan*") to the Borrower on the Effective Date in an amount not to exceed such Lender's Term B Commitment at such time.  The Term B Borrowing shall consist of Term B Loans made simultaneously by the

36

Term B Lenders ratably according to their Term B Commitments.  Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.

(b)     The Synthetic L/C Deposits.  In consideration and furtherance of the undertaking of the Synthetic Issuing Bank, each Synthetic L/C Lender severally agrees, on the terms and conditions hereinafter set forth, to remit to the Administrative Agent on the Effective Date an amount in Dollars not to exceed such Synthetic L/C Lender's Synthetic L/C Deposit Commitment (each such amount, a "***Synthetic L/C Deposit***").  The Administrative Agent shall deposit all amounts received by it in the Synthetic L/C Deposit Account promptly upon receipt thereof.  Each Synthetic L/C Lender irrevocably and unconditionally agrees that its Synthetic L/C Deposit shall be available (i) to pay to the Synthetic Issuing Bank such Synthetic L/C Lender's Pro Rata Share of any Unreimbursed Amount under any Synthetic Letter of Credit that is not reimbursed by the Borrower pursuant to Section 2.03(a) and (ii) to fund such Synthetic L/C Lender's Synthetic L/C Loans pursuant to Section 2.03(d)(ii).  The failure of any Synthetic L/C Lender to fund its Synthetic L/C Deposit pursuant to this Section 2.01(b) shall not relieve any other Synthetic L/C Lender of its obligation, if any, hereunder to fund its Synthetic L/C Deposit, but no Synthetic L/C Lender shall be responsible for the failure of any other Synthetic L/C Lender to fund its Synthetic L/C Deposit in accordance with this Section 2.01(b).

(c)     Revolving Credit Loans.  (i)  Subject to the terms and conditions of this Agreement, the Fronting Bank shall, from time to time, during the Revolving Credit Availability Period upon receipt of a Notice of Borrowing from the Borrower, make one or more revolving credit loans ("***Revolving Credit Loans***") to the Borrower in an aggregate principal amount that will not result in the total Revolving Credit Exposures exceeding the lesser of the aggregate balance of the Revolving Credit-Linked Deposit Account (excluding any portion of the Revolving Credit-Linked Deposit Account attributable to interest) or the total Revolving Credit Commitments.  Within the foregoing limits and subject to satisfaction of the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Credit Loans in accordance with the procedures set forth herein.

(ii)     By the making of a Revolving Credit Loan, and without any further action on the part of the Fronting Bank or the Lenders, the Fronting Bank hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from the Fronting Bank, a participation in such Loan equal to such Lender's Applicable Revolving Credit Percentage of the principal amount thereof.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section in respect of Revolving Credit Loans is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or, subject to Section 2.18(f), reduction or termination of the Revolving Credit Commitments.

(iii)     In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally authorizes and directs the Administrative Agent to withdraw from the Revolving Credit-Linked Deposit Account (and debit such Lender's Revolving Credit-Linked Sub-Account in the amount of) such Lender's Applicable Revolving Credit Percentage of the principal  amount of each

37

Revolving Credit Loan not paid when due (whether at stated maturity, acceleration or otherwise), or of any payment of principal of any Revolving Credit Loan required to be refunded to the Borrower for any reason (it being understood and agreed that each Revolving Credit Lender's obligations in respect of participations in Revolving Credit Loans shall be payable solely from, and limited to, such Lender's Revolving Credit-Linked Deposit).

      (d)    <u>Synthetic Letters of Credit</u>.

      (i)    [Reserved].

      (ii)    <u>Synthetic Letters of Credit</u>. The Synthetic Issuing Bank agrees, on the terms and conditions hereinafter set forth and in reliance on the agreements of the Synthetic L/C Lenders set forth in <u>Section 2.03</u> below, to issue (or cause its Affiliate that is a commercial bank that meets the criteria set forth in the definition of "*Eligible Assignee*" to issue on its behalf) letters of credit (the "*Synthetic Letters of Credit*") in U.S. Dollars for the account of the Borrower from time to time on any Business Day during the period from the Effective Date until 30 days before the Synthetic L/C Maturity Date in an aggregate Available Amount for all Synthetic Letters of Credit not to exceed at any time (A) the Synthetic L/C Facility at such time *minus* the sum of (1) the Unreimbursed Amount under all Synthetic Letters of Credit and (2) the Available Amount of any Synthetic Letters of Credit outstanding at such time and (B) the Synthetic L/C Available Amount at such time; *provided* that the aggregate face amount of Synthetic Letters of Credit issued to counterparties under the Initial Commodity Hedge and Power Sale Agreements and the Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to <u>Section 5.01(s)</u> at any time shall not exceed $150,000,000.

      (iii)    <u>Renewal and Termination of Synthetic Letters of Credit</u>. No Synthetic Letter of Credit shall have an expiration date (including all rights of the Borrower or the beneficiary to require renewal) later than the earlier of (A) twelve (12) months after such Letter of Credit's issuance (*provided* (a) that any Synthetic Letter of Credit issued to the counterparty to the Initial Commodity Hedge and Power Sale Agreement may have an initial expiration date no later than February 1, 2011 and (b) that any Synthetic Letter of Credit issued to the counterparty to an Eligible Permitted Commodity Hedge and Power Sale Agreement may have an initial expiration date no later than 60 days after the term of such agreement) and (B) five (5) Business Days prior to the Synthetic L/C Maturity Date and may by its terms be renewable annually upon notice (a "*Notice of Renewal*") given to the Synthetic Issuing Bank and the Administrative Agent on or prior to any date for notice of renewal set forth in such Synthetic Letter of Credit but in any event at least five (5) Business Days prior to the date of the proposed renewal of such Synthetic Letter of Credit and upon the fulfillment of the applicable conditions set forth in <u>Article III</u> unless the Synthetic Issuing Bank has notified the Borrower (with a copy to the Administrative Agent) on or prior to the date for notice of termination set forth in such Synthetic Letter of Credit but in any event at least sixty (60) Business Days prior to the date of automatic renewal of its election not to renew such Synthetic Letter of Credit (a "*Notice of*

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

***Termination***"); *provided* that the terms of each Synthetic Letter of Credit that is automatically renewable annually shall, (x) require the Synthetic Issuing Bank to give the beneficiary named in such Synthetic Letter of Credit notice of any Notice of Termination, (y) permit such beneficiary, upon receipt of such notice, to draw under such Synthetic Letter of Credit prior to the date such Synthetic Letter of Credit otherwise would have been automatically renewed and (z) not permit the expiration date (after giving effect to any renewal) of such Synthetic Letter of Credit in any event to be extended to a date later than five (5) Business Days before the Synthetic L/C Maturity Date. If either a Notice of Renewal is not given by the Borrower or a Notice of Termination is given by any Synthetic Issuing Bank pursuant to the immediately preceding sentence, such Synthetic Letter of Credit shall expire on the expiry date. Within the limits of the Synthetic L/C Facility and subject to the limits referred to above, the Borrower may request the issuance of Synthetic Letters of Credit under this Section 2.01, repay any Unreimbursed Amounts resulting from drawings thereunder pursuant to Section 2.03(a) and request the issuance of additional Synthetic Letters of Credit under this Section 2.01.

SECTION 2.02. Making the Loans. (a) Except as otherwise provided in Section 2.03, each Borrowing shall be made on notice, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Borrowing, in the case of a Borrowing consisting of Eurodollar Rate Loans, or the same Business Day of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Loans, by the Borrower to the Administrative Agent, which shall give to each Appropriate Lender prompt notice thereof by telecopier or electronic communication. Each such notice of a Borrowing (a "***Notice of Borrowing***") shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested (i) date of such Borrowing, (ii) Facility under which such Borrowing is to be made, (iii) Types of Loans comprising such Borrowing, (iv) aggregate amount of such Borrowing and (v) in the case of a Borrowing consisting of Eurodollar Rate Loans, the initial Interest Period for each such Loan. Each Appropriate Lender shall, before 11:00 A.M. (New York City time) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Borrowing in accordance with the respective Commitments under the applicable Facility of such Lender and the other Appropriate Lenders. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting (1) in the case of the Term B Borrowing, the Funding Account, and (2) in the case of a Revolving Credit Borrowing, the Revenue Account or, on the Effective Date only, the Funding Account.

(b)    Anything in subsection (a) above to the contrary notwithstanding, (i) the Borrower may not select Eurodollar Rate Loans for any Borrowing if the obligation of the Appropriate Lenders to make Eurodollar Rate Loans shall then be suspended pursuant to Section 2.09 or 2.10 and (ii) the Revolving Credit Loans may not be outstanding as part of more than ten (10) separate Borrowings.

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(c)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. In the case of any Borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Loans, the Borrower shall indemnify each Appropriate Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Loan to be made by such Lender as part of such Borrowing when such Loan, as a result of such failure, is not made on such date.

(d)    Unless the Administrative Agent shall have received notice from an Appropriate Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Borrowing for all purposes.

(e)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03.    Issuance of and Drawings and Reimbursement Under Synthetic Letters of Credit and Matters Relating to Synthetic L/C Deposits.

(a)    Request for Issuance. Each Synthetic Letter of Credit shall be issued upon notice, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed issuance of such Synthetic Letter of Credit, by the Borrower to the Synthetic Issuing Bank with a copy to the Administrative Agent by telecopier or electronic communication. The notice of issuance of any Synthetic Letter of Credit shall be substantially in the form attached hereto as Exhibit B-2 (a "*Notice of Issuance*") shall be in writing or by telecopier or electronic communication (and confirmed by telephone), specifying therein the requested (i) date of such issuance (which shall be a Business Day), (ii) Available Amount of such Synthetic Letter of Credit, (iii) expiration date of such Synthetic Letter of Credit, (iv) name and address of the beneficiary of such Synthetic Letter of Credit, (v) supportable obligation and (vi) form of such Synthetic Letter of Credit. If the requested form of such Synthetic Letter of

40

Credit is acceptable to the Synthetic Issuing Bank in its sole discretion, the Synthetic Issuing Bank will, upon fulfillment of the applicable conditions set forth in Article III, make such Synthetic Letter of Credit available to the Borrower at its office referred to in Section 9.02 or as otherwise agreed with the Borrower in connection with such issuance. Notwithstanding anything herein to the contrary, the Synthetic Issuing Bank shall not be under any obligation to issue any Synthetic Letter of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Synthetic Issuing Bank from issuing such Synthetic Letter of Credit, or any law applicable to such Synthetic Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Synthetic Issuing Bank shall prohibit, or direct that such Synthetic Issuing Bank refrain from, the issuance of letters of credit generally or such Synthetic Letter of Credit in particular or shall impose upon such Synthetic Issuing Bank with respect to such Synthetic Letter of Credit any restriction, reserve or capital requirement (for which such Synthetic Issuing Bank is not otherwise compensated hereunder), or shall impose upon such Synthetic Issuing Bank any unreimbursed loss, cost or expense (for which such Synthetic Issuing Bank is not otherwise compensated hereunder).

(b)    Letter of Credit Reports. Each Synthetic Issuing Bank shall furnish (i) to the Administrative Agent on the first Business Day of each week a written report summarizing issuance and expiration dates of Synthetic Letters of Credit issued by such Synthetic Issuing Bank during the previous week and drawings during such week under all Synthetic Letters of Credit issued by such Synthetic Issuing Bank, (ii) to the Administrative Agent on the first Business Day of each month a written report summarizing issuance and expiration dates of Synthetic Letters of Credit issued by it under the Synthetic Letter of Credit Facility, during the preceding month and drawings during such month under all such Synthetic Letters of Credit and (iii) to the Administrative Agent on the last Business Day of each calendar quarter a written report setting forth the average daily aggregate Available Amount during such calendar quarter of all Synthetic Letters of Credit issued by it under the Synthetic Letter of Credit Facility, in each case, with a copy to the Borrower.

(c)    Participations in Synthetic Letters of Credit.

(i)    [Reserved].

(ii)    Upon the issuance of each Synthetic Letter of Credit and without further action, each Synthetic L/C Lender shall be deemed to have irrevocably purchased to the extent of its Pro Rata Share, a participation interest in such Synthetic Letter of Credit including any Unreimbursed Amount in respect thereof (each a "*Synthetic L/C Participation Obligation*") and such Synthetic L/C Lender shall, to the extent of its Pro Rata Share, be responsible for reimbursing the Synthetic Issuing Bank in respect of any Unreimbursed Amount in accordance with Section 2.03(d) (with the terms of this Section surviving the termination of this Agreement). Each Synthetic L/C Lender's Synthetic L/C Participation Obligation shall be cash collateralized (as provided in Section 2.03(e)), in favor of the Synthetic Issuing Bank by such Synthetic L/C Lender's Synthetic L/C Deposit. Each Synthetic L/C Lender's Synthetic L/C Deposit shall be available for withdrawal by the Synthetic Issuing Bank in accordance with Section 2.03(d) to

41

reimburse the Synthetic Issuing Bank for any Unreimbursed Amount in respect of any Synthetic Letter of Credit.

(d)    Drawing and Reimbursement; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Synthetic Letter of Credit of any notice of drawing under such Synthetic Letter of Credit, the Synthetic Issuing Bank that issued such Synthetic Letter of Credit shall notify promptly the Borrower and the Administrative Agent thereof. On the same Business Day on which any payment is made by any Synthetic Issuing Bank under a Synthetic Letter of Credit (each such date, an "***Honor Date***"), the Borrower shall reimburse such Synthetic Issuing Bank through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse any Synthetic Issuing Bank by such time (it being acknowledged and agreed that any such failure shall not be a Default hereunder), the Administrative Agent shall promptly notify each Synthetic L/C Lender of the Honor Date, the amount of the unreimbursed drawing (the "***Unreimbursed Amount***"), and the amount of such Synthetic L/C Lender's Pro Rata Share thereof. In such event, the Borrower shall be deemed to have requested a Synthetic L/C Borrowing under the Synthetic L/C Facility of Eurodollar Rate Loans as described in subsection (iii) below, to be disbursed on the Business Day immediately following the Honor Date in an amount not to exceed the Unreimbursed Amount thereof subject to the amount of the Synthetic L/C Available Amount (without regard to the conditions set forth in Section 3.02). Any notice given by a Synthetic Issuing Bank or the Administrative Agent pursuant to this Section 2.03(d) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    If the Synthetic Issuing Bank shall not have received from the Borrower a reimbursement payment under Section 2.03(d) with respect to any Synthetic Letter of Credit within the time specified in such Section, the Synthetic Issuing Bank will promptly notify the Administrative Agent and the First Lien Collateral Agent of the Unreimbursed Amount in respect thereof. Promptly upon receipt of the foregoing notice in respect of any Unreimbursed Amount under any Synthetic Letter of Credit, the First Lien Collateral Agent shall cause any funds on deposit in, or credited to, the Synthetic L/C Cash Collateral Account to be applied to reimburse the Synthetic Issuing Bank in respect of any such Unreimbursed Amount and the Administrative Agent shall promptly notify each Synthetic L/C Lender of the portion of such Unreimbursed Amount remaining after such application of funds on deposit in, or credited to, the Synthetic L/C Cash Collateral Account and its Pro Rata Share of such portion. Each Synthetic L/C Lender irrevocably and unconditionally authorizes the Administrative Agent on behalf of the Synthetic Issuing Bank to withdraw from the Synthetic L/C Deposit Account the remaining amount of such Unreimbursed Amount (and debit the Synthetic L/C Deposit Sub-Account of each Synthetic L/C Lender in the amount of such Synthetic L/C Lender's Pro Rata Share of such remaining amount) to apply such funds as reimbursement of such Unreimbursed Amount (it being understood that such amount shall be deemed to constitute a Synthetic L/C Loan (which shall initially be a Eurodollar Rate Loan as set forth in clause (iii)

42

below) of such Synthetic L/C Lender). Promptly upon any such application of the Synthetic L/C Deposits pursuant to this Section 2.03(d)(ii), the Synthetic L/C Deposit Commitment of each Synthetic L/C Lender shall be reduced by the amount of its Synthetic L/C Deposit so applied.

(iii)    On each date on which the Administrative Agent charges the Synthetic L/C Deposit Account to reimburse all or a portion of an Unreimbursed Amount in respect of a Synthetic Letter of Credit as provided in Section 2.03(d)(ii) above, such amount shall be deemed to be a Synthetic L/C Loan with an Interest Period coincident with the applicable Investment Period for the Synthetic L/C Deposits and the Eurodollar Rate therefor shall be the same as the applicable Eurodollar Rate for the Synthetic L/C Deposits.

(iv)    If any payment received by the Synthetic Issuing Bank pursuant to Section 2.03(d)(i) is required to be returned under any of the circumstances described in Section 9.12 (including pursuant to any settlement entered into by the Synthetic Issuing Bank in its discretion), each Synthetic L/C Lender hereby authorizes the Synthetic Issuing Bank to reimburse itself solely from such Lender's Synthetic L/C Deposit *plus* interest thereon from the date of such demand to the date such amount is returned by such Synthetic L/C Lender, at a rate *per annum* equal to the Eurodollar Rate then in effect.

(v)    If payment is made from the Synthetic L/C Deposits, the Borrower shall have the right, within five (5) Business Days of the date on which such payment is made (provided that no Default or Event of Default shall have occurred and be continuing), to pay to the Administrative Agent (which shall remit to the Synthetic Issuing Bank for deposit in the Synthetic L/C Deposit Account) an amount equal to the full amount of such payment and such amount shall be added to the Synthetic L/C Deposits of the Synthetic L/C Lenders in accordance with each such Synthetic L/C Lender's Pro Rata Share of such amount (with a corresponding increase in such Synthetic L/C Lender's Synthetic L/C Deposit Commitments), and each such Synthetic L/C Lender's Synthetic L/C Loans shall be automatically reduced by a corresponding equal amount. The Borrower shall pay the Administrative Agent for the account of each Synthetic L/C Lender accrued and unpaid interest to the date of such reduction of Synthetic L/C Loans on the principal amount of such Synthetic L/C Loans so reduced pursuant to this subclause (v).

(e)    Synthetic L/C Deposit Account. (i) On or prior to the Effective Date, the Administrative Agent shall establish the Synthetic L/C Deposit Account. The Administrative Agent shall maintain records enabling it to determine at any time the amount of the interest of each Synthetic L/C Lender in the Synthetic L/C Deposit Account (the interest of each Synthetic L/C Lender in the Synthetic L/C Deposit Account, as evidenced by such records, being referred to as such Synthetic L/C Lender's "*Synthetic L/C Deposit Sub-Account*"). The Administrative Agent shall establish such additional Synthetic L/C Deposit Sub-Accounts for any assignee Lenders as shall be required pursuant to Section 9.07. No Person other than the Administrative Agent (or any of its sub-agents) shall have the right to make any withdrawal from the Synthetic L/C Deposit Account or to exercise any other right or power with respect thereto, except as expressly provided herein. Each Synthetic L/C Lender agrees that its right, title and interest in

43

and to the Synthetic L/C Deposit Account shall be limited to the right to require its Synthetic L/C Deposit Sub-Account to be used as expressly set forth herein and that it will have no right to require the return of any Synthetic L/C Deposit other than as expressly provided herein. Each Synthetic L/C Lender hereby acknowledges that (A) its Synthetic L/C Deposit constitutes payment for its Synthetic L/C Participation Obligation, (B) its Synthetic L/C Deposit and any investments made therewith shall secure its obligations to the Administrative Agent for the benefit of the Synthetic Issuing Bank hereunder (each Synthetic L/C Lender hereby granting to the Administrative Agent for the benefit of the Synthetic Issuing Bank, a security interest in its Synthetic L/C Deposit and agreeing that the Synthetic Issuing Bank, as holder of the Synthetic L/C Deposits on behalf of the Synthetic Issuing Bank and any investments made therewith, will be acting as collateral agent) and (C) the Synthetic Issuing Bank will be issuing, amending, renewing and extending Synthetic Letters of Credit in reliance on the availability of such Lender's Synthetic L/C Deposit to discharge such Lender's obligations in connection with any Unreimbursed Amount under the Synthetic Letters of Credit in accordance with Section 2.03(d)(ii). Each Synthetic L/C Lender hereby grants to the Administrative Agent for the benefit of the Synthetic Issuing Bank a security interest in its rights and interests in such Synthetic L/C Lender's Synthetic L/C Deposit to secure the obligations of such Synthetic L/C Lender hereunder.

(ii)    Each of the Administrative Agent, the Synthetic Issuing Bank and each Synthetic L/C Lender hereby acknowledges and agrees that (A) each Synthetic L/C Lender is funding its Synthetic L/C Deposit to the Administrative Agent for application in the manner contemplated by Section 2.03(d)(ii) and (B) the Administrative Agent may invest the Synthetic L/C Deposits in Cash Equivalents. The Administrative Agent hereby agrees to pay each Synthetic L/C Lender, on the last day of each Investment Period applicable to the Synthetic L/C Deposits, interest (computed on the basis of the actual number of days elapsed over a year of 360 days) on the amount of such Synthetic L/C Lender's Pro Rata Share of the aggregate amount of the Synthetic L/C Deposits during the Investment Period ending on such date at a rate *per annum* equal to the Eurodollar Rate for such Investment Period *less* the Synthetic L/C Deposit Cost Amount attributable thereto.

(iii)    Each party hereto acknowledges and agrees that no Loan Party shall have any right, title or interest in or to the Synthetic L/C Deposits, the Synthetic L/C Deposit Account or any Synthetic L/C Deposit Sub-Account and no obligations with respect thereto, it being acknowledged and agreed by the parties hereto that the making of the Synthetic L/C Deposits by the Synthetic L/C Lenders, the provisions of this Section 2.03(e) and the application of the Synthetic L/C Deposits in the manner contemplated by Section 2.03(d)(ii) constitute agreements among the Administrative Agent, the Synthetic Issuing Bank and each Synthetic L/C Lender with respect to the funding obligations of each Synthetic L/C Lender in respect of its participation in Synthetic Letters of Credit and do not constitute any loan or extension of credit to the Borrower. Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the Synthetic L/C Deposits are and at all times will continue to be property of the Synthetic L/C Lenders and that no amount on deposit at any time in the Synthetic L/C Deposit Account shall be the property of any Loan Party,

44

constitute "*Collateral*" under the Loan Documents or otherwise be available in any manner to satisfy any Obligation of any Loan Party under the Loan Documents.

(iv)    If, for any Interest Rate Determination Date, the Administrative Agent shall have determined (which determination shall be conclusive and binding on each Synthetic L/C Lender) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate, the Administrative Agent shall give notice thereof to the Synthetic L/C Lenders and until such notice has been withdrawn, the Synthetic L/C Deposits on deposit in the Synthetic L/C Deposit Account shall be invested so as to earn a return equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(v)    The Administrative Agent shall return amounts on deposit in, or credited to, the Synthetic L/C Deposit Account to each Synthetic L/C Lender based on such Synthetic L/C Lender's Pro Rata Share of such amount (and the Administrative Agent shall make such payment to each Synthetic L/C Lender promptly upon receipt of such funds) on the earliest to occur of: (a) a Repayment Event (whether or not an Event of Default referred to in subclause (c) below has occurred), (b) on the first date on or after the Term B Maturity Date on which the Synthetic L/C Exposure has been reduced to zero, (c) following the occurrence of an Event of Default (other than an Event of Default of the type described in Section 6.01(g)), on the date occurring 91 days after the Borrower has cash collateralized all Synthetic Letters of Credit pursuant to Section 6.02 and (d) following the occurrence of an Event of Default of the type described in Section 6.01(g), after the termination and cancellation of all Synthetic Letters of Credit.

(f)    Reductions in Synthetic L/C Deposits.  (i) The Borrower may, upon at least three (3) Business Days' irrevocable written notice to the Synthetic Issuing Bank stating the proposed date and aggregate principal amount of the reduction, direct the Synthetic Issuing Bank to reduce in whole or in part the Synthetic L/C Deposits; *provided* that (A) if any such notice is given (1) the amount specified in such notice shall be paid on such date by the Administrative Agent to each Synthetic L/C Lender in accordance with its Pro Rata Share of such reduction amount from the Synthetic L/C Deposit Account and (2) the Borrower shall pay to the Administrative Agent on the date of any such reduction for the ratable benefit of the Appropriate Lenders (x) an amount equal to the accrued Participation Fee through the date of such reduction on the amount of the Synthetic L/C Deposits being so reduced and (y) in the case of any such reduction on a date other than the last day of an Interest Period for such Synthetic L/C Deposits, the amount owing by the Borrower pursuant to Section 9.04(c) and (z) the Administrative Agent shall pay on the date of any such transfer for the ratable benefit of the Synthetic L/C Lenders interest (computed on the basis of the actual number of days elapsed over a year of 360 days) on such amount at a rate per annum equal to the Eurodollar Rate for the then applicable Investment Period *less* the Synthetic L/C Deposit Cost Amount attributable thereto, (B) each partial reduction of any of the Synthetic L/C Deposits (1) shall be in an aggregate amount of $1,000,000 or an integral multiple of $500,000 in excess thereof and (2) shall be made ratably among the Synthetic L/C Lenders in accordance with their Synthetic L/C Deposit Commitments and (C) no such reduction shall be permitted if, after giving effect to such reduction, the Synthetic L/C

45

Exposure would exceed the sum of (x) the Synthetic L/C Deposits remaining on deposit in the Synthetic L/C Deposit Account *plus* (y) the amounts on deposit in the Synthetic L/C Cash Collateral Account after giving effect to such reduction.

(ii)    On any date on which any amounts are deposited into the Synthetic L/C Cash Collateral Account pursuant to Section 2.06(b), (A) the Administrative Agent shall reduce the Synthetic L/C Deposit Account for payment to each Synthetic L/C Lender an amount equal to such Synthetic L/C Lender's Pro Rata Share of the amount so deposited in the Synthetic L/C Cash Collateral Account from the Synthetic L/C Deposit Account, (B) the Administrative Agent shall pay on the date of any such transfer for the ratable benefit of the Synthetic L/C Lenders interest (computed on the basis of the actual number of days elapsed over a year of 360 days) on such amount at a rate *per annum* equal to the Eurodollar Rate for the then applicable Investment Period *less* the Synthetic L/C Deposit Cost amount attributable thereto, and (C) the Borrower shall pay to the Administrative Agent on the date of any such transfer for the ratable benefit of the Synthetic L/C Lenders (1) an amount equal to the accrued Participation Fee through the date of such reduction on the amount of the Synthetic L/C Deposits being so reduced and (2) in the case of any such reduction on a date other than the last day of an Investment Period for such Synthetic L/C Deposits, the amount owing by the Borrower pursuant to Section 9.04(c). Notwithstanding the foregoing, the Administrative Agent shall not be required to reduce the Synthetic L/C Deposits to the extent that after giving effect to such reduction, the Synthetic L/C Exposure would exceed the sum of (x) the Synthetic L/C Deposits remaining on deposit in the Synthetic L/C Deposit Account *plus* (y) the amounts on deposit in the Synthetic L/C Cash Collateral Account, after giving effect to such reduction.

(iii)    On any date on which the Synthetic L/C Deposit Commitments are reduced pursuant to Section 2.05, (A) the Administrative Agent shall reduce the Synthetic L/C Deposit Account by the amount of such reduction and shall transfer such amount to each Synthetic L/C Lender based on such Synthetic L/C Lender's Pro Rata Share of the amount by which the Synthetic L/C Deposit Commitments are so reduced, (B) the Administrative Agent shall pay on the date of any such transfer for the ratable benefit of the Synthetic L/C Lenders interest (computed on the basis of the actual number of days elapsed over a year of 360 days) on such amount at a rate *per annum* equal to the Eurodollar Rate for the then applicable Investment Period *less* the Synthetic L/C Deposit Cost Amount attributable thereto, and (C) the Borrower shall pay to the Administrative Agent on the date of any such transfer for the ratable benefit of the Synthetic L/C Lenders (1) an amount equal to the accrued Participation Fee through the date of such reduction on the amount of the Synthetic L/C Deposits being so reduced and (2) in the case of any such reduction on a date other than the last day of an Investment Period of such Synthetic L/C Deposits, the amount owing by the Borrower pursuant to Section 9.04(c).

(g)    Obligations Absolute. The Obligations of the Borrower under this Agreement and any other agreement or instrument relating to any Synthetic Letter of Credit shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this

46

Agreement and such other agreement or instrument under all circumstances, including, without limitation, the following circumstances:

(i)     any lack of validity or enforceability of any Loan Document, any Synthetic Letter of Credit or any other agreement or instrument relating thereto (all of the foregoing being, collectively, the "*L/C Related Documents*");

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations of the Borrower in respect of any L/C Related Document or any other amendment or waiver of, or any consent to departure from, all or any of the L/C Related Documents;

(iii)   the existence of any claim, set-off, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a Synthetic Letter of Credit (or any Persons for which any such beneficiary or any such transferee may be acting), any Synthetic Issuing Bank or any other Person, whether in connection with the transactions contemplated by the L/C Related Documents or any unrelated transaction;

(iv)    any statement or any other document presented under a Synthetic Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)     payment by any Synthetic Issuing Bank under a Synthetic Letter of Credit against presentation of a draft, certificate or other document that does not strictly comply with the terms of such Synthetic Letter of Credit;

(vi)    any exchange, release or non-perfection of any Collateral or other collateral, or any release or amendment or waiver of or consent to departure from the Guarantees or any other guarantee, for all or any of the Obligations of the Borrower in respect of the L/C Related Documents; or

(vii)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including, without limitation, any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

(h)     Replacement of a Synthetic Issuing Bank.  Any Synthetic Issuing Bank may be replaced at any time by written agreement among the Borrower, the new Synthetic Issuing Bank and the Administrative Agent (with notice to the Synthetic Issuing Bank being replaced); *provided, however*, that, if the Synthetic Issuing Bank being replaced so requests, any Synthetic Letter of Credit issued by such Synthetic Issuing Bank shall be replaced and cancelled prior to the removal of such Synthetic Issuing Bank and all fees and other amounts owed to such removed Synthetic Issuing Bank shall be paid to it.

(i)     If at any time the unsecured senior debt of any Synthetic Issuing Bank is not rated at least A3 by Moody's and A- by S&P, then the Borrower may, upon 10 days' prior written notice to such Synthetic Issuing Bank and the Administrative Agent, elect to

47

(A) replace such Synthetic Issuing Bank with a Person selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent or (B) cause such Synthetic Issuing Bank to assign its Synthetic Letter of Credit Commitment to an additional Synthetic Issuing Bank selected by the Borrower so long as such Person is an Eligible Assignee and is reasonably satisfactory to the Administrative Agent. Each replacement or assignment pursuant to this Section 2.03(h) shall be done in accordance with Section 9.07.

(ii)    From and after the effective date of any such replacement or addition, (A) the successor or additional Synthetic Issuing Bank shall have all the rights and obligations of a Synthetic Issuing Bank under this Agreement (and the Synthetic Letters of Credit to be issued by it on such effective date or thereafter) and (B) references herein to the term "Synthetic Issuing Bank" shall be deemed to refer to such successor, additional Synthetic Issuing Bank or to any previous Synthetic Issuing Bank, or to such successor, additional Synthetic Issuing Bank and all previous Synthetic Issuing Banks, as the context may require.

(i)    Existing Letters of Credit. The Borrower and the Guarantors hereby (A) designate each Existing Letter of Credit as a Synthetic Letter of Credit and (B) accept, acknowledge and assume all obligations with respect to such Existing Letters of Credit pursuant to the terms and conditions of this Agreement.

SECTION 2.04.  Repayment of Loans.

(a)    Term B Loans. The Borrower shall repay to the Administrative Agent for the ratable account of the Term B Lenders the aggregate outstanding principal amount of the Term B Loans on the last Business Day of each calendar quarter commencing on the last Business Day of March 2007 in an amount equal to $2,825,000 (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.06); provided, however, that the final principal installment shall be repaid on the Term B Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of the Term B Loans outstanding on such date.

(b)    Revolving Credit Loans. The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Credit Lenders on the Revolving Credit Termination Date the aggregate principal amount of the Revolving Credit Loans then outstanding.

(c)    Synthetic L/C Loans. The Borrower shall repay to the Administrative Agent for the account of the Synthetic Issuing Bank and each Synthetic L/C Lender that has made Synthetic L/C Loans on the Synthetic L/C Maturity Date the outstanding principal amount of each Synthetic L/C Loan made by each of them.

SECTION 2.05.  Termination or Reduction of the Commitments.

(a)    Optional. The Borrower may, upon at least five Business Days' irrevocable notice to the Administrative Agent (provided that, if a notice is conditioned upon the

48

effectiveness of other credit facilities or any incurrence or issuance of debt or equity, such notice may be revoked by the Borrower (by notice to the Administrative Agent) if such credit facilities do not become effective or such other transaction does not close, subject to the obligations of the Borrower under Section 9.04(c)), terminate in whole or reduce in part the unused portions of the Term B Commitments, the Unused Revolving Credit Commitments and the Synthetic L/C Deposit Commitments; *provided, however*, that each partial reduction of a Facility (i) shall be in an aggregate amount of $1,000,000 or an integral multiple of $500,000 in excess thereof, (ii) shall be made ratably among the Appropriate Lenders in accordance with their Commitments with respect to such Facility, (iii) after giving effect to any such reduction in respect of the Synthetic L/C Deposit Commitments, the remaining amount of the Synthetic L/C Deposit Commitments shall be equal to or greater than the Synthetic L/C Exposure at such time, (iv) the Borrower shall not terminate or reduce any Revolving Credit Commitments, if, after giving effect to such reduction and any concurrent prepayment of the Loans in accordance with Section 2.06, the aggregate Revolving Credit Exposure would exceed the aggregate Revolving Credit Commitments and (v) with respect to such termination or reduction consisting of a re-pricing or a refinancing of all or substantially all of any such unutilized Commitments, the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Appropriate Lenders, the Call Premium, if any. The Borrower's notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction, the amount of any partial reduction and the Call Premium, if any, and such termination or reduction of the relevant Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the relevant Commitments of the Appropriate Lenders proportionately in accordance with each such Appropriate Lender's Pro Rata Share thereof.

(b)    Mandatory. (i) Subject to any increases in Synthetic L/C Deposit Commitments of Synthetic L/C Lenders pursuant to Section 2.03(d)(v), the Synthetic L/C Deposit Commitment of each Synthetic L/C Lender shall be permanently and ratably reduced from time to time upon any reduction in the Synthetic L/C Deposits.

(ii)    Any termination or reduction of the Revolving Credit Commitments or the aggregate Revolving Credit-Linked Deposits pursuant to Section 2.05 shall be permanent.

(iii)    Unless previously terminated or reduced, the Revolving Credit Commitments shall terminate and be reduced to zero on the Revolving Credit Termination Date. Subject only to the Borrower's compliance with its obligations under the preceding sentence, any amount of the Revolving Credit-Linked Deposits held in the Revolving Credit-Linked Deposit Account will be returned to the Revolving Credit Lenders on the Revolving Credit Termination Date ratably in accordance with their Applicable Revolving Credit Percentages of the total Revolving Credit-Linked Deposits for all Revolving Credit Lenders.

(c)    In the event the aggregate Revolving Credit Commitments shall be reduced as provided in clause (a) above, the Administrative Agent will return all amounts in the Revolving Credit-Linked Deposit Account in excess of the reduced aggregate Revolving Credit-Linked Deposits corresponding to the reduced Revolving Credit Commitments to the Revolving Credit Lenders, ratably in accordance with their Applicable Revolving Credit Percentages of the

49

Revolving Credit Commitments. Any such reduction of the Revolving Credit Commitments and Revolving Credit-Linked Deposits shall be subject to the provisions of Section 9.04(c).

SECTION 2.06. Prepayments.

(a)    Optional. The Borrower may, upon at least one Business Day's irrevocable notice in the case of Base Rate Loans and three Business Days' irrevocable notice in the case of Eurodollar Rate Loans, in each case to the Administrative Agent (*provided* that, if a notice is conditioned upon the effectiveness of other credit facilities or any incurrence or issuance of debt or equity, such notice may be revoked by the Borrower (by notice to the Administrative Agent) if such credit facilities do not become effective or such other transaction does not close, subject to the obligations of the Borrower under Section 9.04(c)) stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall prepay the outstanding aggregate principal amount of the Loans comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment unless such accrued interest is in respect of a prepayment that is a prepayment of Revolving Credit Loans consisting of Base Rate Loans which accrued and unpaid interest shall be in arrears on the last Business Day of December, March, June and September commencing on the last Business Day of March 2007 on the aggregate principal amount prepaid; *provided, however*, that (i) each partial prepayment shall be in an aggregate principal amount of $1,000,000 or an integral multiple of $500,000 in excess thereof, (ii) if any prepayment of a Eurodollar Rate Loan is made on a date other than the last day of an Interest Period for such Loan, the Borrower shall also pay any amounts owing pursuant to Section 9.04(c) and (iii) with respect to such prepayment consisting of a re-pricing or a refinancing of all or substantially all of any such Loans with the proceeds of Debt for Borrowed Money issued or incurred by any of the Loan Parties, the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Appropriate Lenders, the Call Premium, if any. Each such prepayment of the Term B Loans shall be applied to the installments thereof *pro rata*.

(b)    Mandatory.    (i)  The Borrower shall on the date specified in the last sentence of clause (c) below (A) prepay an aggregate principal amount of the Loans plus accrued and unpaid interest thereon to the date of prepayment and any amounts owing pursuant to Section 9.04(c) and (B) deposit funds in the Synthetic L/C Cash Collateral Account, in either case, with funds then on deposit in the Prepayment Account on each Semi-Annual Prepayment Date (other than Net Cash Proceeds (if any) referred to in clause (ii) below) in accordance with the priorities *first* through *fourth* of Section 3.8 of the Security Deposit Agreement. Each such prepayment of the Term B Facility shall be applied to the installments of such Term B Facility *pro rata*.

(ii)    Subject to the Security Deposit Agreement, following the receipt of any Net Cash Proceeds of any Casualty Event, Event of Eminent Domain, Asset Sale, Equity Issuance or the incurrence or issuance of any Debt (other than Debt permitted to be incurred pursuant to Section 5.02(b)), the Borrower shall on the date specified in the last sentence of clause (c) below (A) prepay an aggregate principal amount of the Loans plus accrued and unpaid interest thereon to the date of prepayment and any amounts owing pursuant to Section 9.04(c) and (B) deposit funds in the Synthetic L/C Cash Collateral

50

Account, in either case, with such Net Cash Proceeds then on deposit in the Prepayment Account in accordance with priorities *first* through *fourth* of Section 3.8 of the Security Deposit Agreement. Each such prepayment of the Term B Facility shall be applied to the installments of such Term B Facility *pro rata.*

(c)    Procedures; Option to Decline. Not later than 11:00 a.m. (New York City time) on the Business Day following each Semi-Annual Prepayment Date, in the cause of clause (b)(i) above, or following the receipt of Net Cash Proceeds, in the case of clause (b)(ii) above, the Borrower shall notify the Administrative Agent of the amount that is available to prepay such Loans (the "*Prepayment Amount*"). On the date of receipt of such notice, or, if such notice is received after 11:00 A.M. (New York City time), on the next succeeding Business Day, the Administrative Agent shall provide written notice (the "*First Offer*") to the Appropriate Lenders of the amount available to prepay the Loans. Any Appropriate Lender, at its option, may elect not to accept any prepayment of such Loans pursuant to Section 2.06(b). Any Appropriate Lender declining such prepayment (a "*Declining Lender*") shall give written notice thereof to the Administrative Agent by 11:00 a.m. (New York City time) no later than two Business Days after the date of such notice from the Administrative Agent. On such date the Administrative Agent shall then provide written notice (the "*Second Offer*") to the Appropriate Lenders other than the Declining Lenders (such Appropriate Lenders being the "*Accepting Lenders*") of the additional amount available (due to such Declining Lenders' declining such prepayment) to prepay such Loans owing to such Accepting Lenders. Any Appropriate Lender declining prepayment pursuant to such Second Offer, shall give written notice thereof to the Administrative Agent by 11:00 a.m. (New York City time) no later than two Business Days after the date of such notice of a Second Offer. The Administrative Agent shall repeat the First Offer and Second Offer, if applicable, for any Facility entitled to a repayment of Loans under Section 2.06(b) until the date that the Administrative Agent shall have determined the amounts to be prepaid hereunder in connection with such mandatory prepayments, and, on such date, the Administrative Agent shall give written notice to the Borrower of the amount of the prepayments required to be made on the applicable prepayment date pursuant to Section 2.06(b), after giving effect to the First Offer and the Second Offer. The Borrower shall direct the prepayment of such Loans in accordance with the Security Deposit Agreement, in the aggregate amount specified in the notice from the Administrative Agent described in the immediately preceding sentence, within one Business Day after its receipt of notice from the Administrative Agent of the aggregate amount of such prepayment.

(d)    Application of Prepayment by Type of Term B Loans. In connection with any voluntary prepayments by the Borrower pursuant to clause (a) above, any voluntary prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 9.04(c).

(e)    In connection with any mandatory prepayments by the Borrower of the Term B Loans pursuant to clause (b) above and Section 2.15, such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term B Loans are Base Rate Loans or Eurodollar Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term B Loans

51

pursuant to clause (c) above or Section 2.15 then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Term B Loans that are Base Rate Loans to the full extent thereof before application to Term B Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 9.04(c).

SECTION 2.07.  Interest.

(a)    Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Loan owing to each Lender from the date of such Loan until such principal amount shall be paid in full, at the following rates per annum:

(i)    Base Rate Loans.  During such periods as such Loan is a Base Rate Loan, a rate per annum equal at all times to the sum of (A) the Base Rate in effect from time to time *plus* (B) the Applicable Margin in effect from time to time, payable in arrears quarterly on the last Business Day of each December, March, June and September during such periods and on the date such Base Rate Loan shall be Converted or paid in full commencing on the last Business Day of March 2007.

(ii)    Eurodollar Rate Loans.  During such periods as such Loan is a Eurodollar Rate Loan, a rate per annum equal at all times during each Interest Period for such Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Loan *plus* (B) the Applicable Margin in effect, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Loan shall be Converted or paid in full.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the request of the Required Lenders shall, require that the Borrower pay interest ("*Default Interest*") on (i) the unpaid principal amount of each Loan owing to each Lender Party, payable in arrears on the dates referred to in clause (i) or (ii) of Section 2.07(a), as applicable, and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid on such Loan pursuant to clause (i) or (ii) of Section 2.07(a), as applicable, and (ii) to the fullest extent permitted by applicable law, the amount of any interest, fee (including the Participation Fee) or other amount payable under this Agreement or any other Loan Document to any Agent or any Lender Party that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid on Base Rate Loans pursuant to clause (i) of Section 2.07(a); *provided, however,* that following the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, Default Interest shall accrue and be payable hereunder whether or not previously required by the Administrative Agent.  Payment or acceptance of the increased rates of interest provided for in this Section 2.07(b) is not a permitted alternative to timely payment and shall not

52

constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender Party.

(c)    Notice of Interest Period and Interest Rate. Promptly after receipt of a Notice of Borrowing pursuant to Section 2.02(a), a notice of Conversion pursuant to Section 2.09 or a notice of selection of an Interest Period pursuant to the terms of the definition of "Interest Period," the Administrative Agent shall give notice to the Borrower and each Appropriate Lender of the applicable Interest Period and the applicable interest rate determined by the Administrative Agent for purposes of clause (a)(i) or (a)(ii) above.

SECTION 2.08.  Fees.

(a)    Revolver Fee. The Borrower agrees to pay to the Administrative Agent on behalf of the Revolving Credit Lenders on a quarterly basis on the last Business Day of each December, March, June and September (commencing on the last Business Day of March 2007) occurring after the Effective Date for the account of each Revolving Credit Lender a fee, accruing (subject to Section 2.07(b)) at a rate per annum equal to the Applicable Margin on the daily amount of the Revolving Credit-Linked Deposit of such Revolving Credit Lender (less the principal amount of the Revolving Credit Loans held by Revolving Credit Lenders during such period and not by the Fronting Bank in its capacity as such) during the period from and including the Effective Date to but excluding the date on which each of the Revolving Credit Commitments of all of the Revolving Credit Lenders has been reduced to zero. In addition, the Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender an additional amount, accruing at the rate of 0.125% per annum, on the daily amount of the Revolving Credit-Linked Deposit of such Revolving Credit Lender during the period from and including the Effective Date hereof to but excluding the date on which each of the Revolving Credit Commitments of all of the Revolving Credit Lenders has been reduced to zero (less the principal amount of the Revolving Credit Loans held by Revolving Credit Lenders during such period and not by the Fronting Bank in its capacity as such). All fees payable under this paragraph shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The foregoing fees shall be due and payable in arrears quarterly on the last Business Day of each December, March, June and September (commencing on the last Business Day of March 2007) occurring after the Effective Date, and on the date on which each of the Revolving Credit Commitments of all of the Revolving Credit Lenders has been reduced to zero.

(b)    Letter of Credit Fees. (i) [Reserved].

(ii)    The Borrower agrees to pay to the Administrative Agent for the account of each Synthetic L/C Lender a participation fee (a "*Participation Fee*") with respect to its agreement to participate in the Synthetic Letters of Credit, which Participation Fee shall accrue at a rate per annum equal to the Applicable Margin *plus* the Synthetic L/C Deposit Cost Amount attributable to such Synthetic L/C Lender's Synthetic L/C Deposit, on the average daily amount of such Synthetic L/C Lender's Synthetic L/C Deposit during the period from and including, the Effective Date and to but excluding the date on which such Synthetic L/C Lender's Synthetic L/C Deposit is returned to such Synthetic L/C

53

Lender in accordance with Section 2.03(e)(v). Accrued Participation Fees shall be due and payable in arrears quarterly on the last Business Day of each December, March, June and September (commencing on the last Business Day of March 2007) occurring after the Effective Date; *provided* that all such Participation Fees shall be payable on the date on which any Synthetic L/C Deposits are returned to the Synthetic L/C Lenders pursuant to Section 2.03(e)(v).

(iii)    The Borrower shall pay the Synthetic Issuing Bank, for its own account, such commissions, issuance fees, fronting fees, transfer fees and other fees and charges in connection with the issuance, administration and amendment of each Synthetic Letter of Credit as the Borrower and such Synthetic Issuing Bank may agree.

(c)    Agents' Fees. The Borrower shall pay to each Agent for its own account such fees as may from time to time be agreed between the Borrower and such Agent.

SECTION 2.09.  Conversion of Loans.

(a)    Optional. The Borrower may on any Business Day, upon notice given to the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Section 2.10, Convert all or any portion of the Loans of one Type comprising the same Borrowing into Loans of the other Type; *provided, however*, that any Conversion of Eurodollar Rate Loans into Base Rate Loans shall be made only on the last day of an Interest Period for such Eurodollar Rate Loans or, if made on another date, shall be subject to the provisions of Section 9.04(c), any Conversion of Base Rate Loans into Eurodollar Rate Loans shall be in an amount not less than the minimum amount specified in Section 2.02(b), no Conversion of any Loans shall result in more separate Borrowings than permitted under Section 2.02(b) and each Conversion of Loans comprising part of the same Borrowing under any Facility shall be made ratably among the Appropriate Lenders in accordance with their Commitments under such Facility. Each such notice of Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Loans to be Converted and (iii) if such Conversion is into Eurodollar Rate Loans, the duration of the initial Interest Period for such Loans. Each notice of Conversion shall be irrevocable and binding on the Borrower.

(b)    Mandatory. (i) If the Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Loans in accordance with the provisions contained in the definition of "*Interest Period*" in Section 1.01, the Administrative Agent will forthwith so notify the Borrower and the Appropriate Lenders, whereupon each such Eurodollar Rate Loan shall have an Interest Period of one month.

(ii)    Upon the occurrence and during the continuance of any Event of Default, (x) each Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (y) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended.

54

SECTION 2.10.  Increased Costs, Etc.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender Party of agreeing to make or of making, funding or maintaining Eurodollar Rate Loans, any Revolving Credit-Linked Deposit or any Synthetic L/C Deposit or of agreeing to issue or of issuing or maintaining or participating in Synthetic Letters of Credit or of agreeing to make or of making or maintaining Synthetic L/C Loans or Revolving Credit Loans (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis or rate of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender Party is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrower shall from time to time, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party additional amounts sufficient to compensate such Lender Party for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender Party, shall be conclusive and binding for all purposes, absent manifest error.

(b)    If any Lender Party determines that compliance with any law or regulation or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender Party or any corporation controlling such Lender Party and that the amount of such capital is increased by or based upon the existence of such Lender Party's commitment to make Loans, to maintain Synthetic L/C Deposits, Revolving Credit-Linked Deposits or to issue or participate in Synthetic Letters of Credit hereunder and other commitments of such type or the issuance or maintenance of or participation in the Synthetic Letters of Credit (or similar Guaranteed Debts), then, upon demand by such Lender Party or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender Party, from time to time as specified by such Lender Party, additional amounts sufficient to compensate such Lender Party in the light of such circumstances, to the extent that such Lender Party reasonably determines such increase in capital to be allocable to the existence of such Lender Party's commitment to make Loans, to maintain Synthetic L/C Deposits or Revolving Credit-Linked Deposits or to issue or participate in Synthetic Letters of Credit hereunder or to the issuance or maintenance of or participation in any Synthetic Letters of Credit.  A certificate as to such amounts submitted to the Borrower by such Lender Party shall be conclusive and binding for all purposes, absent manifest error.

(c)    If, with respect to any Eurodollar Rate Loans under any Facility, Lenders owed at least 33⅓% of the then aggregate unpaid principal amount thereof notify the Administrative Agent that the Eurodollar Rate for any Interest Period for such Loans will not adequately reflect the cost to such Lenders of making, funding or maintaining their Eurodollar Rate Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Appropriate Lenders, whereupon (i) each such Eurodollar Rate Loan under such Facility will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (ii) the obligation of the Appropriate Lenders to make, or to

55

Convert Loans into, Eurodollar Rate Loans shall be suspended and (iii) the Revolving Credit-Linked Deposit and the Synthetic L/C Deposits shall be invested so as to earn a return equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, in each case, until the Administrative Agent shall notify the Borrower that such Lenders have determined that the circumstances causing such suspension no longer exist, in which case (x) the obligation of the Appropriate Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated and (y) the Revolving Credit-Linked Deposit and the Synthetic L/C Deposits shall be invested as otherwise provided herein.

(d)    Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other governmental authority shall assert that it is unlawful, for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans hereunder, then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) each Eurodollar Rate Loan under each Facility under which such Lender has a Commitment will automatically, upon such demand, Convert into a Base Rate Loan, (ii) the obligation of the Appropriate Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended and (iii) the Revolving Credit-Linked Deposits and the Synthetic L/C Deposits shall be invested so as to earn a return equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, in each case, until the Administrative Agent shall notify the Borrower that such Lender has determined that the circumstances causing such suspension no longer exist, in which case (x) the obligation of the Appropriate Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated and (y) the Revolving Credit-Linked Deposits and the Synthetic L/C Deposits shall be invested as otherwise provided herein; *provided*, *however*, that, before making any such demand, such Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Eurodollar Lending Office if the making of such a designation would allow such Lender or its Eurodollar Lending Office to continue to perform its obligations to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans, Revolving Credit-Linked Deposits or its Synthetic L/C Deposit and would not, in the judgment of such Lender, be otherwise disadvantageous to such Lender.

SECTION 2.11. Payments and Computations. (a) The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in Section 2.13), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day in the Administrative Agent's sole discretion. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender Party, to such Lender Parties for the account of their respective Applicable Lending Offices ratably in

56

accordance with the amounts of such respective Obligations then payable to such Lender Parties and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender Party, to such Lender Party for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    The Borrower hereby authorizes each Lender Party and each of its Affiliates, if and to the extent payment owed to such Lender Party is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender Party or such Affiliate any amount so due.

(c)    All computations of interest based on the Base Rate shall be made by the Administrative Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of fees (including the Participation Fees) and Synthetic Letter of Credit commissions shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Except as otherwise provided under the Loan Documents, whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee or commission, as the case may be; *provided, however,* that, if such extension would cause payment of interest or commitment fee or commission on or principal of Eurodollar Rate Loans, Revolving Credit-Linked Deposits or Synthetic L/C Deposits to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender Party hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender Party on such due date an amount equal to the amount then due such Lender Party. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender Party shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender Party together with interest thereon, for each day from the date such amount is distributed to such Lender Party until the date such Lender Party repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Loans or the Facility to which, or the manner in which, such funds are to be applied, the Administrative Agent may, if no instructions with

57

respect thereto are received from the Lender Parties upon request, but shall not be obligated to, elect to distribute such funds to each of the Lender Parties in accordance with such Lender Party's Pro Rata Share of the sum of (without duplication) (i) the aggregate principal amount of all Loans outstanding at such time, (ii) the aggregate amount of the Synthetic L/C Deposits at such time, (iii) the aggregate Available Amount of all Synthetic Letters of Credit outstanding at such time and (iv) the aggregate amount of the Revolving Credit-Linked Deposits at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender Party, and, in the case of the Term B Facility, for application to such principal repayment installments thereof, as the Administrative Agent shall direct.

SECTION 2.12.  Taxes.  (a)  Any and all payments by any Loan Party to or for the account of any Lender Party or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.11 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender Party and each Agent, (x) taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which such Lender Party or such Agent, as the case may be, is organized (or any political subdivision thereof), has its Applicable Lending Office, has a permanent establishment or is engaged in business (other than the business that the Lender Party is engaged in solely by reason of the transactions contemplated by this Agreement), (y) any branch profits taxes imposed by the United States of America and (z) withholding taxes imposed under law in effect on the date hereof or at the time the Lender Party designates a new Applicable Lending Office, other than any new Applicable Lending Office designated at the written request of a Loan Party (in the case of a Lender Party that is not an Initial Lender, this clause (z) shall include taxes imposed under law in effect on the date such Lender Party becomes a Lender, except to the extent that the Lender's predecessor would have been entitled to receive additional amounts under this Section 2.12(a)) and, in the case of each Lender Party, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of such Lender Party's Applicable Lending Office or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "*Taxes*").  If any Loan Party or the Administrative Agent shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender Party or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender Party or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, each Loan Party shall pay any present or future stamp, documentary, excise, property (including intangible property, but with regard to all property taxes, only to the extent relating to property of a Loan Party) mortgage recording or similar

58

taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under this Agreement or the other Loan Documents (hereinafter referred to as "*Other Taxes*").

(c)    The Loan Parties shall indemnify each Lender Party and each Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender Party or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto. This indemnification shall be made within 30 days from the date such Lender Party or such Agent (as the case may be) makes written demand therefor.

(d)    Within 30 days after the date of any payment of Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent. In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Loan Party through an account or branch outside the United States or by or on behalf of a Loan Party by a payor that is not a United States person, if such Loan Party determines that no Taxes are payable in respect thereof, such Loan Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this Section 2.12, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)    Each Lender Party organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender Party and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender Party in the case of each other Lender Party, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender Party remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two original Internal Revenue Service Forms W-8BEN or W-8ECI or (in the case of a Lender Party that has certified in writing to the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender Party is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender Party that has certified that it is not a "bank" as described above, certifying that such Lender Party is a foreign corporation, partnership, estate or trust. As provided in Section 2.12(a), if the forms provided by a Lender Party at the time such Lender Party first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender Party provides the appropriate forms certifying that a lesser rate applies,

59

whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided, however,* that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender Party becomes a party to this Agreement, the Lender Party assignor was entitled to payments under subsection (a) of this Section 2.12 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender Party assignee on such date.  If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, that the applicable Lender Party reasonably considers to be confidential, such Lender Party shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)     For any period with respect to which a Lender Party has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender Party shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.12 with respect to Taxes imposed by the United States by reason of such failure; *provided, however,* that should a Lender Party become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Lender Party shall reasonably request, at the Lender Party's sole expense and as long as the Loan Parties determine that such steps will not, in the reasonable judgment of the Loan Parties, be disadvantageous to the Loan Parties, to assist such Lender Party to recover such Taxes.

(g)     Any Lender Party claiming any additional amounts payable pursuant to this Section 2.12 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender Party, be otherwise disadvantageous to such Lender Party.  In addition, if a Lender Party determines, in such Lender Party's sole discretion, that it has received a refund or credit in respect of any Taxes or Other Taxes as to which it has been indemnified pursuant to Section 2.12(c), or with respect to which additional amounts have been paid pursuant to Section 2.12(a), such Lender Party shall pay to the Borrower an amount equal to such refund (but such amount in no event to exceed the amount of any indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses of such Lender Party, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of such Lender Party, shall agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender Party in the event such Lender Party subsequently determines that

60

such refund or credit is unavailable under applicable law or is otherwise required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require a Lender Party to rearrange its tax affairs or to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(h)    The Administrative Agent shall deliver to each Loan Party on the Effective Date (and shall keep effective thereafter) two duly completed copies of Internal Revenue Service Form W-8IMY, or any successor or other form prescribed by the Internal Revenue Service, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with each Loan Party to be treated as a U.S. person with respect to such payments (and each Loan Party and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments), with the effect that each Loan Party can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

SECTION 2.13.  Sharing of Payments, Etc.  If any Lender Party shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 9.07), (a) on account of Obligations due and payable to such Lender Party hereunder and under the other Loan Documents or on account of the Synthetic L/C Deposits or the Revolving Credit-Linked Deposits maintained by such Lender Party at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender Party or, to the extent applicable, the Synthetic L/C Deposits or the Revolving Credit-Linked Deposits maintained by such Lender Party at such time to (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time or, to the extent applicable, the total Synthetic L/C Deposits and Revolving Credit-Linked Deposits maintained by all Lenders at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents, the Revolving Credit-Linked Deposits or the Synthetic L/C Deposits maintained by the Lenders, as applicable, at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the other Loan Documents, the Revolving Credit-Linked Deposits or the Synthetic L/C Deposits maintained by the Lenders, as applicable, at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time or the Synthetic L/C Deposits maintained by such Lender Party at such time, as applicable, to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents or the total Synthetic L/C Deposits or the Revolving Credit-Linked Deposits maintained by the Lenders, as applicable, at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such interests or participating interests in the Obligations, the Revolving Credit-Linked Deposits or Synthetic L/C Deposits due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; *provided, however,* that if all or any portion of such excess payment is thereafter recovered from such

61

purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered. The Loan Parties agree that any Lender Party so purchasing an interest or participating interest from another Lender Party pursuant to this Section 2.13 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender Party were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be.

SECTION 2.14.  Use of Proceeds.  (a)  The proceeds of the Term B Loans shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to refinance all outstanding indebtedness under the Existing Credit Agreements, (ii) to provide working capital for the Loan Parties, (iii) to fund the Distribution and the Tender Offer of EBG Holdings, and (iv) pay transaction fees and expenses.

(b)     The proceeds of the Revolving Credit Loans shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to provide working capital for the Loan Parties and (ii) for the Loan Parties' other general corporate purposes.

(c)     The proceeds and issuances of Synthetic Letters of Credit shall be available (and the Borrower agrees that it shall use such proceeds and Synthetic Letters of Credit) solely (i) to provide credit support in respect of the Borrower's and the Guarantor's working capital needs including in respect of Permitted Commodity Hedge and Power Sale Agreements, (ii) to fulfill in whole or in part the First Lien Debt Service Reserve Requirement and the Second Lien Debt Service Reserve Requirement under (and as defined in) the Second Lien Credit Agreement and (iii) to provide support for other performance obligations of the Loan Parties.

SECTION 2.15.  Change of Control Prepayment.  (a) No later than three (3) Business Days after the occurrence of a Change of Control, the Borrower shall through the Administrative Agent offer to each Lender (by delivery of a prepayment offer to the Administrative Agent) to prepay all (but not part) of its outstanding Loans and return all outstanding Synthetic L/C Deposits and all outstanding Revolving Credit-Linked Deposits in accordance with this Section 2.15.  The prepayment offer may be conditioned on the occurrence of such Change of Control (if made prior to such occurrence) and otherwise shall be irrevocable and shall state: (i) the proposed date of such prepayment and/or return (which date shall be no earlier than (x) the end of the Offer Period and (y) the date of the applicable Change of Control and no later than ten (10) Business Days from the date of the applicable Change of Control) (or, if later, the end of the Offer Period); (ii) the prepayment price (which, with respect to each Lender, shall be calculated as the sum of (w) the aggregate principal amount of the outstanding Loans made by, and Synthetic L/C Deposits and Revolving Credit-Linked Deposits of, such

62

Lender, (x) without duplication, an amount equal to 1.00% of the aggregate principal amount of such outstanding Loans made by, and Synthetic L/C Deposits and Revolving Credit-Linked Deposits of, such Lender, (y) all accrued and unpaid interest on such Loans and Synthetic L/C Deposits and Revolving Credit-Linked Deposits and (z) all accrued interest on the principal amount being repaid, prepaid or returned and any amounts owing pursuant to Section 9.04(c)); (iii) that each Lender that accepts such prepayment offer must accept such offer with respect to all (but not part) of its Loans, Revolving Credit-Linked Deposits and Synthetic L/C Deposits; (iv) that each Lender must accept such offer by delivering notice of such acceptance to the Administrative Agent within ten (10) days after the date the Borrower makes its offer to such Lender (the "*Offer Period*"); and (v) in reasonable detail, the nature of the applicable Change of Control and the projected impact of such Change of Control on the Projects, the operations thereof and the Borrower and the Guarantors.

(b)    The Borrower shall comply with the terms of each such prepayment offer. Each Lender shall have the right to accept such offer prior to the expiration of the applicable Offer Period.

(c)    Notwithstanding anything to the contrary herein, the Borrower shall not request, nor shall any Lender be obligated to make, any Loans under the Revolving Credit Facility or issue Synthetic Letters of Credit under the Synthetic L/C Facility from and after the date of a Change of Control until the date the Borrower prepays Loans of and/or returns Synthetic L/C Deposits and Revolving Credit-Linked Deposits to all of the Lenders who have accepted a prepayment offer in accordance with this Section 2.15.

(d)    The Commitments of each Lender that accepts a prepayment offer in accordance with this Section 2.15 shall terminate in its entirety on the date such Lender's Loans are repaid or, if later, scheduled to be repaid or returned.

SECTION 2.16.  Evidence of Debt. (a) Each Lender Party shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan owing to such Lender Party from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. The Borrower agrees that upon notice by any Lender Party to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender Party to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender Party, the Borrower shall promptly execute and deliver to such Lender Party, with a copy to the Administrative Agent, a Revolving Credit Note, a Synthetic L/C Note and a Term B Note, as applicable, in substantially the form of Exhibits A-1, A-2 and A-3 hereto, respectively, payable to the order of such Lender Party in a principal amount equal to the Revolving Credit Commitment, Synthetic L/C Loans and Term B Loans, respectively, of such Lender Party. All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Register maintained by the Administrative Agent pursuant to Section 9.07(e) shall include a control account and a subsidiary account for each Lender Party, in

63

which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder, the Type of Loans comprising such Borrowing and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender Party hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender Party's share thereof.

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender Party in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender Party and, in the case of such account or accounts, such Lender Party, under this Agreement, absent manifest error; *provided, however*, that the failure of the Administrative Agent or such Lender Party to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.17.    Duty to Mitigate.    In the event that any Lender Party demands payment of costs or additional amounts pursuant to Section 2.10 or 2.12 or asserts, pursuant to Section 2.10(d), that it is unlawful for such Lender Party to make Eurodollar Rate Loans then (subject to such Lender Party's right to rescind such demand or assertion within 10 days after the notice from the Borrower referred to below) the Borrower may, upon 20 days' prior written notice to such Lender Party and the Administrative Agent, elect to cause such Lender Party to assign its Loans and Commitments in full to one or more Persons selected by the Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent and any Synthetic Issuing Bank, (ii) such Lender Party receives payment in full in cash of the outstanding principal amount of all Loans made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender Party as of the date of such assignment (including, without limitation, amounts owing pursuant to Sections 2.10, 2.12 and 9.04) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender Party hereunder in accordance with Section 9.07.

SECTION 2.18.    Revolving Credit-Linked Deposit Accounts.

(a)    Establishment of Revolving Credit-Linked Deposit Account and Revolving Credit-Linked Sub-Accounts.    On or prior to the Effective Date, the Administrative Agent shall establish a Revolving Credit-Linked Deposit Account with the title "Revolving Credit Lenders (Boston Gen) Credit-Linked Deposit Account".    The Administrative Agent shall maintain records enabling it to determine at any time the amount of the interest of each Revolving Credit Lender in the Revolving Credit-Linked Deposit Account (the interest of each Revolving Credit Lender in the Revolving Credit-Linked Deposit Account, as evidenced by such records, being referred to as such Lender's "***Revolving Credit-Linked Sub-Account***").    The Administrative Agent shall establish such additional Revolving Credit-Linked Sub-Accounts for assignee Lenders as shall be required pursuant to Section 9.07(b).    No Person (other than the Administrative Agent) shall have the right to make any withdrawal from the Revolving Credit-

64

Linked Deposit Account or to exercise any other right or power with respect thereto. Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the Revolving Credit-Linked Deposits are and (subject to the last paragraph of Article VI) will at all times be solely the property of the Revolving Credit Lenders, that the Revolving Credit-Linked Deposits shall be used solely in accordance with this Agreement and that no amount on deposit at any time in the Revolving Credit-Linked Deposit Account shall be the property of any of the Loan Parties, constitute collateral for any Obligations of the Loan Parties under the Loan Documents or otherwise be available in any manner to satisfy any Obligations of any of the Loan Parties under the Loan Documents. Each Revolving Credit Lender agrees that its right, title and interest in and to the Revolving Credit-Linked Deposit Account shall be limited to the right to require amounts in its Revolving Credit-Linked Sub-Account to be applied as provided in Section 2.18(c) below and that it will have no right to require the return of its Revolving Credit-Linked Deposit other than as expressly provided in such Section 2.18(c) (each Revolving Credit Lender hereby acknowledging that its Revolving Credit-Linked Deposit constitutes payment for its participations in Revolving Credit Loans made or to be made hereunder and that the Fronting Bank will be making Revolving Credit Loans in reliance on the availability of such Lender's Revolving Credit-Linked Deposit to discharge such Lender's obligations in accordance with Section 2.18(i)). The funding of the Revolving Credit-Linked Deposits and the agreements with respect thereto set forth in this Agreement constitute arrangements solely among the Administrative Agent, the Fronting Bank and the Revolving Credit Lenders with respect to the funding and reimbursement obligations of the Revolving Credit Lenders under this Agreement, and do not constitute loans, extensions of credit or other financial accommodations to any Loan Party. No Loan Party shall have any responsibility or liability to the Revolving Credit Lenders, the Administrative Agent or any other Person in respect of the establishment, maintenance, administration or misappropriation of the Revolving Credit-Linked Deposit Account (or any Revolving Credit-Linked Sub-Account) or with respect to the investment of amounts held therein, including pursuant to Section 2.18(d) below.

(b)     Deposits in Revolving Credit-Linked Deposit Account. The following amounts will be deposited in the Revolving Credit-Linked Deposit Account at the following times:

(i)     On the Effective Date, each Revolving Credit Lender shall deposit in the Revolving Credit-Linked Deposit Account an amount in Dollars equal to such Lender's Revolving Credit Commitment. Thereafter, the Revolving Credit-Linked Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Section 2.18(i) to pay such Lender's Applicable Revolving Credit Percentage of the principal of Revolving Credit Loans that are not paid when due (at stated maturity, by acceleration or otherwise).

(ii)     On any date prior to the Revolving Credit Termination Date on which the Administrative Agent or the Fronting Bank receives any payment of principal of Revolving Credit Loans, with respect to which amounts were withdrawn from the Revolving Credit-Linked Deposit Account to reimburse or pay the Fronting Bank, subject to clause (iii) below, the Administrative Agent shall deposit in the Revolving Credit-Linked Deposit Account, and credit to the Revolving Credit-Linked Sub-Accounts of the

Revolving Credit Lenders, the portion of such reimbursement or other payment to be deposited therein, in accordance with Sections 2.18(i).

(iii)    If at any time when any amount is required to be deposited in the Revolving Credit-Linked Deposit Account under clause (ii) above the sum of such amount and the aggregate amount of the Revolving Credit-Linked Deposits at such time would exceed the higher of the total aggregate Revolving Credit Commitments and the Revolving Credit Exposure, then such excess shall not be deposited in the Revolving Credit-Linked Deposit Account and the Administrative Agent shall instead pay to each Revolving Credit Lender its Applicable Revolving Credit Percentage of such excess.

(iv)    Concurrently with the effectiveness of any assignment by any Revolving Credit Lender of all or any portion of its Revolving Credit Commitment, the Administrative Agent shall transfer into the Revolving Credit-Linked Sub-Account of the assignee the corresponding portion of the amount on deposit in the assignor's Revolving Credit-Linked Sub-Account in accordance with Section 9.7(b).

(c)    Withdrawals From and Closing of Revolving Credit-Linked Deposit Account. Each Revolving Credit Lender irrevocably and unconditionally agrees that its deposit in the Revolving Credit-Linked Deposit Account shall be withdrawn and distributed (or transferred, in the case of clause (v) below) as follows:

(i)    In the event the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Revolving Credit Loan, the Administrative Agent shall withdraw from the Revolving Credit-Linked Deposit Account (and debit each Lender's Revolving Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Revolving Credit Percentage of the amount of such principal not paid when due and the Revolving Credit Commitment shall be reduced by such amount.

(ii)    At any time and from time to time, if the Fronting Bank, in its sole discretion, directs the Administrative Agent to withdraw an amount from the Revolving Credit-Linked Deposit Account sufficient to repay all outstanding Revolving Credit Loans or any portion thereof, the Administrative Agent shall withdraw from the Revolving Credit-Linked Deposit Account (and debit each Lender's Revolving Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Revolving Credit Percentage of such amount so directed and the Revolving Credit Commitment shall be reduced by such amount. Additionally, the Fronting Bank, in its sole discretion, may direct the Administrative Agent to fund a Revolving Credit Loan directly with amounts on deposit in the Revolving Credit-Linked Deposit Account (and such Revolving Credit Loan shall immediately become a Funded Revolving Credit Loan as set forth in clause (iii)).

(iii)    Upon the withdrawal of any amounts on deposit in the Revolving Credit-Linked Deposit Account pursuant to clause (c)(i) or (ii), each Revolving Credit Lender shall be deemed to have made a loan (relative to each Revolving Credit Lender, its

66

"*Funded Revolving Credit Loan*") to the Borrower in an amount equal to such Revolving Credit Lender's Applicable Revolving Credit Percentage of the amount withdrawn from the Revolving Credit-Linked Deposit Account. The Borrower may elect to have Funded Revolving Credit Loans accrue as Eurodollar Rate Loans or Base Rate Loans as further set forth in Section 2.09. The Borrower may repay Funded Revolving Credit Loans by making deposits into the Revolving Credit-Linked Deposit Account, which will not cause a reduction in the Revolving Credit Commitment.

(iv)    Concurrently with the effectiveness of any assignment by any Revolving Credit Lender of all or any portion of its Revolving Credit Commitment, the corresponding portion of the assignor's Revolving Credit-Linked Sub-Account shall be transferred from the assignor's Revolving Credit-Linked Sub-Account to the assignee's Revolving Credit-Linked Sub-Account in accordance with Section 9.07(b) and, if required by Section 9.07(b), the Administrative Agent shall close such assignor's Revolving Credit-Linked Sub-Account.

(v)    Upon the reduction of each of the Revolving Credit Commitments to zero, the Administrative Agent shall withdraw from the Revolving Credit-Linked Deposit Account and pay to each Revolving Credit Lender the entire remaining amount of such Lender's Revolving Credit-Linked Deposit, and shall close the Revolving Credit-Linked Deposit Account.

Each Revolving Credit Lender irrevocably and unconditionally agrees that its Revolving Credit-Linked Deposit may be applied or withdrawn from time to time as set forth in this Section 2.18(c).

(d)    Deposit Earnings. Each of the Administrative Agent, the Fronting Bank and each Revolving Credit Lender hereby acknowledges and agrees that (i) each Revolving Credit Lender is funding its Revolving Credit-Linked Deposit to the Administrative Agent for application in the manner contemplated by Section 2.18(i), (ii) the Administrative Agent has agreed to invest the Revolving Credit-Linked Deposits in Cash Equivalents and (iii) the Administrative Agent shall pay to the Revolving Credit Lenders a return on such Revolving Credit-Linked Deposit (except during periods when such Revolving Credit-Linked Deposits are used to cover Revolving Credit Loans that have not been repaid when due (at stated maturity, by acceleration or otherwise)) equal at any time to (x) the Eurodollar Rate for a three-month interest period (*provided*, however that the initial Interest Period shall be the period commencing on the Effective Date and ending on March 30, 2007) minus (y) 12.5 basis points. Such interest will be paid to the Revolving Credit Lenders by the Administrative Agent in arrears on each day on the last day of the interest period applicable to such Revolving Credit-Linked Deposit (which corresponds to the date on which fees are due and payable to the Revolving Credit Lenders under Section 2.08). Any amounts earned and received with respect to Revolving Credit-Linked Deposits during any applicable Interest Period in excess of the Eurodollar Rate for the Interest Period in effect shall be for the account of the Administrative Agent. No Person other than the Administrative Agent shall have any obligation under or in respect of this clause. Notwithstanding anything to the contrary in this Agreement, the Borrower shall not be liable for any losses due to (i) the misappropriation of any Revolving Credit-Linked Deposit or return

67

thereon or (ii) the failure of the Administrative Agent to pay a return to any Revolving Credit Lender (it being understood and agreed for greater certainty that this clause shall not limit any obligation of the Borrower hereunder to pay any fees pursuant to Section 2.08, repay any Revolving Credit Loan or Funded Revolving Credit Loan). Neither the Administrative Agent, the Fronting Bank nor any other Person guarantees any rate of return on the investment of any Revolving Credit-Linked Deposit held in the Revolving Credit-Linked Deposit Account.

(e)    Sufficiency of Deposits to Provide for Revolving Credit Exposure. Notwithstanding any other provision of this Agreement, no Revolving Credit Loan shall be made, if after giving effect thereto the aggregate amount of the Revolving Credit Exposures would exceed the aggregate amount of the Revolving Credit-Linked Deposits.

(f)    Satisfaction of Lender Funding Obligations. The Borrower and the Fronting Bank acknowledge and agree that, notwithstanding any other provision contained herein (but without limiting the obligations of any Revolving Credit Lender under Section 7.05), the deposit by each Revolving Credit Lender in the Revolving Credit-Linked Deposit Account on the Effective Date of funds equal to its Revolving Credit Commitment will fully discharge the obligation of such Lender to fund Loans by such Lender pursuant to Section 2.01, and that no other or further payments shall be required to be made by any Revolving Credit Lender in respect of any such funding or reimbursement obligations.

(g)    Security. Each Revolving Credit Lender hereby grants to the Fronting Bank a first priority security interest in such Revolving Credit Lender's Revolving Credit-Linked Deposit to secure the obligations of such Revolving Credit Lender under Section 2.18(i).

(h)    Fronting Bank Insecure. If the Fronting Bank is enjoined from taking any action referred to in Section 2.18(c), or if the Fronting Bank reasonably determines that, by operation of law, it may reasonably be precluded from taking any such action, or if any Loan Party or Revolving Credit Lender challenges in any legal proceeding any of its respective acknowledgements, agreements or characterizations set forth in Section 2.18(a), then, in any such case (and so long as such event or condition shall be continuing), and notwithstanding anything contained herein to the contrary, the Fronting Bank shall not be required to make any Revolving Credit Loan.

(i)    Reimbursement of Fronting Bank. If the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Revolving Credit Loan, the Fronting Bank shall direct the Administrative Agent to withdraw from the Revolving Credit-Linked Deposit Account (and debit each Revolving Credit Lender's Revolving Credit-Linked Sub-Account in the amount of) such Lender's Applicable Revolving Credit Percentage of the amount of such principal not paid when due. Promptly following receipt by the Administrative Agent of any payment from the Borrower of principal of Revolving Credit Loans, the Administrative Agent shall distribute such payment to the Fronting Bank or, to the extent that amounts have been withdrawn from the Revolving Credit-Linked Deposit Account to make any payment pursuant to this paragraph to the Fronting Bank, then such payment shall be deposited in the Revolving Credit-Linked Deposit Account (and credited to each Revolving Credit Lender's Revolving Credit-Linked Sub-Account in the amount of such Lender's Applicable

68

Revolving Credit Percentage of such deposit). Any payment made with amounts withdrawn from the Revolving Credit-Linked Deposit Account to pay the Fronting Bank for any defaulted principal payment shall constitute the funding by the respective Revolving Credit Lender of its participation in the related Revolving Credit Loan and shall not constitute a new Loan or relieve the Borrower of its obligation to pay such principal.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING
## AND ISSUANCES OF SYNTHETIC LETTERS OF CREDIT

SECTION 3.01.  Conditions Precedent.  Section 2.01 of this Agreement shall become effective on and as of the first date on or before December 21, 2006 (the "*Effective Date*") on which the following conditions precedent have been satisfied (and the obligation of each Lender to make a Loan or any Synthetic Issuing Bank to issue a Synthetic Letter of Credit on the occasion of the Initial Extension of Credit hereunder is subject to the satisfaction of such conditions precedent before or concurrently with the Effective Date):

(a)    The Administrative Agent shall have received on or before the Effective Date the following, each dated as of such date (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)    The Notes payable to the order of the Lenders to the extent requested by the Lenders pursuant to the terms of Section 2.16.

(ii)    The First Lien Security Agreement substantially in the form of Exhibit K duly executed by the Borrower, each Guarantor and the First Lien Collateral Agent, together with:

(A)    confirmation reasonably satisfactory to the Administrative Agent that (1) certificates (if any) representing the Initial Pledged Equity (as defined in the First Lien Security Agreement) accompanied by undated membership interest powers or stock powers, as applicable, executed in blank, and (2) instruments evidencing the Initial Pledged Debt (as defined in the First Lien Security Agreement), indorsed in blank, in each case, have been delivered to the First Lien Collateral Agent,

(B)    appropriately completed financing statements in form appropriate for filing under the Uniform Commercial Code in the State of Delaware, covering the Collateral described in the First Lien Security Agreement,

(C)    completed requests for information or similar search reports, dated on or not more than 14 days before the Effective Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name any Loan Party as debtor, together with copies of such other financing statements,

69

      (D)    certified copies of each Material Contract,

      (E)    each First Lien Consent and Agreement in respect of each Initial Commodity Hedge and Power Sale Agreement and each other Material Contract then in effect (other than each of the Material Contracts set forth on Part III of Schedule 4.01(t)), duly executed by each party to such Initial Commodity Hedge and Power Sale Agreement or Material Contract, as applicable, and

      (F)    evidence that all other action that the Administrative Agent and the First Lien Collateral Agent may deem reasonably necessary in order to perfect and protect the first priority liens and security interests created under the First Lien Security Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and UCC-3 termination statements).

      (iii)    The First Lien Pledge Agreement substantially in the form of Exhibit L duly executed by EBG Holdings and the First Lien Collateral Agent, together with:

      (A)    Confirmation reasonably satisfactory to the Administrative Agent that certificates, if any, representing the Initial Pledged Equity (as defined in the First Lien Pledge Agreement) accompanied by undated membership interest powers or stock powers, as applicable, executed in blank have been delivered to the First Lien Collateral Agent,

      (B)    appropriately completed financing statements in form appropriate for filing under the Uniform Commercial Code in the State of Delaware, covering the Collateral described in the First Lien Pledge Agreement,

      (C)    completed requests for information or similar search reports, dated on or not more than 14 days before the Effective Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name EBG Holdings as debtor, together with copies of such other financing statements, and

      (D)    evidence that all other action that the Administrative Agent and the First Lien Collateral Agent may deem reasonably necessary in order to perfect and protect the first priority liens and security interests created under the First Lien Pledge Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and UCC-3 termination statements).

      (iv)    Original counterparts of the mortgages, deeds of trust or security deeds encumbering each of the Real Properties and substantially in the form of

70

Exhibit D (the "*First Lien Mortgages*") duly executed and delivered by the appropriate Loan Party in recordable form, together with:

(A)    to the extent necessary under applicable law, Uniform Commercial Code Financing Statements covering fixtures ("*UCC Fixture Filings*") appropriately completed for filing in the appropriate filing or recording offices,

(B)    evidence that counterparts of the First Lien Mortgages and UCC Fixture Filings have been either (x) duly recorded on or before the Effective Date or (y) duly executed, acknowledged and delivered to the Title Company in form suitable for filing or recording, in all filing or recording offices necessary in order to create a valid first and subsisting Lien on the property described therein in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties and that all filing and recording taxes and fees have been paid to the Title Company,

(C)    certified copies of the fully paid American Land Title Association Lender's Extended Coverage title insurance policies or an irrevocable written commitment to issue mortgage title policies or marked-up unconditional binders for such insurance (the "*First Lien Mortgage Policies*") in amounts and in form and substance, and with endorsements (including zoning endorsements) to the extent available, reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent, issued by the Title Company, reinsured by title insurers reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent, insuring the First Lien Mortgages to be valid first and subsisting Liens on the property described therein, free of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Liens, and providing for such other affirmative insurance, to the extent available (including endorsements for future advances under the Loan Documents and for mechanics' and materialmen's Liens), in form acceptable to the Administrative Agent and the First Lien Collateral Agent,

(D)    certified copies of American Land Title Association/ American Congress on Surveying and Mapping form surveys, for which all necessary fees (where applicable) have been paid, and dated no more than 60 days before the Effective Date, certified to the Administrative Agent and the First Lien Collateral Agent and the Title Company using a form of certification reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent by a land surveyor duly registered and licensed in the States in which the property described in such surveys is located showing the matters required by such certification and the absence of material encroachments and any other material defects other than

71

encroachments or other defects acceptable to the Administrative Agent and the First Lien Collateral Agent,

(E)    Proof of payment to the Title Company of (A) all expenses and premiums of the Title Company in connection with the issuance of the First Lien Mortgage Policies and (B) an amount equal to any fees or taxes including, without limitation, the recording, mortgage, intangible, transfer and stamp taxes payable in connection with recording the First Lien Mortgages and UCC Fixture Filings, if applicable, in the appropriate government office(s),

(F)    Certified copies of permanent and unconditional certificates of occupancy (or, if it is not the practice to issue certificates of occupancy in a jurisdiction in which the facilities to be covered by the Mortgages are located, then such other evidence reasonably satisfactory to the Administrative Agent and the First Lien Collateral Agent) permitting the fully functioning operation and occupancy of each such facility and of such other permits necessary for the use and operation of each such facility issued by the respective governmental authorities having jurisdiction over each such facility, and

(G)    evidence of the insurance required by the terms of the First Lien Mortgages.

(v)    The Intercreditor Agreement substantially in the form of Exhibit G duly executed by the Borrower, the Guarantors, EBG Holdings, the First Lien Collateral Agent, the Second Lien Collateral Agent, the Administrative Agent, the Second Lien Administrative Agent, and Credit Suisse Energy LLC.

(vi)    The Security Deposit Agreement substantially in the form of Exhibit H duly executed by the Borrower, each Guarantor, the First Lien Collateral Agent, the Second Lien Collateral Agent and the Depositary.

(vii)    Certified copies of the resolutions of the sole members of the Borrower and the Board of Directors of EBG Holdings and authorizations of the sole member or Board of Directors, as applicable, of each other Guarantor approving the Transaction and each Transaction Document to which it is or is to be a party, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the Transaction and each Transaction Document to which it is or is to be a party.

(viii)    A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Effective Date certifying (A) as to a true and correct copy of the certificate of formation or certificate of incorporation, as the case may be, of each Loan Party and EBG Holdings and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to

72

such Loan Party's and EBG Holding's certificate of formation or certificate of incorporation, as the case may be, on file in such Secretary's office, (2) to the extent applicable, each of such Loan Party and EBG Holdings has paid all franchise taxes to the date of such certificate and (3) to the extent applicable, each of such Loan Party and EBG Holdings is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(ix)   A certificate of each Loan Party and EBG Holdings signed on behalf of such Loan Party and EBG Holdings by a Responsible Officer thereof, dated the Effective Date (the statements made in such certificate shall be true on and as of the Effective Date), certifying as to (A) the absence of any amendments to the certificate of formation or certificate of incorporation, as the case may be, of such Loan Party or EBG Holdings (as applicable) since the date of the Secretary of State's certificate referred to in Section 3.01(a)(viii), (B) a true and correct copy of the limited liability company agreement or bylaws, as the case may be, of such Loan Party or EBG Holdings (as applicable) as in effect on the date on which the resolutions referred to in Section 3.01(a)(vii) were adopted and on the Effective Date, (C) the due formation and good standing or valid existence of such Loan Party or EBG Holdings (as applicable) as a limited liability company or corporation, as the case may be, organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of such Loan Party or EBG Holdings (as applicable) and (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Effective Date.

(x)   Certificates of EBG Holdings and each of the Loan Parties executed by an authorized officer thereof in each case certifying the name and true signature of the officer of EBG Holdings or such Loan Party authorized to sign each Transaction Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(xi)   Certified copies of each of the Related Documents, duly executed by the parties.

(xii)   Certificates in substantially the form of Exhibit E, attesting to (A) the Solvency of EBG Holdings and its Subsidiaries on a Consolidated basis after giving effect to the Transaction and the other transactions contemplated thereby, and (B) the Solvency of the Borrower and its Subsidiaries on a Consolidated basis after giving effect to the Transactions and the other transactions contemplated hereby, in each case from the director of finance of EBG Holdings.

(xiii)   (A) A certified hard copy of, and a computer disk containing, *pro forma* balance sheets, income statements and cash flow statements with respect to EBG Holdings consolidated with its Subsidiaries for the period through Fiscal Year 2014, on a quarterly basis for the period from January 1, 2007 through

73

December 31, 2008 and on an annual basis for each year thereafter (the "***Base Case Projections***") and (B) a certified copy of the operating budget for the Borrower and its Subsidiaries for Fiscal Year 2007 (the "***Initial Operating Budget***").

(xiv)    (A) Certified copies of audited financial statements of the Borrower and its Subsidiaries dated December 31, 2005 and interim financial statements of the Borrower and its Subsidiaries dated the end of each Fiscal Quarter ending since December 31, 2005, and (B) the Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as of September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve-month period then ended.

(xv)    Copies of final due diligence reports updated within 30 days of the Effective Date from the following consultants in form and substance reasonably satisfactory to the Administrative Agent: (A) the Independent Engineer; (B) the Independent Power Market Consultant; and (C) the Independent Insurance Consultant.

(xvi)    Copies of all certificates representing the policies, endorsements and other documents required under Section 5.01(d) to be in effect as of the Effective Date, accompanied by (A) a certificate of the Borrower signed by a Responsible Officer certifying that the copies of each of the policies, endorsements and other documents delivered pursuant to this Section 3.01(a)(xvi) are true, correct and complete copies thereof, (B) letters from the Borrower's insurance brokers or insurers, dated not earlier than fifteen (15) days prior to the Effective Date, stating with respect to each such insurance policy that (1) such policy is in full force and effect, (2) all premiums theretofore due and payable thereon have been paid and (3) the underwriters of such insurance have agreed that the policies, when issued, will contain the provisions required under Section 5.01(d) and (C) a certificate from the Independent Insurance Consultant in form and substance reasonably satisfactory to the Lenders confirming that such required insurance is in full force and effect in accordance with the terms of this Agreement.

(xvii)    A favorable opinion of Debevoise & Plimpton LLP, counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.

(xviii)    Favorable opinions of Nutter, McClennen & Fish LLP, local counsel for the Loan Parties with respect to the enforceability and perfection of each First Lien Mortgage and any related fixture filings and with respect to local permitting, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

74

(xix)    A favorable opinion of White & Case LLP, special federal energy regulatory counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.

(xx)    Account control agreements reasonably acceptable to the Administrative Agent and the First Lien Collateral Agent for the Local Accounts executed by the depositary financial institution holding such accounts and the applicable Loan Parties.

(xxi)    Reasonable evidence that, concurrent with or promptly following the consummation of the transaction contemplated hereby, (A) the Accounts have been established in accordance with the requirements of the Security Deposit Agreement, and (B) after giving effect to the Borrowings to be made on the Effective Date, the First Lien Debt Service Reserve Requirement has been satisfied.

(b)    [Reserved].

(c)    The Lender Parties shall be reasonably satisfied that:

(i)    all Existing Debt, other than Surviving Debt, has been (or is contemporaneously being) prepaid, redeemed or defeased in full or otherwise satisfied and extinguished and all commitments relating thereto terminated (or contemporaneously therewith terminated) and that all Surviving Debt is on terms and conditions reasonably satisfactory to the Lender Parties;

(ii)    all Liens securing payment of any Existing Debt shall have been released; and

(iii)    the Administrative Agent shall have received all Uniform Commercial Code Form UCC-3 termination statements, mortgage releases, pay-off letters and other instruments as may be necessary or desirable, in the reasonable judgment of the Administrative Agent, in connection therewith.

(d)    Before giving effect to the Transaction, there shall have occurred no Material Adverse Change since December 31, 2005.

(e)    Except as set forth on Schedule 4.01(g), there shall exist no action, suit, investigation, litigation or proceeding affecting EBG Holdings or any Loan Party pending or threatened in writing before any Governmental Authority that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(f)    Except for any Governmental Authorizations required in connection with the Lender Parties' exercise of remedies under the Loan Documents, all Governmental Authorizations and member, shareholder and third party consents and approvals necessary in connection with the Transaction or for the ownership and operation of the

75

Projects shall have been obtained (without the imposition of any conditions that are not acceptable to the Lender Parties) and shall remain in full force and effect.

(g)    The Borrower shall have paid (or shall be contemporaneously paying from the proceeds of the Loans) all accrued fees of the Agents and the Lender Parties and all accrued expenses of the Agents (including the accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lender Parties).

(h)    The Administrative Agent shall have received evidence reasonably satisfactory to it that prior to, or concurrently with, the making of the Initial Extension of Credit hereunder:

(i)     the Borrower shall have received not less than $350,000,000 in gross cash proceeds from borrowings under the Second Lien Credit Agreement; and

(ii)    EBG Holdings shall have received not less than $300,000,000 in gross cash proceeds from borrowings under the Mezzanine Documents.

(i)    The Related Documents, including the Mezzanine Documents, Initial Commodity Hedge and Power Sale Agreements and the Second Lien Loan Documents, shall have been executed and delivered by all parties thereto and shall be effective, and all material obligations to be performed under any such documents on or before the Effective Date shall have been performed.

(j)    The Facilities shall have been rated by each of S&P and Moody's.

(k)    The Lenders shall have received, to the extent requested, on or before the date which is five (5) Business Days prior to the Effective Date, all documentation and other information required by bank regulatory authorities under applicable "*know your customer*" and anti-money laundering rules and regulations including the Patriot Act.

(l)    The Administrative Agent shall have received the Closing Date Summary Funds Flow Memo substantially in the form attached hereto as Exhibit N (the "***Closing Date Summary Funds Flow Memo***").

SECTION 3.02.  Conditions Precedent to Each Borrowing and Issuance.  The obligation of each Appropriate Lender to make a Loan (other than a Synthetic L/C Loan made by a Synthetic Issuing Bank) on the occasion of each Borrowing (including the initial Borrowing), and the obligation of each Synthetic Issuing Bank to issue a Synthetic Letter of Credit (including the initial issuance) shall be subject to the further conditions precedent that on the date of such Borrowing or issuance the following statements shall be true and the Administrative Agent shall have received for the account of such Lender or such Synthetic Issuing Bank a certificate signed by a duly authorized officer of the Borrower, dated the date of such Borrowing or issuance, stating that (and each of the giving of the applicable Notice of Borrowing or Notice of Issuance and the acceptance by the Borrower of the proceeds of such Borrowing or of such Synthetic

Letter of Credit shall constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Borrowing or issuance such statements are true):

(a)    the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date, as though made on and as of such date, before and after giving effect to such Borrowing or issuance and to the application of the proceeds therefrom, except for representations and warranties that speak as of an earlier date or period which shall be true and correct as of such date or period; and

(b)    (i) with respect to the Initial Extension of Credit on the Effective Date, no Default has occurred and is continuing, or would result from such Initial Extension of Credit or from the application of proceeds therefrom; and (ii) with respect to each such Borrowing or issuance after the Effective Date, no Event of Default has occurred and is continuing, or would result from such Borrowing or issuance or from the application of the proceeds therefrom.

SECTION 3.03.  Determinations Under Section 3.01.  For purposes of determining compliance with the conditions specified in Section 3.01, each Lender Party shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender Parties unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender Party prior to the Effective Date specifying its objection thereto and, if the Initial Extension of Credit consists of a Borrowing, such Lender Party shall not have made available to the Administrative Agent such Lender Party's ratable portion of such Borrowing.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.  Representations and Warranties.  Each Loan Party represents and warrants on behalf of itself as follows:

(a)    Organization.  It (i) is a limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a limited liability company or corporation in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably likely to have a Material Adverse Effect and (iii) has all requisite limited liability company or corporate (as applicable) power and authority (including, without limitation, all material Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)    Location.  Set forth on Schedule 4.01(b) hereto is a complete and accurate list of all Loan Parties and their Subsidiaries, showing as of the date hereof (as to each

77

Loan Party and each such Subsidiary) the jurisdiction of its formation or incorporation (as applicable), the address of its principal place of business and its U.S. taxpayer identification number. The copy of the certificate of formation or certificate of incorporation, as applicable, of each Loan Party and each amendment thereto provided pursuant to Section 3.01(a)(viii) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(c)    Ownership Information.  Set forth on Schedule 4.01(c) hereto is a complete and accurate list of all Subsidiaries of each Loan Party, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares or membership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares or membership interests (as applicable) covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof. All of the outstanding Equity Interests in each Loan Party's Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Subsidiaries free and clear of all Liens, except those created under the First Lien Collateral Documents, the Second Lien Collateral Documents or Permitted Liens.

(d)    Authorization; Non-Contravention.  The execution, delivery and performance by each Loan Party of each Transaction Document to which it is or is to be a party, and the consummation of the Transaction, are within such Loan Party's limited liability company or corporate (as applicable) powers, have been duly authorized by all necessary limited liability company or corporate (as applicable) action, and do not (i) contravene such Loan Party's limited liability company agreement, certificate of incorporation, bylaws or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to or binding on it, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, a Contractual Obligation of any Loan Party (except to the extent such conflict, breach, default or payment could not reasonably be expected to have a Material Adverse Effect) or (iv) except for the Liens created under the First Lien Collateral Documents and the Second Lien Collateral Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of any Loan Party or any of its Subsidiaries. As of the Effective Date, no Loan Party is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

(e)    Consents and Approvals.  (i) No Governmental Authorization, and no notice to, filing with, or consent or approval of any other third party is required for (A) the due execution, delivery, recordation, filing or performance by any Loan Party of any Transaction Document to which it is or is to be a party, or for the consummation of

78

the Transaction, (B) the grant by any Loan Party of the Liens granted by it pursuant to the First Lien Collateral Documents, (C) the perfection or maintenance of the Liens created under the First Lien Collateral Documents (including the first priority nature thereof) or (D) the exercise by any Agent or any Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the First Lien Collateral Documents, except for (1) those authorizations, approvals, actions, notices and filings set forth on Schedule 4.01(e), (I) all of which have been duly obtained, taken, given or made, (II) are in full force and effect, (III) are free from conditions or requirements that have not been met or complied with, (2) authorizations, approvals, actions, notices and filings required by securities, regulatory or applicable law in connection with an exercise of remedies or (3) those Governmental Authorizations, notices, filings with, or consents of, any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(ii)    No Governmental Authorization, and no notice to, filing with, or consent or approval of any Governmental Authority or any other third party is required in connection with the operation of the Projects in accordance with applicable law and as otherwise contemplated by this Agreement, except for (A) the Governmental Authorizations, notices and filings set forth on Schedule 4.01(e), (1) all of which have been duly obtained, taken, given or made, (2) are in full force and effect and (3) are free from conditions or requirements that have not been met or complied with or (B) those Governmental Authorizations, notices, filings with or consents of any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(f)    Binding Agreement.  This Agreement has been, and each other Transaction Document when delivered hereunder will have been, duly executed and delivered by each Loan Party thereto.  This Agreement is, and each other Transaction Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party thereto, enforceable against such Loan Party in accordance with its terms.

(g)    Litigation.  Except as set forth on Schedule 4.01(g), there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened in writing before any Governmental Authority or arbitrator that (i) could reasonably be likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(h)    Financial Statements.  (i)  The Consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2005, the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended and the Consolidated balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the

79

nine months then ended, duly certified by the senior financial officer of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects, subject, in the case of said balance sheet as at September 30, 2006, and said statements of income and cash flows for the nine months then ended, to year end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated results of operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis.

(ii)    The Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve-month period then ended, respectively, certified by the senior financial officer of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects the Consolidated pro forma financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated pro forma results of operations of the Borrower and its Subsidiaries for the period ended on such date giving effect to the Transaction, all in accordance with GAAP.

(iii)    The Consolidated forecasted balance sheet, statement of income and statement of cash flows of EBG Holdings and its Subsidiaries delivered to the Administrative Agent, pursuant to Section 3.01(a)(xiii) and the Budget required by Section 5.03(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's reasonable best estimate of its future financial performance.

(i)    Accuracy of Information; Projections. All information (other than the information delivered pursuant to Section 3.01(a)(xiii), other financial projections and general economic information) heretofore or contemporaneously furnished to any Lender Party by or on behalf of EBG Holdings or any Loan Party in connection with any Loan Document or any transaction contemplated hereby (including the Transactions), taken together as a whole with all other information with which such Lender Party has previously been furnished, is complete and correct in all material respects, as of the date such information was furnished and as of the Effective Date, and did not contain any untrue statement of a material fact or omit to state any material fact necessary to make any information not misleading in light of the circumstances under which furnished.

(j)    Margin Stock. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan or drawings under any Synthetic Letter of Credit will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

80

(k)     Investment Company Act. No Loan Party is an "*investment company,*" as defined in or subject to regulations under the Investment Company Act of 1940, as amended.

(l)     Security Interest. All filings and other actions necessary to perfect and protect the security interest in the Collateral created under the First Lien Collateral Documents have been duly made or taken and are in full force and effect, and the First Lien Collateral Documents create in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral, securing the payment of the First Lien Obligations. The Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(m)     Solvency. After giving affect to the Transaction, the Borrower and its Subsidiaries are, on a Consolidated basis, Solvent.

(n)     ERISA Etc. (i) No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has had or is reasonably expected to have a Material Adverse Effect.

(ii)     Neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan except for Withdrawal Liability that could not reasonably be expected to have a Material Adverse Effect.

(iii)     Neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a material Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(o)     Environmental Matters. (i) Except as otherwise set forth on Part I of Schedule 4.01(o) hereto, the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, except for any such non-compliance, obligation or cost that could not reasonably be likely to have a Material Adverse Effect and, to the best knowledge of each Loan Party, no circumstances exist that could (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that could reasonably be likely to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

81

(ii)    Except as otherwise set forth on Part II of <u>Schedule 4.01(o)</u> hereto, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is currently listed or proposed for listing on the NPL or on the CERCLIS or any analogous state or local list; there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries except where such treatment, storage or disposal could not reasonably be likely to have a Material Adverse Effect; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries that requires abatement under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries in a manner that would reasonably be expected to require any investigation, cleanup, remediation or remedial action by any Loan Party under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect.

(iii)    Except as otherwise set forth on Part III of <u>Schedule 4.01(o)</u> hereto, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries, except, in each case above, where any such investigation or assessment or remedial or response action or liability could not reasonably be likely to have a Material Adverse Effect.

(p)    <u>Tax Matters</u>. (i) Neither any Loan Party nor any of its Subsidiaries is party to any tax sharing agreement.

(ii)    Each Loan Party and each of its Subsidiaries has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed, other than those tax returns where the failure to file such returns could not be reasonably expected to have a Material Adverse Effect, and has paid all taxes shown thereon to be due, together with applicable interest and penalties (other than taxes contested in good faith).

82

(iii)    No issues have been raised by the Internal Revenue Service in respect of federal income tax returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(iv)    No issues have been raised by any state, local or foreign taxing authorities, in respect of the returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise, that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(q)    Surviving Debt. Set forth on Schedule 4.01(q) hereto is a complete and accurate list of all Surviving Debt, showing the obligor and the principal amount outstanding thereunder and the maturity date thereof.

(r)    Owned Real Property. Set forth on Schedule 4.01(r) hereto is a complete and accurate list of all material real property owned by any Loan Party, showing as of the date hereof the street address, county or other relevant jurisdiction, state and record owner thereof. Each Loan Party has good and marketable fee simple title to such real property, free and clear of all Liens, other than Permitted Liens.

(s)    Leased Real Property. Set forth on Schedule 4.01(s) hereto is a complete and accurate list of all material leases of real property under which any Loan Party is the lessee, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor and lessee thereof. Each such lease is the legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights of creditors generally and except to the extent that enforcement of rights and remedies set forth therein may be limited by equitable principles (regardless of whether enforcement is considered in a court of law or a proceeding in equity).

(t)    Material Contracts. Except as set forth on Schedule 4.01(t), each Material Contract (i) has been duly authorized, executed and delivered by all parties thereto, has not been amended or otherwise modified from the form previously delivered to the Administrative Agent, except in accordance with the terms of this Agreement, (ii) is in full force and effect and is binding upon and enforceable against all parties thereto in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights of creditors generally and except to the extent that enforcement of rights and remedies set forth therein may be limited by equitable principles (regardless of whether enforcement is considered in a court of law or a proceeding in equity), and (iii) to the best knowledge of the relevant Loan Party, there exists no material default under any Material Contract by any party thereto.

83

(u)    <u>Accounts</u>. Neither the Borrower nor any of its Subsidiaries has any deposit or securities accounts other than the Accounts or Local Accounts otherwise permitted under the terms of this Agreement.

(v)    <u>Regulatory Status</u>. Each Project Company: (i) meets the requirements for, and has made the necessary filing with, or has been determined by, FERC to be an exempt wholesale generator ("*EWG*") within the meaning of Section 1262(6) of the Public Utility Holding Company Act of 2005 ("*PUHCA*"); (ii) is authorized by FERC pursuant to Section 205 of the FPA to sell electric power, including energy and capacity, at market-based rates; and (iii) is authorized by FERC to issue securities and assume obligations or liabilities pursuant to Section 204 of the FPA.

(w)    <u>FERC Proceedings</u>. There are no pending FERC proceedings in which the EWG status, market-based rate authority or the FPA Section 204 authority of a Project Company is subject to withdrawal, revocation or material modification other than FERC rulemakings of general applicability, including, but not limited to, *Market-Based Rates for Wholesale Sales of Energy, Capacity and Ancillary Services by Public Utilities* in Docket No. RM04-7-000.

(x)    <u>Regulatory Approvals</u>. Except for any FERC approvals required in connection with the Lender Parties' exercise of remedies under the Loan Documents, no approvals or authorizations from FERC are required to be obtained by any Project Company, the Loan Parties, the First Lien Collateral Agent or the Lender Parties with respect to the Transaction.

(y)    <u>Existing Regulatory Orders</u>. The Borrower and each Project Company is in full compliance in all material respects with the terms and conditions of all orders issued by FERC under Section 203 of the FPA and obtained by the Borrower or any Project Company.

(z)    <u>PUHCA</u>. The Borrower is a "*holding company*" within the meaning of Section 1262(8) of PUHCA solely with respect to its ownership of one or more EWGs, and is not subject to or is otherwise exempt from regulation under PUHCA except for regulation under Section 1265 of PUHCA.

(aa)    <u>Material Adverse Effect</u>. Except as disclosed in writing to the Lender Parties, since the Effective Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(bb)    <u>Violation of Law</u>. No Loan Party is in violation of any applicable law, rule, regulation, order, writ, judgment, injunction, decree, determination or award binding on it, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

84

## ARTICLE V

## COVENANTS

SECTION 5.01. <u>Affirmative Covenants</u>. Until a Repayment Event has occurred, the Borrower and each Guarantor will:

(a)     <u>Compliance with Laws, Etc.</u>  Comply with all applicable laws, rules, regulations and orders binding on it, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, other than any such non-compliance which could not reasonably be expected to have a Material Adverse Effect.

(b)     <u>Payment of Taxes, Etc.</u>  Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property (unless, in the case of (i) and (ii), the failure to do so could not reasonably be expected to have a Material Adverse Effect); *provided, however*, that no Loan Party shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and only to the extent that adequate reserves are being maintained.

(c)     <u>Compliance with Environmental Laws</u>.  Comply and, if applicable, take commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties (except where such failure to obtain or renew could not reasonably be expected to have a Material Adverse Effect); and conduct any investigation, study, sampling and testing, cleanup, removal, remedial or other action in response to any release, discharge or disposal of any Hazardous Materials from or at any of its properties, to the extent required by, and in compliance with, all Environmental Laws (other than any such failure to investigate, study, sample, test, cleanup, remove, remediate or take such other action as could not reasonably be expected to have a Material Adverse Effect); *provided, however*, that no Loan Party shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained in accordance with GAAP.

(d)     <u>Maintenance of Insurance</u>.  Maintain insurance in accordance with Schedule 5.01(d).

(e)     <u>Preservation of Existence, Etc.</u>  Preserve and maintain its existence as a limited liability company or corporation, as applicable, and its good standing in the State of Delaware; provided, *however*, that any Loan Party may consummate any merger or consolidation permitted under Section 5.02(d).

85

(f)    Visitation Rights. Upon reasonable notice, at any reasonable time and from time to time, permit any of the Agents or any of the Lender Parties, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, any Loan Party, and to discuss the affairs, finances and accounts of any Loan Party with any of their officers or directors and with their independent certified public accountants; *provided* that (i) so long as no Default shall have occurred and be continuing or (ii) the Borrower shall have consented thereto, neither the Agents nor the Lender Parties shall be entitled to more than one visit to any single Project in any Fiscal Year.

(g)    Keeping of Books. Keep proper books of record and account in accordance with GAAP.

(h)    Maintenance of Properties, Etc. Maintain, preserve and protect (or cause to be maintained, preserved or protected) all of its properties and equipment necessary in the conduct of the business of the Projects in good working order and condition, ordinary wear and tear excepted, and in accordance with Prudent Industry Practices.

(i)    [Reserved].

(j)    Covenant to Give Security. Upon the acquisition or lease of any property by any Loan Party with a fair market value in excess of $25,000,000, and such property, in the reasonable judgment of the Administrative Agent or the First Lien Collateral Agent, shall not already be subject to a perfected first priority security interest in favor of the First Lien Collateral Agent for the benefit of the First Lien Secured Parties, then in each case at the Borrower's expense:

(i)    no later than 10 Business Days after such acquisition, furnish to the Administrative Agent and the First Lien Collateral Agent a description of the real and personal properties so acquired, in each case in detail reasonably satisfactory to the Administrative Agent; and

(ii)    promptly, but in any event within 90 days after such acquisition, take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, title insurance, surveys, certificates of occupancy, estoppel and consent agreements of lessors, documents, instruments, agreements, opinions and certificates with respect to such Property as the Administrative Agent shall reasonably request to create (and provide evidence thereof) a valid and perfected first priority Lien on such Property in favor of the First Lien Collateral Agent (for the benefit of the First Lien Secured Parties), subject to Permitted Liens.

(k)    Further Assurances. (i) Upon the formation of any Subsidiary permitted pursuant to Section 5.02(k) or (ii) promptly upon reasonable request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds,

conveyances, pledge agreements, mortgages, estoppel and consent agreements of lessors, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender Party through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any such Subsidiary's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the First Lien Collateral Documents, (iii) cause each such Subsidiary to become a Guarantor hereunder by executing a Joinder Agreement and to pledge all of its assets under the First Lien Security Agreement or a security agreement substantially similar thereto to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties (together with any opinions of counsel reasonably requested by any Agent) and (iv) perfect and maintain the validity, effectiveness and priority of any of the First Lien Collateral Documents and any of the Liens intended to be created thereunder.

(l)    Accounts. (i) Establish (unless already established) and maintain at all times in accordance with the Security Deposit Agreement, the Accounts, (ii) cause all Revenues (as defined in the Security Deposit Agreement) and other amounts payable to it (except for interest earned on deposits in the Local Accounts, if any, which shall be credited to such Local Account) to be deposited into, or credited to, the Accounts, in accordance with the terms of the Security Deposit Agreement and (iii) cause all funds (to the extent permitted by the Security Deposit Account) deposited in the Accounts to be applied and disbursed in accordance with the terms of the Security Deposit Agreement.

(m)    Interest Rate Hedging. Enter into prior to the date that is 75 days following the Effective Date, and maintain for a period of no less than three and one-half years, interest rate Hedge Agreements with Hedge Banks covering a notional amount of not less than 50% of the sum of the outstanding principal amount of the Term B Loans and providing for such Persons to make payments thereunder for a period of no less than three and one-half years.

(n)    Maintenance of Credit Ratings. Use all commercially reasonable efforts to maintain ratings on the Facilities from each of Moody's and S&P for so long as such rating agency is in the business of rating loans and securities of a type similar to the Facilities (it being acknowledged and agreed that the Borrower shall not be required to maintain any minimum credit rating).

(o)    Consents. The Borrower will use commercially reasonable efforts to promptly obtain the consents referred to in Section 5.03(f)(ii)(B).

(p)    Separateness. Comply with the following:

(i)    Each of the Borrower and its Subsidiaries will act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

87

(ii)    Each of the Borrower and its Subsidiaries will conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iii)    Each of the Borrower and its Subsidiaries will obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(iv)    Each of the Borrower and its Subsidiaries will comply in all material respects with the terms of its certificate of incorporation or formation and by-laws or limited liability company agreement (or similar constituent documents).

(q)    Maintenance of Regulatory Status. The Project Companies shall maintain EWG status, market-based rate authority under FPA Section 205, FPA Section 204 blanket authorization and compliance with previously issued FPA Section 203 orders applicable to the Borrower or Project Company, except in the event that such authorizations become no longer available, or to the extent such authorizations are limited or restored as a result of FERC's rulemakings of general applicability including, but not limited to, Market-Based Rates for Wholesale Sales of Energy, Capacity and Ancillary Services by Public Utilities in Docket No. RM04-7-000.

(r)    Certain Collateral Matters. Use commercially reasonable efforts to obtain consents necessary for the granting of any Lien on Property constituting Excluded Property pursuant to clause (a) of the definition thereof.

(s)    Commodity Hedging. Enter into prior to the date that is twelve (12) months following the Effective Date, and maintain at all times for the term referred to below, Eligible Permitted Commodity Hedge and Power Sale Agreements covering capacity payments and/or premiums to be received by the Borrower for an additional 600 to 800 megawatts of capacity for a term of three to five years in the form of a heat rate tolling option or of a similar product or set of products and otherwise reasonably acceptable to the Administrative Agent; *provided* that any Eligible Permitted Commodity Hedge and Power Sale Agreement that is in form and substance substantially similar to the Initial Commodity Hedge and Power Sale Agreement (with such modifications thereto as are necessary or desirable to reflect the modified term and modified capacity requirements stated herein) shall be acceptable for purposes hereof.

SECTION 5.02. Negative Covenants. Until a Repayment Event has occurred, neither the Borrower nor any Guarantor will, at any time:

(a)    Liens, Etc. Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character (including, without limitation, accounts)

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

whether now owned or hereafter acquired or assign any accounts or other right to receive income, except:

(i)    Liens created under the First Lien Collateral Documents; *provided* that (i) such Liens only secure (A) Debt permitted under Section 5.02(b)(i), (B) obligations under Eligible Permitted Commodity Hedge and Power Sale Agreements (including, without limitation, the Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s)) and (C) obligations under Secured Hedge Agreements, (ii) such Liens are subject to the terms of the Intercreditor Agreement and (iii) any Commodity Hedge Counterparty party to any such Eligible Permitted Commodity Hedge and Power Sale Agreement or any Hedge Bank party to any such Secured Hedge Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of, a First Lien Secured Party thereunder;

(ii)    Liens created under the Second Lien Collateral Documents; *provided* that (i) such Liens only secure Debt permitted under Section 5.02(b)(ii), (ii) such Liens are subject to the terms of the Intercreditor Agreement and (iii) any lender (or any agent or trustee thereof) with respect to such Debt shall have become a party to the Intercreditor Agreement as, and shall have the obligations of a Second Lien Secured Party thereunder;

(iii)    Permitted Liens;

(iv)    Liens existing on the date hereof and described on Schedule 5.02(a) hereto;

(v)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower or any of its Subsidiaries in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing or refinancing the acquisition of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (v) shall not exceed the amount permitted under Section 5.02(b)(iv) at any time outstanding;

(vi)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(vii)    Liens arising from precautionary Uniform Commercial Code financing statements regarding, and any interest or title of a licensor, lessor or sublessor under, any operating lease;

(viii)    pledges or deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to providers of property, casualty or liability insurance in the ordinary course of business;

(ix)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(viii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the property subject to such Capitalized Leases;

(x)    Liens securing Debt permitted under Section 5.02(b)(iii); and

(xi)    any other Liens securing Debt in aggregate amount not to exceed at any time $5,000,000.

(b)    Debt.  Create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    Debt under the Second Lien Loan Documents in an aggregate principal amount not to exceed $350,000,000;

(iii)    Debt incurred solely to finance Permitted Developments not to exceed in the aggregate, when taken together with any equity proceeds referred to in Section 5.02(f)(viii)(A), $140,000,000;

(iv)    Debt secured by Liens permitted by Section 5.02(a)(v) not to exceed in the aggregate $25,000,000 at any time outstanding;

(v)    to the extent constituting Debt, (A) payment obligations under Secured Hedge Agreements and (B) obligations under the Borrower's fuel oil inventory financing program relating to (x) Mystic I, not to exceed in the aggregate at any time 750,000 bbls and (y) Fore River, not to exceed in the aggregate at any time 700,000 bbls;

(vi)    to the extent permitted under Section 5.02(l) and constituting Debt, obligations under any (A) Permitted Commodity Hedge and Power Sale Agreements and (B) other Commodity Hedge and Power Sale Agreements with net exposure thereunder not to exceed in the aggregate at any time $100,000,000;

(vii)    Debt owed to any Loan Party, which Debt shall (x) constitute Pledged Debt, (y) be subordinated pursuant to the Terms of Subordination and (z) be otherwise permitted under Section 5.02(f);

90

(viii)   Capitalized Leases not to exceed in the aggregate $20,000,000 for Fore River, $40,000,000 for Mystic Development and $15,000,000 for Mystic I, in each case, at any time outstanding;

(ix)   to the extent constituting Debt, Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and similar obligations incurred in the ordinary course of business and not in connection with Debt for Borrowed Money;

(x)   other unsecured Debt of the Loan Parties issued in settlement of delinquent obligation of the Loan Parties or disputes between the Loan Parties and other Persons under Contractual Obligations of the Loan Parties (other than in respect of Debt);

(xi)   Guaranteed Debt of any Loan Party in respect of any Debt otherwise permitted to be incurred under this Section 5.02(b);

(xii)   endorsements of negotiable instruments for collection;

(xiii)   (without duplication) Surviving Debt; and

(xiv)   other unsecured Debt of the Loan Parties in an aggregate amount not to exceed $50,000,000 at any time outstanding.

(c)   Change in Nature of Business.  Make any material change in the nature of its business as carried on at the date hereof and activities reasonably incidental thereto or in connection with any Permitted Development.

(d)   Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it; *provided* that any Subsidiary of the Borrower may merge into or consolidate with any other Subsidiary of the Borrower; *provided* that, in the case of any such merger or consolidation, the Person formed by such merger or consolidation shall be a wholly owned Subsidiary of the Borrower; *provided* that the Person formed by such merger or consolidation obtains prior approval under Section 204 of the FPA to the extent required; and *provided further* that, in the case of any such merger or consolidation to which a Guarantor is a party, the Person formed by such merger or consolidation shall be a Guarantor.

(e)   Sales of Assets, Etc.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except:

(i)   sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) power, natural gas, fuel, capacity, gas or fuel transportation, power transportation or ancillary services or other inventory in the

ordinary course of such Person's business including, without limitation, Permitted Trading Activities;

(ii)    sales, transfers or other dispositions in the ordinary course of its business of Property that is surplus (including, without limitation, surplus land and emission credits not required for the continued operation of any Project in any given year), obsolete, defective, worn-out, damaged, rendered unfit for normal use or property that is being exchanged for similar property, or that individually or in the aggregate is not essential for the continued operation of any Project;

(iii)    the liquidation, sale or use of Cash and Cash Equivalents;

(iv)    sales, transfers or other dispositions of assets among Loan Parties;

(v)    sales or discounts without recourse of accounts receivable arising in the ordinary course of such Person's business in connection with the compromise or collection thereof;

(vi)    dispositions required or contemplated by the Contractual Obligations in existence as of the date hereof with or relating to Governmental Authorities and relating to the Guarantors; and

(vii)    sales of Property by the Borrower or any Guarantor so long as (A) the purchase price paid to the Borrower or such Guarantor for such Property shall be no less than the fair market value of such Property at the time of such sale, (B) at least 75% of the consideration to be received is paid in cash or Cash Equivalents and such remaining 25% is not a debt instrument of the Borrower or any of its Affiliates (*provided* that for purposes of this subclause (B), (I) any amounts deposited into an escrow or other type of holdback account and any consideration in the form of readily marketable securities shall be deemed to be cash, (II) customary purchase price adjustments may be settled on a non-cash basis and (III) the assumption of Debt relating to the asset being disposed shall be disregarded for the purposes of this provision); and (C) the aggregate purchase price paid to the Borrower and all of the Guarantors for such Property and all other Property sold by the Borrower and the Guarantors (1) during the same Fiscal Year pursuant to this clause (vii) shall not exceed $25,000,000 and (2) since the Effective Date shall not exceed $125,000,000.

Events of Eminent Domain or Casualty Events (as such terms are defined in the Security Deposit Agreement) do not qualify as sales, leases, transfers or other dispositions of Property for purposes of this Section 5.02(e).

(f)    Investments in Other Persons.  Make or hold any Investment in any Person, except:

(i)    Investments by and among Loan Parties in other Loan Parties;

92

(ii)     Investments by the Loan Parties in Cash Equivalents;

(iii)    to the extent constituting Investments, Investments in contracts and agreements (including, without limitation, (A) Permitted Commodity Hedge and Power Sale Agreements, (B) interest rate Hedge Agreements and (C) other Commodity Hedge and Power Sale Agreements with net exposure thereunder not to exceed in the aggregate $100,000,000 at any time, when taken together with any net exposure referred to in Section 5.02(b)(vi)(B)), including prepaid deposits and expenses thereunder, to the extent permitted under the Loan Documents;

(iv)    Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business;

(v)    Investments in the Accounts and the Local Accounts and Investments of the funds on deposit therein, in each case, as otherwise permitted under the Loan Documents;

(vi)    loans and advances to officers, directors and employees of any Loan Party for reasonable and customary business related travel expenses, moving expenses and similar expenses incurred in the ordinary course of business of such Loan Party in an aggregate principal amount at any time outstanding not exceeding $1,000,000;

(vii)    to the extent constituting Investments, Debt which is permitted under Section 5.02(b);

(viii)    Investments by the Borrower or any Guarantor in Permitted Developments made solely with the proceeds (not to exceed, in the aggregate, $140,000,000) of (A) of capital contributions (or sales of equity securities of EBG Holdings) received directly or indirectly from EBG Holdings and (B) any Debt permitted to be incurred pursuant to Sections 5.02(b)(ix); and

(ix)    Investments in Permitted Developments by the Borrower or any Guarantor after the Effective Date in an aggregate amount not to exceed $10,000,000; and

(x)    any other Investments in an aggregate amount not to exceed $5,000,000 at any time.

(g)    Restricted Payments. Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Subsidiaries to do any of the foregoing, or permit any of its

93

Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower, except that any Subsidiary of the Borrower may (A) declare and pay cash dividends to the Borrower or to any Loan Party of which it is a Subsidiary and (B) accept capital contributions from its parent to the extent permitted under Section 5.02(f); *provided* that the Borrower shall be able to pay EBG Holdings Tax Liabilities, EBG Holdings O&M Costs, the Distribution and the Tender Offer, in each case, in accordance with the Closing Date Flow of Funds Memo or the Security Deposit Agreement.

(h)    Amendments of Constitutive Documents.  Amend its limited liability company agreement, bylaws or other constitutive documents other than amendments that could not be reasonably expected to have a Material Adverse Effect.

(i)    Accounting Changes.  Make or permit, or permit any of its Subsidiaries to make or permit, any change in (i) accounting policies or reporting practices, except as permitted by GAAP, or (ii) Fiscal Year.

(j)    Prepayments, Etc., of Debt.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Debt other than the intercompany Debt among the Loan Parties that is expressly subordinated to the Obligations hereunder, or that is secured and the Liens securing such Debt rank behind the Liens created by the First Lien Collateral Documents, or permit any of its Subsidiaries to do any of the foregoing, in each case, except to the extent permitted by the Loan Documents.

(k)    Partnerships; Formation of Subsidiaries, Etc.  (i) Become a general partner in any general or limited partnership or joint venture, or permit any of its Subsidiaries to do so or (ii) organize any new Subsidiary (other than (x) a Permitted Development Subsidiary organized in connection with a Permitted Development or (y) a Subsidiary formed for the purpose of conducting Permitted Trading Activities, in each case, in compliance with Section 5.01(k)).

(l)    Speculative Transactions and Permitted Commodity Hedge and Power Sale Agreements.  Engage, or permit any of its Subsidiaries to engage, in any Commodity Hedge and Power Sale Agreements or any similar transactions entered into solely for speculative purposes (it being acknowledged and agreed that the Initial Commodity Hedge and Power Sale Agreements, the Eligible Permitted Commodity Hedge and Power Sale Agreements required pursuant to Section 5.01(s) and any other Eligible Permitted Commodity Hedge and Power Sale Agreements or any other Permitted Trading Activity (other than an Excess Duration Transaction) shall be deemed to be in compliance with this Section 5.02(l)).

For purposes of this Section 5.02(l), "**Excess Duration Transaction**" means any Commodity Hedge and Power Sale Agreements or any similar transactions (A) that, when taken together on a net basis with all other such agreements outstanding (other than the RMR Agreement) for any period, would cause the aggregate amount of contracted capacity to be provided (whether

94

financially or physically) by the Loan Parties pursuant to such agreements for such period to exceed an amount equal to the projected available capacity of all of the Projects for such period; *provided* that, if the Permitted Development is not subject to the independent system operator to which the other Projects are subject, the projected available capacity related to the Permitted Development shall not be taken together with the projected available capacity of the other Projects but shall be treated as separate contracted capacity or (B) other than any Eligible Permitted Commodity Hedge and Power Sale Agreements, have a stated maturity in excess of 14 months from the date such agreement is entered into.

(m)    Capital Expenditures. Make any Capital Expenditures that would cause the aggregate of all such Capital Expenditures made by the Loan Parties to exceed, in any Fiscal Year, the Adjusted Capex Limit. During any Fiscal Year, Capital Expenditures shall be deemed to be made *first* from Carryover Amounts for such Fiscal Year, *second* from the Base Capex Allowance for such Fiscal Year and *third* from any Pullback Amount for such Fiscal Year.

(n)    Amendment, Etc., of Material Contracts. Cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract or give any consent, waiver or approval thereunder, waive any default under or breach of any Material Contract, or agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract, except as could not reasonably be expected to have a Material Adverse Effect; *provided* that no such cancellation, termination, amendment, modification, change, agreement, waiver, approval or consent shall be a Default hereunder if such Loan Party enters into a Replacement Material Contract within 60 days thereafter; *provided further* that, if a Responsible Officer of the Borrower certifies to the satisfaction of the Administrative Agent that the Borrower or any Loan Party is diligently pursuing such Replacement Material Contract and that such Replacement Material Contract is reasonably likely to be entered into within the next 60 days, then such 60-day period shall be extended for an additional 60 days; *provided further* that notwithstanding the foregoing, the Borrower and Mystic Development shall be permitted to terminate and release the Distrigas Guaranty and/or the Cabot Guaranty in connection with the settlement of the Distrigas Litigation.

(o)    Regulatory Matters. Make or permit to be made any change in the upstream ownership of a Guarantor without first obtaining any necessary authorization under Section 203 of the FPA.

(p)    Transactions with Affiliates. Enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is:

(i)    (A) on fair and reasonable terms no less favorable to such Loan Party than it could obtain in an arm's-length transaction with a Person that is not

95

an Affiliate and (B) of the kind which would be entered into by a prudent Person in the position of such Loan Party with a Person that is not one of its Affiliates;

(ii)     an arrangement, transaction or contract expressly permitted by the terms of this Agreement;

(iii)     the payment of fees and indemnities to directors, officers, consultants and employees of the Loan Parties in the ordinary course of business;

(iv)     pursuant to the Management and Operation Agreements, including the payment of fees, costs and expenses as required thereunder (as of the date hereof);

(v)     (A) any employment or severance agreements or arrangements entered into by the Loan Parties in the ordinary course of business, or (B) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract or arrangement and transactions pursuant thereto; or

(vi)     the payment of fees, expenses, bonuses and awards related to the Transactions contemplated by the Transaction Documents and Loan Documents to the extent, in the case of the Transaction Documents, written notice thereof has been provided to the Administrative Agent prior to the Effective Date.

(q)     <u>Maintenance of Accounts</u>.  Establish or maintain any account other than (i) the Accounts established and maintained pursuant to the Security Deposit Agreement, (ii) the Local Accounts and (iii) other accounts in existence on the Effective Date (provided that the Borrower causes each such account to be closed and the funds on deposit therein or credited thereto at the time of such closure to be transferred to the Revenue Account within 60 days after the Effective Date).

SECTION 5.03.  <u>Reporting Requirements</u>.  Until a Repayment Event has occurred, the Borrower will furnish to the Agents (who will then circulate to the Lenders):

(a)     <u>Default Notice</u>.  As soon as possible and in any event within five days after the Borrower obtains knowledge thereof, the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth details of such Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)     <u>Annual Financials</u>.  As soon as available and in any event within 120 days after the end of each Fiscal Year (but, in the case of the 2006 Fiscal Year, 150 days after the end of such Fiscal Year), a copy of the annual audit report for such year for the Borrower and its Subsidiaries, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its

96

Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of KPMG LLP or other independent public accountants of recognized standing acceptable to the Administrative Agent and (ii) a certificate of the senior financial officer of the Borrower (A) certifying such financial statements as having been prepared in accordance with GAAP, (B) stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto and (C) attaching a schedule in form reasonably satisfactory to the Administrative Agent of the computations used by the Borrower in determining, as of the end of such Fiscal Year, compliance with the covenants contained in Section 5.04; *provided* that, in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(c)     Quarterly Financials.  As soon as available and in any event within 60 days after the end of each of the first three quarters of each Fiscal Year, a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by the senior financial officer of the Borrower as having been prepared in accordance with GAAP, together with (i) a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto and (ii) a schedule in form satisfactory to the Administrative Agent of the computations used by the Borrower in determining compliance with the covenants contained in Section 5.04; *provided* that, in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(d)     Annual Budget.  As soon as available and in any event no later than 15 days before the start of each Fiscal Year, an annual budget, prepared on a quarterly basis for such Fiscal Year in substantially the form attached hereto as Exhibit I or in form otherwise acceptable to the Administrative Agent (with respect to each such Fiscal Year, the "*Budget*"), which Budget shall be certified by the senior financial officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made.  The Borrower and the Guarantors shall use their best efforts to comply in all material respects with each applicable Budget, subject to market conditions.

97

(e)    Litigation. Promptly after the commencement thereof, notice of all actions, suits, litigation and proceedings before any Governmental Authority of the type described in Section 4.01(g).

(f)    Agreement Notices; Etc. (i) Promptly upon execution thereof, copies of any Material Contract entered into by any Loan Party after the date hereof;

(ii)    (A) Promptly (but in any event within 10 days) following any Loan Party's entering into of any Material Contract after the date hereof, a Consent and Agreement in respect of such Material Contract and (B) promptly following receipt by the Borrower after the Effective Date, a Consent and Agreement with respect of each Material Contract as of the Effective Date for which a Consent and Agreement was not delivered pursuant to Section 3.01(a)(ii)(E); and

(iii)    Promptly upon execution thereof, copies of any amendment, modification or waiver of any material provision of any Second Lien Loan Document or any Material Contracts.

(g)    ERISA.

(i)    ERISA Events and ERISA Reports. (A) Promptly and in any event within 10 Business Days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liability in excess of $10,000,000, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party or such ERISA Affiliate has taken and proposes to take with respect thereto and (B) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information within 10 Business Days.

(ii)    Plan Terminations. Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(iii)    Multiemployer Plan Notices. Promptly and in any event within ten Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability that could reasonably be expected to result in liability in excess of $10,000,000 by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan that could reasonably be expected to result in liability in excess of $10,000,000 or (C) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in clause (A) or (B).

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(h)    Environmental Conditions. Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance known to the Borrower by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in the First Lien Mortgages to be subject to any material restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(i)    Real Property. As soon as available and in any event within 30 days after the end of each Fiscal Year, a report supplementing Schedules 4.01(r) and 4.01(s) hereto, including an identification of all material owned and leased real property disposed of by the Borrower or any of its Subsidiaries during such Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, and, in the case of leases of property, lessor and lessee thereof) of all material real property acquired or leased during such Fiscal Year and a description of such other changes in the information included in such Schedules as may be reasonably necessary for such Schedules to be accurate and complete.

(j)    Insurance. (i) Promptly after the Borrower gains knowledge of the occurrence thereof, a report summarizing any changes in the insurance coverage of the Borrower and its Subsidiaries resulting from a change in the insurance markets of the type described in Section 2 of Schedule 5.01(d).

(ii)    Promptly after the occurrence thereof, notice of any Casualty Event or Event of Eminent Domain affecting any Loan Party, whether or not insured, through fire, theft, other hazard, casualty involving a probable loss of $10,000,000 or more.

(iii)    Promptly after receipt thereof, copies of any cancellation or receipt of written notice of threatened cancellation of any property damage insurance required to be maintained under Section 5.01(d).

(k)    Other Information. Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender Party through the Administrative Agent, may from time to time reasonably request.

SECTION 5.04. Financial Covenants. Until a Repayment Event has occurred, the Borrower will:

(a)    Leverage Ratio. The Borrower shall not permit the Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2007, to exceed the correlative ratio indicated:

| Leverage Ratio | |
| --- | --- |
| **Fiscal Quarter** | **Ratio** |
| Quarter 1 2007 ................................................... | 11.0x |
| Quarter 2 2007 ................................................... | 11.0x |
| Quarter 3 2007 ................................................... | 11.0x |
| Quarter 4 2007 ................................................... | 11.0x |
| Quarter 1 2008 ................................................... | 11.0x |
| Quarter 2 2008 ................................................... | 11.0x |
| Quarter 3 2008 ................................................... | 11.0x |
| Quarter 4 2008 ................................................... | 11.0x |
| Quarter 1 2009 ................................................... | 10.0x |
| Quarter 2 2009 ................................................... | 10.0x |
| Quarter 3 2009 ................................................... | 10.0x |
| Quarter 4 2009 ................................................... | 10.0x |
| Quarter 1 2010 ................................................... | 9.0x |
| Quarter 2 2010 ................................................... | 9.0x |
| Quarter 3 2010 ................................................... | 9.0x |
| Quarter 4 2010 ................................................... | 9.0x |
| Quarter 1 2011 ................................................... | 8.0x |
| Quarter 2 2011 ................................................... | 8.0x |
| Quarter 3 2011 ................................................... | 8.0x |
| Quarter 4 2011 ................................................... | 8.0x |
| Quarter 1 2012 ................................................... | 7.0x |
| Quarter 2 2012 ................................................... | 7.0x |
| Quarter 3 2012 ................................................... | 7.0x |
| Quarter 4 2012 ................................................... | 7.0x |
| Quarter 1 2013 ................................................... | 6.0x |
| Quarter 2 2013 ................................................... | 6.0x |
| Quarter 3 2013 ................................................... | 6.0x |
| Quarter 4 2013 ................................................... | 6.0x |

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(b)    Interest Coverage Ratio.  The Borrower shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2007, to be less than the correlative ratio indicated:

| Interest Coverage Ratio | |
|---|---|
| Fiscal Quarter | Ratio |
| Quarter 1 2007 | 1.05x |
| Quarter 2 2007 | 1.05x |
| Quarter 3 2007 | 1.05x |
| Quarter 4 2007 | 1.05x |
| Quarter 1 2008 | 1.05x |
| Quarter 2 2008 | 1.05x |
| Quarter 3 2008 | 1.10x |
| Quarter 4 2008 | 1.10x |
| Quarter 1 2009 | 1.10x |
| Quarter 2 2009 | 1.10x |
| Quarter 3 2009 | 1.10x |
| Quarter 4 2009 | 1.10x |
| Quarter 1 2010 | 1.25x |
| Quarter 2 2010 | 1.25x |
| Quarter 3 2010 | 1.25x |
| Quarter 4 2010 | 1.25x |
| Quarter 1 2011 | 1.50x |
| Quarter 2 2011 | 1.50x |
| Quarter 3 2011 | 1.50x |
| Quarter 4 2011 | 1.50x |
| Quarter 1 2012 | 1.75x |
| Quarter 2 2012 | 1.75x |
| Quarter 3 2012 | 1.75x |
| Quarter 4 2012 | 1.75x |
| Quarter 1 2013 | 2.00x |
| Quarter 2 2013 | 2.00x |

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

| Interest Coverage Ratio | |
|---|---|
| **Fiscal Quarter** | **Ratio** |
| Quarter 3 2013 ...................................................... | 2.00x |
| Quarter 4 2013 ...................................................... | 2.00x |

(c)    Right to Cure Financial Covenants. (i) Notwithstanding anything to the contrary contained in Section 5.04(a) or (b), if the Loan Parties fail to comply with the requirements of either covenant set forth in Section 5.04(a) or (b) (the "*Financial Covenants*"), then until the 10th calendar day after delivery of the related certificate pursuant to Section 5.03(b) or (c), the Borrower shall have the right to receive cash contributions from EBG Holdings in an aggregate amount equal to or greater than the amount that, if added to Consolidated Adjusted EBITDA for the relevant Fiscal Quarter, would have been sufficient to cause compliance with the Financial Covenants for such Fiscal Quarter (an "*Equity Cure*").

(ii)    The Borrower shall give the Administrative Agent written notice (the "*Cure Notice*") of an Equity Cure on or before the day the Equity Cure is consummated. The Borrower shall not be entitled to exercise the Equity Cure any more than one time in any consecutive four Fiscal Quarters.

(iii)    Upon the delivery by the Borrower of a Cure Notice, no Event of Default or Default shall be deemed to exist pursuant to the Financial Covenants (and any such Default or Event of Default shall be retroactively considered not to have existed or occurred). If the Equity Cure is not consummated within 10 days after delivery of the related certificate pursuant to Section 5.03(b) or (c), each such Default or Event of Default shall be deemed reinstated.

(iv)    The cash amount received by the Borrower pursuant to exercise of the Equity Cure shall be added to Consolidated Adjusted EBITDA for the immediately preceding Fiscal Quarter solely for purposes of recalculating compliance with the Financial Covenants for such Fiscal Quarter and of calculating the Financial Covenants for the periods that include such Fiscal Quarter.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    Events of Default. If any of the following events ("*Events of Default*") shall occur and be continuing:

(a)    Payment Defaults. (i) the Borrower shall fail to pay any principal of any Loan when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on any Loan within three Business Days after the same shall become due and

payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this <u>clause (a)</u> within ten Business Days after the same shall become due and payable;

(b)     <u>Misrepresentation</u>. any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; *provided, however*, that if (i) such Loan Party was not aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied, within 30 days from the date on which the Borrower or any officer thereof first obtains knowledge thereof such that such incorrect or false representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such incorrect or false representation or warranty shall not constitute a Default or Event of Default;

(c)     <u>Certain Covenants</u>. the Borrower shall fail to perform or observe any term, covenant or agreement contained in (i) <u>Sections 2.14</u>, <u>5.01(e)</u> and <u>(l)</u>, <u>5.02</u> (other than <u>clauses (l)</u> and <u>(p)</u> thereof), <u>5.03(a)</u> or <u>5.04</u> or (ii) <u>Sections 5.01(d)</u>, <u>(m)</u>, <u>(p)</u> and <u>(s)</u> and <u>5.02(l)</u> and <u>(p)</u> and such default under this subclause (ii) shall continue unremedied for a period of ten (10) days after the earlier of the date on which (x) any Responsible Officer of a Loan Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party;

(d)     <u>Other Covenants</u>. any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 30 days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party; *provided, however*, that (A) if such failure is not susceptible to being remedied solely by the payment of money to any Person that is due after giving effect to any grace provisions, dispute resolution provisions or similar provisions and is not susceptible to cure within 30 days, (B) such Loan Party is proceeding with diligence and in good faith to cure such default and such default is susceptible to cure and (C) the existence of such failure could not reasonably be expected to have a Material Adverse Effect, such 30-day period shall be extended as may be necessary to cure such failure, such extended period not to exceed 90 days in the aggregate (inclusive of the original 30-day period);

(e)     <u>Cross Default</u>. any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount of at least $25,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding under this

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

Agreement and obligations under Hedge Agreements, Commodity Hedge and Power Sale Agreements and Debt described in clause (b) of the definition of "*Guaranteed Debt*"), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof;

(f) Hedge Cross Default. any Loan Party shall default under any one or more Hedge Agreements or Commodity Hedge and Power Sale Agreements on any required payment obligation in excess of $25,000,000 individually or in the aggregate for all Loan Parties, after giving effect to any grace periods, dispute resolution provisions or similar provisions contained in such Hedge Agreement or Commodity Hedge and Power Sale Agreement (it being acknowledged and agreed that any such Default shall be deemed to be cured for all purposes under the Loan Documents if and when such Loan Party pays or causes the payment of such defaulted amount);

(g) Insolvency Event. any Loan Party or any of its Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Loan Party or any of its Subsidiaries seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or any Loan Party or any of its Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (g);

(h) Judgments. any final judgments or orders, either individually or in the aggregate, for the payment of money in excess of $25,000,000 shall be rendered against any Loan Party or any of its Subsidiaries by one or more Governmental Authorities, arbitral tribunals or other bodies having jurisdiction against such Loan Party which remains unsatisfied and either (i) enforcement proceedings shall have been commenced

104

by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which a stay of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    Non-Monetary Judgments. any non-monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)    Invalidity. any provision of any Loan Document after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (except as a result of acts or omissions of the First Lien Secured Parties) cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

(k)    Collateral. any First Lien Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in any material portion of the Collateral purported to be covered thereby;

(l)    Equity of Borrower. the failure of EBG Holdings to hold (directly or indirectly) 100% of the Equity Interests of the Borrower and its Subsidiaries;

(m)    ERISA. (i) any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) could reasonably be expected to have a Material Adverse Effect;

(ii)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), could reasonably be expected to have a Material Adverse Effect;

(iii)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

such reorganization or termination occurs by an amount that could reasonably be expected to have a Material Adverse Effect;

(n)     Commodity Hedge and Power Sale Agreements.  (i) any Commodity Hedge Counterparty to any Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) shall fail to perform or observe any material term, covenant or agreement contained in such Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) if after each case, such failure shall remain unremedied for 30 days or (ii) any Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) shall terminate on or before its scheduled expiration date except upon fulfillment of each party's obligations thereunder, or shall be declared null and void or unenforceable by a Governmental Authority or a party thereto anticipatorily repudiates its obligations thereunder, and in each such case of (i) or (ii), the Loan Parties shall not have entered into a Replacement Commodity Hedge and Power Sale Agreement within 60 days of the occurrence of any such event; or

(o)     Loss Proceeds.  the occurrence of (i) a Casualty Event with respect to (A) all or a material portion of the Property of any Project or (B) all or a material portion of the Collateral or (ii) an Event of Eminent Domain with respect to (A) all or a material portion of the Property of any Project or (B) all or a material portion of the Collateral, unless in the case of each of clause (i) and (ii) the Borrower shall have received, within 90 days after such occurrence, Insurance Proceeds or Eminent Domain Proceeds or cash equity contributions from EBG Holdings in an amount sufficient to repair or rebuild such Project or Collateral, as the case may be;

then, and in any such event, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender Party and the obligation of each Lender Party to make Loans (other than Synthetic L/C Loans by the Synthetic Issuing Banks, Revolving Credit Lenders or Synthetic L/C Lenders pursuant to Section 2.03(c)) and of each Synthetic Issuing Bank to issue Synthetic Letters of Credit to be terminated, whereupon the same shall forthwith terminate and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; *provided, however*, that, in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, (x) the Commitments of each Lender Party and the obligation of each Lender Party to make Loans (other than Synthetic L/C Loans by the Synthetic Issuing Banks, Revolving Credit Lenders or Synthetic L/C Lenders pursuant to Section 2.03(c)) and of each Synthetic Issuing Bank to issue Synthetic Letters of Credit shall automatically be terminated and (y) the Loans, all such interest and all such amounts

106

shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

SECTION 6.02. <u>Actions in Respect of the Synthetic Letters of Credit upon Default</u>. If any Event of Default shall have occurred and be continuing, the Administrative Agent may, or shall at the request of the Required Lenders, irrespective of whether it is taking any of the actions described in <u>Section 6.01</u> or otherwise, make demand upon the Borrower to, and forthwith upon such demand the Borrower will, pay to the First Lien Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Synthetic L/C Cash Collateral Account, an amount equal to 103.0% of the aggregate Available Amount of all Synthetic Letters of Credit then outstanding; *provided, however*, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, the Borrower shall be obligated to pay to the Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Synthetic L/C Cash Collateral Account, an amount equal to 103.0% of the aggregate Available Amount of all Letters of Credit then outstanding, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower. If at any time the Administrative Agent or the First Lien Collateral Agent determines that any funds held in the Synthetic L/C Cash Collateral Account are subject to any right or claim of any Person other than the Agents and the Lender Parties or that the total amount of such funds is less than 103.0% of the aggregate Available Amount of all Synthetic Letters of Credit, the Borrower will, forthwith upon demand by the Administrative Agent or the First Lien Collateral Agent, pay to the Collateral Agent, as additional funds to be deposited and held in the Synthetic L/C Cash Collateral Account, an amount equal to the excess of (a) 103.0% of the aggregate Available Amount of all Synthetic Letters of Credit then outstanding *over* (b) the total amount of funds, if any, then held in the Synthetic L/C Cash Collateral Account that the Administrative Agent or the First Lien Collateral Agent, as the case may be, determines to be free and clear of any such right and claim. Upon the drawing of any Synthetic Letter of Credit for which funds are on deposit in the Synthetic L/C Cash Collateral Account, such funds shall be applied to reimburse the Synthetic Issuing Bank or the Appropriate Lenders, as applicable, to the extent permitted by applicable law.

## ARTICLE VII

## THE AGENTS

SECTION 7.01. <u>Authorization and Action</u>. (a) Each Lender Party (in its capacities as a Lender and a Synthetic Issuing Bank (if applicable)) hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

instructions shall be binding upon all Lender Parties and all holders of Notes; *provided, however*, that the Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)     The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the First Lien Collateral Documents or of exercising any rights and remedies thereunder at the direction of the First Lien Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney-in-fact that it selects in accordance with the foregoing provisions of this Section 7.01(b) in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 7.02. Administrative Agent's Reliance, Etc. Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, the Administrative Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender Party and shall not be responsible to any Lender Party for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03. Initial Banks and Affiliates. With respect to its Commitments, the Loans made by it and any Notes issued to it, each Initial Bank shall have the same rights and powers under the Loan Documents as any other Lender Party and may exercise the same as though each were not an Agent; and the term "*Lender Party*" or "*Lender Parties*" shall, unless otherwise expressly indicated, include each Initial Bank in their respective individual capacities. Each Initial Bank and their respective affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Initial

108

Bank was not an Agent and without any duty to account therefor to the Lender Parties. No Initial Bank shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Initial Bank.

SECTION 7.04. Lender Party Credit Decision. Each Lender Party acknowledges that it has, independently and without reliance upon any Agent or any other Lender Party and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender Party also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05. Indemnification. (a) Each Lender Party severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "***Indemnified Costs***"); *provided, however,* that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender Party agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender Party or any other Person.

(b)     Each Synthetic L/C Lender severally agrees to indemnify the Synthetic Issuing Bank (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Synthetic Issuing Bank in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Synthetic Issuing Bank under the Loan Documents; *provided, however,* that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Synthetic Issuing Bank's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Synthetic L/C Lender agrees to reimburse the Synthetic Issuing Bank promptly upon demand for its ratable share of any costs and expenses (including,

without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Synthetic Issuing Bank is not promptly reimbursed for such costs and expenses by the Borrower.

(c)    For purposes of Section 7.05(a), (i) each Lender Party's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Loans outstanding at such time and owing to such Lender Party, (B) in the case of any Synthetic L/C Lender, such Synthetic L/C Lender's Pro Rata Shares of the aggregate Available Amount of all Synthetic Letters of Credit outstanding at such time, (C) in the case of any Term B Lender, the aggregate unused portions of such Term B Lender's Term B Commitments at such time and (D) in the case of any Revolving Credit Lender, such Revolving Credit Lender's Unused Revolving Credit Commitments at such time, (ii) each Revolving Credit Lender's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Revolving Credit Loans outstanding at such time and owing to such Lender, and (B) such Lender's Unused Revolving Credit Commitments at such time, (iii) each Synthetic L/C Lender's ratable share of any amount shall be determined, at any time, according to the sum of (A) the aggregate principal amount of the Synthetic L/C Loans outstanding at such time and owing to such Lender and (B) the aggregate unused portion of such Lender's Synthetic L/C Deposit Commitment, if any, at such time. The failure of any Lender Party to reimburse any Agent or any Synthetic Issuing Bank, as the case may be, promptly upon demand for its ratable share of any amount required to be paid by the Lender Parties to the such Agent or such Synthetic Issuing Bank, as the case may be, as provided herein shall not relieve any other Lender Party of its obligation hereunder to reimburse such Agent or Synthetic Issuing Bank, as the case may be, for its ratable share of such amount, but no Lender Party shall be responsible for the failure of any other Lender Party to reimburse such Agent or Synthetic Issuing Bank, as the case may be, for such other Lender Party's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender Party hereunder, the agreement and obligations of each Lender Party contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

(d)    Each Revolving Credit Lender severally agrees to indemnify the Fronting Bank (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided in clause (d) above) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Fronting Bank in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Fronting Bank under the Loan Documents; *provided, however*, that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Fronting Bank's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Revolving Credit Lender agrees to reimburse the Fronting Bank promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Fronting Bank is not promptly reimbursed for such costs and expenses by the Borrower.

110

SECTION 7.06. <u>Successor Administrative Agent</u>. The Administrative Agent may resign as to any or all of the Facilities at any time by giving 30 days' written notice thereof to the Lender Parties and the Borrower and may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent as to such of the Facilities as to which the Administrative Agent has resigned or been removed. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lender Parties, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent as to less than all of the Facilities, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent as to such Facilities, other than with respect to funds transfers and other similar aspects of the administration of Borrowings under such Facilities, issuances of Synthetic Letters of Credit (notwithstanding any resignation as Administrative Agent with respect to the Synthetic L/C Facility) and payments by the Borrower in respect of such Facilities, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement as to such Facilities, other than as aforesaid. If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this <u>Section 7.06</u> no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent as to any of the Facilities shall have become effective, the provisions of this <u>Article VII</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent as to such Facilities under this Agreement.

## ARTICLE VIII

## GUARANTY

SECTION 8.01. <u>Guaranty; Limitation of Liability</u>. (a) Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any

111

extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "***Guaranteed Obligations***"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Lender Party in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)     Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Lender Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Administrative Agent, the other Lender Parties and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender Parties under or in respect of the Loan Documents.

SECTION 8.02.  Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Lender Party with respect thereto. The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(b)   any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)   any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)   any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)   any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)   any failure of any Lender Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender Party (each Guarantor waiving any duty on the part of the Lender Parties to disclose such information);

(g)   the failure of any other Person to execute or deliver this Agreement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)   any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender Party or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 8.03.  Waivers and Acknowledgments.  (a)  Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

113

(b)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)     Each Guarantor acknowledges that the First Lien Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the First Lien Collateral Agent and the other First Lien Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender Party.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 8.02 and this Section 8.03 are knowingly made in contemplation of such benefits.

SECTION 8.04.  Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender Party against the Borrower, any other Loan Party or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower or any other Loan Party directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash, all Synthetic Letters of Credit and all Secured Hedge Agreements shall have expired or been terminated and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, (b) the Term B Maturity Date, (c) the latest date of

114

expiration or termination of all Synthetic Letters of Credit and all Secured Hedge Agreements and (d) the return of the Synthetic L/C Deposits and the Revolving Credit-Linked Deposits, such amount shall be received and held in trust for the benefit of the Lender Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to any Lender Party of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash, (iii) the Term B Maturity Date shall have occurred, (iv) all Synthetic Letters of Credit and all Secured Hedge Agreements shall have expired or been terminated and (v) the Synthetic L/C Deposits and the Revolving Credit-Linked Deposits shall have been returned to the Synthetic L/C Lenders, the Lender Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 8.05.  Subordination.  Each Loan Party hereby subordinates any and all debts, liabilities and other Obligations owed to such Loan Party by each other Loan Party (the "**Subordinated Obligations**") to the First Lien Obligations of such Loan Party to the extent and in the manner provided in the Terms of Subordination.

SECTION 8.06.  Continuing Guaranty; Assignments.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until a Repayment Event has occurred, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lender Parties and their successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Lender Party may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it, its Synthetic L/C Deposits, its Revolving Credit-Linked Deposits and any Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender Party herein or otherwise, in each case as and to the extent provided in Section 9.07.  Except as expressly permitted under the Loan Documents, no Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender Parties.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01.  Amendments, Etc.  (a) Subject to Section 5.3(d) of the Intercreditor Agreement and clause (b) below, no amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document (including the Intercreditor Agreement and

115

the Security Deposit Agreement), nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Required Lenders (or the Administrative Agent on their behalf), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however,* that

    (i)    no amendment, waiver or consent shall, unless in writing and signed by the Borrower and all of the Lender Parties, do any of the following at any time:

    (A)    waive any of the conditions specified in <u>Section 3.01</u> or, in the case of the Initial Extension of Credit, <u>Section 3.02</u>;

    (B)    change (A) the definition of "*Required Lenders*" or (B) the number of Lenders or the percentage of (x) the Commitments, (y) the aggregate unpaid principal amount of the Loans or (z) the aggregate Available Amount of outstanding Synthetic Letters of Credit that, in each case, shall be required for the Lenders or any of them to take any action hereunder or under any other Loan Document;

    (C)    change any other definition in the Intercreditor Agreement or the Security Deposit Agreement in any manner materially and adversely affecting the Lender Parties;

    (D)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lender Parties under the Guaranties) if such release or limitation is in respect of a material portion of the value of the Guaranties to the Lender Parties;

    (E)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release any material portion of the Collateral in any transaction or series of related transactions; or

    (F)    amend this <u>Section 9.01</u>, and

    (ii)    no amendment, waiver or consent shall, unless in writing and signed by the Borrower and the Required Lenders and each Lender Party specified below for such amendment, waiver or consent:

    (A)    increase the Commitments of a Lender Party without the consent of such Lender Party;

    (B)    reduce the principal of, or stated rate of interest on, the Loans owed to a Lender Party or the Synthetic L/C Deposit or the Revolving Credit-Linked Deposit of such Lender Party or any fees

116

(including the Participation Fee and other fees payable pursuant to Section 2.08) or any other amounts stated to be payable hereunder or under the other Loan Documents to such Lender Party without the consent of such Lender Party;

(C)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or 2.07, any date on which the Synthetic L/C Deposits or the Revolving Credit-Linked Deposit are to be returned in full to the Synthetic L/C Lenders or any date fixed for any payment of fees hereunder in each case payable to a Lender Party without the consent of such Lender Party;

(D)    impose any restrictions on the rights of such Lender Party under Section 9.07;

(E)    change the order of application of any reduction in the Commitments or any prepayment of Loans among the Facilities from the application thereof set forth in the applicable provisions of Section 2.05(b) or 2.06(b), respectively, in any manner that materially adversely affects the Lenders under a Facility without the consent of holders of a majority of the Commitments or Loans outstanding under such Facility;

(F)    change the order of application of proceeds of Collateral and other payments set forth in Section 4.1 of the Intercreditor Agreement or Article III of the Security Deposit Agreement in a manner that materially adversely affects any Lender Party without the consent of such Lender Party; or

(G)    otherwise amend or modify any of the Intercreditor Agreement or any First Lien Collateral Document in a manner which disproportionately affects any Lender Party vis-à-vis any other Secured Party without the written consent of such Lender Party;

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by each Synthetic Issuing Bank, as the case may be, in addition to the Borrower and the Lenders required above to take such action, affect the rights or obligations of the Synthetic Issuing Banks, as the case may be, under this Agreement; and *provided further* that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Borrower and the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

(b)    Notwithstanding the other provisions of this Section 9.01, the Borrower, the Guarantors, the First Lien Collateral Agent and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender Party:  (i) to cure any ambiguity, defect or inconsistency; (ii) to make any change that would provide any additional rights or benefits to the Lender Parties; (iii) to make, complete or confirm

117

any grant of Collateral permitted or required by this Agreement or any of the First Lien Collateral Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the First Lien Collateral Documents or (iv) to facilitate the return of the Synthetic Deposits to the Synthetic L/C Lenders in a manner consistent with the intent of this Agreement.

(c)     If, in connection with any proposed amendment, waiver or consent, the consent of all of the Lenders, or all of the Lenders directly affected thereby, is required pursuant to this Section 9.01, and any such Lender refuses to consent to such amendment, waiver or consent as to which the Required Lenders have consented (any such Lender whose consent is not obtained as described in this Section 9.01 being referred to as a "*Non-Consenting Lender*"), then, so long as the Administrative Agent is not a Non-Consenting Lender, at the Borrower's request and at the sole cost and expense of the Borrower, the Administrative Agent or an Eligible Assignee shall be entitled (but shall have no obligation) to purchase from such Non-Consenting Lender, and such Non-Consenting Lender (by its acceptance of the benefits of the applicable Loan Documents) agrees that it shall, upon the Administrative Agent's request, sell and assign to the Administrative Agent or such Eligible Assignee, all of the Loans and Commitments of such Non-Consenting Lender or Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lender and all accrued interest and fees with respect thereto through the date of sale; *provided* that such Eligible Assignee consents to the proposed amendment, waiver or consent (it being understood and agreed that the Commitments of such Non-Consenting Lender shall include, if such Non-Consenting Lender is a Synthetic Issuing Bank, the Synthetic L/C Issuing Commitment of such Non-Consenting Lender). Each Lender (by its acceptance of the benefits of the Loan Documents) agrees that, if it becomes a Non-Consenting Lender, it shall execute and deliver to the Administrative Agent an Assignment and Acceptance to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by Notes) subject to such Assignment and Acceptance; *provided, however*, that the failure of any Non-Consenting Lender to execute an Assignment and Acceptance shall not render such sale and purchase (and the corresponding assignment) ineffective.

SECTION 9.02. Notices, Etc. (a) All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic (including portable document format (pdf)) communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in Section 9.02(b) and in the proviso to this Section 9.02(a), in an electronic medium and delivered as set forth in Section 9.02(b), if to any Loan Party, to the Borrower at its address at The Schrafft Center, 529 Main Street, Suite 605, Charlestown, MA 02129, Attention: Executive Vice President, Fax: (617) 381-2211 (with a copy sent to Boston Generating LLC c/o K Road Power Management, LLC, 330 Madison Avenue, 25th Floor, New York, NY 10017, Attention: President, Fax: (212) 351-0515 and a copy sent to Robert F. Quaintance Jr. and Paul D. Brusiloff, Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Fax: (212) 521-7451 and (212) 521-7015, respectively); if to any Initial Lender Party, at its Domestic Lending Office specified opposite its name on Schedule I hereto; if to any other Lender Party, at its Domestic Lending Office specified in the administrative questionnaire delivered in conjunction with the Assignment and Acceptance pursuant to which it became a Lender Party; if to the Administrative Agent or the

118

First Lien Collateral Agent, at its address at 11 Madison Avenue, New York, NY 10010, Attention: Candace Sorina, Fax: (212) 325-8304, E-mail Address: candace.sorina@credit-suisse.com; or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided, however,* that materials and information described in Section 9.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent. All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective when deposited in the mails, delivered to the telegraph company, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to any Agent pursuant to Article II, III or VII shall not be effective until received by such Agent. Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b)    The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a Conversion of an existing, Borrowing (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other Extension of Credit thereunder (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "***Platform***").

(c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender Party agrees (i) that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents. Each Lender Party agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03.  No Waiver; Remedies.  No failure on the part of any Lender Party or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.  Costs and Expenses.  (a)  Other than with respect to Other Taxes which are governed solely by Section 2.12, the Borrower agrees to pay on demand (i) all costs and expenses of each Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for each Agent with respect thereto, with respect to advising such Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any

120

bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of each Agent and each Lender Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each Lender Party with respect thereto).

(b)    The Borrower agrees to indemnify, defend and save and hold harmless each Agent, each Lender Party and each of their Affiliates (other than any Commodity Hedge Counterparty in such capacity) and their respective officers, directors, employees, agents, trustees and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and related expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facilities, the actual or proposed use of the proceeds of the Loans, the Revolving Credit-Linked Deposits, the Synthetic L/C Deposits or the Synthetic Letters of Credit, the Transaction Documents or any of the transactions contemplated thereby (including, without limitation, the Transaction) or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense (x) is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct or (y) in the case of clause (i) above, is a tax. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the Transaction is consummated. The Borrower also agrees not to assert any claim against any Agent, any Lender Party or any of their Affiliates, or any of their respective officers, directors, employees, agents, trustees and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facilities, the actual or proposed use of the proceeds of the Loans, the Revolving Credit-Linked Deposits, the Synthetic L/C Deposits or the Synthetic Letters of Credit, the Transaction Documents or any of the transactions contemplated by the Transaction Documents.

(c)    If any payment of principal of, or Conversion of, any Eurodollar Rate Loan is made by the Borrower to or for the account of a Lender Party, any Revolving Credit-Linked Deposit is returned to any Revolving Credit Lender or any Synthetic L/C Deposit is returned to any Synthetic L/C Lender other than on the last day of the Interest Period for such Loan or Synthetic L/C Deposit, as applicable, as a result of a payment or Conversion pursuant to Section 2.06, 2.09(b)(i) or 2.10(d), acceleration of the maturity of the Loans pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of an Loan for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.06 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to

121

the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Loan.

(d)    If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender Party, in its sole discretion.

(e)    Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Sections 2.10 and 2.12 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05.  Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender Party or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender Party shall have made any demand under this Agreement and although such Obligations may be unmatured. Each Agent and each Lender Party agrees promptly to notify the Borrower after any such set-off and application; *provided, however,* that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender Party and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender Party and their respective Affiliates may have.

SECTION 9.06.  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each Initial Lender Party that such Initial Lender Party has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender Party and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.

SECTION 9.07.  Assignments and Participations.  (a)  Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement

122

(including, without limitation, all or a portion of its Commitment or Commitments, the Loans owing to it, its Synthetic L/C Deposit, its Revolving Credit-Linked Deposit and the Note or Notes held by it); *provided, however,* that (i) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower) for each Facility being assigned, *provided* that simultaneous assignments by two or more Related Funds shall be treated as one assignment for purposes of the minimum assignment requirement, (ii) each such assignment shall be to an Eligible Assignee, and (A) to the extent that such assignment is in respect of the Revolving Credit Facility, the Administrative Agent shall have consented to such assignment and, so long as no Event of Default shall have occurred and be continuing, the Borrower shall have consented to such assignment and (B) to the extent such assignment is to any Eligible Assignee that, immediately prior to such assignment, was not a Lender, an Affiliate of a Lender or an Approved Fund, the Administrative Agent shall have consented to such assignment (in each case such consent not to be unreasonably withheld or delayed), (iii) each such assignment made as a result of a demand by the Borrower pursuant to Section 2.17 or Section 9.01 shall be arranged by the Borrower after consultation with the Administrative Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of the rights and obligations of the assigning Lender under this Agreement, (iv) no Lender shall be obligated to make any such assignment as a result of a demand by the Borrower pursuant to Section 2.17 or Section 9.01 unless and until such Lender shall have received one or more payments from either the Borrower or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Advances owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement, (v) no such assignments shall be permitted without the consent of the Administrative Agent until the Administrative Agent shall have notified the Lender Parties that syndication of the Commitments hereunder has been completed and (vi) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with (A) any Note or Notes (if any) subject to such assignment, (B) an administrative questionnaire and tax forms, if applicable and (C) a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided, however,* that only one such fee shall be payable with respect to simultaneous assignments by or to one or more Related Funds; *provided further* that for each such assignment made as a result of a demand by the Borrower pursuant to Section 2.17 or Section 9.01, the Borrower shall pay to the Administrative Agent the applicable processing and recordation fee.

       (b)     (i) In connection with each assignment of a Synthetic L/C Deposit Commitment, the Synthetic L/C Deposit of the assignor Synthetic L/C Lender shall not be

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

released, but shall instead be purchased by the relevant assignee and continue to be held for application (to the extent not already applied) in accordance with Article II to satisfy the relevant Eligible Assignee's obligations in respect of Synthetic Letters of Credit and

(ii)    in connection with each assignment of Revolving Credit Commitments, the Revolving Credit-Linked Deposit of the assignor Revolving Credit Lender shall not be released, but shall instead be purchased by the relevant assignee and continue to be held for application (to the extent not already applied) in accordance with Article II to satisfy such assignee's obligations in respect of Revolving Credit Loans.  Each Revolving Credit Lender agrees that immediately prior to each assignment by a Revolving Credit Lender (A) the Administrative Agent shall establish a new Revolving Credit-Linked Sub-Account in the name of the assignee, (B) unless otherwise consented to by the Administrative Agent, a corresponding portion of the Revolving Credit-Linked Deposit credited to the Revolving Credit-Linked Sub-Account of the assignor Revolving Credit Lender shall be purchased by the assignee and shall be transferred from the assignor's Revolving Credit-Linked Sub-Account to the assignee's Revolving Credit-Linked Sub-Account and (C) if after giving effect to such assignment the Revolving Credit Commitment of the assignor Revolving Credit Lender shall be zero, the Administrative Agent shall close the Revolving Credit-Linked Sub-Account of such assignor Revolving Credit Lender.

(c)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender or Synthetic Issuing Bank, as the case may be, hereunder and (ii) the Lender or Synthetic Issuing Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's or Synthetic Issuing Bank's rights and obligations under this Agreement, such Lender or Synthetic Issuing Bank shall cease to be a party hereto).

(d)    By executing and delivering an Assignment and Acceptance, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto;

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender or Synthetic Issuing Bank, as the case may be.

(e)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lender Parties and the Commitment under each Facility of, and principal amount of the Loans owing under each Facility to, each Lender Party from time to time (the "*Register*"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties shall treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(f)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender Party and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent. If requested, in the case of any assignment by a Lender, within 10 Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) an amended and restated Note (which shall be marked "*Amended and Restated*") to the account of such Eligible Assignee in an amount equal to the Commitment assumed by it under each Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such Facility, an amended and restated Note to the account of such assigning Lender in an amount equal to the Commitment retained by it hereunder. Such amended and restated Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A-1, A-2 or A-3 hereto, as the case may be.

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

(g)     Each Synthetic Issuing Bank may assign to an Eligible Assignee all of its rights and obligations under the undrawn portion of its Synthetic Letter of Credit Commitment at any time; *provided, however*, that (i) each such assignment shall be to an Eligible Assignee and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with a processing and recordation fee of $3,500.

(h)     Each Lender Party may sell participations to one or more Persons (other than any Loan Party) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Loans owing to it, its Synthetic L/C Deposit, its Revolving Credit-Linked Deposits and the Note or Notes (if any) held by it); *provided, however*, that (i) such Lender Party's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender Party shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender Party shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral or the value of the Guarantys.

(i)     Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; *provided, however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender Party.

(j)     Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it, its Synthetic L/C Deposit, its Revolving Credit-Linked Deposits and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(k)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it, its Synthetic L/C Deposit, its Revolving Credit-Linked Deposits and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender

126

in compliance with the other provisions of this <u>Section 9.07</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(l)    Notwithstanding anything to the contrary contained herein, any Lender Party (a "*Granting Lender*") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "*SPC*") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender Party would be liable, (ii) no SPC shall be entitled to the benefits of <u>Sections 2.10</u> and <u>2.12</u> (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender Party of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $500, assign all or any portion of its interest in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This <u>subsection (l)</u> may not be amended without the prior written consent of each Granting Lender, all or any part of whose Loans are being funded by the SPC at the time of such amendment.

SECTION 9.08. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Electronic delivery (by telecopier or portable document format (pdf)) of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 9.09. <u>No Liability of the Synthetic Issuing Banks</u>. The Borrower assumes all risks of the acts or omissions of any beneficiary or transferee of any Synthetic Letter of Credit with respect to its use of such Synthetic Letter of Credit. Neither any Synthetic Issuing Bank nor any of its officers or directors shall be liable or responsible for: (a) the use that may be

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

made of any Synthetic Letter of Credit or any acts or omissions of any beneficiary or transferee in connection therewith; (b) the validity, sufficiency or genuineness of documents, or of any endorsement thereon, even if such documents should prove to be in any or all respects invalid, insufficient, fraudulent or forged; (c) payment by such Synthetic Issuing Bank against presentation of documents that do not comply with the terms of a Synthetic Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Letter of Credit; or (d) any other circumstances whatsoever in making or failing to make payment under any Synthetic Letter of Credit, except that the Borrower shall have a claim against such Synthetic Issuing Bank, and such Synthetic Issuing Bank shall be liable to the Borrower, to the extent of any direct, but not consequential, damages suffered by the Borrower that the Borrower proves were caused by (i) such Synthetic Issuing Bank's willful misconduct or gross negligence as determined in a final, non-appealable judgment by a court of competent jurisdiction in determining whether documents presented under any Synthetic Letter of Credit comply with the terms of the Synthetic Letter of Credit or (ii) such Synthetic Issuing Bank's willful failure to make lawful payment under a Synthetic Letter of Credit after the presentation to it of a draft and certificates strictly complying with the terms and conditions of the Synthetic Letter of Credit. In furtherance and not in limitation of the foregoing, such Synthetic Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in connection therewith, shall adhere to Uniform Customs and Practice for Documentary Credits, 1993 Revision, International Chamber of Commerce Publication No. 500.

SECTION 9.10. Confidentiality. Neither any Agent nor any Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender Party's Affiliates and their officers, directors, employees, agents, trustees and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender Party, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender Party, (e) in connection with any litigation or proceeding to which such Agent or such Lender Party or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 9.11. Marshalling; Payments Set Aside. Neither any Agent nor any Lender Party shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lender Parties (or to the Administrative Agent, on behalf of the Lender Parties), or any Agent or Lender Party enforces any security interests or exercise its rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common

128

law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

SECTION 9.12.  Patriot Act Notice.  Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.  The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with the Patriot Act.

SECTION 9.13.  Hedge Banks.  Each Lender Party hereby agrees that in its capacity as a Hedge Bank it shall, and shall cause its Affiliates in their capacity as Hedge Banks to, comply with all obligations of such party as a Hedge Bank under the Intercreditor Agreement.

SECTION 9.14.  Intercreditor Agreement.  Each Lender hereby acknowledges and agrees on behalf of itself and each of its Affiliates in their capacity as Hedge Banks that their respective Lien priorities and other matters related to the Loan Documents and the Collateral are subject to and governed by the Intercreditor Agreement.  Each Lender, by delivering its signature page hereto, funding its Loans on the Effective Date and/or executing an Assignment and Acceptance (as applicable) shall be deemed to have (a) acknowledged receipt of, consented to and approved of the Intercreditor Agreement both on its behalf (and on behalf of its Affiliates acting as Hedge Banks) and (b) authorized (on behalf of itself and any Affiliate acting as a Hedge Bank) the Administrative Agent and the First Lien Collateral Agent to perform their respective obligations thereunder.

SECTION 9.15.  Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have

129

to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.16.  Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.17.  Waiver of Jury Trial.  Each of the Loan Parties, the Agents and the Lender Parties irrevocably waives, to the fullest extent permitted by applicable law, all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans, the Synthetic Letters of Credit or the actions of any Agent or any Lender Party in the negotiation, administration, performance or enforcement thereof.

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3436966v11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BOSTON GENERATING, LLC,
as Borrower

By: _____

Name: DAVID L. TOHIR
Title: Pres.

MYSTIC I, LLC,
as Guarantor

By: _____

Name: DAVID L TOHIR
Title: Pres.

FORE RIVER DEVELOPMENT, LLC,
as Guarantor

By: _____

Name: DAVID L TOHIR
Title: Pres.

MYSTIC DEVELOPMENT, LLC,
as Guarantor

By: _____

Name: DAVID L. TOHIR
Title: Pres.

BG BOSTON SERVICES, LLC,
as Guarantor

By: _____

Name: DAVID L. TOHIR
Title: Pres.

[Signature Page - First Lien Credit and Guaranty Agreement]

BG NEW ENGLAND POWER
SERVICES, INC.,
as Guarantor

By: _____

Name: DAVID L. TOHIR
Title:   PRES.

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH,
as Administrative Agent, First Lien
Collateral Agent, Initial Lender,
Synthetic Issuing Bank and Fronting
Bank

By:_____

Name: James Moran
Title: Managing Director

By:_____

Name: Nupur Kumare
Title: Associate

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3439953v2

GOLDMAN SACHS CREDIT
PARTNERS, L.P.,
as Initial Lender

By

Name:
Title:        BRUCE H. MENDELSOHN
              **AUTHORIZED SIGNATORY**

Boston Generating, LLC
First Lien Credit Agreement
NY1:#3439953v2

EXHIBIT F

EXECUTION COUNTERPART

**$350,000,000 SECOND LIEN CREDIT AND GUARANTY AGREEMENT**

Dated as of December 21, 2006

Among

BOSTON GENERATING, LLC

as <u>Borrower</u>

and

THE GUARANTORS

as <u>Guarantors</u>

and

THE INITIAL LENDERS NAMED HEREIN

as <u>Initial Lenders</u>

and

CREDIT SUISSE

as <u>Second Lien Collateral Agent</u>

and

CREDIT SUISSE

as <u>Administrative Agent</u>

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as <u>Co-Syndication Agents</u> and as <u>Co-Documentation Agents</u>

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as <u>Joint Lead Arrangers</u> and as <u>Joint Book Running Managers</u>

# EXHIBIT F

# T A B L E   O F   C O N T E N T S

**Section**                                                                                    **Page**

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms........................................................................................ 2
SECTION 1.02. Computation of Time Periods; Other Definitional Provisions........................... 31
SECTION 1.03. Accounting Terms............................................................................................. 31

## ARTICLE II

### AMOUNTS AND TERMS OF THE LOANS

SECTION 2.01. The Loans......................................................................................................... 31
SECTION 2.02. Making the Loans............................................................................................. 31
SECTION 2.03. [Reserved] ....................................................................................................... 33
SECTION 2.04. Repayment of Loans ........................................................................................ 33
SECTION 2.05. [Reserved] ....................................................................................................... 33
SECTION 2.06. Prepayments .................................................................................................... 33
SECTION 2.07. Interest.............................................................................................................. 35
SECTION 2.08. Fees .................................................................................................................. 36
SECTION 2.09. Conversion of Loans ........................................................................................ 36
SECTION 2.10. Increased Costs, Etc. ....................................................................................... 36
SECTION 2.11. Payments and Computations............................................................................ 38
SECTION 2.12. Taxes ................................................................................................................ 39
SECTION 2.13. Sharing of Payments, Etc. ............................................................................... 42
SECTION 2.14. Use of Proceeds............................................................................................... 43
SECTION 2.15. Change of Control Prepayment........................................................................ 43
SECTION 2.16. Evidence of Debt.............................................................................................. 44
SECTION 2.17. Duty to Mitigate ............................................................................................... 45

## ARTICLE III

### CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01. Conditions Precedent ....................................................................................... 45
SECTION 3.02. Conditions Precedent to Each Borrowing and Issuance ................................... 53
SECTION 3.03. Determinations Under Section 3.01 ................................................................. 53

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties......................................................................... 53

# ARTICLE V

## COVENANTS

SECTION 5.01. Affirmative Covenants ............................................................................. 61
SECTION 5.02. Negative Covenants ................................................................................ 65
SECTION 5.03. Reporting Requirements ......................................................................... 72
SECTION 5.04. Financial Covenants ............................................................................... 76

# ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default ................................................................................... 79

# ARTICLE VII

## THE AGENTS

SECTION 7.01. Authorization and Action ........................................................................ 83
SECTION 7.02. Administrative Agent's Reliance, Etc. ................................................... 84
SECTION 7.03. Initial Banks and Affiliates .................................................................... 84
SECTION 7.04. Lender Credit Decision .......................................................................... 85
SECTION 7.05. Indemnification ...................................................................................... 85
SECTION 7.06. Successor Administrative Agent ............................................................ 85

# ARTICLE VIII

## GUARANTY

SECTION 8.01. Guaranty; Limitation of Liability ........................................................... 86
SECTION 8.02. Guaranty Absolute ................................................................................. 87
SECTION 8.03. Waivers and Acknowledgments ............................................................ 88
SECTION 8.04. Subrogation ............................................................................................ 89
SECTION 8.05. Subordination ......................................................................................... 90
SECTION 8.06. Continuing Guaranty; Assignments ...................................................... 90

# ARTICLE IX

## MISCELLANEOUS

SECTION 9.01. Amendments, Etc. ................................................................................... 90
SECTION 9.02. Notices, Etc. ........................................................................................... 92
SECTION 9.03. No Waiver; Remedies ............................................................................ 94
SECTION 9.04. Costs and Expenses ............................................................................... 95
SECTION 9.05. Right of Set-off ...................................................................................... 96
SECTION 9.06. Binding Effect ........................................................................................ 97

SECTION 9.07. Assignments and Participations ........................................................................ 97
SECTION 9.08. Execution in Counterparts............................................................................... 101
SECTION 9.09. [Reserved] ...................................................................................................... 101
SECTION 9.10. Confidentiality ............................................................................................... 101
SECTION 9.11. Marshalling; Payments Set Aside .................................................................. 101
SECTION 9.12. Patriot Act Notice........................................................................................... 101
SECTION 9.13. Hedge Banks .................................................................................................. 102
SECTION 9.14. Intercreditor Agreement................................................................................. 102
SECTION 9.15. Jurisdiction, Etc............................................................................................. 102
SECTION 9.16. Governing Law .............................................................................................. 103
SECTION 9.17. Waiver of Jury Trial....................................................................................... 103

SCHEDULES

| Schedule I | - | Commitments and Applicable Lending Offices |
| Schedule 2.03(i) | - | Existing Letters of Credit |
| Schedule 4.01(b) | - | Loan Parties |
| Schedule 4.01(c) | - | Subsidiaries |
| Schedule 4.01(e) | - | Governmental Approvals and Authorizations |
| Schedule 4.01(g) | - | Litigation |
| Schedule 4.01(o) | - | Environmental Disclosure |
| Schedule 4.01(q) | - | Surviving Debt |
| Schedule 4.01(r) | - | Owned Real Property |
| Schedule 4.01(s) | - | Leased Real Property |
| Schedule 4.01(t) | - | Material Contracts |
| Schedule 5.01(d) | - | Insurance |
| Schedule 5.02(a) | - | Liens |
| Schedule 5.02(m) | | 2006 Base Capex Amount |

EXHIBITS

| Exhibit A | - | Form of Note |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Assignment and Acceptance |
| Exhibit D | - | Form of Second Lien Mortgage |
| Exhibit E | - | Form of Solvency Certificate |
| Exhibit F-1 | - | Form of Consent and Agreement for Permitted Commodity Hedge and Power Sale Agreements |
| Exhibit F-2 | - | Form of Consent and Agreement for Other Material Contracts |
| Exhibit F-3 | - | Form of Consent and Agreement for Other Material Contracts with Affiliates |
| Exhibit G | - | Form of Intercreditor Agreement |
| Exhibit H | - | Form of Security Deposit Agreement |
| Exhibit I | - | Form of Annual Budget |
| Exhibit J | - | Form of Joinder Agreement |
| Exhibit K | - | Form of Second Lien Security Agreement |
| Exhibit L | - | Form of Second Lien Pledge Agreement |
| Exhibit M | - | Terms of Subordination |
| Exhibit N | - | Form of Closing Date Funds Flow Memo |

## SECOND LIEN CREDIT AND GUARANTY AGREEMENT

BOSTON GENERATING, LLC SECOND LIEN CREDIT AND GUARANTY AGREEMENT dated as of December 21, 2006 among BOSTON GENERATING, LLC, a Delaware limited liability company (the "***Borrower***"), the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), CREDIT SUISSE, CAYMAN ISLANDS BRANCH ("***CS***"), as second lien collateral agent (together with any successor collateral agent appointed pursuant to Section 7 of the Intercreditor Agreement, the "***Second Lien Collateral Agent***") for the Second Lien Secured Parties (as hereinafter defined), and CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-syndication agents (together with any successor co-syndication agents, the "***Co-Syndication Agents***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-documentation agents (together with any successor co-documentation agents, the "***Co-Documentation Agents***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as joint lead arrangers (together with any successor joint lead arrangers, the "***Joint Lead Arrangers***") and as joint lead book running managers (together with any successor joint lead arrangers, the "***Joint Book Running Managers***"), and CS, as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***" and, together with the Second Lien Collateral Agent, the "***Agents***") for the Lenders (as hereinafter defined).

### PRELIMINARY STATEMENTS:

(1)    The Borrower has requested that the Lenders lend to the Borrower up to $350,000,000 to repay all outstanding obligations under the Existing Credit Agreements, pay transaction fees and expenses in connection with the foregoing ("***Transaction Costs***"), to support the working capital needs and obligations of the Borrower and Guarantors and provide funds for ongoing working capital requirements, to fund in part the Distribution and the Tender Offer (each as hereinafter defined) and provide funds for other general corporate purposes of the Borrower and the Guarantors.

(2)    Prior to entering into this Agreement, the Borrower has entered into a certain Initial Commodity Hedge and Power Sale Agreement (as hereinafter defined) dated as of November 20, 2006, with Credit Suisse Energy LLC relating to a total of approximately 1600 MW of generating capacity.

(3)    EBG Holdings has commenced the Tender Offer (as hereinafter defined) for up to $925,000,000 of its Units (as hereinafter defined) to be financed in part with the proceeds from the Facility (as hereinafter defined).

(4)    EBG Holdings intends to make a pro rata distribution to its unit holders, prior to the purchase of Units in the Tender Offer, in an amount of up to $40,000,000 to be financed in part with the proceeds from the Facility (the "***Distribution***").

(5)    Simultaneously with the entering into of this Agreement, the Borrower and the Guarantors are entering into that certain First Lien Credit and Guaranty Agreement, dated as of the date hereof (the "***First Lien Credit Agreement***"), with each of the banks, financial

institutions and other institutional lenders party thereto from time to time (the "*First Lien Lenders*"), and CS, as First Lien Collateral Agent and as administrative agent (the "*First Lien Administrative Agent*"), the proceeds of which shall be used in part to repay in full amounts outstanding under the Existing Credit Agreements.

(6)    The Lenders have indicated their willingness to agree to make Loans (as hereinafter defined) subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Accepting Lenders*" has the meaning specified in Section 2.06(c).

"*Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Accumulated Emissions Credits*" has the meaning specified in the Security Deposit Agreement.

"*Adjusted Base Capex Allowance*" means, for any Fiscal Year, $10,000,000 *minus* any amount that was, during the prior Fiscal Year, a Pullback Amount.

"*Adjusted Capex Limit*" means, for any Fiscal Year, the Adjusted Base Capex Allowance *plus* any Carryover Amount for such Fiscal Year *plus* any Pullback Amount for such Fiscal Year.

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lenders from time to time.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "*control*" (including the terms "*controlling*," "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to vote 15% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies

2

of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" has the meaning specified in the recital of parties to this Agreement.

"*Agreement*" means this Second Lien Credit and Guaranty Agreement, as amended.

"*Agreement Value*" means, for each Hedge Agreement or Commodity Hedge and Power Sale Agreement, on any date of determination, the amount, if any, that would be payable by any Loan Party to its counterparty to such Hedge Agreement or Commodity Hedge and Power Sale Agreement, as the case may be, in accordance with its terms as if an Early Termination Event has occurred on such date of determination.

"*Applicable Lending Office*" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Loan and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Loan.

"*Applicable Margin*" means 3.25% per annum for Base Rate Loans and 4.25% per annum for Eurodollar Rate Loans.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Asset Sale*" has the meaning specified in the Security Deposit Agreement.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "*Eligible Assignee*"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"*Auction Date*" means the date of the consummation of the Tender Offer.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "*Bankruptcy*," as now and hereafter in effect, or any successor statute.

"*Bankruptcy Law*" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

3

"***Base Capex Amount***" means, for each Fiscal Year, $10,000,000; *provided* that the Base Capex Amount for the 2006 Fiscal Year shall be $12,093,000 to be utilized for the Capital Expenditures set forth on Schedule 5.02(m) only.

"***Base Case Projections***" has the meaning specified in Section 3.01(a)(xiii).

"***Base Rate***" means a fluctuating interest rate *per annum* in effect from time to time, which rate per annum shall at all times be equal to the higher of:

> (a)     the rate of interest announced by CS in New York, New York, from time to time, as the prime rate; and

> (b)     ½ of 1% *per annum* above the Federal Funds Rate.

"***Base Rate Loan***" means any Loan that bears interest as provided in Section 2.07(a)(i).

"***Borrower***" has the meaning specified in the recital of parties to this Agreement.

"***Borrowing***" means a borrowing consisting of simultaneous Loans of the same Type made by the Lenders.

"***Budget***" has the meaning specified in Section 5.03(d).

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; *provided* that, when used in connection with a Eurodollar Rate Loan, the term "***Business Day***" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"***Cabot Guaranty***" means the guaranty dated as of January 15, 2000, by Cabot LNG LLC, a Delaware limited liability company, in favor of Mystic Development and Exelon New England Power Marketing Limited Partnership, a limited partnership organized under the laws of Delaware.

"***Call Premium***" shall mean, with respect to any applicable prepayment under Section 2.06(a), an amount equal to (a) 2% of the aggregate principal amount of such prepayment if such prepayment occurs within twelve (12) months of the Effective Date, (b) 1% of the aggregate amount of such prepayment if such prepayment occurs after twelve (12) months from the Effective Date but within twenty-four (24) months of the Effective Date. Any prepayment made more than twenty-four (24) months after the Effective Date will not be subject to the Call Premium.

"***Capital Expenditures***" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or

4

improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person *plus* (b) the aggregate principal amount of all Debt (including obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, "*Capital Expenditures*" shall not include: (i) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds, except to the extent that the gross amount of such purchase price exceeds the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be and (ii) expenditures made as a part of a Permitted Development so long as such expenditure is included in the calculation of the aggregate amount of consideration payable for such Permitted Development and is permitted by the terms of this Agreement.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Carryover Amount*" means, for any Fiscal Year, the amount (not to exceed $10,000,000, provided that the Carryover Amount for the 2007 and 2008 Fiscal Years shall also include that portion of the Base Capex Amount for the 2006 Fiscal Year not utilized in the prior year) by which the Adjusted Base Capex Allowance for the prior Fiscal Year *plus* any Carryover Amount as determined during such prior Fiscal Year exceeds Capital Expenditures made in such prior Fiscal Year.

"*Cash*" means money, currency or a credit balance in any demand account or deposit account.

"*Cash Equivalents*" has the meaning specified in the Security Deposit Agreement.

"*Casualty Event*" has the meaning specified in the Security Deposit Agreement.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"*Change of Control*" means, at any time after the Auction Date, any "*person*" or "*group*" (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) (other than any such "*person*" or "*group*" holding, directly or indirectly, beneficially or of record, any Equity Interests in EBG Holdings as of the Auction Date) (the "*Proposed Acquiror*") shall have acquired ownership, directly or indirectly, beneficially or of record, of more than 35% on a fully diluted basis of the aggregate voting power

5

represented by the issued and outstanding Equity Interests in EBG Holdings unless
(i) such Proposed Acquiror is a Qualified Owner and (ii) each of S&P and Moody's shall
have provided written confirmation of their respective ratings of the Facility (as in effect
immediately prior to such acquisition) after giving effect to such acquisition.  For the
purposes of this definition, a "***person***" or "***group***" shall not include any of the unit
holders of EBG Holdings solely by virtue of such unit holders being a party to the limited
liability company agreement of EBG Holdings.

"***Closing Date Summary Funds Flow Memo***" has the meaning specified in
Section 3.01(l).

"***Co-Documentation Agents***" has the meaning specified in the recital of parties to
this Agreement.

"***Co-Syndication Agent***" has the meaning specified in the recital of parties to this
Agreement.

"***Collateral***" means all Property (including Equity Interests in any Guarantor) of
the Loan Parties, now owned or hereafter acquired, other than Excluded Property.

"***Commitment***" means, with respect to any Lender at any time, the amount set
forth opposite such Lender's name on Schedule I hereto under the caption "Commitment"
or, if such Lender has entered into one or more Assignment and Acceptances, set forth
for such Lender in the Register maintained by the Administrative Agent pursuant to
Section 9.07(d) as such Lender's "Commitment."

"***Commodity Hedge and Power Sale Agreement***" means, with respect to power,
electricity, capacity, ancillary services, electric transmission, weather, fuel, fuel
transmission, fuel transportation, fuel storage, heat rate analysis, emissions allowances
and emissions credits and, in the case of each of the foregoing, products related thereto,
any swap, cap, collar, floor, ceiling, option, future, forward, spot agreement, contract for
differences, basis trade, purchase agreement, sale agreement, netting agreement, tolling
agreement or any other similar agreement, whether physical or financial, entered into
with respect to any commodity or commodity-related product.

"***Commodity Hedge Counterparty***" means any Person that (a) (i) is a commercial
bank, insurance company, investment fund or other similar financial institution (including
CS) or any Affiliate thereof which is engaged in the business of entering into Commodity
Hedge and Power Sale Agreements, (ii) is a public utility or (iii) is in the business of
selling, marketing, purchasing, transporting, distributing or storing electric energy, fuel,
oil, natural gas or weather-related derivatives, as applicable, and (b) at the time the
applicable Permitted Commodity Hedge and Power Sale Agreement is entered into, has a
Required Rating.

"***Communications***" has the meaning specified in Section 9.02(b).

6

"*Comparable Project*" means one or more electric generating facilities that are of a size and scope substantially similar to or greater than the Projects taken as a whole.

"*Confidential Information*" means information that any Loan Party furnishes to any Agent or any Lender designated as confidential, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender of its obligations hereunder or that is or becomes available to such Agent or such Lender from a source other than the Loan Parties that is not, to the best of such Agent's or such Lender's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Consolidated Adjusted EBITDA*" means, for any period (without duplication), an amount determined for the Borrower and its Subsidiaries on a Consolidated basis equal to (a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Cash Interest Expense, (iii) provisions for taxes based on income, (iv) Cash proceeds of any Permitted Emissions Sales Gains, (v) total depreciation expense, (vi) total amortization expense, (vii) other non-Cash items reducing Consolidated Net Income for such period, including unrealized losses attributable to the change in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements and accruals for liquidated damages and related late fees associated with the Distrigas Litigation described in Schedule 4.01(g) (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period), *minus* (b) to the extent included in determining Consolidated Net Income, other non-Cash items increasing Consolidated Net Income for such period, including unrealized gains attributable to the changes in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash items in any prior period). For purposes of this definition, Consolidated Adjusted EBITDA for each of the periods ending the last day of each of June, September and December 2006 shall be deemed to be $57,250,000, $57,250,000 and $57,250,000, respectively.

"*Consolidated Cash Interest Expense*" means, for any period, total interest expense (including that portion attributable to Capitalized Leases in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries on a Consolidated basis with respect to all outstanding Debt for Borrowed Money of the Borrower and its Subsidiaries for such period, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net obligations under Hedge Agreements, but excluding, however, (a) any amount for related late fees and interest associated with the Distrigas Litigation described in Schedule 4.01(g), (b) interest payable under the Borrower's fuel oil inventory program permitted pursuant to Section 5.02(b)(v)(B) and (c) interest and fees associated with RMR Revenues subject to refund. For purposes of determining Consolidated Cash Interest Expense for any period

ending prior to January 1, 2008, Consolidated Cash Interest Expense shall be deemed to be: (i) for the Fiscal Quarter ending March 31, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarter *multiplied by* (y) four (4), (ii) for the two Fiscal Quarters ending June 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) two (2), (iii) for the three Fiscal Quarters ending September 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) four-thirds (4/3), and (iv) for the four Fiscal Quarters ending December 31, 2007, actual Consolidated Cash Interest Expense for such Fiscal Quarters.

"*Consolidated Net Income*" means, for any period, (a) the net income (or loss) of the Borrower and its Subsidiaries on a Consolidated basis for such period determined in conformity with GAAP, *minus* (b) to the extent otherwise included in Consolidated Net Income, (i) the income of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (ii) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Plan, (iii) (to the extent not included in clauses (i) and (ii) above) any net extraordinary gains or net extraordinary losses and (iv) income attributable to the RMR Agreement (other than Permitted RMR Revenues) *plus* (c) without duplication, Permitted RMR Revenues. In addition, Consolidated Net Income for any period shall reflect expenses associated with long-term service agreements on the basis of equivalent operating hours incurred during such period (instead of on the basis of maintenance work performed during such period as required by GAAP).

"*Consolidated Total Debt*" means, as at any date of determination, the aggregate stated balance sheet amount of all Debt for Borrowed Money of the Borrower and its Subsidiaries determined on a Consolidated basis in accordance with GAAP.

"*Contractual Obligations*" means, as applied to any Person, any provision of any Equity Interests issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"*Control*" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Conversion,*" "*Convert*" and "*Converted*" each refer to a conversion of Loans of one Type into Loans of the other Type pursuant to Section 2.09 or 2.10.

"*CS*" has the meaning specified in the recital of parties to this Agreement.

"*Cure Notice*" has the meaning specified in Section 5.04(c)(ii).

8

"***Debt***" of any Person means, without duplication, (a) Debt for Borrowed Money of such Person, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue (unless being contested in good faith by appropriate proceedings for which reserves and other appropriate provisions, if any, required by GAAP shall have been made) by more than ninety (90) days incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (g) all obligations of such Person in respect of Hedge Agreements and Commodity Hedge and Power Sale Agreements (valued at the Agreement Value thereof), in each case, pursuant to an International Swap Dealers Association agreement, form or other similar arrangement, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations.

"***Debt for Borrowed Money***" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, and (b) all Synthetic Debt of such Person at such date; *provided* that with respect to each of clauses (a) and (b) above, any amounts associated with unutilized and undrawn amounts under the Synthetic L/C Facility and the Revolving Credit Facility (each as defined in the First Lien Credit Agreement) shall not be deemed Debt for Borrowed Money.

"***Declining Lender***" has the meaning set forth in Section 2.06(c).

"***Default***" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"***Default Interest***" has the meaning set forth in Section 2.07(b).

"***Depositary***" has the meaning specified in the Security Deposit Agreement.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

"*Distribution*" has the meaning set forth in the preliminary statements to this Agreement.

"*Distrigas Guaranty*" means the guaranty dated as of January 15, 2000, by Exelon New England Holdings, LLC, a Delaware limited liability company, in favor of Distrigas of Massachusetts Corporation and its successors.

"*Distrigas Litigation*" means that certain case pending in the Suffolk County, Massachusetts Superior Court (Civil Action No: 05-0764) entitled Distrigas of Massachusetts, LLC v. Mystic Development and Exelon New England, LLC, as described in Schedule 4.01(g).

"*Dollars*" and the sign "*$*" mean the lawful currency of the United States of America.

"*Domestic Lending Office*" means, with respect to any Lender, the office of such Lender specified as its "*Domestic Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender, as the case may be, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"*Early Termination Event*" has the meaning specified in the Intercreditor Agreement.

"*EBG Holdings*" means EBG Holdings LLC, a Delaware limited liability company.

"*EBG Holdings O&M Costs*" has the meaning specified in the Security Deposit Agreement.

"*EBG Holdings Tax Liabilities*" has the meaning specified in the Security Deposit Agreement.

"*Effective Date*" has the meaning specified in Section 3.01.

"*Eligible Assignee*" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed); *provided, however,* that no Loan Party shall qualify as an Eligible Assignee under this definition.

"*Eligible Permitted Commodity Hedge and Power Sale Agreement*" means any Permitted Commodity Hedge and Power Sale Agreement entered into by any Loan Party which, at the time such Permitted Commodity and Hedge and Power Sale Agreement is entered into, is structured such that the Commodity Hedge Counterparty's credit exposure and active or projected mark-to-market exposure to the Borrower or any other Loan Party

10

is positively correlated with the price of the relevant commodity (including "spark spread"), including the Initial Commodity Hedge and Power Sale Agreement.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, written notice of non compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"*Environmental Law*" means any Federal, state or local statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Materials, health or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Cure*" has the meaning specified in Section 5.04(c)(i).

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"*Equity Issuance*" has the meaning specified in the Security Deposit Agreement.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 414(b) or (c) of the Internal Revenue Code.

11

"***ERISA Event***" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"***Eurocurrency Liabilities***" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"***Eurodollar Lending Office***" means, with respect to any Lender, the office of such Lender specified as its "*Eurodollar Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"***Eurodollar Rate***" means, for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing, an interest rate *per annum* equal to the rate *per annum* obtained by dividing (a) the rate *per annum* determined by the Administrative Agent by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which had been nominated by the British Bankers' Association as a authorized information vendor for the purpose of displaying such rates) as the London interbank offered rate for deposits in U.S. dollars at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period for a period equal to such Interest Period (*provided* that, if for any reason such rate is not available, the term "*Eurodollar Rate*" shall mean, for any Interest Period, the rate *per annum* determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered to major banks in the London

interbank market in London, England at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period) by (b) a percentage equal to 100% *minus* the Eurodollar Rate Reserve Percentage for such Interest Period.

"*Eurodollar Rate Loan*" means a Loan that bears interest as provided in Section 2.07(a)(ii).

"*Eurodollar Rate Reserve Percentage*" for any Interest Period for all Eurodollar Rate Loans comprising part of the same Borrowing means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Loans) having a term equal to such Interest Period.

"*Event of Eminent Domain*" has the meaning specified in the Security Deposit Agreement.

"*Events of Default*" has the meaning specified in Section 6.01.

"*EWG*" has the meaning specified in Section 4.01(v).

"*Excess Duration Transaction*" has the meaning specified in Section 5.02(l).

"*Excluded Property*" has the meaning specified in the Intercreditor Agreement.

"*Existing Credit Agreements*" means, collectively, (i) the Amended and Restated First Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the First Lien Term Lenders named therein, the Working Capital Lenders named therein, the LC Lenders named therein, the LC-DSR Lenders named therein, CS, as First Lien Administrative Agent and CS, as Collateral Agent and (ii) the Amended and Restated Second Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the Second Lien Lenders named therein, CS, as Second Lien Administrative Agent and CS, as Collateral Agent.

"*Existing Debt*" means Debt of each Loan Party outstanding immediately before the occurrence of the Effective Date.

"*Existing Letters of Credit*" means each letter of credit set forth on Schedule 2.03(i).

13

"*Facility*" means, at such time, the aggregate amount of Commitments at such time.

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate *per annum* equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Fee Letter*" means the fee letter dated November 20, 2006 between the Borrower and CS as Administrative Agent and Second Lien Collateral Agent, as amended.

"*FERC*" means the Federal Energy Regulatory Commission and its successors.

"*Financial Covenants*" has the meaning specified in Section 5.04(c).

"*First Lien Administrative Agent*" has the meaning specified in the preliminary statements to this Agreement.

"*First Lien Collateral Agent*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Collateral Documents*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Credit Agreement*" has the meaning specified in the preliminary statements to this Agreement.

"*First Lien Lenders*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Loans*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Loan Documents*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Obligations*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Secured Parties*" has the meaning specified in the Intercreditor Agreement.

"*First Offer*" has the meaning specified in Section 2.06(c).

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

"*Fiscal Year*" means a fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"*Fore River*" means Fore River Development, LLC, a Delaware limited liability company.

"*Fore River Project*" means a combined-cycle electric generating facility in Weymouth and Quincy, Massachusetts and owned by Fore River with a nominal capacity of 807 MW in operation.

"*FPA*" means the Federal Power Act, as amended.

"*Fund*" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"*Funding Account*" has the meaning specified in the Security Deposit Agreement.

"*GAAP*" has the meaning specified in Section 1.03.

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"*Granting Lender*" has the meaning specified in Section 9.07(j).

"*Guaranteed Debt*" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to

15

maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in Section 8.01.

"*Guarantors*" means BG Boston Services, LLC, BG New England Power Services, Inc. and each of the Project Companies and each other Person becoming a party hereto pursuant to Section 5.01(k) by the execution and delivery of a Joinder Agreement substantially in the form attached hereto as Exhibit J.

"*Guaranty*" means the guaranty of the Guarantors set forth in Article VIII.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements but excluding any Commodity Hedge and Power Sale Agreement.

"*Hedge Bank*" means any Person that is a commercial bank, insurance company or other similar financial institution, or any Affiliate thereof, that (a) is engaged in the business of entering into interest rate Hedge Agreements and (b) at the time the applicable Hedge Agreement is entered into, has a Required Rating.

"*Indemnified Costs*" has the meaning specified in Section 7.05(a).

"*Indemnified Party*" has the meaning specified in Section 9.04(b).

"*Independent Engineer*" means any independent consulting engineer reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lenders from time to time, including, as of the date hereof, Black & Veatch Corporation.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

"*Independent Insurance Consultant*" means any independent insurance consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lenders from time to time, including, as of the date hereof, ARM Tech, a division of AON Risk Services, Inc.

"*Independent Power Market Consultant*" means any independent power market consultant reasonably acceptable to the Administrative Agent retained on behalf of or for the benefit of the Lenders from time to time, including, as of the date hereof, Navigant Consulting, Inc.

"*Initial Banks*" means the Administrative Agent, the Second Lien Collateral Agent, each Co-Syndication Agent, each Co-Documentation Agent, each Joint Book Running Manager and each Joint Lead Arranger.

"*Initial Commodity Hedge and Power Sale Agreements*" means, collectively:

      (a)    the ISDA Master Agreement dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

      (b)    the Schedule to the 1992 ISDA Master Agreement dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

      (c)    two Confirmations to Credit Suisse Energy LLC Re:  Financial Put Swaption – Cash Settled dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC; and

      (d)    two Confirmations to Credit Suisse Energy LLC Re:  Financial Swap – Cash Settled dated as of November 20, 2006 between Credit Suisse Energy LLC and Boston Generating, LLC;

in each case as amended.

"*Initial Extension of Credit*" means the initial Borrowing.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Operating Budget*" has the meaning specified in <u>Section 3.01(a)(xiii)</u>.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"*Insurance Proceeds*" has the meaning set forth in the Security Deposit Agreement.

17

"*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, substantially in the form attached hereto as Exhibit G, dated as of December 21, 2006, by and among the Borrower, the Guarantors, EBG Holdings, the First Lien Collateral Agent, the Second Lien Collateral Agent, First Lien Administrative Agent, the Administrative Agent, certain Commodity Hedge Counterparties and the other Persons party thereto from time to time, as amended.

"*Interest Coverage Ratio*" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period then ended to (b) Consolidated Cash Interest Expense for such four-Fiscal Quarter period.

"*Interest Period*" means, for each Eurodollar Rate Loan comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Loan or the date of the Conversion of any Base Rate Loan into such Eurodollar Rate Loan, and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months, or, if available to each Lender, nine or twelve months or such other period acceptable to the Administrative Agent, as the Borrower may, upon notice received by the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, select; *provided, however,* that:

(a)    the Borrower may not select any Interest Period with respect to any Eurodollar Rate Loan under a Facility that ends after any principal repayment installment date for such Facility unless, after giving effect to such selection, the aggregate principal amount of Base Rate Loans and of Eurodollar Rate Loans having Interest Periods that end on or prior to such principal repayment installment date for such Facility shall be at least equal to the aggregate principal amount of Loans under such Facility due and payable on or prior to such date;

(b)    [Reserved];

(c)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, *provided, however,* that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(d)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month; and

18

(e) the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than eight (8) different dates (it being understood that there shall not be more than eight (8) contracts in respect of Eurodollar Rate Loans in effect at any one time).

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*Investment*" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "*Debt*" in respect of such Person.

"*Joinder Agreement*" means a Joinder Agreement substantially in the form of Exhibit J.

"*Joint Book Running Managers*" has the meaning specified in the recital of parties to this Agreement.

"*Joint Lead Arrangers*" has the meaning specified in the recital of parties to this Agreement.

"*K Road Manager*" means K Road BG Management, LLC, a Delaware limited liability company.

"*Lenders*" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 9.07 for so long as such Initial Lender or Person, as the case may be, shall be a party to this Agreement.

"*Leverage Ratio*" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Total Debt as of such day to (b) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"*Lien*" means, with respect to any Property, (a) any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such Property, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), relating to such Property, and (c) in the case of Equity Interests or debt securities, any purchase option, call or similar right of a third party with respect to such Equity Interests or debt securities. For the avoidance of doubt, "*Lien*" shall not include any netting or set-off arrangements under any Contractual Obligation

19

(other than Contractual Obligations constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms of the Loan Documents.

"*Loan*" has the meaning specified in <u>Section 2.01</u>.

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Intercreditor Agreement, (e) the Second Lien Collateral Documents and (f) the Fee Letter, in each case as amended.

"*Loan Parties*" means the Borrower and the Guarantors.

"*Local Accounts*" has the meaning specified in the Security Deposit Agreement.

"*Management and Operation Agreements*" means each of the Management and Operation Agreements each dated as of October 11, 2005 between K Road Manager and each of the Borrower and the Project Companies.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Change*" means any change, occurrence or development (including, without limitation, as a result of regulatory changes applicable to the Borrower or any of its Subsidiaries) that has had or could reasonably be expected to have a Material Adverse Effect.

"*Material Adverse Effect*" means a material adverse effect on (a) the condition (financial or otherwise), business, results or operations of the Borrower and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or the Lenders, taken as a whole, under any Loan Document or (c) the ability of the Loan Parties to perform their respective Obligations under the Loan Documents.

"*Material Contract*" means (a) each of the agreements set forth on Schedule 4.01(t), (b) any Permitted Commodity Hedge and Power Sale Agreement with a term in excess of fourteen (14) months after the first delivery or settlement thereunder, and (c) any other Contractual Obligation (other than the Loan Documents or any Related Document) entered into after the date hereof by any Loan Party for which breach, nonperformance or cancellation could reasonably be expected to have a Material Adverse Effect.

"*Maturity Date*" means June 20, 2014.

"*Mezzanine Documents*" means the Credit Agreement dated as of December 21, 2006 among EBG Holdings, the financial institutions and lenders party thereto from time to time and CS, as administrative agent and each of the other Loan Documents referred to therein (other than the Fee Letter referred to therein).

20

"***Moody's***" means Moody's Investors Services, Inc.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"***Mystic 8&9 Project***" means two (2) combined-cycle electric generating facilities with a combined nominal capacity of 1614 MW in operation in Everett, Massachusetts owned by Mystic Development.

"***Mystic Development***" means Mystic Development, LLC, f/k/a Exelon Mystic Development LLC, a Delaware limited liability company.

"***Mystic I***" means Mystic I, LLC, a Delaware limited liability company.

"***Mystic Station Project***" means an electric generating facility with a nominal capacity of 576 MW in operation in Everett, Massachusetts and owned by Mystic I.

"***Net Cash Proceeds***" has the meaning specified in the Security Deposit Agreement.

"***Non-Consenting Lender***" has the meaning specified in Section 9.01(c).

"***Note***" means a promissory note of the Borrower payable to the order of any Lender, in substantially the form of Exhibit A hereto, evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, as amended.

"***Notice of Borrowing***" has the meaning specified in Section 2.02(a).

"***NPL***" means the National Priorities List under CERCLA.

"***Obligation***" means all payment obligations of every nature of each Loan Party from time to time owed to any Agent (including former Agents) or any Lender from time to time under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

21

"*Offer Period*" has the meaning specified in Section 2.15(a).

"*Other Taxes*" has the meaning specified in Section 2.12(b).

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Permitted Commodity Hedge and Power Sale Agreement*" means (a) Permitted Trading Activity entered into by any Loan Party and a Commodity Hedge Counterparty, including, without limitation, the Initial Commodity Hedge and Power Sale Agreements and (b) the transactions pursuant to each of the Material Contracts set forth on Part II of Schedule 4.01(t) (as amended, modified or replaced).

"*Permitted Development*" means, after the Effective Date, the development or construction of any electric generating facility; *provided* that at the time any amount is invested (or committed to be invested) in respect of Permitted Developments that exceeds amounts permitted to be invested pursuant to Section 5.02(f)(ix) each of the following conditions are met:

(a)     the Permitted Development is financed with amounts permitted pursuant to Sections 5.02(b)(iii) and 5.02(f)(viii);

(b)     the Independent Engineer shall have certified that any such development or construction would not reasonably be expected to materially and adversely impact the operation of the Projects or the efficient generation and distribution of electricity from the Projects (both during and after such development or construction) and shall have confirmed to the Lenders that amounts invested and committed to be invested by the Borrower and the Guarantors are sufficient to pay for all costs associated therewith; and

(c)     each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Facility (as in effect immediately prior to giving effect to such Permitted Development).

"*Permitted Development Subsidiary*" means any Subsidiary of a Loan Party created in connection with any Permitted Development.

"*Permitted Emissions Sales Gains*" means gains (determined in accordance with GAAP) from the sales of Accumulated Emissions Credits to the extent such proceeds are deposited into the Revenue Account in accordance with the Security Deposit Agreement.

"*Permitted Encumbrances*" means the Liens and encumbrances of record identified in the Second Lien Mortgage Policies as of the Effective Date.

22

"*Permitted Liens*" means (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business (i) for amounts that are not overdue or (ii) for amounts that are overdue that (A) do not materially adversely affect the use of, and which do not individually or in the aggregate materially affect the value of, the Property to which they relate or (B) are bonded or are being contested in good faith by appropriate proceedings for which reserve and other appropriate provisions, if any, required by GAAP shall have been made; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation, unemployment insurance, social security legislation or other similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens arising from judgments (or the payment of money not constituting a Default under Section 6.01(h)) or securing appeal or other surety bonds related to such judgments; (f) Permitted Encumbrances; and (g) easements, rights-of-way, restrictions, encroachments and other minor defects or irregularities in title and any zoning (or other similar restrictions to, or vested in, any governmental office or agency to control or regulate the use of any Real Property), that individually or in the aggregate do not materially adversely affect the value of said Real Property or materially impair the ability of the Loan Parties to operate the Real Property to which they relate in the ordinary course of business.

"*Permitted RMR Revenues*" means, for any period, funds transferred to the Revenue Account pursuant to Section 3.15(a)(iv) of the Security Deposit Agreement; *provided* that for purposes of determining the applicable Fiscal Quarter to which such funds will be included in Consolidated Net Income, funds transferred within 45 days following any Fiscal Quarter shall be deemed, at the option of the Borrower, to be included (without duplication) in Consolidated Net Income for such Fiscal Quarter or the immediately preceding Fiscal Quarter.

"*Permitted Second Lien Payment Date*" means each Funding Date (as defined in the Security Deposit Agreement) on which the following conditions are met: (a) all First Lien Loans under, and First Lien Obligations then due and owing in respect of, the Facilities (as defined in the First Lien Credit Agreement) shall have been repaid in full and (b) amounts on deposit in, or credited to, the Synthetic L/C Cash Collateral Account (as defined in the Security Deposit Agreement) shall be equal to at least 103% of the unused Commitment of the Synthetic Issuing Bank (as defined in the First Lien Credit Agreement) under the Synthetic L/C Facility (as defined in the First Lien Credit Agreement) and the Available Amount (as defined in the First Lien Credit Agreement) of any issued and outstanding Synthetic Letters of Credit (as defined in the First Lien Credit Agreement).

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

"***Permitted Trading Activity***" means the entry into of any Commodity Hedge and Power Sale Agreement in a manner consistent with Prudent Industry Practice from time to time in support of the marketing and trading related to the Projects or any Permitted Development, whether physical or financial, in each case, to the extent such activity is conducted in the ordinary course of business of the Borrower and the other Loan Parties.

"***Person***" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"***Plan***" means a Single Employer Plan or a Multiple Employer Plan.

"***Platform***" has the meaning specified in Section 9.02(b).

"***Pledged Debt***" has the meaning specified in the Second Lien Security Agreement.

"***Preferred Interests***" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

"***Prepayment Account***" has the meaning specified in the Security Deposit Agreement.

"***Prepayment Amount***" has the meaning specified in Section 2.06(c).

"***Pro Rata Share***" of any amount means, with respect to any Lender at any time and with respect to the Facility, the product of such amount *times* a fraction the numerator of which is the amount of Loans owed to such Lender under the Facility at such time and the denominator of which is the aggregate amount of the Loans then outstanding and owed to all Lenders under the Facility at such time.

"***Project Company***" means each of Mystic I, Mystic Development and Fore River (and collectively, the "***Project Companies***").

"***Projects***" means Mystic Station Project, Mystic 8&9 Project, Fore River Project and, if applicable, the Permitted Development.

"***Property***" means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether intangible or tangible.

"***Prudent Industry Practice***" means those practices, methods, equipment, specifications and standards of safety and performance, as are commonly used by electric

generating stations in the United States utilizing comparable fuels as good, safe and prudent engineering practices would dictate in connection with the design, construction, operation, maintenance, repair and use of electrical and other equipment, facilities and improvements of such electrical generating stations, with commensurate standards of safety, performance, dependability (including the implementation of procedures that shall not adversely affect the long term reliability of the Projects, in favor of short term performance), efficiency and economy, in each such case as the same may evolve from time to time, consistent with applicable law and considering the state in which a Project is located and the type and size of such Project. "*Prudent Industry Practice*" as defined herein does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

"*PUHCA*" has the meaning specified in Section 4.01(v).

"*Pullback Amount*" means, for any Fiscal Year, the amount (not to exceed $10,000,000) of the Base Capex Allowance for the following Fiscal Year which the Borrower, in its sole discretion, allocates to Capital Expenditures in the current Fiscal Year.

"*Qualified Owner*" means any Person (including any Person Controlled by such Person) that (a) is a past or present owner of a Comparable Project, (b) has substantial experience as an operator of a Comparable Project or (c) has contracted for the operation of the Projects by K Road Manager or by a Person meeting the requirements of clause (b) of this definition.

"*Real Properties*" means each item of Property listed on Schedules 4.01(r) and 4.01(s) hereto and any other real property subsequently acquired by any Loan Party covered by Section 5.01(j) hereof.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Register*" has the meaning specified in Section 9.07(d).

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Related Documents*" means the Initial Commodity Hedge and Power Sale Agreements, the First Lien Loan Documents, the Mezzanine Documents and the Secured Hedge Agreements.

25

"***Related Fund***" means, with respect to any Lender that is a Fund, any other Fund that is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"***Repayment Event***" means the satisfaction of the following conditions: (a) the repayment in full in Cash of all of the outstanding principal amount of the Loans and all other Obligations (other than contingent Obligations) due and payable under the Loan Documents and (b) the termination of all Commitments.

"***Replacement Commodity Hedge and Power Sale Agreement***" means, with respect to any Initial Commodity Hedge and Power Sale Agreement and the Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s), any Eligible Permitted Commodity Hedge and Power Sale Agreement entered into by any Loan Party after the date hereof: (a) with a termination date that is no earlier than the termination date of the relevant Eligible Permitted Commodity Hedge and Power Sale Agreement it replaces; (b) that is otherwise on terms substantially consistent with, or more favorable to the Loan Parties than, the relevant Eligible Permitted Commodity Hedge and Power Sale Agreement it replaces; and (c) with respect to which the Borrower has delivered to the Administrative Agent amended projections giving pro forma effect to such replacement Eligible Permitted Commodity Hedge and Power Sale Agreement prepared in good faith based on reasonable assumptions in light of the conditions existing at such time and showing to the reasonable satisfaction of the Administrative Agent compliance with Section 5.04 at all times until the earlier of (i) the Maturity Date or (ii) the termination date applicable to such replacement Eligible Permitted Commodity Hedge and Power Sale Agreement.

"***Replacement Material Contract***" shall mean any one or more contracts entered into in replacement of an existing Material Contract (i) with terms taken as a whole, as favorable to the Loan Parties as can be obtained based on market conditions prevailing at such time and (ii) with one or more counterparties (including any guarantor of, or letter of credit or other credit support providers to, such counterparty's obligations) having substantially similar creditworthiness on the date of such replacement as the counterparty to the Material Contract being replaced.

"***Required Lenders***" means, at any time, Lenders owed or holding more than 50% of the aggregate principal amount of the Loans outstanding at such time.

"***Required Rating***" means with respect to (a) any Commodity Hedge Counterparty that is described in clause (a)(i) of the definition of "*Commodity Hedge Counterparty*" or any Hedge Bank either (i) the unsecured senior debt obligations of such Person are rated at least A3 by Moody's and at least A- by S&P or (ii) such Person's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement or Secured Hedge Agreement, as the case may be, are guaranteed by (or supported by a letter of credit provided by) a Person whose unsecured senior debt obligations are rated at least A3 by Moody's and at least A- by S&P and (b) any other Commodity Hedge Counterparty either (i) the unsecured senior debt obligations of such

26

Person are rated at least Baa3 by Moody's and at least BBB- by S&P, (ii) such Commodity Hedge Counterparty's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement are guaranteed by a Commodity Hedge Counterparty that is described in <u>clause (a)(ii)</u> of the definition of "Commodity Hedge Counterparty" whose unsecured senior debt obligations are rated at least Baa3 by Moody's and at least BBB- by S&P or (iii) such Commodity Hedge Counterparty's obligations under any applicable Permitted Commodity Hedge and Power Sale Agreement are supported by a letter of credit provided by a Person whose unsecured senior debt obligations are rated at least A3 by Moody's and at least A- by S&P.

"***Responsible Officer***" means, as to any Person, any individual holding the position of chairman of the board (if an officer), president, chief executive officer, senior vice president, treasurer, chief financial officer or director of finance.

"***Revenue Account***" has the meaning specified in the Security Deposit Agreement.

"***RMR Agreement***" means the Cost-of-Service Agreement, effective as of January 1, 2006, among Mystic Development, LLC, Sempra Energy Trading Corp. and ISO New England Inc.

"***RMR Revenues***" has the meaning specified in the Security Deposit Agreement.

"***S&P***" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"***Second Lien Collateral Agent***" has the meaning specified in the recital of parties to this Agreement.

"***Second Lien Collateral Documents***" means the Second Lien Pledge Agreement, Second Lien Security Agreement, the Security Deposit Agreement, the Second Lien Mortgages, each Second Lien Consent and Agreement, each of the collateral documents, instruments and agreements delivered pursuant to <u>Section 5.01(j)</u>, and each other agreement that creates or purports to create a Lien in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties.

"***Second Lien Consent and Agreement***" means (a) with respect to the Initial Commodity Hedge and Power Sale Agreement, a consent and agreement in substantially the form attached hereto as <u>Exhibit F-1</u>, and (b) with respect to any Material Contract entered into after the Effective Date, (i) if such Material Contract is a Permitted Commodity Hedge and Power Sale Agreement, a consent and agreement in favor of the Second Lien Collateral Agent (for the benefit of the Second Lien Secured Parties) in substantially the form attached hereto as <u>Exhibit F-1</u> and (ii) in the case of any other such Material Contract, a consent and agreement in favor of the Second Lien Collateral Agent (for the benefit of the Second Lien Secured Parties) in substantially the form attached

27

hereto as Exhibit F-2 or, in either case, otherwise in form and substance reasonably satisfactory to the Second Lien Collateral Agent and the Administrative Agent.

"*Second Lien Debt Service Reserve Requirement*" means (a) on the Effective Date, $16,700,000 and (b) on any date of determination occurring after the Effective Date, an amount equal to 100% of the sum of the reasonably anticipated aggregate interest and fees payable during the following six (6) month period occurring after such date of determination in respect of the Facility.

"*Second Lien Mortgage Policies*" has the meaning specified in Section 3.01(a)(iv).

"*Second Lien Mortgages*" has the meaning specified in Section 3.01(a)(iv) and shall include any other deed of trust, trust deed, mortgage, leasehold mortgage or leasehold deed of trust delivered from time to time after the date hereof pursuant to Section 5.01(j), in each case as amended.

"*Second Lien Obligations*" has the meaning specified in the Intercreditor Agreement.

"*Second Lien Pledge Agreement*" means that certain Second Lien Pledge Agreement substantially in the form of Exhibit L and dated as of December 21, 2006 by EBG Holdings in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties, as amended.

"*Second Lien Secured Parties*" has the meaning specified in the Intercreditor Agreement.

"*Second Lien Security Agreement*" means that certain Second Lien Security Agreement substantially in the form of Exhibit K and dated December 21, 2006 by the Borrower and the Guarantors in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties, as amended.

"*Second Offer*" has the meaning specified in Section 2.06(c).

"*Secured Hedge Agreement*" has the meaning specified in the First Lien Credit Agreement.

"*Secured Party*" has the meaning specified in the Intercreditor Agreement.

"*Security Deposit Agreement*" means that certain Security Deposit Agreement substantially in the form of Exhibit H dated December 21, 2006 by the Borrower, the Guarantors, the First Lien Collateral Agent, the Second Lien Collateral Agent and the Depositary, as amended.

28

"*Semi-Annual Prepayment Date*" has the meaning specified in the Security Deposit Agreement.

"*Single Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"*Solvent*" and "*Solvency*" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property and assets of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature (taking into account reasonably anticipated prepayments and refinancings) and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*SPC*" has the meaning specified in <u>Section 9.07(j)</u>.

"*Subordinated Obligations*" has the meaning specified in <u>Section 8.05</u>.

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Surviving Debt*" means Debt of each Loan Party outstanding after giving effect to the Initial Extension of Credit on the Effective Date (other than Debt secured by the First Lien Collateral Documents and the Second Lien Collateral Documents).

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," the principal amount of all (a) obligations of such

29

Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" has the meaning specified in Section 2.12(a).

"*Tender Offer*" shall mean, collectively, (a) the offer by EBG Holdings to purchase outstanding units of limited liability company interest in EBG Holdings pursuant to the Offer to Purchase dated as of November 16, 2006 and the related letter of transmittal sent to holders of such units, as each may be amended and supplemented from time to time and (b) the repurchase of warrants and the cashless exercise of warrants referred to in such Offer to Purchase.

"*Terms of Subordination*" means the Terms of Subordination attached hereto as Exhibit M.

"*Title Company*" means Lawyers Title Insurance Corporation.

"*Transaction*" means (a) the entering into of the Initial Commodity Hedge and Power Sale Agreements, (b) the Distribution and the Tender Offer, (c) the entering into of the First Lien Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under the First Lien Credit Agreement, (d) the entering into of the Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under this Agreement, (e) the entering into of the Mezzanine Documents and (f) the other transactions contemplated by the Transaction Documents.

"*Transaction Costs*" has the meaning set forth in the preliminary statements hereto.

"*Transaction Documents*" means, collectively, the Loan Documents and the Related Documents.

"*Type*" refers to the distinction between Loans bearing interest at the Base Rate and Loans bearing interest at the Eurodollar Rate.

"*UCC Fixture Filing*" has the meaning specified in Section 3.01(a)(iv)(A).

"*Units*" means units of limited liability company interests in EBG Holdings.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"*Withdrawal Liability*" has the meaning specified in Part 1 of Subtitle E of Title IV of ERISA.

SECTION 1.02. <u>Computation of Time Periods; Other Definitional Provisions</u>.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding."  References in the Loan Documents to any agreement or contract "*as amended*" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03. <u>Accounting Terms</u>.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in effect in the United States from time to time ("*GAAP*"); *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

SECTION 2.01. <u>The Loans</u>.  Each Lender severally agrees, on the terms and conditions hereinafter set forth, to make a single advance (a "*Loan*") to the Borrower on the Effective Date in an amount not to exceed such Lender's Commitment at such time.  The Borrowing shall consist of Loans made simultaneously by the Lenders ratably according to their Commitments.  Amounts borrowed under this <u>Section 2.01</u> and repaid or prepaid may not be reborrowed.

SECTION 2.02. <u>Making the Loans</u>.  (a)  The Borrowing shall be made on notice, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Borrowing, in the case of a Borrowing consisting of Eurodollar Rate Loans, or the same Business Day of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Loans, by the Borrower to the Administrative Agent, which shall give to each Lender prompt notice thereof by telecopier or electronic communication.  Each such notice

31

of a Borrowing (a "***Notice of Borrowing***") shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B hereto, specifying therein the requested (i) date of such Borrowing, (ii) Types of Loans comprising such Borrowing, (iii) aggregate amount of such Borrowing and (iv) in the case of a Borrowing consisting of Eurodollar Rate Loans, the initial Interest Period for each such Loan. Each Lender shall, before 11:00 A.M. (New York City time) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Borrowing in accordance with its respective Commitment. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting the Funding Account.

(b)    Anything in subsection (a) above to the contrary notwithstanding, the Borrower may not select Eurodollar Rate Loans for any Borrowing if the obligation of the Lenders to make Eurodollar Rate Loans shall then be suspended pursuant to Section 2.09 or 2.10.

(c)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. In the case of any Borrowing that the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Loans, the Borrower shall indemnify each Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Loan to be made by such Lender as part of such Borrowing when such Loan, as a result of such failure, is not made on such date.

(d)    Unless the Administrative Agent shall have received notice from an Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Borrowing for all purposes.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

(e)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03.  [Reserved].

SECTION 2.04.  Repayment of Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date the aggregate principal amount of the Loans then outstanding.

SECTION 2.05.  [Reserved].

SECTION 2.06.  Prepayments.

(a)    Optional.  From and after the Permitted Second Lien Payment Date (unless otherwise permitted by the First Lien Loan Documents or consented to by the First Lien Lenders), the Borrower may, upon at least one (1) Business Day's irrevocable notice in the case of Base Rate Loans and three (3) Business Days' irrevocable notice in the case of Eurodollar Rate Loans, in each case to the Administrative Agent (*provided* that, if a notice is conditioned upon the effectiveness of other credit facilities or any incurrence or issuance of debt or equity, such notice may be revoked by the Borrower (by notice to the Administrative Agent) if such credit facilities do not become effective or such other transaction does not close, subject to the obligations of the Borrower under Section 9.04(c)) stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall prepay the outstanding aggregate principal amount of the Loans comprising part of the same Borrowing in whole or ratably in part, together with accrued and unpaid interest to the date of such prepayment; *provided, however,* that (i) each partial prepayment shall be in an aggregate principal amount of $1,000,000 or an integral multiple of $500,000 in excess thereof, (ii) if any prepayment of a Eurodollar Rate Loan is made on a date other than the last day of an Interest Period for such Loan, the Borrower shall also pay any amounts owing pursuant to Section 9.04(c) and (iii) the Borrower shall pay to the Administrative Agent, for the ratable benefit of the Lenders, the Call Premium, if any.

(b)    Mandatory.  (i)    Subject to the terms of the Security Deposit Agreement, the Borrower shall on the date specified in the last sentence of clause (c) below prepay an aggregate principal amount of the Loans plus accrued and unpaid interest thereon to the date of prepayment and any amounts owing pursuant to Section 9.04(c) comprising part of the same Borrowings with funds then on deposit in the Prepayment Account on each Semi-Annual Prepayment Date (other than Net Cash Proceeds (if any) referred to in clause (ii) below) in accordance with the provisions of priority *fifth* of Section 3.8 of the Security Deposit Agreement.

(ii)    Subject to the Security Deposit Agreement, following the receipt of any Net Cash Proceeds of any Casualty Event, Event of Eminent Domain, Asset Sale, Equity Issuance or the incurrence or issuance of any Debt (other than Debt permitted to be

33

incurred pursuant to Section 5.02(b)), the Borrower shall on the date specified in the last sentence of clause (c) below prepay an aggregate principal amount of the Loans plus accrued and unpaid interest thereon to the date of prepayment and any amounts owing pursuant to Section 9.04(c) in accordance with the provisions of priority *fifth* of Section 3.8 of the Security Deposit Agreement.

(c)    Procedures; Option to Decline. Not later than 11:00 a.m. (New York City time) on the Business Day following each Semi-Annual Prepayment Date, in the cause of clause (b)(i) above, or following the receipt of Net Cash Proceeds, in the case of clause (b)(ii) above, the Borrower shall notify the Administrative Agent of the amount that is available to prepay such Loans (the "***Prepayment Amount***"). On the date of receipt of such notice, or, if such notice is received after 11:00 A.M. (New York City time), on the next succeeding Business Day, the Administrative Agent shall provide written notice (the "***First Offer***") to the Lenders of the amount available to prepay the Loans. Any Lender, at its option, may elect not to accept any prepayment of such Loans pursuant to Section 2.06(b). Any Lender declining such prepayment (a "***Declining Lender***") shall give written notice thereof to the Administrative Agent by 11:00 a.m. (New York City time) no later than two Business Days after the date of such notice from the Administrative Agent. On such date the Administrative Agent shall then provide written notice (the "***Second Offer***") to the Lenders other than the Declining Lenders (such Lenders being the "***Accepting Lenders***") of the additional amount available (due to such Declining Lenders' declining such prepayment) to prepay such Loans owing to such Accepting Lenders. Any Lender declining prepayment pursuant to such Second Offer, shall give written notice thereof to the Administrative Agent by 11:00 a.m. (New York City time) no later than two Business Days after the date of such notice of a Second Offer, and, on such date, the Administrative Agent shall give written notice to the Borrower of the amount of the prepayments required to be made on the applicable prepayment date pursuant to Section 2.06(b), after giving effect to the First Offer and the Second Offer. The Borrower shall direct the prepayment of such Loans in accordance with the Security Deposit Agreement, in the aggregate amount specified in the notice from the Administrative Agent described in the immediately preceding sentence, within one Business Day after its receipt of notice from the Administrative Agent of the aggregate amount of such prepayment.

(d)    Application of Prepayment by Type of Loans. In connection with any voluntary prepayments by the Borrower pursuant to clause (a) above, any voluntary prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 9.04(c).

(e)    In connection with any mandatory prepayments by the Borrower of the Loans pursuant to clause (b) and Section 2.15, such prepayments shall be applied on a pro rata basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are Base Rate Loans or Eurodollar Rate Loans; *provided*, that if no Lenders exercise the right to waive a given mandatory prepayment of the Loans pursuant to clause (c) above or Section 2.15 then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Loans that are Base Rate Loans to the full extent thereof before

34

application to Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 9.04(c).

SECTION 2.07. Interest.

(a)     Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Loan owing to each Lender from the date of such Loan until such principal amount shall be paid in full, at the following rates per annum:

(i)     Base Rate Loans.  During such periods as such Loan is a Base Rate Loan, a rate per annum equal at all times to the sum of (A) the Base Rate in effect from time to time *plus* (B) the Applicable Margin in effect from time to time, payable in arrears quarterly on the last Business Day of each December, March, June and September during such periods and on the date such Base Rate Loan shall be Converted or paid in full commencing on the last Business Day of March 2007.

(ii)     Eurodollar Rate Loans.  During such periods as such Loan is a Eurodollar Rate Loan, a rate per annum equal at all times during each Interest Period for such Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Loan *plus* (B) the Applicable Margin in effect, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three (3) months, on each day that occurs during such Interest Period every three (3) months from the first day of such Interest Period and on the date such Eurodollar Rate Loan shall be Converted or paid in full.

(b)     Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the request of the Required Lenders shall, require that the Borrower pay interest ("***Default Interest***") on (i) the unpaid principal amount of each Loan owing to each Lender, payable in arrears on the dates referred to in clause (i) or (ii) of Section 2.07(a), as applicable, and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid on such Loan pursuant to clause (i) or (ii) of Section 2.07(a), as applicable, and (ii) to the fullest extent permitted by applicable law, the amount of any interest, fee or other amount payable under this Agreement or any other Loan Document to any Agent or any Lender that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate *per annum* equal at all times to 2% *per annum* above the rate *per annum* required to be paid on Base Rate Loans pursuant to clause (i) of Section 2.07(a); *provided, however,* that following the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, Default Interest shall accrue and be payable hereunder whether or not previously required by the Administrative Agent.  Payment or acceptance of the increased rates of interest provided for in this Section 2.07(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

(c)    Notice of Interest Period and Interest Rate. Promptly after receipt of a Notice of Borrowing pursuant to Section 2.02(a), a notice of Conversion pursuant to Section 2.09 or a notice of selection of an Interest Period pursuant to the terms of the definition of "*Interest Period*," the Administrative Agent shall give notice to the Borrower and each Lender of the applicable Interest Period and the applicable interest rate determined by the Administrative Agent for purposes of clause (a)(i) or (a)(ii) above.

SECTION 2.08. Fees. The Borrower shall pay to each Agent for its own account such fees as may from time to time be agreed between the Borrower and such Agent.

SECTION 2.09. Conversion of Loans.

(a)    Optional. The Borrower may on any Business Day, upon notice given to the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Section 2.10, Convert all or any portion of the Loans of one Type comprising the same Borrowing into Loans of the other Type; *provided, however*, that any Conversion of Eurodollar Rate Loans into Base Rate Loans shall be made only on the last day of an Interest Period for such Eurodollar Rate Loans or, if made on another date, shall be subject to the provisions of Section 9.04(c), any Conversion of Base Rate Loans into Eurodollar Rate Loans shall be in an amount not less than the minimum amount specified in Section 2.02(b), no Conversion of any Loans shall result in more separate Borrowings than permitted under Section 2.02(b) and each Conversion of Loans comprising part of the same Borrowing shall be made ratably among the Lenders in accordance with their Commitments. Each such notice of Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Loans to be Converted and (iii) if such Conversion is into Eurodollar Rate Loans, the duration of the initial Interest Period for such Loans. Each notice of Conversion shall be irrevocable and binding on the Borrower.

(b)    Mandatory. (i) If the Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Loans in accordance with the provisions contained in the definition of "*Interest Period*" in Section 1.01, the Administrative Agent will forthwith so notify the Borrower and the Lenders, whereupon each such Eurodollar Rate Loan shall have an Interest Period of one month.

(ii)    Upon the occurrence and during the continuance of any Event of Default, (x) each Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (y) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended.

SECTION 2.10. Increased Costs, Etc. (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender of agreeing to make or of making, funding or maintaining Eurodollar Rate Loans (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis or rate of

36

taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost. A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

(b)    If any Lender determines that compliance with any law or regulation or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender and that the amount of such capital is increased by or based upon the existence of such Lender's commitment to make Loans and other commitments of such type, then, upon demand by such Lender or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital to be allocable to the existence of such Lender's commitment to make Loans. A certificate as to such amounts submitted to the Borrower by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    If, with respect to any Eurodollar Rate Loans, Lenders owed at least 33⅓% of the then aggregate unpaid principal amount thereof notify the Administrative Agent that the Eurodollar Rate for any Interest Period for such Loans will not adequately reflect the cost to such Lenders of making, funding or maintaining their Eurodollar Rate Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon (i) each such Eurodollar Rate Loan under such Facility will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (ii) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended, in each case, until the Administrative Agent shall notify the Borrower that such Lenders have determined that the circumstances causing such suspension no longer exist, in which case the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated.

(d)    Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans hereunder, then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) each Eurodollar Rate Loan under which such Lender has a Commitment will automatically, upon such demand, Convert into a Base Rate Loan and (ii) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended, in each case, until the

37

Administrative Agent shall notify the Borrower that such Lender has determined that the circumstances causing such suspension no longer exist, in which case the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated; *provided, however,* that, before making any such demand, such Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Eurodollar Lending Office if the making of such a designation would allow such Lender or its Eurodollar Lending Office to continue to perform its obligations to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans and would not, in the judgment of such Lender, be otherwise disadvantageous to such Lender.

SECTION 2.11. <u>Payments and Computations</u>. (a) The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in <u>Section 2.13</u>), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day in the Administrative Agent's sole discretion. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    The Borrower hereby authorizes each Lender and each of its Affiliates, if and to the extent payment owed to such Lender is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender or such Affiliate any amount so due.

(c)    All computations of interest based on the Base Rate shall be made by the Administrative Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Except as otherwise provided under the Loan Documents, whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee or commission, as the case may be; *provided, however,* that, if such extension

38

would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Loans to which, or the manner in which, such funds are to be applied, the Administrative Agent may, if no instructions with respect thereto are received from the Lenders upon request, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the aggregate principal amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

SECTION 2.12.  Taxes.  (a)  Any and all payments by any Loan Party to or for the account of any Lender or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.11 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender and each Agent, (x) taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which such Lender or such Agent, as the case may be, is organized (or any political subdivision thereof), has its Applicable Lending Office, has a permanent establishment or is engaged in business (other than the business that the Lender is engaged in solely by reason of the transactions contemplated by this Agreement), (y) any branch profits taxes imposed by the United States of America and (z) withholding taxes imposed under law in effect on the date hereof or at the time the Lender designates a new Applicable Lending Office, other than any new Applicable Lending Office designated at the written request of a Loan Party (in the case of a Lender that is not an Initial Lender, this clause (z) shall include taxes imposed under law in effect on the date such Lender becomes a Lender, except to the extent that the Lender's predecessor would have been entitled to receive additional amounts under this Section 2.12(a)) and, in the case of each Lender, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of such Lender's Applicable Lending Office or any political subdivision thereof (all such non-excluded taxes, levies, imposts,

39

deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "*Taxes*"). If any Loan Party or the Administrative Agent shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, each Loan Party shall pay any present or future stamp, documentary, excise, property (including intangible property, but with regard to all property taxes, only to the extent relating to property of a Loan Party) mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under this Agreement or the other Loan Documents (hereinafter referred to as "*Other Taxes*").

(c)     The Loan Parties shall indemnify each Lender and each Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto. This indemnification shall be made within thirty (30) days from the date such Lender or such Agent (as the case may be) makes written demand therefor.

(d)     Within thirty (30) days after the date of any payment of Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent. In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Loan Party through an account or branch outside the United States or by or on behalf of a Loan Party by a payor that is not a United States person, if such Loan Party determines that no Taxes are payable in respect thereof, such Loan Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this Section 2.12, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)     Each Lender organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as

40

reasonably requested in writing by the Borrower (but only so long thereafter as such Lender remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two original Internal Revenue Service Forms W-8BEN or W-8ECI or (in the case of a Lender that has certified in writing to the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that such Lender is a foreign corporation, partnership, estate or trust. As provided in Section 2.12(a), if the forms provided by a Lender at the time such Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided, however*, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) of this Section 2.12 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, that the applicable Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)    For any period with respect to which a Lender has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.12 with respect to Taxes imposed by the United States by reason of such failure; *provided, however*, that should a Lender become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Lender shall reasonably request, at the Lender's sole expense and as long as the Loan Parties determine that such steps will not, in the reasonable judgment of the Loan Parties, be disadvantageous to the Loan Parties, to assist such Lender to recover such Taxes.

41

(g)    Any Lender claiming any additional amounts payable pursuant to this Section 2.12 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. In addition, if a Lender determines, in such Lender's sole discretion, that it has received a refund or credit in respect of any Taxes or Other Taxes as to which it has been indemnified pursuant to Section 2.12(c), or with respect to which additional amounts have been paid pursuant to Section 2.12(a), such Lender shall pay to the Borrower an amount equal to such refund (but such amount in no event to exceed the amount of any indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses of such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of such Lender, shall agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender subsequently determines that such refund or credit is unavailable under applicable law or is otherwise required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require a Lender to rearrange its tax affairs or to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(h)    The Administrative Agent shall deliver to each Loan Party on the Effective Date (and shall keep effective thereafter) two duly completed copies of Internal Revenue Service Form W-8IMY, or any successor or other form prescribed by the Internal Revenue Service, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with each Loan Party to be treated as a U.S. person with respect to such payments (and each Loan Party and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments), with the effect that each Loan Party can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

SECTION 2.13. Sharing of Payments, Etc. If any Lender shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 9.07), (a) on account of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) on account of Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender at such time to (ii) the aggregate amount of

42

the Obligations owing (but not due and payable) to all Lenders hereunder and under the other
Loan Documents at such time) of payments on account of the Obligations owing (but not due
and payable) to all Lenders hereunder and under the other Loan Documents at such time
obtained by all of the Lenders at such time, such Lender shall forthwith purchase from the other
Lenders such interests or participating interests in the Obligations as shall be necessary to cause
such purchasing Lender to share the excess payment ratably with each of them; *provided*,
*however*, that if all or any portion of such excess payment is thereafter recovered from such
purchasing Lender, such purchase from each other Lender shall be rescinded and such other
Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's
ratable share (according to the proportion of (i) the purchase price paid to such Lender to (ii) the
aggregate purchase price paid to all Lenders) of such recovery together with an amount equal to
such Lender's ratable share (according to the proportion of (i) the amount of such other Lender's
required repayment to (ii) the total amount so recovered from the purchasing Lender) of any
interest or other amount paid or payable by the purchasing Lender in respect of the total amount
so recovered. The Loan Parties agree that any Lender so purchasing an interest or participating
interest from another Lender pursuant to this Section 2.13 may, to the fullest extent permitted by
law, exercise all its rights of payment (including the right of set-off) with respect to such interest
or participating interest, as the case may be, as fully as if such Lender were the direct creditor of
the Loan Parties in the amount of such interest or participating interest, as the case may be.

SECTION 2.14. Use of Proceeds. The proceeds of the Loans shall be
available (and the Borrower agrees that it shall use such proceeds) solely (i) to refinance all
outstanding indebtedness under the Existing Credit Agreements, (ii) to provide working capital
for the Loan Parties, (iii) to fund the Distribution and the Tender Offer of EBG Holdings,
(iv) pay transaction fees and expenses and (v) provide funds for other general corporate and
working capital purposes.

SECTION 2.15. Change of Control Prepayment. (a) No later than three
(3) Business Days after the occurrence of a Change of Control, the Borrower shall through the
Administrative Agent offer to each Lender (by delivery of a prepayment offer to the
Administrative Agent) to prepay all (but not part) of its outstanding Loans in accordance with
this Section 2.15. The prepayment offer may be conditioned on the occurrence of such Change
of Control (if made prior to such occurrence) and otherwise shall be irrevocable and shall state:
(i) the proposed date of such prepayment and/or return (which date shall be no earlier than
(x) the end of the Offer Period and (y) the date of the applicable Change of Control and no later
than ten (10) Business Days from the date of the applicable Change of Control) (or, if later, the
end of the Offer Period); (ii) the prepayment price (which, with respect to each Lender, shall be
calculated as the sum of (A) the aggregate principal amount of the outstanding Loans made by
such Lender, (B) the greater of (x) an amount equal to 1.00% of the aggregate principal amount
of such outstanding Loans made by such Lender and (y) the Call Premium (if any), (C) all
accrued and unpaid interest on such Loans and (D) all accrued interest on the principal amount
being repaid, prepaid or returned and any amounts owing pursuant to Section 9.04(c)); (iii) that
each Lender that accepts such prepayment offer must accept such offer with respect to all (but
not part) of its Loans; (iv) that each Lender must accept such offer by delivering notice of such
acceptance to the Administrative Agent within ten (10) days after the date the Borrower makes

43

its offer to such Lender (the "*Offer Period*"); and (v) in reasonable detail, the nature of the applicable Change of Control and the projected impact of such Change of Control on the Projects, the operations thereof and the Borrower and the Guarantors.

(b)     The Borrower shall comply with the terms of each such prepayment offer. Each Lender shall have the right to accept such offer prior to the expiration of the applicable Offer Period.

(c)     [Reserved].

(d)     The Commitments of each Lender that accepts a prepayment offer in accordance with this Section 2.15 shall terminate in its entirety on the date such Lender's Loans are repaid or, if later, scheduled to be repaid or returned.

SECTION 2.16.  Evidence of Debt.  (a)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  The Borrower agrees that upon notice by any Lender to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender, the Borrower shall promptly execute and deliver to such Lender, with a copy to the Administrative Agent, a Note, as applicable, in substantially the form of Exhibit A hereto, respectively, payable to the order of such Lender in a principal amount equal to the Loans, respectively, of such Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)     The Register maintained by the Administrative Agent pursuant to Section 9.07(d) shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder, the Type of Loans comprising such Borrowing and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender's share thereof.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; *provided, however*, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

44

SECTION 2.17. <u>Duty to Mitigate.</u> In the event that any Lender demands payment of costs or additional amounts pursuant to <u>Section 2.10</u> or <u>2.12</u> or asserts, pursuant to <u>Section 2.10(d)</u>, that it is unlawful for such Lender to make Eurodollar Rate Loans then (subject to such Lender's right to rescind such demand or assertion within ten (10) days after the notice from the Borrower referred to below) the Borrower may, upon twenty (20) days' prior written notice to such Lender and the Administrative Agent, elect to cause such Lender to assign its Loans and Commitments in full to one or more Persons selected by the Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent, (ii) such Lender receives payment in full in cash of the outstanding principal amount of all Loans made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender as of the date of such assignment (including, without limitation, amounts owing pursuant to <u>Sections 2.10</u>, <u>2.12</u> and <u>9.04</u>) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender hereunder in accordance with <u>Section 9.07</u>.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01. <u>Conditions Precedent.</u> <u>Section 2.01</u> of this Agreement shall become effective on and as of the first date on or before December 21, 2006 (the "***Effective Date***") on which the following conditions precedent have been satisfied (and the obligation of each Lender to make a Loan on the occasion of the initial Borrowing hereunder is subject to the satisfaction of such conditions precedent before or concurrently with the Effective Date):

(a)    The Administrative Agent shall have received on or before the Effective Date the following, each dated as of such date (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)    The Notes payable to the order of the Lenders to the extent requested by the Lenders pursuant to the terms of <u>Section 2.16</u>.

(ii)    The Second Lien Security Agreement substantially in the form of <u>Exhibit K</u> duly executed by the Borrower, each Guarantor and the Second Lien Collateral Agent, together with:

(A)    confirmation reasonably satisfactory to the Administrative Agent that (1) certificates (if any) representing the Initial Pledged Equity (as defined in the Second Lien Security Agreement) accompanied by undated membership interest powers or stock powers, as applicable, executed in blank, and (2) instruments evidencing the Initial Pledged Debt (as defined in the Second Lien Security Agreement), indorsed in blank, in each case, have been delivered to the Second Lien Collateral Agent,

(B)    appropriately completed financing statements in form appropriate for filing under the Uniform Commercial Code in the State of

45

Delaware, covering the Collateral described in the Second Lien Security Agreement,

(C)    completed requests for information or similar search reports, dated on or not more than fourteen (14) days before the Effective Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name any Loan Party as debtor, together with copies of such other financing statements,

(D)    certified copies of each Material Contract,

(E)    each Second Lien Consent and Agreement in respect of each Initial Commodity Hedge and Power Sale Agreement and each other Material Contract then in effect (other than each of the Material Contracts set forth on Part III of Schedule 4.01(t)), duly executed by each party to such Initial Commodity Hedge and Power Sale Agreement or Material Contract, as applicable, and

(F)    evidence that all other action that the Administrative Agent and the Second Lien Collateral Agent may deem reasonably necessary in order to perfect and protect the second priority liens and security interests created under the Second Lien Security Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and UCC-3 termination statements).

(iii)    The Second Lien Pledge Agreement substantially in the form of Exhibit L duly executed by EBG Holdings and the Second Lien Collateral Agent, together with:

(A)    Confirmation reasonably satisfactory to the Administrative Agent that certificates, if any, representing the Initial Pledged Equity (as defined in the Second Lien Pledge Agreement) accompanied by undated membership interest powers or stock powers, as applicable, executed in blank have been delivered to the Second Lien Collateral Agent,

(B)    appropriately completed financing statements in form appropriate for filing under the Uniform Commercial Code in the State of Delaware, covering the Collateral described in the Second Lien Pledge Agreement,

(C)    completed requests for information or similar search reports, dated on or not more than fourteen (14) days before the Effective Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name EBG Holdings as debtor, together with copies of such other financing statements, and

46

(D)    evidence that all other action that the Administrative Agent and the Second Lien Collateral Agent may deem reasonably necessary in order to perfect and protect the second priority liens and security interests created under the Second Lien Pledge Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and UCC-3 termination statements).

(iv)    Original counterparts of the mortgages, deeds of trust or security deeds encumbering each of the Real Properties and substantially in the form of Exhibit D (the "*Second Lien Mortgages*") duly executed and delivered by the appropriate Loan Party in recordable form, together with:

(A)    to the extent necessary under applicable law, Uniform Commercial Code Financing Statements covering fixtures ("*UCC Fixture Filings*") appropriately completed for filing in the appropriate filing or recording offices,

(B)    evidence that counterparts of the Second Lien Mortgages and UCC Fixture Filings have been either (x) duly recorded on or before the Effective Date or (y) duly executed, acknowledged and delivered to the Title Company in form suitable for filing or recording, in all filing or recording offices necessary in order to create a valid second and subsisting Lien on the property described therein in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties and that all filing and recording taxes and fees have been paid to the Title Company,

(C)    certified copies of the fully paid American Land Title Association Lender's Extended Coverage title insurance policies or an irrevocable written commitment to issue mortgage title policies or marked-up unconditional binders for such insurance (the "*Second Lien Mortgage Policies*") in amounts and in form and substance, and with endorsements (including zoning endorsements) to the extent available, reasonably acceptable to the Administrative Agent and the Second Lien Collateral Agent, issued by the Title Company, reinsured by title insurers reasonably acceptable to the Administrative Agent and the Second Lien Collateral Agent, insuring the Second Lien Mortgages to be valid second and subsisting Liens on the property described therein, free of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Liens, and providing for such other affirmative insurance, to the extent available (including endorsements for future advances under the Loan Documents and for mechanics' and materialmen's Liens), in form acceptable to the Administrative Agent and the Second Lien Collateral Agent,

47

(D)    certified copies of American Land Title Association/ American Congress on Surveying and Mapping form surveys, for which all necessary fees (where applicable) have been paid, and dated no more than sixty (60) days before the Effective Date, certified to the Administrative Agent and the Second Lien Collateral Agent and the Title Company using a form of certification reasonably acceptable to the Administrative Agent and the Second Lien Collateral Agent by a land surveyor duly registered and licensed in the States in which the property described in such surveys is located showing the matters required by such certification and the absence of material encroachments and any other material defects other than encroachments or other defects acceptable to the Administrative Agent and the Second Lien Collateral Agent, and

(E)    Proof of payment to the Title Company of (A) all expenses and premiums of the Title Company in connection with the issuance of the Second Lien Mortgage Policies and (B) an amount equal to any fees or taxes including, without limitation, the recording, mortgage, intangible, transfer and stamp taxes payable in connection with recording the Second Lien Mortgages and UCC Fixture Filings, if applicable, in the appropriate government office(s),

(F)    Certified copies of permanent and unconditional certificates of occupancy (or, if it is not the practice to issue certificates of occupancy in a jurisdiction in which the facilities to be covered by the Mortgages are located, then such other evidence reasonably satisfactory to the Administrative Agent and the Second Lien Collateral Agent) permitting the fully functioning operation and occupancy of each such facility and of such other permits necessary for the use and operation of each such facility issued by the respective governmental authorities having jurisdiction over each such facility, and

(G)    evidence of the insurance required by the terms of the Second Lien Mortgages.

(v)    The Intercreditor Agreement substantially in the form of Exhibit G duly executed by the Borrower, the Guarantors, EBG Holdings, the First Lien Collateral Agent, the Second Lien Collateral Agent, the Administrative Agent, the First Lien Administrative Agent and Credit Suisse Energy LLC.

(vi)    The Security Deposit Agreement substantially in the form of Exhibit H duly executed by the Borrower, each Guarantor, the First Lien Collateral Agent, the Second Lien Collateral Agent and the Depositary.

(vii)    Certified copies of the resolutions of the sole members of the Borrower and the Board of Directors of EBG Holdings and authorizations of the sole member or Board of Directors, as applicable, of each other Guarantor

48

approving the Transaction and each Transaction Document to which it is or is to be a party, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the Transaction and each Transaction Document to which it is or is to be a party.

(viii)    A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Effective Date certifying (A) as to a true and correct copy of the certificate of formation or certificate of incorporation, as the case may be, of each Loan Party and EBG Holdings and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to such Loan Party's and EBG Holding's certificate of formation or certificate of incorporation, as the case may be, on file in such Secretary's office, (2) to the extent applicable, each of such Loan Party and EBG Holdings has paid all franchise taxes to the date of such certificate and (3) to the extent applicable, each of such Loan Party and EBG Holdings is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(ix)    A certificate of each Loan Party and EBG Holdings signed on behalf of such Loan Party and EBG Holdings by a Responsible Officer thereof, dated the Effective Date (the statements made in such certificate shall be true on and as of the Effective Date), certifying as to (A) the absence of any amendments to the certificate of formation or certificate of incorporation, as the case may be, of such Loan Party or EBG Holdings (as applicable) since the date of the Secretary of State's certificate referred to in Section 3.01(a)(viii), (B) a true and correct copy of the limited liability company agreement or bylaws, as the case may be, of such Loan Party or EBG Holdings (as applicable) as in effect on the date on which the resolutions referred to in Section 3.01(a)(vii) were adopted and on the Effective Date, (C) the due formation and good standing or valid existence of such Loan Party or EBG Holdings (as applicable) as a limited liability company or corporation, as the case may be, organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of such Loan Party or EBG Holdings (as applicable) and (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Effective Date.

(x)    Certificates of EBG Holdings and each of the Loan Parties executed by an authorized officer thereof in each case certifying the name and true signature of the officer of EBG Holdings or such Loan Party authorized to sign each Transaction Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(xi)    Certified copies of each of the Related Documents, duly executed by the parties.

(xii)    Certificates in substantially the form of Exhibit E, attesting to (A) the Solvency of EBG Holdings and its Subsidiaries on a Consolidated basis

49

after giving effect to the Transaction and the other transactions contemplated thereby, and (B) the Solvency of the Borrower and its Subsidiaries on a Consolidated basis after giving effect to the Transactions and the other transactions contemplated hereby, in each case from the director of finance of EBG Holdings.

(xiii)    (A) A certified hard copy of, and a computer disk containing, *pro forma* balance sheets, income statements and cash flow statements with respect to EBG Holdings consolidated with its Subsidiaries for the period through Fiscal Year 2014, on a quarterly basis for the period from January 1, 2007 through December 31, 2008 and on an annual basis for each year thereafter (the "*Base Case Projections*"); and (B) a certified copy of the operating budget for the Borrower and its Subsidiaries for Fiscal Year 2007 (the "*Initial Operating Budget*").

(xiv)    (A) Certified copies of audited financial statements of the Borrower and its Subsidiaries dated December 31, 2005 and interim financial statements of the Borrower and its Subsidiaries dated the end of each Fiscal Quarter ending since December 31, 2005, and (B) the Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as of September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve (12) month period then ended.

(xv)    Copies of final due diligence reports updated within thirty (30) days of the Effective Date from the following consultants in form and substance reasonably satisfactory to the Administrative Agent:  (A) the Independent Engineer; (B) the Independent Power Market Consultant; and (C) the Independent Insurance Consultant.

(xvi)    Copies of all certificates representing the policies, endorsements and other documents required under Section 5.01(d) to be in effect as of the Effective Date, accompanied by (A) a certificate of the Borrower signed by a Responsible Officer certifying that the copies of each of the policies, endorsements and other documents delivered pursuant to this Section 3.01(a)(xvi) are true, correct and complete copies thereof, (B) letters from the Borrower's insurance brokers or insurers, dated not earlier than fifteen (15) days prior to the Effective Date, stating with respect to each such insurance policy that (1) such policy is in full force and effect, (2) all premiums theretofore due and payable thereon have been paid and (3) the underwriters of such insurance have agreed that the policies, when issued, will contain the provisions required under Section 5.01(d) and (C) a certificate from the Independent Insurance Consultant in form and substance reasonably satisfactory to the Lenders confirming that such required insurance is in full force and effect in accordance with the terms of this Agreement.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

(xvii)   A favorable opinion of Debevoise & Plimpton LLP, counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.

(xviii)   Favorable opinions of Nutter, McClennen & Fish LLP, local counsel for the Loan Parties with respect to the enforceability and perfection of each Second Lien Mortgage and any related fixture filings and with respect to local permitting, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

(xix)   A favorable opinion of White & Case LLP, special federal energy regulatory counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.

(xx)    Account control agreements reasonably acceptable to the Administrative Agent and the Second Lien Collateral Agent for the Local Accounts executed by the depositary financial institution holding such accounts and the applicable Loan Parties.

(xxi)   Reasonable evidence that, concurrent with or promptly following the consummation of the transaction contemplated hereby, (A) the Accounts have been established in accordance with the requirements of the Security Deposit Agreement, and (B) after giving effect to the Borrowings to be made on the Effective Date, the Second Lien Debt Service Reserve Requirement has been satisfied.

(b)    [Reserved].

(c)    The Lenders shall be reasonably satisfied that:

(i)    all Existing Debt, other than Surviving Debt, has been (or is contemporaneously being) prepaid, redeemed or defeased in full or otherwise satisfied and extinguished and all commitments relating thereto terminated (or contemporaneously therewith terminated) and that all Surviving Debt is on terms and conditions reasonably satisfactory to the Lenders;

(ii)    all Liens securing payment of any Existing Debt shall have been released; and

(iii)    the Administrative Agent shall have received all Uniform Commercial Code Form UCC-3 termination statements, mortgage releases, pay-off letters and other instruments as may be necessary or desirable, in the reasonable judgment of the Administrative Agent, in connection therewith.

(d)    Before giving effect to the Transaction, there shall have occurred no Material Adverse Change since December 31, 2005.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

(e)    Except as set forth on Schedule 4.01(g), there shall exist no action, suit, investigation, litigation or proceeding affecting EBG Holdings or any Loan Party pending or threatened in writing before any Governmental Authority that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(f)    Except for any Governmental Authorizations required in connection with the Lenders' exercise of remedies under the Loan Documents, all Governmental Authorizations and member, shareholder and third party consents and approvals necessary in connection with the Transaction or for the ownership and operation of the Projects shall have been obtained (without the imposition of any conditions that are not acceptable to the Lenders) and shall remain in full force and effect.

(g)    The Borrower shall have paid (or shall be contemporaneously paying from the proceeds of the Loans) all accrued fees of the Agents and the Lenders and all accrued expenses of the Agents (including the accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lenders).

(h)    The Administrative Agent shall have received evidence reasonably satisfactory to it that prior to, or concurrently with, the making of the Initial Extension of Credit hereunder:

(i)    the Borrower shall have received not less than $1,130,000,000 in gross cash proceeds from borrowings $250,000,000 in letter of credit commitments and $70,000,000 in revolving credit commitments, in each case, under the First Lien Credit Agreement; and

(ii)    EBG Holdings shall have received not less than $300,000,000 in gross cash proceeds from borrowings under the Mezzanine Documents.

(i)    The Related Documents, including the Mezzanine Documents, Initial Commodity Hedge and Power Sale Agreements and the First Lien Loan Documents, shall have been executed and delivered by all parties thereto and shall be effective, and all material obligations to be performed under any such documents on or before the Effective Date shall have been performed.

(j)    The Facility shall have been rated by each of S&P and Moody's.

(k)    The Lenders shall have received, to the extent requested, on or before the date which is five (5) Business Days prior to the Effective Date, all documentation and other information required by bank regulatory authorities under applicable "*know your customer*" and anti-money laundering rules and regulations including the Patriot Act.

(l)    The Administrative Agent shall have received the Closing Date Funds Flow Memo substantially in the form attached hereto as Exhibit N (the "***Closing Date Summary Funds Flow Memo***").

52

SECTION 3.02. <u>Conditions Precedent to Each Borrowing and Issuance</u>. The obligation of each Lender to make a Loan on the occasion of the initial Borrowing shall be subject to the further conditions precedent that on the date of such Borrowing the following statements shall be true and the Administrative Agent shall have received for the account of such Lender a certificate signed by a duly authorized officer of the Borrower, dated the date of such Borrowing, stating that (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Borrowing such statements are true):

(a)    the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date, as though made on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, except for representations and warranties that speak as of an earlier date or period which shall be true and correct as of such date or period; and

(b)    with respect to the Initial Extension of Credit on the Effective Date, no Default has occurred and is continuing, or would result from such Initial Extension of Credit or from the application of proceeds therefrom.

SECTION 3.03. <u>Determinations Under Section 3.01</u>. For purposes of determining compliance with the conditions specified in <u>Section 3.01</u>, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the Effective Date specifying its objection thereto and, if the Initial Extension of Credit consists of a Borrowing, such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowing.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. <u>Representations and Warranties</u>. Each Loan Party represents and warrants on behalf of itself as follows:

(a)    <u>Organization</u>. It (i) is a limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a limited liability company or corporation in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably likely to have a Material Adverse Effect and (iii) has all requisite limited liability company or corporate (as applicable) power and authority (including, without limitation, all material Governmental Authorizations) to

53

own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

      (b)    <u>Location</u>. Set forth on <u>Schedule 4.01(b)</u> hereto is a complete and accurate list of all Loan Parties and their Subsidiaries, showing as of the date hereof (as to each Loan Party and each such Subsidiary) the jurisdiction of its formation or incorporation (as applicable), the address of its principal place of business and its U.S. taxpayer identification number. The copy of the certificate of formation or certificate of incorporation, as applicable, of each Loan Party and each amendment thereto provided pursuant to <u>Section 3.01(a)(viii)</u> is a true and correct copy of each such document, each of which is valid and in full force and effect.

      (c)    <u>Ownership Information</u>. Set forth on <u>Schedule 4.01(c)</u> hereto is a complete and accurate list of all Subsidiaries of each Loan Party, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares or membership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares or membership interests (as applicable) covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof. All of the outstanding Equity Interests in each Loan Party's Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Subsidiaries free and clear of all Liens, except those created under the First Lien Collateral Documents, the Second Lien Collateral Documents or Permitted Liens.

      (d)    <u>Authorization; Non-Contravention</u>. The execution, delivery and performance by each Loan Party of each Transaction Document to which it is or is to be a party, and the consummation of the Transaction, are within such Loan Party's limited liability company or corporate (as applicable) powers, have been duly authorized by all necessary limited liability company or corporate (as applicable) action, and do not (i) contravene such Loan Party's limited liability company agreement, certificate of incorporation, bylaws or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to or binding on it, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, a Contractual Obligation of any Loan Party (except to the extent such conflict, breach, default or payment could not reasonably be expected to have a Material Adverse Effect) or (iv) except for the Liens created under the First Lien Collateral Documents and the Second Lien Collateral Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of any Loan Party or any of its Subsidiaries. As of the Effective Date, no Loan Party is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the

54

violation or breach of which could be reasonably likely to have a Material Adverse
Effect.

(e)     Consents and Approvals. (i)  No Governmental Authorization, and no
notice to, filing with, or consent or approval of any other third party is required for
(A) the due execution, delivery, recordation, filing or performance by any Loan Party of
any Transaction Document to which it is or is to be a party, or for the consummation of
the Transaction, (B) the grant by any Loan Party of the Liens granted by it pursuant to the
Second Lien Collateral Documents, (C) the perfection or maintenance of the Liens
created under the Second Lien Collateral Documents (including the second priority
nature thereof) or (D) the exercise by any Agent or any Lender of its rights under the
Loan Documents or the remedies in respect of the Collateral pursuant to the Second Lien
Collateral Documents, except for (1) those authorizations, approvals, actions, notices and
filings set forth on Schedule 4.01(e), (I) all of which have been duly obtained, taken,
given or made, (II) are in full force and effect, (III) are free from conditions or
requirements that have not been met or complied with, (2) authorizations, approvals,
actions, notices and filings required by securities, regulatory or applicable law in
connection with  an exercise of remedies or (3) those Governmental Authorizations,
notices, filings with, or consents of, any other third party, the failure of which to obtain
and maintain could not reasonably be expected to result in a Material Adverse Effect.

(ii)     No Governmental Authorization, and no notice to, filing with, or
consent or approval of any Governmental Authority or any other third party is
required in connection with the operation of the Projects in accordance with
applicable law and as otherwise contemplated by this Agreement, except for
(A) the Governmental Authorizations, notices and filings set forth on
Schedule 4.01(e), (1) all of which have been duly obtained, taken, given or made,
(2) are in full force and effect and (3) are free from conditions or requirements
that have not been met or complied with or (B) those Governmental
Authorizations, notices, filings with or consents of any other third party, the
failure of which to obtain and maintain could not reasonably be expected to result
in a Material Adverse Effect.

(f)     Binding Agreement.  This Agreement has been, and each other
Transaction Document when delivered hereunder will have been, duly executed and
delivered by each Loan Party thereto.  This Agreement is, and each other Transaction
Document when delivered hereunder will be, the legal, valid and binding obligation of
each Loan Party thereto, enforceable against such Loan Party in accordance with its
terms.

(g)     Litigation.  Except as set forth on Schedule 4.01(g), there is no action, suit,
investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries,
including any Environmental Action, pending or threatened in writing before any
Governmental Authority or arbitrator that (i) could reasonably be likely to have a

55

Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(h)    Financial Statements. (i) The Consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2005, the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended and the Consolidated balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the nine (9) months then ended, duly certified by the senior financial officer of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects, subject, in the case of said balance sheet as at September 30, 2006, and said statements of income and cash flows for the nine (9) months then ended, to year end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated results of operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis.

(ii)    The Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve-month period then ended, respectively, certified by the senior financial officer of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects the Consolidated pro forma financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated pro forma results of operations of the Borrower and its Subsidiaries for the period ended on such date giving effect to the Transaction, all in accordance with GAAP.

(iii)    The Consolidated forecasted balance sheet, statement of income and statement of cash flows of EBG Holdings and its Subsidiaries delivered to the Administrative Agent, pursuant to Section 3.01(a)(xiii) and the Budget required by Section 5.03(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's reasonable best estimate of its future financial performance.

(i)    Accuracy of Information; Projections. All information (other than the information delivered pursuant to Section 3.01(a)(xiii), other financial projections and general economic information) heretofore or contemporaneously furnished to any Lender by or on behalf of EBG Holdings or any Loan Party in connection with any Loan Document or any transaction contemplated hereby (including the Transactions), taken together as a whole with all other information with which such Lender has previously been furnished, is complete and correct in all material respects, as of the date such information was furnished and as of the Effective Date, and did not contain any untrue

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

statement of a material fact or omit to state any material fact necessary to make any information not misleading in light of the circumstances under which furnished.

(j)    Margin Stock. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(k)    Investment Company Act. No Loan Party is an "*investment company*," as defined in or subject to regulations under the Investment Company Act of 1940, as amended.

(l)    Security Interest. All filings and other actions necessary to perfect and protect the security interest in the Collateral created under the Second Lien Collateral Documents have been duly made or taken and are in full force and effect, and the Second Lien Collateral Documents create in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties a valid and, together with such filings and other actions, perfected second priority security interest in the Collateral, securing the payment of the Second Lien Obligations. The Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(m)    Solvency. After giving affect to the Transaction, the Borrower and its Subsidiaries are, on a Consolidated basis, Solvent.

(n)    ERISA Etc. (i) No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has had or is reasonably expected to have a Material Adverse Effect.

(ii)    Neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan except for Withdrawal Liability that could not reasonably be expected to have a Material Adverse Effect.

(iii)    Neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a material Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(o)    Environmental Matters. (i) Except as otherwise set forth on Part I of Schedule 4.01(o) hereto, the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, except for any such noncompliance, obligation or cost that could not reasonably be likely to have a Material Adverse Effect

and, to the best knowledge of each Loan Party, no circumstances exist that could (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that could reasonably be likely to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(ii)    Except as otherwise set forth on Part II of Schedule 4.01(o) hereto, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is currently listed or proposed for listing on the NPL or on the CERCLIS or any analogous state or local list; there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries except where such treatment, storage or disposal could not reasonably be likely to have a Material Adverse Effect; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries that requires abatement under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries in a manner that would reasonably be expected to require any investigation, cleanup, remediation or remedial action by any Loan Party under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect.

(iii)    Except as otherwise set forth on Part III of Schedule 4.01(o) hereto, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries, except, in each case above, where any such investigation or assessment or remedial or response action or liability could not reasonably be likely to have a Material Adverse Effect.

58

(p)    Tax Matters. (i) Neither any Loan Party nor any of its Subsidiaries is party to any tax sharing agreement.

(i)    Each Loan Party and each of its Subsidiaries has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed, other than those tax returns where the failure to file such returns could not be reasonably expected to have a Material Adverse Effect, and has paid all taxes shown thereon to be due, together with applicable interest and penalties (other than taxes contested in good faith).

(ii)    No issues have been raised by the Internal Revenue Service in respect of federal income tax returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(iii)    No issues have been raised by any state, local or foreign taxing authorities, in respect of the returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise, that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(q)    Surviving Debt. Set forth on Schedule 4.01(q) hereto is a complete and accurate list of all Surviving Debt, showing the obligor and the principal amount outstanding thereunder and the maturity date thereof.

(r)    Owned Real Property. Set forth on Schedule 4.01(r) hereto is a complete and accurate list of all material real property owned by any Loan Party, showing as of the date hereof the street address, county or other relevant jurisdiction, state and record owner thereof. Each Loan Party has good and marketable fee simple title to such real property, free and clear of all Liens, other than Permitted Liens.

(s)    Leased Real Property. Set forth on Schedule 4.01(s) hereto is a complete and accurate list of all material leases of real property under which any Loan Party is the lessee, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor and lessee thereof. Each such lease is the legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights of creditors generally and except to the extent that enforcement of rights and remedies set forth therein may be limited by equitable principles (regardless of whether enforcement is considered in a court of law or a proceeding in equity).

(t)    Material Contracts. Except as set forth on Schedule 4.01(t), each Material Contract (i) has been duly authorized, executed and delivered by all parties thereto, has not been amended or otherwise modified from the form previously delivered to the

59

Administrative Agent, except in accordance with the terms of this Agreement, (ii) is in full force and effect and is binding upon and enforceable against all parties thereto in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights of creditors generally and except to the extent that enforcement of rights and remedies set forth therein may be limited by equitable principles (regardless of whether enforcement is considered in a court of law or a proceeding in equity), and (iii) to the best knowledge of the relevant Loan Party, there exists no material default under any Material Contract by any party thereto.

(u)    Accounts. Neither the Borrower nor any of its Subsidiaries has any deposit or securities accounts other than the Accounts or Local Accounts otherwise permitted under the terms of this Agreement.

(v)    Regulatory Status. Each Project Company: (i) meets the requirements for, and has made the necessary filing with, or has been determined by, FERC to be an exempt wholesale generator ("*EWG*") within the meaning of Section 1262(6) of the Public Utility Holding Company Act of 2005 ("*PUHCA*"); (ii) is authorized by FERC pursuant to Section 205 of the FPA to sell electric power, including energy and capacity, at market-based rates; and (iii) is authorized by FERC to issue securities and assume obligations or liabilities pursuant to Section 204 of the FPA.

(w)    FERC Proceedings. There are no pending FERC proceedings in which the EWG status, market-based rate authority or the FPA Section 204 authority of a Project Company is subject to withdrawal, revocation or material modification other than FERC rulemakings of general applicability, including, but not limited to, *Market-Based Rates for Wholesale Sales of Energy, Capacity and Ancillary Services by Public Utilities* in Docket No. RM04-7-000.

(x)    Regulatory Approvals. Except for any FERC approvals required in connection with the Lenders' exercise of remedies under the Loan Documents, no approvals or authorizations from FERC are required to be obtained by any Project Company, the Loan Parties, the Second Lien Collateral Agent or the Lenders with respect to the Transaction.

(y)    Existing Regulatory Orders. The Borrower and each Project Company is in full compliance in all material respects with the terms and conditions of all orders issued by FERC under Section 203 of the FPA and obtained by the Borrower or any Project Company.

(z)    PUHCA. The Borrower is a "*holding company*" within the meaning of Section 1262(8) of PUHCA solely with respect to its ownership of one or more EWGs, and is not subject to or is otherwise exempt from regulation under PUHCA except for regulation under Section 1265 of PUHCA.

60

(aa)    Material Adverse Effect. Except as disclosed in writing to the Lenders, since the Effective Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(bb)    Violation of Law. No Loan Party is in violation of any applicable law, rule, regulation, order, writ, judgment, injunction, decree, determination or award binding on it, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS

SECTION 5.01. Affirmative Covenants. Until a Repayment Event has occurred, the Borrower and each Guarantor will:

(a)    Compliance with Laws, Etc. Comply with all applicable laws, rules, regulations and orders binding on it, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, other than any such non-compliance which could not reasonably be expected to have a Material Adverse Effect.

(b)    Payment of Taxes, Etc. Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property (unless, in the case of (i) and (ii), the failure to do so could not reasonably be expected to have a Material Adverse Effect); *provided, however*, that no Loan Party shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and only to the extent that adequate reserves are being maintained.

(c)    Compliance with Environmental Laws. Comply and, if applicable, take commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties (except where such failure to obtain or renew could not reasonably be expected to have a Material Adverse Effect); and conduct any investigation, study, sampling and testing, cleanup, removal, remedial or other action in response to any release, discharge or disposal of any Hazardous Materials from or at any of its properties, to the extent required by, and in compliance with, all Environmental Laws (other than any such failure to investigate study, sample, test, cleanup, remove, remediate or take such other action as could not reasonably be expected to have a Material Adverse Effect); *provided, however*, that no Loan Party shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its

61

obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained in accordance with GAAP.

(d)     Maintenance of Insurance.  Maintain insurance in accordance with Schedule 5.01(d).

(e)     Preservation of Existence, Etc.  Preserve and maintain its existence as a limited liability company or corporation, as applicable, and its good standing in the State of Delaware; *provided, however*, that any Loan Party may consummate any merger or consolidation permitted under Section 5.02(d).

(f)     Visitation Rights.  Upon reasonable notice, at any reasonable time and from time to time, permit any of the Agents or any of the Lenders, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, any Loan Party, and to discuss the affairs, finances and accounts of any Loan Party with any of their officers or directors and with their independent certified public accountants; *provided* that (i) so long as no Default shall have occurred and be continuing or (ii) the Borrower shall have consented thereto, neither the Agents nor the Lenders shall be entitled to more than one (1) visit to any single Project in any Fiscal Year.

(g)     Keeping of Books.  Keep proper books of record and account in accordance with GAAP.

(h)     Maintenance of Properties, Etc.  Maintain, preserve and protect (or cause to be maintained, preserved or protected) all of its properties and equipment necessary in the conduct of the business of the Projects in good working order and condition, ordinary wear and tear excepted, and in accordance with Prudent Industry Practices.

(i)     [Reserved].

(j)     Covenant to Give Security.  Upon the acquisition or lease of any property by any Loan Party with a fair market value in excess of $25,000,000, and such property, in the reasonable judgment of the Administrative Agent or the Second Lien Collateral Agent, shall not already be subject to a perfected second priority security interest in favor of the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties, then in each case at the Borrower's expense:

(i)     no later than ten (10) Business Days after such acquisition, furnish to the Administrative Agent and the Second Lien Collateral Agent a description of the real and personal properties so acquired, in each case in detail reasonably satisfactory to the Administrative Agent; and

(ii)     promptly, but in any event within ninety (90) days after such acquisition, take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, title insurance, surveys, certificates of

62

occupancy, estoppel and consent agreements of lessors, documents, instruments, agreements, opinions and certificates with respect to such Property as the Administrative Agent shall reasonably request to create (and provide evidence thereof) a valid and perfected second priority Lien on such Property in favor of the Second Lien Collateral Agent (for the benefit of the Second Lien Secured Parties), subject to Permitted Liens.

(k)    Further Assurances. (i) Upon the formation of any Subsidiary permitted pursuant to Section 5.02(k) or (ii) promptly upon reasonable request by any Agent, or any Lender through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, estoppel and consent agreements of lessors, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any such Subsidiary's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Second Lien Collateral Documents, (iii) cause each such Subsidiary to become a Guarantor hereunder by executing a Joinder Agreement and to pledge all of its assets under the Second Lien Security Agreement or a security agreement substantially similar thereto to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties (together with any opinions of counsel reasonably requested by any Agent) and (iv) perfect and maintain the validity, effectiveness and priority of any of the Second Lien Collateral Documents and any of the Liens intended to be created thereunder.

(l)    Accounts. (i) Establish (unless already established) and maintain at all times in accordance with the Security Deposit Agreement, the Accounts, (ii) cause all Revenues (as defined in the Security Deposit Agreement) and other amounts payable to it (except for interest earned on deposits in the Local Accounts, if any, which shall be credited to such Local Account) to be deposited into, or credited to, the Accounts, in accordance with the terms of the Security Deposit Agreement and (iii) cause all funds (to the extent permitted by the Security Deposit Account) deposited in the Accounts to be applied and disbursed in accordance with the terms of the Security Deposit Agreement.

(m)    [Reserved].

(n)    Maintenance of Credit Ratings. Use all commercially reasonable efforts to maintain ratings on the Facility from each of Moody's and S&P for so long as such rating agency is in the business of rating loans and securities of a type similar to the Facility (it being acknowledged and agreed that the Borrower shall not be required to maintain any minimum credit rating).

(o)    Consents. The Borrower will use commercially reasonable efforts to promptly obtain the consents referred to in Section 5.03(f)(ii)(B).

63

(p)    Separateness. Comply with the following:

(i)    Each of the Borrower and its Subsidiaries will act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(ii)    Each of the Borrower and its Subsidiaries will conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iii)    Each of the Borrower and its Subsidiaries will obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(iv)    Each of the Borrower and its Subsidiaries will comply in all material respects with the terms of its certificate of incorporation or formation and by-laws or limited liability company agreement (or similar constituent documents).

(q)    Maintenance of Regulatory Status. The Project Companies shall maintain EWG status, market-based rate authority under FPA Section 205, FPA Section 204 blanket authorization and compliance with previously issued FPA Section 203 orders applicable to the Borrower or Project Company, except in the event that such authorizations become no longer available, or to the extent such authorizations are limited or restored as a result of FERC's rulemakings of general applicability including but not limited to, Market-Based Rates for Wholesale Sales of Energy, Capacity and Ancillary Services by Public Utilities in Docket No. RM04-7-000.

(r)    Certain Collateral Matters. Use commercially reasonable efforts to obtain consents necessary for the granting of any Lien on Property constituting Excluded Property pursuant to clause (a) of the definition thereof.

(s)    Commodity Hedging. Enter into prior to the date that is twelve (12) months following the Effective Date, and maintain at all times for the term referred to below, Eligible Permitted Commodity Hedge and Power Sale Agreements covering capacity payments and/or premiums to be received by the Borrower for an additional 600 to 800 megawatts of capacity for a term of three (3) to five (5) years in the form of a heat rate tolling option or of a similar product or set of products and otherwise reasonably acceptable to the Administrative Agent; *provided* that any Eligible Permitted Commodity Hedge and Power Sale Agreement that is in form and substance substantially similar to the Initial Commodity Hedge and Power Sale Agreement (with such modifications thereto as are necessary or desirable to reflect the modified term and modified capacity requirements stated herein) shall be acceptable for purposes hereof.

64

SECTION 5.02. <u>Negative Covenants</u>. Until a Repayment Event has occurred, neither the Borrower nor any Guarantor will, at any time:

(a)     <u>Liens, Etc.</u> Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired or assign any accounts or other right to receive income, except:

(i)     Liens created under the First Lien Collateral Documents; *provided* that (i) such Liens only secure (A) Debt permitted under <u>Section 5.02(b)(ii)</u>, (B) obligations under Eligible Permitted Commodity Hedge and Power Sale Agreements (including, without limitation, the Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to <u>Section 5.01(s)</u>) and (C) obligations under Secured Hedge Agreements, (ii) such Liens are subject to the terms of the Intercreditor Agreement and (iii) any Commodity Hedge Counterparty party to any such Eligible Permitted Commodity Hedge and Power Sale Agreement or any Hedge Bank party to any such Secured Hedge Agreement shall have become a party to the Intercreditor Agreement as, and shall have the obligations of, a First Lien Secured Party thereunder;

(ii)     Liens created under the Second Lien Collateral Documents; *provided* that (i) such Liens only secure Debt permitted under <u>Section 5.02(b)(i)</u>, (ii) such Liens are subject to the terms of the Intercreditor Agreement and (iii) any lender (or any agent or trustee thereof) with respect to such Debt shall have become a party to the Intercreditor Agreement as, and shall have the obligations of a Second Lien Secured Party thereunder;

(iii)     Permitted Liens;

(iv)     Liens existing on the date hereof and described on <u>Schedule 5.02(a)</u> hereto;

(v)     purchase money Liens upon or in real property or equipment acquired or held by the Borrower or any of its Subsidiaries in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing or refinancing the acquisition of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however,* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt

65

secured by Liens permitted by this clause (v) shall not exceed the amount permitted under Section 5.02(b)(iv) at any time outstanding;

(vi)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(vii)    Liens arising from precautionary Uniform Commercial Code financing statements regarding and any interest or title of a licensor, lessor or sublessor under, any operating lease;

(viii)    pledges or deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to providers of property, casualty or liability insurance in the ordinary course of business;

(ix)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(viii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the property subject to such Capitalized Leases;

(x)    Liens securing Debt permitted under Section 5.02(b)(iii); and

(xi)    any other Liens securing Debt in aggregate amount not to exceed at any time $7,500,000.

(b)    Debt. Create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    Debt under the First Lien Loan Documents in an aggregate principal amount not to exceed $1,500,000,000;

(iii)    Debt incurred solely to finance Permitted Developments not to exceed in the aggregate, when taken together with any equity proceeds referred to in Section 5.02(f)(viii)(A), $140,000,000;

(iv)    Debt secured by Liens permitted by Section 5.02(a)(v) not to exceed in the aggregate $30,000,000 at any time outstanding;

(v)    to the extent constituting Debt, (A) payment obligations under Secured Hedge Agreements and (B) obligations under the Borrower's fuel oil inventory financing program relating to (x) Mystic I not to exceed in the aggregate at any time 750,000 bbls and (y) Fore River not to exceed in the aggregate at any time 700,000 bbls;

(vi)    to the extent permitted under Section 5.02(l) and constituting Debt, obligations under any (A) Permitted Commodity Hedge and Power Sale

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

Agreements and (B) other Commodity Hedge and Power Sale Agreements with net exposure thereunder not to exceed in the aggregate at any time $110,000,000;

(vii)    Debt owed to any Loan Party, which Debt shall (x) constitute Pledged Debt, (y) be subordinated pursuant to the Terms of Subordination and (z) be otherwise permitted under Section 5.02(f);

(viii)    Capitalized Leases not to exceed in the aggregate $25,000,000 for Fore River, $45,000,000 for Mystic Development and $20,000,000 for Mystic I, in each case, at any time outstanding;

(ix)    to the extent constituting Debt, Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and similar obligations incurred in the ordinary course of business and not in connection with Debt for Borrowed Money;

(x)    other unsecured Debt of the Loan Parties issued in settlement of delinquent obligation of the Loan Parties or disputes between the Loan Parties and other Persons under Contractual Obligations of the Loan Parties (other than in respect of Debt);

(xi)    Guaranteed Debt of any Loan Party in respect of any Debt otherwise permitted to be incurred under this Section 5.02(b);

(xii)    endorsements of negotiable instruments for collection;

(xiii)    (without duplication) Surviving Debt; and

(xiv)    other unsecured Debt of the Loan Parties in an aggregate amount not to exceed $55,000,000 at any time outstanding.

(c)    Change in Nature of Business.  Make any material change in the nature of its business as carried on at the date hereof and activities reasonably incidental thereto or in connection with any Permitted Development.

(d)    Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it; *provided* that any Subsidiary of the Borrower may merge into or consolidate with any other Subsidiary of the Borrower; *provided* that, in the case of any such merger or consolidation, the Person formed by such merger or consolidation shall be a wholly owned Subsidiary of the Borrower; *provided* that the Person formed by such merger or consolidation obtain prior approval under Section 204 of the FPA to the extent required; and *provided further* that, in the case of any such merger or consolidation to which a Guarantor is a party, the Person formed by such merger or consolidation shall be a Guarantor.

67

(e)      Sales of Assets, Etc.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except:

(i)      sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) power, natural gas, fuel, capacity, gas or fuel transportation, power transportation or ancillary services or other inventory in the ordinary course of such Person's business including, without limitation, Permitted Trading Activities;

(ii)      sales, transfers or other dispositions in the ordinary course of its business of Property that is surplus (including, without limitation, surplus land and emission credits not required for the continued operation of any Project in any given year), obsolete, defective, worn-out, damaged, rendered unfit for normal use or property that is being exchanged for similar property, or that individually or in the aggregate is not essential for the continued operation of any Project;

(iii)      the liquidation, sale or use of Cash and Cash Equivalents;

(iv)      sales, transfers or other dispositions of assets among Loan Parties;

(v)      sales or discounts without recourse of accounts receivable arising in the ordinary course of such Person's business in connection with the compromise or collection thereof;

(vi)      dispositions required or contemplated by the Contractual Obligations in existence as of the date hereof with or relating to Governmental Authorities and relating to the Guarantors; and

(vii)      sales of Property by the Borrower or any Guarantor so long as (A) the purchase price paid to the Borrower or such Guarantor for such Property shall be no less than the fair market value of such Property at the time of such sale, (B) at least 75% of the consideration to be received is paid in cash or Cash Equivalents and such remaining 25% is not a debt instrument of the Borrower or any of its Affiliates (*provided* that for purposes of this subclause (B), (I) any amounts deposited into an escrow or other type of holdback account and any consideration in the form of readily marketable securities shall be deemed to be cash, (II) customary purchase price adjustments may be settled on a non-cash basis and (III) the assumption of Debt relating to the asset being disposed shall be disregarded for the purposes of this provision) and (C) the aggregate purchase price paid to the Borrower and all of the Guarantors for such Property and all other Property sold by the Borrower and the Guarantors (1) during the same Fiscal Year pursuant to this clause (vii) shall not exceed $30,000,000 and (2) since the Effective Date shall not exceed $140,000,000.

68

Events of Eminent Domain or Casualty Events (as such terms are defined in the Security Deposit Agreement) do not qualify as sales, leases, transfers or other dispositions of Property for purposes of this Section 5.02(e).

(f)     Investments in Other Persons.  Make or hold any Investment in any Person, except:

(i)     Investments by and among Loan Parties in other Loan Parties;

(ii)     Investments by the Loan Parties in Cash Equivalents;

(iii)     to the extent constituting Investments, Investments in contracts and agreements (including, without limitation, (A) Permitted Commodity Hedge and Power Sale Agreements, (B) interest rate Hedge Agreements and (C) other Commodity Hedge and Power Sale Agreements with net exposure thereunder not to exceed in the aggregate $110,000,000 at any time, when taken together with any net exposure referred to in Section 5.02(b)(vi)(B)), including prepaid deposits and expenses thereunder, to the extent permitted under the Loan Documents;

(iv)     Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business;

(v)     Investments in the Accounts and the Local Accounts and Investments of the funds on deposit therein, in each case, as otherwise permitted under the Loan Documents;

(vi)     loans and advances to officers, directors and employees of any Loan Party for reasonable and customary business related travel expenses, moving expenses and similar expenses incurred in the ordinary course of business of such Loan Party in an aggregate principal amount at any time outstanding not exceeding $1,000,000;

(vii)     to the extent constituting Investments, Debt which is permitted under Section 5.02(b);

(viii)     Investments by the Borrower or any Guarantor in Permitted Developments made solely with the proceeds (not to exceed, in the aggregate, $140,000,000) of (A) of capital contributions (or sales of equity securities of EBG Holdings) received directly or indirectly from EBG Holdings and (B) any Debt permitted to be incurred pursuant to Sections 5.02(b)(ix); and

(ix)     Investments in Permitted Developments by the Borrower or any Guarantor after the Effective Date in an aggregate amount not to exceed $10,000,000; and

69

(x)    any other Investments in an aggregate amount not to exceed $7,500,000 at any time.

(g)    <u>Restricted Payments</u>.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Subsidiaries to do any of the foregoing, or permit any of its Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower, except that any Subsidiary of the Borrower may (A) declare and pay cash dividends to the Borrower or to any Loan Party of which it is a Subsidiary and (B) accept capital contributions from its parent to the extent permitted under <u>Section 5.02(f)</u>; *provided* that the Borrower shall be able to pay EBG Holdings Tax Liabilities, EBG Holdings O&M Costs, the Distribution and the Tender Offer, in each case, in accordance with the Closing Date Flow of Funds Memo or the Security Deposit Agreement.

(h)    <u>Amendments of Constitutive Documents</u>.  Amend its limited liability company agreement, bylaws or other constitutive documents other than amendments that could not be reasonably expected to have a Material Adverse Effect.

(i)    <u>Accounting Changes</u>.  Make or permit, or permit any of its Subsidiaries to make or permit, any change in (i) accounting policies or reporting practices, except as permitted by GAAP, or (ii) Fiscal Year.

(j)    <u>Prepayments, Etc. of Debt</u>.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Debt other than the intercompany Debt among the Loan Parties that is expressly subordinated to the Obligations hereunder, or that is secured and the Liens securing such Debt rank behind the Liens created by the Second Lien Collateral Documents, or permit any of its Subsidiaries to do any of the foregoing, in each case, except to the extent permitted by the Loan Documents.

(k)    <u>Partnerships; Formation of Subsidiaries, Etc.</u>  (i) Become a general partner in any general or limited partnership or joint venture, or permit any of its Subsidiaries to do so or (ii) organize any new Subsidiary (other than (x) a Permitted Development Subsidiary organized in connection with a Permitted Development or (y) a Subsidiary formed for the purpose of conducting Permitted Trading Activities, in each case, in compliance with <u>Section 5.01(k)</u>).

(l)    <u>Speculative Transactions and Permitted Commodity Hedge and Power Sale Agreements</u>.  Engage, or permit any of its Subsidiaries to engage, in any Commodity Hedge and Power Sale Agreements or any similar transactions entered into solely for speculative purposes (it being acknowledged and agreed that the Initial Commodity Hedge and Power Sale Agreements, the Eligible Permitted Commodity Hedge and Power

70

Sale Agreements required pursuant to <u>Section 5.01(s)</u> and any other Eligible Permitted Commodity Hedge and Power Sale Agreements or any other Permitted Trading Activity (other than an Excess Duration Transaction) shall be deemed to be in compliance with this <u>Section 5.02(l)</u>).

For purposes of this <u>Section 5.02(l)</u>, "***Excess Duration Transaction***" means any Commodity Hedge and Power Sale Agreements or any similar transactions (A) that, when taken together on a net basis with all other such agreements outstanding (other than the RMR Agreement) for any period, would cause the aggregate amount of contracted capacity to be provided (whether financially or physically) by the Loan Parties pursuant to such agreements for such period to exceed an amount equal to the projected available capacity of all of the Projects for such period; *provided* that, if the Permitted Development is not subject to the independent system operator to which the other Projects are subject, the projected available capacity related to the Permitted Development shall not be taken together with the projected available capacity of the other Projects but shall be treated as separate contracted capacity or (B) other than any Eligible Permitted Commodity Hedge and Power Sale Agreements, have a stated maturity in excess of fourteen (14) months from the date such agreement is entered into.

(m)    <u>Capital Expenditures</u>.  Make any Capital Expenditures that would cause the aggregate of all such Capital Expenditures made by the Loan Parties to exceed, in any Fiscal Year, the Adjusted Capex Limit.  During any Fiscal Year, Capital Expenditures shall be deemed to be made *first* from Carryover Amounts for such Fiscal Year, *second* from the Base Capex Allowance for such Fiscal Year and *third* from any Pullback Amount for such Fiscal Year.

(n)    <u>Amendment, Etc. of Material Contracts</u>.  Cancel or terminate any Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any Material Contract or give any consent, waiver or approval thereunder, waive any default under or breach of any Material Contract, or agree in any manner to any other amendment, modification or change of any term or condition of any Material Contract, except as could not reasonably be expected to have a Material Adverse Effect ; *provided* that  no such cancellation, termination, amendment, modification, change, agreement, waiver, approval or consent shall be a Default hereunder if such Loan Party enters into a Replacement Material Contract within sixty (60) days thereafter; *provided further* that, if a Responsible Officer of the Borrower certifies to the satisfaction of the Administrative Agent that the Borrower or any Loan Party is diligently pursuing such Replacement Material Contract and that such Replacement Material Contract is reasonably likely to be entered into within the next sixty (60) days, then such 60-day period shall be extended for an additional sixty (60) days; *provided further* that notwithstanding the foregoing, the Borrower and Mystic Development shall be permitted to terminate and release the Distrigas Guaranty and/or the Cabot Guaranty in connection with the settlement of the Distrigas Litigation.

71

(o)   (ii) Regulatory Matters.  Make or permit to be made any change in the upstream ownership of a Guarantor without first obtaining any necessary authorization under Section 203 of the FPA.

(p)   Transactions with Affiliates.  Enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is:

(i)   (A) on fair and reasonable terms no less favorable to such Loan Party than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and (B) of the kind which would be entered into by a prudent Person in the position of such Loan Party with a Person that is not one of its Affiliates;

(ii)   an arrangement, transaction or contract expressly permitted by the terms of this Agreement;

(iii)   the payment of fees and indemnities to directors, officers, consultants and employees of the Loan Parties in the ordinary course of business;

(iv)   pursuant to the Management and Operation Agreements, including the payment of fees, costs and expenses as required thereunder (as of the date hereof);

(v)   (A) any employment or severance agreements or arrangements entered into by the Loan Parties in the ordinary course of business, or (B) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract or arrangement and transactions pursuant thereto; or

(vi)   the payment of fees, expenses, bonuses and awards related to the Transactions contemplated by the Transaction Documents and Loan Documents to the extent, in the case of the Transaction Documents, written notice thereof has been provided to the Administrative Agent prior to the Effective Date.

(q)   Maintenance of Accounts.  Establish or maintain any account other than (i) the Accounts established and maintained pursuant to the Security Deposit Agreement, (ii) the Local Accounts and (iii) other accounts in existence on the Effective Date (provided that the Borrower causes each such account to be closed and the funds on deposit therein, or credited thereto, at the time of such closure to be transferred to the Revenue Account within sixty (60) days after the Effective Date).

SECTION 5.03.  Reporting Requirements.  Until a Repayment Event has occurred, the Borrower will furnish to the Agents (who will then circulate to the Lenders):

(a)    Default Notice. As soon as possible and in any event within five (5) days after the Borrower obtains knowledge thereof, the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth details of such Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)    Annual Financials. As soon as available and in any event within 120 days after the end of each Fiscal Year (but, in the case of the 2006 Fiscal Year, 150 days after the end of such Fiscal Year), a copy of the annual audit report for such year for the Borrower and its Subsidiaries, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of KPMG LLP or other independent public accountants of recognized standing acceptable to the Administrative Agent and (ii) a certificate of the senior financial officer of the Borrower (A) certifying such financial statements as having been prepared in accordance with GAAP, (B) stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto and (C) attaching a schedule in form reasonably satisfactory to the Administrative Agent of the computations used by the Borrower in determining, as of the end of such Fiscal Year, compliance with the covenants contained in Section 5.04; *provided* that, in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(c)    Quarterly Financials. As soon as available and in any event within sixty (60) days after the end of each of the first three (3) quarters of each Fiscal Year, a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by the senior financial officer of the Borrower as having been prepared in accordance with GAAP, together with (i) a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto and (ii) a schedule in form satisfactory to the Administrative Agent of the computations used by the Borrower in determining compliance with the covenants contained in Section 5.04; *provided* that, in the event of any change in

73

generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(d)   <u>Annual Budget</u>. As soon as available and in any event no later than fifteen (15) days before the start of each Fiscal Year, an annual budget, prepared on a quarterly basis for such Fiscal Year in substantially the form attached hereto as <u>Exhibit I</u> or in a form otherwise acceptable to the Administrative Agent (with respect to each such Fiscal Year, the "***Budget***"), which Budget shall be certified by the senior financial officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made. The Borrower and the Guarantors shall use their best efforts to comply in all material respects with each applicable Budget, subject to market conditions.

(e)   <u>Litigation</u>. Promptly after the commencement thereof, notice of all actions, suits, litigation and proceedings before any Governmental Authority of the type described in <u>Section 4.01(g)</u>.

(f)   <u>Agreement Notices; Etc.</u> (i) Promptly upon execution thereof, copies of any Material Contract entered into by any Loan Party after the date hereof;

(ii)   (A) Promptly (but in any event within 10 days) following any Loan Party's entering into of any Material Contract after the date hereof, a Consent and Agreement in respect of such Material Contract and (B) promptly following receipt by the Borrower after the Effective Date, a Consent and Agreement with respect of each Material Contract as of the Effective Date for which a Consent and Agreement was not delivered pursuant to <u>Section 3.01(a)(ii)(E)</u>; and

(iii)   Promptly upon execution thereof, copies of any amendment, modification or waiver of any material provision of any First Lien Loan Document or any Material Contracts.

(g)   <u>ERISA</u>.

(i)   <u>ERISA Events and ERISA Reports</u>. (A) Promptly and in any event within ten (10) Business Days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liability in excess of $10,000,000, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party or such ERISA Affiliate has taken and proposes to take with respect thereto and (B) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information within 10 Business Days.

74

(ii)     Plan Terminations. Promptly and in any event within ten Business
Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of
each notice from the PBGC stating its intention to terminate any Plan or to have a
trustee appointed to administer any Plan.

(iii)     Multiemployer Plan Notices. Promptly and in any event within ten
Business Days after receipt thereof by any Loan Party or any ERISA Affiliate
from the sponsor of a Multiemployer Plan, copies of each notice concerning
(A) the imposition of Withdrawal Liability that could reasonably be expected to
result in liability in excess of $10,000,000 by any such Multiemployer Plan,
(B) the reorganization or termination, within the meaning of Title IV of ERISA,
of any such Multiemployer Plan that could reasonably be expected to result in
liability in excess of $10,000,000 or (C) the amount of liability incurred, or that
may be incurred, by such Loan Party or any ERISA Affiliate in connection with
any event described in clause (A) or (B).

(h)     Environmental Conditions. Promptly after the assertion or occurrence
thereof, notice of any Environmental Action against or of any noncompliance known to
the Borrower by any Loan Party or any of its Subsidiaries with any Environmental Law
or Environmental Permit that could (i) reasonably be expected to have a Material
Adverse Effect or (ii) cause any property described in the Second Lien Mortgages to be
subject to any material restrictions on ownership or transferability, or subject to any
material Lien, under any Environmental Law.

(i)     Real Property. As soon as available and in any event within thirty
(30) days after the end of each Fiscal Year, a report supplementing Schedules 4.01(r) and
4.01(s) hereto, including an identification of all material owned and leased real property
disposed of by the Borrower or any of its Subsidiaries during such Fiscal Year, a list and
description (including the street address, county or other relevant jurisdiction, state,
record owner, and, in the case of leases of property, lessor and lessee thereof) of all
material real property acquired or leased during such Fiscal Year and a description of
such other changes in the information included in such Schedules as may be reasonably
necessary for such Schedules to be accurate and complete.

(j)     Insurance. Promptly after the Borrower gains knowledge of the
occurrence thereof, a report summarizing any changes in the insurance coverage of the
Borrower and its Subsidiaries resulting from a change in the insurance markets of the
type described in Section 2 of Schedule 5.01(d).

(i)     Promptly after the occurrence thereof, notice of any Casualty
Event or Event of Eminent Domain affecting any Loan Party, whether or not
insured, through fire, theft, other hazard, casualty involving a probable loss of
$10,000,000 or more.

75

(ii)    Promptly after receipt thereof, copies of any cancellation or receipt of written notice of threatened cancellation of any property damage insurance required to be maintained under Section 5.01(d).

(k)    Other Information. Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender through the Administrative Agent, may from time to time reasonably request.

SECTION 5.04. Financial Covenants. Until a Repayment Event has occurred, the Borrower will:

(a)    Leverage Ratio. The Borrower shall not permit the Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31 2007, to exceed the correlative ratio indicated:

| Leverage Ratio | |
| --- | --- |
| **Fiscal Quarter** | **Ratio** |
| Quarter 1 2007 ................................................... | 12.0x |
| Quarter 2 2007 ................................................... | 12.0x |
| Quarter 3 2007 ................................................... | 12.0x |
| Quarter 4 2007 ................................................... | 12.0x |
| Quarter 1 2008 ................................................... | 12.0x |
| Quarter 2 2008 ................................................... | 12.0x |
| Quarter 3 2008 ................................................... | 12.0x |
| Quarter 4 2008 ................................................... | 12.0x |
| Quarter 1 2009 ................................................... | 11.0x |
| Quarter 2 2009 ................................................... | 11.0x |
| Quarter 3 2009 ................................................... | 11.0x |
| Quarter 4 2009 ................................................... | 11.0x |
| Quarter 1 2010 ................................................... | 10.0x |
| Quarter 2 2010 ................................................... | 10.0x |
| Quarter 3 2010 ................................................... | 10.0x |
| Quarter 4 2010 ................................................... | 10.0x |
| Quarter 1 2011 ................................................... | 9.0x |

76

| Leverage Ratio | |
|---|---|
| **Fiscal Quarter** | **Ratio** |
| Quarter 2 2011 ..................................................... | 9.0x |
| Quarter 3 2011 ..................................................... | 9.0x |
| Quarter 4 2011 ..................................................... | 9.0x |
| Quarter 1 2012 ..................................................... | 8.0x |
| Quarter 2 2012 ..................................................... | 8.0x |
| Quarter 3 2012 ..................................................... | 8.0x |
| Quarter 4 2012 ..................................................... | 8.0x |
| Quarter 1 2013 ..................................................... | 7.0x |
| Quarter 2 2013 ..................................................... | 7.0x |
| Quarter 3 2013 ..................................................... | 7.0x |
| Quarter 4 2013 ..................................................... | 7.0x |

(b)    Interest Coverage Ratio.  The Borrower shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2007, to be less than the correlative ratio indicated:

| Interest Coverage Ratio | |
|---|---|
| **Fiscal Quarter** | **Ratio** |
| Quarter 1 2007 ..................................................... | 1.00x |
| Quarter 2 2007 ..................................................... | 1.00x |
| Quarter 3 2007 ..................................................... | 1.00x |
| Quarter 4 2007 ..................................................... | 1.00x |
| Quarter 1 2008 ..................................................... | 1.00x |
| Quarter 2 2008 ..................................................... | 1.00x |
| Quarter 3 2008 ..................................................... | 1.05x |
| Quarter 4 2008 ..................................................... | 1.05x |
| Quarter 1 2009 ..................................................... | 1.05x |
| Quarter 2 2009 ..................................................... | 1.05x |
| Quarter 3 2009 ..................................................... | 1.05x |

77

| Interest Coverage Ratio | |
| --- | --- |
| **Fiscal Quarter** | **Ratio** |
| Quarter 4 2009 ...................................................... | 1.05x |
| Quarter 1 2010 ...................................................... | 1.10x |
| Quarter 2 2010 ...................................................... | 1.10x |
| Quarter 3 2010 ...................................................... | 1.10x |
| Quarter 4 2010 ...................................................... | 1.10x |
| Quarter 1 2011 ...................................................... | 1.25x |
| Quarter 2 2011 ...................................................... | 1.25x |
| Quarter 3 2011 ...................................................... | 1.25x |
| Quarter 4 2011 ...................................................... | 1.25x |
| Quarter 1 2012 ...................................................... | 1.50x |
| Quarter 2 2012 ...................................................... | 1.50x |
| Quarter 3 2012 ...................................................... | 1.50x |
| Quarter 4 2012 ...................................................... | 1.50x |
| Quarter 1 2013 ...................................................... | 1.75x |
| Quarter 2 2013 ...................................................... | 1.75x |
| Quarter 3 2013 ...................................................... | 1.75x |
| Quarter 4 2013 ...................................................... | 1.75x |

(c)    Right to Cure Financial Covenants.  (i) Notwithstanding anything to the contrary contained in Section 5.04(a) or (b), if the Loan Parties fail to comply with the requirements of either covenant set forth in Section 5.04(a) or (b) (the "*Financial Covenants*"), then until the 10th calendar day after delivery of the related certificate pursuant to Section 5.03(b) or (c), the Borrower shall have the right to receive cash contributions from EBG Holdings in an aggregate amount equal to or greater than the amount that, if added to Consolidated Adjusted EBITDA for the relevant Fiscal Quarter, would have been sufficient to cause compliance with the Financial Covenants for such Fiscal Quarter (an "*Equity Cure*").

(ii)    The Borrower shall give the Administrative Agent written notice (the "*Cure Notice*") of an Equity Cure on or before the day the Equity Cure is consummated.  The Borrower shall not be entitled to exercise the Equity Cure any more than one (1) time in any consecutive four (4) Fiscal Quarters.

78

(iii)    Upon the delivery by the Borrower of a Cure Notice, no Event of Default or Default shall be deemed to exist pursuant to the Financial Covenants (and any such Default or Event of Default shall be retroactively considered not to have existed or occurred). If the Equity Cure is not consummated within ten (10) days after delivery of the related certificate pursuant to Section 5.03(b) or (c), each such Default or Event of Default shall be deemed reinstated.

(iv)    The cash amount received by the Borrower pursuant to exercise of the Equity Cure shall be added to Consolidated Adjusted EBITDA for the immediately preceding Fiscal Quarter solely for purposes of recalculating compliance with the Financial Covenants for such Fiscal Quarter and of calculating the Financial Covenants for the periods that include such Fiscal Quarter.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.  Events of Default.  If any of the following events (*"Events of Default"*) shall occur and be continuing:

(a)    Payment Defaults.  (i) the Borrower shall fail to pay any principal of any Loan when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on any Loan within three (3) Business Days after the same shall become due and payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (a) within ten (10) Business Days after the same shall become due and payable;

(b)    Misrepresentation.  any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; *provided, however,* that if (i) such Loan Party was not aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied, within thirty (30) days from the date on which the Borrower or any officer thereof first obtains knowledge thereof such that such incorrect or false representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such incorrect or false representation or warranty shall not constitute a Default or Event of Default;

(c)    Certain Covenants.  the Borrower shall fail to perform or observe any term, covenant or agreement contained in (i) Section 2.14, 5.01(e) and (l), 5.02 (other than clause (l) and (p) thereof), 5.03(a) or 5.04 or (ii) Sections 5.01(d), (m), (p) and (s) and 5.02(l) and (p) and such default under this subclause (ii) shall continue

79

unremedied for a period of ten (10) days after the earlier of the date on which (x) any Responsible Officer of a Loan Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower by any Agent or any Lender;

(d)    Other Covenants.  any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for thirty (30) days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender; *provided, however,* that (A) if such failure is not susceptible of being remedied solely by the payment of money to any Person that is due after giving effect to any grace provisions, dispute resolution provisions or similar provisions and is not susceptible of cure within 30 days, (B) such Loan Party is proceeding with diligence and in good faith to cure such default and such default is susceptible to cure and (C) the existence of such failure could not reasonably be expected to have a Material Adverse Effect, such 30-day period shall be extended as may be necessary to cure such failure, such extended period not to exceed ninety (90) days in the aggregate (inclusive of the original 30-day period);

(e)    Cross Default.  any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount of at least $30,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding under this Agreement and obligations under Hedge Agreements, Commodity Hedge and Power Sale Agreements and Debt described in clause (b) of the definition of "***Guaranteed Debt***"), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; *provided* that in the case of any such failure to pay, event or condition described in this subsection (e) in respect of the First Lien Credit Agreement, such failure, event or condition shall only constitute an Event of Default under this Agreement if such failure, event or condition is not cured or waived prior to the date that is forty-five (45) days after the occurrence of such failure, event or condition;

Boston Generating, LLC
Second Lien Credit Agreement
NYI:#3439094v7

(f)    Hedge Cross Default. any Loan Party shall default under any one or more Hedge Agreements or Commodity Hedge and Power Sale Agreements on any required payment obligation in excess of $30,000,000 individually or in the aggregate for all Loan Parties, after giving effect to any grace periods, dispute resolution provisions or similar provisions contained in such Hedge Agreement or Commodity Hedge and Power Sale Agreement (it being acknowledged and agreed that any such Default shall be deemed to be cured for all purposes under the Loan Documents if and when such Loan Party pays or causes the payment of such defaulted amount);

(g)    Insolvency Event. any Loan Party or any of its Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Loan Party or any of its Subsidiaries seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or any Loan Party or any of its Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (g);

(h)    Judgments. any final judgments or orders, either individually or in the aggregate, for the payment of money in excess of $30,000,000 shall be rendered against any Loan Party or any of its Subsidiaries by one or more Governmental Authorities, arbitral tribunals or other bodies having jurisdiction against such Loan Party which remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which a stay of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    Non-Monetary Judgments. any non-monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)    Invalidity. any provision of any Loan Document after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (except as a result of acts or omissions of the Second Lien Secured Parties) cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

81

(k)     Collateral. any Second Lien Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or 5.01(j) shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected second priority lien on and security interest in any material portion of the Collateral purported to be covered thereby;

(l)     Equity of Borrower. the failure of EBG Holdings to hold (directly or indirectly) 100% of the Equity Interests of the Borrower and its Subsidiaries;

(m)     ERISA. (i) any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) could reasonably be expected to have a Material Adverse Effect;

(ii)     any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), could reasonably be expected to have a Material Adverse Effect;

(iii)     any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount that could reasonably be expected to have a Material Adverse Effect;

(n)     Commodity Hedge and Power Sale Agreements. (i) any Commodity Hedge Counterparty to any Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) shall fail to perform or observe any material term, covenant or agreement contained in such Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) if after each case, such failure shall remain unremedied for 30 days or (ii) any Initial Commodity Hedge and Power Sale Agreement or any Eligible Permitted Commodity Hedge and Power Sale Agreement required pursuant to Section 5.01(s) shall terminate on or before its scheduled expiration date except upon fulfillment of each party's obligations thereunder, or shall be declared null and void or unenforceable by a Governmental Authority or a party thereto anticipatorily repudiates its obligations

82

thereunder, and in each such case of (i) or (ii), the Loan Parties shall not have entered into a Replacement Commodity Hedge and Power Sale Agreement within 60 days of the occurrence of any such event; or

(o)    Loss Proceeds.  the occurrence of (i) a Casualty Event with respect to (A) all or a material portion of the Property of any Project or (B) all or a material portion of the Collateral or (ii) an Event of Eminent Domain with respect to (A) all or a material portion of the Property of any Project or (B) all or a material portion of the Collateral, unless in the case of each of clause (i) and (ii) the Borrower shall have received, within 90 days after such occurrence, Insurance Proceeds or Eminent Domain Proceeds or cash equity contributions from EBG Holdings in an amount sufficient to repair or rebuild such Project or Collateral, as the case may be;

then, and in any such event, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender and the obligation of each Lender to make Loans to be terminated, whereupon the same shall forthwith terminate and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; *provided, however*, that, in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, (x) the Commitments of each Lender and the obligation of each Lender to make Loans shall automatically be terminated and (y) the Loans, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE VII

## THE AGENTS

SECTION 7.01.  Authorization and Action.  (a)  Each Lender (in its capacity as a Lender) hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of Notes; *provided, however*, that the Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or applicable law.

83

(b)    The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Second Lien Collateral Documents or of exercising any rights and remedies thereunder at the direction of the Second Lien Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney-in-fact that it selects in accordance with the foregoing provisions of this Section 7.01(b) in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 7.02. Administrative Agent's Reliance, Etc. Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, the Administrative Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03. Initial Banks and Affiliates. With respect to its Commitments, the Loans made by it and any Notes issued to it, each Initial Bank shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though each were not an Agent; and the term "*Lender*" or "*Lenders*" shall, unless otherwise expressly indicated, include each Initial Bank in their respective individual capacities. Each Initial Bank and their respective affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Initial Bank was not an Agent and without any duty to account therefor to the Lenders. No Initial Bank shall have any duty to disclose any information obtained or received by it or any of its Affiliates

84

relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Initial Bank.

SECTION 7.04. Lender Credit Decision. Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05. Indemnification. (a)  Each Lender severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "*Indemnified Costs*"); *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)    For purposes of Section 7.05(a), each Lender's ratable share of any amount shall be determined, at any time, according to the aggregate principal amount of the Loans outstanding at such time and owing to such Lender. The failure of any Lender to reimburse any Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. Successor Administrative Agent. The Administrative Agent may resign at any time by giving 30 days' written notice thereof to the Lenders and the Borrower and may be removed at any time with or without cause by the Required Lenders.

85

Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this Section 7.06 no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Administrative Agent's resignation or removal hereunder shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

## ARTICLE VIII

### GUARANTY

SECTION 8.01. Guaranty; Limitation of Liability. (a) Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "*Guaranteed Obligations*"), and agrees to pay any and all expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Lender in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

86

(b)    Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Lender, hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Administrative Agent, the other Lenders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lenders under or in respect of the Loan Documents.

SECTION 8.02.  Guaranty Absolute. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

87

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender (each Guarantor waiving any duty on the part of the Lenders to disclose such information);

(g)     the failure of any other Person to execute or deliver this Agreement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 8.03.  Waivers and Acknowledgments.  (a)  Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any

88

other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)     Each Guarantor acknowledges that the Second Lien Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Second Lien Collateral Agent and the other Second Lien Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 8.02 and this Section 8.03 are knowingly made in contemplation of such benefits.

SECTION 8.04. Subrogation. Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender against the Borrower, any other Loan Party or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower or any other Loan Party directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Commitments shall have expired or been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, (b) the Maturity Date and (c) the latest date of expiration or termination of all Secured Hedge Agreements, such amount shall be received and held in trust for the benefit of the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make payment to any Lender of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this

89

Guaranty shall have been paid in full in cash and (iii) the Maturity Date shall have occurred, the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 8.05.  Subordination.  Each Loan Party hereby subordinates any and all debts, liabilities and other Obligations owed to such Loan Party by each other Loan Party (the "*Subordinated Obligations*") to the Second Lien Obligations of such Loan Party to the extent and in the manner provided in the Terms of Subordination.

SECTION 8.06.  Continuing Guaranty; Assignments.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until a Repayment Event has occurred, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lenders and their successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and any Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise, in each case as and to the extent provided in Section 9.07.  Except as expressly permitted under the Loan Documents, no Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders.

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01.  Amendments, Etc.  (a) Subject to Sections 5.3(d) of the Intercreditor Agreement and clause (b) below, no amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document (including the Intercreditor Agreement and the Security Deposit Agreement), nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Required Lenders (or the Administrative Agent on their behalf), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however,* that

(i)    no amendment, waiver or consent shall, unless in writing and signed by the Borrower and all of the Lenders, do any of the following at any time:

(A)    waive any of the conditions specified in Section 3.01 or, in the case of the Initial Extension of Credit, Section 3.02;

(B)    change (A) the definition of "*Required Lenders*" or (B) the number of Lenders or the percentage of (x) the Commitments or (y) the

90

aggregate unpaid principal amount of the Loans that, in each case, shall be required for the Lenders or any of them to take any action hereunder or under any other Loan Document;

(C)    change any other definition in the Intercreditor Agreement or the Security Deposit Agreement in any manner materially and adversely affecting the Lenders;

(D)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranties) if such release or limitation is in respect of a material portion of the value of the Guaranties to the Lenders;

(E)    other than as expressly contemplated by Section 5.1 of the Intercreditor Agreement, release any material portion of the Collateral in any transaction or series of related transactions; or

(F)    amend this Section 9.01, and

(ii)    no amendment, waiver or consent shall, unless in writing and signed by the Borrower and the Required Lenders and each Lender specified below for such amendment, waiver or consent:

(A)    increase the Commitments of a Lender without the consent of such Lender;

(B)    reduce the principal of, or stated rate of interest on, the Loans owed to a Lender or any fees or any other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender;

(C)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or 2.07 or any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender;

(D)    impose any restrictions on the rights of such Lender under Section 9.07;

(E)    [Reserved];

(F)    change the order of application of proceeds of Collateral and other payments set forth in Section 4.1 of the Intercreditor Agreement or Article III of the Security Deposit Agreement in a manner that

91

materially adversely affects any Lender without the consent of such Lender; or

(G)    otherwise amend or modify any of the Intercreditor Agreement or any Second Lien Collateral Document in a manner which disproportionately affects any Lender vis-à-vis any other Secured Party without the written consent of such Lender;

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Borrower and the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

(b)    Notwithstanding the other provisions of this <u>Section 9.01</u>, the Borrower, the Guarantors, the Second Lien Collateral Agent and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender: (i) to cure any ambiguity, defect or inconsistency; (ii) to make any change that would provide any additional rights or benefits to the Lenders; or (iii) to make, complete or confirm any grant of Collateral permitted or required by this Agreement or any of the Second Lien Collateral Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the Second Lien Collateral Documents.

(c)    If, in connection with any proposed amendment, waiver or consent, the consent of all of the Lenders, or all of the Lenders directly affected thereby, is required pursuant to this <u>Section 9.01</u>, and any such Lender refuses to consent to such amendment, waiver or consent as to which the Required Lenders have consented (any such Lender whose consent is not obtained as described in this <u>Section 9.01</u> being referred to as a "***Non-Consenting Lender***"), then, so long as the Administrative Agent is not a Non-Consenting Lender, at the Borrower's request and at the sole cost and expense of the Borrower, the Administrative Agent or an Eligible Assignee shall be entitled (but shall have no obligation) to purchase from such Non-Consenting Lender, and such Non-Consenting Lender (by its acceptance of the benefits of the applicable Loan Documents) agrees that it shall, upon the Administrative Agent's request, sell and assign to the Administrative Agent or such Eligible Assignee, all of the Loans and Commitments of such Non-Consenting Lender or Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lender and all accrued interest and fees with respect thereto through the date of sale; *provided* that such Eligible Assignee consents to the proposed amendment, waiver or consent. Each Lender (by its acceptance of the benefits of the Loan Documents) agrees that, if it becomes a Non-Consenting Lender, it shall execute and deliver to the Administrative Agent an Assignment and Acceptance to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by Notes) subject to such Assignment and Acceptance; *provided, however,* that the failure of any Non-Consenting Lender to execute an Assignment and Acceptance shall not render such sale and purchase (and the corresponding assignment) ineffective.

SECTION 9.02.  <u>Notices, Etc.</u> (a)  All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic (including portable document format (pdf)) communication) and mailed, telegraphed, telecopied

or delivered or (y) as and to the extent set forth in Section 9.02(b) and in the proviso to this Section 9.02(a), in an electronic medium and delivered as set forth in Section 9.02(b), if to any Loan Party, to the Borrower at its address at The Schrafft Center, 529 Main Street, Suite 605, Charlestown, MA 02129, Attention: Executive Vice President, Fax: (617) 381-2211 (with a copy sent to Boston Generating LLC c/o K Road Power Management, LLC, 330 Madison Avenue, 25th Floor, New York, NY 10017, Attention: President, Fax: (212) 351-0515 and a copy sent to Robert F. Quaintance Jr. and Paul D. Brusiloff, Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Fax: (212) 521-7451 and (212) 521-7015, respectively); if to any Initial Lender, at its Domestic Lending Office specified opposite its name on Schedule 1 hereto; if to any other Lender, at its Domestic Lending Office specified in the administrative questionnaire delivered in conjunction with the Assignment and Acceptance pursuant to which it became a Lender; if to the Administrative Agent or the Second Lien Collateral Agent, at its address at 11 Madison Avenue, New York, NY 10010, Attention: Candace Sorina, Fax: (212) 325-8304, E-mail Address: candace.sorina@credit-suisse.com; or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided, however,* that materials and information described in Section 9.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent. All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective when deposited in the mails, delivered to the telegraph company, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to any Agent pursuant to Article II, III or VII shall not be effective until received by such Agent. Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b)    The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a Conversion of an existing, Borrowing (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other Extension of Credit thereunder (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the

93

Communications on IntraLinks or a substantially similar electronic transmission system (the "*Platform*").

(c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees (i) that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03.  No Waiver; Remedies.  No failure on the part of any Lender or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

94

The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04. Costs and Expenses. (a) Other than with respect to Other Taxes which are governed solely by Section 2.12, the Borrower agrees to pay on demand (i) all costs and expenses of each Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for each Agent with respect thereto, with respect to advising such Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of each Agent and each Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each Lender with respect thereto).

(b)    The Borrower agrees to indemnify, defend and save and hold harmless each Agent, each Lender and each of their Affiliates (other than any Commodity Hedge Counterparty in such capacity) and their respective officers, directors, employees, agents, trustees and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and related expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facility, the actual or proposed use of the proceeds of the Loans, the Transaction Documents or any of the transactions contemplated thereby (including, without limitation, the Transaction) or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense (x) is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct or (y) in the case of clause (i) above, is a tax. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the Transaction is consummated. The Borrower also agrees not to assert any claim against any Agent, any Lender or any of their Affiliates, or any of their respective officers, directors, employees, agents, trustees and advisors, on any theory of liability,

95

for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facility, the actual or proposed use of the proceeds of the Loans, the Transaction Documents or any of the transactions contemplated by the Transaction Documents.

(c)    If any payment of principal of, or Conversion of, any Eurodollar Rate Loan is made by the Borrower to or for the account of a Lender as a result of a payment or Conversion pursuant to Section 2.06, 2.09(b)(i) or 2.10(d), acceleration of the maturity of the Loans pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of an Loan for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.06 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Loan.

(d)    If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)    Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Sections 2.10 and 2.12 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05.  Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured. Each Agent and each Lender agrees promptly to notify the Borrower after any such set-off and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Agent and each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender and their respective Affiliates may have.

96

SECTION 9.06. <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

SECTION 9.07. <u>Assignments and Participations</u>. (a) Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Loans owing to it and the Note or Notes held by it); *provided, however,* that (i) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower) for the Facility, *provided* that simultaneous assignments by two or more Related Funds shall be treated as one assignment for purposes of the minimum assignment requirement, (ii) each such assignment shall be to an Eligible Assignee, and to the extent such assignment is to any Eligible Assignee that, immediately prior to such assignment, was not a Lender, an Affiliate of a Lender or an Approved Fund, the Administrative Agent shall have consented to such assignment (in each case such consent not to be unreasonably withheld or delayed), (iii) each such assignment made as a result of a demand by the Borrower pursuant to <u>Section 2.17</u> or <u>Section 9.01</u> shall be arranged by the Borrower after consultation with the Administrative Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of the rights and obligations of the assigning Lender under this Agreement, (iv) no Lender shall be obligated to make any such assignment as a result of a demand by the Borrower pursuant to <u>Section 2.17</u> or <u>Section 9.01</u> unless and until such Lender shall have received one or more payments from either the Borrower or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Advances owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement, (v) no such assignments shall be permitted without the consent of the Administrative Agent until the Administrative Agent shall have notified the Lenders that syndication of the Commitments hereunder has been completed and (vi) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with (A) any Note or Notes (if any) subject to such assignment (B) an administrative questionnaire and tax forms, if applicable and (C) a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent);

97

*provided, however,* that only one such fee shall be payable with respect to simultaneous assignments by or to one or more Related Funds; *provided further* that for each such assignment made as a result of a demand by the Borrower pursuant to Section 2.17 or 9.01, the Borrower shall pay to the Administrative Agent the applicable processing and recordation fee.

(b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender, as the case may be, hereunder and (ii) the Lender or assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 9.02 a

98

copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments under the Facility, and the principal amount of the Loans owing under the Facility to, each Lender from time to time (the "*Register*"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent. If requested, in the case of any assignment by a Lender, within ten (10) Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) an amended and restated Note (which shall be marked "*Amended and Restated*") to the account of such Eligible Assignee in an amount equal to the Commitment assumed by it under the Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such Facility, an amended and restated Note to the account of such assigning Lender in an amount equal to the Commitment retained by it hereunder. Such amended and restated Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A hereto.

(f)    Each Lender may sell participations to one or more Persons (other than any Loan Party) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Loans owing to it and the Note or Notes (if any) held by it); *provided, however*, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral or the value of the Guarantys.

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439094v7

(g)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided, however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(i)    Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)    Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "***SPC***") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of an Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.10 and 2.12 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent

100

and with the payment of a processing fee of $500, assign all or any portion of its interest in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This subsection (j) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Loans are being funded by the SPC at the time of such amendment.

SECTION 9.08. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Electronic delivery (by telecopier or portable document format (pdf)) of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 9.09. [Reserved].

SECTION 9.10. Confidentiality. Neither any Agent nor any Lender shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender's Affiliates and their officers, directors, employees, agents, trustees and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender, (e) in connection with any litigation or proceeding to which such Agent or such Lender or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 9.11. Marshalling; Payments Set Aside. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercise its rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

SECTION 9.12. Patriot Act Notice. Each Lender and each Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of

101

the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender in order to assist the Agents and the Lenders in maintaining compliance with the Patriot Act.

SECTION 9.13. Hedge Banks. Each Lender hereby agrees that in its capacity as a Hedge Bank it shall, and shall cause its Affiliates in their capacity as Hedge Banks to, comply with all obligations of such party as a Hedge Bank under the Intercreditor Agreement.

SECTION 9.14. Intercreditor Agreement. Each Lender hereby acknowledges and agrees on behalf of itself and each of its Affiliates in their capacity as Hedge Banks that their respective Lien priorities and other matters related to the Loan Documents and the Collateral are subject to and governed by the Intercreditor Agreement. Each Lender, by delivering its signature page hereto, funding its Loans on the Effective Date and/or executing an Assignment and Acceptance (as applicable) shall be deemed to have (a) acknowledged receipt of, consented to and approved of the Intercreditor Agreement both on its behalf (and on behalf of its Affiliates acting as Hedge Banks) and (b) authorized (on behalf of itself and any Affiliate acting as a Hedge Bank) the Administrative Agent and the Second Lien Collateral Agent to perform their respective obligations thereunder.

SECTION 9.15. Jurisdiction, Etc. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)   Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

102

SECTION 9.16. <u>Governing Law</u>. This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.17. <u>Waiver of Jury Trial</u>. Each of the Loan Parties, the Agents and the Lenders irrevocably waives, to the fullest extent permitted by applicable law, all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans or the actions of any Agent or any Lender in the negotiation, administration, performance or enforcement thereof.

103

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BOSTON GENERATING, LLC,
as Borrower

By: _____

Name: David L. Tonir
Title: President

MYSTIC I, LLC,
as Guarantor

By: _____

Name: David L. Tonir
Title: President

FORE RIVER DEVELOPMENT, LLC,
as Guarantor

By: _____

Name: David L. Tonir
Title: President

MYSTIC DEVELOPMENT, LLC,
as Guarantor

By: _____

Name: David L. Tonir
Title: President

BG BOSTON SERVICES, LLC,
as Guarantor

By: _____

Name: David L. Tonir
Title: President

[Signature Page - Second Lien Credit Agreement]

BG NEW ENGLAND POWER
SERVICES, INC.,
as Guarantor

By: _____

Name:   David L. Tohir
Title:   President

[Signature Page - Second Lien Credit Agreement]

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH,
as Administrative Agent, Second Lien
Collateral Agent and Initial Lender

By: _____

Name: James Moran
Title: Managing Director

By: _____

Name: Nupur Kumar
Title: Associate

Boston Generating, LLC
Second Lien Credit Agreement
NY1:#3439953v2

GOLDMAN SACHS CREDIT
PARTNERS, L.P.,
as Initial Lender

By:

Name:
Title:    BRUCE H. MENDELSOHN
AUTHORIZED SIGNATORY

# EXHIBIT G

EXECUTION COUNTERPART

**$300,000,000 CREDIT AGREEMENT**

Dated as of December 21, 2006

Among

EBG HOLDINGS LLC

as <u>Borrower</u>

and

THE INITIAL LENDERS HEREIN

as <u>Initial Lenders</u>

and

CREDIT SUISSE

as <u>Administrative Agent</u>

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as <u>Co-Syndication Agent</u> and as <u>Co-Documentation Agent</u>

and

CREDIT SUISSE SECURITIES (USA) LLC AND
GOLDMAN SACHS CREDIT PARTNERS L.P.

as <u>Joint Lead Arrangers</u> and as <u>Joint Book Running Managers</u>

EBG Holdings LLC
Credit Agreement
NY1:#3437976v11

# EXHIBIT G

# TABLE OF CONTENTS

**Section**                                                                          **Page**

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms.................................................................................... 2
SECTION 1.02. Computation of Time Periods; Other Definitional Provisions........................... 28
SECTION 1.03. Accounting Terms............................................................................................ 28

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

SECTION 2.01. The Loans........................................................................................................ 29
SECTION 2.02. Making the Loans............................................................................................ 29
SECTION 2.03. [Reserved] ...................................................................................................... 30
SECTION 2.04. Repayment of Loans ....................................................................................... 30
SECTION 2.05. Prepayments .................................................................................................... 30
SECTION 2.06. Application....................................................................................................... 31
SECTION 2.07. Interest............................................................................................................. 32
SECTION 2.08. Conversion of Loans ....................................................................................... 34
SECTION 2.09. Increased Costs, Etc. ....................................................................................... 34
SECTION 2.10. Payments and Computations............................................................................ 35
SECTION 2.11. Taxes ............................................................................................................... 37
SECTION 2.12. Sharing of Payments, Etc. ............................................................................... 40
SECTION 2.13. Use of Proceeds............................................................................................... 40
SECTION 2.14. Change of Control Prepayment........................................................................ 41
SECTION 2.15. Evidence of Debt............................................................................................. 41
SECTION 2.16. Duty to Mitigate .............................................................................................. 42

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01. Conditions Precedent ....................................................................................... 42
SECTION 3.02. Determinations Under Section 3.01 ................................................................. 45

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties......................................................................... 46

EBG Holdings LLC
Credit Agreement
NY1:#3437976v11

## ARTICLE V

## COVENANTS

SECTION 5.01. Affirmative Covenants ................................................................................. 51
SECTION 5.02. Negative Covenants ................................................................................... 52
SECTION 5.03. Reporting Requirements ............................................................................ 56

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default ....................................................................................... 57
SECTION 6.02. Action if Insolvency .................................................................................. 60
SECTION 6.03. Action if Other Event of Default .............................................................. 60

## ARTICLE VII

## THE AGENTS

SECTION 7.01. Authorization and Action ........................................................................... 61
SECTION 7.02. Administrative Agent's Reliance, Etc. ....................................................... 61
SECTION 7.03. Initial Banks and Affiliates ...................................................................... 62
SECTION 7.04. Lender Credit Decision ............................................................................. 62
SECTION 7.05. Indemnification ......................................................................................... 62
SECTION 7.06. Successor Administrative Agent ............................................................... 63

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01. Amendments, Etc. ..................................................................................... 63
SECTION 8.02. Notices, Etc. ............................................................................................. 65
SECTION 8.03. No Waiver; Remedies ............................................................................... 67
SECTION 8.04. Costs and Expenses .................................................................................. 67
SECTION 8.05. Right of Set-off ........................................................................................ 69
SECTION 8.06. Binding Effect .......................................................................................... 69
SECTION 8.07. Assignments and Participations ............................................................... 69
SECTION 8.08. Execution in Counterparts ........................................................................ 73
SECTION 8.09. Confidentiality .......................................................................................... 73
SECTION 8.10. Patriot Act Notice ..................................................................................... 73
SECTION 8.11. Jurisdiction, Etc. ...................................................................................... 73
SECTION 8.12. Governing Law ......................................................................................... 74
SECTION 8.13. Waiver of Jury Trial .................................................................................. 74

SCHEDULES

Schedule I               -    Commitments and Applicable Lending Offices
Schedule II              -    Make Whole Premium
Schedule 4.01(b)         -    Subsidiaries
Schedule 4.01(c)         -    Ownership Information
Schedule 4.01(e)         -    Consents and Approvals
Schedule 4.01(g)         -    Litigation
Schedule 4.01(o)         -    Environmental Matters
Schedule 4.01(p)         -    Existing Debt

EXHIBITS

Exhibit A        -    Form of Note
Exhibit B        -    Form of Notice of Borrowing
Exhibit C        -    Form of Assignment and Acceptance
Exhibit D        -    Form of Solvency Certificate
Exhibit E        -    Form of Annual Budget

iii

## CREDIT AGREEMENT

CREDIT AGREEMENT dated as of December 21, 2006 among EBG HOLDINGS LLC, a Delaware limited liability company (the "***Borrower***"), the Lenders (as hereinafter defined), CREDIT SUISSE, CAYMAN ISLANDS BRANCH ("***CS***"), as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***") for the Lenders, CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-syndication agents (together with any successor co-syndication agents, the "***Co-Syndication Agent***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as co-documentation agents (together with any successor co-documentation agents, the "***Co-Documentation Agent***"), CREDIT SUISSE SECURITIES (USA) LLC and GOLDMAN SACHS CREDIT PARTNERS L.P., as joint lead arrangers (together with any successor joint lead arrangers, the "***Joint Lead Arrangers***") and as joint lead book running managers (together with any successor joint lead arrangers, the "***Joint Book Running Managers***").

PRELIMINARY STATEMENTS:

(1)    The Borrower has requested that the Lenders provide a term loan facility to the Borrower and make loans up to $300,000,000 to pay transaction fees and expenses and to fund in part the Distribution and the Tender Offer (each as hereinafter defined) and to provide funds for other general corporate purposes of the Borrower.

(2)    The Borrower has commenced the Tender Offer (as herein after defined) for up to $925,000,000 of its Units (as hereinafter defined) to be financed in part with the proceeds of the loans hereunder.

(3)    Simultaneously with the entering into of this Agreement, Boston Generating, LLC ("***BostonGen***") and the Guarantors named therein are entering into that certain (a) First Lien Credit and Guarantee Agreement dated as of the date hereof (the "***First Lien Credit Agreement***") with each of the banks, financial institutions and other institutional lenders party thereto from time to time (the "***First Lien Lenders***"), and CS, as administrative agent (the "***First Lien Administrative Agent***"), and (b) Second Lien Credit and Guaranty Agreement, dated as of the date hereof (the "***Second Lien Credit Agreement***") with each of the banks, financial institutions and other institutional lenders party thereto from time to time (the "***Second Lien Lenders***"), and CS, as administrative agent (the "***Second Lien Administrative Agent***"), the proceeds of which shall be used to (i) repay in full amounts outstanding under the Existing Credit Agreements, (ii) fund the Distribution and the Tender Offer, (iii) provide working capital, and (iv) to pay transaction fees and expenses ("***Transaction Costs***").

(4)    The Borrower intends to make a pro rata distribution to its unit holders, prior to the purchase of Units in the Tender Offer, in an amount of up to $40,000,000 to be financed in part with the proceeds of the loans hereunder (the "***Distribution***").

(5)    The Lenders have indicated their willingness to agree to make Loans (as hereinafter defined), subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lenders from time to time.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "*control*" (including the terms "*controlling,*" "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to vote 15% or more of the Voting Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agreement*" means this Credit Agreement, as amended.

"*Applicable Lending Office*" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Loan and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Loan.

"*Applicable Margin*" means 6.00% per annum for Base Rate Loans and 7.00% per annum for Eurodollar Rate Loans.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Asset Sale*" means any sale, lease, transfer or other disposition of any Property of the Borrower or any of its Subsidiaries (other than (a) sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) power, natural gas, fuel, capacity, gas or fuel transportation, power transportation or ancillary services or other inventory in the ordinary course of such Person's business including, without limitation, Permitted Trading Activities, (b) the liquidation, sale or use of Cash and Cash Equivalents, (c) sales, transfers or other dispositions of assets among BostonGen and its Subsidiaries, (d) sales or discounts without recourse of accounts receivable arising in the ordinary course of such Person's business in connection with the compromise or

collection thereof, (e) dispositions required or contemplated by the Contractual Obligations in existence as of the date hereof with or relating to Governmental Authorities and relating to the Subsidiaries of BostonGen and (f) sales, transfers or other dispositions of Property on an arm's length basis for cash consideration in an aggregate amount not to exceed $10,000,000 per calendar year).

"*Asset Sale Proceeds*" means, with respect to any Asset Sale, the Net Cash Proceeds payable to the Borrower or any of its Subsidiaries in connection with such Asset Sale.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 8.07 or by the definition of "*Eligible Assignee*"), and accepted by the Administrative Agent, in accordance with Section 8.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"*Auction Date*" means the date of the consummation of the Tender Offer.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "*Bankruptcy*," as now and hereafter in effect, or any successor statute.

"*Base Case Projections*" has the meaning specified in Section 3.01(a)(ix).

"*Base Rate*" means a fluctuating interest rate *per annum* in effect from time to time, which rate per annum shall at all times be equal to the higher of:

(a) the rate of interest announced publicly by CS in New York, New York, from time to time, as the prime rate; and

(b) ½ of 1% *per annum* above the Federal Funds Rate.

"*Base Rate Loan*" means any Loan that bears interest as provided in Section 2.07(a)(i).

"*Borrower*" has the meaning specified in the recital of parties to this Agreement.

"*Borrowing*" means a borrowing consisting of simultaneous Loans of the same Type made by the Lenders.

"*BostonGen*" has the meaning specified in the preliminary statements to this Agreement.

"*BostonGen Facilities*" means each of the First Lien Credit Agreement and the Second Lien Credit Agreement.

"*BostonGen Repayment Event*" means the date on which both (a) a Repayment Event (as defined in the First Lien Credit Agreement) or any other similar event under any Successor Facility (as defined below) has occurred on or prior to such date and (b) a

3

Repayment Event (as defined in the Second Lien Credit Agreement) or any other similar event under any Successor Facility (as defined below) has occurred on or prior to such date; *provided that*, any such Repayment Event or similar event shall not be deemed to have occurred under any facility by reason of any extension, replacement or other refinancing of such facility, in each case in an aggregate principal amount not to exceed the sum of the principal amount being extended, replaced or refinanced, accrued interest thereon, prepayment premiums (if any) and associated transaction fees and expenses (such extension, replacement or refinancing, a "Successor Facility").

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; *provided* that, when used in connection with a Eurodollar Rate Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"*Call Premium*" shall mean, with respect to any applicable prepayment under Section 2.05 or Section 2.14, an amount equal to (a) the Make Whole Premium on such prepayment if such prepayment is made on or prior to the second anniversary of the Effective Date, (b) 3.00% of the aggregate principal amount of such prepayment if such prepayment is made after the second anniversary of the Effective Date but on or prior to the third anniversary of the Effective Date, (c) 2.00% of the aggregate principal amount of such prepayment if such prepayment is made after the third anniversary of the Effective Date but on or prior to the fourth anniversary of the Effective Date or (d) 1.00% of the aggregate principal amount of such prepayment if such prepayment is made after the fourth anniversary of the Effective Date but on or prior to the fifth anniversary of the Effective Date. Any commitment reduction or prepayment after the fifth anniversary of the Effective Date will not be subject to the Call Premium.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Cash*" means money, currency or a credit balance in any demand account or deposit account.

"*Cash Equivalents*" means any of the following: (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof; (b) securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than one year from the date of acquisition thereof and, at the time of acquisition, having a rating of AA- or higher from S&P or Aa3 or higher from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); (c) investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A 1 or P 1

from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); (d) investments in certificates of deposit, banker's acceptances and time deposits maturing within 270 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Depositary, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000; (e) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (d) above; (f) investments in *"money market funds"* within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above (without regard, however, to the thirty (30) day term restriction described in clause (e) above or the one year term restriction described in clause (a) above); (g) other short-term investments utilized by foreign subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing; and (h) cash.

*"Casualty Event"* means a casualty event that causes all or a portion of the tangible Collateral (as defined in the Related Documents) to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever, other than (a) ordinary use and wear and tear or (b) any Event of Eminent Domain.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

*"CERCLIS"* means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

*"Change of Control"* means, at any time after the Auction Date, any *"person"* or *"group"* (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) (other than any such *"person"* or *"group"* holding, directly or indirectly, beneficially or of record, any Equity Interests in the Borrower as of the Auction Date) (the *"Proposed Acquiror"*) shall have acquired ownership, directly or indirectly, beneficially or of record, of more than 35% on a fully diluted basis of the aggregate voting power represented by the issued and outstanding Equity Interests in the Borrower unless such Proposed Acquiror is a Qualified Owner and each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Debt under the BostonGen Facilities (as in effect immediately prior to such acquisition) after giving effect to such acquisition. For the purposes of this definition, a *"person"* or *"group"* shall not include any of the unit holders of the Borrower solely by virtue of such unit holders being a party to the limited liability company agreement of the Borrower.

"*Co-Documentation Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Co-Syndication Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Commitment*" means, with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "*Commitment*" or, if such Lender has entered into one or more Assignment and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 8.07(e) as such Lender's "*Commitment*," as such amount may be reduced at or prior to such time pursuant to Section 2.05.

"*Commodity Hedge and Power Sale Agreement*" means, with respect to power, electricity, capacity, ancillary services, electric transmission, weather, fuel, fuel transmission, fuel transportation, fuel storage, heat rate options, emissions allowances and emissions credits and, in the case of each of the foregoing, products related thereto, any swap, cap, collar, floor, ceiling, option, future, forward, spot agreement, contract for differences, basis trade, purchase agreement, sale agreement, netting agreement, tolling agreement or any other similar agreement, whether physical or financial, entered into with respect to any commodity or commodity-related product.

"*Communications*" has the meaning specified in Section 8.02(b).

"*Comparable Project*" means one or more electric generating facilities that are of the size and scope substantially similar to or greater than the Projects taken as a whole.

"*Confidential Information*" means information that the Borrower furnishes to any Administrative Agent or any Lender designated as confidential, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Administrative Agent or any Lender of its obligations hereunder or that is or becomes available to such Administrative Agent or such Lender from a source other than the Borrower that is not, to the best of such Administrative Agent's or such Lender's knowledge, acting in violation of a confidentiality agreement with the Borrower.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Consolidated Adjusted EBITDA*" means, for any period (without duplication), an amount determined for the Borrower and its Subsidiaries on a Consolidated basis equal to (a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Cash Interest Expense, (iii) provisions for taxes based on income, (iv) Cash proceeds of any Permitted Emissions Sales Gains, (v) total depreciation expense, (vi) total amortization expense, (vii) other non Cash items reducing Consolidated Net Income for such period, including unrealized losses attributable to the change in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements and accruals for liquidated damages and related late fees associated with the Distrigas Litigation described in Schedule 4.01(g) (excluding any

6

such non Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period), *minus* (b) to the extent included in determining Consolidated Net Income, other non Cash items increasing Consolidated Net Income for such period, including unrealized gains attributable to the changes in fair market value of all Commodity Hedge and Power Sale Agreements and Hedge Agreements (excluding any such non Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash items in any prior period). For purposes of this definition, Consolidated Adjusted EBITDA for each of the periods ending the last day of each of June, September and December 2006 shall be $57,250,000, $57,250,000 and $57,250,000, respectively.

"*Consolidated Cash Interest Expense*" means, for any period, total interest expense (including that portion attributable to Capitalized Leases in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries on a Consolidated basis with respect to all outstanding Debt for Borrowed Money of the Borrower and its Subsidiaries for such period, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net obligations under Hedge Agreements, but excluding, however, (a) any amount for related late fees and interest associated with the Distrigas Litigation described in Schedule 4.01(g), (b) interest payable under BostonGen's fuel oil inventory program permitted under the Related Documents and (c) interest and fees associated with RMR Revenues subject to refund. For purposes of determining Consolidated Cash Interest Expense for any period ending prior to January 1, 2008, Consolidated Cash Interest Expense shall be deemed to be: (i) for the Fiscal Quarter ending March 31, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarter *multiplied by* (y) four (4), (ii) for the two Fiscal Quarters ending June 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) two (2), (iii) for the three Fiscal Quarters ending September 30, 2007, an amount equal to (x) actual Consolidated Cash Interest Expense for such Fiscal Quarters *multiplied by* (y) four-thirds (4/3) and (iv) for the four Fiscal Quarters ending December 31, 2007, actual Consolidated Cash Interest Expense for such Fiscal Quarters.

"*Consolidated Net Income*" means, for any period, (a) the net income (or loss) of the Borrower and its Subsidiaries on a Consolidated basis for such period determined in conformity with GAAP, *minus* (b) to the extent otherwise included in Consolidated Net Income, (i) the income of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (ii) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Plan, (iii) (to the extent not included in clauses (i) and (ii) above) any net extraordinary gains or net extraordinary losses and (iv) income attributable to the RMR Agreement (other than Permitted RMR Revenues) *plus* (c) without duplication, Permitted RMR Revenues. In addition, Consolidated Net Income for any period shall reflect expenses associated with long-term service agreements on the basis of equivalent operating hours incurred during such period (instead of on the basis of maintenance work performed during such period as required by GAAP).

"*Consolidated Total Debt*" means, as at any date of determination, the aggregate stated balance sheet amount of all Debt for Borrowed Money of the Borrower and its Subsidiaries determined on a Consolidated basis in accordance with GAAP.

"*Contractual Obligations*" means, as applied to any Person, any provision of any Equity Interests issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its Properties is bound.

"*Control*" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Conversion*," "*Convert*" and "*Converted*" each refer to a conversion of Loans of one Type into Loans of the other Type pursuant to Section 2.08 or 2.09.

"*CS*" has the meaning specified in the recital of parties to this Agreement.

"*Current Assets*" means, at any time, Consolidated current assets of the Borrower and its Subsidiaries at such time that would, in accordance with GAAP, be classified in a consolidated balance sheet of the Borrower as current assets at such date of determination, but excluding cash, Cash Equivalents and liabilities owed to the Borrower and its Subsidiaries by any Affiliate thereof.

"*Current Liabilities*" means, at any time, Consolidated current liabilities of the Borrower and its Subsidiaries at such time that would, in accordance with GAAP, be classified on a balance sheet of the Borrower as current liabilities at such date of determination, and in any event shall include all Debt payable on demand or within one year from any date of determination without any option on the part of the obligor thereunder to extend or renew beyond such year and all accruals for federal or other taxes based on or measured by income and payable within one year, but excluding the current portion of long-term debt (including any Debt hereunder) required to be paid within one year.

"*Debt*" of any Person means, without duplication, (a) Debt for Borrowed Money of such Person, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue (unless being contested in good faith by appropriate proceedings for which reserves and other appropriate provisions, if any, required by GAAP shall have been made) by more than 90 days incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person to purchase, redeem,

8

retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (g) all obligations of such Person in respect of Hedge Agreements and Commodity Hedge and Power Sale Agreements (valued at the Agreement Value thereof), in each case, pursuant to an International Swap Dealers Association agreement form or similar arrangement, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations.

"***Debt for Borrowed Money***" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date and (b) all Synthetic Debt of such Person at such date; *provided* that with respect to each of clauses (a) and (b) above, any amounts associated with unutilized and undrawn amounts under the Synthetic L/C Facility and the Revolving Credit Facility (each as defined in the First Lien Credit Agreement) shall not be deemed Debt for Borrowed Money.

"***Debt Proceeds***" means, with respect to the incurrence or issuance of any Debt by the Borrower (other than Permitted Debt) or any of its Subsidiaries (other than Debt Permitted under the Related Documents), the Net Cash Proceeds payable to the Borrower or any of its Subsidiaries in connection with such incurrence or issuance.

"***Default***" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"***Default Interest***" has the meaning set forth in Section 2.07(b).

"***Distribution***" has the meaning set forth in the preliminary statements to this Agreement.

"***Distrigas Litigation***" means that certain case pending in the Suffolk County, Massachusetts Superior Court (Civil Action No: 05-0764) entitled Distrigas of Massachusetts, LLC v. Mystic Development and Exelon New England, LLC, as described in Schedule 4.01(g).

"***Dollars***" and the sign "*$*" mean the lawful currency of the United States of America.

"***Domestic Lending Office***" means, with respect to any Lender, the office of such Lender specified as its "*Domestic Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender, as the case

may be, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"*Effective Date*" has the meaning specified in <u>Section 3.01</u>.

"*Eligible Assignee*" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed); *provided, however*, that neither the Borrower nor its Subsidiaries shall qualify as an Eligible Assignee under this definition.

"*Eminent Domain Proceeds*" means with respect to any Event of Eminent Domain, the Net Cash Proceeds payable to the Borrower or any of its Subsidiaries in connection with such Event of Eminent Domain.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, written notice of non compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"*Environmental Law*" means any Federal, state or local statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Materials, health or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"*Equity Issuance*" means any issuance of any Equity Interests by the Borrower or any of its Subsidiaries, other than any Excluded Equity Issuance.

"***Equity Proceeds***" means, with respect to any Equity Issuance, the Net Cash Proceeds payable to the Borrower or any of its Subsidiaries in connection with such Equity Issuance.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of the Borrower, or under common control with the Borrower, within the meaning of Section 414(b) or (c) of the Internal Revenue Code.

"***ERISA Event***" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of the Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by the Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"***Eurocurrency Liabilities***" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"***Eurodollar Lending Office***" means, with respect to any Lender, the office of such Lender specified as its "*Eurodollar Lending Office*" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"***Eurodollar Rate***" means, for any Interest Period for all Eurodollar Rate Loans comprising part of the same Borrowing an interest rate *per annum* equal to the rate per annum obtained by dividing (a) the rate *per annum* (rounded upwards, if necessary, to the

nearest 1/100 of 1%) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at 11:00 A.M. (London time) on the Interest Rate Determination Date for such Interest Period for a period equal to such Interest Period (*provided* that, if for any reason such rate is not available, the term "*Eurodollar Rate*" shall mean, for any Interest Period for all Eurodollar Rate Loans, the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; *provided, however,* if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates), by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period.

"*Eurodollar Rate Loan*" means a Loan that bears interest as provided in Section 2.07(a)(ii).

"*Eurodollar Rate Reserve Percentage*" for any Interest Period for all Eurodollar Rate Loans comprising part of the same Borrowing means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Loans is determined) having a term equal to such Interest Period.

"*Event of Eminent Domain*" means any action, series of actions, omissions or series of omissions by any Governmental Authority (a) by which such Governmental Authority appropriates, confiscates, condemns, expropriates, nationalizes, seizes or otherwise takes all or a material portion of the Property of the Borrower or any of its Subsidiaries (including any Equity Interests of the Borrower or any of its Subsidiaries) or (b) by which such Governmental Authority assumes custody or control of the Property (other than immaterial portions of such Property) or business operations of the Borrower or any of its Subsidiaries or any Equity Interests of the Borrower or any of its Subsidiaries.

"*Events of Default*" has the meaning specified in Section 6.01.

"*EWG*" means an exempt wholesale generator within the meaning of Section 1262(6) of PUHCA.

"*Excess Cash Flow*" means, for any Semi-Annual Period, the excess (if any) of

(a)    the sum of (i) Consolidated Adjusted EBITDA for such Semi-Annual Period, (ii) to the extent not included in such Consolidated Adjusted EBITDA, cash actually received by the Borrower and its Subsidiaries during such

Semi-Annual Period in respect of extraordinary gains and gains from any sale, transfer or disposition of cash or Cash Equivalents, or in respect of business interruption insurance, and (iii) reductions (if any) to non-cash working capital of the Borrower and its Subsidiaries for such Semi-Annual Period (i.e., the decrease (if any) in Current Assets minus Current Liabilities from the beginning to the end of such Semi-Annual Period) other than reductions attributable to the reclassification of any Debt from "long term debt" to "Current Liabilities"

over

(b)      the sum (for such Semi-Annual Period) of (i) the aggregate amount of all principal payments, whether scheduled payments, mandatory prepayments or voluntary prepayments, paid by the Borrower and its Subsidiaries on all Debt during such period (including the principal portion of payments in respect of Capitalized Leases but excluding prepayments made pursuant to clause (b) of Section 2.05), in each case, to the extent permitted to be made under this Agreement and so long as not made with, or on account of, proceeds of Debt or equity issuances or other proceeds that would not be included in Consolidated Adjusted EBITDA, (ii) all Consolidated Cash Interest Expense paid or payable in cash during such Semi-Annual Period (including the capitalized interest portion of obligations under Capitalized Leases paid in cash and the interest portion of any deferred payment obligation paid in cash during such Semi-Annual Period), to the extent such payments are in respect of interest which accrued during such Semi-Annual Period; provided that, for the avoidance of doubt, amounts deducted under this clause may be deducted in only one Semi-Annual Period, (iii) all Capital Expenditures made by the Borrower and its Subsidiaries paid or payable in cash to the extent permitted to be made under this Agreement and so long as not financed with the proceeds of Debt or equity issuances or other proceeds that would not be included in Consolidated Adjusted EBITDA; provided that, for the avoidance of doubt, amounts deducted under this clause may be deducted in only one Semi-Annual Period, (iv) all Taxes paid by the Borrower in cash during such Semi-Annual Period, to the extent such payments are in respect of income which accrued during such Semi-Annual Period, (v) to the extent not subtracted in determining Consolidated Adjusted EBITDA for such Semi-Annual Period, cash actually paid by the Borrower and its Subsidiaries during such Semi-Annual Period in respect of losses from any sale, transfer or disposition of cash or Cash Equivalents, (vi) to the extent added to Consolidated Net Income in determining Consolidated Adjusted EBITDA for such Semi-Annual Period, Transaction Costs actually paid in cash by the Borrower and its Subsidiaries during such Semi-Annual Period, and (vii) additions (if any) to non-cash working capital of the Borrower and its Subsidiaries for such Semi-Annual Period (i.e., the increase (if any) in Current Assets minus Current Liabilities from the beginning to the end of such Semi-Annual Period).

"***Excluded Equity Issuance***" means (i) any issuance of any Equity Interests, the proceeds of which are to be used to finance a Permitted Development, (ii) any issuance of any Equity Interests in connection with an Equity Cure under (and as defined in) the

Related Documents, (iii) any issuance of any Equity Interest in connection with an Investment permitted pursuant to Section 5.02(f)(iv), (iv) any issuance of any Equity Interests in transactions permitted pursuant to Section 5.02(g)(i) or (v) any other issuance of any Equity Interests in an amount not to exceed $25,000,000 in the aggregate.

"*Existing Credit Agreements*" means, collectively, (i) the Amended and Restated First Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the First Lien Term Lenders named therein, the Working Capital Lenders named therein, the LC Lenders named therein, the LC-DSR Lenders named therein, CS, as First Lien Administrative Agent and CS, as Collateral Agent and (ii) the Amended and Restated Second Lien Credit and Reimbursement Agreement dated as of October 11, 2005 among the Borrower, the Second Lien Lenders named therein, CS, as Second Lien Administrative Agent and CS, as Collateral Agent.

"*Existing Debt*" has the meaning specified in Section 4.01(p).

"*Facility*" means, at any time, the aggregate amount of the Lenders' Commitments at such time.

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate *per annum* equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Fee Letter*" means the engagement letter dated November 20, 2006 between the Borrower, BostonGen and CS.

"*FERC*" means the Federal Energy Regulatory Commission and its successors.

"*Financing Documents*" has the meaning specified in the Intercreditor Agreement.

"*First Lien Administrative Agent*" has the meaning specified in the preliminary statements to this Agreement.

"*First Lien Credit Agreement*" has the meaning specified in the preliminary statements to this Agreement.

"*First Lien Lenders*" has the meaning specified in the preliminary statements to this Agreement.

"*First Lien Pledge Agreement*" means that certain First Lien Pledge Agreement dated as of December 21, 2006 by the Borrower in favor of the First Lien Collateral Administrative Agent for the benefit of the First Lien Secured Parties, as amended.

14

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

"*Fiscal Year*" means a fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"*Fore River*" means Fore River Development, LLC, a Delaware limited liability company.

"*Fore River Project*" means a combined-cycle electric generating facility in Weymouth and Quincy, Massachusetts and owned by Fore River with a nominal capacity of 807 MW in operation.

"*FPA*" means the Federal Power Act, as amended.

"*Fund*" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"*GAAP*" has the meaning specified in Section 1.03.

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"*Granting Lender*" has the meaning specified in Section 8.07(j).

"*Guaranteed Debt*" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary

15

obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements but excluding any Commodity Hedge and Power Sale Agreement.

"*Indemnified Costs*" has the meaning specified in Section 7.05.

"*Indemnified Party*" has the meaning specified in Section 8.04(b).

"*Initial Banks*" means the Administrative Agent, each Co-Syndication Agent, each Co-Documentation Agent, each Joint Book Running Manager and each Joint Lead Arranger.

"*Initial Extension of Credit*" means the initial Borrowing hereunder.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Operating Budget*" means has the meaning specified in Section 3.01(a)(ix).

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"*Insurance Proceeds*" means, with respect to any Casualty Event, the Net Cash Proceeds payable to the Borrower or any of its Subsidiaries from time to time with respect to such Casualty Event.

"*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, dated as of December 21, 2006, by and among BostonGen, the Borrower, the Guarantors named therein, the First Lien Collateral Administrative Agent, the Second Lien Collateral Administrative Agent, First Lien Administrative Agent, CS, as Second

Lien Administrative Agent, certain Commodity Hedge Counterparties and the other
Persons party thereto from time to time, as amended.

"*Interest Period*" means, for each Eurodollar Rate Loan comprising part of the
same Borrowing, the period commencing on the date of such Eurodollar Rate Loan or the
date of the Conversion of any Base Rate Loan into such Eurodollar Rate Loan, and
ending on the last day of the period selected by the Borrower pursuant to the provisions
below and, thereafter, each subsequent period commencing on the last day of the
immediately preceding Interest Period and ending on the last day of the period selected
by the Borrower pursuant to the provisions below. The duration of each such Interest
Period shall be one, two, three or six months, or, if available to each Lender, nine or
twelve months or such other period acceptable to the Administrative Agent, as the
Borrower may, upon notice received by the Administrative Agent not later than
11:00 A.M. (New York City time) on the third Business Day prior to the first day of such
Interest Period, select; *provided, however*, that:

(a) the Borrower may not select any Interest Period with respect to any
Eurodollar Rate Loan under a Facility that ends after any principal repayment
installment date for such Facility unless, after giving effect to such selection, the
aggregate principal amount of Base Rate Loans and of Eurodollar Rate Loans
having Interest Periods that end on or prior to such principal repayment
installment date for such Facility shall be at least equal to the aggregate principal
amount of Loans under such Facility due and payable on or prior to such date;

(b) [Reserved];

(c) whenever the last day of any Interest Period would otherwise occur on
a day other than a Business Day, the last day of such Interest Period shall be
extended to occur on the next succeeding Business Day, *provided, however*, that,
if such extension would cause the last day of such Interest Period to occur in the
next following calendar month, the last day of such Interest Period shall occur on
the next preceding Business Day;

(d) whenever the first day of any Interest Period occurs on a day of an
initial calendar month for which there is no numerically corresponding day in the
calendar month that succeeds such initial calendar month by the number of
months equal to the number of months in such Interest Period, such Interest
Period shall end on the last Business Day of such succeeding calendar month; and

(e) the Borrower shall not be permitted to select Interest Periods to be in
effect at any one time which have expiration dates occurring on more than eight
different dates (it being understood that there shall not be more than eight
contracts in respect of Eurodollar Rate Loans in effect at any one time).

"*Interest Rate Determination Date*" means, with respect to any Interest Period,
the date that is two Business Days prior to the first day of such Interest Period.

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***Investment***" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "***Debt***" in respect of such Person.

"***Joint Book Running Managers***" has the meaning specified in the recital of parties to this Agreement.

"***Joint Lead Arrangers***" has the meaning specified in the recital of parties to this Agreement.

"***K Road Manager***" means K Road BG Management, LLC, a Delaware limited liability company.

"***Lender***" means any Lender that has a Commitment.

"***Lenders***" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 8.07 for so long as such Initial Lender or Person, as the case may be, shall be a party to this Agreement.

"***Leverage Ratio***" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Total Debt as of such day to (b) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"***Lien***" means, with respect to any Property, (a) any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such Property, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), relating to such Property, and (c) in the case of Equity Interests or debt securities, any purchase option, call or similar right of a third party with respect to such Equity Interests or debt securities. For the avoidance of doubt, "***Lien***" shall not include any netting or set-off arrangements under any Contractual Obligation (other than Contractual Obligations constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms of the Loan Documents.

"***Loan***" has the meaning specified in Section 2.01.

"***Loan Documents***" means (a) this Agreement, (b) the Notes and (c) the Fee Letter, in each case as amended.

"***Make Whole Premium***" means, with respect to any applicable prepayment, a make-whole premium, as reasonably determined by the Administrative Agent in accordance with accepted financial practice and as set forth in Schedule II.

"***Management and Operation Agreements***" means each of the Management and Operation Agreements each dated as of October 11, 2005 between K Road Manager and each of BostonGen and the Project Companies.

"***Margin Stock***" has the meaning specified in Regulation U.

"***Material Adverse Change***" means any change, occurrence or development (including, without limitation, as a result of regulatory changes applicable to the Borrower or any of its Subsidiaries) that has had or could reasonably be expected to have a Material Adverse Effect.

"***Material Adverse Effect***" means a material adverse effect on (a) the condition (financial or otherwise), business, results or operations of the Borrower and its Subsidiaries, taken as a whole, (b) the rights and remedies of the Administrative Agent or the Lenders, taken as a whole, under any Loan Document or (c) the ability of the Borrower to perform its Obligations under the Loan Documents.

"***Maturity Date***" means December 20, 2016.

"***Moody's***" means Moody's Investors Services, Inc.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"***Mystic 8&9 Project***" means two (2) combined-cycle electric generating facilities with a combined nominal capacity of 1614 MW in operation in Everett, Massachusetts owned by Mystic Development.

"***Mystic Development***" means Mystic Development, LLC, f/k/a Exelon Mystic Development LLC, a Delaware limited liability company.

"***Mystic I***" means Mystic I, LLC, a Delaware limited liability company.

"***Mystic Station Project***" means an electric generating facility with a nominal capacity of 576 MW in operation in Everett, Massachusetts and owned by Mystic I.

"**_Net Cash Proceeds_**" means:

(a) with respect to any Asset Sale, the excess, if any, of (i) the sum of Cash and Cash Equivalents received by the Borrower or any of its Subsidiaries in connection with such Asset Sale *minus* (ii)(A) the out of pocket costs, fees, commissions, premiums and expenses (including legal and accounting costs, fees and expenses and title and recording fees, costs and expenses) reasonably incurred directly or indirectly by the Borrower or any of its Subsidiaries in connection with such Asset Sale to the extent such amounts were not deducted in determining the amount referred to in clause (i) and (B) federal, state and local taxes paid or reasonably estimated to be payable by the Borrower or any of its Subsidiaries in connection therewith to the extent such amounts were not deducted in determining the amount referred to in clause (i); *provided, however*, that, (i) to the extent that, within three-hundred sixty-five (365) days of receipt of proceeds of any Asset Sale in an amount not to exceed $500,000, the applicable Loan Party reinvests such proceeds in productive assets of a kind then used or usable in connection with the operation and maintenance of the Projects, such proceeds shall not constitute Net Cash Proceeds and (ii) if the Borrower shall deliver a certificate of a Responsible Officer of the Borrower to the Administrative Agent at the time of receipt thereof setting forth the intent of the Borrower or any of its Subsidiaries to reinvest proceeds of any Asset Sale in excess of $500,000 in productive assets of a kind then used or usable in connection with the operation and maintenance of the Projects, within three-hundred sixty-five (365) days of receipt of such proceeds, such proceeds shall not constitute Net Cash Proceeds if and to the extent that the Independent Engineer (as defined in the First Lien Credit Agreement) has provided to the Administrative Agent a certificate, certifying that such assets are productive assets of a kind then used or usable in connection with the operation and maintenance of the Projects;

(b) with respect to the incurrence or issuance of any Debt by the Borrower or any of its Subsidiaries the excess if any, of (i) the sum of the Cash and Cash Equivalents received by Borrower or any of its Subsidiaries in connection with such incurrence or issuance *minus* (ii) the underwriting discounts and commissions or other similar payments, and other out of pocket costs, fees, commissions, premiums and expenses (including legal and accounting costs, fees and expenses and title and recording fees, costs and expenses) reasonably incurred directly or indirectly by the Borrower or any of its Subsidiaries in connection with such incurrence or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i) of this paragraph (b);

(c) with respect to any Equity Issuance, the excess of (i) the sum of the Cash and Cash Equivalents received by the Borrower or any of its Subsidiaries in connection with such sale or issuance *minus* (ii) the underwriting discounts and commissions or similar payments, and other out of pocket costs, fees, commissions, premiums and expenses (including legal and accounting costs, fees and expenses), reasonably incurred by the Borrower or any of its Subsidiaries in connection with such sale or issuance to the extent such amounts were not

deducted in determining the amount referred to in <u>clause (i)</u> of this paragraph (c); and

(d) with respect to any Event of Eminent Domain or Casualty Event, the excess, if any, of (i) the sum of Cash and Cash Equivalents received by the Borrower or any of its Subsidiaries in connection with such Event of Eminent Domain or Casualty Event *minus* (ii) the sum of (A) the out-of-pocket costs and expenses reasonably incurred by the Borrower or any of its Subsidiaries in connection with the collection, enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of the relevant proceeds to the extent such amounts were not deducted in determining the amount referred to in <u>clause (i)</u> of this paragraph (d) and (B) federal, state and local taxes reasonably estimated to be payable by the Borrower or any of its Subsidiaries in connection therewith to the extent such amounts were not deducted in determining the amount referred to in <u>clause (i)</u> of this paragraph (d).

"***Non-Consenting Lender***" has the meaning specified in <u>Section 8.01(c)</u>.

"***Note***" means a promissory note of the Borrower payable to the order of any Lender, in substantially the form of <u>Exhibit A</u> hereto, evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, as amended.

"***Notice of Borrowing***" means a Notice of Borrowing substantially in the form of <u>Exhibit B</u> hereto.

"***NPL***" means the National Priorities List under CERCLA.

"***Obligation***" means all payment obligations of every nature of the Borrower from time to time owed to the Administrative Agent (including former Administrative Agents) or any Lender from time to time under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to the Borrower, would have accrued on any Obligation, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy proceeding), expenses, indemnification or otherwise.

"***Other Taxes***" has the meaning specified in <u>Section 2.11(b)</u>.

"***Patriot Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"***PBGC***" means the Pension Benefit Guaranty Corporation (or any successor).

"***Permitted Debt***" means:

(a)   Debt under the Loan Documents;

(b)     (without duplication of any other Permitted Debt) Existing Debt;

(c)     Debt of the Borrower arising by reason of any Lien permitted by Section 5.02(a)(iii);

(d)     Debt of the Borrower arising from the honoring of a check, draft or similar instrument of the Borrower drawn against insufficient funds, *provided*, *however*, that such Debt is extinguished within five Business Days of its incurrence;

(e)     to the extent deemed to be Debt, (1) unit appreciation rights granted to directors in an aggregate amount (valued as of the date of issuance) incurred in any Fiscal Year not to exceed $1,000,000 in such Fiscal Year (provided that such directors shall have acknowledged and agreed that, with respect to any such unit appreciation rights granted after the date hereof, any purchase, redemption, retirement, defeasance or other acquisition of such unit appreciation rights by the Borrower may be made only to the extent permitted by Section 5.02(g)) and (2) obligations to purchase warrants in an aggregate amount to not exceed $1,000,000 at any time outstanding; and

(f)     additional unsecured Debt of the Borrower not to exceed $300,000 at any time outstanding.

"*Permitted Development*" means, after the Effective Date, the development or construction of any electric generating facility; *provided* that at the time any amount is invested (or committed to be invested) in respect of Permitted Developments by BostonGen and its Subsidiaries in excess of $10,000,000 in the aggregate each of the following conditions are met:

(a)     the Permitted Development is financed with amounts permitted pursuant to Sections 5.02(b) and 5.02(f)(iii).

(b)     an independent engineer reasonably acceptable to the Administrative Agent shall have certified that any such development or construction would not reasonably be expected to materially and adversely impact the operation of the Projects or the efficient generation and distribution of electricity from the Projects (both during and after such development or construction) and shall have confirmed to the Lenders that amounts invested and committed to be invested by BostonGen and its Subsidiaries are sufficient to pay for all costs associated therewith; and

(c)     each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Debt under BostonGen Facilities (as in effect immediately prior to giving effect to such Permitted Development).

"*Permitted Emissions Sales Gains*" means gains (determined in accordance with GAAP) from the sales of Accumulated Emissions Credits (as defined in the Security

Deposit Agreement) to the extent such proceeds are deposited into the Revenue Account
in accordance with the Security Deposit Agreement.

"*Permitted Liens*" means (a) Liens for taxes, assessments and governmental
charges or levies to the extent not required to be paid under Section 5.01(b); (b) pledges
or deposits in the ordinary course of business to secure obligations under workers'
compensation, unemployment insurance, social security legislation or other similar
legislation or to secure public or statutory obligations; (c) Liens arising from judgments
(or the payment of money not constituting a Default under Section 6.01(g)) or securing
appeal or other surety bonds related to such judgments.

"*Permitted RMR Revenues*" means, for any period, funds transferred to the
Revenue Account pursuant to Section 3.15(a)(iv) of the Security Deposit Agreement;
*provided* that for purposes of determining the applicable Fiscal Quarter to which such
funds will be included in Consolidated Net Income, funds transferred within 45 days
following any Fiscal Quarter shall be deemed, at the option of the Borrower, to be
included (without duplication) in Consolidated Net Income for such Fiscal Quarter or the
immediately preceding Fiscal Quarter.

"*Permitted Subsidiary Asset Sales*" means:

(i)     sales of (or the granting of any option or other right to purchase, lease or
otherwise acquire) power, natural gas, fuel, capacity, gas or fuel transportation, power
transportation or ancillary services or other inventory in the ordinary course of such
Person's business including, without limitation, Permitted Trading Activities;

(ii)    sales, transfers or other dispositions in the ordinary course of its business
of Property that is surplus (including, without limitation, surplus land and emission
credits not required for the continued operation of any Project in any given year),
obsolete, defective, worn-out, damaged, rendered unfit for normal use or property that is
being exchanged for similar property, or that individually or in the aggregate is not
essential for the continued operation of any Project;

(iii)   the liquidation, sale or use of Cash and Cash Equivalents;

(iv)    sales, transfers or other dispositions of assets among BostonGen and its
Subsidiaries;

(v)     sales or discounts without recourse of accounts receivable arising in the
ordinary course of such Person's business in connection with the compromise or
collection thereof;

(vi)    dispositions required or contemplated by the Contractual Obligations in
existence as of the date hereof with or relating to Governmental Authorities and relating
to the Project Companies; and

(vii)   sales of Property by BostonGen or its Subsidiaries so long as (A) the
purchase price paid to BostonGen or such Subsidiary for such Property shall be no less

23

than the fair market value of such Property at the time of such sale, (B) at least 75% of the consideration to be received is paid in cash or Cash Equivalents and such remaining 25% is not a debt instrument of the Borrower or any of its Affiliates (provided that for purposes of this subclause (B), (I) any amounts deposited into an escrow or other type of holdback account and any consideration in the form of readily marketable securities shall be deemed to be cash, (II) customary purchase price adjustments may be settled on a non-cash basis and (III) the assumption of Debt relating to the asset being disposed shall be disregarded for the purposes of this provision); and (C) the aggregate purchase price paid to BostonGen and its Subsidiaries for such Property and all other Property sold by BostonGen and its Subsidiaries (1) during the same Fiscal Year pursuant to this clause (vii) shall not exceed $50,000,000 and (2) since the Effective Date shall not exceed $250,000,000.

*"Permitted Trading Activity"* means the entry into of any Commodity Hedge and Power Sale Agreement in a manner consistent with Prudent Industry Practice from time to time in support of the marketing and trading related to the Projects or any Permitted Development, whether physical or financial, in each case, to the extent such activity is conducted in the ordinary course of business of the Borrower and the other Loan Parties.

*"Person"* means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

*"Plan"* means a Single Employer Plan or a Multiple Employer Plan.

*"Platform"* has the meaning specified in Section 8.02(b).

*"Preferred Interests"*, means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

*"Project Company"* means each of Mystic I, Mystic Development and Fore River (and collectively, the *"Project Companies"*).

*"Projects"* means, Mystic Station Project, Mystic 8&9 Project and Fore River Project and, if applicable, the Permitted Development.

*"Property"* means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether intangible or tangible.

*"Prudent Industry Practice"* means those practices, methods, equipment, specifications and standards of safety and performance, as are commonly used by electric generating stations in the United States utilizing comparable fuels as good, safe and prudent engineering practices would dictate in connection with the design, construction, operation, maintenance, repair and use of electrical and other equipment, facilities and

improvements of such electrical generating stations, with commensurate standards of safety, performance, dependability (including the implementation of procedures that shall not adversely affect the long term reliability of the Projects, in favor of short term performance), efficiency and economy, in each such case as the same may evolve from time to time, consistent with applicable law and considering the state in which a Project is located and the type and size of such Project. "Prudent Industry Practice" as defined herein does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

"*PUHCA*" means the Public Utility Holding Company Act of 2005.

"*Qualified Owner*" means any Person (including any Person Controlled by such Person) that (a) is a past or present owner of a Comparable Project, (b) has substantial experience as an operator of a Comparable Project or (c) has contracted for the operation of the Projects by K Road Manager or by a Person meeting the requirements of clause (b) of this definition.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Refinance*" means, in respect of the applicable Debt, (a) such Debt (or any portion thereof) as extended, renewed, defeased, refinanced, replaced, refunded or repaid, and (b) any other Debt issued in exchange or replacement for or to refinance such Debt, in whole or in part, whether with the same or different leaders, arrangers and/or a longer or shorter maturity, in each case, to the extent permitted under the terms of the Loan Documents. "*Refinanced*" and "*Refinancing*" shall have correlative meanings.

"*Register*" has the meaning specified in Section 8.07(d).

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Related Documents*" means the First Lien Credit Agreement and the Second Lien Credit Agreement.

"*Related Fund*" means, with respect to any Lender that is a Fund, any other Fund that is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"*Repayment Event*" means the satisfaction of the following conditions the repayment in full in Cash of all of the outstanding principal amount of the Loans and all other Obligations (other than contingent Obligations) due and payable under the Loan Documents.

"***Required Lenders***" means, at any time, Lenders owed or holding more than 50% of the aggregate principal amount of the Loans outstanding at such time.

"***Responsible Officer***" means, as to any Person, any individual holding the position of chairman of the board (if an officer), president, chief executive officer, senior vice president, treasurer, chief financial officer or director of finance.

"***Revenue Account***" has the meaning specified in the Security Deposit Agreement.

"***RMR Agreement***" means the Cost-of-Service Agreement, effective as of January 1, 2006, among Mystic Development, LLC, Sempra Energy Trading Corp. and ISO New England Inc.

"***RMR Revenues***" has the meaning specified in the Security Deposit Agreement.

"***S&P***" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"***Second Lien Administrative Agent***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Credit Agreement***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Lenders***" has the meaning specified in the preliminary statements to this Agreement.

"***Second Lien Pledge Agreement***" means that certain Second Lien Pledge Agreement dated as of December 21, 2006 by the Borrower in favor of the Second Lien Collateral Administrative Agent for the benefit of the Second Lien Secured Parties, as amended.

"***Security Deposit Agreement***" means that certain Security Deposit Agreement dated December 21, 2006 by BostonGen and its Subsidiaries and the First Lien Collateral Agent, the Second Lien Collateral Agent and the Depositary, in each case, party thereto, as amended.

"***Semi-Annual Period***" means a period commencing on a Semi-Annual Prepayment Date and ending on the next-succeeding Semi-Annual Prepayment Date.

"***Semi-Annual Prepayment Date***" means the last Business Day of each June and December, commencing on the first to occur of such date after the BostonGen Repayment Event.

"***Single Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or

(b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"*Solvent*" and "*Solvency*" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property and assets of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature (taking into account reasonably anticipated prepayments and refinancings) and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," the principal amount of all (a) obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" has the meaning specified in Section 2.11(a).

"*Tender Offer*" shall mean, collectively, (a) the offer by the Borrower to purchase outstanding units of limited liability company interest in the Borrower pursuant to the

Offer to Purchase dated as of November 16, 2006 and the related letter of transmittal sent to holders of such units, as each may be amended and supplemented from time to time and (b) the repurchase of warrants and the cashless exercise of warrants referred to in such Offer to Purchase.

"*Transaction*" means (a) the entering into of the Initial Commodity Hedge and Power Sale Agreements (as defined in the First Lien Credit Agreement), (b) the Distribution and the Tender Offer, (c) the entering into of the First Lien Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under the First Lien Credit Agreement, (d) the entering into of the Second Lien Loan Documents and the refinancing of amounts outstanding under the Existing Credit Agreements in part with the proceeds of amounts under the Second Lien Credit Agreement, (e) the entering into of the Mezzanine Documents and (f) the other transactions contemplated by the Transaction Documents.

"*Transaction Costs*" has the meaning specified in the preliminary statements to this Agreement.

"*Transaction Documents*" means, collectively, the Loan Documents and the Related Documents.

"*Type*" refers to the distinction between Loans bearing interest at the Base Rate and Loans bearing interest at the Eurodollar Rate.

"*Units*" means units of limited liability company interests in the Borrower.

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency. For the avoidance of doubt with regard to the Borrower, all Units shall be deemed to be Voting Interests.

"*Withdrawal Liability*" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Computation of Time Periods; Other Definitional Provisions. In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding." References in the Loan Documents to any agreement or contract "*as amended*" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03. Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in effect in the United States from time to time ("*GAAP*"); *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to

eliminate the effect of any change occurring after the date hereof in GAAP or in the application
thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower
that the Required Lenders request an amendment to any provision hereof for such purpose),
regardless of whether any such notice is given before or after such change in GAAP or in the
application thereof, then such provision shall be interpreted on the basis of GAAP as in effect
and applied immediately before such change shall have become effective until such notice shall
have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

SECTION 2.01.  The Loans.  Each Lender severally agrees, on the terms and
conditions hereinafter set forth, to make a single advance (a "*Loan*") to the Borrower on the
Effective Date in an amount not to exceed such Lender's Commitment at such time.  The
Borrowing on the Effective Date shall consist of Eurodollar Rate Loans and shall be made
simultaneously by the Lenders ratably according to their Commitments.  Amounts borrowed
under this Section 2.01 and repaid or prepaid may not be reborrowed.

SECTION 2.02.  Making the Loans.  Each Lender shall, before 11:00 A.M. (New
York City time) on the date of the initial Borrowing, make available for the account of its
Applicable Lending Office to the Administrative Agent at the Administrative Agent's Account,
in same day funds, such Lender's ratable portion of such Borrowing in accordance with the
Commitments of such Lender.  After the Administrative Agent's receipt of such funds and upon
fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will
make such funds available to the Borrower by crediting the account of the Borrower set forth in
the Notice of Borrowing.

(a)     The initial Notice of Borrowing shall be irrevocable and binding on the
Borrower.  In the case of any Borrowing that the related Notice of Borrowing specifies is to be
comprised of Eurodollar Rate Loans, the Borrower shall indemnify each Lender against any loss,
cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date
specified in the initial Notice of Borrowing conditions set forth in Article III, including, without
limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason
of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund
the Loan to be made by such Lender when such Loan, as a result of such failure, is not made on
such date.

(b)     Unless the Administrative Agent shall have received notice from a Lender
prior to the date of the initial Borrowing that such Lender will not make available to the
Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative
Agent may assume that such Lender has made such portion available to the Administrative
Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and
the Administrative Agent may, in reliance upon such assumption, make available to the
Borrower on such date a corresponding amount.  If and to the extent that such Lender shall not
have so made such ratable portion available to the Administrative Agent, such Lender and the
Borrower severally agree to repay or pay to the Administrative Agent forthwith on demand such

corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Borrowing for all purposes.

(c)   The failure of any Lender to make the Loan to be made by it as part of the initial Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of the initial Borrowing.

SECTION 2.03.   [Reserved]

SECTION 2.04.   Repayment of Loans.   The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date the aggregate outstanding principal amount of the then outstanding Loans.

SECTION 2.05.   Prepayments.

(a)   From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans together with any accrued interest, which has not been previously capitalized and added to the outstanding principal amount of the Loans, to the date of such prepayment on the aggregate outstanding principal amount prepaid; *provided* that (i) any prepayment of Loans is to be applied pro rata among the Loans so prepaid of the same type and, if applicable, having the same Interest Period of all Lenders that have made such Loans (to be applied as set forth in Section 2.06), (ii) all such voluntary prepayments shall require at least one but no more than five Business Days' (and at least three Business Days in the case of Eurodollar Rate Loans) irrevocable prior written notice the Administrative Agent, (iii) all such voluntary partial prepayments of any Loans shall be in an aggregate minimum amount of $5,000,000 and (iv) each prepayment of Loans shall include the applicable Call Premium (if any). Each such irrevocable request may be made by telephone confirmed promptly by hand delivery, portable document format (PDF) or facsimile to the Administrative Agent of the applicable voluntary prepayment.

(b)   Promptly following each Semi-Annual Prepayment Date, beginning with the first of such Semi-Annual Prepayment Dates after the BostonGen Repayment Event, the Borrower shall make a mandatory prepayment of the Loans with 100% of Excess Cash Flow (if any) for the Semi-Annual Period then ending and deliver a statement, certified by the senior financial officer of the Borrower, that sets forth in reasonable detail the calculation of such Excess Cash Flow; *provided* that if the Leverage Ratio is less than 2.50:1.00, the percentage of Excess Cash Flow to be prepaid in accordance with this clause (b) shall be 50.0%.

(c)   From and after the BostonGen Repayment Event, no later than one Business Day following the receipt by the Borrower or any Subsidiary of any Debt Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such Debt

Proceeds and make a mandatory prepayment of the Loans in an amount equal to 100% of such Debt Proceeds to be applied as set forth in <u>Section 2.06</u>.

(d)   From and after the BostonGen Repayment Event, no later than five Business Days following the receipt by the Borrower or any Subsidiary of any Asset Sale Proceeds, Insurance Proceeds or Eminent Domain Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such proceeds and, in the event the aggregate amount of such proceeds received by the Borrower or any Subsidiary exceeds $10,000,000, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of all such Asset Sale Proceeds, Insurance Proceeds or Eminent Domain Proceeds, to be applied as set forth in <u>Section 2.06</u>; *provided* that, upon written notice by the Borrower to the Administrative Agent not more than five Business Days following receipt of any such Asset Sale Proceeds, Insurance Proceeds or Eminent Domain Proceeds, such proceeds may be retained by the Borrower (and be excluded from the prepayment requirements of this clause) if (i) the Borrower informs the Administrative Agent in such notice of its good faith intention to apply such Asset Sale Proceeds, Insurance Proceeds or Eminent Domain Proceeds to the acquisition of other assets or properties consistent with the businesses permitted to be conducted pursuant to <u>Article V</u> or, in the case of Insurance Proceeds, the rebuilding or restoration of the assets subject to the Casualty Event which resulted in such Insurance Proceeds, and (ii) such proceeds are applied or committed to such acquisition, rebuilding or restoration. The amount of such Asset Sale Proceeds, Insurance Proceeds or Eminent Domain Proceeds unused or uncommitted shall be applied to prepay the Loans as set forth in this <u>clause (d)</u> and in <u>Section 2.06</u>.

(e)   From and after the BostonGen Repayment Event, no later than one Business Day following the receipt by the Borrower or any Subsidiary of any Equity Proceeds, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 50% of such Equity Proceeds, to be applied as set forth in <u>Section 2.06</u>; *provided* that if the Leverage Ratio is less than 2.50:1.00, the percentage of Equity Proceeds to be prepaid in accordance with this <u>clause (e)</u> shall be 25%.

Each prepayment of any Loans made pursuant to this <u>Section 2.05</u> shall be without premium or penalty, except as may be required by <u>Section 8.04(c)</u> and <u>Section 2.05(a)</u>. The Borrower shall give prior written notice of any mandatory prepayment required under <u>clauses (b)</u>, <u>(c)</u>, <u>(d)</u> and <u>(e)</u> of this <u>Section 2.05</u> (including the date and an estimate of the aggregate amount of such mandatory prepayment at least five Business Days prior thereto); *provided* that the failure to give such notice shall not relieve the Borrower of its obligation to make such mandatory prepayments on or prior to the dates set forth in such <u>clauses (b)</u>, <u>(c)</u>, <u>(d)</u> and <u>(e)</u> and the Borrower shall be permitted to make such mandatory prepayments on or prior to such dates.

SECTION 2.06. <u>Application</u>. Amounts prepaid pursuant to <u>Section 2.05</u> shall be applied as set forth in this Section.

(a)   Subject to <u>clause (b)</u> of this <u>Section 2.06</u>, each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, <u>first</u>, to the principal amount thereof being maintained as Base Rate Loans, and <u>second</u>, subject

to the terms of <u>Section 8.04(c)</u>, to the principal amount thereof being maintained as Eurodollar
Rate Loans.

(b)     Each prepayment of Loans made pursuant to <u>Section 2.05</u> pro rata to a
prepayment of the outstanding principal amount of all Loans regardless of what Type (with the
amount of such prepayment of Loans being applied to the remaining Loans on a pro rata basis);
*provided* that, subject to the terms set forth in the immediately succeeding <u>clause (c)</u>, each
Lender entitled to receive any mandatory prepayment of its Loans under this clause may waive
its right to receive any such mandatory prepayment, and the aggregate amount of such
prepayments so waived shall be offered to the Lenders that did not waive their rights to such
prepayments for application in accordance with this clause.

(c)     So long as the Administrative Agent has received prior written notice from
the Borrower of a mandatory prepayment that may be waived by the Lenders pursuant to <u>clause
(b)</u> above, the Administrative Agent shall provide notice of such mandatory prepayment to the
Lenders.  Unless the Administrative Agent shall otherwise so provide, in the event a Lender does
not notify the Administrative Agent in writing of its waiver of the right to receive:

(i)     its pro rata share of such mandatory prepayment; and

(ii)     its pro rata share (such pro rata share to be based on the percentage
obtained by dividing the principal amount of Loans held immediately prior to such
mandatory prepayment by such Lender by the aggregate principal amount of Loans held
immediately prior to such mandatory prepayments by the Lenders that do not waive their
right to receive a portion of the mandatory prepayment described in this clause) of any
portion (if any) of such mandatory prepayment that may be waived by Lenders, within
two Business Days of the providing of such notice by the Administrative Agent;

the Administrative Agent may assume that such Lender will receive its applicable pro rata share
of such mandatory prepayment and such portion (if any) of such mandatory prepayment that has
actually been waived by the Lenders.  It is understood and agreed by the Borrower that,
notwithstanding receipt by the Administrative Agent of any such mandatory prepayment, the
Loans shall not be deemed repaid, unless otherwise consented to by the Administrative Agent,
until five Business Days have elapsed from the delivery to the Administrative Agent of the
notice described in the last paragraph of <u>Section 2.05</u>.

SECTION 2.07.  <u>Interest</u>.

(a)     <u>Scheduled Interest</u>.  Interest, including Default Interest, on the unpaid
principal amount of each Loan owing to each Lender shall be capitalized and added to the
outstanding amount of such Loan from the date of such Loan until such principal amount shall be
paid in full, at the following rates per annum:

(i)     <u>Base Rate Loans</u>.  During such periods as such Loan is a Base Rate Loan,
a rate per annum equal at all times to the sum of (A) the Base Rate in effect from time to
time *plus* (B) the Applicable Margin in effect from time to time, which shall be
automatically capitalized and added to the outstanding principal amount of such Loan in
arrears quarterly on the last Business Day of each December, March, June and September

during such periods and on the date such Base Rate Loan shall be Converted or paid in full commencing on the last Business Day of March 2007.

(ii)    Eurodollar Rate Loans. During such periods as such Loan is a Eurodollar Rate Loan, a rate per annum equal at all times during each Interest Period for such Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Loan *plus* (B) the Applicable Margin in effect, which shall be automatically capitalized and added to the outstanding principal amount of such Loan in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Loan shall be Converted or paid in full.

Any accrued and capitalized interest under this Section 2.07 shall, after being so capitalized, be treated as a part of the principal amount of such Loan and bear interest in accordance with this Section 2.07.

(b)    Default Interest. Upon the occurrence and during the continuance of an Event of Default, the Borrower shall pay interest ("*Default Interest*") on (i) the unpaid principal amount of each Loan owing to each Lender, payable in arrears on the dates referred to in clause (i) or (ii) of Section 2.07(a), as applicable, and, payable in the manner set forth in subsection (a), at a rate per annum equal at all times to 2% *per annum* above the rate *per annum* required to be paid on such Loan pursuant to clause (i) or (ii) of Section 2.07(a), as applicable, and (ii) to the fullest extent permitted by applicable law, the amount of any interest, fee or other amount payable under this Agreement or any other Loan Document to any Agent or any Lender that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and, payable in the manner set forth in subsection (a), at a rate per annum equal at all times to 2% *per annum* above the rate *per annum* required to be paid on Base Rate Loans pursuant to clause (i) of Section 2.07(a); *provided, however*, that following the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, Default Interest shall accrue and be payable hereunder whether or not previously required by the Administrative Agent; *provided, further*, that notwithstanding the foregoing, Default Interest arising pursuant to this Section 2.07(b) shall be automatically capitalized and added to the outstanding principal amount of such Loan and will remain due and payable. Payment or acceptance of the increased rates of interest provided for in this Section 2.07(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

(c)    Notice of Interest Period and Interest Rate. Promptly after the Effective Date, a notice of Conversion pursuant to Section 2.08 or a notice of selection of an Interest Period pursuant to the terms of the definition of "Interest Period," the Administrative Agent shall give notice to the Borrower and each Appropriate Lender of the applicable Interest Period and the applicable interest rate determined by the Administrative Agent for purposes of clause (a)(i) or (a)(ii) above.

(d)     Administrative Agent's Fees.  The Borrower shall pay to the Administrative Agent for its own account such fees as may from time to time be agreed between the Borrower and the Administrative Agent.

SECTION 2.08.  Conversion of Loans.

(a)     Optional.  The Borrower may on any Business Day, upon notice given to the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Section 2.09, Convert all or any portion of the Loans of one Type into Loans of the other Type; *provided, however*, that any Conversion of Eurodollar Rate Loans into Base Rate Loans shall be made only on the last day of an Interest Period for such Eurodollar Rate Loans or, if made on another date, shall be subject to the provisions of Section 8.04(c), any Conversion of Base Rate Loans into Eurodollar Rate Loans shall be in an amount not less than an aggregate minimum amount of $5,000,000.  Each such notice of Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion and (ii) if such Conversion is into Eurodollar Rate Loans, the duration of the initial Interest Period for such Loans.  Each notice of Conversion shall be irrevocable and binding on the Borrower.

(b)     Mandatory.  (i)  If the Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Loans in accordance with the provisions contained in the definition of "*Interest Period*" in Section 1.01, the Administrative Agent will forthwith so notify the Borrower and the Lenders, whereupon each such Eurodollar Rate Loan shall have an Interest Period of one month.

(ii)     Upon the occurrence and during the continuance of any Event of Default, (x) each Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (y) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended.

SECTION 2.09.  Increased Costs, Etc.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender of agreeing to make or of making, funding or maintaining Eurodollar Rate Loans (excluding, for purposes of this Section 2.09, any such increased costs resulting from (x) Taxes or Other Taxes (as to which Section 2.11 shall govern) and (y) changes in the basis or rate of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

(b)     If any Lender determines that compliance with any law or regulation or any guideline or request from any central bank or other Governmental Authority (whether or not

having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender and that the amount of such capital is increased by or based upon the existence of such Lender's Loans, then, upon demand by such Lender or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital to be allocable to the existence of such Lender's Loans. A certificate as to such amounts submitted to the Borrower by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    If, with respect to any Eurodollar Rate Loans, Lenders owed at least 33⅓% of the then aggregate unpaid principal amount thereof notify the Administrative Agent that the Eurodollar Rate for any Interest Period for such Loans will not adequately reflect the cost to such Lenders of making, funding or maintaining their Eurodollar Rate Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon (i) each such Eurodollar Rate Loan will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Loan and (ii) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended, in each case, until the Administrative Agent shall notify the Borrower that such Lenders have determined that the circumstances causing such suspension no longer exist, in which case (x) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated.

(d)    Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans hereunder, then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) each Eurodollar Rate Loan of such Lender will automatically, upon such demand, Convert into a Base Rate Loan and (ii) the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be suspended, in each case, until the Administrative Agent shall notify the Borrower that such Lender has determined that the circumstances causing such suspension no longer exist, in which case the obligation of the Lenders to make, or to Convert Loans into, Eurodollar Rate Loans shall be reinstated; *provided, however*, that, before making any such demand, such Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Eurodollar Lending Office if the making of such a designation would allow such Lender or its Eurodollar Lending Office to continue to perform its obligations to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans and would not, in the judgment of such Lender, be otherwise disadvantageous to such Lender.

SECTION 2.10.  Payments and Computations.  (a) The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in Section 2.12), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the

Administrative Agent after such time being deemed to have been received on the next succeeding Business Day in the Administrative Agent's sole discretion. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    The Borrower hereby authorizes each Lender and each of its Affiliates, if and to the extent payment owed to such Lender is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender or such Affiliate any amount so due.

(c)    All computations of interest based on the Base Rate shall be made by the Administrative Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Except as otherwise provided under the Loan Documents, whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest, fee or commission, as the case may be; *provided, however,* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    If the Administrative Agent receives funds for application to the Obligations of the Borrower under or in respect of the Loan Documents under circumstances for

EBG Holdings LLC
Credit Agreement
NY1:#3437976v11

36

which the Loan Documents do not specify to which, or the manner in which, such funds are to be applied, the Administrative Agent may, if no instructions with respect thereto are received from the Lenders upon request, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's pro rata share of the aggregate principal amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender, as the Administrative Agent shall direct.

SECTION 2.11. Taxes. (a) Any and all payments by the Borrower to or for the account of any Lender or the Administrative Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.10 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender and the Administrative Agent, (x) taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which such Lender or the Administrative Agent, as the case may be, is organized (or any political subdivision thereof), has its Applicable Lending Office, has a permanent establishment or is engaged in business (other than the business that the Lender is engaged in solely by reason of the transactions contemplated by this Agreement), (y) any branch profits taxes imposed by the United States of America and (z) withholding taxes imposed under law in effect on the date hereof or at the time the Lender designates a new Applicable Lending Office, other than any new Applicable Lending Office designated at the written request of the Borrower (in the case of a Lender that is not an Initial Lender, this clause (z) shall include taxes imposed under law in effect on the date such Lender becomes a Lender, except to the extent that the Lender's predecessor would have been entitled to receive additional amounts under this Section 2.11(a)) and, in the case of each Lender, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction of such Lender's Applicable Lending Office or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "***Taxes***"). If the Borrower or the Administrative Agent shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender or the Administrative Agent, (i) the sum payable by the Borrower shall be increased as may be necessary so that after the Borrower and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.11) such Lender or the Administrative Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make all such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b) In addition, the Borrower shall pay any present or future stamp, documentary, excise, property (including intangible property, but with regard to all property taxes, only to the extent relating to property of the Borrower) mortgage recording or similar taxes, charges or levies that arise from any payment made by the Borrower hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under this Agreement or the other Loan Documents (hereinafter referred to as "***Other Taxes***").

(c)     The Borrower shall indemnify each Lender and the Administrative Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.11, imposed on or paid by such Lender or the Administrative Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such Lender or the Administrative Agent (as the case may be) makes written demand therefor.

(d)     Within 30 days after the date of any payment of Taxes, the Borrower shall furnish to the Administrative Agent, at its address referred to in Section 8.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.  In the case of any payment hereunder or under the other Loan Documents by or on behalf of the Borrower through an account or branch outside the United States or by or on behalf of the Borrower by a payor that is not a United States person, if the Borrower determines that no Taxes are payable in respect thereof, the Borrower shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes.  For purposes of subsections (d) and (e) of this Section 2.11, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)     Each Lender organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two original Internal Revenue Service Forms W-8BEN or W-8ECI or (in the case of a Lender that has certified in writing to the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Borrower or (iii) a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Internal Revenue Code), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that such Lender is a foreign corporation, partnership, estate or trust.  As provided in Section 2.11(a), if the forms provided by a Lender at the time such Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided, however*, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) of this Section 2.11 in respect of United States withholding tax with respect to interest paid at such date,

then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) United States withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, that the applicable Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)     For any period with respect to which a Lender has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.11 with respect to Taxes imposed by the United States by reason of such failure; *provided, however,* that should a Lender become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrower shall take such steps as such Lender shall reasonably request, at the Lender's sole expense and as long as the Borrower determine that such steps will not, in the reasonable judgment of the Borrower, be disadvantageous to the Borrower, to assist such Lender to recover such Taxes.

(g)     Any Lender claiming any additional amounts payable pursuant to this Section 2.11 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. In addition, if a Lender determines, in such Lender's sole discretion, that it has received a refund or credit in respect of any Taxes or Other Taxes as to which it has been indemnified pursuant to Section 2.11(c), or with respect to which additional amounts have been paid pursuant to Section 2.11(a), such Lender shall pay to the Borrower an amount equal to such refund (but such amount in no event to exceed the amount of any indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.11 with respect to the Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses of such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of such Lender, shall agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender subsequently determines that such refund or credit is unavailable under applicable law or is otherwise required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require a Lender to rearrange its tax affairs or to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(h)     The Administrative Agent shall deliver to the Borrower on the Effective Date (and shall keep effective thereafter) two duly completed copies of Internal Revenue Service

Form W-8IMY, or any successor or other form prescribed by the Internal Revenue Service, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

SECTION 2.12.  Sharing of Payments, Etc.  If any Lender shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 8.07), (a) on account of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) on account of Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, such Lender shall forthwith purchase from the other Lenders such interests or participating interests in the Obligations due and payable or owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; *provided, however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each other Lender shall be rescinded and such other Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's ratable share (according to the proportion of (i) the purchase price paid to such Lender to (ii) the aggregate purchase price paid to all Lenders) of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such other Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrower agrees that any Lender so purchasing an interest or participating interest from another Lender pursuant to this Section 2.12 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender were the direct creditor of the Borrower in the amount of such interest or participating interest, as the case may be.

SECTION 2.13.  Use of Proceeds.  The proceeds of the Loans shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to fund the Distribution and the Tender Offer of the Borrower, (ii) to pay transaction fees and expenses and (iii) for general corporate purposes.

40

SECTION 2.14.  Change of Control Prepayment.  (a) No later than three (3) Business Days after the occurrence of a Change of Control, the Borrower shall through the Administrative Agent offer to each Lender (by delivery of a prepayment offer to the Administrative Agent) to prepay all (but not part) of its outstanding Loans in accordance with this Section 2.14.  The prepayment offer may be conditioned on the occurrence of such Change of Control (if made prior to such occurrence) and otherwise shall be irrevocable and shall state: (i) the proposed date of such prepayment and/or return (which date shall be no earlier than (x) the end of the Offer Period and (y) the date of the applicable Change of Control and no later than ten (10) Business Days from the date of the applicable Change of Control); (ii) the prepayment price (which, with respect to each Lender, shall be calculated as the sum of (A) the aggregate principal amount of the outstanding Loans made by such Lender, (B) the greater of (x) an amount equal to 1.00% of the aggregate principal amount of such outstanding Loans made by such Lender and (y) the Call Premium (if any), (C) all accrued and unpaid interest on the principal amount being repaid, prepaid or returned and (D) any amounts owing pursuant to Section 8.04(c)); (iii) that each Lender that accepts such prepayment offer must accept such offer with respect to all (but not part) of its Loans; (iv) that each Lender must accept such offer by delivering notice of such acceptance to the Administrative Agent within ten (10) days after the date the Borrower makes its offer to such Lender (the "*Offer Period*"); and (v) in reasonable detail, the nature of the applicable Change of Control and the projected impact of such Change of Control on the Projects, the operations thereof and BostonGen and its Subsidiaries.

(b)    The Borrower shall comply with the terms of each such prepayment offer. Each Lender shall have the right to accept such offer prior to the expiration of the applicable Offer Period.

(c)    The Commitments of each Lender that accepts a prepayment offer in accordance with this Section 2.14 shall terminate in its entirety on the date such Lender's Loans are repaid or, if later, scheduled to be repaid or returned.

SECTION 2.15.  Evidence of Debt.  (a)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  The Borrower agrees that upon notice by any Lender to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender, the Borrower shall promptly execute and deliver to such Lender, with a copy to the Administrative Agent, a Note in substantially the form of Exhibit A hereto, payable to the order of such Lender in a principal amount equal to the Loans of such Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Register maintained by the Administrative Agent pursuant to Section 8.07(e) shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of the Loans made hereunder, the Type of the Loans and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any

41

principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender's share thereof.

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; *provided, however*, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.16.  Duty to Mitigate.  In the event that any Lender demands payment of costs or additional amounts pursuant to Section 2.09 or 2.11 or asserts, pursuant to Section 2.09(d), that it is unlawful for such Lender to make Eurodollar Rate Loans then (subject to such Lender's right to rescind such demand or assertion within 10 days after the notice from the Borrower referred to below) the Borrower may, upon 20 days' prior written notice to such Lender and the Administrative Agent, elect to cause such Lender to assign its Loans and Commitments in full to one or more Persons selected by the Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent, (ii) such Lender receives payment in full in cash of the outstanding principal amount of all Loans made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender as of the date of such assignment (including, without limitation, amounts owing pursuant to Sections 2.09, 2.11 and 8.04) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender hereunder in accordance with Section 8.07.

## ARTICLE III

### CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01.  Conditions Precedent.  Section 2.01 of this Agreement shall become effective on and as of the first date on or before December 21, 2006 (the "***Effective Date***") on which the following conditions precedent have been satisfied (and the obligation of each Lender to make a Loan on the occasion of the Initial Extension of Credit hereunder is subject to the satisfaction of such conditions precedent before or concurrently with the Effective Date):

(a)    The Administrative Agent shall have received on or before the Effective Date the following, each dated as of such date (unless otherwise specified) and in form and substance reasonably satisfactory to the Administrative Agent:

(i)    The Notes payable to the order of the Lenders to the extent requested by the Lenders pursuant to the terms of Section 2.15.

(ii)     completed requests for information or similar search reports, dated on or not more than 14 days before the Effective Date, listing all effective financing statements filed in the State of Delaware and any other jurisdiction in which the Borrower owns Property that names the Borrower as debtor, together with copies of such other financing statements.

(iii)     Certified copies of the resolutions of the board of directors of the Borrower approving the Transaction and each Transaction Document to which it is or is to be a party, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the Transaction and each Transaction Document to which it is or is to be a party.

(iv)     A copy of a certificate of the Secretary of State of Delaware, dated reasonably near the Effective Date certifying (A) as to a true and correct copy of the certificate of formation of the Borrower and each amendment thereto on file in such Secretary's office and (B) that (1) such amendments are the only amendments to the Borrower's certificate of formation, as the case may be, on file in such Secretary's office, (2) to the extent applicable, the Borrower has paid all franchise taxes to the date of such certificate and (3) the Borrower is duly formed and in good standing or presently subsisting under the laws of the State of Delaware.

(v)     A certificate of the Borrower signed on behalf of the Borrower by a Responsible Officer, dated the Effective Date (the statements made in such certificate shall be true on and as of the Effective Date), certifying as to (A) the absence of any amendments to the certificate of formation of the Borrower since the date of the Secretary of State's certificate referred to in Section 3.01(a)(viii), (B) a true and correct copy of the limited liability company agreement of the Borrower as in effect on the date on which the resolutions referred to in Section 3.01(a)(vii) were adopted and on the Effective Date, (C) the due formation and good standing or valid existence of the Borrower as a limited liability company organized under the laws of the jurisdiction of its formation, and the absence of any proceeding for the dissolution or liquidation of the Borrower and (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Effective Date.

(vi)     A Certificate of the Borrower executed by a Responsible Officer thereof certifying the name and true signature of each officer of the Borrower authorized to sign each Transaction Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(vii)     Certified copies of each of the Related Documents, duly executed by each of the parties thereto.

(viii)     Certificates in substantially the form of Exhibit D, attesting to the Solvency of the Borrower and its Subsidiaries on a Consolidated basis after giving

effect to the Transactions and the other transactions contemplated hereby from its director of finance.

(ix)    (A) A certified hard copy of, and a computer disk containing, *pro forma* balance sheets, income statements and cash flow statements with respect to the Borrower consolidated with its Subsidiaries for the period through Fiscal Year 2014, on a quarterly basis for the period from January 1, 2007 through December 31, 2008 and on an annual basis for each year thereafter (the "***Base Case Projections***") and (B) a certified copy of the operating budget for BostonGen and its Subsidiaries for Fiscal Year 2007 (the "***Initial Operating Budget***").

(x)    (A) Certified copies of audited financial statements of the Borrower and its Subsidiaries dated December 31, 2005 and interim financial statements of the Borrower and its Subsidiaries dated the end of each Fiscal Quarter ending since December 31, 2005 and (B) the Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve-month period then ended.

(xi)    [Reserved].

(xii)    A favorable opinion of Debevoise & Plimpton LLP, counsel for the Borrower, in form and substance reasonably satisfactory to the Administrative Agent.

(xiii)    A favorable opinion of White & Case LLP, special federal energy regulatory counsel for the Borrower in form and substance reasonably satisfactory to the Administrative Agent.

(b)    The Lender shall be reasonably satisfied that:

(i)    all Existing Debt, other than Surviving Debt, has been (or is contemporaneously being) prepaid, redeemed or defeased in full or otherwise satisfied and extinguished and all commitments relating thereto terminated (or contemporaneously therewith terminated) and that all Surviving Debt is on terms and conditions reasonably satisfactory to the Lender;

(ii)    all Liens securing payment of any Existing Debt shall have been released; and

(iii)    the Administrative Agent shall have received all Uniform Commercial Code Form UCC-3 termination statements, mortgage releases, pay-off letters and other instruments as may be necessary or desirable, in the reasonable judgment of the Administrative Agent, in connection therewith.

(c)    Before giving effect to the Transaction, there shall have occurred no Material Adverse Change since December 31, 2005.

(d)     Except as set forth on Schedule 4.01(g), there shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower pending or threatened in writing before any Governmental Authority that (i) could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(e)     All Governmental Authorizations and members, shareholder and third party consents and approvals necessary in connection with the Transaction shall have been obtained (without the imposition of any conditions that are not acceptable to the Lenders) and shall remain in full force and effect.

(f)     The Borrower shall have paid (or shall be contemporaneously paying from the proceeds of the Loans) all accrued fees of the Administrative Agent and the Lenders and all accrued expenses of the Administrative Agent (including the accrued fees and expenses of counsel to the Administrative Agent and local counsel to the Lenders).

(g)     The Administrative Agent shall have received evidence reasonably satisfactory to it that prior to, or concurrently with, the making of the Initial Extension of Credit hereunder, BostonGen shall have received not less than (i) $1,130,000,000 in gross cash, commitments and proceeds from borrowings, $250,000,000 in letter of credit commitments and $70,000,000 in revolving credit commitments, in each case, under the First Lien Credit Agreement and (ii) $350,000,000 in gross cash proceeds from borrowings under the Second Lien Credit Agreement.

(h)     The Related Documents shall have been executed and delivered by all parties thereto and shall be effective, and all material obligations to be performed under any such documents on or before the Effective Date shall have been performed.

(i)     The Lenders shall have received, to the extent requested, on or before the date which is five (5) Business Days prior to the Effective Date, all documentation and other information required by bank regulatory authorities under applicable *"know your customer"* and anti-money laundering rules and regulations including the Patriot Act.

(j)     The Administrative Agent shall have received for the account of each Lender a certificate signed by a Responsible Officer of the Borrower, dated the date hereof, stating that:

(i)     the representations and warranties contained in each Loan Document are correct in all material respects on and as of the Effective Date, before and after giving effect to the initial Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

(ii)     no Default has occurred and is continuing, or would result the initial Borrowing or issuance or from the application of the proceeds therefrom.

SECTION 3.02. Determinations Under Section 3.01. For purposes of determining compliance with the conditions specified in Section 3.01, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or

other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the Effective Date specifying its objection thereto and such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of the initial Borrowing.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties. The Borrower represents and warrants on behalf of itself as of the date hereof as follows:

(a)    Organization. It (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a limited liability company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably likely to have a Material Adverse Effect and (iii) has all requisite limited liability company power and authority (including, without limitation, all material Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)    Subsidiaries. Set forth on Schedule 4.01(b) hereto is a complete and accurate list of the Borrower and each of its Subsidiaries. The copy of the certificate of formation of the Borrower and each amendment thereto provided pursuant to Section 3.01(a)(iv) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(c)    Ownership Information. (i) Set forth on Schedule 4.01(c) hereto is a complete and accurate list of all of the Subsidiaries of the Borrower, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares or membership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by the Borrower and the number of shares or membership interests (as applicable) covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof. (ii) All of the outstanding Equity Interests in BostonGen have been validly issued, are fully paid and non-assessable and are owned by the Borrower free and clear of all liens, except those created under the First Lien Pledge Agreement, the Second Lien Pledge Agreement or Permitted Liens.

(d)    Authorization; Non-Contravention. The execution, delivery and performance by the Borrower of each Transaction Document to which it is or is to be a party, and the consummation of the Transactions are within the Borrower's limited liability company powers, have been duly authorized by all necessary limited liability company action, and do not (i) contravene the Borrower's limited liability company

agreement or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to or binding on it, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, a Contractual Obligation of the Borrower (except to the extent such conflict, breach, default or payment could not reasonably be expected to have a Material Adverse Effect) or (iv) except for the Liens created under the First Lien Pledge Agreement and the Second Lien Pledge Agreement, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of the Borrower. As of the Effective Date, the Borrower is not in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

(e)     Consents and Approvals. No Governmental Authorization, and no notice to, filing with, or consent or approval of any other third party is required for (A) the due execution, delivery, recordation, filing or performance by the Borrower of any Transaction Document to which it is or is to be a party, or for the consummation of the Transaction or (B) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents, except for (1) those authorizations, approvals, actions, notices and filings set forth on Schedule 4.01(e), (I) all of which have been duly obtained, taken, given or made, (II) are in full force and effect, (III) are free from conditions or requirements that have not been met or complied with, (2) authorizations, approvals, actions, notices and filings required by securities, regulatory or applicable law in connection with an exercise of remedies or (3) those Governmental Authorizations, notices, filings with, or consents of, any other third party, the failure of which to obtain and maintain could not reasonably be expected to result in a Material Adverse Effect.

(f)     Binding Agreement. This Agreement has been, and each other Transaction Document when delivered hereunder will have been, duly executed and delivered by the Borrower. This Agreement is, and each other Transaction Document when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(g)     Litigation. Except as set forth on Schedule 4.01(g), there is no action, suit, investigation, litigation or proceeding affecting the Borrower or any of its Subsidiaries, including any Environmental Action, pending or threatened in writing before any Governmental Authority or arbitrator that (i) could reasonably be likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transaction.

(h)     Financial Statements. (i) The Consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2005, the related Consolidated statement of income and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended and the Consolidated balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated statement of income

and Consolidated statement of cash flows of the Borrower and its Subsidiaries for the nine months then ended, duly certified by the director of finance of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects, subject, in the case of said balance sheet as at September 30, 2006, and said statements of income and cash flows for the nine months then ended, to year end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated results of operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis.

(ii)    The Consolidated pro forma balance sheet of the Borrower and its Subsidiaries as at September 30, 2006, and the related Consolidated pro forma statement of income of the Borrower and its Subsidiaries for the twelve-month period then ended, respectively, certified by the director of finance of the Borrower, copies of which have been furnished to the Administrative Agent pursuant to Section 3.01, fairly present in all material respects the Consolidated pro forma financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated pro forma results of operations of the Borrower and its Subsidiaries for the period ended on such date giving effect to the Transaction, all in accordance with GAAP.

(iii)   The Consolidated forecasted balance sheet, statement of income and statement of cash flows of the Borrower and its Subsidiaries delivered to the Administrative Agent, pursuant to Section 3.01(a)(ix) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's reasonable best estimate of its future financial performance.

(i)    Accuracy of Information; Projections.  All information (other than the information delivered pursuant to Section 3.01(a)(ix), other financial projections and general economic information) heretofore or contemporaneously furnished to any Lender by or on behalf of the Borrower in connection with any Loan Document or any transaction contemplated hereby (including the Transactions), taken together as a whole with all other information with which such Lender has previously been furnished, is complete and correct in all material respects, as of the date such information was furnished and as of the Effective Date, and did not contain any untrue statement of a material fact or omit to state any material fact necessary to make any information not misleading in light of the circumstances under which furnished.

(j)    Margin Stock.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(k)    Investment Company Act.  The Borrower is not an "*investment company*," as defined in or subject to regulations under the Investment Company Act of 1940, as amended.

EBG Holdings LLC
Credit Agreement
NY1:#3437976v11

48

(l)    Solvency.  After giving affect to the Transaction, the Borrower and its Subsidiaries are, on a Consolidated basis, Solvent.

(m)    ERISA Etc.  (i) No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has had or is reasonably expected to have a Material Adverse Effect.

(ii)    Neither the Borrower nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan except for Withdrawal Liability that could not reasonably be expected to have a Material Adverse Effect.

(iii)    Neither the Borrower nor any ERISA Affiliate has been notified by the sponsor of a material Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(n)    Environmental Matters.  (i) Except as otherwise set forth on Part I of Schedule 4.01(o) hereto, the operations and properties of the Borrower and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, except for any such noncompliance, obligation or cost that could not reasonably be likely to have a Material Adverse Effect and, to the best knowledge of the Borrower, no circumstances exist that could (A) form the basis of an Environmental Action against the Borrower or any of its Subsidiaries or any of their properties that could reasonably be likely to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership or transferability, or subject to any material Lien, under any Environmental Law.

(ii)    Except as otherwise set forth on Part II of Schedule 4.01(o) hereto, none of the properties currently or formerly owned or operated by the Borrower or any of its Subsidiaries is currently listed or proposed for listing on the NPL or on the CERCLIS or any analogous state or local list; there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or any of its Subsidiaries except where such treatment, storage or disposal could not reasonably be likely to have a Material Adverse Effect; there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower or any of its Subsidiaries that requires abatement under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by the Borrower or any of its Subsidiaries in a manner that would reasonably be expected to require any investigation, cleanup, remediation or remedial action by the Borrower under any applicable Environmental Law that could reasonably be likely to have a Material Adverse Effect.

(iii)     Except as otherwise set forth on Part III of <u>Schedule 4.01(o)</u> hereto, neither the Borrower nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by the Borrower or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to the Borrower or any of its Subsidiaries, except, in each case above, where any such investigation or assessment or remedial or response action or liability could not reasonably be likely to have a Material Adverse Effect.

(o)     <u>Tax Matters</u>.  (i) Neither the Borrower nor any of its Subsidiaries is party to any tax sharing agreement.

(ii)     The Borrower and each of its Subsidiaries has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed, other than those tax returns where the failure to file such returns could not be reasonably expected to have a Material Adverse Effect, and has paid all taxes shown thereon to be due, together with applicable interest and penalties (other than taxes contested in good faith).

(iii)     No issues have been raised by the Internal Revenue Service in respect of federal income tax returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(iv)     No issues have been raised by any state, local or foreign taxing authorities, in respect of the returns for years for which the expiration of the applicable statute of limitations has not occurred by reason of extension or otherwise, that, in the aggregate, could be reasonably likely to have a Material Adverse Effect.

(p)     <u>Debt</u>.  Except as otherwise set forth on <u>Schedule 4.01(p)</u> ("Existing Debt"), the Borrower has no Debt other than Debt under this Agreement.

(q)     <u>Regulatory Approvals</u>.  Except for any FERC approvals required in connection with the Secured Parties' (as defined in the Intercreditor Agreement) exercise of remedies under the Financing Documents, no approvals or authorizations from FERC are required to be obtained by the Borrower, its Subsidiaries or the Lenders with respect to the Transaction.

(r)     <u>Existing Regulatory Orders</u>.  The Borrower and each of its Subsidiaries are in full compliance in all material respects with the terms and conditions of all orders issued by FERC under Section 203 of the FPA and obtained by the Borrower or any such Subsidiary.

(s)    PUHCA.  The Borrower is a "*holding company*" within the meaning of Section 1262(8) of PUHCA solely with respect to its ownership of one or more EWGs, and is not subject to or is otherwise exempt from regulation under PUHCA except for regulation under Section 1265 of PUHCA.

(t)    Violation of Law.  The Borrower is not in violation of any applicable law, rule, regulation, order, writ, judgment, injunction, decree, determination or award binding on it, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS

SECTION 5.01.  Affirmative Covenants.  Until a Repayment Event has occurred, the Borrower will:

(a)    Compliance with Laws, Etc.  Comply with all applicable laws, rules, regulations and orders binding on it, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, other than any such non-compliance which could not reasonably be expected to have a Material Adverse Effect.

(b)    Payment of Taxes, Etc.  Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property (unless, in the case of (i) and (ii), the failure to do so could not reasonably be expected to have a Material Adverse Effect); *provided, however*, that the Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and only to the extent that adequate reserves are being maintained.

(c)    Preservation of Existence, Etc.  Preserve and maintain its existence as a limited liability company and its good standing in the State of Delaware.

(d)    Visitation Rights.  Upon reasonable advance notice, at any reasonable time following the occurrence and continuance of an Event of Default, permit the Administrative Agent or any of the Lenders, or any agents or representatives thereof (at the sole expense of the Administrative Agent, Lender, agent or representative) to examine and make copies of and abstracts from the records and books of account of the Borrower and to discuss the finances and accounts of the Borrower with its certified public accountants.

(e)    Keeping of Books.  Keep proper books and records and in accordance with GAAP.

51

(f)     Separateness. Comply with the following:

(i)     The Borrower will act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(ii)    The Borrower will conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

(iii)   The Borrower will obtain proper authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(iv)    Each of the Borrower and its Subsidiaries will comply in all material respects with the terms of its certificate of incorporation or formation and by-laws or limited liability company agreement (or similar constituent documents).

SECTION 5.02. Negative Covenants. Until a Repayment Event has occurred, the Borrower will not, at any time:

(a)     Liens, Etc. Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired or assign any accounts or other right to receive income, except:

(i)     Permitted Liens;

(ii)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights; and

(iii)   Liens under the First Lien Pledge Agreement and the Second Lien Pledge Agreement and Liens under pledge agreements in respect of a Refinancing of Debt of BostonGen permitted hereunder and under the Related Documents.

(b)     Debt. Create, incur, assume or suffer to exist any Debt, except Permitted Debt.

(c)     Change in Nature of Business. Engage in any business other than holding the Equity Interests in BostonGen and activities reasonably incidental thereto or in connection with any Permitted Development.

(d)     Mergers, Etc. The Borrower shall not consolidate or merge with or into (whether or not the Borrower is the surviving corporation), in one or more related transactions, any other Person unless (i) (1) the Borrower is the surviving corporation or (2) the entity or the Person formed by or surviving any such consolidation or merger (if other than the Borrower) (the entity or Person described in this clause (2), the "Successor Company") is a corporation, partnership, limited liability company or trust organized or

52

existing under the laws of the United States or any State thereof, (ii) immediately after giving effect to such transaction no Default or Event of Default shall occur or be continuing and no Default or Event of Default, in each case, under (and as defined in) the Related Documents and the Financing Documents referred to therein shall have occurred and be continuing, (iii) immediately after giving effect to such transaction, the Borrower or the Successor Company shall own all of the Equity Interests of BostonGen, (iv) such other Person is a Qualified Owner, (v) each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Debt under the BostonGen Facilities (as in effect immediately prior to such consolidation or merger) after giving effect to such consolidation or merger and (vi) the Successor Company assumes all of the obligations of the Borrower under the Notes and this Agreement pursuant to an amendment or supplement to this Agreement and each other instrument, document or agreement entered into by the Borrower in connection therewith, in each case, in a form reasonably satisfactory to the Administrative Agent.

(e)     Sales of Assets, Etc.

(i)     sell, lease, transfer or otherwise dispose of its Equity Interests in BostonGen or its Subsidiaries (other than the Liens permitted pursuant to Section 5.02(a)(iii));

(ii)    permit any of its Subsidiaries to sell, lease, transfer or otherwise dispose of any assets of such Subsidiary, except Permitted Subsidiary Asset Sales;

(iii)   sell, lease, transfer or otherwise dispose of any other assets of the Borrower;

(iv)    grant any option or other right to purchase, lease or otherwise acquire any assets referred to in clause (i) or (iii) above (unless such option or right is conditioned upon compliance with all obligations of the Borrower and its Subsidiaries under the Loan Documents, the Related Documents and the Financing Documents referred to therein);

except, in any case:

(A)     the liquidation, sale or use of Cash and Cash Equivalents; and

(B)     Events of Eminent Domain or Casualty Events (as such terms are defined in the Security Deposit Agreement) are deemed not to constitute sales, leases, transfers or other dispositions of Property for purposes of this Section 5.02(e).

(f)     Investments in Other Persons.  Make or hold any Investment in any Person, except:

(i)     Investments by the Borrower from time to time in the Equity Interests of Persons who are its Subsidiaries on the Effective Date;

(ii)     Investments by the Borrower in Cash and Cash Equivalents;

(iii)    Investments indirectly by the Borrower in Permitted Developments made solely with the proceeds of capital contributions to the Borrower from the holders of its Equity Interests (or sales of equity securities of the Borrower) not to exceed (when together with the aggregate amount of Debt incurred by BostonGen and its Subsidiaries in connection with a Permitted Development) in the aggregate $140,000,000;

(iv)    Investments individually by the Borrower in any other Subsidiary permitted pursuant to Section 5.02(j) in an aggregate amount not to exceed $5,000,000; and

(v)     any other investments in an aggregate amount not to exceed $500,000 at any time.

(g)     Restricted Payments.  Except in connection with the Tender Offer and the Distribution, declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such or permit any of its Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower, except that any Subsidiary of the Borrower may declare and pay cash dividends to the Borrower or to any Subsidiary of the Borrower of which it is a Subsidiary, except:

(i)     in connection with the issuance of Equity Interests of the Borrower and contemporaneous purchase of its Equity Interests (for consideration consisting of Cash and/or Equity Interests) from existing unitholders in a transaction (including by way of merger permitted pursuant to Section 5.02(d)) in which any "*person*" or "*group*" (within the meaning of Rules 13(d) of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date) (other than any such "*person*" or "*group*" holding, directly or indirectly, beneficially or of record, any Equity Interests in the Borrower as of the Auction Date) (the "***Proposed Acquiror***") acquires ownership, directly or indirectly, beneficially or of record, of more than 35% on a fully diluted basis of the aggregate voting power represented by the issued and outstanding Equity Interests in the Borrower; *provided* that (A) such Proposed Acquiror is a Qualified Owner (B) each of S&P and Moody's shall have provided written confirmation of their respective ratings of the Debt under the BostonGen Facilities (as in effect immediately prior to such acquisition) after giving effect to such acquisition and (C) immediately after giving effect to such issuance or sale of Equity Interests no Default or Event of Default shall have occurred and be continuing and no Default or Event of Default, in each case, under (and as defined in) the Related Documents and the Financing Documents shall have occurred and be continuing;

(ii)    the purchase, redemption, or acquisition for value of any of its Equity Interests (other than unit appreciation rights) from its existing unitholders and holders of warrants of the Borrower as of the Effective Date in an aggregate amount not to exceed $25,000,000; and

(iii)    the purchase of unit appreciation rights of directors not to exceed $1,000,000 for each Fiscal Year that has elapsed since the Effective Date.

(h)    Amendments of Constitutive Documents.  Amend its limited liability company agreement, bylaws or other constitutive documents other than amendments that could not be reasonably expected to have a Material Adverse Effect.

(i)    Accounting Changes.  Make or permit any change in accounting policies or reporting practices, except as permitted by GAAP.

(j)    Partnerships; Formation of Subsidiaries, Etc.  (i) Become a general partner in any general or limited partnership or joint venture or (ii) organize any new Subsidiary (other than Subsidiaries of BostonGen permitted under the First Lien Credit Agreement).

(k)    Regulatory Matters.  Make or permit to be made any change in the ownership of it or its Subsidiaries without first obtaining any necessary authorization under Section 203 of the FPA.

(l)    Transactions with Affiliates.  Borrower will not enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is:

(i)    (A) on fair and reasonable terms no less favorable to the Borrower than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and (B) of the kind which would be entered into by a prudent Person in the position of the Borrower with a Person that is not one of its Affiliates;

(ii)    an arrangement, transaction or contract expressly permitted by the terms of this Agreement;

(iii)    the payment of fees (including any payments in respect of unit appreciation rights permitted pursuant to Section 5.02(g)(iii)) and indemnities to directors, officers, consultants and employees of the Borrower in the ordinary course of business;

(iv)    pursuant to the Management and Operation Agreements (if any), including the payment of fees, costs and expenses as required thereunder (as of the date hereof); or

(v)    the payment of fees, expenses, bonuses and awards related to the Transactions contemplated by the Transaction Documents and Loan Documents

to the extent, in the case of the Transaction Documents, written notice thereof has been provided to the Administrative Agent prior to the Effective Date.

SECTION 5.03. <u>Reporting Requirements</u>. Until a Repayment Event has occurred, the Borrower will furnish to the Administrative Agent (who will then circulate to the Lenders):

(a)   <u>Default Notice</u>. As soon as possible and in any event within five days after the Borrower obtains knowledge thereof, the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth details of such Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)   <u>Annual Financials</u>. As soon as available and in any event within 120 days after the end of each Fiscal Year (but, in the case of the 2006 Fiscal Year, 150 days after the end of such Fiscal Year), a copy of the annual audit report for such year for the Borrower and its Subsidiaries, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of KPMG LLP or other independent public accountants of recognized standing acceptable to the Administrative Agent and (ii) a certificate of the director of finance of the Borrower (A) certifying such financial statements as having been prepared in accordance with GAAP and (B) stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto; *provided* that, in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(c)   <u>Quarterly Financials</u>. As soon as available and in any event within 60 days after the end of each of the first three quarters of each Fiscal Year, a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter and a Consolidated statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by the director of finance of the Borrower as having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto; *provided* that, in the event of any change in generally accepted accounting principles used in the

preparation of such financial statements, the Borrower shall also provide a reconciliation of such financial statements to GAAP.

(d)     [Reserved].

(e)     Litigation. Promptly after the commencement thereof, notice of all actions, suits, litigation and proceedings before any Governmental Authority of the type described in Section 4.01(g).

(f)     ERISA.

(i)     ERISA Events and ERISA Reports. (A) Promptly and in any event within 10 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liability in excess of $10,000,000, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that the Borrower or such ERISA Affiliate has taken and proposes to take with respect thereto and (B) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information within 10 Business Days.

(ii)     Plan Terminations. Promptly and in any event within ten Business Days after receipt thereof by the Borrower or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(iii)     Multiemployer Plan Notices. Promptly and in any event within ten Business Days after receipt thereof by the Borrower or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability that could reasonably be expected to result in liability in excess of $10,000,000 by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan that could reasonably be expected to result in liability in excess of $10,000,000 or (C) the amount of liability incurred, or that may be incurred, by the Borrower or any ERISA Affiliate in connection with any event described in clause (A) or (B).

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default. Each of the following events or occurrences described in this Article shall constitute an "*Event of Default*".

(a)     Payment Defaults. (i) the Borrower shall fail to pay any principal of any Loan when the same shall become due and payable or (ii) the Borrower shall fail to make any other payment under any Loan Document, in each case under this clause (a) within ten Business Days after the same shall become due and payable.

(b)   Misrepresentation. any representation or warranty made by the Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; *provided, however*, that if (i) the Borrower was not aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied, within 30 days from the date on which the Borrower or any officer thereof first obtains knowledge thereof such that such incorrect or false representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such incorrect or false representation or warranty shall not constitute a Default or Event of Default.

(c)   Certain Covenants. the Borrower shall fail to perform or observe any term, covenant or agreement contained in Sections 2.13, 5.01(c), 5.02 or 5.03(a) and such default shall continue unremedied for a period of 30 days after the earlier of the date on which (x) any Responsible Officer of the Borrower becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender.

(d)   Other Covenants. the Borrower shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 60 days after the earlier of the date on which written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender.

(e)   Cross Default. the Borrower shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Debt of the Borrower that is outstanding in a principal amount of at least $25,000,000 either individually or in the aggregate for the Borrower (but excluding Debt outstanding under this Agreement), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof.

(f)   Insolvency Event. the Borrower or any of its Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any

proceeding shall be instituted by or against the Borrower or any such Subsidiary seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or the Borrower or any of its Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (f).

(g)     Judgments.  any final judgments or orders, either individually or in the aggregate, for the payment of money in excess of $25,000,000 shall be rendered against the Borrower by one or more Governmental Authorities, arbitral tribunals or other bodies having jurisdiction against the Borrower which remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which a stay of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

(h)     Non-Monetary Judgments.  any non-monetary judgment or order shall be rendered against the Borrower that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

(i)     Invalidity.  any provision of any Loan Document after delivery thereof pursuant to Section 3.01 shall for any reason cease to be valid and binding on or enforceable against the Borrower to it, or the Borrower shall so state in writing.

(j)     ERISA.  (i) any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Borrower and the ERISA Affiliates related to such ERISA Event) that could reasonably be expected to have a Material Adverse Effect.

(ii)     the Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Borrower and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), that could reasonably be expected to have a Material Adverse Effect.

(iii)    the Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Borrower and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount that could reasonably be expected to have a Material Adverse Effect.

SECTION 6.02.  Action if Insolvency.  In the event of an actual or deemed entry of an order for relief with respect to the Borrower or any of its Subsidiaries under the Federal Bankruptcy Code, (x) the Commitments of each Lender and the obligation of each Lender to make Loans shall automatically be terminated and (y) the Loans, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

SECTION 6.03.  Action if Other Event of Default.  (a) If any Event of Default specified in Sections 6.01(a), (c) (other than with respect to the breach of covenants set forth in Section 5.02(i)), (d) (other than with respect to the breach of covenants set forth in Section 5.01(a), (d) and (e) and Sections 5.03(b), (c), (e) and (f)), (g), (i) or (j) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender and the obligation of each Lender to make Loans and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

(b)    If prior to a BostonGen Repayment Event any event shall occur or condition shall exist under any agreement or instrument relating to any Debt under the First Lien Credit Agreement or the Second Lien Credit Agreement (or, in each case, any Refinancing thereof permitted by this Agreement and the Related Documents) and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate the maturity of such Debt or otherwise to cause such Debt to mature; or any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased in each case prior to the stated maturity thereof and if any Event of Default specified in Section 6.01(b), (c) (with respect to a breach of the covenant set forth in Section 5.02(i)), (d) (other than with respect to the breach of covenants set forth in Section 5.01(d) or (e) or Sections 5.03(b), (c), (e) and (f)) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender and the obligation of each Lender to make Loans and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due

and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

(c)    If after a BostonGen Repayment Event, any Event of Default specified in Section 6.01(d), (e) or (h) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender and the obligation of each Lender to make Loans and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE VII

## THE AGENTS

SECTION 7.01.  Authorization and Action.  (a)  Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Borrower), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of Notes; *provided, however*, that the Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)    The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, employee or attorney-in-fact that it selects in accordance with the foregoing provisions of this Section 7.01(b) in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 7.02.  Administrative Agent's Reliance, Etc.  Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, the Administrative Agent:  (a) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good

faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of the Borrower or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of the Borrower; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03.  Initial Banks and Affiliates.  With respect to its Commitments, the Loans made by it and any Notes issued to it, each Initial Bank shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though each were not an Administrative Agent; and the term "*Lenders*" or "*Lender*" shall, unless otherwise expressly indicated, include each Initial Bank in their respective individual capacities. Each Initial Bank and their respective affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of its Subsidiaries and any Person that may do business with or own securities of the Borrower or any such Subsidiary, all as if such Initial Bank was not an Administrative Agent and without any duty to account therefor to the Lenders. No Initial Bank shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to the Borrower or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Initial Bank.

SECTION 7.04.  Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05.  Indemnification.  Each Lender severally agrees to indemnify the Administrative Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Administrative Agent under the Loan Documents (collectively, the "*Indemnified Costs*"); *provided, however,* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or

disbursements resulting from the Administrative Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 8.04, to the extent that the Administrative Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

SECTION 7.06.  Successor Administrative Agent.  The Administrative Agent may resign at any time by giving 30 days' written notice thereof to the Lenders and the Borrower and may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent as to such of the Facilities as to which the Administrative Agent has resigned or been removed. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this Section 7.06 no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above. After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.  Amendments, Etc.  (a) Subject to clause (b) below, no amendment or waiver of any provision of this Agreement, the Notes or any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Required Lenders (or the Administrative Agent on their behalf), and then such waiver or consent shall be

effective only in the specific instance and for the specific purpose for which given; *provided, however,* that

(i) no amendment, waiver or consent shall, unless in writing and signed by the Borrower and all of the Lenders, do any of the following at any time:

(A)    waive any of the conditions specified in Section 3.01;

(B)    change (A) the definition of "*Required Lenders*" or (B) the number of Lenders or the percentage of the aggregate unpaid principal amount of the Loans shall be required for the Lenders or any of them to take any action hereunder or under any other Loan Document; or

(C)    amend this Section 8.01; and

(ii) no amendment, waiver or consent shall, unless in writing and signed by the Borrower and the Required Lenders and each Lender specified below for such amendment, waiver or consent:

(A)    reduce the principal of, or stated rate of interest on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender;

(B)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or 2.07 or any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender;

(C)    impose any restrictions on the rights of such Lender under Section 8.07; or

(D)    change the order of application of any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.06 in any manner that materially adversely affects the Lenders without the consent of holders of a majority of the Loans outstanding hereunder;

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by the Borrower and the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or the other Loan Documents.

(b)    Notwithstanding the other provisions of this Section 8.01, the Borrower and the Administrative Agent may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any Lender: (i) to cure any ambiguity, defect or inconsistency or (ii) to make any change that would provide any additional rights or benefits to the Lender.

(c)    If, in connection with any proposed amendment, waiver or consent, the consent of all of the Lenders, or all of the Lenders directly affected thereby, is required pursuant to this Section 8.01, and any such Lender refuses to consent to such amendment, waiver or

consent as to which the Required Lenders have consented (any such Lender whose consent is not obtained as described in this Section 8.01 being referred to as a "***Non-Consenting Lender***"), then, so long as the Administrative Agent is not a Non-Consenting Lender, at the Borrower's request and at the sole cost and expense of the Borrower, the Administrative Agent or an Eligible Assignee shall be entitled (but shall have no obligation) to purchase from such Non-Consenting Lender, and such Non-Consenting Lender (by its acceptance of the benefits of the applicable Loan Documents) agrees that it shall, upon the Administrative Agent's request, sell and assign to the Administrative Agent or such Eligible Assignee, all of the Loans and Commitments of such Non-Consenting Lender or Non-Consenting Lenders for an amount equal to the principal balance of all Loans held by the Non-Consenting Lender and all accrued interest and fees with respect thereto through the date of sale; *provided* that such Eligible Assignee consents to the proposed amendment, waiver or consent. Each Lender (by its acceptance of the benefits of the Loan Documents) agrees that, if it becomes a Non-Consenting Lender, it shall execute and deliver to the Administrative Agent an Assignment and Acceptance to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by Notes) subject to such Assignment and Acceptance; *provided, however*, that the failure of any Non-Consenting Lender to execute an Assignment and Acceptance shall not render such sale and purchase (and the corresponding assignment) ineffective.

SECTION 8.02. Notices, Etc. (a) All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic (including portable document format (pdf) communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in Section 8.02(b) and in the proviso to this Section 8.02(a), in an electronic medium and delivered as set forth in Section 8.02(b), if to the Borrower, at its address at The Schrafft Center, 529 Main Street, Suite 605, Charlestown, MA 02129, Attention: Chief Executive Officer, Fax: (617) 381-2211 (with a copy sent to EBG Holdings LLC c/o K Road Power Management, LLC, 330 Madison Avenue, 25th Floor, New York, NY 10017, Attention: Chief Executive Officer, Fax: (212) 351-0515 and a copy sent to Robert F. Quaintance Jr. and Paul D. Brusiloff, Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Fax: (212) 521-7451 and (212) 521-7015, respectively); if to any Initial Lender, at its Domestic Lending Office specified opposite its name on Schedule I hereto; if to any other Lender, at its Domestic Lending Office specified in the administrative questionnaire delivered in conjunction with the Assignment and Acceptance pursuant to which it became a Lender; and if to the Administrative Agent, at its address at 11 Madison Avenue, New York, NY 10010, Attention: Candace Sorina, Fax: (212) 325-8304, E-mail Address: candace.sorina@credit-suisse.com or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided, however*, that materials and information described in Section 8.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent. All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective when deposited in the mails, delivered to the telegraph company, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to the Administrative Agent pursuant to Article II, III or VII shall not be effective until received by the Administrative Agent. Delivery by telecopier of an executed

counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a Conversion of an existing, Loan (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "***Platform***").

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees (i) that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 8.03.  No Waiver; Remedies.  No failure on the part of any Lender or the Administrative Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.  Costs and Expenses.  (a)  Other than with respect to Other Taxes which are governed solely by Section 2.11, the Borrower agrees to pay on demand (i) all costs and expenses of the Administrative Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for the Administrative Agent with respect thereto, with respect to advising the Administrative Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with the Borrower or with other creditors of the Borrower or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of the Administrative Agent and each Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each Lender with respect thereto).

(b)    The Borrower agrees to indemnify, defend and save and hold harmless the Administrative Agent, each Lender and each of their Affiliates and their respective officers, directors, employees, agents, trustees and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and related expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any

investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the actual or proposed use of the proceeds of the Loans, the Transaction Documents or any of the transactions contemplated thereby (including, without limitation, the Transaction) or (ii) the actual or alleged presence of Hazardous Materials on any property of the Borrower or any of its Subsidiaries or any Environmental Action relating in any way to the Borrower or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense (x) is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct or (y) in the case of clause (i) above, is a tax. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the Transaction is consummated. The Borrower also agrees not to assert any claim against the Administrative Agent, any Lender or any of their Affiliates, or any of their respective officers, directors, employees, agents, trustees and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the actual or proposed use of the proceeds of the Loans, the Transaction Documents or any of the transactions contemplated by the Transaction Documents.

(c)     If any payment of principal of, or Conversion of, any Eurodollar Rate Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Loan as a result of a payment or Conversion pursuant to Section 2.05, 2.08(b)(i) or 2.09(d), acceleration of the maturity of the Loans pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of an Loan for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.05 or Section 6.01 or otherwise, the Borrower shall, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any loss (but excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Loan.

(d)     If the Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of the Borrower by the Administrative Agent or any Lender, in its sole discretion.

(e)     Without prejudice to the survival of any other agreement of the Borrower hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 8.05. <u>Right of Set-off</u>. Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by <u>Section 6.01</u> to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of <u>Section 6.01</u>, the Administrative Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Administrative Agent, such Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether the Administrative Agent or such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured. The Administrative Agent and each Lender agrees promptly to notify the Borrower after any such set-off and application; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Administrative Agent and each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Administrative Agent, such Lender and their respective Affiliates may have.

SECTION 8.06. <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and the Administrative Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

SECTION 8.07. <u>Assignments and Participations</u>. (a) Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Loans owing to it and the Note or Notes held by it); *provided, however*, that (i) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower), *provided* that simultaneous assignments by two or more Related Funds shall be treated as one assignment for purposes of the minimum assignment requirement, (ii) each such assignment shall be to an Eligible Assignee, and to the extent such assignment is to any Eligible Assignee that, immediately prior to such assignment, was not a Lender, an Affiliate of a Lender or an Approved Fund, the Administrative Agent shall have consented to such assignment (in each case such consent not to be unreasonably withheld or delayed), (iii) each such assignment made as a result of a demand by the Borrower pursuant to <u>Section 8.01</u> shall be arranged by the Borrower after consultation with the Administrative Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of

the rights and obligations of the assigning Lender under this Agreement, (iv) no Lender shall be obligated to make any such assignment as a result of a demand by the Borrower pursuant to Section 2.16 or Section 8.01 unless and until such Lender shall have received one or more payments from either the Borrower or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Advances owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement, (v) no such assignments shall be permitted without the consent of the Administrative Agent until the Administrative Agent shall have notified the Lender that syndication of the Commitments hereunder has been completed and (vi) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with (A) any Note or Notes (if any) subject to such assignment (B) an administrative questionnaire and tax forms, if applicable and (C) a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided, however*, that only one such fee shall be payable with respect to simultaneous assignments by or to one or more Related Funds; *provided further* that for each such assignment made as a result to a demand by the Borrower pursuant to Section 2.16 or Section 8.01, the Borrower shall pay to the Administrative Agent the applicable processing and recordation fee.

(b)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.09, 2.11 and 8.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as

it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 8.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and principal amount of the Loans owing to each Lender from time to time (the "*Register*"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Administrative Agent and each Lender shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or the Administrative Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. If requested, in the case of any assignment by a Lender, within 10 Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) an amended and restated Note (which shall be marked "*Amended and Restated*") to the account of such Eligible Assignee in an amount equal to the Commitment assumed by it under the Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under the Facility, an amended and restated Note to the account of such assigning Lender in an amount equal to the Commitment retained by it hereunder. Such amended and restated Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A hereto.

(f)    Each Lender may sell participations to one or more Persons (other than the Borrower or any of its Subsidiaries) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Loans owing to it and the Note or Notes (if any) held by it); *provided, however,* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the

Administrative Agent and the other Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by the Borrower therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation.

(g)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 8.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided, however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(i)    Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 8.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)    Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "***SPC***") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.09 and 2.11 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this

Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $500, assign all or any portion of its interest in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This subsection (j) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Loans are being funded by the SPC at the time of such amendment.

SECTION 8.08. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Electronic delivery (by telecopier or portable document format (pdf)) of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 8.09. Confidentiality. Neither the Administrative Agent nor any Lender shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to the Administrative Agent's or such Lender's Affiliates and their officers, directors, employees, agents, trustees and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Borrower received by it from such Lender, (e) in connection with any litigation or proceeding to which the Administrative Agent or such Lender or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 8.10. Patriot Act Notice. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act. The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by the Administrative Agent or any Lender in order to assist the Administrative Agent and the Lender in maintaining compliance with the Patriot Act.

SECTION 8.11. Jurisdiction, Etc. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive

jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 8.12.  Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the internal laws of the State of New York.

SECTION 8.13.  Waiver of Jury Trial.  Each of the Borrower, the Administrative Agent and the Lender irrevocably waives, to the fullest extent permitted by applicable law, all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans or the actions of the Administrative Agent or any Lender in the negotiation, administration, performance or enforcement thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

EBG HOLDINGS LLC,
as Borrower

By:_____
Name: William Kriegel
Title: President

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH,
as Administrative Agent

By:_____
Name: James Moran
Title: Managing Director


By:_____
Name:
Title: Nupur Kumar
Associate

GOLDMAN SACHS CREDIT
PARTNERS, L.P.,
as Initial Lender

By:
Name:
Title:        BRUCE H. MENDELSOHN,
              **AUTHORIZED SIGNATORY**

# EXHIBIT H

**11**

# EXHIBIT H

# Bostön
# Generating, LLC

The Schrafft Center
529 Main Street, Suite 605
Charlestown, MA 02129
Tel: 617-381-2270
Fax: 617-381-2211

December 21, 2006

US Bank National Association
Corporate Trust Department
One Federal Street, 3rd Floor
Boston, MA 02110

Attention: David Ganss

RE: Closing Date Funds Flow Memorandum

Dear Mr. Ganss,

This certificate and instruction is delivered to you by Boston Generating, LLC (the "Borrower") pursuant to Section 3.22 of the Security Deposit Agreement dated as of December 21, 2006 (the "Security Deposit Agreement") by and among the Borrower, the Guarantors from time to time party thereto, Credit Suisse, Cayman Islands Branch, as First Lien Collateral Agent and as Second Lien Collateral Agent, and U.S. Bank National Association, as Depositary (the "Depositary"). Any capitalized terms appearing herein but not otherwise expressly defined herein are used with the meanings assigned to those terms in the Security Deposit Agreement.

Attached hereto is a true, accurate and complete copy of the Closing Date Funds Flow Memorandum (the "FFM"). The terms of the Closing Date Funds Flow Memorandum applicable to the Depositary, including the deposits identified therein to be made to the Depositary on the Closing Date and the transfers to be made by the Depositary on the dates and in the amounts specified in the Closing Date Funds Flow Memorandum, are as follows (and are limited to the following):

(i)    the deposits listed on the third page (page entitled "Boston Generating, LLC, *Funds Flow Memorandum*")[1] of the FFM will be transferred to the Depositary on the Closing Date;

---

[1] In the EXCEL file, the fourth tab, labeled "Boston Generating."

(ii)    the disbursements listed on the third page (page entitled "Boston Generating, LLC, *Funds Flow Memorandum*")[2] of the FFM are to be disbursed by the Depositary on the Closing Date (the details of such disbursements for expenses are more fully described in (iv) below;

(iii)    the Account allocations listed on the fourth page (page entitled "Boston Generating, LLC, *Cash Calculation Worksheet*")[3] of the FFM are to be made by the Depositary from the amounts deposited on the Closing Date; and

(iv)    the disbursements listed on the eighth page under the caption "Boston Generating to be paid from the Funding Account at US Bank, ABA# 091000022, A/C# 173103321092, Ref: Boston Generating Funding Account, Trust Acct # 126875-053, unless indicated as To Be Netted from Proceeds" (page entitled "Boston Generating, LCC / EBG Holdings, LLC, *Fees and Expenses*")[4], other than those listed as Underwriter Fees and Underwriter Expenses (which are indicated as "To Be Netted From Proceeds") are to be disbursed by the Depositary on the Closing Date from the amounts deposited in the Funding Account.

The Depositary is hereby authorized and instructed to accept such deposits and to make such allocations, transfers and payments in accordance with the FFM.

This Certificate has been executed and delivered by a duly authorized officer of the Borrower.

Very truly yours,

BOSTON GENERATING, LLC

By: _____

    Title: Nicholas P. Donahue
    Name: Treasurer

---

[2] In the EXCEL file, the fourth tab, labeled "Boston Generating."

[3] In the EXCEL file, the fifth tab, labeled "Cash Sweep."

[4] In the EXCEL file, the ninth tab, labeled "Transaction Fees and Expenses."

# Bost⏻n Generating, LLC

## EBG Holdings LLC

### Revised Funds Flow Memo
December 21, 2006

Confidential

**Boston Generating, LLC / EBG Holdings LLC**

*Funds Flow Memorandum*

| Sources | | Uses | |
|---|---|---|---|
| Existing Synthetically Funded Cash | $130,000,000 | Distribution, Unit Buyback and Warrants Repurchase | $1,011,000,000 |
| First Lien Term Loan | 1,130,000,000 | Refinancing Existing Debt | 806,919,360 |
| Synthetic Revolving Facility | 70,000,000 | Synthetic Revolving Facility | 30,000,000 |
| Synthetic L/C Facility | 250,000,000 | Synthetic L/C Facility | 250,000,000 |
| Second Lien Term Loan | 350,000,000 | Existing Facilities Call Premium | 13,963,000 |
| Mezzanine Facility | 300,000,000 | Working Capital | 71,958,723 |
| Proceeds from Warrants Exercise | 6,300,000 | Transaction Fees and Expenses | 52,458,917 |
| **Total Sources** | **$2,236,300,000** | **Total Uses** | **$2,236,300,000** |

**EBG Holdings LLC**
*Funds Flow Memorandum*

| Sources | | Uses | |
|---|---|---|---|
| Distribution from Boston Generating | $707,967,388.71 | Distribution, Unit Buyback and Warrants Repurchase | $1,011,000,000.00 |
| Mezzanine Facility | 300,000,000.00 | Transaction Fees and Expenses | 3,267,388.71 |
| Proceeds from Warrants Exercise | 6,300,000.00 | | |
| **Total Sources** | **$1,014,267,388.71** | **Total Uses** | **$1,014,267,388.71** |

| | Amount | Bank Name | ABA# | A/C Name | A/C # | Ref. | Attn. |
|---|---|---|---|---|---|---|---|
| **Sources** | | | | | | | |
| Distribution from Boston Generating [BG] | $707,967,388.71 | Bank of America | 026009593 | EBG Holdings, LLC | 004806563956 | | |
| Mezzanine Facility [CS] | 298,400,000.00 | Bank of America | 026009593 | EBG Holdings, LLC | 004806563956 | | ᵕ |
| Proceeds from Warrants Exercise [EBG] | 6,300,000.00 | Monies Already in Account | | | | | |
| **Total Sources** | **$1,012,667,388.71** | | | | | | |
| | | | | | | | |
| **Uses** | | | | | | | |
| Distribution, Unit Buyback and Warrants Repurchase | $1,011,000,000.00 | See Detailed Schedule | | | | | |
| Transaction Fees and Expenses | 1,667,388.71 | See Detailed Schedule | | | | | |
| **Total Uses** | **$1,012,667,388.71** | | | | | | |

**Boston Generating, LLC**
*Funds Flow Memorandum*

| Sources | | Uses | |
|---|---|---|---|
| Existing Synthetically Funded Cash | $130,000,000.00 | Distribution to EBG Holdings LLC | $707,967,358.71 |
| First Lien Term Loan | 1,130,000,000.00 | Refinancing Existing Debt | 658,919,352.47 |
| Synthetic Revolving Facility | 70,000,000.00 | Synthetic Revolving Facility | 30,000,000.00 |
| Synthetic L/C Facility | 250,000,000.00 | Synthetic L/C Facility | 250,000,000.00 |
| Second Lien Term Loan | 250,000,000.00 | Existing Facilities Call Premium | 13,953,000.00 |
| | | Working Capital | 71,968,722.70 |
| | | Transaction Fees and Expenses | 48,191,546.12 |
| **Total Sources** | **$1,930,000,000.00** | **Total Uses** | **$1,930,000,000.00** |

| Sources | Amount | Bank Name | ABA# | A/C Name | A/C # | Ref. | Attn. |
|---|---|---|---|---|---|---|---|
| Existing Synthetically Funded Cash – Bank of NY [BONY] | $60,000,000.00 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct # 126875-053 | Claire Young (Daily Operations) / David Ganas (Closing Transaction) |
| Existing Synthetically Funded Cash – US Bank [US Bank] | 70,000,000.00 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct # 126875-053 | Claire Young (Daily Operations) / David Ganas (Closing Transaction) |
| New Credit Facilities [CS] | 658,904,130.33 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct # 126875-053 | Claire Young (Daily Operations) / David Ganas (Closing Transaction) |
| **Total Sources** | **$788,904,130.33** | | | | | | |

| Uses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Distribution to EBG Holdings LLC | $707,967,358.71 | Bank of America | 026009593 | EBG Holdings, LLC | 004808533656 | | |
| Transaction Fees and Expenses | 8,978,038.92 | See Detailed Schedule | | | | | |
| **Total Uses** | **$716,945,407.63** | | | | | | |

| | |
|---|---|
| **Balance for Working Capital** | **$71,958,722.70** |

**Boston Generating, LLC**
Cash Calculation Worksheet

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Existing Cash | $125,827,892.74 | | Operating Account | $60,000,000.00 | |
| Incremental Cash | 71,958,722.70 | | Revenue Account | 12,586,615.44 | |
| | | | Debt Service Payment Account | 200,000.00 | |
| | | | Post Closing Contingency Account | 125,000,000.00 | |

| Total Sources | $197,786,615.44 | | Total Uses | $197,786,615.44 | |

| | Amount | Bank Name | ABA# | A/C Name | A/C # | Ref. | Attn. |
|---|---|---|---|---|---|---|---|
| **Sources** | | | | | | | |
| Existing Cash (US Bank) | $125,827,892.74 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct.# 126876-XXX | Claire Young (Daily Operations) / David Ganss (Closing Transaction) |
| Incremental Cash | 71,958,722.70 | | | | | | |
| **Total Sources** | $197,786,615.44 | | | | | | |
| | | | | | | | |
| **Uses** | | | | | | | |
| Operating Account | $60,000,000.00 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct.# 126875-050 | Claire Young (Daily Operations) / David Ganss (Closing Transaction) |
| Revenue Account | 12,586,615.44 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct.# 126875-001 | Claire Young (Daily Operations) / David Ganss (Closing Transaction) |
| Debt Service Payment Account | 200,000.00 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct.# 126875-002 | Claire Young (Daily Operations) / David Ganss (Closing Transaction) |
| Post Closing Contingency Account | 125,000,000.00 | US Bank | 091000022 | Boston Generating, LLC | 173103321092 | Trust Acct.# 126875-056 | Claire Young (Daily Operations) / David Ganss (Closing Transaction) |
| **Total Uses** | $197,786,615.44 | | | | | | |

**Boston Generating, LLC / EBG Holdings LLC**

*Unit Buyback, Warrants Repurchase and Distribution Detail*

| Summary | No. of Units | Avg. Price | Total Uses |
|---|---|---|---|
| Tender Offer | | | $925,000,000.00 |
| Warrants Repurchase | | | 51,000,000.00 |
| Distribution to Unit Holders | NA | NA | 35,000,000.00 |
| Total | | | $1,011,000,000.00 |

| Uses | Amount | Bank Name | ABA# | A/C Name | A/C # | Ref. | Attn. |
|---|---|---|---|---|---|---|---|
| Tender Offer | $925,000,000.00 | Bank of New York | 021000018 | EBG Holdings | 111363 | Distribution Account #866896 | |
| Distribution to Unit Holders | 35,000,000.00 | Bank of New York | 021000018 | EBG Holdings | 111363 | Distribution Account #866896 | |
| Warrants Repurchase | 51,000,000.00 | To Be Completed Post-Closing | | | | | |
| Total | $1,011,000,000.00 | | | | | | |

**Boston Generating, LLC / EBG Holdings LLC**

*Funds Flow Memorandum*

**Boston Generating – Debt Repayment**

| First Lien | |
|---|---|
| Existing First Lien W/C Facility | $70,000,000.00 |
| Existing First Lien Synthetic L/C Facility | 30,000,000.00 |
| Existing First Lien Synthetic Debt Service Reserve Facility | 30,000,000.00 |
| Existing First Lien Term Loan | 366,300,000.00 |
| **Total Existing First Lien Debt** | **$496,300,000.00** |
| | |
| Second Lien | |
| Existing Second Lien Term Debt | 300,000,000.00 |
| **Total Existing First and Second Lien Debt** | **$796,300,000.00** |

**Boston Generating – Accrued Interest and Breakage Costs**

| First Lien | |
|---|---|
| Existing First Lien W/C Facility | $859,618.81 |
| Existing First Lien Synthetic L/C Facility | 157,116.67 |
| Existing First Lien Synthetic Debt Service Reserve Facility | 157,116.67 |
| Existing First Lien Term Loan | 7,277,170.58 |
| L/C Fronting Fee | 28,004.41 |
| Existing First Lien Breakage Costs | 5,000.00 |
| **Total Existing First Lien Accrued Interest** | **$8,484,027.13** |
| | |
| Second Lien | |
| Existing Second Lien Term Debt | 2,130,333.33 |
| Existing Second Lien Breakage Costs | 5,000.00 |
| **Total Existing First and Second Lien Accrued Interest** | **$10,619,360.47** |

**Boston Generating – Call Premium Calculation**

| First Lien | |
|---|---|
| First Lien Principal Amount | $496,300,000.00 |
| First Lien Call Premium @ 1% | 4,963,000.00 |
| | |
| Second Lien | |
| Second Lien Principal Amount | $300,000,000.00 |
| Second Lien Call Premium @ 3% | 9,000,000.00 |
| | |
| **Total Call Premium** | **$13,963,000.00** |

## Boston Generating, LLC

*Interest and Fees Calculation*

| Facility | Outstanding Balance | All-In Rate | Interest Due on 12/21/06 | Interest Due on 12/22/06 |
|---|---|---|---|---|
| First Lien | | | | |
| Letter of Credit | $30,000,000.00 | 8.57% | $157,116.67 | $164,258.33 |
| Letter of Credit (DSR) | 30,000,000.00 | 8.57% | 157,116.67 | 164,258.33 |
| | | | | |
| Series A - Term Loan | 346,511,428.56 | 8.62% | 8,884,037.06 | 8,966,977.26 |
| Series B - Term Loan | 19,788,571.44 | 8.62% | 393,133.52 | 397,870.07 |
| | | | | |
| Working Capital | 36,300,000.00 | 8.57% | 190,111.17 | 198,752.58 |
| | 33,700,000.00 | 8.62% | 669,507.64 | 677,574.00 |
| | | | | |
| Breakage Costs | 5,000.00 | | | |
| L/C Fronting Fee | 28,004.41 | | | |
| Second Lien | | | | |
| Term Loan | 300,000,000.00 | 11.62% | 2,130,333.33 | 2,227,166.67 |
| Breakage Costs | 5,000.00 | | | |
| **Total Interest** | | | $10,581,358.06 | $10,796,857.25 |
| | | | | |
| Total Payoff As Of 12/21/06 | $806,919,360.47 | | | |
| Total Payoff As of 12/22/06 | $807,134,881.66 | | | |

**Boston Generating, LLC / EBG Holdings LLC**

*Fees and Expenses*

Boston Generating to be paid from Funding Account at US Bank, ABA# 091000022, A/C# 173103321092, Ref: Boston Generating Funding Account, Trust Acct # 126675-053, unless indicated as To Be Netted from Proceeds

| Use | Name | Bank Name | ABA# | A/C Name | A/C # | Reference | Attn. | Fed Ref.# | Total Fees |
|---|---|---|---|---|---|---|---|---|---|
| **Underwriter Fees** | | | | | | | | | |
| | Credit Suisse (Admin) | | | | To Be Netted from Proceeds | | | | $225,000.00 |
| | Credit Suisse (Arrangement) | | | | To Be Netted from Proceeds | | | | 23,820,000.00 |
| | Goldman Sachs | | | | To Be Netted from Proceeds | | | | 15,880,000.00 |
| | Subtotal | | | | | | | | $39,925,000.00 |
| **Underwriter Expenses** | | | | | | | | | |
| | Credit Suisse (General Expenses) | | | | To Be Netted from Proceeds | | | | $60,926.23 |
| | Credit Suisse (Bk. Mtg. and Misc.) | | | | To Be Netted from Proceeds | | | | 67,595.97 |
| | Credit Suisse (Clay,Pkr, and CUSIP) | | | | To Be Netted from Proceeds | | | | 153,085.00 |
| | Subtotal | | | | | | | | $288,509.20 |
| **Energy Upfront Payment** | | | | | | | | | |
| | Credit Suisse Energy | Citibank, New York | 021000089 | | 30592297 | | | | $3,500,000.00 |
| | Subtotal | | | | | | | | $3,500,000.00 |
| **Legal Fees** | | | | | | | | | |
| | Milbank | JF Morgan Chase | 021000021 | | 9101073923 | Bill Ref. 261161, File No. 26302-34701 | | 13-5537279 | $1,285,714.28 |
| | Cadwvale & Pilmpton | Citibank NA, NY,NY | 021000089 | | 49109225 | Reference 22353077, Invoice 1075628 | | | 2,200,000.00 |
| | White & Case | JF Morgan Chase | 021000021 | | 301177137286 | Boston Gen Reti, Invoice 611949 | | 13-5005970 | 43,723.90 |
| | Harris James | Wilmington Trust Company | 031100092 | | 2822-6691 | Matter # 111921-0002 | | 51-0023480 | 53,927.00 |
| | Nutter | Citizens Bank of MA | 011500120 | | 1131796697 | | | 36-5199545 | 47,300.00 |
| | Subtotal | | | | | | | | $3,530,364.28 |
| **Consultant, Advisor and Other Fees** | | | | | | | | | |
| | Sharin & Looger LLP | Citizens Bank | 011500120 | Sherin and Lodgen LLP Client Funds Account | 1107850034 | Ref. Inv. # 156951 | | 04-2022901 | $3,752.50 |
| | Bank of NY | Bank of New York | 021000018 | | 072634 | A/C GLA 111-565 Boston Generating Fees | Corporate Finance | 15-6160382 | 1,500.00 |
| | US Bank | US Bank | 091000022 | | 180150133135 | Trust Acct# 126675-001 | Fee Department | 31-6641368 | 1,000.00 |
| | Navigant Consulting | LaSalle Bank | 071000505 | | 5603151127 | Ref. Inv. # 186028 | | 36-4084654 | 195,000.00 |
| | Black & Veatch | Commerce Bank, KC, MO. USA | 101000019 | | 5338422 | Invoice No. 1009077 | | 43-1633073 | 10,000.00 |
| | Black & Veatch | Commerce Bank, KC, MO. USA | 101000019 | | 5338422 | Invoice No. 1010486 | | 43-1633073 | 49,271.35 |
| | ARInTech | JPM Chase, Chicago, IL | 021000021 | | 1109164 | Ref. Inv. # 0011957-IN | | 33-0141815 | 7,500.00 |
| | Land America | Bank of America | 026009593 | | 51170724 | Laurie Ward, Boston Gen File # 03586 | | 54-0278740 | 279,435.00 |
| | Seals & Thomas | Middlesex Savings Bank | 211371227 | | 800306165 | Ref Invoice #'s W-1424,15-1 and W-1389,19-1 | | 04-2826500 | 17,073.40 |
| | Nixon Peabody | | | | | | | | |
| | Environ | Wachovia Bank NA | 031201467 | | 2000020014684S | Invoice No. 212654 | | 52-1246616 | 28,075.92 |
| | Subtotal | | | | | | | | $602,238.17 |
| **Rating Agency Fees** | | | | | | | | | |
| | Moody's | Suntrust Bank | 061000104 | | 8401033447 | Ref Invoice # G1566461-000 | | 13-1658883 | $375,000.00 |
| | Standard & Poor's | Bank of America San Francisco CA | 026009593 | | 12334-C2500 | Ref Invoice # 10128844 | | 13-1026996 | 770,000.00 |
| | Subtotal | | | | | | | | $1,145,000.00 |
| **Printing Fees** | | | | | | | | | |
| | Advanced Business Group, Inc. | JPMorgan Chase | 021000021 | | 020508452366 | Invoice No. 41555 | | 37,108.35 |
| | Advanced Business Group, Inc. | JPMorgan Chase | 021000021 | | 020508452368 | Invoice No. 41556 | | 3,327.11 |
| | Subtotal | | | | | | | | $10,436.46 |
| **Total Fees and Expenses** | | | | | | | | | $49,151,548.12 |

EBG Holdings to be paid from EBG Holdings Bank of America Account, ABA# 026009593, A/C# 004506583956, unless indicated as To Be Netted from Proceeds

| Use | Name | Bank Name | ABA# | A/C Name | A/C # | Reference | Attn. | Fed Ref.# | Total Fees |
|---|---|---|---|---|---|---|---|---|---|
| **Underwriter Fees** | | | | | | | | | |
| | Credit Suisse | | | | To Be Netted from Proceeds | | | | $900,000.00 |
| | Credit Suisse (Admin) | | | | To Be Netted from Proceeds | | | | $100,000.00 |
| | Goldman Sachs | | | | To Be Netted from Proceeds | | | | 600,000.00 |
| | Subtotal | | | | | | | | $1,600,000.00 |
| **Consultant and Advisor Fees** | | | | | | | | | |
| | Duff & Phelps | Lasalle Bank | 071000505 | | 5600074600 | Ref. Invoice 19188 | | 36-4090668 | $210,000.00 |
| | KPMG | Mellon Bank | 043000261 | | 0013809 | Invoice 42629180 | | 13-5565207 | 43,083.00 |
| | Subtotal | | | | | | | | $253,083.00 |
| **Legal Fees** | | | | | | | | | |
| | Milbank | JP Morgan Chase | 021000021 | | 9101073923 | Bill Ref. 261161, File No. 26302-34701 | | | $214,256.71 |
| | Cadwvale & Pilmpton | Citibank NA, NY,NY | 021000089 | | 4819-6225 | Reference 22353071, Invoice 1075628 | | 13-5537279 | 1,200,000.00 |
| | Subtotal | | | | | | | | $1,414,256.71 |
| **Total Fees and Expenses** | | | | | | | | | $3,267,339.71 |
| **Total Fees and Expenses** | | | | | | | | | $52,418,918.83 |

## Boston Generating, LLC / EBG Holdings LLC

*Fee and Disbursement Worksheet*

### Arrangement Fee

| Facility | Size | Fee % | Fee |
|---|---|---|---|
| 1st Lien Term Loan | $1,080,000,000 | 2.15% | $23,220,000 |
| 1st Lien Revolver | 70,000,000 | 2.15% | 1,505,000 |
| 1st Lien Synethetic L/C | 250,000,000 | 2.15% | 5,375,000 |
| 2nd Lien Term Loan | 400,000,000 | 2.40% | 9,600,000 |
| Mezzenine Facility | 300,000,000 | 0.50% | 1,500,000 |
| **Total Underwriting Fees** | | | **$41,200,000** |

### Administration Fees

| | |
|---|---|
| First and Second Lien - BG | $225,000 |
| Mezzenine - EBG | 100,000 |
| | $325,000 |

### Boston Generating – Underwriter Share

| | Allocation | Total Fee |
|---|---|---|
| Credit Suisse | 60% | $23,820,000 |
| Goldman Sachs | 40% | 15,880,000 |

### Boston Generating – Fees and Expenses

| | Total Fee |
|---|---|
| Credit Suisse | $24,333,509 |
| Goldman Sachs | 15,880,000 |

### EBG Holdings – Underwriter Share

| | Allocation | Total Fee |
|---|---|---|
| Credit Suisse | 60% | $900,000 |
| Goldman Sachs | 40% | 600,000 |

### EBG Holdings – Fees and Expenses

| | Total Fee |
|---|---|
| Credit Suisse | $1,000,000 |
| Goldman Sachs | 600,000 |