**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br>BOSTON GENERATING LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |
| MARK HOLLIDAY, the Liquidating Trustee of the BosGen Liquidating Trust,<br><br>Plaintiff,<br><br>-versus-<br><br>K ROAD POWER MANAGEMENT, LLC, *et al.*,<br><br>Defendants. | Adversary Proceeding<br><br>No. 12-01879 (MEW) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**
**<u>THE THIRD AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................1

STATEMENT OF FACTS ....................4

A. The Leveraged Recapitalization ....................4

B. Bankruptcy Proceedings ....................6

C. The Trustee's Third Amended Complaint ....................9

ARGUMENT ....................10

I. The Trustee's Claims Are Not Plausible, And The Intentional Fraudulent Conveyance Claims Lack The Requisite Particularity Under Rule 9(b) ....................10

II. All Of The Trustee's Claims Are Time-Barred ....................12

A. Delaware's Three-Year Statute Of Repose Bars The Trustee's Claims To Recover Distributions From BosGen And EBG To Their Members ....................13

1. The Delaware Statute Of Repose Applies To The Trustee's Claims ....................13

2. The Delaware Statute Bars Each Of The Trustee's Claims ....................17

3. Neither The Discovery Rule Nor Equitable Tolling Applies ....................18

B. The Trustee Cannot Take Advantage Of New York's Six-Year Statute Of Limitations ....................18

1. The Trustee Has Failed To Adequately Plead His Entitlement To New York's Statute Of Limitations ....................18

2. The Trustee Fails To Plead Equitable Tolling Or The Discovery Rule ....................21

III. The Trustee's Claims Are Preempted And Barred By § 546(e)'s Safe Harbor ....................23

A. Section 546(e) Preempts Creditors' State Law Fraudulent-Transfer Claims That § 546(e) Would Bar The Bankruptcy Trustee From Bringing ....................24

B. Section 546(e) Bars Avoidance Of The Payments To EBG's Members ....................27

1. The Payments Were "Settlement Payments" And "Transfers … In Connection With A Securities Contract" ....................27

2. The Payments Were Made "By Or To (Or For The Benefit Of)" Entities Covered By § 546(e) ....... 28

a. EBG Was A "Financial Institution" ....... 28

b. EBG's Members Were "Financial Institutions" (And Many Members Were Other Covered Entities As Well) ....... 31

C. The Trustee's Attempt To Evade The Safe Harbor Fails ....... 32

1. Section 546(e) Preempts State-Law Intentional Fraudulent-Transfer Claims ....... 33

2. Section 546(e) Bars Avoidance Of The $35 Million in "Dividend Payments" Because They Were "Settlement Payments" or "Transfer[s] … In Connection With A Securities Contract" ....... 34

3. Section 546(e) Bars Avoidance Of The $1 Billion EBG Paid To Repurchase Its Equity Securities, Even If The Payments Were Financed With Loan Proceeds That First Passed Through BosGen ....... 35

IV. The Trustee's Cause Of Action For Unjust Enrichment Fails As A Matter Of Law ....... 40

V. To The Extent The Trustee Seeks To Recover On Behalf Of The Lenders, And Their Successors, He Is Estopped From Doing So ....... 42

VI. The Actual Fraudulent Conveyance Claims Fail To Allege That A "Critical Mass" Of The EBG Board Acted With Fraudulent Intent ....... 47

VII. The Trustee Is Barred From Suing Dissolved Corporate Entities ....... 49

CONCLUSION ....... 50

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adelphia Recovery Tr. v. HSBC Bank USA (In re Adelphia Recovery Tr.)*,
634 F.3d 678 (2d Cir. 2011)....................43, 45

*Am. Cas. Co. v. Lee Brands, Inc.*,
2010 WL 743839 (S.D.N.Y. Mar. 3, 2010)....................49

*AP Servs. LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)....................25

*Bartfield v. Murphy*,
578 F. Supp. 2d 638 (S.D.N.Y. 2008)....................40

*Bd. of Managers of Chocolate Factory Condo. ex rel. Chocolate Factory Condo. v. Chocolate Partners, LLC*,
992 N.Y.S.2d 157, 2014 WL 1910237 (Sup. Ct. 2014)....................14, 16

*Bianco v. Erkins (In re Gaston & Snow)*,
243 F.3d 599 (2d Cir. 2001)....................16, 19

*Bresnahan v. Dunn (In re Dunn)*,
2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006)....................43

*Chadirjian v. Kanian*,
506 N.Y.S.2d 880 (App. Div. 1986)....................42

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,*
516 N.E.2d 190 (N.Y. 1987)....................42

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009), *overruled in part by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018)....................25

*Cosmas v. Hassett,*
886 F.2d 8 (2d Cir. 1989)....................12

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013)....................35, 39, 45

*Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.),*
818 F.3d 98 (2d Cir. 2016).................... *passim*

*Deutsche Bank Tr. Co. Ams. v. Robert R. McCormick Found.*,
138 S. Ct. 1162 (2018) ....................26

*Deutsche Bank Trust Co. Ams. v. Robert R. McCormick Found.*,
139 S. Ct. 2050 (2019) ....................26

*Diamond v. Friedman (In re Century City Doctors Hosp.), LLC*,
466 B.R. 1 (Bankr. C.D. Cal. 2012) ....................14, 15, 16, 17, 18

*Eberhard v. Marcu*,
530 F.3d 122 (2d Cir. 2008) ....................42

*Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*,
2013 WL 1200273 (Del. Ch. Mar. 26, 2013) ....................50

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
341 B.R. 451 (Bank. S.D.N.Y. 2006) ....................32

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
379 B.R. 425 (S.D.N.Y. 2007) .................... 45-46

*Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) ....................27, 34, 39

*FDIC v. Porco*,
552 N.E.2d 158 (N.Y. 1990) ....................41

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
712 F.3d 136 (2d Cir. 2013) ....................18

*Field v. Mans*,
516 U.S. 59 (1995) ....................30

*First Fed. Sav. & Loan Ass'n, Ohio v. Napoleon*,
701 N.E.2d 350 (Mass. 1998) ....................11

*Freeman v. Williamson*,
890 N.E.2d 1127 (Ill. App. Ct. 1st Dist. 2008) ....................14

*Geron v. Craig (In re Direct Access Partners, LLC)*,
2019 WL 2323674 (Bankr. S.D.N.Y. May 30, 2019) ....................14, 15

*Glob. Crossing Estate Representative v. Alta Partners Holdings LDC (In re Glob. Crossing, Ltd.)*,
385 B.R. 52 (Bankr. S.D.N.Y. 2008) ....................35

*Glob. Fin. Corp. v. Triarc Corp.*,
715 N.E.2d 482 (N.Y. 1999) ....................19

*Gluck v. Amicor, Inc.*,
487 F. Supp. 608 (S.D.N.Y. 1980)....................19

*Gordon & Co. v. Ross*,
63 F. Supp. 2d 405 (S.D.N.Y. 1999)....................19

*Grayson Consulting. Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*,
716 F.3d 355 (4th Cir. 2013) ....................35

*Green Tree Servicing, LLC v. Christodoulakis*,
689 F. App'x 66 (2d Cir. 2017) ....................42

*Hayes v. Morgan Stanley DW Inc. (In re Stewart Fin. Co.)*,
367 B.R. 909 (Bankr. M.D. Ga. 2007)....................39

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995)....................37

*Hosking v. TPG Capital Mgmt., L.P. (Hellas Telecomms. (Lux.) II SCA)*,
526 B.R. 499 (Bankr. S.D.N.Y. 2015)....................34

*HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*,
2009 WL 385474 (W.D.N.Y. Feb. 12, 2009), *aff'd*, 634 F.3d 678 (2d Cir. 2011) ....................45

*In re Best Prods. Co.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994)....................43

*In re Boston Generating, LLC,*
440 B.R. 302 (Bankr. S.D.N.Y. 2010)....................12

*In re Chemtura Corp.*,
39 B.R. 561 (Bankr. S.D.N.Y. 2010)....................12

*In re Citadel Indus., Inc.*,
423 A.2d 500 (Del. Ch. 1980)....................49, 50

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)....................12

*In re Heritage Organizational, L.L.C.*,
413 B.R. 438 (Bankr. N.D. Tex. 2009)....................15

*In re Hydrogen, L.L.C.*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010)....................4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013), *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016)....................41

*In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999 (Del. Ch. Aug. 18, 2006)....................48

*In re Sabine Oil & Gas Corp.*, 547 B.R. 503 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016)....................40

*In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019).................... *passim*

*Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932 (Del. Ch. June 30, 2004)....................17

*Johnson v. Priceline.com, Inc.*, 711 F.3d 271 (2d Cir. 2013)....................31

*Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238 (2d Cir. 1984)....................19, 20

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017)....................47, 48, 50

*Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012)....................21

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)....................49

*Krys v. Aaron (In re Refco Sec. Litig.)*, 890 F. Supp. 2d 332 (S.D.N.Y. 2012)....................43, 45

*Kwon v. Yun*, 2008 WL 190058 (S.D.N.Y. Jan. 22, 2008)....................50

*Lane v. Eggleston*, 284 F. 743 (5th Cir. 1922)....................43

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012)....................34

*Liquidation Tr. v. Daimler AG (In re Old CarCo, LLC)*, 454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd,* 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd,* 509 F. App'x 77 (2d Cir. 2013).................... 11-12

*Lyman Commerce Solutions, Inc. v. Lung*,
2015 WL 1808693 (S.D.N.Y. Apr. 20, 2015)....................15

*Mahmood v. Research in Motion Ltd.*,
2012 WL 242836 (S.D.N.Y. Jan. 24, 2012)....................22

*Maslan v. Am. Airlines, Inc.*,
885 F. Supp. 90 (S.D.N.Y. 1995)....................20

*Matthew v. Laudamiel*,
2012 WL 605589 (Del. Ch. Feb. 21, 2012)....................50

*Mediators, Inc. v. Manney (In re Mediators, Inc.)*,
190 B.R. 515 (S.D.N.Y. 1995), *aff'd*, 105 F.3d 822 (2d Cir. 1997)....................21

*Menichini v. Grant*,
995 F.2d 1224 (3d Cir. 1993)....................22

*Merit Management Group, LP v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018)....................25, 26, 27, 29

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995)....................12

*Miller v. CSFB (In re Refco, Inc. Sec. Litig.)*,
2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009), *adopted*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010)....................29-30, 44

*Moore v. Paladini (In re CD Liquidation Co.)*,
462 B.R. 124 (Bankr. D. Del. 2011)....................40, 41

*Mostel v. Petrycki*,
885 N.Y.S.2d 397 (Sup. Ct. 2009)....................14-15

*O'Connell v. Shallo (In re Die Fliedermaus LLC)*,
323 B.R. 101 (Bankr. S.D.N.Y. 2005)....................14

*Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
719 F.3d 94 (2d Cir. 2013)....................25-26

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
344 B.R. 340 (W.D. Pa. 2006)....................33-34, 38

*Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*,
274 B.R. 71 (D. Del. 2002)....................25, 34

*Official Comm. of Unsecured Creditors v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*,
524 B.R. 536 (Bankr. S.D.N.Y. 2015)....................14, 16

*Ont. Teachers' Pension Plan Bd. v. IG Holdings, Inc.*,
2000 WL 1234592 (S.D.N.Y. Aug. 31, 2000)....................28

*Orr v. Kinderhill Corp.*,
991 F.2d 31 (2d Cir. 1993)....................37

*PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*,
2016 WL 3611831 (Bankr. D. Del. June 20, 2016)....................45

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002)....................22

*Peckar & Abramson, P.C. v. Lyford Holdings, Ltd.*,
20 N.Y.S.3d 41 (App. Div. 2015)....................15, 16

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014)....................35, 39

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
721 F.3d 95 (2d Cir. 2013)....................18

*Portfolio Recovery Assocs., LLC v. King*,
927 N.E.2d 1059 (2010)....................19

*QSI Holdings, Inc. v. Alford*,
382 B.R. 731 (W.D. Mich. 2007), *aff'd*, 571 F.3d 545 (6th Cir. 2009)....................45

*Ramiro Aviles v. S & P Glob., Inc.*,
2019 WL 1407473 (S.D.N.Y. Mar. 28, 2019)....................19

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003)....................41

*Robinson v. Deutsche Bank Tr. Co. Americas*,
572 F. Supp. 2d 319 (S.D.N.Y. 2008)....................46

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)....................36

*Setters v. AI Properties & Developments (USA) Corp.*,
32 N.Y.S.3d 87 (App. Div. 2016)....................15

*Silva v. Toll Brothers' Inc*.,
1998 WL 898307 (S.D.N.Y. Dec. 23, 1998) ....................................................................19

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,
446 B.R. 32 (Bankr. E.D.N.Y. 2011)....................................................................................22

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
745 F. Supp. 2d 303 (S.D.N.Y. 2010)....................................................................................48

*Stochastic Decisions*, *Inc. v. DiDomenico*,
995 F.2d 1158 (2d Cir. 1993)................................................................................................41

*Strauss v. Credit Lyonnais*, *S.A.*,
2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007)..............................................................21, 22

*Stuart v. Am. Cyanamid Co.*,
158 F.3d 622 (2d Cir. 1998)...................................................................................................19

*Tanges v. Heidelberg N. Am.*, *Inc.*,
710 N.E.2d 250 (N.Y. 1999) ..................................................................................................16

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...................................................................................45

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
892 F. Supp. 2d 805 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409
(5th Cir. 2014)......................................................................................................25, 33, 45

*U.S. Bank National Association v. Verizon Communications*, *Inc.*,
479 B.R. 405 (N.D. Tex. 2012)...............................................................43, 44, 45, 46, 47

*Urbont v. Sony Music Entm't*,
863 F. Supp. 2d 279 (S.D.N.Y. 2012)....................................................................................22

*US Bank Nat'l Ass'n v. Gestetner*,
960 N.Y.S.2d 227 (App. Div. 2013) .......................................................................................22

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),*
503 B.R. 348 (Bankr. S.D.N.Y. 2014) ...........................................................................3, 44, 45

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
541 B.R. 172 (Bankr. S.D.N.Y. 2015), *rev'd and remanded*, 554 B.R. 635
(S.D.N.Y. 2016) ........................................................................................................................47

*Williamson v. Culbro Corp. Pension Fund*,
838 N.Y.S.2d 524 (App. Div. 1st Dep't 2007) .......................................................................14

*Wood v. Coastal States Gas Corp.*,
401 A.2d 932 (Del. 1979) ....................................................................................42

*Woori Bank v. Merrill Lynch*,
923 F. Supp. 2d 491 (S.D.N.Y. 2013)....................................................................20

*Wyle v. Howard, Weil, Labouisse, Friedrichs Inc. (In re Hamilton Taft & Co.)*,
176 B.R. 895 (Bankr. N.D. Cal. 1995), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997)....................................................................34

**STATUTES**

11 U.S.C. § 101(22A) .................................................................................... *passim*

11 U.S.C. § 101(53A) ....................................................................................32

11 U.S.C. § 544....................................................................................13, 15, 24, 26, 33

11 U.S.C. § 546(e) .................................................................................... *passim*

11 U.S.C. § 548....................................................................................24, 29, 33, 34

11 U.S.C. § 550....................................................................................36, 37, 38

11 U.S.C. § 741....................................................................................27, 30

28 U.S.C. § 1409(c) ....................................................................................15

Del. Code Ann. tit. 6, § 15-101(4) ....................................................................................17

Del. Code Ann. Title 6, § 18-607(c) ....................................................................................13

Del. Code Ann. Title 6, § 18-803(b)....................................................................................50

N.Y. Ltd. Liab. Co. Law § 102(i) ....................................................................................17

N.Y. Ltd. Liab. Co. Law § 508(c)....................................................................................14, 15, 16

Tex. Bus. Orgs. Code Ann. § 101.206 ....................................................................................15

**RULES**

Fed. R. Bankr. P. 7008....................................................................................1

Fed. R. Bankr. P. 7009....................................................................................1

Fed. R. Bankr. P. 7012....................................................................................1

Fed. R. Civ. P. 8....................................................................................1, 11

Fed. R. Civ. P. 9 ....1, 10, 12

Fed. R. Civ. P. 12 ....1, 4, 32

**OTHER AUTHORITIES**

1 Karon S. Walker, New York Limited Liability Companies and Partnerships: A Guide to Law and Practice § 7:11 (West's N.Y. Prac. Series 2013) ....16

5 *Collier on Bankruptcy* ¶ 548.01 (15th ed. rev. 2009) .... 42-43

Martin I. Lubaroff & Paul M. Altman, Lubaroff & Altman on Delaware Limited Partnerships § 6.10 (Supp. 2011) ....16

Restatement (Third) of Agency § 1.01 (2006) ....30

Restatement (Third) of Agency § 3.14 ....31

Restatement (Third) of Agency § 3.16 ....31

Restatement (Third) of Agency § 8.06 ....31

The undersigned defendants (the "Transferee Defendants"[1]) respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6) as incorporated in Fed. R. Bankr. P. 7008, 7009, and 7012(b), to dismiss the Third Amended Complaint ("TAC") filed by Mark Holliday, the Liquidating Trustee of the BosGen Liquidating Trust (the "Trustee"), ECF No. 272-1.

**PRELIMINARY STATEMENT**

This bankruptcy case is nearly nine years old, and this adversary proceeding is nearly seven years old. It concerns a transaction that closed 13 years ago. Since 2012, three sets of plaintiff lawyers have filed four complaints. Like its predecessors, however, this iteration of the complaint fails to state a claim, and intervening case law has now cemented the conclusion that no viable cause of action exists against any of the Transferee Defendants. For seven independent reasons, the Third Amended Complaint should be dismissed, once and for all, with prejudice.

*First*, the Trustee's allegations are implausible. This action challenges the Debtors' 2006 leveraged recapitalization, which was financed by more than $2 billion in loans from some of the world's most sophisticated lenders, under credit agreements that required the Debtors to use the loan proceeds to make distributions to the Debtors' members—the Transferee Defendants. The Trustee's case turns on the remarkable proposition that those distributions, which the lenders not only knowingly financed but required the Debtors to make, defrauded those same lenders. Five years ago, Judge Chapman dismissed the Trustee's common-law fraud claims for lack of particularity under Rule 9(b) and because, even under the more lenient standards of Rule 8, they were fundamentally implausible (ECF Nos. 212, 276). The Trustee has not even sought to

[1] The Third Amended Complaint defines "Transferee Defendants" to be those "who or that received a transfer or distribution pursuant to the Leveraged Recap Transaction" (TAC ¶ 7) and lists them in Exhibit A.

replead those claims, and the Third Amended Complaint does nothing to cure these fundamental defects with respect to the Trustee's remaining allegations sounding in fraud.

*Second*, all of the Trustee's claims are time-barred. The claims seek to avoid and recover distributions made in December 2006 by two Delaware limited liability companies to their members—by Boston Generating LLC ("BosGen") to its sole member EBG Holdings LLC ("EBG"), and then by EBG to its members, including the Transferee Defendants. Delaware has a statute of repose that, after three years, extinguishes entirely an LLC member's liability under any law for distributions from the company. That statute of repose—which is not subject to tolling—renders all of the Trustee's claims, first filed in 2012, untimely. And, even if it did not, the Trustee cannot plead facts showing that most (let alone all) of the creditors in whose shoes he sues resided in New York, so he cannot salvage his claims using New York's unusually long limitation period.

*Third*, the claims are barred under § 546(e) of the Bankruptcy Code, which safe harbors "settlement payment[s]" and payments "in connection with a securities contract" from avoidance and recovery. Two decisions arising out of the *Tribune* bankruptcy, issued after this adversary proceeding was commenced, confirm the point. The first, issued by the Second Circuit, establishes that so long as the safe harbor would block a bankruptcy trustee from avoiding the transfers under federal law, the Bankruptcy Code, basic principles of conflict preemption prevent the Trustee from circumventing the safe harbor by pleading his avoidance claims under state law as an assignee of the Debtors' creditors. The second, issued earlier this year by Judge Cote, held that a bankruptcy trustee could not avoid transfers to shareholders arising out of a transaction virtually identical to that in this case because they were covered by the plain terms of § 546(e).

*Fourth*, in addition to being barred by the federal safe harbor, the Trustee's claim for unjust enrichment fails as a matter of state law. The Debtors' creditors, in whose shoes the Trustee asserts his claims, cannot sue for alleged injuries that BosGen and EBG incurred directly and that the creditors suffered, if at all, only indirectly. Moreover, those creditors never had the type of contractual or other relationship with the Transferee Defendants that is a legal predicate for the quasi-contractual claim of unjust enrichment.

*Fifth*, virtually all of the claims of the creditors in whose shoes the Trustee brings this action are held by the same lenders who not only agreed to, but required, the transfers that the Trustee now seeks to avoid. Under settled law, including Judge Gerber's *Lyondell* decision, those lenders consented to and ratified the distributions, which may not now be avoided by a trustee acting in their stead (as assignee of their claims). The Trustee's assertion that these highly sophisticated lenders were misled by the Debtors about the Debtors' financial condition, and would not otherwise have made the loans, cannot salvage his claims. Even if plausible (and it is not), that assertion would at most support a claim for *fraudulent inducement* against *parties alleged to have actively participated in the fraud*, and then only if the Trustee could establish scienter, justifiable reliance, and the other elements of the claim. As *Lyondell* and numerous other cases hold, such an allegation would not support a claim for fraudulent *transfer* against the *Transferee Defendants*. The Trustee does not and cannot allege either that the creditors were misled that the proceeds of their loans would be used to fund the distributions to the Transferee Defendants, as the loan documents explicitly required, or that any of the Transferee Defendants, as distinguished from the Debtors' management, made any representations (let alone any knowingly false ones) of any kind to the creditors.

*Sixth*, to properly plead a claim for intentional fraudulent conveyance, the Trustee must allege that a "critical mass" of the EBG board of directors, which approved the leveraged recapitalization, acted with fraudulent intent. The Trustee does no such thing. The Trustee's fraud allegations relate solely to K Road, which held only 10% of EBG's stock and appointed only two members to its seven-person board.

*Finally*, the Trustee cannot sue corporate entities that no longer exist. Under the law applicable to each such Defendant, a canceled corporation is not amenable to suit. This action must be dismissed as to each of them for this reason as well.

## STATEMENT OF FACTS[2]

### A. The Leveraged Recapitalization

EBG and BosGen, Delaware limited liability companies (TAC ¶¶ 5-6), constituted with their subsidiaries "a wholesale power generation company that own[ed] and operate[d] three electric power generating facilities located in the Boston metropolitan area," Decl. of Jeff Hunter ("Hunter Decl.") ¶¶ 1, 6, No. 10-14419 (Bankr. S.D.N.Y. Aug. 18, 2010), ECF No. 2. In October 2006, EBG's Board of Directors approved a leveraged recapitalization composed of a $925 million tender offer and the distribution of $35 million in dividends to holders of LLC interests in EBG. TAC ¶¶ 27, 117, 122-125.

To effectuate the tender offer, EBG sent an offer to purchase, advising its members that EBG would purchase for cash up to $925 million of outstanding Class A and Class B

---

[2] This recitation of facts is, for purposes of this motion only, drawn from the Third Amended Complaint, the exhibits attached thereto, and the documents referenced therein, from the record of the proceedings in the Debtors' bankruptcy cases and this adversary proceeding, or from other public records. *See In re Hydrogen*, *L.L.C.*, 431 B.R. 337, 345 (Bankr. S.D.N.Y. 2010). On a Rule 12(b)(6) motion, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as any "documents that are integral to the complaint" (meaning documents where "the complaint relies heavily upon its terms and effect") and any "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Tribune*, 2019 WL 1771786, at *5 (internal quotation marks omitted). The Court "may also take judicial notice of relevant matters of public record." *Id.* (internal quotation marks omitted).

membership units in EBG. *Id.* ¶ 126; Offer to Purchase 1 (Nov. 16, 2006) (Declaration of Philip D. Anker, filed herewith ("Anker Decl."), Ex. 1). Pursuant to the Offer to Purchase, members tendered their units by submitting a Letter of Transmittal along with required documentation to The Bank of New York ("BONY"), the depositary identified in the Offer to Purchase, no later than December 14, 2006. *Id.* at 1, 4. EBG then accepted—i.e., purchased and redeemed—the tendered units by depositing the aggregate purchase price with BONY, which acted "as agent for tendering [m]embers for the purpose of receiving payment from [EBG] and transmitting payment to the tendering [m]embers." *Id.* at 19.

In order to finance the leveraged recapitalization, EBG and BosGen entered into three credit facilities (the "Credit Facilities"). TAC ¶¶ 122-123; *see also* TAC Ex. E ($1,450,000,000 First Lien Credit and Guaranty Agreement (dated as of Dec. 21, 2006)) (the "First Lien Credit Agreement"); TAC Ex. F ($350,000,000 Second Lien Credit and Guaranty Agreement (dated as of Dec. 21, 2006)) (the "Second Lien Credit Agreement"); TAC Ex. G ($300,000,000 Credit Agreement (dated as of Dec. 21, 2006)) (the "Mezzanine Credit Agreement"; together with the First and Second Lien Credit Agreements, the "Credit Agreements"). All three Credit Agreements required that the Debtors use most of the loan proceeds to fund the distributions the Trustee now seeks to avoid. *See* First Lien Credit Agreement § 2.14(a) (credit facility proceeds "shall be available (and the Borrower agrees that it shall use such proceeds) solely … (iii) to fund the Distribution and the Tender Offer of EBG Holdings"); Second Lien Credit Agreement § 2.14 (same); Mezzanine Credit Agreement § 2.13 (same).

For the express purpose of facilitating the leveraged recapitalization, BosGen, the borrower under the first-lien and second-lien facilities, sent approximately $708 million of the funds it borrowed to EBG. TAC Ex. H (Closing Date Funds Flow Memorandum (dated Dec. 21,

2006)) (the "Funds Flow Mem.") at 5 ($708 million "Distribution from Boston Generating" listed for use in "Distribution, Unit Buyback and Warrants Repurchase" and "Transaction Fees and Expenses"). Under the Credit Agreements, EBG was immediately required to use these proceeds (and those it borrowed directly under the Mezzanine Credit Agreement) to fund the leveraged recapitalization. *See* First Lien Credit Agreement § 2.14(a); Second Lien Credit Agreement § 2.14; Mezzanine Credit Agreement Preliminary Statement ¶ 3 ("Simultaneously with the entering into of this Agreement, Boston Generating, LLC … enter[ed] into that certain (a) First Lien Credit and Guarantee Agreement … and (b) Second Lien Credit and Guaranty Agreement … the proceeds of which shall be used to … fund the Distribution and the Tender Offer"), § 2.13; Funds Flow Mem. Cover Ltr., at 1-2 (deposits to and disbursements from the account of BosGen must be made on the Closing Date). As required by the Credit Agreements, in December 2006, EBG disbursed more than $1 billion, consisting of the $708 million that BosGen had borrowed and transferred to it, the $300 million of mezzanine debt, and a small amount of its own cash to its own members in payment (1) for the purchase of those members' equity units pursuant to the tender offer; (2) for the redemption of warrants held by some of the members; and (3) of related dividends on those members' equity interests. TAC ¶ 125.

As also mandated by the Credit Agreements, EBG and the other Debtors used the remainder of the loan proceeds to refinance (*i.e.*, pay down) approximately $800 million in existing debt and to pay approximately $50 million in fees and expenses incurred in connection with the closing of the Credit Facilities. *Id.* ¶ 124.

**B. Bankruptcy Proceedings**

Although the Trustee now claims that the Debtors were insolvent when the leveraged recapitalization occurred in December 2006 (*id.* ¶¶ 129-145), the Debtors continued to operate and pay their debts for many years after the transaction closed. Indeed, the Debtors were able in

June 2007—only six months after the closing—to effect a sale by merger to another major company in which the Debtors were valued at more than $1 billion. They became a wholly owned subsidiary of US Power Generating Company ("USPG") in a transaction in which that highly sophisticated energy company and its majority owner (one of the country's largest and most sophisticated private equity firms) agreed to allow EBG's new equity holders to retain a majority of the equity in the newly merged entity. Hunter Decl. ¶ 10. It was not until August 2010—nearly four years after the transaction that allegedly rendered the company insolvent, and following convulsions in the energy marketplace caused by the global financial crisis—that EBG and its subsidiaries, including BosGen, filed for chapter 11 protection. TAC ¶ 59.

As of the petition date, the Debtors' total indebtedness included approximately $1.1 billion under the First Lien Credit Agreement, $350 million under the Second Lien Credit Agreement, and $422 million under the Mezzanine Credit Agreement. Hunter Decl. ¶¶ 28-35. The Debtors had virtually no other debt, and certainly none that predated the leveraged recapitalization. *See* Disclosure Statement § I.A., No. 10-14419 (Bankr. S.D.N.Y. July 20, 2011), ECF No. 868 (approved July 20, 2011 (ECF No. 865)) ("Disclosure Statement"). Indeed, as noted, that recapitalization had precisely the opposite effect of hindering or defrauding creditors; it resulted in the refinancing—i.e., repayment—of the Debtors' pre-existing borrowings. Notably, the Debtors had approximately $101 million in cash on hand as of the petition date and did not require debtor-in-possession financing. *Id.* ¶ 111.

Most of BosGen's assets were sold during the bankruptcy case. *See* Sale Order, No. 10-14419 (Bankr. S.D.N.Y. Nov. 24, 2010), ECF No. 494. A liquidating plan was subsequently confirmed, under which the first-lien creditors received $1,005,902,449.94 of the sale proceeds in satisfaction of virtually all of their claims. Disclosure Statement § III.F., at 27; *see also* First

Mod. to Second Am. Joint Plan of Liquidation § 502, No. 10-14419 (Bankr. S.D.N.Y. Aug. 26, 2011), ECF No. 904. They were left with a deficiency claim of only $25,000,000. The second-lien lenders received no proceeds directly from the sale; they were granted an unsecured claim in the amount of $346,500,000. *See*, *e.g.*, Disclosure Statement § I.A, at 6, 9-10 n.8; Second Am. Joint Plan of Liquidation § 3.02.3, No. 10-14419 (Bankr. S.D.N.Y. July 20, 2011), ECF No. 867 (confirmed Aug. 31, 2011 (ECF No. 915)) (the "Plan"). The mezzanine lenders also received an unsecured claim in the amount of $426,911,567. Disclosure Statement §§ I.A, at 9-10 n.8, III.F. All three tranches of lenders voted to accept the Plan. *See* Decl. of Jeffrey S. Stein ¶¶ 3, 14, No. 10-14419 (Bankr. S.D.N.Y. Aug. 24, 2011), ECF No. 898.

The Plan created a liquidating trust to pursue claims on behalf of the Debtors' general unsecured creditors. *See* Plan §§ 7.02, 8.01. Those creditors, whose claims are classified in Class 4B of the Plan, consist almost entirely of the lenders who financed the leveraged recapitalization. The Disclosure Statement estimates that there are $820,571,000 in Class 4B general unsecured claims, consisting of (1) the $25,000,000 deficiency claim of the first-lien lenders, (2) the $346,500,000 claim of the second-lien lenders, (3) the $426,911,567 claim of the mezzanine lenders, and (4) miscellaneous other claims totaling only approximately $22 million. Disclosure Statement § I.A., at 9-10 & n.8. Thus, approximately 97% of the claims of creditors in whose shoes the Trustee has brought this action are held by the same lenders who consented to, and indeed required, the transfers that the Trustee now seeks to avoid.

The Trust's assets include (1) all of the Debtors' causes of action and (2) causes of action, if any, of Class 4B claim holders to the extent those creditors purported to assign those causes of action to the Trust. The Trustee asserts that all Class 4B holders, in fact, assigned all of their causes of action related to the leveraged recapitalization to the Trust. TAC ¶¶ 4, 61; *see*

*also* Plan § 7.02. Any proceeds recovered in this action (net of the Trust's costs and the Trustee's and his counsel's fees) will be distributed to the holders of Class 4B claims under the Plan—i.e., overwhelmingly, to the lenders who financed the leveraged recapitalization.

**C. The Trustee's Third Amended Complaint**

Craig R. Jalbert, the first Liquidating Trustee in this case, commenced this action in August 2012, nearly six years after the leveraged recapitalization closed. Jalbert was succeeded as Trustee by Mark Holliday, and Holliday amended Jalbert's original complaint in late 2013. That amended complaint asserted six causes of action to avoid and recover the distributions that the Transferee Defendants received as a result of, or in exchange for, their membership interests. The Trustee then sought leave to file a Second Amended Complaint, purportedly to address arguments raised in Defendants' motions to dismiss, but the Court did not grant permission for the filing. *See* ECF Nos. 181, Ex. 1 & 212 at 276:13-20. When the Trustee retained new counsel in March 2019, counsel sought leave to file a Third Amended Complaint. *See* Mot. to Amend and File Third Am. Compl. ("Mot. for Leave"), ECF No. 272. In an effort to bring this case to a conclusion, the Transferee Defendants consented to the filing, so they could move to dismiss on the merits. Defs.' Consent to Relief Requested in Mot. for Leave, ECF No. 277.

The Third Amended Complaint asserts four fraudulent-transfer claims in which the Trustee purports to sue not as the successor to the Debtors' bankruptcy estate, but rather as the assignee of the Debtors' creditors that financed the leveraged recapitalization and assigned their claims to the Trustee. TAC ¶¶ 4, 61-63, 147, 156, 166, 177. Whereas the prior complaints treated all the distributions together, the Trustee now seeks to avoid as actual and constructive fraudulent conveyances what he characterizes as two "sets" of transfers: an "initial transfer" of $708 million from BosGen to EBG (Counts 2 and 4), and the "subsequent transfer" of those and additional funds from EBG to its members (Counts 1 and 3). As the Trustee has acknowledged,

he has made this pleading change as part of his latest effort to circumvent § 546(e), arguing that the "initial transfer" from Bos Gen to EBG was "neither a settlement payment nor made in connection with a securities contract" and that "because § 546(e) only applies to initial transfers, nothing in the Bankruptcy Code (or the NYDCL) prohibits the Trustee from recovering that transfer from subsequent transferees." Mot. for Leave at 2. The Third Amended Complaint also conspicuously eliminates the Trustee's previous admissions that the lenders on whose behalf he seeks to avoid the transfers themselves required the transfers. *See, e.g.*, *id.* Ex. B ¶ 177.

Finally, the Trustee asserts a claim for unjust enrichment (Count 5), seeking to recover the same distributions. TAC ¶¶ 187-196. As with his fraudulent-transfer claims, the Trustee purports to bring this claim as the assignee of the Debtors' creditors. *See id.* ¶ 188.

## ARGUMENT

### I. The Trustee's Claims Are Not Plausible, And The Intentional Fraudulent Conveyance Claims Lack The Requisite Particularity Under Rule 9(b)

Five years ago, Judge Chapman expressed "serious concerns" about the plausibility of the Trustee's entire case:

> And now you're telling me I should believe that those sophisticated lenders, and I think we can probably agree that they are sophisticated lenders, who lent a lot of money, that they were fooled. I mean it does really push that implausibility button. And it also suggests that everyone was playing this really long game here. That it was a scheme of Madoff-es[que] proportions that I guess orchestrated you say by K Road and Harbinger. They rolled it out for four years right through the middle of the biggest downturn since the great depression. They were that smart, and that gave them kind of additional cover. I mean I'm being quite cynical here, because truthfully I am cynical here because I sat through the case. … I have serious concerns about plausibility. Serious concerns.

May 13, 2014 Hr'g Tr., ECF No. 212, at 214:21-215:8, 276:25-277:1.

These same concerns continue to apply to the Third Amended Complaint. It admits that, before undertaking the recapitalization, the Debtors retained four experienced financial firms "to provide consulting services and opinions to support the transaction." TAC ¶ 2. It claims that the

"centerpiece" of the alleged fraud consisted of alleged misrepresentations and omissions pertaining to "risks intrinsic" to the energy business, *id.* ¶¶ 85-93; yet, it concedes that the loan syndicators, affiliates of Credit Suisse and Goldman Sachs, incorporated these projections into their own promotional materials, *id.* ¶ 115, and that the lenders were all "sophisticated and experienced."[3] It claims that the members of the Nominating Committee allegedly "knew" about the false information provided to the lenders, *id.* ¶ 27, but it admits that they invested millions of dollars in the loans.[4] Moreover, USPG acquired the equity in the Debtors for more than $1 billion six months after the recapitalization, *id.* ¶ 134; KPMG audited USPG's and EBG's financial statements for December 31, 2007 and did not detect any deficiencies;[5] Harbinger continued to purchase shares of USPG, amassing 7.3% of all shares by August 2008;[6] sophisticated investment bankers planned to launch an IPO of USPG in 2008, TAC ¶ 135; and the Debtors continued to pay their debts until the petition date, three-and-a-half years after the recapitalization, *id.* ¶¶ 139-142.

Where, as here, the supposed fraud that underlies avoidance claims is simply implausible on its face, courts routinely dismiss the complaint under Rule 8. *See Liquidation Tr. v. Daimler AG (In re Old CarCo, LLC)*, 454 B.R. 38, 59-60 (Bankr. S.D.N.Y. 2011) ("[T]he [Trust's]

---

[3] ECF No. 155 (Decl. of Tibor L. Nagy) ("Nagy Decl."), Ex. 9 (Confidential Information Memorandum for BosGen and EBG, dated Dec. 2006, cited at TAC ¶¶ 84, 104, 107, 110-15, 119, 205) at 4.

[4] ECF No. 152 (Decl. of William H. Gussman, Jr.), Exs. W-CC (showing that Satellite Senior Income Fund, LLC and one or more of its affiliated funds invested at least $237 million in the loans), Exs. J-S (showing that Anchorage Capital Master Offshore, Ltd. and one or more of its affiliated funds invested at least $68 million in the loans), Exs. T-U (showing that Stonehill Offshore Partners Limited invested at least $41 million in the loans), Ex. V (showing that Castlerigg Master Investments, Ltd. invested at least $35 million in the loans).

[5] Nagy Decl., Ex. 11 (USPG Form S-1, as filed with the SEC on Aug. 12, 2008) ("Form S-1") at 1, 185, F-18, F-78. The Trustee alleges that certain financial statements audited by KPMG and prepared after the recapitalization listed EBG's liabilities in excess of its assets. TAC ¶ 129. However, those statements ascribe a book value to the assets, whereas fraudulent transfer law focuses on the "fair salable value" of a debtor's assets in defining insolvency. *See First Fed. Sav. & Loan Ass'n, Ohio v. Napoleon*, 701 N.E.2d 350, 351 (Mass. 1998). The billion-dollar sale to USPG establishes that the Debtors' assets had substantial fair salable value.

[6] Form S-1 at 158.

allegations are implausible in the context of the involvement of [a third party purchaser], who paid billions of dollars in the transaction. … The Trust's allegations would require an inference that all of these parties were led astray. It is implausible that these sophisticated parties, who had access to the same financial information [], would invest and rely on the wherewithal of [the target company] if it had been stripped of its assets and were unable to sustain its operations."), *aff'd,* 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd,* 509 F. App'x 77 (2d Cir. 2013); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) ("Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets."); *In re Boston Generating, LLC,* 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010) (*citing In re Chemtura Corp.*, 39 B.R. 561, 586 n.106 (Bankr. S.D.N.Y. 2010)) ("It is generally accepted [] that absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."); *In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("there is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction").

The Third Amended Complaint also fails to comply with Rule 9(b). The allegations of fraud, which are all attributed to "K Road" or the "K Road Defendants" (*see* TAC ¶¶ 85-116), are not attributed to any individual and thus lack the requisite particularity. *See Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989). The Trustee's claims should be dismissed.

## II. All Of The Trustee's Claims Are Time-Barred

As noted, the Trustee seeks to avoid two supposed sets of transfers: (1) BosGen's $708 million distribution to EBG, and (2) EBG's subsequent distribution of those proceeds, together with the proceeds of the other Credit Facilities, to EBG's members through unit redemptions,

warrant redemptions, and related dividends. All of those transfers were distributions from a Delaware LLC to its members, and so are subject to the Delaware Limited Liability Company Law's three-year statute of repose, which extinguishes members' liability for any and all causes of action to recover distributions received from the LLC. Because the Trustee's predecessor did not commence this action until nearly six years after these distributions, each of his causes of action is time-barred. And even were that not the case, the Trustee has failed to plead facts sufficient to entitle him to New York's six-year statute of limitations for his claims. Neither the discovery rule nor equitable tolling saves the Trustee's claims.

### A. Delaware's Three-Year Statute Of Repose Bars The Trustee's Claims To Recover Distributions From BosGen And EBG To Their Members

#### 1. The Delaware Statute Of Repose Applies To The Trustee's Claims

The Delaware Limited Liability Company Law—pursuant to which EBG and BosGen were created (*see* TAC ¶¶ 5-6)—provides that "a member who receives a distribution from a limited liability company *shall have no liability under this chapter or other applicable law* for the amount of the distribution *after the expiration of 3 years from the date of the distribution*[.]" Del. Code Ann. tit. 6, § 18-607(c) (emphasis added). By its terms, the statute extinguishes after three years an LLC member's liability under any law for distributions made to the member by the LLC. As this Court recently held in interpreting New York's identical statute of repose, the three-year limitations period specified in the LLC law supersedes any other, longer limitations period, including under otherwise applicable fraudulent-transfer law:

> Under New York law, claims to recover distributions by a limited liability company to its limited liability company members are subject to a three-year statute of limitations, rather than the six-year statute of limitations that ordinarily would apply. … Courts have applied this three-year time limit to avoidance actions under 11 U.S.C. § 544 and under the New York Debtor and Creditor Law.

*Geron v. Craig (In re Direct Access Partners, LLC)*, __ B.R. __, 2019 WL 2323674, at *11 (Bankr. S.D.N.Y. May 30, 2019).

Numerous cases, applying both New York and Delaware law, are in accord. *See Official Comm. of Unsecured Creditors v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 548 (Bankr. S.D.N.Y. 2015) (the "statute of repose [under NY LLC law § 508(c)] overrides the six year statute of limitations normally applied to NYDCL fraudulent conveyance claims"); *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 108 (Bankr. S.D.N.Y. 2005) (same); *Bd. of Managers of Chocolate Factory Condo. ex rel. Chocolate Factory Condo. v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157, 2014 WL 1910237, at *11 (Sup. Ct. 2014) (same); *Williamson v. Culbro Corp. Pension Fund*, 838 N.Y.S.2d 524, 526 (App. Div. 1st Dep't 2007) (statute of repose in New York's LLP statute overrides all other limitations periods, including those applicable to a claim of unjust enrichment); *Diamond v. Friedman (In re Century City Doctors Hosp.), LLC*, 466 B.R. 1, 16 (Bankr. C.D. Cal. 2012) ("[Delaware LLP law] § 17-607(c)'s three-year bar trumps DUFTA's four-year statute of limitations in the context of an alleged wrongful distribution by a limited partnership."); *Freeman v. Williamson*, 890 N.E.2d 1127, 1132 (Ill. App. Ct. 1st Dist. 2008) (Delaware LLP statute "mak[es] clear that no matter what the basis for liability might be, the three-year expiration period applies").

Delaware LLC law's three-year statute of repose controls where, as here, a plaintiff brings a claim under New York law—just as New York's identical statute would limit the claims of a New York LLC. In *Mostel v. Petrycki*, the court applied the Delaware statute of repose and its New York analog to bar fraudulent-transfer claims brought against members of a Delaware LLC, holding that the statute of repose "overrides the limitation period applicable to any claim brought under the DCL with regard to distributions made by a limited liability company to a

member." 885 N.Y.S.2d 397, 399 (Sup. Ct. 2009). This makes good sense, as the Delaware and New York laws are entirely in accord, providing that LLC members should enjoy repose, after three years, from claims seeking to set aside distributions by LLCs.[7] As this Court put it in this case, the Delaware statute "says exactly what the New York statute says." Mar. 14, 2019 Tr. at 18:2-3, ECF No. 267.

In prior briefing, the Trustee has mistakenly contended that the statute of repose does not apply because he sues standing in the shoes of creditors, and not the debtor LLCs. This Court rejected that premise in *Direct Access Partners*, where it found that the statute of repose barred a fraudulent transfer claim brought by the bankruptcy trustee as the creditors' statutory successor. 2019 WL 2323674, at *11; 28 U.S.C. § 1409(c) (trustee acts as the "statutory successor" of the creditors when suing under § 544(b)).[8]

Consistent with this Court's conclusion and the plain language of the statute, many courts and commentators have recognized that the statute of repose applies regardless of whether the claim to recover an LLC's distributions is made by the LLC itself, its representative, or its creditors (or their representatives, including a bankruptcy trustee). *See*, *e.g.*, *Century City*, 466

---

[7] In *In re Heritage Organizational*, *L.L.C.*, the court perceived a conflict between Texas's four-year statute of limitations for fraudulent-conveyance claims and Delaware's three-year statute of repose for distributions to LLC members. 413 B.R. 438 (Bankr. N.D. Tex. 2009). Texas did not have a shorter statute of repose for claims seeking to set aside distributions by an LLC to its members. *See* Tex. Bus. Orgs. Code Ann. § 101.206. Accordingly, the court held that the creditor protection policy manifest in Texas's fraudulent-transfer law took precedence, and that statute's longer limitations period governed. *Heritage*, 413 B.R. at 461-63. In this case, in contrast, there is no conflict between New York and Delaware law. In both Delaware and New York, distributions to LLC members are subject to a specific three-year limitations period that overrides the limitations period under other, more general laws of the state.

[8] The Trustee's principal contrary case, *Lyman Commerce Solutions, Inc. v. Lung*, 2015 WL 1808693 (S.D.N.Y. Apr. 20, 2015), departs from this well-settled authority with essentially no explanation. The *Lyman* court acknowledged *Mostel* and *Peckar*, which "apply Section 508(c)'s three-year limitations period on fraudulent-conveyance claims by outside creditors," but simply "decline[d] to apply their reasoning." *Id.,* at *5 n.2. This Court, in turn, considered but refused to follow *Lyman* in *Direct Access Partners*, relegating it to a "*but see*" cite, 2019 WL 2323674, at *11, and ought not give it any more weight here. Similarly, in *Setters v. AI Properties & Developments (USA) Corp.*, the court cited *Lyman* without providing additional reasoning for the proposition that the three-year limitations period in New York's LLC Law "does not address the claims of outside creditors." 32 N.Y.S.3d 87, 89 (App. Div. 2016). *Setters* is even more thinly reasoned than *Lyman*.

B.R. at 15-17 (applying parallel Delaware LLP provision to California and Delaware fraudulent-transfer claims brought by trustee standing in shoes of creditors); *Peckar & Abramson, P.C. v. Lyford Holdings, Ltd.*, 20 N.Y.S.3d 41, 46 (App. Div. 2015) (applying three-year limitations period under analogous New York LLP law to creditor's claim); *Bd. of Managers of Chocolate Factory Condo.*, 992 N.Y.S.2d 157, 2014 WL 1910237, at *12 (The three year limitations period contained in § 508(c) "applies both to claims by the limited liability company against its members and by third party creditors."); *see also* Martin I. Lubaroff & Paul M. Altman, Lubaroff & Altman on Delaware Limited Partnerships § 6.10, at 6-26 (Supp. 2011) (describing parallel provision in Delaware LLP law as "attempt[ing] to provide a definite point in time that a limited partner will have certainty that a *limited partnership*, *a general partner or a creditor of the limited partnership cannot compel it to return a distribution made to it*" (emphasis added)); 1 Karon S. Walker, New York Limited Liability Companies and Partnerships: A Guide to Law and Practice § 7:11 (West's N.Y. Prac. Series 2013) (describing parallel provision in New York LLC law: "A member who knowingly receives a wrongful distribution is not liable to the LLC *or to creditors* after three years from the date of distribution." (emphasis added)).

Finally, the Delaware law is a statute of repose, not merely a statute of limitations. *Century City*, 466 B.R. at 13; *see also In re Vivaro Corp.*, 524 B.R. at 548. This is significant because, under New York's choice-of-law principles, which govern,[9] statutes of repose are substantive and not merely procedural. *See Tanges v. Heidelberg N. Am., Inc.*, 710 N.E.2d 250, 253 (N.Y. 1999) (applying New York choice-of-law principles and determining that Connecticut's statute of repose governs). The Delaware statute thus extinguishes any liability that the members of a Delaware LLC might otherwise have on account of the Trustee's claims.

[9] *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605-07 (2d Cir. 2001).

**2. The Delaware Statute Bars Each Of The Trustee's Claims**

All of the transfers the Trustee seeks to avoid—BosGen's supposed $708 million transfer to EBG and EBG's transfer of those and other proceeds to its own members—were "distributions" subject to Delaware's statute of repose. While the Delaware LLC law does not define "distribution," New York's nearly identical LLC law defines the term to mean "the transfer of property by a limited liability company to one or more of its members in his or her capacity as a member." N.Y. Ltd. Liab. Co. Law § 102(i); *see also* Del. Code Ann. tit. 6, § 15-101(4) (defining "distribution" to mean "a transfer of money or other property from a partnership to a partner in the partner's capacity as a partner … of all or a part of a partner's economic interest"); *Interactive Corp. v. Vivendi Universal*, *S.A.*, 2004 WL 1572932, *3 (Del. Ch. June 30, 2004) (distributions include the "payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest"); *Century City*, 466 B.R. at 14 (same).

As the Third Amended Complaint alleges, BosGen forwarded the $708 million to EBG "as a member distribution." TAC ¶ 149. EBG, in turn, made payment to the Transferee Defendants in respect of their status as members of EBG. *See*, *e.g.*, TAC ¶ 167 ("Such Transfers purported to be in payment of a dividend on the equity membership interest of relevant Transferee Defendants … , to redeem warrants of relevant Transferee Defendants … and to redeem the equity membership interests of relevant Transferee Defendants[.]"); *see also id.* ¶ 125 ("EBG disbursed more than $1 billion … in payment of dividends on EBG's members' equity interests …, [and to] redeem EBG's members' equity units pursuant to a tender offer[.]"). The payments were thus "distributions" within the meaning of the statute.

As a result, the statute of repose extinguished BosGen and EBG members' liability for the distributions made as part of the December 2006 leveraged recapitalization no later than

December 2009, nearly three years before the Trustee's predecessor commenced this action. Each of the Trustee's claims against the Transferee Defendants is time-barred.

#### 3. Neither The Discovery Rule Nor Equitable Tolling Applies

Neither the discovery rule nor equitable tolling saves the Trustee's claims because neither applies to statutes of repose. As the Second Circuit has observed, statutes of repose "run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action." *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 140 (2d Cir. 2013) (citation omitted); *see also Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013). Thus, even if the Third Amended Complaint adequately pleaded grounds for applying the discovery rule or equitable tolling—and it does not (*see infra* Section I.B.2)—neither doctrine could save the Trustee's claims. *See Century City*, 466 B.R. at 14 ("the court cannot toll the period … under [Delaware LLP Law] § 17-607(c)").

### B. The Trustee Cannot Take Advantage Of New York's Six-Year Statute Of Limitations

#### 1. The Trustee Has Failed To Adequately Plead His Entitlement To New York's Statute Of Limitations

Even if the Trustee's claims were not barred by the three-year statute of repose, his claims would also be time-barred for a second, independent reason. The Trustee necessarily assumes that those claims are subject to New York's six-year statute of limitations for fraudulent transfer—the only potentially applicable statute of limitations that would allow claims arising from December 2006 transfers to be timely when filed in August 2012. But the Trustee has failed to plead facts showing that New York's statute of limitations applies.

A federal court exercising bankruptcy jurisdiction (*see* TAC ¶ 31) must apply the choice-of-law rules of the state in which it sits (here, New York) to determine the applicable statute of

limitations for fraudulent-transfer claims. *See In re Gaston & Snow*, 243 F.3d at 605-607. Under New York's borrowing statute, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998). Accordingly, in cases like this one, fraudulent-transfer actions brought under the New York Debtor & Creditor Law may be subject to limitations periods specified under the laws of other states that are shorter than the six years New York generally provides. *See, e.g.*, *Ramiro Aviles v. S & P Glob., Inc.*, 2019 WL 1407473, at *25 (S.D.N.Y. Mar. 28, 2019).

Here, the Trustee purports to sue in the shoes of EBG's and BosGen's creditors, so the Trustee is a resident of the state of each assigning creditor at the time of the alleged fraudulent transfer. *See, e.g.*, *Gluck v. Amicor*, *Inc.*, 487 F. Supp. 608, 612 (S.D.N.Y. 1980). To the extent any of those creditors did not reside in New York, the Trustee's causes of action did not arise in New York, because any injury underlying the Trustee's claims accrued in the injured party's state of residence. *See Glob. Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999); *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999).

The borrowing statute is meant to dissuade precisely what the Trustee seeks to do here: "forum shopping by nonresidents attempting to take advantage of a more favorable statute of limitations in this state." *Portfolio Recovery Assocs., LLC v. King*, 927 N.E.2d 1059, 1062 (2010). Accordingly, "[w]ith respect to the borrowing statute, … New York law appears to place '[t]he burden of proving residency … upon the party seeking to take advantage of the New York statute.'" *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 243 (2d Cir. 1984); *see Silva v. Toll Brothers' Inc*., 1998 WL 898307, at *2 (S.D.N.Y. Dec. 23, 1998) (plaintiff had "the burden

of establishing [her] residency in order to take advantage of the borrowing statute"; if she is " unable to establish that [she] was a resident of New York at the time of the accrual of the claim, she would face the shorter of the two statutes of limitations").[10]

The Trustee was therefore required to plead, on behalf of each creditor in whose shoes he purports to stand, facts showing his entitlement to New York's six-year statute of limitations. Seven years into this case, the Trustee still fails to do that, instead littering his complaint with irrelevant allegations about the Debtors' principal place of business, TAC ¶ 205, the location of K Road's offices, *id.*, the site of the "Lender Presentation," *id.*, the location of the debtors' bank accounts, *id.* ¶ 206, and the office from which the two initial lenders issued the loans, *id.* None of that matters; only the principal place of business of the assigning creditors determines which state's statute of limitations should apply under the New York borrowing statute. *See Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013).

Effectively conceding as much, the Third Amended Complaint includes an exhibit that purports to show where each of the Debtors' lenders is located. TAC Ex. B. But the Trustee admits that he does not know whether the addresses he lists for the lenders "care of" other entities "constituted the principle [sic] place of business of any of the lenders" and seeks to reserve his right to later argue that they are not. TAC Ex. B n.1. Indeed, for one of the two initial lenders, Credit Suisse, Cayman Islands Branch, the Trustee suggests that its principal place of business is "C/O Credit Suisse (USA), Inc." in New York, notwithstanding publicly available information indicating that its headquarters is located in the Cayman Islands, where the Trustee purported to serve it. And, while the Trustee does list New York addresses for several

[10] District court decisions that have placed the burden on the defendant, *see*, *e.g.*, *Maslan v. Am. Airlines*, *Inc.*, 885 F. Supp. 90, 93 (S.D.N.Y. 1995), conflict with the controlling holding of the Second Circuit that "initially [the plaintiff] ha[s] the burden of proving [residency]," *Katz*, 737 F.2d at 243.

lenders, he alleges that fewer than half of the First and Second Lien Lenders, and none of the "Other Creditors," reside in New York. To the extent the Trustee fails to plausibly allege a New York residence for any assignor creditor, he is foreclosed from suing on that creditor's behalf.

**2. The Trustee Fails To Plead Equitable Tolling Or The Discovery Rule**

As discussed above, if the Delaware statute of repose applies, it is not subject to equitable tolling or the discovery rule. And even if this Court concludes that state limitations law applies, neither equitable tolling nor the discovery rule can rescue the Trustee's untimely claims for creditors residing in states (most of them) whose limitations periods are less than six years.

Where, as here (TAC ¶ 201), a plaintiff pleads equitable tolling based on a fraudulent-concealment theory, the statute of limitations may be tolled only where: "(1) the *defendant* wrongfully concealed material facts relating to *defendant's* wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (emphasis added; internal citation omitted). Because equitable tolling depends upon the *defendant's* misconduct, allegations of fraudulent concealment by a third party do not state a basis for tolling against an innocent defendant. *Mediators*, *Inc. v. Manney (In re Mediators*, *Inc.)*, 190 B.R. 515, 524 (S.D.N.Y. 1995), *aff'd,* 105 F.3d 822 (2d Cir. 1997); *see also Strauss v. Credit Lyonnais*, *S.A.*, 2007 WL 2296832, at *8 n.20 (E.D.N.Y. Aug. 6, 2007) (statute of limitations is not "tolled for a blameless defendant").

Although the Third Amended Complaint alleges misconduct by K Road, TAC ¶ 201—a defendant that is no longer part of the case—it is devoid of plausible, non-conclusory allegations of misconduct by the Transferee Defendants. To the contrary, each Transferee Defendant is named merely by virtue of its "recei[pt of] a transfer or distribution pursuant to the Leveraged

Recap Transaction." *Id.* ¶ 7.[11] That is insufficient to entitle the Trustee to the "extraordinary" relief of equitable tolling. *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002).

Similarly, the "discovery rule was crafted specifically for claims of fraud because, in such circumstances, *a defendant's deceptive conduct* may prevent a plaintiff from even knowing that he or she has been defrauded." *Urbont v. Sony Music Entm't*, 863 F. Supp. 2d 279, 284-85 (S.D.N.Y. 2012) (emphasis added; internal quotation marks omitted); *see also Menichini v. Grant*, 995 F.2d 1224, 1229 (3d Cir. 1993). The Trustee has not alleged any deceptive conduct by any of the Transferee Defendants, and therefore the statute of limitations on his claims cannot be extended. *Strauss*, 2007 WL 2296832, at *8 n.20. And even if the Trustee could otherwise benefit from the discovery rule as to any of the Transferee Defendants, the rule could not apply to the Trustee's claims for constructive fraudulent transfer or unjust enrichment, neither of which sounds in actual fraud.[12]

Moreover, the Third Amended Complaint alleges that the key facts were known at the time of the transfers. For example, the Trustee alleges that the Debtors were "balance sheet insolvent upon the completion of the Leveraged Recap Transaction," and that this was evident from contemporaneous financial statements prepared by the Debtors' outside auditors. *See* TAC ¶ 129. The Trustee further alleges that even before that transaction was completed, there was

---

[11] Although there remain certain conclusory allegations that appear to be "ghosts" or "holdovers" from prior complaints that seek to attribute alleged misconduct by K Road to Harbinger and affiliates as alter egos of each other or K Road, all fraud claims against Harbinger have already been dismissed with prejudice. Accordingly, the Third Amended Complaint asserts only no-fault claims against Harbinger, as against the other remaining Transferee Defendants, that focus entirely on its mere receipt of the distributions at issue. In any event, no conduct by Harbinger is alleged that would begin to implicate equitable tolling or, as discussed below, the discovery rule.

[12] *See US Bank Nat'l Ass'n v. Gestetner*, 960 N.Y.S.2d 227, 229 (App. Div. 2013) (discovery rule does not apply to claims in equity, including unjust enrichment); *Mahmood v. Research in Motion Ltd.*, 2012 WL 242836, at *4 (S.D.N.Y. Jan. 24, 2012) ("[T]he statute of limitations in New York for claims for unjust enrichment … is not subject to the discovery rule."); *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 67 (Bankr. E.D.N.Y. 2011) (discovery rule "applicable to actual fraud claims does not apply to constructive fraud claims").

speculation that "in the event of a bankruptcy BostonGen and EBG would be able to pay only 'a meaningful recovery'—somewhere between 50% and 80%—on the Second Lien Debt," and there would be "little or no recovery on the Mezzanine Debt." *Id.* ¶ 132. Because on the Trustee's own allegations these facts were all known at the time of the challenged transfers, there is no basis to conclude that the basis for the claims was hidden and to toll the limitation period.

## III. The Trustee's Claims Are Preempted And Barred By § 546(e)'s Safe Harbor

Even if they were timely, the Trustee's claims are all barred by § 546(e). To fall within § 546(e)'s safe harbor, two requirements must be met: the payments sought to be avoided must be (1) qualifying payments, such as securities "settlement payment[s]" or "transfer[s] … in connection with a securities contract," and (2) made "by or to (or for the benefit of)" a "financial institution" or other qualifying entity (collectively, "covered entities"). *See* 11 U.S.C. § 546(e). Both requirements are met here: (1) the $1 billion EBG paid to purchase its members' equity securities (and to pay related dividends) were "settlement payments" and transfers "in connection with a securities contract" (as was the $708 million up-streamed from BosGen to EBG as part of the same transaction), and (2) the payments were made "by or to (or for the benefit of)" covered entities because EBG, as well as its equity holders, fall within the definition of "financial institutions" under Bankruptcy Code § 101(22)(A).

Recognizing that § 546(e) would otherwise bar the claims asserted in this action, the Trustee has sought to evade the safe harbor in several ways. Initially, the Trustee (and his predecessor) argued that the safe harbor did not apply because he was asserting the fraudulent-transfer claims, not as the Debtors' estate representative suing under the Code's avoidance provisions, but rather as the purported assignee of whatever fraudulent-transfer claims the Debtors' creditors had under state law. But that effort to circumvent § 546(e) has been foreclosed by the Second Circuit's decision in *Tribune*, which held that § 546(e) preempts

creditors' state-law fraudulent-transfer claims that § 546(e) would bar a bankruptcy trustee from bringing. *Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.),* 818 F.3d 98, 119-24 (2d Cir. 2016). And Judge Cote's subsequent decision in another part of the *Tribune* LBO litigation confirms that § 546(e) would, indeed, preclude a bankruptcy trustee from avoiding transfers such as those at issue here; in that decision, Judge Cote concluded that § 546(e) barred the avoidance by the representative of the bankruptcy estate of a virtually identical tender-offer transaction, explaining that the debtor's payments to repurchase its shareholders' stock were (1) safe-harbored securities payments, and (2) made "by" a covered entity, the debtor-transferor, which qualified as a "financial institution" under the Code. *Tribune*, 2019 WL 1771786, at *9-12.

Having failed in that effort, the Trustee now advances several additional arguments why, even under *Tribune*, the payments fall outside § 546(e)'s scope. He contends that (1) § 546(e) does not bar or preempt state-law *intentional* fraudulent-transfer claims, (2) the $35 million in "dividend" payments are not safe-harbored, and (3) the structure of the transfer's component parts—in which $708 million of the more than $1 billion EBG paid to its members was funded with loan proceeds that passed through EBG's subsidiary BosGen—removes the $708 million from § 546(e) protection. As discussed below, these eleventh-hour arguments also fail.

### A. Section 546(e) Preempts Creditors' State Law Fraudulent-Transfer Claims That § 546(e) Would Bar The Bankruptcy Trustee From Bringing

The Second Circuit's decision in *Tribune* eliminates the Trustee's previous contention that § 546(e) does not apply because he purports to sue as assignee of creditors under state law. *Tribune* held that § 546(e) preempts creditors' state-law fraudulent-transfer claims to the extent that § 546(e) would bar a bankruptcy trustee from bringing those claims as the creditors' statutory successor under Bankruptcy Code §§ 544 and 548. *See* 818 F.3d at 119-24.

Accordingly, the only question is whether § 546(e) would bar the Trustee's claims if the Trustee were suing as an estate representative. As shown below, it would. And that analysis applies not only to the Trustee's fraudulent-transfer claims (Counts 1-4), but also to his unjust enrichment claim (Count 5), which is a fraudulent-transfer claim in all but name. TAC ¶¶ 189, 191, 196 (alleging Defendants were "unjustly enriched because each received the Transfers" that "removed assets from the Debtors that should have been available to pay their debts … for … no value or consideration"); *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (holding § 546(e) preempted unjust enrichment claim).[13]

Nonetheless, the Trustee suggests that he may try to re-litigate the preemption question, contending that *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), calls into question the Second Circuit's preemption ruling in *Tribune*. Tr.'s Feb. 15, 2019 Ltr., at 2, ECF No. 259; Mot. for Leave at 16-17. It does not. *Merit* had nothing to do with preemption. The fraudulent-transfer claim there had been asserted by a bankruptcy estate representative suing under the federal law (the Bankruptcy Code), not creditors suing under state law. Not surprisingly, then, *Merit* did not address preemption; it never mentioned the word or discussed any aspect of the doctrine.

*Merit* merely decided that the safe harbor does not bar an avoidance claim brought by an estate representative under the Bankruptcy Code if the only role played by a "financial institution" or other covered entity in the transaction was that the transfer passed through it as a mere intermediary or conduit. 138 S. Ct. at 892-97 & n.6. That holding overrules the Second Circuit's previously-controlling precedent in *Official Comm. of Unsecured Creditors v. Am.*

---

[13] *Accord Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *overruled in part by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 825 (N.D. Tex. 2012), *aff'd,* 761 F.3d 409 (5th Cir. 2014); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 274 B.R. 71, 96 (D. Del. 2002).

*United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94, 99 (2d Cir. 2013). But it does not say or imply anything about the Second Circuit's separate holding in *Tribune* that, if the safe harbor would preclude the bankruptcy trustee from avoiding the transfer, the debtor's creditors cannot end-run that safe harbor by causing the trustee to "abandon" his standing to sue under federal law, thereby supposedly allowing the creditors (or their assignee) to sue under state law free and clear of the safe harbor.[14]

The critical question, therefore, is whether the safe harbor would have precluded the Trustee from avoiding the distributions at issue had he sued as the representative of the estate under § 544(b). On that issue, *Merit* makes clear that § 546(e) continues to apply if the debtor-transferor *or* the defendant-transferee was itself a covered entity. 138 S. Ct. at 892-97. And, of significance here, *Merit* expressly notes that the Bankruptcy Code defines a "financial institution" to include any "customer" of a bank or trust company that "act[s] as agent" for the customer "in connection with a securities contract." 138 S. Ct. at 890 n.2 (quoting 11 U.S.C. § 101(22)(A)). Indeed, the Court acknowledged the possibility that § 546(e) might have blocked the claim in *Merit* itself because "either the debtor or [transferee-]petitioner … qualified as a

[14] In deciding *Tribune*, the Second Circuit had followed its precedent in *Quebecor* and thereby presumed that a bankruptcy trustee would not have been able to avoid the transfers at issue, since the LBO payments had passed through a bank acting as an intermediary. The court never considered whether the trustee would not have been able to do so anyway because the transferor and/or transferees were themselves financial institutions or other entities covered by § 546(e). After the Supreme Court decided *Merit*, two Justices issued a statement suggesting that the Court lacked a quorum to act on the certiorari petition in *Tribune* and stating that consideration of the petition would be deferred so the lower courts could consider whether to provide relief from judgment "in light of this Court's decision in *Merit Management*"—i.e., to reconsider their opinions in light of *Merit*'s overruling of *Quebecor*. *Deutsche Bank Tr. Co. Ams. v. Robert R. McCormick Found.*, 138 S. Ct. 1162, 1163 (2018) (Kennedy, Thomas, JJ., statement). The Second Circuit then recalled its mandate "in anticipation of further panel review." Order, *In re Tribune Co. Fraudulent Conveyance Litig*., No. 13-3992 (2d Cir. May 15, 2018), ECF 387. It has taken no further action since. For its part, the Supreme Court later granted the Tribune creditors' motion to dismiss their petition in *Tribune*. *Deutsche Bank Trust Co. Ams. v. Robert R. McCormick Found.*, 139 S. Ct. 2050 (2019).

'financial institution' by virtue of its status as a 'customer' under § 101(22)(A)." *Id.*[15] But it did not address that question because the petitioner had not timely raised the point. *Id.*

The district court presiding over the *Tribune* fraudulent transfer MDL *has* addressed the question there, however, holding in a suit by Tribune's estate representative that § 546(e) barred the representative from avoiding the $8 billion Tribune paid to repurchase its shares on the very basis that *Merit* suggested—that the debtor-transferor (Tribune) was itself a "financial institution" under the "customer" prong of that term. 2019 WL 1771786, at *9-12. As discussed below, that holding is on all fours here and disposes of the Trustee's claims.

### B. Section 546(e) Bars Avoidance Of The Payments To EBG's Members

#### 1. The Payments Were "Settlement Payments" And "Transfers … In Connection With A Securities Contract"

Section 546(e)'s first requirement is met because EBG's payment of more than $925 million to purchase its members' equity securities were classic "settlement payments"—i.e., "transfer[s] of cash … made to complete [a] securities transaction." *Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334-35 (2d Cir. 2011). The payments resulted in the repurchase of the Transferee Defendants' investments in the Debtors.

While it is sufficient that the payments were "settlement payments," they also fall within § 546(e) as transfers made "in connection with a securities contract." The Bankruptcy Code defines a "securities contract" to include any "contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). The Offer to Purchase, once accepted, formed a contract. It specified that "the valid tender of Units … will constitute a binding agreement between you and

---

15 *See also* Oral Argument Tr. 15:20-16:11, *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, No. 16-784 (U.S. Nov. 6, 2017) (Breyer, J.) ("[W]hy are we hearing this case? … [I]t seems to me that Citizens Bank is acting [as] agent or custodian of a customer, namely [the debtor] VVD, and it seems to me that Credit Suisse is acting as —as an agent or custodian for VVD. So why doesn't that cover it?").

us." Offer to Purchase, at 15.[16] And the subject matter of that contract was the "purchase" and sale" of "a security." It provided for the "purchase" by EBG (at 1, 19)—and the "sale" by tendering members (at 17)—of securities, i.e., the tendered equity interests in EBG.

#### 2. The Payments Were Made "By Or To (Or For The Benefit Of)" Entities Covered By § 546(e)

Section 546(e)'s second (and last) requirement—that the transfers be made "by or to (or for the benefit of)" a covered entity—is also met for at least two independent reasons: the payments were made (1) "by" EBG which, in connection with this transaction, was a "financial institution," and (2) "to" the Transferee Defendants, which were also "financial institutions," because both were "customers" of a bank (although many Transferee Defendants were stockbrokers, financial participants, or other covered entities in their own regard as well).

##### a. EBG Was A "Financial Institution"

The Code defines "financial institution" to include a "customer" of a "commercial bank" or "trust company" that "is acting as agent" for the customer "in connection with a securities contract." 11 U.S.C. § 101(22)(A). EBG therefore qualifies as a "financial institution" because it was a "customer" of BONY—a "commercial bank"—which acted as EBG's "agent" "in connection with a securities contract," the Offer to Purchase.

The facts regarding BONY's role are evident from the face of the transaction documents. EBG "retained [BONY] to act as Depository in connection with the Offer." Offer to Purchase, at 34. EBG transmitted the cash to purchase its members' shares to BONY. *Id.* at 19 ("We will pay for Units … by depositing the … purchase price … with the Depository"). EBG's members

---

[16] *See also* Offer to Purchase, at 17 ("Our acceptance for payment of Units tendered pursuant to the Offer will constitute a binding agreement between the tendering Member and us"); *Ont. Teachers' Pension Plan Bd. v. IG Holdings, Inc.*, 2000 WL 1234592, at *6 (S.D.N.Y. Aug. 31, 2000) (in a tender offer, "a binding contract is created when the shareholder tenders his securities in connection with the terms of the [tender] offer").

likewise transmitted their shares to BONY. *Id.* at 15 ("to make a valid tender of Units … the Depository must receive … a Letter of Transmittal … and any other required documents"). BONY was required to "retain tendered Units on our [EBG's] behalf," *id.* at 19; deem them "accepted" for payment upon EBG's "notice" of EBG's acceptance, *id.*; and "transmit[] payment to the tendering [m]embers" using the $925 million EBG deposited with BONY to "pay for Units purchased pursuant to the Offer," *id.*

On virtually identical facts, Judge Cote in *Tribune* held that the debtor-transferor (Tribune) qualified as a "financial institution" because it was a "customer" of a bank that played the same role that BONY played here. 2019 WL 1771786, at *9-12 (denying leave to amend complaint to add § 548(a)(1)(B) claim as futile because § 546(e) barred the claim). As here, Tribune retained a financial institution (Computershare Trust Company, or "CTC") to act as depository for its tender offer. *Id.* at *1. Like BONY here, CTC accepted and held tendered shares on Tribune's behalf and paid the $8 billion purchase price it received from Tribune to the tendering shareholders. *Id.* Construing the definition of "financial institution" in § 101(22)(A) in the manner endorsed by the Supreme Court in *Merit*, Judge Cote held that Tribune was a "financial institution" because each of the statutory elements was met: (i) Tribune was a "customer," (ii) of a "bank" (CTC), (iii) that acted as Tribune's "agent," (iv) "in connection with a securities contract" (the tender offer).

Precisely the same analysis applies here. *First*, BONY is a "commercial bank," registered with and licensed by the Office of the Comptroller of the Currency as a "National Bank" and a "Trust Bank."[17] *See also Miller v. CSFB (In re Refco, Inc. Sec. Litig.)*, 2009 WL

---

[17] Office of the Comptroller of the Currency, U.S. Department of the Treasury, National Banks Active as of June 30, 2019 and Trust Banks Active as of June 30, 2019, https://www.occ.treas.gov/topics/licensing/national-banks-fed-savings-assoc-lists/index-active-bank-lists.html.

7242548, at *6-8 (S.D.N.Y. Nov. 13, 2009) (taking judicial notice that BONY is a financial institution under § 546(e)), *adopted*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010).

*Second*, EBG was a "customer" of BONY. Because the Code does not define "customer" as used in § 101(22)(A)'s definition of "financial institution," the term is "'give[n] … its ordinary meaning.'" *Tribune*, 2019 WL 1771786, at *9.[18] A "customer" is a "'purchaser of … services'" or, "'[i]n banking, any person having an account with a bank or for whom a bank has agreed to collect items.'" *Id.* (quoting Black's Law Dictionary). Here, EBG retained BONY as depository, and hence was a "purchaser" of BONY's "services." Moreover, BONY "agreed to collect items" on EBG's behalf, collecting tendered shares and paying the cash it received from BONY to EBG's equity holders. EBG was BONY's "customer." *See id.* at *10 (Tribune was CTC's "customer" as a "purchaser" of CTC's "services as depository").

*Third*, BONY acted as EBG's "agent." The Code does not define "agent," but where, as here, the Code "uses terms that have accumulated settled meaning under … the common law, a court must infer, unless the statute otherwise dictates, that Congress meant to incorporate the established meaning of these terms." *Field v. Mans*, 516 U.S. 59, 69 (1995); *Tribune*, 2019 WL 1771786, at *10. "At common law, '[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act.'" *Id.* (quoting Restatement (Third) of Agency § 1.01 (2006)). Here, BONY acted as an agent, not a principal, in EBG's tender offer. It was entrusted with nearly $1 billion of EBG's cash and charged with making payments on EBG's behalf to

---

[18] The term "customer" is defined elsewhere in the Code (11 U.S.C. § 741), but § 546(e) references the definition of "financial institution" in § 101 and that definition expressly refers to a customer "whether or not a 'customer,' as defined in section 741." 11 U.S.C. § 101(22)(A).

tendering members upon the tender of their shares to BONY. "This is a paradigmatic principal-agent relationship." *Id.* at *11.[19]

*Fourth*, BONY acted as EBG's agent "in connection with a securities contract." EBG retained BONY for the specific purpose of carrying out a securities contract, the Offer to Purchase. BONY was plainly acting "in connection with" that contract. *Tribune*, 2019 WL 1771786, at *11 ("Tribune's use of CTC to repurchase Tribune stock" "establish[es] that CTC's involvement in these LBO transactions was 'in connection with a securities contract'").

**b. EBG's Members Were "Financial Institutions" (And Many Members Were Other Covered Entities As Well)**

Although it suffices that EBG was a financial institution, § 546(e) bars the Trustee's claims for the independent reason that EBG's members also qualify as "financial institutions." BONY was not only EBG's agent, but also the shareholders' agent—thus functioning as a dual agent. *See, e.g.*, Restatement (Third) of Agency §§ 3.14, 3.16, 8.06 (recognizing dual agency in transactions). The Offer to Purchase expressly provided (at 19) that the "Depository … will act *as agent for tendering Members* for the purpose of receiving payment from [EBG] and transmitting payment to the tendering Members." (emphasis added). Likewise, the members were BONY's "customers," for whom BONY "agreed to collect items" (the tendered shares and purchase-price payments). Finally, BONY's role as the members' agent in connection with the Offer to Purchase establishes that BONY was acting "in connection with a securities contract."

Even if the Transferee Defendants were not "financial institutions" by virtue of their status as customers of BONY, most, if not all, of the Transferee Defendants independently qualify as covered entities themselves. For example, the Transferee Defendants include

---

[19] Although agency can sometimes be partly a question of fact, "the issue is properly resolved as a matter of law where," as here, "the relevant facts are uncontroverted." *Tribune*, 2019 WL 1771786, at *10 (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013)).

registered securities broker-dealers (Credit Suisse Securities (USA) LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, and Morgan Stanley & Co., LLC).[20] As to these Transferee Defendants, the Court can take judicial notice on a motion to dismiss that they are "stockbrokers," *see* 11 U.S.C. § 101(53A), and dismiss the claims against them accordingly. *See, e.g.*, *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bank. S.D.N.Y. 2006) (taking judicial notice Bear Stearns was a "stockbroker" and granting Rule 12(b)(6) motion to dismiss claims as barred by § 546(e)). As for the other Transferee Defendants, most qualify as "financial participants," *see* 11 U.S.C. § 101(22A), based on their large positions in "options," "swap agreements" and other qualifying financial contracts, as can be readily established through documentation of those positions, or as "financial institutions" because they held their positions through custody accounts with banks or trust companies.[21]

### C. The Trustee's Attempt To Evade The Safe Harbor Fails

As discussed, the Trustee's initial effort to circumvent § 546(e) by pleading his claims under state law fails under the Second Circuit's *Tribune* decision. Seeking to salvage this action, the Trustee now argues that, even under *Tribune*, he can claw back EBG's payments to its members because those payments supposedly fall outside of § 546(e)'s scope. They do not.

---

[20] *See* Anker Decl., Exs. 6 (FINRA BrokerCheck Report Summary for Credit Suisse Securities (USA) LLC), 7 (FINRA BrokerCheck Report Summary for Goldman Sachs & Co. LLC), 8 (FINRA BrokerCheck Report Summary for J.P. Morgan Securities LLC), and 9 (FINRA BrokerCheck Report Summary for Morgan Stanley & Co. LLC).

[21] In the event the Court determines that any claims against any of the Transferee Defendants cannot be disposed of on this Motion to Dismiss, the Transferee Defendants respectfully request, as the Court suggested at the recent status conference, that the Court provide for the submission of short declarations regarding the Transferee Defendants' status as "financial participants" or other covered entities and limit any discovery and summary-judgment briefing to that issue (and/or the status of EBG or BosGen as "financial participants" as discussed *infra* at n.27). *See* Mar. 14, 2019 Tr. 12:3-8 (If "there's an issue that would be dispositive, but that requires a few additional facts, then we can focus discovery only on those facts and allow summary judgment motions to be made, rather than opening the case up to full-blown expensive years of discovery on issues that we may not ever reach").

### 1. Section 546(e) Preempts State-Law Intentional Fraudulent-Transfer Claims

The Trustee contends that "*Tribune*'s preemption analysis is not controlling with respect to the Trustee's actual-intent fraudulent conveyance claims," emphasizing that the state-law claims the creditors brought in *Tribune* were *constructive* fraudulent-transfer claims. *See* Mot. for Leave at 18. But *Tribune*'s preemption analysis does not turn on whether the state-law claim at issue alleges constructive, versus actual, fraud. It turns on whether § 546(e) would bar a bankruptcy trustee from bringing those claims; if so, the claims are preempted. 818 F.3d at 119-24. The Trustee's argument thus boils down to the proposition that state-law *intentional* fraudulent-transfer claims fall outside the scope of § 546(e).

That is wrong. By its terms, § 546(e) carves out only intentional fraudulent-transfer claims brought under *federal*, not state, law. It makes an express exception solely for intentional fraud claims brought under § 548(a)(1)(A) to avoid transfers made within two years before the bankruptcy—long after the payments here were made (nearly four years before bankruptcy). It makes no such exception for intentional fraud claims brought under state law. To the contrary, § 546(e) expressly bars *all* state-law fraudulent-transfer claims—constructive *or* intentional—that a bankruptcy trustee could bring under § 544. 11 U.S.C. § 546(e) ("Notwithstanding [§§] *544* … [or] 548(a)(1)(B), … the trustee may not avoid a [safe-harbored payment] except under [§] 548(a)(1)(A)" (emphasis added)).

Numerous courts agree. *See, e.g.*, *Verizon*, 892 F. Supp. 2d at 816-17 (rejecting argument Trustee urges here because it "conflict[s] with the clear language of [§] 546(e), which operates notwithstanding all of [§] 544"; "that Congress did expressly exclude [§] 548(a)(1)(A) implies that it did not want to exclude state 'actual intent' fraudulent transfer claims."); *accord Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 369-71 (W.D. Pa.

2006); *Hechinger*, 274 B.R. at 98; *Wyle v. Howard, Weil, Labouisse, Friedrichs Inc. (In re Hamilton Taft & Co.)*, 176 B.R. 895, 901-02 (Bankr. N.D. Cal. 1995), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997).[22]

### 2. Section 546(e) Bars Avoidance Of The $35 Million in "Dividend Payments" Because They Were "Settlement Payments" or "Transfer[s] … In Connection With A Securities Contract"

The Trustee asserts next that the $35 million in "dividend payments" fall outside § 546(e) because "dividend payments are not settlement payments or payments made in connection with a securities contract." Mot. for Leave at 17. But these were not isolated dividends paid in the ordinary course. EBG paid the $35 million as part of an integrated transaction—which the Complaint itself describes as a singular "Leveraged Recap Transaction"—that comprised the "use [of] more than $1 billion to redeem equity interests in EBG, redeem warrants, and pay a dividend to equity." TAC ¶ 1. The Offer to Purchase specifically contemplated (at 28) that the $35 million would be paid "prior to the purchase of Units in the Offer" to "return value to Members … consistent with the Recapitalization and [to] enhance the benefits of the Recapitalization."

Accordingly, because EBG paid the $35 million as part of a single, integrated transaction to settle EBG's repurchase of its members' shares, those payments were "settlement payments"—i.e., "transfers … made to complete [a] securities transaction." *Enron*, 651 F.3d at 334-35. And in any event, the payments plainly fall within §546(e) as "transfer[s] made … in

---

[22] The Trustee's cases (Mot. for Leave at 18) are inapposite. Both were decided before the Second Circuit's preemption ruling in *Tribune* and merely held that § 546(e) did not preempt unjust enrichment claims where those claims mirrored a *federal* intentional fraudulent-transfer claim *brought under § 548(a)(1)(A)*—which, of course, is excepted from § 546(e). *See Hosking v. TPG Capital Mgmt., L.P. (Hellas Telecomms. (Lux.) II SCA)*, 526 B.R. 499, 509-10 (Bankr. S.D.N.Y. 2015); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 450-51, 456-59 (Bankr. S.D.N.Y. 2012). Neither case held that *state law* intentional fraudulent-transfer claims survive § 546(e). Indeed, *Hellas dismissed* the state-law intentional fraudulent-transfer claims asserted there (albeit on other grounds, without addressing § 546(e)'s applicability), *see* 526 B.R. at 504-05, and the *Lehman* plaintiffs did not even assert state law intentional fraud claims, *see* 469 B.R. at 435, 446, 449.

connection with a securities contract." Under "§546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 421 (2d Cir. 2014). "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided," "merely requir[ing] that the transfer have a connection to the securities contract." *Id.* at 422. That "low bar" is easily met here because EBG's payment "ha[d] a connection to" and was thus "related to" the Offer to Purchase, which expressly contemplated that the dividends would be paid as part of the purchase transaction.

In circumstances like these, courts have held that "dividends" paid as part of an integrated securities transaction fall within § 546(e). *See Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 471-476 (W.D. Tex. 2013) (holding that $1 billion that subsidiaries transferred to parent as a "distribution or dividend" was a "settlement payment" and transfer "in connection with a securities contract" because the payment was part of an integrated transaction to sell parent's equity-security holdings in subsidiaries); *cf. Grayson Consulting. Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*, 716 F.3d 355, 364-65 (4th Cir. 2013) (stockbroker commissions were "settlement payments" because they were paid "as part of settling a regular securities transaction").[23]

### 3. Section 546(e) Bars Avoidance Of The $1 Billion EBG Paid To Repurchase Its Equity Securities, Even If The Payments Were Financed With Loan Proceeds That First Passed Through BosGen

Finally, the Trustee contends that $708 million of the more than $1 billion EBG paid to repurchase its shares and warrants falls outside § 546(e) because of how the Debtors structured

[23] This case is thus readily distinguishable from *Glob. Crossing Estate Representative v. Alta Partners Holdings LDC (In re Glob. Crossing, Ltd.)*, 385 B.R. 52 (Bankr. S.D.N.Y. 2008), cited by the Trustee (Mot. for Leave at 17), because that case concerned ordinary dividends paid to shareholders who continued to hold their stock. There was no purchase of stock or securities contracts involved at all. *See id.* at 56 n.1, 59-60.

the transaction. Specifically, the $708 million was (i) disbursed from the lenders to an account held by BosGen at US Bank, (ii) then transmitted to an account held by EBG at Bank of America, and (iii) finally transmitted to BONY to hold and pay to EBG's members for their shares. TAC ¶¶ 122-125; Funds Flow Mem. 2-3, 5. These disbursements all occurred on the same day (the Recap Transaction closing), and BosGen and EBG were each required to pass on the $708 million to fund the purchase of EBG's securities. *See supra* at 4-6. Nonetheless, the Trustee contends that the first component of the transfer—BosGen's transmission of the $708 million to EBG—was a stand-alone "transfer" from BosGen to EBG of an "LLC distribution"; that this "LLC distribution" was an isolated dividend falling outside § 546(e), as neither a settlement payment nor a transfer in connection with a securities contract; and that the Trustee can therefore avoid the "initial transfer" of the $708 million from BosGen to EBG and, because § 546(e) purportedly does not apply to EBG's "subsequent transfer" of those funds to its shareholders, recover the $708 million from the shareholders as "subsequent transferees" (apparently referencing § 550(a)(2)). Mot. for Leave at 2, 6, 17-18, n.5. Every step of that argument is wrong.

*First*, the premise of the Trustee's argument—that if the Trustee can avoid the BosGen-to-EBG "transfer," § 546(e) does not bar the recovery under § 550 of that payment from EBG's shareholders as "subsequent transferees"—is unsound. This is not a case, like that the Trustee cites (Mot. for Leave at 17), in which the "subsequent transfer" was made by a non-debtor who is not subject to § 546(e). *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 183, 185, 197 (Bankr. S.D.N.Y. 2018). The "subsequent transfer" of the $708 million here was the EBG-to-shareholders payment to purchase their shares—a transfer that § 546(e)

renders unavoidable on its face.[24] Section 546(e) reflects Congress's judgment that, even if the EBG-to-shareholders payment of the $708 million was a fraudulent transfer, the aim of fraudulent-transfer law to maximize creditor recoveries must yield to the national interest in protecting the stability of securities markets and the finality of long-settled securities transactions. *Tribune*, 818 F.3d at 119-23. Yet, under the Trustee's theory, despite § 546(e)'s express bar on unwinding EBG's stock-purchase payments to its members, the Trustee can nevertheless recover those payments because they were allegedly also a fraudulent transfer with respect to an additional, affiliated debtor in the bankruptcy (BosGen). That would nullify the very purpose of the safe harbor. Section 546(e) is not a mere regulation about which plaintiff can sue (EBG or BosGen). It is a "safe harbor" protecting securities transactions from being unwound as fraudulent transfers at all, regardless in whose name the suit is brought.

*Second*, the Trustee's theory that he can confine § 546(e)'s application to solely one component of the integrated transaction—the BosGen-to-EBG leg—by declaring that segment a stand-alone "transfer" is wrong. Where, as here, an integrated transaction is comprised of interrelated components, fraudulent-transfer provisions must be analyzed based on the entire transaction, not on a component-by-component basis. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [NY] UFCA."); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("an allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications," and "a single,

[24] It is of no consequence that § 550(a)(2) is not referenced in § 546(e): the same is true of § 550(a)(1), but the safe harbor obviously renders covered transfers unavoidable as to initial transferees.

integrated transaction" must be "viewed in its entirety" (internal quotation marks omitted)). Indeed, at the recent status conference, when the Court asked how the Trustee could pursue the EBG-to-shareholders "subsequent transfer" of the $708 million if the BosGen-to-EBG "initial transfer" was time-barred under Delaware's statute of repose, the Trustee's counsel responded that "I think as we've pled, the transactions can be collapsed." Mar. 14, 2019 Tr. 15:9-16:24.

Accordingly, the Court need not entertain the fiction that there was a free-standing "transfer" of the $708 million from BosGen to EBG, separate and apart from the overarching transfer of those funds to EBG's members to repurchase their shares and warrants. Courts have rejected similar efforts to evade § 546(e). In *Official Committee of Unsecured Creditors v. Clark (In re National Forge Company)*, 344 B.R. 340 (W.D. Pa. 2006), the estate representative argued, as the Trustee does here, that a subsidiary's transmission of loan proceeds to its parent, which the parent used to fund a stock repurchase, was a "transfer" from the subsidiary to the parent that supposedly fell outside § 546(e). By avoiding that "initial transfer," the estate representative argued that it could recover under § 550(a)(2) from the "subsequent transferees," the parent's stockholders. Rejecting that argument, the court explained, "as a matter of law, the initial [subsidiary]-to-[parent] transfer and the subsequent [parent]-to-shareholder transfers must be viewed as one integrated transaction for purposes of the Committee's fraudulent transfer claims." *Id.* at 346-51, 366, 369-71 (holding § 546(e) barred avoidance of the stock-purchase payments to the shareholders).

*Third*, the Trustee's effort to recharacterize the transfer goes nowhere in any event because, even if there had been a separate "transfer" from BosGen to EBG, that "transfer" would still fall within § 546(e). Contrary to the Trustee's contention, the BosGen-to-EBG "transfer" was not a solitary "distribution" or "dividend" disconnected from the larger securities transaction

of which it was one constituent part (i.e., the Tender Offer). As the transaction documents state on their face, BosGen transmitted the $708 million to EBG for the *specific purpose* of "fund[ing] the Distribution and the Tender Offer of EBG." *See supra* Section A. The BosGen-to-EBG disbursement was thus, in and of itself, a safe-harbored "settlement payment" because it was "made to complete [a] securities transaction." *Enron*, 651 F.3d at 334-35. And the BosGen-to-EBG "transfer" also falls within § 546(e) as a transfer made "in connection with a securities contract" because the transmission of the $708 million from Bos Gen to EBG was "related to" and "ha[d] a connection to" the Offer to Purchase. *Madoff*, 773 F.3d at 421-22; *Crescent Res.*, 500 B.R. at 472-77 (§ 546(e) barred avoidance of subsidiary's purportedly "standalone dividend payment" to parent because, "viewed in the context of the entire transaction," the payment was "a necessary transfer in the completion of [a] securities transaction" by the parent).

The BosGen-to-EBG "transfer" also satisfies § 546(e)'s only other requirement—that the transfer be "by or to (or for the benefit of)" a covered entity—because, as discussed, EBG was a "financial institution" (as BONY's "customer"), and hence the BosGen-to-EBG "transfer" was made "to" a covered entity. To be sure, BONY's role in "acting as agent" for EBG was to serve as depository for the exchange of cash and securities between EBG and its members, not the transmittal of the $708 million from BosGen to EBG. But the Code's definition of "financial institution" does not require that BONY act as EBG's "agent" with respect to the transfer sought to be avoided. The definition merely requires that BONY act as "agent" for its "customer" EBG "in connection with a securities contract," and BONY plainly did that with respect to the Offer to Purchase (the same contract that the BosGen-to-EBG disbursement was intended to fulfill). *Cf. Hayes v. Morgan Stanley DW Inc. (In re Stewart Fin. Co.)*, 367 B.R. 909, 918-19 (Bankr. M.D. Ga. 2007) (Morgan Stanley was a "stockbroker" protected by § 546(e) even though it "was not

acting as a 'stockbroker' with regard to the subject transfers"; "[t]here is no requirement in the Code … that require the transferor … to be a 'customer' of the 'stockbroker' *for purposes of the transfers in question*").[25]

## IV. The Trustee's Cause Of Action For Unjust Enrichment Fails As A Matter Of Law

The Trustee's unjust enrichment claim is also barred by § 546(e). *See supra* Section III. But even if it were not, the claim also fails as a matter of state law.

As an initial matter, the unjust enrichment claim must be dismissed for lack of standing. The Trustee purports to bring the claim on behalf of EBG's and BosGen's creditors. TAC ¶ 188. EBG and BosGen were both organized as Delaware LLCs, and thus the rights of their creditors to sue are governed by Delaware law. *See*, *e.g.*, *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 556 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (Delaware law governs the claims of creditors of a Delaware LLC); *Bartfield v. Murphy*, 578 F. Supp. 2d 638, 645 (S.D.N.Y. 2008). Under Delaware law, only a party directly injured by the payments or other transfers at issue may sue for unjust enrichment. *See*, *e.g.*, *Moore v. Paladini (In re CD Liquidation Co.)*, 462 B.R. 124, 133 (Bankr. D. Del. 2011) (dismissing claim for unjust enrichment under Delaware and New York law because harm was "based on a principal injury" to the transferor

---

[25] It appears that EBG and BosGen may also be covered entities on additional grounds. Under § 101(22A)(A), a "financial participant" includes entities having financial contracts totaling $1 billion in notional or actual principal amount or $100 million in mark-to-market positions. EBG may qualify as a "financial participant" because it had securities contracts of at least $975 million in principal amount (the Offer to Purchase $925 million of LLC Units and $50 million of warrants) and may have had other qualifying financial contracts sufficient to exceed the $1 billion-principal test. BosGen may also qualify as a "financial participant" by virtue of its "hedge contracts" with Credit Suisse Energy, TAC ¶ 88, and/or the various "interest-rate swap" or "hedge contracts" it sought to assume or settle shortly after the Petition Date (*In re Boston Generating*, *LLC*, No. 10-14419 (Bankr. S.D.N.Y.), ECF Nos. 25, 27, 77, 599, 813)), which were described as "safe harbor contracts." Further, BosGen may qualify as a "financial institution," as a "customer" of US Bank, which was retained "as Depository" and "authorized and instructed" to "accept such deposits" and "make such … payments in accordance with the [Funds Flow Mem.]," including the $708 million BosGen-to-EBG disbursement to be "Use[d]" by EBG to fund its "Distribution, Unit Buyback and Warrants Repurchases." TAC Ex. H, Cover Ltr., at 1-2 & Funds Flow Mem., at 2-3. If the Court denies this Motion, the Defendants respectfully request that the Court provide for targeted discovery limited to the issue of whether EBG and/or BosGen were covered entities.

company). The Trustee alleges that EBG's members were unjustly enriched through the distributions they received in the leveraged recapitalization. *See* TAC ¶ 189. If anyone was directly harmed by those distributions, it was EBG, which made the distributions to its members; the creditors were harmed indirectly, if at all. *See*, *e.g.*, *CD Liquidation*, 462 B.R. at 133 (Bankr. D. Del. 2011) ("As the party who paid the money (and to whom the money originally belonged), [the debtor] was injured by any purported unjust enrichment," and plaintiff was injured only indirectly).[26] Accordingly, the claim fails. *See id.* at 128-30.

The unjust enrichment claim also fails as a matter of contract and quasi-contract law. Unjust enrichment is available only "as an alternative to contract, where a contractual relationship has legally failed." *Reading Int'l*, *Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 333-34 (S.D.N.Y. 2003). Put differently, the remedy is *not* available where there was no prior relationship between the plaintiff and defendant. *See Reading Int'l*, 317 F. Supp. 2d at 333 (dismissing unjust enrichment claim where "[n]o contractual or quasi-contractual relationship is alleged to have existed between plaintiffs and [defendants]"); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013), *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ("Given that unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant: while a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, there must exist a relationship or connection between the parties that is not too attenuated. Where plaintiff and defendant simply had no dealings with each other, their relationship is too attenuated.") (internal quotations and citations omitted). Here, the Trustee has

---

26 If the funds paid to the Transferee Defendants instead belonged to the creditors, then the Trustee's fraudulent-transfer claims would fail for yet another reason: They would not have entailed a transfer of property *of the debtor*. *See FDIC v. Porco*, 552 N.E.2d 158, 159-60 (N.Y. 1990); *Stochastic Decisions*, *Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993).

not alleged any prior dealings between the creditors in whose shoes he purports to stand and the Transferee Defendants. His claim for unjust enrichment therefore fails as a matter of law.[27]

## V. To The Extent The Trustee Seeks To Recover On Behalf Of The Lenders, And Their Successors, He Is Estopped From Doing So

The Trustee has chosen to stand in the shoes of the Debtors' creditors—the first-lien, second-lien, and mezzanine lenders—in an effort to evade the safe harbor of § 546(e). He cannot do that, for the reasons discussed *supra* at Section III. But even if he could, his claims on behalf of those creditors would fail. To the extent the Trustee seeks to avoid the transfers standing in the shoes of "individual creditors" who "assigned [their claims] to the Liquidating Trust pursuant to the Plan," TAC ¶ 63, and who participated in—indeed, required—the leveraged recapitalization that the Trustee now seeks to set aside, he is estopped from doing so because those creditors themselves would be estopped from avoiding the transfers.

The defining purpose of fraudulent-transfer law is to prevent a debtor from transferring its assets to third parties in order to defraud its creditors, who would otherwise be able to look to those assets for repayment of their claims. *See Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (the "object" of New York fraudulent-transfer law "is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment"); 5 *Collier on Bankruptcy* ¶ 548.01

[27] Even if the Trustee did have standing to sue the Transferee Defendants for unjust enrichment, the claim would be barred because "[t]he existence of a valid and enforceable [written] contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66, 70 (2d Cir. 2017) (quoting *Clark-Fitzpatrick*, *Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193 (N.Y. 1987)). The transfers the Trustee seeks to recover were made pursuant to valid and enforceable written contracts (albeit ones to which the EBG's and BosGen's creditors were strangers)—the Offer to Purchase, pursuant to which the tender offer payments were made, and the EBG LLC agreement, pursuant to which the dividends were distributed to EBG's members. The existence of these agreements precludes recovery in quasi-contract. *See*, *e.g.*, *Chadirjian v. Kanian*, 506 N.Y.S.2d 880, 882 (App. Div. 1986) (affirming grant of summary judgment on unjust-enrichment claim arising from stock repurchase in light of agreement "which explicitly covers the same specific subject matter for which the implied agreement is sought"); *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) (because shareholders' right to receive dividends was set forth in a written contract, they could not recover under an unjust enrichment theory independent of the contract).

(15th ed. rev. 2009) ("A fraudulent transfer can essentially be defined as an act which has the effect of improperly placing assets beyond the reach of creditors."). That rationale has no application where a creditor authorizes the debtor to transfer the assets in question to third parties—much less when a creditor *requires* the debtor to do so. It is thus well established that a transfer cannot be avoided for the benefit of creditors who authorized, consented to, or ratified the transfer at issue. *See*, *e.g.*, *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer … can be ratified by a creditor who is then estopped from seeking its avoidance."); *see also Adelphia Recovery Tr. v. HSBC Bank USA (In re Adelphia Recovery Tr.)*, 634 F.3d 678, 691-92 (2d Cir. 2011); *Bresnahan v. Dunn (In re Dunn)*, 2006 WL 6810930, at *8 (B.A.P. 9th Cir. Oct. 31, 2006); *Lane v. Eggleston*, 284 F. 743, 745 (5th Cir. 1922). That reasoning applies to a litigation trustee who sues on behalf of such creditors. Because such a trustee merely stands in the shoes of the creditors as their assignee, he has no greater rights than the assignors—that is, where the assigning creditors are subject to a defense that bars their claim (*e.g.*, estoppel), so too is the trustee. *See*, *e.g.*, *Krys v. Aaron (In re Refco Sec. Litig.)*, 890 F. Supp. 2d 332, 353 (S.D.N.Y. 2012).

Courts have applied this rule of law to bar fraudulent-transfer actions brought for the benefit of lenders that authorized the transfers at issue through their participation in the challenged transaction. *U.S. Bank National Association v. Verizon Communications*, *Inc.*, 479 B.R. 405 (N.D. Tex. 2012), arose out of Verizon's spin-off of its domestic directories business into a separate company (Idearc). Banks and bondholders had "made loans to Idearc for the express purpose of financing Idearc's acquisition of Verizon's yellow pages business." *Id.* at 410. "Under the terms of the spin-off agreement, these lenders 'required' that their loans to Idearc be used to pay Verizon for the yellow pages business." *Id.* Idearc subsequently filed for

bankruptcy, and a plan was confirmed wherein US Bank was appointed the trustee for a litigation trust whose beneficiaries were the banks and bondholders that financed the spin-off. US Bank filed suit to avoid and recover payments made to Verizon in the spin-off as alleged fraudulent transfers. Relying on the principle that "fraudulent transfers are not voidable where the benefit would run to a creditor that ratified the transfer" (*id.* at 411 (alterations omitted)), the court held that the trustee was barred from suing standing in the shoes of the banks and bondholders:

> Because of their participation in the alleged fraudulent transfers, Idearc's banks and bondholders would have been barred from bringing fraudulent transfer claims on the date Idearc filed its bankruptcy petition. … [T]he banks and bondholders not only knew that their loans would be used to pay Verizon; they not only *consented* that their loans be used to pay Verizon; they *required* that their loans be used to pay Verizon.

*Id.* (internal quotation marks omitted).

Judge Gerber reached the same conclusion in *Lyondell*. He explained that the creditors who financed the leveraged buyout could not have been "ignorant of the fact that [they] w[ere] lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders—especially since … the loan documents required loan proceeds to be used for that purpose." *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),* 503 B.R. 348, 384-85 (Bankr. S.D.N.Y. 2014), *as corrected* (Jan. 16, 2014), and *abrogated on other grounds by Tribune*, 818 F.3d 98 (2d Cir. 2016). Dismissing the claims brought on behalf of those creditors, Judge Gerber concluded that ratification "requires no more than knowledge," and the only knowledge necessary was the purpose of the loan and how the creditors' loan proceeds would be used. *Id.*

Numerous other cases are in accord. *See*, *e.g.*, *Refco*, 2009 WL 7242548, at *11 (where Refco "was heavily involved in structuring the transaction," and the credit agreement "provides that the funds from Refco could be used only for the" transaction, Refco could not "be the triggering creditor, because it was a material participant in the alleged fraudulent transaction");

*HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*, 2009 WL 385474, at *6-7 (W.D.N.Y. Feb. 12, 2009) (fraudulent transfers not voidable where the benefit would run to a creditor that ratified the transfer), *aff'd*, 634 F.3d 678 (2d Cir. 2011); *cf. Crescent Res.*, 500 B.R. at 479-80 (same); *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 742 (W.D. Mich. 2007), *aff'd*, 571 F.3d 545 (6th Cir. 2009).[28]

The facts in this case are similar to those in *Verizon*, *Lyondell*, *Refco* and the other cases. Here, virtually all—97% in dollar amount—of the unpaid creditors of the Debtors in whose stead the Trustee purports to sue are the lenders who financed the very transaction the Trustee challenges. TAC ¶ 63 (Trustee seeks recovery on behalf of "the holders of the First Lien Debt and Second Lien Debt … , the holders of the Mezzanine Debt … and [] all other general unsecured creditors of the Debtors"). There is no dispute that these creditors agreed that their loans would be used by EBG to make the challenged transfers to the Transferee Defendants. Indeed, the creditors *so required*.[29] *See* First Lien Credit Agreement § 2.14(a); Second Lien Credit Agreement § 2.14; Mezzanine Credit Agreement § 2.13.

---

[28] *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), is inapplicable. In that case, Judge Gropper held that Tronox's creditor-bondholders did not ratify the fraudulent transfers where the bondholders did not require that the proceeds of their bonds be used to finance the transfers, nor did they even know of the transfers. *See id.* at 252-53, 258-59 & n.19, 276, 284 (noting that, after Tronox received the bond proceeds, Tronox's parent-company "[e]ventually … required" Tronox to transfer most of its cash to the parent in connection with the parent's subsequent spin-off of Tronox, and that the parent similarly orchestrated the other challenged transfers of Tronox's business assets through intercompany transfers that "were not meaningfully disclosed"). In those circumstances, where "[t]he bondholders did not structure the allegedly fraudulent transaction" or "knowingly g[i]ve sanction to the fraudulent conveyances" but simply purchased bonds "based on the information available to them," Judge Gropper rejected the notion that the mere "decision to become a creditor" could, in itself, suffice to establish ratification. *Id.* at 276. Here, by contrast, the lenders required that their loans be used to fund the challenged distributions to the tendering members for their stock. The only other case the Trustee has cited on this point, *PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016), is not from this Circuit, and is contrary to Judge Gerber's decision in *Lyondell, Verizon*, and the substantial other authority discussed above.

[29] For purposes of this standing rule, it is immaterial that the current holders of the debt may be different from the initial creditors who participated in the First Lien, Second Lien, and Mezzanine Credit Facilities. *See* First Lien and Second Lien Credit Agreements § 9.07 (providing for "Assignments and Participations"). "[A]n assignee stands in the shoes of the assignor and thus acquires no greater rights than its assignor." *Refco Sec. Litig.*, 890 F. Supp. 2d at 354 (internal quotation marks omitted)). Likewise, "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor." *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425,

In an attempt to avoid this settled body of law, the Trustee alleges that the creditors would not have made the loans but for the allegedly inaccurate information K Road provided them regarding BosGen's financial health. Properly pled, those allegations might support a fraudulent-*inducement* claim against *K Road*, but not a fraudulent-*conveyance* claim against the *Transferee Defendants*. Confronted with the same fraudulent-inducement style argument, the court in *Verizon* held that the lenders' claims to avoid the transfer of their loan proceeds were barred, notwithstanding the trustee's argument that the banks and bondholders were allegedly "duped" or "tricked" by the defendants regarding Idearc's ability to repay their loans. This allegation did not matter because the "plaintiff's claims are for fraudulent transfers, not for fraud"; all that mattered was that "Idearc's banks and bondholders did have 'full knowledge' of the transfers from Idearc to Verizon. Indeed, the banks and bondholders themselves required Idearc to make those transfers." 479 B.R. at 411.

The same is true here. The lenders made their loans for the very purpose of providing the funds to make the payments to the shareholders that the Trustee now seeks to avoid and recover for the benefit of those same lenders. *See, e.g.*, TAC ¶¶ 76, 99. If the lenders were defrauded into making their loans by misrepresentations as to the Debtors' creditworthiness, then they needed to bring a fraudulent-inducement claim against those who made the misrepresentations (and not against the Transferee Defendants who are not alleged to have had any dealings at all with the lenders) and to establish all of the elements for such a claim, including falsity, materiality, and justifiable, detrimental reliance. *See, e.g.*, *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008). Even if the creditors were duped into

435-36 (S.D.N.Y. 2007). The current holders of the debt are thus subject to any and all defenses—including ratification and estoppel—that would have barred the claims of the initial lenders. *See Verizon*, 479 B.R. at 412.

making their loans in the first place, they certainly were not misled that the Debtors would *transfer* the loan proceeds to EBG's tendering members, and that is all that matters to defeat the Trustee's fraudulent-*transfer* claims. Indeed, if anything, the arguments for estoppel or ratification are stronger here than in *Verizon*, because in this case the Transferee Defendants (as distinguished from K Road) are not alleged to have made *any* misrepresentations to the lenders, even regarding the Debtors' financial health, whereas in *Verizon* the plaintiff did allege that the transferee-defendant, Verizon, had made misrepresentations regarding Idearc's creditworthiness.

Application of the relevant precedent is straightforward in this case: Because none of these assignor lenders could have avoided the distributions at issue under fraudulent-transfer law, neither can the assignee Trustee. The Third Amended Complaint must be dismissed to the extent—and that extent is 97% or more—that the Trustee purports to bring suit as assignee of the lenders (or their successors) under any of the three Credit Facilities.

## VI. The Actual Fraudulent Conveyance Claims Fail To Allege That A "Critical Mass" Of The EBG Board Acted With Fraudulent Intent

Because EBG's board was required to and did approve the recapitalization (TAC ¶ 68), the Trustee must allege that a "critical mass" of the board acted with fraudulent intent to state a claim for intentional fraudulent conveyance. *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2017 WL 82391, at *6 (S.D.N.Y. Jan. 6, 2017); *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 541 B.R. 172, 177-78 (Bankr. S.D.N.Y. 2015), *rev'd and remanded*, 554 B.R. 635 (S.D.N.Y. 2016). The Trustee makes the conclusory allegation that each of K Road, Harbinger, and the Nominating Committee "dominated and controlled the Debtors," such that their intent may be imputed to the entire board. TAC ¶¶ 16, 26, 69. But K Road held only 10% of EBG's stock and appointed only two members to its seven-person board. *Id.* ¶¶ 71, 75. Accordingly, the Trustee "must show 'such formidable voting and managerial

power that [K Road], as a practical matter, [is] no differently situated than if [it] had majority voting control' of the corporation's shares." *Tribune*, 2017 WL 82391, at *7. K Road's role as a contract manager for the Debtors' day-to-day business (TAC ¶ 74) falls far short of the requisite showing that K Road's power was "so potent" that the five independent directors could not "freely exercise their judgment, fearing retribution" from K Road. *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).[30] Therefore, the intent of K Road and Harbinger (which allegedly controlled the Debtors via its "direction" of K Road, TAC ¶¶ 69, 149-50)[31] cannot be imputed to the board.

That leaves only the Nominating Committee. The Trustee does not allege that the Nominating Committee controlled the two directors appointed by K Road, or that the five independent directors appointed by it reached any sort of "blood pact" to act as a "control group." *See St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 312 (S.D.N.Y. 2010). Therefore, the TAC also fails to allege control by the Nominating Committee. In fact, Judge Chapman previously dismissed all of the Trustee's prior substantive fraud claims against the Nominating Committee—including claims for aiding and abetting fraud, civil conspiracy, and concert of action—with prejudice.

---

[30] The Trustee tacitly admits that K Road did not control the independent directors, acknowledging that K Road required the Nominating Committee's "consent" and had to "negotiat[e] with the Nominating Committee," and that the Nominating Committee ultimately "had the ability to control" the dissemination of information regarding the recapitalization. TAC ¶¶ 26-27, 82-83.

[31] The prayer for relief seeks a "finding that Harbinger Capital Partners, LLC is an alter-ego of Boston Harbor Power LLC and Power Management Financing LLC." TAC Prayer for Relief (f). However, Harbinger is listed as a Transferee Defendant, and assumes that, like all other such defendants, its asserted liability is based solely on its receipt of distributions in the leveraged recapitalization. All substantive fraud allegations against Harbinger, directly or as an alter ego of any entity, were previously dismissed by Judge Chapman. For liability purposes, therefore, the Trustee's conclusory (and specious) allegations, lifted verbatim from prior dismissed complaints, that Harbinger controlled K Road, that K Road controlled the Debtors, and that therefore Harbinger controlled the Debtors (*see, e.g.*, TAC ¶¶ 66-70), are legally irrelevant. If the Trustee asserts any unstated claim that Harbinger is somehow liable as an alter ego of any entity, dissolved or otherwise, such claim must be dismissed.

Because all of the Trustee's remaining fraud allegations thus pertain only to K Road (*see* TAC ¶¶ 85-116), *without any allegations of fraud by the five independent directors*, the TAC fails to allege that a "critical mass" of the board acted with fraudulent intent.[32] The actual fraudulent conveyance claims should be dismissed on this additional ground. Order Dismissing Counts 12-14, with Prejudice, with Respect to the Nominating Committee Defs., ECF No. 276.

## VII. The Trustee Is Barred From Suing Dissolved Corporate Entities

To the extent the Trustee purports to sue corporate entities that are no longer in existence, the claims against those defendants are barred for an additional reason: Those entities have not been (and cannot be) served with the Third Amended Complaint and are not amenable to suit.

"At common law, the dissolution of a corporation abruptly ended its existence, thus abating all pending actions by and against it and terminating its capacity thereafter to sue or be sued. Thus, statutory authority is necessary to prolong the life of a corporation past its date of dissolution." *In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch. 1980). Accordingly, the Trustee may sue a dissolved corporation only if there is express statutory authority for him to do so. There is none here.

For example, the Trustee purports to sue Trade Claim Acquisition, L.L.C. TAC ¶ 41, Ex. A. But that Delaware LLC was canceled in 2010. *See* Anker Decl., Ex. 2.[33] Under Delaware LLC law, a Delaware LLC that has been issued its certificate of cancellation from the Secretary

---

[32] *See, e.g.*, TAC ¶ 88 ("The cost of the Fixed Payments [regarding the Hedges] was variable payments (the 'Floating Payments') from BostonGen to CSE. This was a material hidden liability with a significant negative impact on cash flow, *the disastrous consequences of which were concealed from and not disclosed to* potential lenders, *the independent members of the Board of Directors*, and other parties involved in the Leveraged Recap Transaction. In short, K Road committed fraud—it failed to disclose the way the Hedges actually worked.") (emphasis added).

[33] The certificate of cancellation for Trade Claim Acquisition was filed with the Delaware Secretary of State. This Court may take judicial notice of that document as a public filing. *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); ; *Am. Cas. Co. v. Lee Brands, Inc.*, 2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (taking judicial notice of document on file with California Secretary of State).

of State cannot be sued. Del. Code Ann. tit. 6, § 18-803(b); *see also Kwon v. Yun*, 2008 WL 190058, at *1 (S.D.N.Y. Jan. 22, 2008); *Matthew v. Laudamiel*, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012). The same holds true for putative Transferee Defendant Epic Distressed Debt Holdings, Inc., a Delaware corporation that was dissolved as of September 3, 2009. *See* Anker Decl., Ex. 3; *Citadel Indus.*, 423 A.2d at 503. Similarly, the Trustee has sued Greenwich International, Ltd. and Cedarview EBG Holdings, Ltd. They, too, are canceled corporations—Bermudan and Cayman Islands companies, respectively, that were dissolved and stricken from the companies registers years before the Trustee filed suit. *See* Anker Decl., Exs. 4 & 5. Under applicable law, those entities also cannot be sued. *Cf. Eluv Holdings (BVI) Ltd. v. Dotomi*, *LLC*, 2013 WL 1200273, at *11 (Del. Ch. Mar. 26, 2013).

Thus, this action must be dismissed as against all dissolved entities that, under the applicable law of the jurisdiction of their incorporation, are no longer subject to suit.

## CONCLUSION

For the foregoing reasons, Counts 1-5 of the Trustee's Amended Complaint should be dismissed with prejudice.[34]

Dated: July 18, 2019

Respectfully submitted,

WILMER CUTLER PICKERING
HALE AND DORR LLP

/s/ *Philip D. Anker*
Philip D. Anker

HERRICK, FEINSTEIN LLP

/s/ *Sean E. O'Donnell*
Sean E. O'Donnell
Shivani Poddar

---

[34] *See Tribune*, 2017 WL 82391, at *20-21 (dismissing complaint with prejudice because the plaintiff, a litigation trustee, was a sophisticated bankruptcy professional with significant discovery from Tribune's bankruptcy case, and thus it was unlikely that the pleading deficiencies were "unforeseen" to the trustee, and also because leave to amend would "result in substantial prejudice" to passive shareholder defendants "alleged to have done nothing more than receive payment for their shares," who "have been in limbo for almost a decade," contrary to § 546(e)'s purpose of protecting the finality of securities transactions).

Alan E. Schoenfeld
Joel Millar
Ryanne E. Perio
philip.anker@wilmerhale.com
alan.schoenfeld@wilmerhale.com
joel.millar@wilmerhale.com
ryanne.perio@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

*Attorneys for Credit Suisse Securities (USA) LLC; Credit Suisse (USA), Inc.; D. E. Shaw & Co., L.P.; D. E. Shaw Laminar Portfolios, L.L.C.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Mason Capital Ltd.; Mason Capital Management LLC; Morgan Stanley & Co. LLC; RBS Holdings USA, Inc.; and Taconic Capital Partners 1.5 LP.*

Elena T. McDermott
sodonnell@herrick.com
spoddar@herrick.com
emcdermott@herrick.com
Two Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Ex Orbit, Ltd, Satellite Senior Income Fund, LLC, CMI Holdings Investments Ltd., Castlerigg Partners, LP, Highland Crusader Offshore Partners, LP, GK Debt Opportunity Fund, Ltd., Satellite Asset Management, LP, Sandell Asset Management Corporation, Onex Credit Partners, LLC, Satellite Overseas Fund Ltd., The Apogee Fund, Ltd., Satellite Fund IV, LP, Satellite Overseas Fund V, Ltd., Satellite Overseas Fund VI, Ltd., Satellite Overseas Fund VIII, Ltd., Satellite Overseas Fund IX, Ltd., Satellite Fund I, LP, Satellite Fund II, LP, EX Orbit Group, Ltd., and Satellite Overseas Fund VII, Ltd.*

SHEARMAN & STERLING LLP

*/s/ Richard F. Schwed*
Richard F. Schwed
Randall Martin
rschwed@shearman.com
randy.martin@shearman.com
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Attorneys for Defendants The Raptor Global Portfolio Ltd., The Tudor BVI Global Portfolio L.P., Tudor Proprietary Trading, L.L.C., and Tudor Investment Corporation*

SCHULTE ROTH & ZABEL LLP

*/s/ William H. Gussman, Jr.*
Adam C. Harris
David M. Hillman
William H. Gussman, Jr.
Adam.Harris@srz.com
David.Hillman@srz.com
Bill.Gussman@srz.com
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Anchorage Capital Master Offshore, Ltd., Stonehill Institutional Partners, L.P., Anchorage Capital Group, L.L.C. f/k/a Anchorage Advisors, LLC, Anchorage Capital Master Offshore II, Ltd., Stonehill Capital Management LLC, Boston Generating Offshore Holdings, Ltd., Cedarview Capital Management LP, Citigroup Alternative Investments LLC, as successor in interest to Epic Asset Management LLC, Epic Distressed Debt Opportunities Fund Ltd., Longacre Capital Partners (QP) LP, and Longacre Master Fund, Ltd.*

CLAYMAN & ROSENBERG LLP

*/s/ Ramsey Hinkle*
Ramsey Hinkle
Denis P. Kelleher
hinkle@clayro.com
kelleher@clayro.com
305 Madison Avenue, Ste. 1301
New York, New York 10165
(212) 922-1080

*Attorneys for Sandell Asset Management Corp., CMI Holdings Investments, Ltd., and Castlerigg Partners, L.P.*

GIBSON, DUNN & CRUTCHER LLP

*/s/ Oscar Garza*
Oscar Garza
Douglas Levin
ogarza@gibsondunn.com
dlevin@gibsondunn.com
3161 Michelson Drive
Irvine, California 92612
(949) 451-3800

PACHLUSKI STANG ZIEHL
& JONES LLP

Dean A. Ziehl
dziehl@pszjlaw.com
780 Third Avenue, 36th Floor
New York, New York 10017
Tel.: (212) 561-7700

*Attorneys for Defendants Harbinger Capital Partners, LLC, Boston Harbor Power LLC, Power Management Financing LLC, and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund, Ltd.)*

**CERTIFICATE OF SERVICE**

I, Philip D. Anker, hereby certify that on this 18th day of July 2019, a copy of the foregoing Memorandum was filed electronically with the Clerk of Court through the Court's CM/ECF system, thus serving all registered parties.

/s/ Philip D. Anker
Philip D. Anker