**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

In re:                                                      **FOR PUBLICATION**

BOSTON GENERATING LLC, *et al.*,                            Chapter 11

                                                            Case No. 10-14419 (SCC)

                              Post-Confirmation Debtors.
-------------------------------------------------------------------------x
MARK HOLLIDAY, as the Liquidating Trustee of the
BosGen Liquidating Trust,

                              Plaintiff,
                                                            Adv. Proc. No. 12-01879 (RG)
              v.

K ROAD POWER MANAGEMENT, LLC, *et al.*,

                              Defendants.
-------------------------------------------------------------------------

MEMORANDUM OPINION RESOLVING
MOTION TO DISMISS THIIRD AMENDED COMPLAINT

## I.    Introduction[1]

This adversary proceeding was commenced almost eight years ago to recover approximately $1 billion in allegedly fraudulent transfers under New York State law by the Debtors to the Defendants.  The Trustee asserts claims for intentional and constructive fraudulent transfers under New York's DCL, as well as under the theory of unjust enrichment. In response, the Defendants filed the MTD asserting, among other things, that: (i) the Trustee's claims were time barred; (ii) the Trustee failed to state a plausible claim for relief; (iii) the transfers sought to be avoided are safe-harbored pursuant to section 546(e) of the Bankruptcy Code; and (iv) the Lenders ratified the transfers and thus, are estopped from now trying to avoid and recover the transfers.  For the reasons stated below, the Court dismisses all counts pursuant to section 546(e)

---

[1] Capitalized terms used in Section I but not defined therein shall have the meanings ascribed to them below.

of the Bankruptcy Code.    Notwithstanding the fact that Counts I through V of the TAC are

dismissed pursuant to the safe harbor of section 546(e), the Court will provide an analysis below

of *all* the legal issues raised by the parties in their papers.    The legal conclusions the Court reaches

were shaped by an analysis of *all* the legal issues presented and therefore warrant explanation.

The questions posed in the MTD and the Opposition thereto raise a series of complex and,

in some instances, novel issues. However, at its very heart, the issue for the Court is whether to

apply an analysis of the facts in isolation or to apply an approach that looks at the transactions at

issue in a broader sense so as to view the entire picture established by the record. How a court

applies applicable law is very often a function of how the court views facts presented.  First, the

parties ask the Court to interpret a Delaware Statute of Repose, which limits the claw-back period

to three (3) years to recover a wrongful distribution made to a Delaware LLC's members.  The

Defendants ask the Court to find that the three (3) year limitation period contained in the Delaware

Statute of Repose applies not only to claims for wrongful distribution brought by a Delaware LLC

against its own members, but also to claims asserted by creditors to recover the same distribution.

There is a dearth of authority interpreting the statute of repose as it applies to the issues before the

Court.  However, based on the Court's analysis of the statute and relevant case law, the Court finds

the Delaware Statute of Repose does not apply in the instant case.

Second, the Defendants ask this Court to find that the Trustee's pleadings fail to satisfy the

threshold requirement of setting forth a plausible basis for relief.    At the most basic level, the

Trustee's complaint is premised on the alleged illegality of the Debtors' 2006 leveraged

recapitalization.  This recapitalization was funded by more than $2 billion in loans from, among

others, Bank of America, N.A., Carlyle Capital Investment, LTD, Credit Suisse (Cayman Islands

Branch), and Goldman Sachs Credit Partners L.P.  The Defendants proffer that because the loans

were made by some of the world's most sophisticated financial institutions it is implausible to conclude those same lenders were defrauded.  Notwithstanding the Court's skepticism as to the Trustee's probability of success on the claims asserted, that is not the appropriate inquiry at this stage of the proceeding.  The Court must determine whether the Trustee has articulated more than a "sheer possibility" for obtaining the relief sought.  The Court holds the TAC clearly articulates a claim, that the parties/people in control of the Debtors engaged in a scheme to hinder, delay, and defraud the creditors/lenders that financed the Leveraged Recap Transaction by making material misstatements and omissions during the course of the Lenders' due diligence, which formed the basis for their decision to lend.  The Court is hesitant to assume that the size of an institution insulates it from being a victim of a fraud.  The Court's determination as to whether the Trustee will be able to establish that this conduct rises to the level of being violative of the law and the damages for such actions must be left to another day.

A sub-issue to the Defendants' plausibility argument concerns whether the Trustee, for his intentional fraudulent transfer claims, was required to plead that a "critical mass" of the EBG board of directors, which approved the Leveraged Recap Transaction, acted with fraudulent intent.  Judge Gerber in *Lyondell* and later Judge Sullivan in *Tribune* adopted a rule requiring that a plaintiff plead a "critical mass" acted with fraudulent intent *or otherwise explain how actors with fraudulent intent otherwise caused the disposition of property*.  On appeal to the District Court, Judge Cote reversed Judge Gerber's "critical mass" test and held the actions of the CEO alone could be imputed to the entire board of directors.  Here, the Defendants assert the "critical mass" test should be applied and therefore, the intentional fraudulent transfer claims must be dismissed because only two of the seven EBG board members allegedly acted with fraudulent intent.  Because the Court concludes that the TAC satisfies the more stringent "critical mass" test, it need not delve into the

split at the District Court level concerning the appropriate test to apply. The TAC satisfies the "critical mass" test, and by necessity Judge Cote's less stringent test for imputation to the entire board, because the Trustee has alleged *how actors with fraudulent intent otherwise caused the disposition of property.* Namely, the Trustee alleges that K Road: (i) was EBG's agent; (ii) had fraudulent intent based on various badges of fraud; and (iii) through manipulation, dominance, and control of EBG's operations, caused BosGen and EBG to incur debt under the Credit Facilities and thereafter, transfer the monies to EBG's members for no consideration.

Third, the Court must determine whether section 546(e)'s safe harbor provision applies to the transfers the Trustee seeks to avoid. In answering this question, the Court relies on the United States Supreme Court's recent decision in *Merit* and its interplay with the Second Circuit's December 2019 *Tribune* decision. More specifically, the Court's determination of whether section 546(e) applies to the transfers will focus on whether BosGen and EBG qualify as "financial institutions" by virtue of their agency relationship with "financial institutions" in connection with a securities contract. While also concluding that the additional requirements for safe harbor established in section 546(e) have been met, the Court holds that both BosGen and EBG qualify as "financial institutions" under the Bankruptcy Code.

Finally, the Defendants ask the Court to dismiss the TAC because the Lenders ratified the transfers at issue. In answering this question, the parties call upon the Court to address the split of authority on whether the ratification defense requires the Lenders' knowledge of the material facts related to the fraudulent transfer—namely, the fraud itself. In other words, does ratification require the Lenders' full knowledge of the Debtors' intent and financial condition, or, is it sufficient that the Lenders had mere knowledge of the transferees' identity and approved the transaction. The Court adopts the Material Facts Test and holds that for purposes of the instant motion the Lenders

4

cannot be found to have ratified the transfers at issue because the scope of the Lenders' knowledge

concerning the material facts of the Leveraged Recap Transaction is unclear.

A more fulsome discussion of the Court's holding follows.

## II.    Background[2]

Boston Generating LLC ("BosGen") and EBG Holdings LLC ("EBG"), both Delaware

limited liability companies, constituted with their subsidiaries "a wholesale power generation

company that own[ed] and operate[d] three electric power generating facilities located in the

Boston metropolitan area." Decl. of Jeff Hunter ¶ 6, Case No. 10-14419 (Bankr. S.D.N.Y. Aug.

18, 2010), ECF No. 2 (the "Hunter Decl."). EBG was a holding company with no significant

independent business operations and BosGen served as EBG's main operating entity. *See* Hunter

Decl. ¶ 12.

In October 2006, EBG's board of directors approved a leveraged recapitalization

transaction whereby BosGen and EBG would borrow approximately $2.1 billion from lenders for

use, in part, to fund a $925 million tender offer and the distribution of $35 million in dividends to

EBG LLC interest holders (the "Leveraged Recap Transaction"). *See* Third Amended Complaint

filed by Mark Holliday, the Liquidating Trustee of the BosGen Liquidating Trust (the "Trustee")

¶¶ 1, 27, 117, 122-25, AP Case No. 12-01879 (Bankr. S.D.N.Y. Apr. 3, 2019), ECF No. 272-1 (the

"TAC").

---

[2] The background provided herein is drawn from the TAC, the exhibits attached thereto, and the documents referenced therein, from the record of the proceedings in the Debtors' bankruptcy cases and this adversary proceeding, and from other public records. *See In re Hydrogen, L.L.C.*, 431 B.R. 337, 345 (Bankr. S.D.N.Y. 2010). On a motion brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as any "documents that are integral to the complaint" (meaning documents where "the complaint relies heavily upon its terms and effect") and any "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *In re Tribune Co. Fraudulent Conveyance Litigation*, Case No. 12-cv-2652, 2019 WL 1771786, at *5 (S.D.N.Y. Apr. 23, 2019) (internal quotation marks omitted). The Court "may also take judicial notice of relevant matters of public record." *Id.* (internal quotation marks omitted).

a. *Background of the Leveraged Recapitalization Transaction*

i. The Tender Offer

In an "Offer to Purchase," dated November 16, 2006, EBG and BosGen offered "to purchase for cash up to $925,000,000 in value of Class A and Class B units of limited liability company interests in the Company ('Units') now outstanding . . . ."[3] Decl. of Philip D. Anker, AP Case No. 12-01879 (Bankr. S.D.N.Y. July 18, 2019), ECF No. 290-1, at 1 (the "Tender Offer"). Three points are made abundantly clear in the Tender Offer that are relevant in determining the issues before the Court.

First, the Tender Offer provides that both EBG and BosGen are offering to purchase EBG member units. *See* Tender Offer, at 9 ("*We* invite our Members to tender outstanding units for purchase by *us*.") (emphasis added), 11 (". . . *we* are offering up to $925,000,000 in value of outstanding Units of the Company's membership interests . . . .") (emphasis added).

Second, EBG and BosGen condition the Tender Offer on receipt of $2.1 billion in "new financing." The Tender Offer states, the "Company [including BosGen and EBG] is negotiating with prospective lenders with respect to the New Financing." *Id.* at 23. Further, BosGen and EBG "will not be required to accept for payment, purchase or pay for any Units tendered . . . [if] any of the following events has occurred . . . : The New Financing is not consummated . . . or the Company does not receive proceeds thereof sufficient to enable the Company to carry out the Recapitalization . . . ." *Id.* at 20. According to the Tender Offer, the "New Financing" will consist of: (i) up to $1.4 billion in senior secured first lien credit facilities, (ii) up to $400 million in senior secured second lien term loan facilities, and (iii) up to $300 million in a senior unsecured term

---

[3] The Tender Offer defines the term "Company" as EBG "(together with its subsidiaries . . . ." BosGen is an EBG subsidiary and thus, the term "Company" encompasses, among other subsidiaries, both EBG and BosGen. *See* Hunter Decl. ¶ 12. Additionally, the Tender Offer provides the term "Company" may be used interchangeably with "EBG," "we," or "us."

loan facility.  *See id.* at 23.  Without all three credit facilities described above (and discussed in further detail below), the Tender Offer fails.

Finally: (i) the procedures articulated in the Tender Offer for unit redemptions, (ii) BosGen and EBG's reservation of authority to accept or reject a tendering member's units; and (iii) BosGen and EBG's agreement to pay The Bank of New York ("BONY") for its services make clear that BONY acted as a depository and agent for both BosGen and EBG in connection with the Tender Offer.  As to (i), pursuant to the Tender Offer, members tendered their units by submitting a Letter of Transmittal along with required documents to BONY no later than December 14, 2006.  *See id.* at 1, 4.  Thereafter, "[w]e [including EBG and BosGen] will pay for Units purchased pursuant to the Offer by depositing the aggregate determined purchase price for the Units *with the Depository, which will act as agent* for tendering [m]embers for the purpose of receiving payment from [EBG and BosGen] *and transmitting payments to the tendering [m]embers*."  *Id.* at 19 (emphasis added).

Thus, the Tender Offer demonstrates that both EBG and BosGen were in an agency relationship with BONY for purposes of transmitting monies to tendering EBG LLC members. On several additional occasions throughout the Tender Offer, BONY is listed as the depository for the "Company," thus lending more weight to the conclusion that BONY acted as BosGen and EBG's agent in connection with the Tender Offer.  *See id.* at 2 (noting members may direct questions or requests for assistance to BONY in connection with the Tender Offer), 6 (same), 10 (noting the "Company" will "pay the fees and expenses incurred in connection with the Offer by The Bank of New York, which is the Depository for the Offer."), 36 (noting questions concerning the Tender Offer should be directed to BONY and the Letters of Transmittal should be delivered by each EBG LLC member to BONY).

As to (ii), BosGen and EBG controlled BONY, which was acting as BosGen and EBG's agent, in connection with the Tender Offer.  The Tender Offer provides,  "[f]or purposes of the Offer, we will be deemed to have accepted  the payment (and therefore purchased) . . . Units that are validly tendered at or below the determined purchase price . . . *only when, as and if we give oral or written notice to the Depository of our acceptance of the Units for payment pursuant to the Offer*."  Tender Offer, at 19 (emphasis added).  Thus, BosGen and EBG authorized BONY to act on their behalf in connection with the Tender Offer and expressly reserved ultimate decision-making authority to determine whether to accept tendered units.  In short, the EBG LLC member tendered its unit to BONY and thereafter, BONY held the tendered unit for BosGen and EBG until BosGen and EBG instructed BONY how to proceed.

As to (iii), the Tender Offer provides that "[w]e [defined to include BosGen and EBG] have retained The Bank of New York to act as Depository in connection with this Offer.  The Depository will receive reasonable and customary compensation for its respective services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities in connection with the Offer."  Tender Offer, at 34.  Thus, the language cited from the Tender Offer in this section of the Court's opinion demonstrates that both BosGen and EBG, as BONY's customers, manifested their intent for BONY to serve as their agent in connection with a securities contract (the Tender Offer).

## ii.  The Lenders' Presentation

On December 4, 2006, BosGen presented the proposed Leveraged Recap Transaction in New York to a group of lenders.  *See* Decl. of William H. Gussman, Jr., AP Case No. 12-01879 (Bankr. S.D.N.Y. Nov. 1, 2013), ECF No. 152-4 (the "Lenders' Presentation").  The Lenders' Presentation states that "Boston Generating LLC ('BostonGen' or the 'Company') and EBG

Holding LLC ('EBG') intend to enter into $2.1. billion of credit facilities in connection with the proposed recapitalization of the Company and EBG." Lenders' Presentation, at 1. Further, prospective lenders are informed the "proceeds [from the credit facilities] will be primarily used to repay outstanding indebtedness and to purchase outstanding units of EBG Holdings pursuant to a recapitalization." *Id.* More precisely, prospective lenders are informed $1.025 billion will be used to fund "Unit Buybacks Distributions and Warrants Repurchase." *Id.* at 2. As to timing, the Lenders' Presentation called for lender commitments by December 15, 2006 and closing and funding of the credit facilities to occur on December 22, 2006. *Id.* at 35.

### iii.   The Confidential Information Memorandum

Also in December 2006 and presumably in connection with the Lenders' Presentation, Credit Suisse Securities (USA) LLC ("Credit Suisse"), as "Joint Lead Arranger" and "Joint Bookrunner," and Goldman Sachs Credit Partners L.P. ("Goldman Sachs"), as" Joint Lead Arranger" and "Joint Bookrunner," furnished a Confidential Information Memorandum to prospective lenders on behalf of BosGen and EBG in connection with the proposed Leveraged Recap Transaction. *See* Decl. of Tibor L. Nagy, Jr., AP Case No. 18-01879 (Bankr. S.D.N.Y. Nov. 1, 2013), ECF No. 155-9 (the "CIM"), at 3, 24. The CIM provides that both BosGen and EBG are effectuating the proposed Leveraged Recap Transaction for EBG to repurchase tendered LLC member units, repurchase certain warrants, and make a "distribution" payment to all EBG LLC members.

Specifically, the CIM provides that Credit Suisse and Goldman Sachs have been retained by *EBG and BosGen* to arrange $2.1 billion of credit facilities in connection with the proposed recapitalization of *EBG and BosGen*. *See id.*, at 24 (emphasis added). The CIM goes on to address how proceeds from the $2.1 billion in credit facilities will be used by BosGen and EBG and states,

> [a]s part of the proposed transaction, EBG has made a tender offer to its members . . . in which members have the opportunity to tender all or a portion of their EBG units at a price within a range of prices . . . . EBG will also repurchase from affiliates of K Road certain warrants to purchase EBG units . . . . In addition, the Company intends to make a pro rata distribution to its members prior to the purchase of units in the Tender Offer in order to simplify certain tax planning matters for members and the Company. The Company currently estimates the distribution to be $35 million.

*Id.* at 24. Finally, and consistent with the Lenders' Presentation, the CIM informs prospective lenders that $1.025 billion from the proposed Leveraged Recap Transaction will be used to fund "Unit Buyback Distribution and Warrant Repurchase." *Id.*, at 25. In short, the CIM demonstrates *both BosGen and EBG* intended for slightly more than $1 billion of the $2.1 billion in loans from the proposed credit facilities to fund, pursuant to the Tender Offer, unit redemptions, warrant redemptions, and a distribution that would be made to EBG's LLC members.

### b. BosGen and EBG Execute the Credit Facilities in Furtherance of the Leveraged Recap Transaction

In order to finance the Leveraged Recap Transaction and fund the Tender Offer, three credit facilities (the "Credit Facilities") were executed, which raised $2.1 billion for BosGen and EBG in new capital.[4] *See* TAC, ¶¶ 122-23; TAC Ex. E ($1,450,000,000 First Lien Credit and Guaranty Agreement, dated December 21, 2006, by and among BosGen as the "Borrower," the "Guarantors," the "Initial Lenders," the "Synthetic Issuing Banks," the "Fronting Bank," Credit Suisse as "First Lien Collateral Agent, Credit Suisse as "Administrative Agent," Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Co-Syndication Agents" and as "Co-Documentation Agents," and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Joint Lead Arrangers" and as "Joint Book Running Managers") (the "First

---

[4] Following execution of the Credit Facilities on December 21, 2006, the debt in the Credit Facilities was immediately syndicated and the list of initial participants in the syndication (the "Lenders") is attached to the TAC. *See* TAC, Exhibits B and C. Many of the Lenders are listed as having a New York address. Further, each of the Credit Facilities contains a New York choice of law provision.

Lien Credit Agreement")); TAC Ex. F ($350,000,000 Second Lien Credit and Guaranty Agreement, dated December 21, 2006, by and among BosGen as the "Borrower," the "Guarantors," the "Initial Lenders," Credit Suisse as "Second Lien Collateral Agent, Credit Suisse as "Administrative Agent," Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Co-Syndication Agents" and as "Co-Documentation Agents," and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Joint Lead Arrangers" and as "Joint Book Running Managers") (the "Second Lien Credit Agreement")); TAC Ex. G ($300,000,000 Credit Agreement, dated December 21, 2006, by and among EBG as the "Borrower," the "Initial Lenders," Credit Suisse as "Administrative Agent," Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Co-Syndication Agents" and as "Co-Documentation Agents," and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P. as "Joint Lead Arrangers" and as "Joint Book Running Managers") (the "Mezz Agreement")). To fund the Tender Offer for EBG member units worth up to $925 million, money infused into BosGen from the First Lien Credit Agreement and the Second Lien Credit Agreement had to be transferred to EBG—i.e., $300 million that went into EBG from the Mezz Agreement would be insufficient to meet the capital requirements for the Tender Offer.

The Credit Facilities indicate that proceeds from the First Lien Credit Agreement and the Second Lien Credit Agreement would be transferred by BosGen to EBG and used by EBG with the proceeds from the Mezz Agreement to fund the Tender Offer. The "Preliminary Statement" to the First Lien Credit Agreement provides, among other things, "the Borrower [defined as Bos Gen only, not EBG] has requested that the Lender Parties lend to the Borrower . . . to fund in part the Distribution and the Tender Offer . . ." TAC Ex. E., at 1(1) (the "First Lien Preliminary Statement"). More specifically, section 2.14 of the First Lien Credit Agreement provides:

(a) The proceeds of the Term B Loans shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to refinance all outstanding indebtedness under the Existing Credit Agreements, (ii) to provide working capital for the Loan Parties, (iii) to fund the Distribution and the Tender Offer of EBG Holdings, and (iv) pay transaction fees and expenses.

TAC Ex. E § 2.14 (the "First Lien Funding Provision," together with the First Lien Preliminary Statement, the "First Lien Funding Provisions").[5]

Similarly, the "Preliminary Statement" to the Second Lien Credit Agreement provides, among other things, "the Borrower [defined as Bos Gen only, not EBG] has requested that the Lenders lend to the Borrower . . . to fund in part the Distribution and the Tender Offer . . ." TAC Ex. F, at 1(1) (the "Second Lien Preliminary Statement"). Later, the Second Lien Credit Agreement provides:

(a) The proceeds of the Loans shall be available (and the Borrower agrees that it shall use such proceeds) solely (i) to refinance all outstanding indebtedness under the Existing Credit Agreements, (ii) to provide working capital for the Loan Parties, (iii) to fund the Distribution and the Tender Offer of EBG Holdings, and (iv) pay transaction fees and expenses.

TAC Ex. F § 2.14 (the "Second Lien Funding Provision," together with the Second Lien Preliminary Statement, the "Second Lien Funding Provisions").

---

[5] The First Lien Credit Agreement and the Second Lien Credit Agreement define "Distribution" as follows, "EBG Holdings intends to make a pro rate distribution to its unit holders, prior to the purchase of Units in the Tender Offer, in an amount of up to $40,000,000.00 to be financed in part with the proceeds from the Facilities." TAC Ex. E, at 1(4), and Ex. F, at 1(4). The Mezz Agreement defines Distribution substantially the same. *See* TAC, Ex. G, at 1(4). The term "Distribution" as defined in the Credit Facilities encompasses the Distribution (as defined below).

The First Lien Credit Agreement and the Second Lien Credit Agreement define "Tender Offer" as follows, "(a) the offer by EBG Holdings to purchase outstanding Units of limited liability company interest in EBG Holdings pursuant to the Offer to Purchase dated November 16, 2006 . . . and (b) the repurchase of warrants and the cashless exercise of warrants referred to in such Offer of Purchase." TAC Ex. E, at 34, and Ex. F, at 30. The Mezz Agreement defines Tender Offer substantially the same. *See* TAC Ex. G, at 27-28. Thus, the Tender Offer encompasses the Unit Redemptions and the Warrant Redemptions (as both terms are defined below).

12

Finally, the "Preliminary Statement" to the Mezz Agreement provides, "Simultaneously with the entering into of this Agreement, [Bos Gen] and the Guarantors . . . are entering into that certain . . . [First Lien Credit Agreement and Second Lien Credit Agreement] . . . the proceeds of which shall be used to . . . (ii) fund the Distribution and the Tender Offer . . . ." TAC Ex. G, at 1(3) (the "Mezz Preliminary Statement"). Further, the Mezz Agreement provides:

> The proceeds of the Loans shall be available (and the Borrower agrees that is shall use such proceeds) solely (i) to fund the Distribution and the Tender Offer of the Borrower, (ii) to pay transaction fees and expenses and (iii) for general corporate purposes.

TAC Ex. G § 2.13 (the "Mezz Funding Provision," together with the Mezz Preliminary Statement, the "Mezz Funding Provisions"). Thus, BosGen and EBG clearly intended for the proceeds from the Credit Facilities to be used, in part, "to fund the Distribution and the Tender Offer."

### c. The Transfers to Complete the Leveraged Recap Transaction and Thereafter, Fund: (i) the Unit Redemptions; (ii) the Warrant Redemptions; and (iii) the Distribution

The $2.1 billion cash infusion into BosGen and EBG from the Credit Facilities entered BosGen and EBG bank accounts on December 21, 2006 and thereafter, portions of those monies became the subject of: (i) a two-step intercompany transfer from BosGen to EBG; and (ii) transfers to EBG's LLC members.

### i. The Two-Step Inter-Company Transfer

The First Lien Credit Agreement and the Second Lien Credit Agreement closed on December 21, 2006 and thereafter, the Lenders transferred $1.8 billion into BosGen's account with U.S. Bank, Nation Association ("US Bank"), Account Number -1092 (the "US Bank Account"). *See* TAC ¶¶ 123-24, and Ex. H. Thereafter, on December 22, 2008, step one of the inter-company transfer occurred (the "Step One Transfer")—BosGen caused US Bank to transfer $707,967,367.00 (the "$708 Million") from the US Bank Account to EBG's account with Bank of

13

America ("BoA"), Account Number -3956 (the "BoA Account"). *See id.* ¶ 124, and Ex. H. Step-two of the inter-company transfer occurred sometime between December 22, 2006 and December 28, 2006—EBG caused the $708 Million in the BoA Account to be transferred (the "First BONY Transfer," together with the Step One Transfer, the "BosGen Transfer") to EBG's account with BONY, Account Number -1363 (the "BONY Account"). *See id.* ¶¶ 124-25, and Ex. H. Neither the Trustee's nor the Defendants' papers state the exact date the First BONY Transfer occurred.

### ii. The Funds Flow Memorandum

BosGen delivered the "Closing Date Funds Flow Memorandum," to US Bank on December 21, 2006 wherein BosGen authorizes US Bank to act as its agent in connection with: (i) the receipt of funds from the Lenders pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement; and (ii) the BosGen Transfer. *See* TAC Ex. H (the "FFM") (Instructional Letter introducing the FFM).

As evidence of an agency relationship between BosGen and US Bank, the FFM provides "the deposits listed on the third page . . . of the FFM will be transferred to the Depository [US Bank] on the Closing Date." *Id.* at 1(i). Thereafter, the "disbursements listed on the third page of the FFM will be disbursed by the Depository on the Closing Date . . . ." *Id.* at 2(ii). The FFM goes on to state, "[t]he Depository [US Bank] is hereby authorized and instructed to accept such deposits and to make such allocations, transfers and payments in accordance with the FFM." *See id.* at 2.

Pursuant to the FFM, US Bank initiated the BosGen Transfer on BosGen's behalf in connection with the Tender Offer to fund unit redemptions, warrant redemptions, and a distribution. The FFM demonstrates US Bank sent the $708 Million, on behalf of BosGen, from the US Bank Account to EBG's BoA Account and that those funds would be used for

14

"Distribution, Unit Buyback and Warrant Repurchases," along with "Transaction Fees and Expenses." FFM, at 503. Thus, US Bank served as BosGen's agent for the BosGen Transfer, which the FFM demonstrates was an upstream transfer of monies to EBG in connection with the Tender Offer to fund unit redemptions, warrant redemptions, and a distribution.

### iii.    The $300 Million Infusion into EBG Pursuant to the Mezz Agreement

The Mezz Agreement closed on December 21, 2006 and thereafter, the Lenders transferred $300 million (the "$300 Million") into EBG's BoA Account. *See id.* ¶¶ 125-26, and Ex. H. EBG then caused the $300 Million to be transferred from the BoA Account to the BONY Account (the "Second BONY Transfer"). *See id.* Neither the Trustee's nor the Defendants' papers state the exact date the Second BONY Transfer occurred.

Following the First BONY Transfer and the Second BONY Transfer, the BONY Account held approximately $1.08 billion from the Credit Facilities, which as discussed below, EBG used in connection with the Tender Offer to fund the Unit Redemptions, the Warrant Redemptions, and the Distribution (the preceding three capitalized terms are defined below). *See id.* ¶ 125.

### iv.    The EBG Transfers to its LLC Members

On December 26, 2006 and December 28, 2006, EBG caused BONY to disburse from the BONY Account to EBG's LLC members more than $1 billion (the "EBG Transfers"), "consisting of the $708 million that BostonGen had transferred to it, the $300 million of Mezzanine Debt, and certain of its own cash . . . ." *Id.* The EBG Transfers by BONY on EBG's behalf to EBG's LLC members was composed of the following: (i) $34,996,291.24 as a dividend to EBG members' equity interests (the "Distribution"); (ii) $925,017,940 to redeem EBG's members' equity units pursuant to the Tender Offer (the "Unit Redemptions"); and (iii) $50,359,12713 to redeem warrants held by K Road (the "Warrant Redemptions"). *See id.*

### d. BosGen's Chapter 11 Cases

More than three and a half years after the Credit Facilities closed and EBG made the Unit Redemptions, the Warrant Redemptions, and the Distribution, on August 18, 2010, each of the Debtors in the above-captioned chapter 11 cases filed voluntary petitions for relief under title 11 of the United State Code (the "Bankruptcy Code").  On November 24, 2010, the Court entered an Order authorizing the sale of substantially all of the Debtors' operating assets to Constellation Holdings, Inc. or its nominee (the "Sale").  *See* Sale Order, Case No. 10-14419 (Bankr. S.D.N.Y. Nov. 14, 2010), ECF No. 494.  Proceeds from the Sale funded the Debtors' liquidating plan.

### i.  Chapter 11 Confirmed Plan

A liquidating plan was subsequently confirmed, under which the Lenders pursuant to the First Lien Credit Agreement received $1,005,902,449.94 of the sale proceeds in satisfaction of virtually all of their claims.  *See* Disclosure Statement § III.F., at 27, Case No. 10-14419 (Bankr. S.D.N.Y. July 20, 2011), ECF No. 868 (the "Disclosure Statement"); *see also* First Mod. to Second Am. Joint Plan of Liquidation § 502, Case No. 10-14419 (Bankr. S.D.N.Y. Aug. 26, 2011), ECF No. 904 (confirmed Aug. 31, 2011 (ECF No. 915)) (the "Plan").  The Debtors' estates were substantively consolidated pursuant to the Plan.  *See id.*

 The Lenders pursuant to the First Lien Credit Agreement were left with a deficiency claim of $25,000,000.  The Lenders pursuant to the Second Lien Credit Agreement received no proceeds directly from the sale; they were granted an unsecured claim in the amount of $346,500,000. *See, e.g.*, Disclosure Statement § I.A, at 6, 9-10 n.8; Plan § 3.02.3.  The Lenders pursuant to the Mezz Agreement also received an unsecured claim in the amount of $426,911,567.  *See* Disclosure Statement §§ I.A, at 9-10 n.8, III.F.  All three tranches of the Lenders voted to accept the Plan.

16

*See* Decl. of Jeffrey S. Stein ¶¶ 3, 14, Case No. 10-14419 (Bankr. S.D.N.Y. Aug. 24, 2011), ECF No. 898.

### ii.  Liquidating Trust Created

The Plan created a liquidating trust to pursue claims on behalf of the Debtors' general unsecured creditors (the "Trust").  *See* Plan §§ 7.02, 8.01.  Those creditors, whose claims are classified in Class 4B of the Plan, consist almost entirely of the Lenders who financed the Leveraged Recap Transaction.  The Disclosure Statement estimates that there are $820,571,000 in Class 4B general unsecured claims, consisting of (1) the Lenders' $25,000,000 deficiency pursuant to the First Lien Credit Agreement, (2) the Lenders' $346,500,000 claim pursuant to the Second Lien Credit Agreement, (3) the Lenders' $426,911,567 claim pursuant to the Mezz Agreement, and (4) miscellaneous other claims totaling approximately $22 million.  *See* Disclosure Statement § I.A., at 9-10, n.8.

The Trust's assets include (1) all of the Debtors' causes of action and (2) causes of action, if any, of Class 4B claim holders to the extent those creditors purported to assign those causes of action to the Trust.  The Trustee abandoned all of the Debtors' causes of action.  *See* TAC ¶ 63. The Trustee asserts that all Class 4B holders, in fact, assigned all of their causes of action related to the Leveraged Recap Transaction to the Trust.  *See id.* ¶¶ 4, 61; *see also* Plan § 7.02.  Any proceeds recovered in this action (net of the Trust's costs and the Trustee's and his counsel's fees) will be distributed to the holders of Class 4B claims under the Plan—i.e., overwhelmingly to the Lenders who financed the Credit Facilities for the Leveraged Recap Transaction.

### iii.  Liquidating Trustee Appointed and Procedural History of this Adversary Proceeding

Craig R. Jalbert ("Jalbert"), the first liquidating trustee appointed pursuant to the Plan and the Trust, commenced the above-captioned adversary proceeding on August 17, 2012. Mark

17

Holliday succeeded Jalbert as the Trustee and on August 1, 2013 amended Jalbert's original complaint. *See* Am. Compl., AP Case No. 12-01879 (Bankr. S.D.N.Y. Aug. 1, 2013), ECF No. 96 (the "Amended Complaint"). The Amended Complaint asserted six causes of action to avoid and recover the Unit Redemptions, the Warrant Redemptions, and the Distribution that the Defendants received as a result of, or in exchange for, their membership interests in EBG. *See id.* The Trustee then sought leave to file a Second Amended Complaint, purportedly to address arguments raised in Defendants' motions to dismiss, but the Court did not grant permission for the filing. *See* AP Case No. 12-01879 (Bankr. S.D.N.Y. Jan. 10, 2014), ECF Nos. 181, Ex. 1, and (Bankr. S.D.N.Y. May 27, 2012), ECF No. 212, at 276:13-20. When the Trustee retained new counsel in March 2019, counsel sought leave to file the TAC. *See* Mot. to Amend and File Third Am. Compl., AP Case No. 12-01879 (Bankr. S.D.N.Y. Apr. 3, 2019), ECF No. 272 (the "Motion for Leave"). The Defendants consented to the Trustee filing the TAC so they could move to dismiss on the merits. *See* Defendants.' Consent to Relief Requested in Motion for Leave, AP Case No. 12-01879 (Bankr. S.D.N.Y. Apr. 23, 2019), ECF No. 277. Whereas the complaints filed prior to the TAC treated the BosGen Transfer and the EBG Transfers together, the Trustee now seeks to avoid as intentional and constructive fraudulent conveyances what he characterizes as two "sets" of transfers: an "initial transfer" of the $708 Million from BosGen to EBG, and the "subsequent transfer" of those and additional funds from EBG to its members.

## III.    Summary of the TAC[6]

The Trustee initiated this adversary proceeding asserting the claims of individual creditors that were assigned to the Trust pursuant to the Plan. *See* TAC ¶ 63. Such creditors include (a) the Lenders, and (b) all other general unsecured creditors of the Debtors (the "Other General Claimants"). *See id.* Upon intentional and constructive fraudulent transfer theories pursuant to the New York Debtor & Creditor Law (the "DCL") and under the theory of unjust enrichment, the Trustee seeks to recover from the defendants in the above-captioned adversary proceeding (the "Defendants")[7] the BosGen Transfer and the EBG Transfers. *See* TAC ¶¶ 146-154 (Count I: asserting intentional fraudulent conveyance claims against the Defendants on behalf of EBG's creditors to avoid and recover the Unit Redemptions, the Warrant Redemptions, and the Distribution pursuant to sections 276 and 278 of the DCL), ¶¶ 155-164 (Count II: asserting an intentional fraudulent conveyance claim against the Defendants on behalf of BosGen's creditors to avoid and recover the BosGen Transfer pursuant to sections 276 and 278 of the DCL), ¶¶ 165-175 (Count III: asserting constructive fraudulent conveyance claims against the Defendants on behalf of EBG's creditors to avoid and recover the Unit Redemptions, the Warrant Redemptions, and the Distribution pursuant to sections 273-75, and 278 of the DCL), ¶¶ 176-186 (Count IV: asserting a constructive fraudulent conveyance claim against the Defendants on behalf of BosGen's creditors to avoid and recover the BosGen Transfer pursuant to sections 273-75, and 278 of the DCL), ¶¶ 187-196 (Count V: asserting an unjust enrichment claim against the Defendants on behalf of both BosGen and EBG's creditors for recovery of the BosGen Transfer, the Unit Redemptions, the Warrant Redemptions, and the Distribution).

---

[6] Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the TAC.
[7] The TAC more specifically defines the Defendants to be those "who or that received a transfer or distribution pursuant to the Leveraged Recap Transaction and list the Defendants in Ex. A. The list of defendants in Ex. A to the TAC is incorporated herein into the definition of the "Defendants."

In support of Counts I through V, the Trustee alleges two entities separate and apart from BosGen and EBG, K Road and Harbinger, by and through their officers and employees, assumed control of BosGen and EBG in October 2005 and devised a scheme to defraud the Lenders into entering the Credit Facilities to BosGen and EBG's peril. *See* TAC ¶¶ 66-84. According to the TAC, as a merchant seller of electricity, BosGen was subject to various market forces, and by early 2006, those forces, coupled with the expiration of contracts granting BosGen favorable energy prices, signaled a dismal future for the Debtors. *See id.* ¶¶ 1, 86. Thus, by mid-2006, K Road and Harbinger allegedly schemed to sell their EBG LLC member interests before the electricity market collapsed. *See id.* ¶¶ 78-79. According to the Trustee, realizing that a sale or initial public offering would reveal the impending crisis, K Road created two sets of books for the Debtors. *See id.* ¶¶ 1, 80–81. Then, K Road used the false set's inflated figures along with baseless projections to lure banks into funding the Leveraged Recap Transaction that would allow it, Harbinger, and EBG's other owners to sell their EBG LLC member interests back to EBG and leave the Lenders holding the proverbial bag. *See id.* ¶¶ 1–3, 81, 83–93, 99.

At various instances in the TAC, the Trustee alleges the Lenders were misled regarding the risk profile, expected performance, and solvency of BosGen and EBG. *See id.* ¶¶ 85–102, 114–16, 138, 145. As a result, the Lenders were allegedly defrauded out of $2.1 billion in cash that they transferred to BosGen and EBG. *See id.* ¶¶ 122–23, Ex. H at 503, 504. Approximately $1.8 billion of the Lenders' money went to BosGen via the First Lien Credit Agreement and the Second Lien Credit Agreement and thereafter, the BosGen Transfer of the $708 Million from its US Bank Account to EBG's BoA Account occurred. *See* TAC ¶¶ 122–23. The Trustee alleges the BosGen Transfer left BosGen: (i) balance sheet insolvent by at least $535 million, *see* TAC ¶ 129, (ii) with unreasonably small capital because it had no prospect of servicing its debts while also maintaining

20

its operations, s*ee* TAC ¶¶ 136–38. and (iii) with no chance of paying those debts as they came due.  *See id*. ¶¶ 143–45.

According to the Trustee, EBG used proceeds from the BosGen Transfer, together with the $300 Million from the Mezz Agreement, to fund the Tender Offer to its unit holders.  *See id.* ¶¶ 125–26.  Following the First BONY Transfer and the Second BONY Transfer, EBG had BONY effectuate the Unit Redemptions to the Defendants, which the Trustee alleges, left EBG hopelessly insolvent.  *See id.* ¶¶ 125-26,129-133, 136-145, Ex. H at 503, 506.  Further, the Trustee asserts EBG added to its insolvency woes by making the Distribution and effectuating the Warrant Redemptions.  *See id.* ¶ 125, Ex. H at 506.

Allegedly, the Step One Transfer[8] and EBG Transfers are rife with badges of fraud too. *See* TAC ¶¶ 124–25, 152, 162.  Each transfer purportedly rendered the transferor insolvent, stripped it of liquidity, and transferred the financial risk from the equity holders to the creditors without their informed consent.  Plus, neither BosGen nor EBG received any value or consideration in exchange for the BosGen Transfer and/or the EBG Transfers.  And the only reason that either transferor had the ability to make the conveyances was because of the fraud that they— via the K Road Insiders—had committed against the Lenders.  *See id.* ¶¶ 152, 162.

Three and a half years following the BosGen Transfer and the EBG Transfers, the Debtors collapsed.  According to the Trustee, the Debtors' demise was only briefly delayed by virtue of a merger in 2007 with another compay.  *See id.* ¶ 134.  The Trustee claims that once BosGen and EBG's new owner realized the false assumptions built into K Road's projections, BosGen and EBG were spun off and placed into bankruptcy before this Court.  *See id*. ¶ 135.  Following these

---

[8] The Trustee asks the Court to look only at the Step One Transfer to determine whether the $708 Million left BosGen fraudulently under the DCL.  According to the Trustee, the Court must examine the Step One Transfer as an isolated transaction without regard to the overarching transaction concerning the $708 Million, which is the BosGen Transfer that ultimately came to rest in the BONY Account.

allegations, the Defendants moved to dismiss the TAC on various grounds.  *See* Mem. of Law in Supp. of Motion to Dismiss Third Am. Compl., AP Case No. 12-01879 (Bankr. S.D.N.Y. July 18, 2019), ECF No. 289 (the "MTD").

IV.    **Summary of the MTD, the Trustee's Opposition, Defendants' Reply, and Supplemental Filings**

   *a.  The MTD*

Pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6) as incorporated into this proceeding by Fed. R. Bankr. P. 7008, 7009, and 7012, the Defendants moved to dismiss the TAC.  The MTD asserts seven (7) grounds exist to dismiss all, or a portion, of the TAC.

First, the Defendants insist the Trustee's claims are implausible and not plead with sufficient particularity.  Namely, the Defendants argue the TAC states claims for fraud on behalf of the Lenders challenging the Leveraged Recap Transaction and it's implausible fraud existed in securing the loans for the Leveraged Recap Transaction because (i) some of the world's most sophisticated lenders financed the transaction, and (ii) the Credit Facilities expressly disclosed and required the Debtors to use the loan proceeds in connection with the Tender Offer to fund the Unit Redemptions, the Warrant Redemptions, and the Distribution.  Based on the implausibility of a fraud where sophisticated lenders were involved and the Debtors' full disclosure as to the use of the funds from the Credit Facilities, along with the failure to plead with particularity, the Defendants request dismissal of the TAC.

Second, the Defendants assert the Trustee's claims are time barred.  The Trustee's claims seek to avoid and recover distributions made by two Delaware limited liability companies in December 2006 to their members.  According to the Defendants, the Delaware Code contains a

12-01879-rg    Doc 314    Filed 06/18/20    Entered 06/18/20 11:55:36    Main Document
Pg 23 of 82

statute of repose applicable here that, after three years, extinguishes an LLC member's liability for distributions from the company and thus, the Trustee's claims must be dismissed as time barred.

Third, the Trustee's claims are not subject to avoidance and are "safe-harbored" pursuant to section 546(e) of the Bankruptcy Code. The Defendants contend the BosGen Transfer and the EBG Transfers qualified as "settlement payments" and/or payments "in connection with a securities contract" by or to a financial institution and thus, the TAC must be dismissed.

Fourth, the unjust enrichment claims against the Defendants should be dismissed because, in addition to being "safe-harbored," the Trustee's claim fails as a matter of New York state law.

Fifth, the Trustee's claims on behalf of the Lenders should be dismissed because the Lenders consented to and ratified the Unit Redemptions, the Warrant Redemptions, and the Distribution. Based on the Lenders' ratification, the TAC should be dismissed.

Sixth, the Trustee failed to adequately plead claims for intentional fraudulent conveyance. More specifically, the Defendants assert the Trustee was required to allege that a "critical mass" of the EBG board of directors acted with fraudulent intent when they approved the Leveraged Recap Transaction. The Trustee plead no such "critical mass" and thus, the TAC must be dismissed.

Finally, the TAC must be dismissed as to some of the Defendants because they are corporate entities that are no longer in existence and are not amenable to suit.

###### b. The Trustee's Opposition

On August 30, 2019, the Trustee filed his opposition to the MTD. *See* Memo of Law in Opposition to Motion to Dismiss TAC, AP Case No. 12-01879 (Bankr. S.D.N.Y. Aug. 30, 2019), ECF No. 291 (the "Opposition"). The Opposition challenges the entirety of the Defendants' arguments in the MTD.

First, the Trustee believes his state law fraudulent-transfer claims are well plead. Namely, the Trustee asserts claims under New York law against entities that received, directly and indirectly, almost $1 billion in cash from BosGen and EBG while providing no consideration in return. The gravamen of the complaint is that the parties in control of BosGen and EBG—K Road and Harbinger, among others—engaged in a scheme to hinder, delay, and defraud the Lenders and these insiders alone received a windfall of hundreds of millions of dollars while simultaneously placing BosGen and EBG on a foreseeable path to bankruptcy.

Second, the Trustee asserts his claims are not time-barred. According to the Trustee, this action was brought within New York's applicable six-year statute of limitations for DCL claims and the Defendants cite no authority supporting the application of any foreign law to the Trustee's New York claims—including the inapplicable Delaware statute of repose.

Third, the Trustee asserts section 546(e) of the Bankruptcy Code does not preempt the Trustee's state-law claims and thus, it is irrelevant whether sections 546(e)'s requirements are met here. In the event section 546(e) preempts the Trustee's state-law fraudulent transfer claims, the Trustee asserts sections 546(e)'s requirements are not met. Namely, there is no (i) transfer by, or to (or for the benefit of) a "financial institution," (ii) "settlement payment," and/or (iii) transfer "in connection with a securities contract."

Fourth, the Trustee contends the Defendants' ratification argument also fails. The Lenders did not "ratify" the fraudulent transfers, and certainly did not do so as a matter of law.

Finally, the Trustee makes the conclusory assertion that the "Defendants' remaining arguments are also without merit" and requests "this Court deny Defendants' motion in its entirety." *See* Opposition, at 4, 48-49.

*c. The Defendants Reply to the Opposition and Supplemental Filings*

On September 27, 2019, the Defendant filed their reply to the Opposition. *See* Reply Memo of Law in Supp. of Motion to Dismiss TAC, AP Case No. 12-01879 (Bankr. S.D.N.Y. Sept. 27, 2019), ECF No. 293 (the "Reply"). The Reply reasserts that: (i) Delaware's three-year statute of repose applies to the Trustee's claims; (ii) the claims are not well-plead; (iii) section 546(e) preempts the TAC's state-law claims; and (iv) the Lenders' ratified the transfers at issue.

Following the end of briefing, the Defendants and the Trustee filed a total of three (3) letters on the docket. From the Defendants, the first letter brought an additional statutory provision related to Delaware's three-year statute of repose to the Court attention, which the Defendants claim is dispositive in their favor. *See* Letter to Judge Lane, AP Case No. 12-01879 (Bankr. S.D.N.Y. Dec. 16, 2019), ECF No. 299 (the "First Letter"). Four-days later, the Trustee filed the second letter responding to the substance of the First Letter. *See* Letter to Judge Lane, AP Case No. 12-01879 (Bankr. S.D.N.Y. Dec. 23, 2019), ECF No. 302 (the "Second Letter"). Finally, the Defendants filed a third letter bringing to the Court's attention the recent decision issued by the United States Court of Appeals for the Second Circuit (the "Second Circuit") in *Tribune*. *See* Letter to Judge Lane, AP Case No. 12-01879 (Bankr. S.D.N.Y. Dec. 24, 2019), ECF No. 303 (the "Third Letter").

*d. Oral Argument*

On February 24, 2020, Judge Lane heard arguments in connection with the MTD, the Opposition, the Reply, the First Letter, the Second Letter, and the Third Letter. *See* Hr'g Tr., AP Case No. 12-01879 (Bankr. S.D.N.Y. Feb. 24, 2020), ECF No. 309. On April 25, 2020, the Clerk of the Court reassigned this adversary proceeding to this Court. *See* Notice of Reassignment, AP Case No. 12-01879 (Bankr. S.D.N.Y. Apr. 25, 2020), ECF No. 310. This Court conducted a status

conference in this matter on May 19, 2020 at which time the Court heard further arguments in connection with the MTD, the Opposition, the Reply, the First Letter, the Second Letter, and the Third Letter. *See* Hr'g Tr., AP Case No. 12-01879 (Bankr. S.D.N.Y. May 19, 2020), ECF No. 313 (the "May Transcript"). The decision below follows.

## V.    Timeliness of the Trustee's Claims

Before the TAC's substantive allegations are examined, the Court must determine whether the Trustee's claims are timely. The Court holds the Trustee's claims for intentional and constructively fraudulent transfers pursuant to the DCL were timely filed. However, the Trustee's claim for unjust enrichment under New York state-law is time barred.

### a.    Applicable Statutory Provisions

Both BosGen and EBG are Delaware limited liability companies. By statute, Delaware shortens the limitations period to three-years for actions brought by Delaware LLC's to recover money distributed to its LLC members. Specifically, Delaware law provides:

> (c) Unless otherwise agreed, a member who receives a distribution from a limited liability company shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3-year period and an adjudication of liability against such member is made in the said action.

Del. Code Ann. tit. 6, § 18-607(c) (the "Delaware Statute of Repose").[9]

---

[9] To provide context for the Delaware Statute of Repose, the two preceding sub-paragraphs provide as follows:

> (a) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of that property exceeds that liability. For purposes of this subsection (a), the term "distribution" shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program.

Similarly, New York has its own statute of repose governing transfers by a New York LLC to its LLC members. The New York Limited Liability Company Law (the "NYLLCL") provides:

> (c)  Unless otherwise agreed, a member who receives a wrongful distribution from a limited liability company shall have no liability under this article or other applicable law for the amount of the distribution after the expiration of three years from the date of the distribution.

NYLLCL § 508(c) (the "NY Statute of Repose")[10].

Finally, the NYLLCL contains a provision addressing the proper forum's law to apply when a foreign LLC's members are sued in a New York court for return of a distribution.  The NYLLCL provides:

_____

> (b)  A member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution. A member who receives a distribution in violation of subsection (a) of this section, and who did not know at the time of the distribution that the distribution violated subsection (a) of this section, shall not be liable for the amount of the distribution. Subject to subsection (c) of this section, this subsection shall not affect any obligation or liability of a member under an agreement or other applicable law for the amount of a distribution.

Del. Code Ann. tit. 6, §§ 18-607(a)-(b).

[10] To provide context for the NY Statute of Repose, the two preceding sub-paragraphs provide as follows:

> (a)  A limited liability company shall not make a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their membership interests and liabilities for which recourse of creditors is limited to specified property of the limited liability company, exceed the fair market value of the assets of the limited liability company, except that the fair market value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of such property exceeds such liability.

> (b)  A member who receives a distribution in violation of subdivision (a) of this section, and who knew at the time of distribution that the distribution violated subdivision (a) of this section, shall be liable to the limited liability company for the amount of the distribution.   A member who receives a distribution in violation of subdivision (a) of this section, and who did not know at the time of the distribution that the distribution violated subdivision (a) of this section, shall not be liable for the amount of the distribution.   Subject to subdivision (c) of this section, this subdivision shall not affect any obligation or liability of a member under the operating agreement or other applicable law for the amount of a distribution.

NYLLCL §§ 508(a)-(b).

(a)  the laws of the jurisdiction under which a foreign limited liability company is
formed govern its organization and internal affairs *and the liability of its members
and managers*; and

(b)  a foreign limited liability company may not be denied a certificate of authority
by reason of any difference between such laws and the laws of this state.

NYLLCL § 801 (emphasis added) (the "NY Foreign LLC Law").

### b.    Whether the Trustee's DCL Claims are Time-Barred

Claims brought pursuant to the DCL are subject to a six-year statute of limitations.  *See*

N.Y. Civ. Practice Law & R. ("NYCPLR") § 213(8); *In re Bernard L. Madoff Inv. Securities, LLC*,

458 B.R. 87, 109 (Bankr. S.D.N.Y. 2011) (applying six-year statute of limitations to DCL claims).

The BosGen Transfer and EBF Transfers occurred in December 2006 and the Trustee brought this

action in August 2012.  Thus, the Trustee's DCL claims are timely under New York's six-year

limitation period unless another applicable law, such as the Delaware Statute of Repose, applies

to shorten the limitations period.  The Defendants ask the Court to hold that the Delaware Statute

of Repose: (i) applies to suits brought by creditors to recover a Delaware LLC's member

distributions; and (ii) trumps New York's six-year limitation period for DCL claims.  In contrast,

the Trustee asks the Court to hold that: (i) the Delaware Statute of Repose does not apply to creditor

suits to recover a Delaware LLC's distribution to its members, leaving the Court to apply New

York's six-year limitations period for DCL claims; and (ii) even if the Delaware Statute of Repose

could be applied to creditor suits against a Delaware LLC's members, it should give way to New

York law and its six-year limitations period because New York has a greater interest in seeing its

law applied in this proceeding.  After evaluating how another jurisdiction has interpreted the

Delaware Statute of Repose and analyzing the interpretation New York courts have ascribed to the

virtually identical NY Statute of Repose, the Court concludes the Delaware Statute of Repose does

not apply to creditor suits brought to recover a Delaware LLC's distribution to its members. Therefore, New York's six-year limitations period for DCL claims governs.

i. New York's Choice of Law Standard

Here, New York's choice-of-law rules govern because a federal court exercising bankruptcy jurisdiction must apply the conflict of laws rules of the state in which the federal court sits to determine the applicable limitations period for fraudulent transfer claims. *See Bianco v. Erkins (In re Gaston v. Snow)*, 243 F.3d 599, 605-07 (2d Cir. 2001). The first step of New York's choice-of-law rules is to determine whether there is an actual conflict between the laws of the jurisdictions involved. *See Drenis v. Haligiannis,* 452 F. Supp.2d 418, 426 (S.D.N.Y. 2006). New York law applies when no jurisdictional conflict exists. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) (holding the Court will dispense with a choice of law analysis when there is no conflict). If a jurisdictional conflict does exist, New York courts will apply the law of the state with the greatest interest. *See id*. at 12-13.

First, the Court must determine whether the Delaware Statute of Repose applies to creditor suits, thus potentially shortening the limitations period to three-years for the Trustee's DCL claims and creating a conflict between New York and Delaware substantive law.[11] Second, only if the Delaware Statute of Repose can be applied to creditor suits against a Delaware LLC's members, will the Court then engage in the "interest analysis" to resolve whether Delaware or New York has the greater interest in seeing its law applied. Because the Delaware Statute of Repose does not

---

[11] To be sure, the Delaware Statute of Repose is more than a procedural limitations period. In *Vivaro Corp.*, this Court addressed whether the NY Statute of Repose overtook the six year limitations period for DCL claims and held the New York "statute of repose overrides the six year statute of limitations normally applied to NYDCL fraudulent conveyance claims, provided that the transfers at issue were in fact distributions made by the *LLC to LLC members.*" *In re Vivaro Corp.*, 524 B.R. 536, 548 (Bankr. S.D.N.Y. 2015) (emphasis added). Here, the Delaware Statute of Repose, were it applicable to creditor suits, would not automatically override the DCL's six-year limitations period. Were the Delaware Statute of Repose applicable to creditor suits, it would lead to the "interest analysis" referenced above.

apply to creditor suits, there is no conflict of law present and the Court need not delve into which jurisdiction has the greatest interest in seeing its law applied.

ii.  The NY Foreign LLC Law

Reading their papers, the Trustee and the Defendants take divergent paths at the outset applying New York law.  According to the Defendants, the NY Foreign LLC Law applies, it directs the Court to the Delaware Statute of Repose, which also applies, and therefore the Trustee's DCL claims are time barred.  The Trustee argues, the NY Foreign LLC Law does not apply to fraudulent conveyance claims (only to claims regarding the LLC's internal affairs).  Further, the Trustee posits that even if the NY Foreign LLC law applies here, the Delaware Statute of Repose is inapplicable to creditor suits thus leaving the Court to apply New York's six-year limitations period for DCL claims.  Step one of the analysis must be whether the NY Foreign LLC Law applies only narrowly to claims involving an LLC's internal affairs or whether it applies more broadly to fraudulent conveyance claims against a foreign LLC's members.

The Court holds the NY Foreign LLC Law applies broadly to fraudulent conveyance claims against a foreign LLC's members.  The NY Foreign LLC Law's coverage is not limited by its terms to claims among and between the LLC and its members, or stated another way, the LLC's internal affairs.  *See Treeline 1 OCR, LLC v. Nassau Cty. Indus. Dev. Agency*¸918 N.Y.S.2d 128, 131 (2d Dep't 2011) (applying Texas law to claims against a Texas LLC for damage to real property pursuant to the NY Foreign LLC Law).  The NY Foreign LLC Law governs "the liability of its members and managers" *without any limitation*.  *See id.*  The Trustee argues the NY Foreign LLC Law codifies the common law internal affairs doctrine and must therefore be interpreted restrictively to apply only to the LLC's internal affairs.  The Court will not ascribe this restrictive reading to the NY Foreign LLC Law based on the plain language of the statute and Appellate

30

Division, Second Department's decision in *Treeline 1 OCR, LLC*.  Because the Court holds the

NY Foreign LLC Law applies to fraudulent conveyance claims against a foreign LLC's members,

the Court proceeds to step two of the analysis addressing whether the Delaware Statute of Repose

applies to *creditor* suits against a Delaware LLC's members.[12]

### iii.   Whether the Delaware Statute of Repose Applies to Creditor Claims

#### 1.   The Plan Language of the Delaware Statute of Repose Demonstrates It Does Not Apply to Creditor Claims

The Court holds that the Delaware Statute of Repose does not apply to suits brought by a

liquidating trustee standing in the shoes of creditors, not the debtor, seeking to recover a Delaware

LLC's member distributions.  The Court could not locate decisive authority from a Delaware court

addressing whether the Delaware Statute of Repose applies to creditor claims, though one

Delaware Court has intimated it does not.  *See Pepsi-Col Bottling Co. of Md. v. Handy*, Case No.

1973-S, 2000 WL 364199, at *5 (Del. Ch. March 15, 2000) ("The defendants, however, give a far

more expansive reading to § 18-607 than its language warrants. They claim that the statute shields

---

[12] The Court holds the Delaware Statute of Repose does not apply to creditor suits and therefore, the conflict of law inquiry ends.  Had the Court determined the Delaware Statute of Repose applied to creditor suits, an interest analysis would have been required to determine which jurisdiction has the greater interest in having its law applied here.  Where a conflict of laws exists in tort actions, New York's choice-of-law rules use an "interest analysis" that applies the laws of the jurisdiction with the greatest interest in the application of its law "based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'relate to the purpose of the particular law in conflict.'"  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc. of Am. Secs., LLC*, 446 F.Supp.2d 163, 192 (S.D.N.Y. 2006) (internal citations omitted); *see AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269–70 (2d Cir. 1992); *Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech., Ltd.*, Case No. 94-civ- 5620, 1999 WL 64283, at *5 (S.D.N.Y. Feb. 8, 1999). "When the law is one which regulates conduct, such as fraudulent conveyance statutes, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders," *Pension Comm. of Univ. of Montreal*, 446 F.Supp.2d at 192 (internal quotations and citations omitted), "and parties engaging in those activities would have a reasonable expectation that their activities would be governed by the law of the state in which they are located and reside." *GFL Advantage Fund Ltd. Colkitt*, Case No. 03-civ-1256, 2003 WL 21459716, at *3 (S.D.N.Y. June 24, 2003).  The Trustee contends New York has the greatest interest in seeing its law applied to this dispute because, among other things: (i) BosGen and EBG both had their principle places of business in the New York at the time of the transfers; (ii) K Road allegedly in New York directed the transfers; (iii) the Lenders' presentation occurred in New York; (iv) the majority of the Lenders were based in New York; and (v) the Credit Facilities provided they by New York law.  *See* TAC ¶¶ 5-6, 8-15, 205-06, Ex. B (list of lenders); Ex. E § 9.17, Ex. F § 9.16, Ex. G § 8.12.  Were there a conflict of laws present, the Court expresses no opinion on how it might have decided which jurisdiction has the greater interest in seeing its law applied.

LLC members against *any* other claims against them, *i.e.,* against *all* claims except those that arise under § 18-607. Nothing in § 18-607 so provides."). With this backdrop, the Court will endeavor to determine, based on Delaware's rules for statutory construction, whether the Delaware Statute of Repose applies to the Trustee's claims.

When interpreting a state's statute, a federal court must employ that state's statutory construction principles. *See Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 507 (7th Cir. 1998). The primary rule of statutory construction requires this Court to ascertain and effectuate the Delaware legislature's intent. *See In re Adoption of Swanson*, 623 A.2d 1095, 1096 (Del. 1993). Where a statute "is unambiguous and there is no reasonable doubt as to the meanings of the words used, the court's role is limited to an application of the literal meaning of those words." *Id.* at 1096–97.

The Court finds the Delaware Statute of Repose's interpretation by the United States District Court for the Southern District of Illinois in *A Communication Co. v. Bonutti* persuasive. There, Judge Gilbert addressed whether the Delaware Statute of Repose applied to creditor breach of fiduciary duty claims against a Delaware LLC's members and held:

> When the Court reads subsection (c) in context and views it in its place in the statutory scheme, the Court is further convinced that Delaware's legislature intended subsection (c) to modify the liability set forth in subsection (a) and (b) of Section 18–607. Under statutory construction principles, 'words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' Section 18–607 contains three subsections and *sets forth limitations on distributions from a limited liability company to a member. . . .*

*A Communications Co. v. Bonutti*, 55 F. Supp.3d 1119, 1126-27 (S.D. Ill. 2014) (emphasis added) (internal citations omitted). The Court adopts Judge Gilbert's reasoning and concludes the correct interpretation of the Delaware Statute of Repose is that it modifies the liability of LLC members *to the LLC* under sections 18-607(a)-(b) of title 6 of the Delaware Code. Thus, in this Court's

view, the Delaware Statute of Repose does not apply to creditor claims against a Delaware LLC's members. This interpretation is consistent with how New York courts interpret the NY Statute of Repose, which is virtually identical to the Delaware Statute of Repose. By analogy, the Court finds persuasive New York's interpretation of its own statute of repose.

> **2. The New York Statute of Repose Does Not Apply to Creditor Claims and, By Analogy, Supports the Holding that the Plain Language of Delaware's Statute of Repose Does Not Apply to Creditor Claims**

The NY Statute of Repose provides, "a member who receives a wrongful distribution from a limited liability company shall have no liability under this article or other applicable law for the amount of the distribution after the expiration of three years from the date of the distribution." NYLLCL § 508(c). Courts have applied this three-year time limit to avoidance actions under 11 U.S.C. § 544 and the DCL. *See Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 517-18 (Bankr. S.D.N.Y. 2019) (applying the NY Statute of Repose to claims asserted by the chapter 7 trustee standing in the debtor's shoes); *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 108 (Bankr. S.D.N.Y. 2005) (same). However, other courts have concluded, and this Court agrees, that there is a distinction between a trustee standing in a debtor's shoes suing for the *benefit of creditors* versus suing *as a creditor*. Given the virtually identical language used in the Delaware Statute of Repose to that used in the NY Statute of Repose, it's instructive by analogy for this Court to determine whether the NY Statute of Repose applies to creditor claims to recover a distribution to a New York LLC's members. It does not.

The three-year limitation imposed by the NY Statute of Repose does not apply to fraudulent transfers claims brought by creditors against a New York LLC's members. S*ee Lyman Commerce Solutions, Inc. v. Lung*, Case No. 12-civ-4398, 2015 WL 1808693, at *5 (S.D.N.Y. Apr. 20, 2015) ("Section 508, by its terms, applies to amounts owed by a member to 'the limited liability

33

company'—*not* to outside creditors."). The Court agrees with *Lyman's* reasoning because "[t]o hold that outside creditors are subject to Section 508's limitations period when bringing claims for fraudulent conveyances to corporate members would be to hold that fraudulent transfers to a corporate insider could be challenged for only half as long as transfers to persons outside the corporate entity. Such a holding would turn the purposes of the fraudulent conveyance statute on its head . . . ." *Id.*

Additionally, the Appellate Division, First Department, held the three-year limitation period imposed by the NY Statute of Repose does not override the six-year statute of limitations for fraudulent conveyance claims brought by creditors under the DCL. The Appellate Division, First Department held that the plain language of the NY Statute of Repose indicates that it applies to members of an LLC and holds them "liable to the limited liability company" for wrongful distributions and does not extend to apply to claims of outside creditors. *Setters v. AI Properties and Developments (USA) Corp.*, 139 A.D.3d 492, 492, 32 N.Y.S.3d 87, 89 (1st Dep't. 2016).[13]

iv.  Conclusion

As the Delaware Statute of Repose is inapplicable to creditor claims for the reasons stated above, no conflict of law exists. Therefore, this Court is left with New York's six-year limitations period for DCL claims[14] and the Trustee's DCL claims are timely.

---

[13] There are three cases from New York State courts which support the view that both the NY Statute of Repose and the Delaware Statute of Repose apply to creditor claims against an LLC's members. *See Peckar & Abramson, P.C. v. Lyford Holdings, Ltd.*, 135 A.D.3d 108, 115, 20 N.Y.S.3d 41, 46 (1st Dep't 2015) (applying three-year limitations period under analogous New York LLP law to creditor's claim); *Bd. of Managers of Chocolate Factory Condo.*, 992 N.Y.S.2d 157, 2014 WL 1910237, at *12 (Sup. Ct. Kings County 2014) (holding the three-year limitations period contained in the NY Statute of Repose "applies both to claims by the limited liability company against its members and by third party creditors."); *Mostel v. Petrycki*, 885 N.Y.S.2d 397, 399,25 Misc.3d 929, 932 (Sup. Ct. N.Y. County 2009). However, *Chocolate Factory, Mostel,* and *Peckar* were decided pre-*Setters* and this Court considers those decisions overruled and/or unpersuasive in light of *Setters*.

[14] The NY Statute of Repose applies only to transfers made by a New York limited liability company. Here, it's inapplicable because the BosGen Transfer and the EBG Transfers were effectuated by Delaware limited liability companies.

c.   *Whether the Trustee's Unjust Enrichment Claim is Time-Barred*

The Trustee's unjust enrichment claim is time-barred under New York law because such claim seeks monetary recovery.  Under New York law, the statute of limitations applicable to an unjust enrichment claim depends on the nature of the substantive remedy the plaintiff seeks.  *See Loengard v. Santa Fe Indus., Inc.,* 514 N.E.2d 113, 70 N.Y.2d 262, 266 (1987).  The limitations period is six years where a plaintiff seeks an equitable remedy, but three years where a plaintiff seeks monetary damages.  *See Ingrami v. Rovner,* 45 A.D.3d 806, 808, 847 N.Y.S.2d 132 (2d Dep't 2007); *see Lia v. Saporito,* 909 F.Supp.2d 149, 167 (E.D.N.Y. 2012); *Kermanshah v. Kermanshah,* 580 F. Supp.2d 247, 261 (S.D.N.Y. 2008); *Grynberg v. Eni S.p.A.,* Case No. 06-civ-6495, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007).  The applicable limitations period begins "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered."  *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 364 (2d Cir. 2013) (quoting *Coombs v. Jervier,* 74 A.D.3d 724, 724, 906 N.Y.S.2d 267 (2d Dep't 2010)).

The TAC plainly states the Trustee is seeking monetary damages in connections with his unjust enrichment claim.  The Trustee alleges, "[t]his count [unjust enrichment] is asserted on behalf of the EBG Creditors and the BosGen Creditors.  Upon information and belief, the creditor claims described herein exceed $800 million."  TAC ¶ 188.  Further into the unjust enrichment count in the TAC, the Trustee alleges that:

> [a]s a direct and proximate result of the foregoing, this Court should find that the Transferee Defendants . . .  have been unjustly enriched, and the EBG Creditors and BosGen Creditors whose claims and causes of action have been assigned to the Liquidating Trust . . . have been damaged thereby in an amount to be determined at trial.  Equity and good conscience demand a return of the funds received by the Transferee Defendants . . . or an award of damages equivalent to the amount by the Transferee Defendants . . . were unjustly enriched . . . [plus pre-judgment and post judgment interest with fees and costs].

35

TAC ¶ 196; *see id.* ¶ Prayer for Relief, at 69(c) ("on Count Five . . . EBG and BosGen Creditors have been damaged in an amount to be determined at trial but believed to be in excess of $1 billion . . . ."). The Trustee seeks monetary damages more than three-years after the transfers complained of occurred and thus, his unjust enrichment claim is time-barred.

### d.  New York's Borrowing Statute

The Defendants assert that the Trustee's claims are barred for a second, independent reason—CPLR § 202. As noted above, this Court must apply New York choice of law rules. *See In re Gaston v. Snow*, 243 F.3d 599, 605-07 (2d Cir. 2001). CPLR section 202 provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

CPLR § 202 (the "Borrowing Statute"). Under the Borrowing Statute, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitation period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998). Here, many of the Lenders and Other General Claimants, who the Trustee is suing on behalf of, are not New York residents. Therefore, according the Defendants, the Borrowing Statute applies, other (shorter) limitations periods apply via the Borrowing Statute, and the Trustee's claims are time barred. The Borrowing Statute places the burden of proof on the Defendants, and they have not provided the Court with sufficient documentation to carry their burden of proof on this issue. *Cf.* Reply, at 19-20 (arguing the Trustee bears the burden of proving residency in New York under the Borrowing Statute).

The burden of proving that a particular statute of limitation has expired falls on the defendant. *See Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 767 n.3 (S.D.N.Y. 1993). However, the plaintiff bears the burden of proving that a particular statute of limitation has been tolled. *See id*. Finally, when another state's statute of limitation is considered pursuant to the Borrowing Statute, the party seeking to benefit therefrom bears the burden of proof. *See id.* (citing *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 (2d Cir. 1984)).

In *Cuccolo*, considering a defendant's motion to dismiss pursuant to Rule 12(b)(6) based, in part, on the Borrowing Statute, the Court held:

> there is no evidence in the papers submitted to the Court indicating that defendants would be amenable to jurisdiction in New Jersey. Plaintiffs' argument is based on *Stafford v. Int'l Harvester Co.,* 668 F.2d 142, 152 (2d Cir. 1981), which held that New York's borrowing statute does not require consideration of the limitations period of another jurisdiction if the plaintiff's cause of action could not have been brought there. The Court of Appeals explained: 'Insofar as the purpose of the borrowing statute is . . . to prevent a plaintiff from forum shopping, it makes no sense at all to apply [a statute of] limitation of a state where the defendant could not have been sued.' *Id.* Although *Stafford* 's reasoning has been questioned . . . this Court is bound by the Second Circuit's holding. Since plaintiffs' argument was not contested and no evidence indicated the defendants—who bore the burden of proof—would be amenable to a New Jersey court's jurisdiction, only the New York statute of limitations will be considered. *Cf. Maiden v. Biehl,* 582 F. Supp. 1209, 1215 (S.D.N.Y. 1984) (defendants proffered evidence indicating they would be amenable to foreign court's jurisdiction).

*Id.* The Defendants have not demonstrated in their papers that they would be amenable to suit in another foreign jurisdiction and that alone under *Stafford* and *Cuccolo* is sufficient to deny Defendants' request to apply the Borrowing Statute. Additionally, as further support of the Court's conclusion, the Defendants have not identified a jurisdiction in which the Trustee's claims are untimely. Thus, the Borrowing Statute cannot be applied here.

VI.    **Pleading Standards for the Trustee's Claims on Behalf of the Lenders and the Other General Claimants**

   a.   *Standard for Motion to Dismiss*

A motion to dismiss for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012, requires a determination as to whether the complaint properly states a claim under Fed. R. Civ. P. 8 ("Rule 8"). *See* Fed. R. Bankr. P. 7008. Under Rule 8, a complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 668 (2009).   Recently, the Supreme Court has twice taken up the requirements of Rule 8. *See id.* at 662; *see also Bell Atl. Corp.  v. Twombly,* 550 U.S. 544, 555 (2007).   In both cases, the Supreme Court emphasized two principles which form the basis for determining a Rule 12(b)(6) motion.

First, the tenet that a court must "accept all factual allegations as true" is limited to factual allegations and does not apply to legal conclusions listed in the plaintiff's complaint.  *Ashcroft v. Iqbal,* 556 U.S. at 668.   The Court explained that legal conclusions are not entitled to the assumption of truth: "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 676.

Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* The Supreme Court has explained that "[t]he plausibility standard is not akin to a probability requirement, but asks for more than a sheer possibility."  *Id.*  This two-pronged approach now forms the standard to be applied when courts are determining a motion to dismiss for failure to state a cause of action.  *Id.*  Courts must focus only on the allegations in the complaint

which are entitled to the assumption of truth, "discounting legal conclusions clothed in the factual garb." *Gowan v. Novator Credit Mgmt. (In re Dreier LLP),* 452 B.R. 467, 475 (Bankr. S.D.N.Y. 2011). Based on these well-pleaded factual allegations, courts must determine if the complaint states a plausible claim for relief. *See id.*

Determining whether a complaint states a plausible claim is "context specific, requiring the court to draw on its experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 668. However, the "pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 184 (2d Cir. 2008). A complaint has facial plausibility when "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* 556 U.S. at 668. Additionally, courts must "draw inferences . . . in the light most favorable to the [nonmovant], and construe the complaint liberally." *Gowan v. Novator Credit Mgmt.,* 452 B.R. at 476 (quoting *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir. 2001) (other citations omitted)).

Finally, "courts must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 310 (2007). The Court may take judicial notice of the public record in related cases involving one of the parties. *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006). A court may even consider a document that has not been incorporated by reference "'where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'" *Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.),* 374 B.R. 113, 119 (Bankr. S.D.N.Y. 2007) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) (other citations omitted)).

### b. Heightened Pleading Standard for Intentional Fraud

Fed. R. Civ. P. 9(b) ("Rule 9(b)"), which is applicable in this case pursuant to Bankruptcy Rule 7009, governs claims for intentional fraudulent transfers. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.),* 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005). The first and second counts in the TAC arise under DCL §§ 276 and 278, and each count requires a finding of intent by the transferor to defraud. *Picard v. Madoff, et al. (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011) ("*Picard v. Madoff* ") (citing *Gowan v. The Patriot Group, LLC (In re Dreier LLP),* 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011)). As intentional intent fraudulent transfers, these claims must meet the heightened specificity requirements under Rule 9(b). *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir. 2005). However, where a bankruptcy trustee is the party asserting the intentional fraudulent transfer claim, the Second Circuit has adopted " 'a more liberal view . . . since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.'" *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) ("*Picard v. Cohmad*") (citing *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (other citations omitted)).

### c. The Trustee's Intentional Fraud Claims are Well Plead

#### i. Allegations Necessary to Sustain Counts I and II

Section 276 of the DCL provides that "every conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." This section authorizes a party "to avoid transactions which have the purpose or effect of removing property from a debtor's estate which should properly be used to repay creditors." *Kramer v. Mahia (In re Kahn),* Case No. 11-01520,

2014 WL 10474969, at *21 (E.D.N.Y. Dec. 24, 2014) (citing *Strauss v. Sixty-Five Brokers, (In re*

*Churchill Mortg. Inv. Corp.),* 256 B.R. 664, 675 (Bankr. S.D.N.Y. 2000)).

> To survive a motion to dismiss on an intentional fraud claim pursuant to DCL section 276:
>
> a plaintiff must allege that a defendant acted with 'actual intent to hinder, delay, or defraud' creditors and must plead its allegations with particularity as required by Rule 9(b). Due to the difficulty of proving intent, plaintiffs may rely on 'badges of fraud'—'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.' The 'badges of fraud' include: 'a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration . . . and retention of control of the property by the transferor after the conveyance.

*Techno-Comp. Inc. v. Arcabascio*, 130 F. Supp.3d 734, 745 (E.D.N.Y. 2015) (internal citations

omitted). ‼

### ii.    The Trustee's Allegations Were Sufficient to Sustain Counts I and II

The Trustee sufficiently plead intentional fraud pursuant to section 276 of the DCL.  Taken

together, all of the allegations in the TAC plead: (i) that the K Road Insiders, which included the

CEO and Chairman of EBG's board of directors, were agents of BosGen and EBG; (ii) the K Road

Insiders' knowledge, by virtue of their dominance and control of the EBG's operations, was

imputed to BosGen and EBG; (iii) the K Road Insiders omitted and/or misrepresented the Debtors'

financial condition to the Lenders; (iv) the K Road Insiders intended to defraud the Lenders and

the Other Claimants; and (v) the BosGen Transfer and the EBG Transfers provided value to the

Defendants with no value to BosGen and/or EBG in return.  The specific fraud allegedly committed

by the K Road Insiders was concealing and misrepresenting BosGen and EBG's true financial

condition from the Lenders.  *See* TAC ¶¶ 17-27, 74-77, 83, 88, 104, 106, 117 (alleging the K Road

Insiders caused the board of directors to approve the Leveraged Recap Transaction, which the

Trustee alleges was fraudulent), ¶¶ 17-24, 74-76 (alleging K Road directly appointed and

41

controlled two members of EBG's seven-member board of directors and all of EBG's senior management was comprised of K Road Insiders), ¶ 26 (alleging the remaining five of the seven directors on EBG's board were controlled by K Road because, as K Road internally acknowledged, the "EBG Board of Directors would approve whatever K Road told them to, as long as the Nominating Committee was in agreement").

More specifically, the Trustee alleges numerous badges of fraud which the Court finds sufficient to hold that the Trustee has satisfied the pleading requirements of Rule 8 and Rule 9(b) for a DCL section 276 claim.  Among other allegations sufficient to demonstrate "badges of fraud" were present surrounding the BosGen Transfer and the EBG Transfers, the Trustee alleges: (i) inadequacy of consideration for the BosGen Transfer and the EBG Transfers because, a) BosGen and EBG were balance-sheet insolvent as a result of the transfers, b) BosGen and EBG knew they could not pay their debts as they came due as a result of the transfers, c) BosGen and EBG received no value or consideration in exchange for the transfers, and d) such transfers rendered BosGen and EBG insolvent; (ii) a close-relationship between K Road, EBG, BosGen, parties to the alleged fraud; and (iii) the BosGen Transfer and EBG Transfers were questionable transactions based on false and misleading projections.  *See* TAC ¶¶ 152, 162 (summaries for Counts I and II).

### iii.  Whether a "Critical Mass" of the EBG Board Acted with Fraudulent Intent

The Defendants assert that the Trustee was required to allege that a "critical mass" of the EBG board acted with fraudulent intent.  According to the Defendants, the Trustee's allegation that K Road, Harbinger, and the Nominating Committee "dominated and controlled" the Debtors such that their intent can be imputed to the entire board of directors is insufficient.  The Court disagrees.

In *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 388 (Bankr. S.D.N.Y. 2014), Judge Gerber held that where board approval is required, a plaintiff must plead that a "critical mass" of directors acted with the requisite intent *or otherwise explain how actors with fraudulent intent otherwise caused the disposition of property. See id.* (emphasis added). Here, the Trustee has alleged *how actors with fraudulent intent otherwise caused the disposition of property.* The TAC alleges that K Road: (i) was EBG's agent; (ii) had fraudulent intent based on the badges of fraud discussed above; and (iii) through manipulation, dominance, and control of EBG's operations, caused BosGen and EBG to incur debt under the Credit Facilities and thereafter, transfer the monies to EBG's members for no consideration. *See* TAC ¶¶ 74-76 (alleging K Road directly appointed and controlled two members of EBG's seven-member board of directors and all of EBG's senior management was comprised of K Road Insiders), ¶ 26 (alleging the remaining five of the seven directors on EBG's board were controlled by K Road because, as K Road internally acknowledged, the "EBG Board of Directors would approve whatever K Road told them to, as long as the Nominating Committee was in agreement"). The Trustee may not be able to prove these facts following discovery. Nevertheless, he has plead facts sufficient to withstand the MTD under the Bankruptcy Court's decision in *Lyondell*.

Further, Judge Cote reversed Judge Gerber's decision in *Lyondell* holding the CEO's "knowledge that the EBITDA figures were fraudulent, as well as his intent in creating and presenting them, can be imputed." *In re Lyondell*, 554 B.R. 635, 648 (S.D.N.Y. 2016). In reaching this holding, the District Court rejected the Bankruptcy Court's determination that an additional showing—through a "critical mass" or otherwise—was necessary to impute the acts of corporate agents for transactions involving board approval. *See id.* at 647–50.

Notwithstanding the District Court's decision in *Lyondell*, the Defendants argue the Bankruptcy Court's reasoning should still apply for two reasons. First, because Judge Sullivan, sitting on the District Court, agreed that Judge Gerber's holding that the "critical mass" test "appropriately accounts for the distinct roles played by directors and officers under corporate law." Reply, at 5 (quoting Judge Sullivan in *Tribune*). However, Judge Sullivan's full quotation provides that the "critical mass" test "appropriately accounts for the distinct roles play by directors and officers under corporate law, *while also factoring in the power certain officers and other actors may exercise over the corporation's decision to consummate a transaction.*" (quoting *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litigation)*, Case No. 12-civ-2652, 2017 WL 82391, at *6 (S.D.N.Y. Jan. 6, 2017) (emphasis added) (noting Judge Cote's reversal of *Lyondell*, disagreeing with Judge Cote, concluding her decision in *Lyondell* was not binding in *Tribune*, and holding, "Specifically, the Court agrees with . . . [Judge Gerber] that the intent of the debtor's officers may be imputed to the debtor if the officers were 'in a position to control the disposition of [the transferor's] property,' thereby effectuating the underlying offense."))); *see In re Adler, Coleman Cleaning Corp.*, 263 B.R. 406 (S.D.N.Y. 2001) (cited with approval by Judge Sullivan for the proposition that that a transferee's intentional fraudulent intent may be ascribed to the transferor corporation where transferee "dominated or controlled [transferor's] disposition" of its property). As discussed above, the Trustee has alleged such domination of BosGen and EBG by the K Road Insiders.

Second, Judge Cote was given the opportunity to reverse Judge Sullivan's *Tribune* decision when she took the case over following Judge Sullivan's elevation to the Second Circuit, and she declined to do so. *See Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litigation)*, Case

44

No. 12-civ-2652, 2019 WL 1771786, at *3 (S.D.N.Y. Apr. 23, 2019). The Court refuses to infer anything from Judge Cote's *inaction*.

Notwithstanding that there is a split of authority at the district court level concerning the appropriate test to apply for imputation of a director or officer's knowledge and/or conduct to the entire board, the facts alleged in the TAC satisfy the tests adopted by Judge Gerber in *Lyondell* and Judge Sullivan in *Tribune* for the reasons stated above,.[15]

> d. *The Trustee's Constructive Fraud Claims are Well Plead*

> i. <u>Allegations Necessary to Sustain Counts III and IV</u>

The DCL provides several paths to recover a constructively fraudulent transfer:

> [A] conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,' and . . . one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005). Such claims need not be plead with particularity under Rule 9(b). Instead, "the pleading standards of Rule 8 . . . apply, subject, of course, to the 'plausibility' requirements of *Iqbal* and *Twombly.*" *Techno-Comp. Inc. v. Arcabascio*, 130 F. Supp.3d 734, 746 (E.D.N.Y. 2015).

> ii. <u>The Trustee's Allegations Were Sufficient to Sustain Counts III and IV</u>

The Trustee sufficiently plead that BosGen and EBG did not receive fair consideration from the BosGen Transfer and the EBG Transfers. *See* TAC ¶¶ 124-25, 152, 162, 170, 181, 191.

---

[15] Certainly, the TAC satisfies the less stringent standard for imputation adopted by Judge Cote in *Lyondell*, which accounts for a distinction in cases addressing "the imputation of a transferee's intent" from those addressing imputation of an agent's intent. *Lyondell*, 554 B.R. at 649. Under Judge Cote's approach, when a single corporate officer's conduct falls within the scope of his authority as an agent, everything such agent knows or does is imputed to their principals. *See Kirschner v. KPMG LLP*, 25 N.Y.3d 446, 465 (2010).

Further, the Trustee alleged that BosGen and EBG: (i) were rendered insolvent by the transfers; (ii) were left with unreasonably small capital following the transfers; and (iii) believed they would incur debt beyond their ability to pay. *See* TAC ¶¶ 129-135, 136-145, 171-72, 182-83.

### e.   *Count V (Unjust Enrichment) Must Be Dismissed Pursuant to Rule 12(b)(6)*

Pursuant to New York state law, "unjust enrichment is not a catchall cause of action to be used when others fail.  It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 18 N.Y.3d 777, 790–91 (2012).  "Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Eidelman v. Sun Products Corp.*, Case No. 16-civ-3914, 2017 WL 4277187, at *6 (S.D.N.Y. Sep. 25, 2017) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d at 790).

Here, the Trustee alleges a wrongdoing—the same wrongdoing that underlies his intentional and constructive DCL fraudulent transfer claims—and that this wrongdoing is the source of the Defendants' "equitable obligation" to pay the same damages that the Trustee plead in connection with his other tort claims under the DCL.  "Although a plaintiff 'may plead unjust enrichment in the alternative to his other claims,' " the unjust enrichment claim will not survive a motion to dismiss where the plaintiff " 'fail[s] to explain how [it] is not merely duplicative of [his] other causes of action.'" *Nelson v. MillerCoors, LLC*, Case No. 15-civ-7082, 2017 WL 1403343, at *9 (E.D.N.Y. Mar. 31, 2017).  The Trustee's unjust enrichment claim duplicates his claims pursuant to the DCL.  Further, the Trustee has not offered the Court any explanation as to why the unjust enrichment claim is not merely duplicative of the DCL claims. Therefore, the unjust enrichment claim fails under New York law and must be dismissed pursuant to Rule

12(b)(6). *See Corsello v. Verizon N.Y., Inc*., 18 N.Y.3d at 790 (unjust enrichment claim is "not available" where its underlying allegations "simply duplicate" plaintiffs' legal causes of action); *Ebin v. Kangadis Food Inc.*, Case No. 13-civ-2311, 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013) (dismissing unjust enrichment claims under New York and New Jersey law where plaintiffs "failed to explain" how it is "not merely duplicative of their other causes of action.").

### f. Plausibility

As discussed above, the Trustee sufficiently *plead* the intentional and constructive fraudulent transfer claims contained in Counts I through IV of the TAC. However, this doesn't end the inquiry. Counts I through IV must also state a *plausible* basis for the relief sought. The plausibility determination is "context specific, requiring the court to draw on its experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 668 (2009). For a claim to be plausible, it must state more than the "sheer possibility" for relief. *See id.*

The lynchpin of the TAC is that the K Road Insiders actively concealed from, and misrepresented information to, the Lenders. The TAC alleges the K Road Insiders controlled the flow of information to the Lenders by, among other things, concealing the terms of material hedge contracts from those who could have identified errors in BosGen's cash flow projections and maintaining two sets of books so the Lenders would not identify the misinformation. *See* TAC ¶¶ 85-102, 110-16. Additionally, the Trustee alleged the K Road Insiders concealed the same information from the financial firms retained by the Debtors to provide consulting services and issue opinions in connection with the Leveraged Recap Transaction, and those financial firms disclaimed any responsibility for BosGen's financial projections. *See* TAC ¶¶ 2, 78, 96-97, 105, 107, 120.

The Defendants contend the participation of independent financial firms and sophisticated lenders in the Leveraged Recap Transaction demonstrates the Lenders were not duped. However, sophisticated parties can be the subject of a fraud. This Court is not prepared at this stage of the proceeding to hold that the Trustee's claims are implausible where the Trustee has alleged material misstatements and omissions by the Debtors in connection with the Leveraged Recap Transaction. *See LaMonica v. CEVA Group (In re CIL Ltd.)*, 582 B.R. 46, 108-09 (Bankr. S.D.N.Y. 2018) (holding that plausibility based on the involvement of independent third parties, such as the financial firms and the "sophisticated lenders," is only relevant when the third parties had access to all relevant information), *amended on reconsideration on other grounds*, Case No. 13-11272, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

The Defendants note, however, that the Debtors were able in June 2007—only six months after the closing—to effect a sale by merger to another major company in which the Debtors were valued at more than $1 billion. The Debtors became a wholly owned subsidiary of US Power Generating Company ("USPG") in a transaction in which USPG agreed to allow EBG's new equity holders to retain a majority of the equity in the newly merged entity. *See* Hunter Decl. ¶ 10. Nearly four years after the Leveraged Recap Transaction that allegedly rendered the company insolvent, and following convulsions in the energy marketplace caused by the global financial crisis, EBG and its subsidiaries, including BosGen, filed for chapter 11 protection. *See* TAC ¶ 59. As of the petition date, the Debtors' total indebtedness included approximately $1.1 billion under the First Lien Credit Agreement, $350 million under the Second Lien Credit Agreement, and $422 million under the Mezzanine Credit Agreement. *See* Hunter Decl. ¶¶ 28-35. The Debtors had virtually no other debt than the amounts owed under the Credit Facilities. *See* Disclosure Statement § I.A.

48

In light of these facts, the Trustee may have a difficult time proving, among other things, that the Leveraged Recap Transaction left the Debtors insolvent or that somehow the Lenders were duped. However, the Court is not prepared to say now it's completely implausible. The allegations in the TAC state more than a "sheer possibility" for relief under the DCL for intentional and constructive fraudulent transfers. Therefore, the Court finds the Trustee's request for relief plausible.

### g.  Conclusion

For the reasons stated above, the Court dismisses Count V pursuant to Rules 8 and 12(b)(6). The Trustee sufficiently plead Counts I through IV and met the plausibility standard. In any event, Counts I through V are dismissed pursuant to section 546(e) of the Bankruptcy Code.

## VII.    The Safe Harbor

Pursuant to section 546(e) of the Bankruptcy Code, certain transfers are excepted from avoidance and recovery. To qualify for this "safe-harbor," section 546(e) of the Bankruptcy Code provides the payments sought to be avoided must be (i) qualifying payments, such as securities "settlement payment[s]" or "transfer[s] . . . in connection with a securities contract," and (ii) made by, or to (or for the benefit of) a "financial institution."

As an initial matter, the Court must determine whether the Trustee's state-law claims are preempted by section 546(e) of the Bankruptcy Code. The Court holds section 546(e) preempts Counts I through V in the TAC.

> *a. Section 546(e) Preempts the Trustee's Claims*

>> i. The Safe Harbor Preempts the Trustee's Constructive Fraudulent Transfer Claims in Counts III and IV

Recently, the Second Circuit held that section 546(e)'s safe harbor preempts state-law constructive fraudulent transfer claims asserted by a litigation trustee standing in the shoes of a debtor's creditors. *See In re Tribune Co. Fraudulent Conveyance Litigation*, 818 F.3d 98, 119-124 (2d Cir. 2016) ("*Tribune I*").[16]  The Court next must determine whether this holding applies when a litigation trustee suing on behalf of a debtor's creditors assert state law *intentional* fraudulent transfer claims.  It does.

>> ii. The Safe Harbor Preempts the Trustee's State Law Intentional Fraudulent Transfer Claims in Counts I and II

>>> **1. Whether the Trustee's Intentional Fraudulent Transfer Claims are Preempted**

As discussed in *Tribune I* and *II*, the safe harbor's scope is not limited to avoidance actions brought by a "trustee."  The safe harbor's coverage extends to suits brought by a debtor's creditors. *See Tribune I*, 818 F.3d at 119-124.  The Second Circuit reasoned that if the safe harbor would preclude the bankruptcy trustee from avoiding a transfer, the debtor's creditors cannot do an end-run around that safe harbor by causing a bankruptcy trustee to abandon his standing to sue, thereby allowing creditors to sue free and clear of the safe harbor. *See id.*  The Second Circuit's reasoning applies equally to the Trustee's state law *intentional* fraudulent transfer claims asserted on behalf of the Lenders and the Other General Claimants.

---

[16]  The Second Circuit recalled *Tribune I* following the United States Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, —— U.S. ——, 138 S. Ct. 883 (2018) ("*Merit*"), and issues an amended opinion. *See In re Tribune Co. Fraudulent Conveyance Litigation*, 946 F.3d 66 (2d Cir. 2019) ("*Tribune II*"). *Tribune II* reaffirmed *Tribune I*'s holding that section 546(e) preempts state law constructive fraudulent transfer claims asserted by a litigation trustee standing in the shoes of creditors. *See Tribune II*, 946 F.3d at 81-82.

Neither *Tribune I* nor *II* addressed whether section 546(e) preempts intentional state law fraudulent transfer claims and the Court sees no reason why *Tribune*'s reasoning does not extend to intentional state law fraudulent transfer claims.    Nevertheless, the Court will engage in the appropriate inquiry.

Preemption is always a matter of congressional intent, even where that intent must be inferred. *See Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992).    As in the present matter, the presumption against preemption usually goes to the weight to be given to the lack of an express statement overriding state law.    *See Tribune I*, 818 F.3d at 111-12.    The presumption is strongest when Congress is legislating in an area recognized as traditionally one of state law alone.    *See id.* However, the present context is not such an area.    To be sure, the regulation of creditors' rights has '"a history of significant federal presence."'    *Id.* (quoting *United States v. Locke,* 529 U.S. 89, 90 (2000)).    Congress's power to enact bankruptcy laws was made explicit in the Constitution as originally enacted, Art. 1, § 8, cl. 4. Once a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights.    *See id.*; *Eastern Equip. and Servs. Corp. v. Factory Point Nat. Bank, Bennington,* 236 F.3d 117, 120 (2d Cir. 2001) ("The United States Bankruptcy Code provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights."); *In re Miles,* 430 F.3d 1083, 1091 (9th Cir.2005) ("Congress intended the Bankruptcy Code to create a whole scheme under federal control that would adjust *all* of the rights and duties of creditors and debtors alike . . . ."). The Court in *Tribune I* held, "[w]hile the issue before us is often described as whether Section 546(e) preempts state fraudulent conveyance laws, that is a mischaracterization.    Appellants' state law claims were preempted when the Chapter 11 proceedings commenced and were not dismissed." *Tribune I*, 818 F.3d at 112 (internal citations

omitted).  Thus, section 546(e) preempts the Trustee's intentional fraudulent transfer claims under the DCL.  Next, the Court must examine whether, despite the safe harbor's preemption of state law, section 546(e) creates an exception from its coverage for state law intentional fraudulent transfer claims.  It does not.

> **2.  The Safe Harbor Excludes from its Coverage Claims Brought Pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and this Exclusion Does Not Extend to Encompass State Law Intentional Fraudulent Transfer Claims**

Section 546(e) excepts from its coverage claims for intentional fraudulent transfers brought under the Bankruptcy Code.  The Trustee argues that this section 548(a)(1)(A) "exception" also includes intentional fraudulent transfers brought under state law.  The Court declines to extend section 546(e)'s exception for intentional fraudulent transfer claims brought under the Bankruptcy Code to include state law intentional fraudulent transfers claims.

Section 548(a)(1)(A) of the Bankruptcy Code empowers a trustee to avoid a transfer made with actual intent to hinder, delay or defraud any entity.  Section 276 of the DCL requires a showing of actual intent to hinder, delay, or defraud creditors.  Fundamentally, there is no difference between a claim brought pursuant to the DCL compared to one under the Bankruptcy Code for avoidance and recovery of an intentional fraudulent transfer.  *See In re Actrade Fin. Tech. Ltd.*, 337 B.R. 791, 799 n.5 (Bankr. S.D.N.Y. 2005) ("A cause of action under DCL § 276 is substantially similar to that under § 548(a)(1)(A) but has a six-year statute of limitations as opposed to the one-year reach back period provided for under the Bankruptcy Code.").  However, Congress did not act with only New York in mind and this Court is bound by the plain language of section 546(e), which provides an exception only for intentional fraudulent transfer claims brought under the Bankruptcy Code and no more.  *See US Bank Nat'l Assoc. v. Verizon Communications, Inc.*, 892 F. Supp.2d 805, 816-17 (N.D. Tex. 2012) (rejecting an argument

similar to the one advanced here by the Trustee because "it conflict[s] with the clear language of [section] 546(e), which operates notwithstanding all of [section] 544"; "that Congress did expressly exclude [section] 548(a)(1)(A) implies that it did not want to exclude state 'actual intent' fraudulent transfer claims.").

In fact, Congress may well have had its reasons for not excepting state law intentional fraudulent transfer claims from the safe harbor. !!While it's true that sections 548(a)(1)(A) and 546(e) apply to all cases brought under the Bankruptcy Code, that is not the case for intentional state law fraudulent transfer claims that may be brought through section 544 of the Bankruptcy Code. As Judge Holwell held in *Drenis*, some states have adopted the Uniform Fraudulent Conveyance Act (the "UFCA") and other have adopted the Uniform Fraudulent Transfer Act (the "UFTA").  While the UFCA and the UFTA are similar in most respects, there are differences between the two.  *See Drenis v. Haligiannis,* 452 F. Supp.2d 418, 426-27 (S.D.N.Y. 2006). *Compare,* Del. Code Ann. tit. 6 § 1308 (providing good faith on part of transferee or exchange of reasonably equivalent value as a defense to intentional fraudulent conveyance under § 1304(a)(1), as distinguished from constructive fraudulent conveyance), *with* DCL § 276 (providing that every conveyance with actual intent to defraud present or future creditors is fraudulent, irrespective of transferee's good faith (or lack thereof) or exchange of fair consideration).

At a minimum, *Drenis* demonstrates state law fraudulent transfer statutes are far from uniform.  Further, there are fifty (50) separate state judiciaries interpreting those fifty (50) separate "uniform" [sic] statutes.   The *Tribune I* Court held "that the policies reflected in Section 546(e) relate to securities markets, which are subject to extensive federal regulation. The regulation of these markets has existed and grown for over eighty years and reflects very important federal concerns." *Tribune I*, 818 F.3d at 112.  Congress may have specifically excluded state law

intentional fraudulent transfer claims from section 546(e)'s exception having determined the need

for stability in the securities markets overrode the potential danger of creditors escaping claims for

intentional fraud based on a fear that inconsistent application of fifty (50) states' fraudulent transfer

statutes would result in instability in the securities markets.    In any event, state law intentional

fraudulent transfer claims are not excepted from section 546(e)'s coverage within the section

548(a)(1)(A) exception to section 546(e) nor anywhere else in section 546(e) of the Bankruptcy

Code.

          iii.   The Safe Harbor Preempts the Trustee's Unjust Enrichment Claim
               in Count V

In *AP Servs. LLP*, a litigation trustee brought, among other causes of action, an unjust

enrichment claim under New York state law in connection with a leveraged buyout transaction.

The Court held,

> The Trustee's claim for unjust enrichment is preempted by Section 546(e). The unjust
> enrichment claim "seeks to recover the same payments ... held ... unavoidable under §
> 546(e)." Indeed, "[a]llowing recovery for unjust enrichment ... would implicate the same
> concerns regarding the unraveling of settled securities transactions ... which is precisely
> the result that section 546(e) precludes. The Court could not permit the unjust enrichment
> claim to go forward without frustrating the purpose of Section 546(e). The unjust
> enrichment claim (Count Five) is thus dismissed.

*In re AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (internal citations omitted).  Here,

the Trustee's unjust enrichment claim seeks recovery of the BosGen Transfer and the EBG

Transfers, which is an attempt to unwind a securities transaction.  Allowing this would thwart

section 546(e)'s purpose and thus, Count V of the TAC is preempted.

iv.   Preemption Conclusion

Because the Court holds section 546(e) preempts all the Trustee's claims, the next

determination must be whether the BosGen Transfer[17] and/or the EBG Transfers satisfy section

546(e)'s safe harbor requirements, i.e., "financial institution" and "settlement payment" or "in

connection with a securities contract."  If the transfers do, Counts I through V must be dismissed

under the safe harbor.  Applying *Merit* and *Tribune II*, among other cases, to the facts presented

here, the Court holds that the BosGen Transfer and the EBG Transfers satisfy the safe-harbor

requirements of section 546(e) and thus, Counts I through V of the TAC are dismissed.

b.  *Statutory Predicate for the Safe Harbor and a Brief Synopsis of the Safe Harbor's Construction*

i.   Statutory Provisions

Section 546(e) provides that a transfer: (i) which qualifies as a settlement payment or is

one made in connection with a securities contract (ii) by, or to, or for the benefit of, a financial

institution will fall within the scope of section 546(e)'s safe harbor and is not subject to avoidance.

*See* 11 U.S.C. § 546(e).[18]

The  Bankruptcy  Code  defines  "settlement  payment"  as,  "a  preliminary  settlement

payment, a partial settlement payment, an interim settlement payment, a settlement payment on

---

[17] Again, the Court recognizes the Trustee asks the Court to look only at the Step One Transfer and not the overarching transaction, which is the BosGen Transfer.

[18] The full text of the section 546(e) provides,

(e) Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, *or settlement payment*, as defined in section 101 or 741 of this title, *made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, *or* that is a transfer *made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, *in connection with a securities contract*, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

Id. (emphasis added).

account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8); *see* 11 U.S.C. § 101 (51(A)) (defining "settlement payment" "for purposes of the forward contract provisions of this title, [as] a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.").

The Bankruptcy Code defines "securities contract" to include, among other things:

> (a) (i) a contract for the purchase, sale, or loan of a security . . . , or option on any of the foregoing, including an option to purchase or sell any such security . . . and including any repurchase  . . . transaction on any such security . . . (whether or not such repurchase . . . transaction is a "repurchase agreement", as defined in section 101).

11 U.S.C. § 741(7)(a)(1).

The Bankruptcy Code defines "financial institution" as:

> (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator *or entity is acting as agent or custodian for a customer* (whether or not a "customer", as defined in section 741) *in connection with a securities contract* (as defined in section 741) . . . .

11 U.S.C. § 101(22) (emphasis added).  Under this definition, a private entity (or, the customer) qualifies as a financial institution provided: (i) a financial institution (such as a commercial bank) transfers money on the customer's behalf; (ii) as such customer's agent; (iii) in connection with a securities contract (as defined above).  *See* 11 U.S.C § 741(2) (defining "customer"); 11 U.S.C. § 101(22) (providing the term "customer," as used in this section, is not limited to the definition provided in section 741).

ii.  Interpreting "Settlement Payment" and "In Connection with a Securities
Contract"

In *In re Quebecor World (USA) Inc.*, 453 B.R. 201 (Bankr. S.D.N.Y. 2011), Judge Peck

addressed Defendants motion for summary judgment wherein they contended that prepetition

payments totaling approximately $376 million received from Quebecor World (USA) Inc.

("QWUSA", and with its various debtor and non-debtor affiliates, "Quebecor") during the

preference period were exempt from avoidance as a matter of law by virtue of section 546(e).  "The

question presented calls for examination of this "safe harbor" provision with particular emphasis

on the proper application of the term "settlement payment" as defined in section 741(8) of the

Code when used in reference to a repurchase and subsequent cancellation of privately-placed

notes." *Id.* at 203.  Relying on the Second Circuit's decision in *In re Enron Creditors Recovery

Corp. v. Alfa S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) ("*Enron"),* Judge Peck held that the

payments at issue were protected as both settlement payments and transfers in connection with a

securities contract. *See In re Quebecor World (USA) Inc.*, 453 B.R. at 215-19.

On October 29, 2007, the agent under the Credit Agreement wired approximately $426

million to QWUSA's main operating account at Bank of America, N.A. ("Bank of America").

Bank of America then wired approximately $376 million of this amount to CIBC Mellon Trust

Co. ("CIBC Mellon"), the trustee for the notes (the "Disputed Transfer").  CIBC Mellon, in turn,

wired to each noteholder its portion of that amount.  *See id.*

Judge Peck held:

The definition [of settlement payment] in the Code may be self-referential and
circular, but the direction given by the *Enron* majority with respect to that
definition is both uncomplicated and crystal clear—a settlement payment, quite
simply, is a "transfer of cash ... made to complete [a] securities
transaction." *Enron*, 2011 WL 2536101, at *9 (quotations omitted).

Under this easy-to-apply formulation, the Court concludes that the Disputed Transfer qualifies for the exemption under section 546(e). The transaction in question involves three elements that together support this conclusion—(i) the transfer by QWUSA of cash (ii) to a financial institution that was acting as agent for the Noteholders (iii) made to repurchase and cancel securities, *i.e.,* to complete a securities transaction. The first part of the formulation—that the "settlement payment" be a "transfer of cash"—is demonstrated by the wiring of funds from QWUSA to CIBC Mellon. The second required component, consistent with section 546(e), is that the transfer be made to a financial institution. This requirement is satisfied by the involvement of CIBC Mellon, a financial institution, in receiving the Disputed Transfer. The third element is present because the cash was transferred for securities in "completion" of the transaction.

*In re Quebecor World (USA) Inc*., 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 468 (S.D.N.Y. 2012), *aff'd*, 719 F.3d 94 (2d Cir. 2013). Recently, the United States Supreme Court in *Merit* addressed the breadth of the term "financial institution" as used in section 546(e). *Merit* leaves unchanged Judge Peck's analysis of what is or is not a settlement payment or transfer made in connection with a securities contract.

### iii.  *Tribune I*

In *Tribune,* the Official Committee of Unsecured Creditors brought an adversary proceedings asserting intentional fraudulent transfer claims against corporate debtor's cashed-out shareholders, officers and directors, financial advisors, and others who benefited from a prepetition leveraged buyout of the debtor, and, after conditional stay relief was granted, individual creditors brought actions asserting state-law constructive fraudulent transfer claims to unwind buyouts of debtor's shareholders. *See Tribune I*, 818 F.3d 98, 106 (2d Cir. 2016).

Tribune transferred over $8 billion to a securities clearing agency (or financial institution as used in section 546(e)), acting as an intermediary in the leveraged buyout transaction. *See id.* In turn, the intermediary paid the funds to the shareholders in exchange for their shares that were then returned to Tribune. *See id.* In short, *Tribune I* held safe harbor protections did, in fact,

apply to any transaction that passed through a financial intermediary, regardless of whether the banks and brokers at issue received any of the funds themselves. *See id.* at 112.

> iv. *Merit*

The United States Supreme Court's decision in *Merit* addresses the "by or to (or for the benefit of) a . . . financial institution" requirement of section 546(e). *See Merit*, 138 S. Ct. 883 (2017). In 2007, a would-be racing casino Valley View Downs, LP agreed to purchase the stock of Bedford Downs Management Corporation, a company with which it had been competing for the last available harness-racing license in Pennsylvania. *See id*. at 890-92. After Valley View was unable to secure a necessary gaming license in the time allotted for it to do so under a financing agreement, it and its parent company Centaur, LLC filed for bankruptcy. *See id.* The Bankruptcy Court confirmed a reorganization plan and appointed FTI Consulting, Inc. as trustee of the Centaur litigation trust. *See id.*

Thereafter, FTI Consulting filed a lawsuit against Merit Management to claw back $16.5 million in funds that Merit Management had received as a stockholder in Bedford Downs. *See id.* As part of the stock acquisition agreement, Valley View had arranged for Credit Suisse to finance the transaction. *See id.* Credit Suisse wired the purchase price to the Citizens Bank of Pennsylvania, which agreed to serve as the third-party escrow agent for the transaction. *See id.* Merit Management, along with other Bedford Downs shareholders, deposited its stock certificates into escrow, and Citizens Bank of Pennsylvania distributed the purchase proceeds to stockholders including Merit Management. *See id.*

Before the Court determined whether the transfer at issue was "made by or to (or for the benefit of)" a financial institution, it first identified the relevant transfer to test in that inquiry. *See id.* at 891-95. Merit posited that the relevant transfer should include not only the Valley–View–

59

to–Merit end-to-end transfer, but also all of its component parts, *i.e.,* the Credit–Suisse–to–Citizens–Bank and the Citizens–Bank–to–Merit transfers. *See id.* FTI maintained that the only relevant transfer is the transfer that it sought to avoid, specifically, the overarching transfer between Valley View and Merit. *See id.*

Ultimately, the Court concluded that the relevant transfer for purposes of section 546(e)'s safe harbor was the overarching transfer between Valley View and Merit, not the component transfers to and between the financial institutions. *See id.* at 896-97. The Court held that if an entity covered by the exception is only a "conduit" or a component part of an overall transfer, then the safe harbor does not apply. *See id.* Because the parties did not assert that either Valley View or Merit Management was a "financial Institution," or other covered entity, the transfer fell outside the section 546(e) safe harbor. *See id.* In light of *Merit*, the Second Circuit recalled *Tribune I.*

### v. *Tribune II*

*Merit* abrogated *Tribune I*'s holding that "the language of Section 546(e) covers all transfers by or to financial intermediaries that are 'settlement payment[s]' or 'in connection with a securities contract.'" Nevertheless, the Second Circuit held in *Tribune II* that the transfers at issue were still safe harbored.

On recall, the *Tribune II* Court held the transferor debtor, Tribune, itself met the statutory definition of a "financial institution." *See Tribune II*, 946 F.3d 66, 78-80 (2d Cir. 2019). In *Tribune II*, the transferor qualified as a "financial institution" because it was a "customer" of a trust company and bank (Computershare) that was "acting as agent" for its "customer" in "connection with a securities contract." *See id.* at 78-79. The securities contract in Tribune was the *tender offer repurchase and redemption* of Tribune's shares from its shareholders. *See id.* (emphasis added).

More specifically, the Second Circuit concluded Tribune qualified as a financial institution because it retained:

> Computershare to act as 'Depositary' in connection with the LBO tender offer. Computershare is a 'financial institution' for the purposes of Section 546(e) because it is a trust company and a bank [pursuant to the Office of the Comptroller of the Currency website]. Therefore, Tribune was likewise a 'financial institution' with respect to the LBO payments if it was Computershare's 'customer,' and Computershare was acting as its agent. In its role as Depositary, Computershare performed multiple services for Tribune. First, Computershare received and held Tribune's deposit of the aggregate purchase price for the shares. Then, Computershare received tendered shares, retained them on Tribune's behalf, and paid the tendering shareholders. Given these facts, we conclude that Tribune was Computershare's 'customer' with respect to the LBO payments.

*Id.* at 78 (internal citations omitted). Further, the Court concluded that Computer share was Tribune's agent because "Tribune manifested its intent to grant authority to Computershare by depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders. Computershare, in turn, manifested its assent by accepting the funds and effectuating the transaction." *Id.* at 80.

Given the entirety of this backdrop concerning section 546(e), the Court turns to the BosGen Transfer and the EBG Transfers at issue.

### c. *The BosGen Transfer Meets Section 546(e)'s Safe Harbor Requirements*

The BosGen Transfer meets the statutory requirements for safe harbor because a financial institution (US Bank), as agent for its customer (BosGen), transferred the $708 Million to EBG in connection with the tender offer by EBG for the Unit Redemptions, the Warrant Redemptions, and the Distribution. Additionally, or, in the alternative, the BosGen Transfer meets the statutory requirements for safe harbor because BosGen transferred the $708 Million to a financial institution (BONY), as agent for its customers (BosGen and EBG) in connection with the Tender Offer.

61

To support his argument that the BosGen Transfer was neither a settlement payment nor a transfer in connection with a securities contract, the Trustee asserts that the BosGen Transfer was a standalone payment from BosGen to EBG of an LLC distribution, that this LLC distribution was an isolated dividend falling outside section 546(e)'s scope, and therefore, the Trustee can avoid the BosGen Transfer. Each of, and certainly in the aggregate, the Lenders' Presentation, the CIM, the FFM, the Tender Offer, and the Credit Facilities demonstrate the BosGen Transfer was a settlement payment and a transfer in connection with a securities contract.

i. The BosGen Transfer was a "Settlement Payment"

Simply put, a transfer of cash to a financial institution made to repurchase and cancel securities—in other words, to complete a securities transaction--qualifies for the safe harbor as a settlement payment. *See Enron*, 651 F.3d 329, 334 (2d Cir. 2011). The first part of the formulation—that the "settlement payment" be a transfer of cash—is demonstrated by the wiring of funds from BosGen's US Bank Account to EBG's BoA Account. *See* FFM (providing also that BoA would thereafter wire the funds to BONY). The second component, that the transfer be made by or to a financial institution, is addressed below. The third element is met because the BosGen Transfer was made to EBG to fund the Unit Redemptions, the Warrant Redemption, and the Distribution, i.e., to complete a securities transaction (the Tender Offer).

As the transfer of cash is self-evident and the requirement that such transfer be by, to, or for the benefit of, a financial institution addressed below, the Court turns to whether the BosGen Transfer was made to complete a securities transaction and holds that it was. BosGen Transferred the $708 Million to EBG for EBG to fund the Unit Redemptions, the Warrant Redemption, and the Distribution—i.e., to complete a securities transaction (the Tender Offer).

First, the Court must determine whether EBG repurchased "securities."  Thereafter, the Court turns to whether the BosGen Transfer was made to complete the repurchase of "securities." Though the Bankruptcy Code's definition of "security" does not expressly include the LLC member units and warrants that are the subject of the Tender Offer.  The definition of security is broad and includes, among other things, any "other claim or interest commonly known as 'security.'"  11 U.S.C. § 101(49)(A)(xiv).  The LLC member units and warrants most certainly qualify as securities under the Bankruptcy Code's broad definition.  *See In re Lehman Bros. Holdings Inc.,* 855 F.3d 459, 473 (2d Cir. 2017) (citing with approval, *O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013) (concluding that a membership interest in an LLC is a "security"), *aff'd*, 782 F.3d 492 (9th Cir. 2015)); *see also O'Cheskey v. Templeton (In re Am. Hous. Found.)*, Case No. 09-20232-RLJ-11, 2013 WL 1316723, at *18, 2013 Bankr. LEXIS 1449 (Bankr. N.D. Tex. Mar. 30, 2013) (concluding that the enumerated list in section 101(49) is not exhaustive and that securities are not limited to the items specifically identified), *aff'd in part, rev'd in part on other grounds*, 785 F.3d 143 (5th Cir. 2015). Indeed, the residual clause set forth in section 101 (49)(A)(xiv) clearly opens the door to securities not specifically listed; *see also SeaQuest Diving, LP v. S&J Diving, Inc. (In the matter of SeaQuest Diving, LP)*, 579 F.3d 411, 418 (5th Cir. 2009) (observing that subsection (A)(xiv) is a "broad residual category").

BosGen made the BosGen Transfer to complete a securities transaction. The Credit Facilities expressly say in the First Lien Funding Provisions, the Second Lien Funding Provisions, and the Mezz Funding Provisions that the monies loaned to Bos Gen and EBG pursuant to the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Mezz Agreement will be made available to fund the Tender Offer.  Put another way, of course the $708 Million was transferred

to EBG to complete the repurchase of securities—without it, EBG would not have had enough money from the Mezz Agreement (providing for the $300 Million) to fund the Unit Redemptions, the Warrant Redemptions, and the Distribution which required over $900 million.

Further, the Trustee concedes that "[t]here was . . . [a] settlement payment here—the transfer from EBG to its members." Opposition, at 31 (conceding also that the BosGen Transfer funded that settlement payment). For the reasons stated above, the BosGen Transfer qualifies as a "settlement payment" and, in any event, it was also a transfer "in connection with a securities contract."

     ii. The BosGen Transfer was Made "In Connection with a Securities Contract"

The BosGen Transfer occurred in connection with a securities contract too. The term "securities contract" includes "any repurchase . . . transaction on any such security." 11 U.S.C. § 741(7)(a)(1). Under "§ 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 421 (2d Cir. 2014). "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided," "merely requir[ing] that the transfer have a connection to the securities contract." *Id*. at 422. Here, the BosGen Transfer had a substantial relationship to the Tender Offer.

The Trustee concedes the Tender Offer was a securities contract between EBG and its members. *See* Opposition, at 30. However, the Tender Offer was more than a securities contract between EBG and its members. The Tender Offer was a contract among BosGen, EBG, and EBG's members. *See* Tender Offer, at 9 (providing both BosGen and EBG invite members to tender). As discussed above, the Lenders' Presentation, the CIM, the Credit Facilities, and the FFM all demonstrate a large portion of the monies loaned to BosGen and EBG pursuant to the

First Lien Credit Agreement, the Second Lien Credit Agreement, and the Mezz Agreement would be used to fund the Tender Offer *made by BosGen and EBG*.  As more direct evidence of this, the First Lien Funding Provisions and the Second Lien Funding Provisions make clear a portion of the monies loaned to BosGen would be transferred to fund the Tender Offer.  Thus, the BosGen Transfer occurred in connection with a securities contract (the Tender Offer).

By analogy, in *Tribune II*, the Court held the securities contract was the tender offer repurchase and redemption of Tribune's shares from its shareholders.  *See Tribune II*, 946 F.3d 66, 78-80 (2d Cir. 2019).  As "shares" are securities under the Bankruptcy Code, so too are the units and warrants that were redeemed pursuant to the Tender Offer.  *See* Section VI(c)(i).  The *Tribune* Court had "no trouble concluding, based on Section 741(7)'s plain language, that all of the payments at issue, *including those connected to the redemption of shares*, were "in connection with a securities contract."  *Id.* at 81 (emphasis added).  Likewise, this Court concludes that the BosGen Transfer funded the Unit Redemptions, the Warrant Redemptions, and the Distribution and thus, were made in connection with a securities contract.

      iii.   BosGen Qualifies as a "Financial Institution" for the BosGen Transfer By Virtue of its Relationship with US Bank

The customer of a "financial institution" will itself qualify as a "financial institution" under section 546(e) of the Bankruptcy Code if, (i) the "financial institution" acts as its customer's agent, (ii) in connection with a securities contract.  As the Trustee correctly writes, "for the customer to qualify as a financial institution, the bank that sends or receives the relevant transfer must be acting as the customer's agent or custodian in connection with a securities contract."  Opposition, at 29. As demonstrated below, the Trustee's test is met here because US Bank sent the BosGen Transfer, as BosGen's agent, in connection with the Tender Offer.  Thus, BosGen qualifies as the financial institution for purposes of section 546(e)'s safe harbor.

As a preliminary matter, the Court notes at the outset that US Bank is a "financial institution" for purposes of section 546(e) of the Bankruptcy Code because it is a bank pursuant to the Office of the Comptroller of the Currency website. *See* Office of the Comptroller of the Currency, Office of the Comptroller of the Currency at https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists. The next two inquiries are whether: (i) BosGen was US Bank's customer; and (ii) US Bank served as BosGen's agent in connection with a securities contract. If the answer to both of those questions is yes, the BosGen Transfer is safe harbored.

### 1. BosGen Was US Bank's Customer

The FFM and its terms demonstrate BosGen was US Bank's customer. *See* FFM (providing instructions to US Bank from BosGen for the disbursement of funds by US Bank from BosGen's US Bank Account). Further, nowhere in the record does the Trustee dispute BosGen is US Bank's customer. Next, US Bank must have acted as BosGen's agent in connection with a securities contract.

### 2. US Bank Acted as BosGen's Agent in Connection with a Securities Contract

An agency relationship is typically established by "written or spoken words *or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.*" *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 702 (2d Cir. 1990) (emphasis added) (quoting Restatement (Second) of Agency § 26 (1958)). The elements of an agency relationship are: (1) "a manifestation by the principal that the agent shall act for him," (2) "accept [ance of] the undertaking" by the agent, and (3) "an understanding between the parties that the principal is to be in control of the undertaking." *In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416,

422 (S.D.N.Y. 1990). Of these, the critical element is control of the agent by the principal. *In re Shulman Transp. Enterprises, Inc.,* 744 F.2d 293, 295 (2d Cir. 1984).

The agency test's first requirement is satisfied. In the FFM, BosGen manifested an intent for US Bank to act on its behalf in connection with a securities contract. Therein, BosGen authorizes US Bank to act in connection with: (i) the receipt of funds from the Lenders pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement; and (ii) the BosGen Transfer. *See* TAC Ex. H (the "FFM") (Instructional Letter introducing the FFM). As evidence that BosGen manifested an intent for US Bank to serve as its agent, the FFM provides "the deposits listed on the third page . . . of the FFM will be transferred to the Depository [US Bank] on the Closing Date." *Id.* at 1(i). Thereafter, the "disbursements listed on the third page of the FFM will be disbursed by the Depository on the Closing Date . . . ." *Id.* at 2(ii). The FFM goes on to state, "[t]he Depository [US Bank] is hereby authorized and instructed to accept such deposits and to make such allocations, transfers and payments in accordance with the FFM." *See id*. at 2. The FFM further demonstrates that US Bank sent the $708 Million, on behalf of BosGen, from the US Bank Account to EBG's BoA Account and that those funds would be used for "Distribution, Unit Buyback and Warrant Repurchases," along with "Transaction Fees and Expenses." FFM, at 503. Thus, US Bank served as BosGen's agent for the BosGen Transfer, which the FFM demonstrates was an upstream transfer of monies to EBG in connection with the Tender Offer to fund the Unit Redemptions, the Warrant Redemptions, and the Distribution.

The agency test's second requirement is satisfied. US Bank accepted the task of serving as BosGen's agent. As evidence of US Bank's acceptance, US Bank did actually receive the monies loaned to BosGen pursuant to the First Lien Credit Agreement and the Second Lien Credit

Agreement and thereafter, did actually transfer a portion of those loan proceeds to EBG on BosGen's behalf to fund the Tender Offer.  *See* FFM.

The agency test's third requirement is satisfied.  BosGen remained in control of the undertaking.  Namely, the BosGen directed US Bank to effectuate the BosGen Transfer to fund the Tender Offer.  *See* FFF (providing "the disbursements . . . *are to be disbursed by the Depository* . . ." and further providing, that US Bank "is authorized *and instructed* to accept such deposits . . . and to make such allocations . . .") (emphasis added).

*Tribune*'s reasoning further supports the conclusion that US Bank served as BosGen's agent in connection with the Tender Offer.  There, the transferor qualified as a "financial institution" because it was a "customer" of a trust company and bank (Computershare) that was "acting as agent" for its "customer" in "connection with a securities contract." *See Tribune II*, 946 F.3d 66, 78-80 (2d Cir. 2019).  The securities contract in *Tribune* was the tender offer repurchase and redemption of Tribune's shares from its shareholders.  *See id.* (emphasis added).

As in *Tribune*, BosGen qualifies as a "financial institution."  BosGen retained US Bank to act as depository and agent in connection with the Tender Offer.[19]  The result of this relationship being, BosGen is likewise a financial institution with respect to the BosGen Transfer because: (i) BosGen was US Bank's customer; (ii) US Bank was acting as BosGen's agent for the BosGen Transfer; and (iii) the BosGen Transfer was in connection with a securities contract.[20]

Thus, the BosGen Transfer meets the safe harbor requirements of section 546(e) of the Bankruptcy Code and Counts II and IV of the TAC are dismissed.

---

[19] The FFM acknowledges it is delivered to US Bank by BosGen "pursuant to Section 3.22 of the Security Deposit Agreement dated as of December 21, 2006 (the 'Security Deposit Agreement') by and among the Borrower [defined as BosGen], the Guarantors from time to time party thereto, Credit Suisse, Cayman Islands Branch, as First Lien Collateral Agent and as Second Lien Collateral Agent, *and U.S. Bank National Association, as depository (the 'Depository')*.  The FFM, at 1.
[20] The Court has already concluded above in Section VII (c)(ii) that the BosGen Transfer was in connection with a securities contract.

iv. <u>Additionally, or, In the Alternative, Both BosGen and EBG Qualify as "Financial Institutions" for the BosGen Transfer By Virtue of Their Relationship with BONY</u>

As a preliminary matter, the Court notes at the outset that BONY is a "financial institution" for purposes of section 546(e) of the Bankruptcy Code because it is a bank pursuant to the Office of the Comptroller of the Currency website. *See* Office of the Comptroller of the Currency, Office of the Comptroller of the Currency at https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists. Also, the Trustee concedes BONY qualifies as a financial institution. *See* May Transcript, at 28:16-18. The next two inquiries are whether: (i) BosGen and/or EBG was BONY's customer; and (ii) BONY served as BosGen and/or EBG's agent in connection with a securities contract. If the answer to both of those questions is yes as to BosGen or EBG, the BosGen Transfer is safe harbored.

## 1. BosGen and EBG Were BONY's Customers

The Tender Offer provides that "[w]e [defined to include BosGen and EBG] have retained The Bank of New York to act as Depository in connection with this Offer. The Depository will receive reasonable and customary compensation for its respective services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities in connection with the Offer." Tender Offer, at 34. Thus, according to the Tender Offer, both BosGen and EBG were BONY's customers.

## 2. BONY Acted as Both BosGen and EBG's Agent in Connection with a Securities Contract

As discussed above in section VII(c)(iii)(2), an agency relationship is established by (1) "a manifestation by the principal that the agent shall act for him," (2) "accept [ance of] the undertaking" by the agent, and (3) "an understanding between the parties that the principal is to be

in control of the undertaking." *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 422 (S.D.N.Y. 1990).

The agency test's first requirement is satisfied. BosGen and EBG manifested their intent for BONY to act as their agent in connection with the Tender Offer *prior to the Step One Transfer* (as early as November 16, 2006, the date of the Tender Offer). The Court's conclusion that BONY acted as both BosGen and EBG's agent in connection with the Tender Offer is supported by: (i) the procedures articulated in the Tender Offer for unit redemptions, (ii) BosGen and EBG's reservation of authority to accept or reject a tendering member's units; and (iii) BosGen and EBG's agreement to pay BONY for its services. As to (i), pursuant to the Tender Offer, members tendered their units by submitting a Letter of Transmittal along with required documents to BONY no later than December 14, 2006. *See* Tender Offer, at 1, 4. Thereafter, "[w]e [including EBG and BosGen] will pay for Units purchased pursuant to the Offer by depositing the aggregate determined purchase price for the Units *with the Depository, which will act as agent* for tendering [m]embers for the purpose of receiving payment from [EBG and BosGen] *and transmitting payments to the tendering [m]embers.*" *Id.* at 19 (emphasis added). Thus, the Tender Offer demonstrates that both EBG and BosGen were in an agency relationship with BONY for purposes of transmitting monies to tendering EBG members. On several additional occasions throughout the Tender Offer, BONY is listed as the depository for the "Company," thus lending more weight to the conclusion that BONY acted as BosGen and EBG's agent in connection with the Tender Offer. *See id.* at 2 (noting members may direct questions or requests for assistance to BONY in connection with the Tender Offer), 6 (same), 10 (noting the "Company" will "pay the fees and expenses incurred in connection with the Offer by The Bank of New York, which is the Depository for the Offer."), 36 (noting

questions concerning the Tender Offer should be directed to BONY and the Letters of Transmittal should be delivered by each member to BONY).

As to (ii), BosGen and EBG controlled BONY, their agent, in connection with the Tender Offer. The Tender Offer provides, "[f]or purposes of the Offer, we will be deemed to have accepted the payment (and therefore purchased) . . . Units that are validly tendered at or below the determined purchase price . . . *only when, as and if we give oral or written notice to the Depository of our acceptance of the Units for payment pursuant to the Offer*." Tender Offer, at 19 (emphasis added). Thus, BosGen and EBG authorized BONY to act on their behalf in connection with the Tender Offer and expressly reserved ultimate decision-making authority to determine whether to accept tendered units. In short, the EBG LLC member tendered its unit to BONY and thereafter, BONY held the tendering unit for BosGen and EBG until BosGen and EBG instructed BONY how to proceed.

As to (iii), The Tender Offer provides that "[w]e [defined to include BosGen and EBG] have retained The Bank of New York to act as Depository in connection with this Offer. The Depository will receive reasonable and customary compensation for its respective services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities in connection with the Offer." Tender Offer, at 34. Thus, according to the Tender Offer, BosGen and EBG retained BONY to act as their Depository in connection with a securities contract (the Tender Offer). As discussed below, the language cited from the Tender Offer in this section of the Court's opinion demonstrates BosGen and EBG manifested their intent for BONY to serve as their agent in connection with the Tender Offer.

The agency test's second requirement is satisfied. BONY accepted the task of serving as BosGen and EBG's agent. As evidence of BONY's acceptance, BONY did actually receive the

Letter of Transmittal from EBG LLC members and thereafter, did actually transfer monies to those members for the Unit Redemptions, the Warrant Redemptions, and the Distribution.

The agency test's third requirement is satisfied. BosGen and EBG remained in control of the undertaking. The Court's conclusion is supported by language in the Tender Offer that provides, "Units that are validly tendered at or below the determined purchase price . . . *only when, as and if we give oral or written notice to the Depository of our acceptance of the Units for payment pursuant to the Offer*." Tender Offer, at 19 (emphasis added). Thus, BosGen and EBG authorized BONY to act on their behalf in connection with the Tender Offer and expressly reserved ultimate decision-making authority to determine whether to accept tendered units.

In short, both BosGen and EBG qualify as "financial institutions." BosGen and EBG retained BONY to act as depository and agent in connection with the Tender Offer. The result of this relationship being, BosGen and EBG are likewise a financial institutions with respect to the BosGen Transfer because: (i) BosGen and EBG were BONY's customers; (ii) BONY acted as both BosGen and EBG's agent for the BosGen Transfer; and (iii) the BosGen Transfer was in connection with a securities contract.

Thus, the BosGen Transfer meets the safe harbor requirements of section 546(e) of the Bankruptcy Code and Counts II and IV of the TAC are dismissed.

### 3. The Trustee Argues Only the Step One Transfer is Relevant

The Court will address the Trustee's contention that the appropriate inquiry here is whether the *Step One Transfer*, not the overarching BosGen Transfer, qualifies for the safe harbor. According to the Trustee, BONY was not acting as BosGen or EBG's agent in connection with the Tender Offer when EBG received the $708 Million into its BoA Account and thus, EBG does not qualify as a financial institution as BONY's customer. *See* Opposition, at 28-29; May

72

Transcript, at 30:2-10 ("MR. REID: Well, let's take the obvious. If Boston Generating had sent the money to the BONY account directly, and not the Bank of America account, then I think the argument would fall away because clearly BONY, in this counter factual world, received the money and was acting as agent. But the fact that it is planning to act as agent in the future and eventually does act as agent in the future does not fall within the statutory language that requires it be acting at the time. That's our argument."). Put another way, the Trustee asks the Court to review the Step One Transfer as an isolated transaction.

The Trustee points the Court to a footnote in Judge Cote's *Tribune* decision in which she holds that a transfer "<u>is</u> a settlement payment" to a bank that "<u>is</u> acting as agent" for its customer in connection with a securities contract. *In re Tribune Co. Fraudulent Conveyance Litigation*, Case No. 11-MDL-2295, 2019 WL 1771786, at *11 n.11 (S.D.N.Y. Apr. 23, 2019). According to the Trustee, neither BosGen nor EBG qualifies as a financial institution because the BosGen Transfer went first to BoA and BoA was neither of their agents in connection with a securities contract. The Trustee contends the inquiry ends here.

Section 546(e) provides that the Trustee may not avoid a transfer that is by or to *(or for the benefit of)* a financial institution as a settlement payment or in connection with a securities contract. *See* 11 U.S.C. § 546(e) (emphasis added). The Step One Transfer to BoA, which is the first part of the BosGen Transfer, was clearly intended for the benefit of a financial institution, BONY. *See* FFM (describing, before the BosGen Transfer even occurred, the transfer of the $708 Million from US Bank to BoA and thereafter, BONY using $1.011 billion to fund the Unit Redemptions, the Warrant Redemptions, and the Distribution pursuant to the Tender Offer). The $708 Million was transferred for the benefit of a financial institution (BONY) in connection with a securities contract (the Tender Offer), and BONY was both BosGen and EBG's agent.

73

According to the Trustee, because EBG did not cause BoA to effectuate the First BONY transfer until a few days after BoA received monies from the Credit Facilities,[21] BONY does not qualify as a "financial institution" acting in connection with a securities contract because BONY could not have manifested their intent to serve as agent prior to their receipt of the First BONY Transfer and the Second BONY Transfer.  *See* May Transcript, at 28-31.  The Court disagrees.

As discussed above, BONY manifested their intent to serve as BosGen and EBG's agent in connection with the Tender Offer well before the First BONY Transfer.  In any event, following the Supreme Court's *Merit* decision, the Court must examine the overarching transaction.  In this case, that is the BosGen Transfer, not the Step One Transfer. In *Merit*, the Supreme Court held that the relevant transfer for purposes of section 546(e)'s safe harbor was the overarching transfer between Valley View and Merit, not the component transfers to and between the financial institutions.  *See Merit*, 138 S. Ct. 883, 896-97 (2017).  The Supreme Court held that if an entity covered by the exception is only a "conduit" or a component part of an overall transfer, then the safe harbor does not apply.  *See id.*  Because the parties did not assert that either Valley View or Merit Management was a "financial Institution," or other covered entity, the transfer fell outside the section 546(e) safe harbor.  *See id.*  Unlike in *Merit*, the parties to the overarching transfer (BosGen and EBG) both qualify as "financial institutions" for the BosGen Transfer because of their relationship with BONY in connection with the Tender Offer.  *Merit*'s holding does not instruct the Court to confine its inquiry to the Step One Transfer.  In fact, *Merit* requires the opposite.

---

[21] The record before the Court does not make clear how many days elapsed between BoA receipt of funds from: (i) the Step One Transfer; and (ii) the Mezz Agreement and the subsequent First BONY Transfer and Second BONY Transfer.

For the reasons articulated above, BONY's agency relationship with BosGen and EBG has been established pursuant to the term of the Tender Offer and the parties' conduct, and the relevant transaction to consider under *Merit* is the overarching BosGen Transfer.

> ### d.  The Unit Redemptions and the Warrant Redemptions Meet Section 546(e)'s Safe Harbor Requirements
>
> #### i.  <u>Constructive Fraudulent Transfer of the Unit Redemptions and the Warrant Redemptions</u>

In light of *Tribune II*, the Trustee concedes his constructive fraudulent transfer claim to recover the Unit Redemptions and the Warrant Redemptions made by EBG to its members fails. *See* Opposition, at 25-26 (conceding Count III survives only to the extent it seeks to avoid the Distribution).   Further, the Trustee concedes: (ii) the Tender Offer was a securities contract between EBG and its members, *see id.* at 30; (ii) that "[t]here was . . . [a] settlement payment here—the transfer from EBG to its members," *id.* at 31; and (iii) that EBG "transferred funds to BONY for that bank to act as EBG's agent in connection with the subsequent settlement payments," *id.* at 30—i.e., that EBG was a financial institution as BONY's (its agent's) customer.

> #### ii.  <u>Intentional Fraudulent Transfer of the Unit Redemptions and the Warrant Redemptions</u>

Because this Court holds that: (i) section 546(e) of the Bankruptcy Code also preempts the Trustee's state-law intentional fraudulent transfer claims; and (ii) the Unit Redemptions and the Warrant Redemptions are safe harbored from the Trustee's state-law constructive fraudulent transfer claims, the Trustee's state-law intentional fraudulent transfer claim to recover the Unit Redemptions and the Warrant Redemptions is safe harbored too.

iii. Conclusion

Accordingly, those portions of Counts I and III that seeks to recover the Unit Redemptions and the Warrant Redemptions from the Defendants are dismissed pursuant to section 546(e) of the Bankruptcy Code.

*e. The Distribution Meets Sections 546(e)'s Safe Harbor Requirements*

The Trustee asserts next that the Distribution falls outside section 546(e) because dividend payments are not settlement payments or payments made in connection with a securities contract. As discussed above, the Trustee concedes the Distribution was made by a financial institution (BONY), as agent for its customer (EBG). The Trustee relies on Judge Gerber's *Global Crossing* decision, 385 B.R. 52, 56 n.1 (Bankr. S.D.N.Y. 2008), which holds that issuance of a dividend on previously purchased stock is not a "settlement payment" exempt from section 546(e)'s coverage. However, in *Global Crossing*, the dividend was a true dividend to shareholders who retained their equity following the dividend. No purchase of stock or securities contracts were involved in *Global Crossing* at all. *See id.* at 59-60. It was not, as here, a transfer in exchange for the member's equity interest.

The Distribution was not an isolated dividend paid in the ordinary course. EBG paid the $35 million as part of an integrated transaction—which the TAC itself describes as a singular "Leveraged Recap Transaction"—that comprised the "use [of] more than $1 billion to redeem equity interests in EBG, redeem warrants, and pay a dividend to equity." TAC ¶ 1. The Tender Offer specifically contemplated that the $35 million would be paid "prior to the purchase of Units in the Offer" to "return value to Members . . . consistent with the Recapitalization and [to] enhance the benefits of the Recapitalization." Tender Offer, at 28. Accordingly, because EBG paid the Distribution as part of a single, integrated transaction to settle EBG's repurchase of its members'

shares, those payments were "settlement payments"—i.e., "transfers . . . made to complete [a] securities transaction." *See Enron*, 651 F.3d 329, 334-35 (2d Cir. 2011).

Further, the payments plainly fall within section 546(e) as "transfer[s] made . . . in connection with a securities contract." Under "§ 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 421 (2d Cir. 2014). "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided," "merely requir[ing] that the transfer have a connection to the securities contract." *Id*. at 422. That "low bar" is easily met here because EBG's payment "ha[d] a connection to" and was thus "related to" the Tender Offer, which expressly contemplated that the Distribution would be paid as part of the purchase transaction. Other courts have held that "dividends" paid as part of an integrated securities transaction fall within sections 546(e)'s scope. *See Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 471-476 (W.D. Tex. 2013) (holding that $1 billion that subsidiaries transferred to parent as a "distribution or dividend" was a "settlement payment" and transfer "in connection with a securities contract" because the payment was part of an integrated transaction to sell parent's equity-security holdings in subsidiaries).

Accordingly, those portions of Counts I and III that seek to recover the Distribution from the Defendants are dismissed pursuant to section 546(e) of the Bankruptcy Code.

## VIII.   Ratification

Next, the Defendants assert the Trustee's claims *on behalf of the Lenders* must be dismissed because the Lenders ratified the Leveraged Recap Transaction. For the reasons that follows, the Court finds the Defendants reasoning unpersuasive.

More specifically, they argue that because the Lenders were aware that the proceeds from the Credit Facilities would be used to cash out EBG's LLC members they are estopped from seeking to avoid the very transfer they allegedly approved.  Relying primarily on *Lyondell*, the Defendants encourage the court to adopt the view that "[c]reditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *In re Lyondell Chemical Co.*, 503 B.R. 348, 383- 84 (Bankr. S.D.N.Y. 2014).  In *Lyondell*, the Court noted that a creditor's knowledge that it was lending "for the purpose of financing an LBO, and that the LBO proceeds would go to the stockholders" was sufficient to establish a ratification defense.  *Id*. at 385.  In response, the Trustee claims that the Lenders could not have possibly ratified the transaction because they loaned money in reliance on fraudulent financial statements and projections.

The Trustee believes that the appropriate question to ask is whether the Lenders "had full knowledge of all material facts" surrounding the transaction (the "Material Facts Test").  *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 427 (S.D. Tex. 2008).  "Ratification 'is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding.'"  *PAH Litigation Trust v. Water Street Healthcare Partners, L.P. (In re Physiotherapy Holdings Inc.)*, Case No. 13-12965, 2016 WL 3611831, at *12 (Bankr. D. Del. June 20, 2016) (quoting 57 N.Y. Jur.2d Estoppel, Ratification and Waiver § 87 (2007)). This defense "implies assent, express or implied, and a change of position on the part of one who acts in reliance on such assent." *Id.*  With regard to transactions such as the Leveraged Recap Transaction, courts have noted that "[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur." *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia*

*Recovery Trust*), 634 F.3d 678, 693-94 (2d Cir. 2011) (citing *King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1187 (7th Cir. 1987)).  Other courts have held that the ratification defense is applicable "only if [the creditor] actually participated in structuring the transaction that damaged creditors." *Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.)*, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013). *See also In re Refco, Inc. Sec. Litig.*, No. 07 MDL 1902 GEL, 2009 WL 7242548, at *11 (S.D.N.Y. Nov. 13, 2009), report adopted, 2010 WL 5129027 (S.D.N.Y. Jan. 12, 2010) (noting that the transferee was "heavily involved in structuring the transaction for the purchase of PlusFunds shares).  In *Tronox*, the Court held that because the defendants "did not establish that the bondholders *knowingly gave sanction to the fraudulent conveyances complained of* in this case," a finding of ratification was inappropriate.  *In re Tronox*, 503 B.R. at 276.

Both the *Adelphia* court and the *Tronox* court appeared to endorse the Material Facts Test. Contrary to the Defendants' assertions, the use of proceeds from the Credit Facilities is simply one piece of the entire "fraud alleged in the complaint.'"  *In re Refco Inc. Sec. Litigation*, 2009 WL 7242548, at * 10.  As a result, the Court holds that there is a material dispute as to whether or not the Lenders had knowledge of the material facts surrounding the Leveraged Recap Transaction. With respect to the loans made pursuant to the Credit Facilities and BosGen and EBG's ability to repay those loans, BosGen and EBG's financial health is likely the most material fact.   As Judge Gross noted in *Physiotherapy Holdings*,

> [c]ompanies rely on cash flow to service their debts. A firm with poor cash flows may find itself unable to pay its debts as they come due. Clearly, this information is highly pertinent to a reasonable investor's decision to lend money to a company. Simply put, the Trustee has advanced sufficient allegations to suggest that the Senior Noteholders may have been misled into lending money to a company whose financial health was poorer than represented. Because intent is the central element of ratification, it is far from certain that the Senior Noteholders intended to extend credit to an insolvent company. Rather, the bondholders 'simply bought into [the transaction] based on the information available to them.'

*In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *12 (quoting *Tronox,* 503 B.R. at 276). The Trustee has alleged that the information in, among other things, the Lenders' Presentations, the CIM, and the Tender Offer did not indicate BosGen and EBG's true financial condition by omission and misrepresentation, provide accurate projections for BosGen's future cash flow, or disclose the risks associated with various hedge contracts BosGen had entered. Thus, a finding of ratification is inappropriate at this juncture.

The Court finds *Lyondell* distinguishable from the facts presented here because there were no allegations in *Lyondell* that their lenders relied on false financial statements. There, the creditors knew they were participating in a leveraged buyout that carried potential risk. Whereas here, the Lenders knew they were participating in a leveraged recapitalization transaction that carried potential risk but also, according to the Trustee, may have made the decision to loan money based on material misstatements and omissions. For these reasons, the Court adopts the Material Facts Test discussed above and the Defendants request to dismiss the TAC based on the Lenders' ratification of the Leveraged Recap Transaction is denied.

## IX.    Claims Against Defunct Entities

To the extent the Trustee purports to sue corporate entities that are no longer in existence, the claims against those defendants are barred because they have not been (and cannot be) served with the TAC and are not amenable to suit. "At common law, the dissolution of a corporation abruptly ended its existence, thus abating all pending actions by and against it and terminating its capacity thereafter to sue or be sued. Thus, statutory authority is necessary to prolong the life of a corporation past its date of dissolution." *In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch. 1980). Thus, the Trustee may sue a dissolved corporation only if there is express statutory authority granting him the right. No such statutory right exits here. For example, the Trustee

purports to sue Trade Claim Acquisition, L.L.C.  TAC ¶ 41, Ex. A.  But that Delaware LLC was

canceled in 2010. *See* Anker Decl., Ex. 2.[22]  Under Delaware LLC law, a Delaware LLC that has

been issued its certificate of cancellation from the Secretary of State cannot be sued.  *See* Del.

Code Ann. tit. 6, § 18-803(b); *see also Kwon v. Yun*, Case No. 05-civ-1142, 2008 WL 190058, at

*1 (S.D.N.Y. Jan. 22, 2008); *Matthew v. Laudamiel*, Case No. 5957-VCN, 2012 WL 605589, at

*21 (Del. Ch. Feb. 21, 2012).  Here, the same holds true for Defendant Epic Distressed Debt

Holdings, Inc. ("Epic"), a Delaware corporation that was dissolved as of September 3, 2009. *See*

Anker Decl., Ex. 3; *Citadel Indus.*, 423 A.2d at 503.

Similarly, the Trustee has sued Greenwich International, Ltd. ("Greenwich") and

Cedarview EBG Holdings, Ltd. ("Cedarview," together with Epic and Greenwich, the "Defunct

Entities").  They too, are canceled corporations—Bermudan and Cayman Islands companies,

respectively, that were dissolved and stricken from the companies registers years before the

Trustee filed suit. *See* Anker Decl., Exs. 4 & 5.  Under applicable law, those entities also cannot

be sued. *Cf. Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, Case No. 6894-VCP, 2013 WL 1200273,

at *11 (Del. Ch. Mar. 26, 2013).  Thus, this action must be dismissed as against all dissolved

entities that, under the applicable law of the jurisdiction of their incorporation, are no longer

subject to suit.

## X.    Conclusion

For the reasons stated above: (i) Counts I through IV of the TAC are dismissed as to all

Defendants pursuant to section 546(e) of the Bankruptcy Code; (ii) Count V of the TAC is

dismissed as to all Defendants pursuant to, a) New York's applicable statute of limitations, b)

---

[22] The certificate of cancellation for Trade Claim Acquisition was filed with the Delaware Secretary of State. This Court takes judicial notice of that document as a public filing.

Rules 8 and 12(b)(6), and c) section 546(e) of the Bankruptcy Code; and (iii) additionally, Counts

I through V of the TAC are dismissed as to the Defunct Entities.  The Defendants are directed to

submit an Order to the Court consistent with this opinion.


Dated: New York, New York
       June 18, 2020

                               *s/ Robert E. Grossman*
                               Honorable Robert E. Grossman
                               United States Bankruptcy Judge